**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| IN RE COBALT INTERNATIONAL ENERGY, INC. SECURITIES LITIGATION | Lead Case No. 4:14-cv-3428 |
| | **CLASS ACTION** |
| | JURY TRIAL DEMANDED |

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................. 2

II. JURISDICTION AND VENUE ........................................................................... 7

III. PARTIES .............................................................................................................. 8

    A. Plaintiffs ................................................................................................... 8

    B. The Corporate Defendant ......................................................................... 9

    C. The Executive Defendants ........................................................................ 9

    D. The Securities Act Defendants ................................................................ 10

        1. The Underwriter Defendants ........................................................ 10

        2. The Director Defendants .............................................................. 11

        3. The Controlling Entity Defendants ............................................. 12

IV. SUMMARY OF THE ACTION ......................................................................... 15

    A. Overview of Cobalt .................................................................................. 15

    B. Angola's Rich Oil Fields And The Role Of Sonangol ........................... 17

    C. Cobalt Enters Angola ............................................................................... 20

    D. Cobalt Denies Early Concerns About Its "Partners" ............................. 28

    E. Cobalt Continues To Assure Investors That Its Partners Are
       Legitimate ................................................................................................. 30

    F. Cobalt's Board Requires Management To Conduct An Internal
       Investigation That Shows A History Of Bribes In Angola By A
       Senior Cobalt Executive .......................................................................... 31

    G. Additional Questions Arise About Cobalt's Partners, And Cobalt's
       Insiders Sell Their Shares ........................................................................ 34

    H. The *Financial Times* Identifies The True Owners Of Nazaki And
       Alper, Which Cobalt Continues To Deny ............................................... 36

    I. Cobalt Deflects Attention From Its "Partners" By Touting Its
       Wells While Selling More Securities ....................................................... 39

    J. Cobalt Is Forced To Disclose The Truth About Its Lontra "Oil"
       Well .......................................................................................................... 42

K. With Lontra Exposed, Cobalt Focuses On Its Loengo Well And Sells More Securities ...................................................................... 44

L. The SEC Escalates Its Investigation, Cobalt's "Social Payments" Are Revealed To Be For A Project That Does Not Exist, And Angola Removes Nazaki And Alper ...................................................... 45

V. VIOLATIONS OF THE EXCHANGE ACT ............................................. 49

 A. Defendants' Material Misstatements And Omissions In Violation Of The Exchange Act .......................................................................... 49

  1. Defendants' Materially False And Misleading Statements And Omissions In 2011 ................................................ 51

  2. Defendants' Materially False And Misleading Statements And Omissions In 2012 ................................................ 54

  3. Defendants' Materially False And Misleading Statements And Omissions In 2013 ................................................ 61

  4. Defendants' Materially False And Misleading Statements And Omissions In 2014 ................................................ 67

 B. Additional Allegations of Defendants' Scienter .................................... 70

 C. Loss Causation .......................................................................................... 77

 D. Presumption of Reliance .......................................................................... 82

VI. VIOLATIONS OF THE SECURITIES ACT ......................................... 83

 A. The February 2012 Common Stock Offering ....................................... 84

 B. The December 2012 Bond Offering ...................................................... 88

 C. The January 2013 Common Stock Offering ......................................... 91

 D. The May 2013 Common Stock Offering ............................................... 93

 E. The May 2014 Bond Offering ............................................................... 94

VII. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ...................................................... 97

VIII. CLASS ACTION ALLEGATIONS ......................................................... 98

IX. CLAIMS FOR RELIEF ............................................................................. 100

COUNT I  For Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5 Against Cobalt And The Executive Defendants .............................................. 100

COUNT II  For Violations Of Section 20(a) Of The Exchange Act Against The Executive Defendants ............................................................................................... 102

COUNT III  For Violations Of Section 11 Of The Securities Act Against Cobalt,
    The Director Defendants And The Underwriter Defendants ........................................ 102

COUNT IV  For Violations Of Section 15 Of The Securities Act Against The
    Control Person Defendants ........................................................................................... 106

COUNT V  For Violations Of Section 12(a)(2) Of The Securities Act Against The
    Underwriter Defendants ............................................................................................... 110

X.      PRAYER FOR RELIEF .............................................................................................. 112

XI.    JURY DEMAND ......................................................................................................... 113

Lead Plaintiffs, GAMCO Global Gold, Natural Resources & Income Trust and GAMCO Natural Resources, Gold & Income Trust (together, "Lead Plaintiffs") and additional Plaintiffs St. Lucie County Fire District Firefighters' Pension Trust Fund ("St. Lucie FF"), Fire and Police Retiree Health Care Fund, San Antonio ("San Antonio Health"), Sjunde AP-Fonden ("AP7"), and Universal Investment Gesellschaft m.b.H. ("Universal") (the "Additional Plaintiffs"; collectively, with Lead Plaintiffs, the "Plaintiffs"), bring this action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act") on behalf of themselves and all other persons or entities who purchased or otherwise acquired securities of Cobalt International Energy, Inc. ("Cobalt" or the "Company") in the open market or pursuant or traceable to the Offerings during the period from March 1, 2011 through November 3, 2014, inclusive (the "Class Period") and were damaged thereby (the "Class").[1]

Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief are based on the ongoing independent investigation of their undersigned counsel. This investigation includes a review and analysis of: (i) Cobalt's public filings with the Securities and Exchange Commission (the "SEC"); (ii) research reports by securities and financial analysts; (iii) transcripts of Cobalt's conference calls with analysts and investors; (iv) presentations, press releases, and reports; (v) news and media reports concerning the Company and other facts related to this action; (vi) data reflecting the pricing of Cobalt securities; (vii) consultations with relevant experts; (viii) information provided by former Cobalt employees; and (ix) other material and data

---

[1] "Offerings" refers to: (i) the registered public offerings of stock on February 23, 2012, January 16, 2013 and May 8, 2013; (ii) the registered public offering of Cobalt 2.625% Convertible Senior Notes due 2019 on December 11, 2012; and (iii) the registered public offering of Cobalt 3.125% Convertible Senior Notes due 2024 on May 8, 2014.

concerning the Company, as identified herein.  Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by the Defendants or are exclusively within their custody or control.  Lead Plaintiffs believe that substantial additional evidentiary support is likely to exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

## I.   **INTRODUCTION**

1.       Cobalt is a Houston-based oil and gas exploration company focused primarily on off-shore drilling in Angola.  Angola is ranked by monitoring groups and transparency indexes as one of the most corrupt countries in the world, due in large part to exploitation by its state-run oil company, Sonangol.  In October 2009, Cobalt – led by its Chief Executive Officer ("CEO"), Joseph Bryant ("Bryant") – announced that it would be developing Angola's lucrative oil fields pursuant to a partnership with Sonangol and two other entities, Nazaki and Alper (the "Partnership").  Cobalt emphasized the rich oil fields involved, the strength of the Partnership and the quality of its partners, repeatedly telling investors that it had "world class … partners" and "[p]artnerships with leading global deepwater operators."

2.       Both before and during the Class Period, Cobalt denied allegations that two of its partners – Nazaki and Alper – were secretly owned and controlled by the head of Sonangol, Manuel Vicente, as well as two other senior Angolan government officials, General Kopelipa and General Dino.  These allegations first arose in May 2010, when journalists at Global Witness reported that "many observers believe that [Nazaki and Alper] are used as fronts by top Angolan officials to enrich themselves privately."  If true, these allegations meant that Cobalt used sham partners in Angola and that the Company may have violated the Foreign Corrupt Practices Act of 1977

("FCPA"), which prohibits funneling money to foreign officials in order to secure a business advantage.

3.      Cobalt vehemently denied the allegations raised by Global Witness, as well as later reports indicating that the three top Angolan governmental officials – Vicente, Kopelipa, and Dino – were the true owners of Nazaki and Alper.  On March 1, 2011, the first day of the Class Period, Cobalt filed its 2010 Form 10-K with the SEC claiming ignorance of any "connection between senior Angolan government officials and Nazaki," which Cobalt represented was "a full paying member of the contractor group for Blocks 9 and 21" in Angola.  Cobalt continued to make similar representations throughout the Class Period, repeatedly assuring investors that it had conducted an "extensive investigation" and "extensive due diligence" into its Angolan partners and that Cobalt's "activities in Angola [] complied with all laws, including the FCPA."

4.      Contrary to the Company's repeated representations, on April 15, 2012, the *Financial Times* published two reports that Nazaki was, in fact, owned by Vicente, Kopelipa, and Dino.  Indeed, Vicente, Kopelipa, and Dino admitted their ownership interests to the *Financial Times*.  The reports further noted that Nazaki's basic organizational documents confirmed these admissions.  In response to this news, the price of Cobalt's common stock shares fell by over 7%, erasing nearly $800 million of market capitalization.  The United States Department of Justice ("DOJ") and the SEC launched criminal and civil investigations, respectively, into Cobalt's relationship with Nazaki and Alper.  The DOJ's criminal probe remains ongoing.

5.      Nonetheless, during the Class Period, Cobalt steadfastly denied the information set forth in the *Financial Times* reports and emphasized the strength of its partners and the legitimacy of its Angolan operations.  Unknown to investors, however, Cobalt internally knew that its representations about its partners were false.  Cobalt's former Chief Financial Officer and

3

Executive Vice President from June 2009 to June 2010, at the time that Cobalt entered into the Partnership, explained that Nazaki and Alper were "absolutely not" "world class" partners of Cobalt, and both Bryant and the former CFO believed the two companies were not going to add any value to the partnership.  As the Angolan government would ultimately admit in August 2014, when it announced that it had expelled Nazaki from the Partnership, Cobalt's partner lacked "competence and financial capacity."

6.      It was well known inside the Company that the Partnership was, contrary to Cobalt's statements, funneling profits to senior Angolan officials through the front companies Nazaki and Alper.  A former Cobalt Shorebase Foreman from February 2013 to June 2014 stated that he was aware that Nazaki was owned by three senior-level Angolan officials, as "[w]e all knew that.  My second or third day there, I learned this."  He continued that it was "common knowledge" at Cobalt that Nazaki was owned by the three senior Angolan officials and that, if anyone questioned that inside Cobalt, they were told "[t]hat's just the way you do business around here."  In addition, Nazaki's registration documents, which were available to Cobalt during its purported "due diligence," showed that Vicente, Kopelipa, and Dino formed Nazaki using the same frontmen that they had used for numerous other shell companies in Angola, with Nazaki's office registered at the same address used for nearly 40 other shell companies owned by the three Angolan government officials.

7.      Additional facts have further confirmed that Cobalt's "partners" were nothing more than sham entities used to pay off Angolan officials to secure oil sites.  The Angolan government has terminated Nazaki's and Alper's interests in the Partnership, with their interests reverting to Sonangol.  In doing so, the Angolan government stated that Nazaki did not have "proven competence and financial capacity" to hold the blocks and that it repeatedly had not met its

"economic and financial commitments."  And while the Angolan government issued its decrees expelling Alper in March 2014, Cobalt still identified Alper as its partner in an SEC filing as late as May 2014, i.e., more than a month after Alper was no longer Cobalt's partner.  As *Forbes* concluded in a recent report looking back at Cobalt's Partnership, it is "hard to believe that Cobalt did not know a complex opaque partnership deal arranged by a corrupt government would probably channel money to members of that government."

8.     Cobalt also represented to the public in December 2011 that it was obligated to make certain "social" payments to the Angolan government as a term of its contractual agreement. These payments, according to Cobalt, went to fund, among other things, the Sonangol Research and Technology Center, which was supposed to be an Angolan "social project" benefitting Angolan residents.  On August 5, 2014, however, it was disclosed that the supposed recipient of Cobalt's "social payments" – the Sonangol Research and Technology Center – did not exist.  An extensive investigation by journalists at Global Witness revealed that nobody at Cobalt, Sonangol, BP, the Norwegian oil company Statoil, or "well-placed industry insiders" could confirm the existence of the Sonangol Research and Technology Center.

9.     In addition to falsely claiming legitimate partners and ignorance of any "connection between senior Angolan government officials and Nazaki" and funneling payments to the Angolan government, Cobalt also misrepresented the high oil content of its Angolan wells, which Cobalt claimed were "oil-focused" and "high impact."  In this regard, Cobalt repeatedly touted the Company's success in two particular Angolan wells, Lontra and Loengo.  For instance, the Company repeatedly represented that its Lontra well was a "massive," "super-size," and "oil-focused" well and, similarly, that its Loengo well was "large and oil focused."  According to the Company, these two highly anticipated prospects were "key" to Cobalt's success in Angola.

5

10.     Cobalt's representations about its oil wells, as with its representations about its partners, were false, misleading and omitted material facts.  Unknown to investors at the time, Sonangol insisted that Cobalt withhold facts about its oil wells.  For example, according to Cobalt's Chief Information Officer ("CIO") from June 2012 to April 2014, Defendants knew "fairly early on" that they had hit a gaseous hydrocarbon column at Lontra, but delayed disclosing that information to investors because Sonangol required Cobalt to "sit on information," including information regarding Lontra.  The former CIO stated that this requirement that Cobalt delay releasing information to investors was "openly talked about" at the Company, including during an executive meeting.  The former CIO also stated that there was "not even a question" that Loengo was not a good prospect and that there was "not even a remote chance" of success on the Loengo well, with the former CIO's supposition that Cobalt was "forced" to take Block 9, where it drilled Loengo, to satisfy the wishes of Angola's state-owned Sonangol.

11.     By concealing the truth, Cobalt was able to raise over $6 billion through numerous offerings of Cobalt common stock and debt.  Through these securities offerings, Company insiders – including Defendant Bryant – collected tens of millions of dollars in insider stock sales, and Cobalt's private equity backers, including Goldman Sachs, The Carlyle Group, and Riverstone Holdings, made billions of dollars more.

12.     Investors have gradually learned the truth about the Partnership and the Company's Angolan wells.  On December 1, 2013, it was disclosed that the Company's highly-touted Lontra well had, in fact, a large amount of gas that Cobalt did not have the rights to sell.  On August 5, 2014, news reports disclosed that the Company's payments to the Angolan government for a research and technology center, which totaled hundreds of millions of dollars, went to a center that, in fact, did not exist.  Also on August 5, Cobalt disclosed that it had received a Wells Notice

from the SEC, signifying an elevation of the regulators' investigation based on additional evidence and leading analysts to focus on the potential implications of the DOJ's ongoing criminal investigation.  Finally, on November 4, 2014, investors learned that the Loengo well – which Cobalt had touted as a "large structure" in a zone in which Cobalt supposedly knew there was "certainly" oil – was in fact a "dry hole" with no oil.  These revelations collectively caused the Company's stock to plummet, wiping out over $3.2 billion in market capitalization.  Investors who purchased Cobalt's securities at artificially inflated prices during the Class Period have suffered substantial losses from Defendants' violations of the federal securities laws.

13.     The prices of the Company's securities have not recovered, with the Company's stock currently trading at $10.54, or 71.1% below its peak during the Class Period.

## II.     JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and Section 22 of the Securities Act, 15 U.S.C. § 77v.  In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

16.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

III.     **PARTIES**

A.      **Plaintiffs**

17.     Lead Plaintiffs GAMCO Global Gold, Natural Resources & Income Trust and GAMCO Natural Resources, Gold & Income Trust (the "Funds") are closed-end management investment companies headquartered in Rye, New York.  As set forth in the attached Certification, the Funds purchased Cobalt securities during the Class Period and were damaged thereby.

18.     Additional Plaintiff St. Lucie FF is a pension fund headquartered in St. Lucie, Florida, for the benefit of current and former firefighters of the St. Lucie County Fire District and their families.  As set forth in the attached Certification, St. Lucie FF purchased Cobalt securities during the Class Period and was damaged thereby.

19.     Additional Plaintiff San Antonio Health is the plan sponsor for the health plan of retired firefighters and police officers for the City of San Antonio, Texas.  As set forth in the attached Certification, San Antonio Health purchased Cobalt securities during the Class Period and was damaged thereby.

20.     Additional Plaintiff AP7 is part of the Swedish national pension system and is located in Stockholm, Sweden.  AP7 manages approximately $18 billion in premium pension assets on behalf of more than 6 million Swedish investors.   As set forth in the attached Certification, AP7 purchased Cobalt securities during the Class Period and was damaged thereby.

21.     Additional Plaintiff Universal Investment Gesellschaft m.b.H. is an investment company based in Frankfurt, Germany, that manages assets of approximately $206 billion.  As reflected in a Certification to be filed with the Court, Universal purchased Cobalt securities during the Class Period and was damaged thereby.

### B.     The Corporate Defendant

22.     Defendant Cobalt International Energy, Inc. is a Delaware corporation with its principal executive offices at 920 Memorial City Way, Suite 100, Houston, Texas 77024.  Cobalt was founded in 2005 and went public in December 2009.  The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "CIE."  As of November 4, 2014, there were over 412 million shares of Cobalt common stock outstanding.  Defendant Cobalt is named in Count I (violations of Section 10(b) of the Exchange Act) and Count III (violations of Section 11 of the Securities Act).

### C.     The Executive Defendants

23.     Defendant Bryant has served as Cobalt's Chairman of the Board and CEO from November 2005 to the present.  Defendant Bryant signed the Company's materially misstated public filings, including the Cobalt Registration Statements and Prospectuses filed with the SEC on January 4, 2011 and December 30, 2013, and made other materially false and misleading statements to investors, as set forth below.  Defendant Bryant is named in Count I (violations of Section 10(b) of the Exchange Act), Count II (violations of Section 20(a) of the Exchange Act), Count III (violations of Section 11 of the Securities Act), and Count IV (violations of Section 15 of the Securities Act).

24.     Defendant James W. Farnsworth ("Farnsworth") has served as Cobalt's Chief Exploration Officer from November 2005 to the present.  Defendant Farnsworth made materially false and misleading statements to investors, as set forth below.  Defendant Farnsworth is named in Count I (violations of Section 10(b) of the Exchange Act), Count II (violations of Section 20(a) of the Exchange Act), and Count IV (violations of Section 15 of the Securities Act).

25.     Defendant John P. Wilkirson ("Wilkirson") has served as Cobalt's Chief Financial Officer and Executive Vice President from June 2010 to the present.  Defendant Wilkirson signed

the Company's materially misstated Registration Statements and Prospectuses filed with the SEC on January 4, 2011 and December 30, 2013, as well as other Cobalt public filings in which materially false and misleading statements were made to investors.  Defendant Wilkirson is named in Count I (violations of Section 10(b) of the Exchange Act), Count II (violations of Section 20(a) of the Exchange Act), Count III (violations of Section 11 of the Securities Act), and Count IV (violations of Section 15 of the Securities Act).

26.     Defendants Bryant, Farnsworth and Wilkirson are collectively referred to herein as the "Executive Defendants."

### D.     The Securities Act Defendants

27.     Plaintiffs in this action bring claims under both the Securities Act and the Exchange Act.  The Securities Act imposes strict liability for untrue statements or omissions of material fact in a registration statement used to offer securities.  Strict liability is imposed on, among others, the signatories of the registration statement, the directors of the company issuing the securities, and the underwriters of the offering. Claims brought under the Securities Act do not require a showing of fraud, scienter, reliance, or causation.  The following Defendants are named as Defendants in this action for Plaintiffs' claims under the Securities Act:

### 1.     The Underwriter Defendants

28.     The following investment banks were underwriters of offerings of Cobalt securities issued by way of registration statements that contained materially untrue and misleading statements and omitted material facts:  Goldman, Sachs & Co. ("Goldman Sachs"), Morgan Stanley & Co. LLC ("Morgan Stanley"), Credit Suisse Securities (USA) LLC ("Credit Suisse"), Citigroup Global Markets Inc. ("CGMI"), J.P. Morgan Securities LLC ("J.P. Morgan"), Tudor, Pickering, Holt & Co. Securities, Inc. ("Tudor"), Deutsche Bank Securities Inc. ("Deutsche Bank"), RBC Capital Markets, LLC ("RBC"), UBS Securities LLC ("UBS"), Howard Weil

Incorporated ("Howard Weil"), Stifel, Nicolaus & Company, Incorporated ("Stifel Nicolaus"), Capital One Southcoast, Inc. ("Capital One"), and Lazard Capital Markets LLC ("Lazard") (collectively, the "Underwriter Defendants").  The Underwriter Defendants are named in Count III (violations of Section 11 of the Securities Act) and Count V (violations of Section 12(a)(2) of the Securities Act).

29.    Each of the Underwriter Defendants, with the exception of Lazard, served as underwriters of the Cobalt February 23, 2012 Stock Offering.

30.    Underwriter Defendants Goldman Sachs and Morgan Stanley also served as underwriters of the Cobalt December 12, 2012 Bond Offering.

31.    Underwriter Defendants Morgan Stanley and CGMI also served as underwriters of the Cobalt January 15, 2013 Stock Offering.

32.    Underwriter Defendant CGMI also served as an underwriter of the Cobalt May 8, 2013 Stock Offering.

33.    Underwriter Defendants Goldman Sachs, Credit Suisse, CGMI, RBC, and Lazard also served as underwriters of the Cobalt May 8, 2014 Bond Offering.

## 2.    The Director Defendants

34.    The following defendants were directors of Cobalt's Board of Directors and signatories of registration statements that contained materially untrue and misleading statements and omitted material facts:  Defendants Peter R. Coneway ("Coneway"), Henry Cornell ("Cornell"), Jack E. Golden ("Golden"), N. John Lancaster ("Lancaster"), Jon A. Marshall ("Marshall"), Kenneth W. Moore ("Moore"), J. Hardy Murchison ("Murchison"), Kenneth A. Pontarelli ("Pontarelli"), Myles W. Scoggins ("Scoggins"), D. Jeff van Steenbergen ("van Steenbergen"), William P. Utt ("Utt"), and Martin H. Young, Jr. ("Young") (collectively, the

11

"Director Defendants").  The Director Defendants are named in Count III (violations of Section 11 of the Securities Act) and Count IV (violations of Section 15 of the Securities Act).

35.     Director Defendants Coneway, Cornell, Golden, Lancaster, Marshall, Moore, Murchison, Pontarelli, Scoggins, van Steenbergen, and Young signed the Company's Registration Statements and Prospectuses filed with the SEC on January 4, 2011, which contained materially untrue and misleading statements and omitted material facts.

36.     Director Defendants Coneway, Golden, Marshall, Moore, Scoggins, van Steenbergen, Utt, and Young signed the Company's Registration Statements and Prospectuses filed with the SEC on December 30, 2013, which contained materially untrue and misleading statements and omitted material facts.

### 3.       The Controlling Entity Defendants

37.     As Cobalt has admitted in its public filings during the Class Period, it was a "controlled company" as that term is defined in Section 303A of the NYSE Listed Company Manual.  The following Defendants exercised control over Cobalt within this meaning during the Class Period:

38.     Defendant Goldman Sachs Group, Inc. is a global investment banking, securities and investment management firm that exercised control over Cobalt via its financing of Cobalt and significant stock ownership in the Company.  In addition, two of its Managing Directors also served on the Cobalt Board of Directors while they were simultaneously Managing Directors at Goldman Sachs.  Affiliates of Defendants Goldman Sachs Group, Inc. and Goldman Sachs are the general partner, managing limited partner or managing partner of limited partnerships that owned at least 74.8 million shares of Cobalt stock (19.09% of the Company) as of March 22, 2012.  Defendant Goldman Sachs Group, Inc. is named in Count IV (violations of Section 15 of the Securities Act).

39.     Defendant Riverstone Holdings LLC ("Riverstone") is an energy and power-related private investment fund founded in the year 2000 and led by David M. Leuschen (a former Partner and Managing Director at Goldman Sachs and the Founder and Head of the Goldman Sachs Global Energy & Power Group) and Pierre F. Lapeyre, Jr. (a former Managing Director of Goldman Sachs).  Riverstone exercised control over Cobalt, and owned Cobalt shares through its affiliate funds C/R [i.e., Carlyle/Riverstone] Energy GP II, LLC ("GP II") and C/R Energy GP III, LLC ("GP III").[2]   Riverstone also exercised control over Cobalt via its financing of Cobalt and significant stock ownership in the Company, as well as the fact that two of its Managing Directors – Defendants Coneway and Lancaster – served on the Cobalt Board of Directors while they were Managing Directors of Riverstone.  Defendant Riverstone is named in Count IV (violations of Section 15 of the Securities Act).

40.     Defendant The Carlyle Group ("Carlyle") is a global alternative asset manager based in Washington, D.C.  Carlyle exercised control over Cobalt, and owned Cobalt shares through its affiliate funds GP II and GP III.[3]  Defendants Riverstone and Carlyle acted jointly with respect to their control of Cobalt, including as it pertains to the appointment of Cobalt Board members, such as Defendants Coneway and Lancaster.  As of March 22, 2012, Carlyle/Riverstone affiliate funds owned over 74.8 million shares of Cobalt stock (19.09% of the Company). Defendant Carlyle is named in Count IV (violations of Section 15 of the Securities Act).

---

[2] GP II and GP III were managed by a managing board whose members included Riverstone Founders Pierre F. Lapeyre, Jr. and David M. Leuschen, Riverstone Partners Lord Browne of Madingley and Andrew W. Ward, and Riverstone Managing Directors Michael B. Hoffman and Defendant Lancaster, as well as the Carlyle executives listed in footnote 3.

[3] GP II and GP III were managed during the Class Period by a managing board whose members included Carlyle Chairman and Co-Founder Daniel A. D'Aniello and Carlyle Managing Director and Board member Edward J. Mathias, as well as the Riverstone executives listed in footnote 2.

41.     Defendant First Reserve Corporation ("First Reserve") is a global energy-related private equity and infrastructure investment firm based in Greenwich, Connecticut.  During the Class Period, First Reserve exercised control over Cobalt via its significant stock ownership of the Company through its affiliate funds.  First Reserve also exercised control over Cobalt by having two of its Managing Directors, and a First Reserve consultant and former Managing Director, serve on the Cobalt Board of Directors while they were Managing Directors, and a consultant, respectively, at First Reserve.  As of March 22, 2012, First Reserve's affiliate funds owned over 74.2 million shares of Cobalt stock (18.92% of the Company).  Defendant First Reserve is named in Count IV (violations of Section 15 of the Securities Act).

42.     Defendant KERN Partners Ltd. ("KERN") is an energy-related private equity firm based in Calgary, Alberta, Canada.  KERN exercised control over Cobalt via its significant stock ownership of the Company during the Class Period through its affiliate fund, as well as the fact that its Co-Founder and Managing Partner, Defendant van Steenbergen, served on the Cobalt Board of Directors while he was a Managing Partner at KERN.  As of March 22, 2012, KERN funds owned over 32 million shares of Cobalt stock (8.17% of the Company).  Defendant KERN is named in Count IV (violations of Section 15 of the Securities Act).

43.     Defendants Goldman Sachs Group, Inc., Riverstone, Carlyle, First Reserve and KERN are collectively referred to herein as the "Controlling Entity Defendants."

44.     The Executive Defendants, Goldman Sachs, the Director Defendants, and the Controlling Entity Defendants are collectively referred to herein as the "Control Person Defendants."

## IV.   SUMMARY OF THE ACTION

### A.   Overview of Cobalt

45.   Cobalt is an oil and gas exploration company located in Houston, Texas.  Cobalt was formed in 2005 by Goldman Sachs and Riverstone, an investment firm that two former Goldman Sachs executives started with $500 million in seed funding.  The Cobalt investor group, which was joined by Canada's KERN Partners Ltd. and Cobalt's management, received an additional $350 million private equity commitment from the First Reserve Corporation in November 2007.  As Cobalt has acknowledged in its SEC filings, these investment firms exercised "control" over the Company through, among other things, their ownership of 50% of the Company's stock, their membership on the Company's board of directors, and their right to appoint 7 of Cobalt's 12 directors.  Under these investment firms' control, Cobalt went public and became listed on the NYSE in December 2009.

46.   Cobalt describes itself as an "independent" oil and gas exploration company.  "Independent" oil companies operate independently of governmental control and must compete to obtain permission from governments to drill for oil or gas on government lands.  In contrast, "national oil companies" have relationships with particular governments and often have preferred rights to the underlying oil.  National oil companies include, for instance, Sonangol (which is owned by the Angolan government), Petrobras (which is largely owned by the Brazilian government), Pemex (which is owned by the Mexican government) and Gazprom (which is owned by the Russian government).

47.   "Independent" oil companies offer investors the assurance of staff integrity and limited political interference in technical decisions, whereas "national oil companies" such as Sonangol are known or suspected to have close relationships to government officials.  Independent oil companies also offer greater transparency in their investment policies through, among other

things, public reporting of financial data.  Studies of the oil industry show that "revenue tends to decrease with an increase in government controls."[4]

48.     Cobalt is small in size and has limited experience relative to other oil and gas companies, like BP and ExxonMobil.  In 2007, when Cobalt negotiated for contract rights to oil wells in Angola, Cobalt had only 35 employees located in just one Houston office, and the Company has since grown in size only modestly.  Meanwhile, its competitors have decades more experience, as well as large and sophisticated enterprises.  For instance, BP, which has been involved in the industry since 1908, had 97,600 employees in more than 100 countries in 2007, while ExxonMobil, which had begun with an oil discovery in 1859, had 80,800 employees in over 50 countries.

49.     Oil and gas exploration has been a highly competitive field for more than a century, as independent oil and gas producers vie for the rights to drill on state-owned lands and in state-owned waters worldwide.  Relative to its competitors, Cobalt was at a significant disadvantage to win the rights to drill on these lands due to its small size and inexperience.  In its filings with the SEC, Cobalt recognized its disadvantage, stating that "[t]he oil and gas industry, including the acquisition of exploratory acreage in . . . offshore West Africa, is intensely competitive" and "highly competitive in all aspects."   Cobalt admitted it "operate[d] in a highly competitive environment for acquiring exploratory acreage" and that "[m]any of [Cobalt's] competitors possess and employ financial, technical and personnel resources substantially greater than [Cobalt's], which can be particularly important in the areas in which we operate."   As Cobalt's CEO, Defendant Bryant, acknowledged in an interview discussed in a July 2013 E&Y article entitled

---

[4] Stacy L. Eller, *Empirical Evidence on the Operational Efficiency of National Oil Companies*, The James A. Baker III Institute for Public Policy, Rice University (March 2007), 26.

"Cobalt International Energy," in stark contrast to its competitors, "[w]e were literally going from my garage to competing with the biggest companies in the world."

> **B.**     **Angola's Rich Oil Fields And The Role Of Sonangol**

50.     Oil production from large offshore reserves in Angola began in 1968.  To capitalize on its rich oil resources, the Angolan government created in 1976 the Sociedade Nacional de Combustíveis de Angola – Empresa Pública ("Sonangol"), which is an Angolan government-owned oil company charged with exploring and extracting oil from the country's soils and deep-waters.

51.     Sonangol lacks the expertise to extract Angolan offshore oils efficiently and at an affordable price.  Accordingly, over the past decades, it has formed partnerships with "oil majors," such as BP, Statoil, and ExxonMobil.  BP has been in Angola for approximately 40 years, Statoil for almost 20 years, and ExxonMobil since the mid-Nineties.  These companies have partnered with Sonangol to drill Angola's offshore reserves.  Through these partnerships, Angola has drilled billions of gallons of oil, and brought in billions of dollars.  Today, Angola is one of the largest exporters of oil in the world, with oil accounting for approximately 98% of its exports and 75% of its national income.

52.     In 1999, the President of Angola appointed Manuel Domingos Vicente to serve as the head of Sonangol.  Vicente remained the head of Sonangol for over a decade, departing only when he assumed the position of Minister of State of Economic Cooperation in 2012.  In September 2012, Vicente became Vice President of Angola.  As a top Angolan official, Vicente has for years been a member of the "Futungo," a group of families that run Sonangol and Angola.  Other members of the Futungo include General Manuel Helder Vieira Dias Junior, also known as "General Kopelipa" (who, as head of the Military and the chief of the Security Intelligence Bureau of the Presidency, is widely regarded as the most powerful man in Angola aside from the President

of Angola), and Leopoldino Fragoso do Nascimento, also known as "General Dino" (who, as the former head of communications for the President's Office, travelled extensively with Vicente, before becoming General Kopelipa's special advisor).

53.     Under Vicente, Sonangol served as a vehicle to enrich the Futungo privately through corrupt partnerships.  As noted by the Open Society Initiative for Southern Africa, aside from the Angolan Presidency, "Sonangol is the most economically and politically important institution in Angola," with billions of dollars in oil rents passing through Sonangol and "doled out to feed the vast patronage system that helps the presidency and party maintain political power."

54.     The nexus between Sonangol and the Angolan government, the method for assigning private oil sector work, and Angola's relaxed procurement regulations, together provide for a secretive and complex system that is ripe for corruption.  As reported by author and *Financial Times* journalist Tom Burgis, "Sonangol awarded itself stakes in oil ventures operated by foreign companies and used the revenues to push its tentacles into every corner of the domestic economy."

55.     Investigative journalist Rafael Marques de Morais, among others, has documented how the trio of Vicente, General Kopelipa, and General Dino amassed vast private fortunes through Sonangol, including by receiving personal benefits when approving Sonangol's contracts with international oil companies.  Vicente, Kopelipa, and Dino have been widely criticized for sharing extensive interests in various sectors of the Angolan economy through their joint ownership of nearly 40 different companies – all of which use the same business address.  According to an August 2014 *Forbes* article, "virtually everything in Angola is owned directly or indirectly by the Presidential clique – the [President's] family, . . . Manuel Vicente, the Head of Military Intelligence General Manuel Helder Vieira Dias Junior (who goes by the nickname Kopelipa) and General

Leopoldino Fragoso do Nascimento, usually known as Dino." These three Angolan officials, *Forbes* explained, "hunt as a pack."

56.     The actions of Sonangol and the trio of Vicente, Kopelipa, and Dino were emblematic of government-sanctioned corruption in Angola.  In 2011, the non-governmental organization Transparency International ranked Angola 168th out of 178 countries in its annual corruption perceptions index.  The U.S. State Department's 2008 Human Rights Report described corruption in Angola as "widespread" and noted "there were no public investigations or prosecutions of government officials during the year."  The State Department also identified serious transparency concerns related to Angola's state-run Sonangol.

57.     Defendant Bryant has a long history of working in Angola and, as confirmed by Cobalt's former Chief Financial Officer ("CFO") and Executive Vice President from 2006 to October 2008,[5] made multiple trips to the country while CEO of Cobalt.  Prior to Cobalt's founding, Bryant lived in Angola and established close relationships with many of the important figures at Sonangol, including the most powerful Sonangol representative, Vicente.  As financial commentators have observed, Bryant first developed a close relationship with Vicente during his tenure at Amoco in 1998.  Tom Burgis of the *Financial Times* explained how Bryant "cultivated the Futungo" and "made himself an inner-circle oilman" through his work as the head of BP's Angolan operations.  As Vicente noted in a 2012 interview, he knew Bryant "very well" as a result of their many years of working together.

_____

[5] Cobalt's CFO and Executive Vice President of Cobalt from 2006 to October 2008, referred to herein, was responsible for all aspects of Cobalt's financial management, strategic planning and budgeting.  When Cobalt hired him as its CFO, Bryant stated publicly that part of this CFO's role was to "carry out [Cobalt's] strategic, financial and operating goals."  This CFO has more than 40 years in the energy industry, including extensive engineering and finance experience in oil exploration and production.

### C.    <u>Cobalt Enters Angola</u>

58.    In October 2007, Sonangol asked pre-qualified companies to submit proposals by December 2007 for oil concessions as part of Angola's 2007-2008 Licensing Round, including for Blocks 9 and 21.  The recipient of the licenses for Blocks 9 and 21 would receive the rights to extract oil, but any gas extracted from Angolan soils would remain the property of Angola.  To the surprise of Cobalt's competitors and industry experts, Cobalt secured the licenses for Blocks 9 and 21.  In fact, as Cobalt later announced, it had <u>already</u> obtained rights to Blocks 9 and 21 in Angola one month <u>before</u> Sonangol's Licensing Round was even scheduled to commence and three months <u>before</u> Sonangol's deadline for oil companies to submit proposals.  According to the Company's former CFO from 2006 through October 2008 (*see* ¶57 n.5), Cobalt's CEO Bryant was involved in its negotiations and agreements in Angola.  As commentators have explained, in obtaining rights to Blocks 9 and 21, Cobalt and Bryant circumvented the procedures set forth in Angola's Petroleum Activities Law (Law No. 10/04) and corresponding regulations regarding the "compulsory public tendering" process provided for "regulating in an ethical and transparent way competition between firms that legitimately intend to associate with the National Concessionaire."[6]  The Company's former CFO from 2006 through October 2008 acknowledged that it is "very unusual for a startup company to get a toehold in a country like Angola; it's usually dominated by international oil companies competing for those things."

59.    In order to begin drilling for Angolan oil in Blocks 9 and 21, Cobalt needed to negotiate and enter into Risk Services Agreements ("RSAs") with Sonangol and obtain approval of them from the Angolan government.  During the negotiations of the RSAs, Sonangol required

---

[6] *See, e.g.*, Decree No. 48/06 on the Rules and Procedures for Public Tender for the acquisition of a License of Association with the National Concessionary Authority.

that the Partnership include two additional entities, Nazaki and Alper.  Cobalt stated that the Angolan government designated Alper as a partner "to help develop and build Angola's local expertise in the oil and gas business" and that Cobalt was required to "initially finance Alper's costs related to Blocks 9 and 21."  Nazaki was purportedly "a full paying member of the [Partnership]."

60.     As Cobalt would later say, however, it had never heard of Nazaki before "July 2008 as part of Concession Decrees approved by the Angolan Council of Ministers."  Nor had it ever heard of Alper until Sonangol identified the entity in October 2008.  Nevertheless, Cobalt agreed to proceed with a Partnership with Sonangol, Nazaki and Alper for Blocks 9 and 21.  The RSAs for Blocks 9 and 21, which Cobalt filed with the SEC, were signed by Vicente on behalf of Sonangol, Zandre Campos on behalf of Nazaki, and Alberto da Fonseca Abrantes and Antonio do Nascimento Pegado on behalf of Alper.

61.     Cobalt's CFO and Executive Vice President from June 2009 to June 2010[7] described how Cobalt internally discussed Nazaki and Alper in numerous meetings of Cobalt executives between June 2009 and June 2010, with these meetings including the former CFO and Bryant.  Cobalt's former CFO stated that Cobalt executives from "Bryant on down" articulated concerns in those meetings about not needing Nazaki and Alper, and stated that the last thing Cobalt wanted was to have more people who had a say in the project.  According to Cobalt's former CFO, it was common knowledge and the belief of everyone at the office, that Nazaki and Alper were not going to bring a lot to the table; Bryant and the former CFO believed the two companies

---

[7] Cobalt's CFO and Executive Vice President from June 2009 to June 2010, referred to herein, was one of the Company's top executives, and spoke with Bryant on a daily basis regarding matters of strategic concern, including Cobalt's operations in Angola.  According to Cobalt, this CFO had more than 30 years of experience in the energy industry as of 2009.

were not going to add any value to the partnership; and they were "absolutely not" world class partners.  Cobalt's former CFO further stated, however, that "[o]bviously Cobalt was going to do the deal" with Sonangol for Blocks 9 and 21 because such a deal represented "huge economics" to Cobalt.  Cobalt's former CFO stated that Cobalt would have wanted an 80-100% interest – rather than the 40% interest it obtained – in the Partnership, but the Angolan government "called the shots."  "The main objective was to do what Sonangol required us to do," and Cobalt "didn't have control beyond that," the former CFO explained.  The former CFO further noted that, when Sonangol says here are your partners, the response is "okay, we'll have these partners" – the Partnership was a "*fait accompli*."

62.     On December 16, 2009, Cobalt announced the initial public offering of its stock on the NYSE, through which it raised over $850 million from shareholders.  In connection with its IPO, Cobalt told its investors that it had signed the RSAs with Sonangol, Nazaki, and Alper.  The Company's offering documents further told investors Cobalt held a 40% interest in the Partnership; Nazaki held a 30% interest; Sonangol held a 20% interest; and Alper held a 10% interest.



63.     From the outset of the Partnership, Cobalt was internally aware of the true owners of Nazaki through different sources, including documents available to Cobalt in Angola.  Nazaki's registration documents from 2007 and 2010 showed that Nazaki had the same address that the trio of senior Angolan officials, Vicente, Kopelipa, and Dino, had used to set up almost 40 companies: Rua Luís Mota Feo 3-2°, apartment 5, Ingombota, Luanda, Angola.   Reviewing Nazaki's registration documents is a basic task of any due diligence investigation into whether Nazaki had connections to senior Angolan government officials.[8]

64.     Nazaki's registration documents that were available to Cobalt reflected the entity's ties to Angolan governmental officials in other ways as well.  For instance, the documents identified Nazaki's five shareholders, the most prominent of which was Grupo Aquattro Internacional S.A., which held 99.96% of Nazaki and was solely owned by the trio of Vicente, Kopelipa, and Dino.  Grupo Aquattro has been reported as the trio's vehicle for owning a "business empire," including Grupo Aquattro's similar 99.96% stake in the company Zahara.[9]

65.     The other four Nazaki shareholders identified in its registration documents were also Angolan governmental officials.  These four officials were connected to General Kopelipa, who (as noted above at ¶¶52, 64) was a shareholder of Grupo Aquattro, the head of the Military, and the chief of the Security Intelligence Bureau of the Presidency.  These four officials were (i) Colonel Joao Manuel Ingles, a senior Angolan official and Kopelipa's logistics officer, regarded as the "figurehead" of the trio of Vicente, Kopelipa, and Dino;[10] (ii) Domingos Manuel Ingles, Kopelipa's private business assistant and the brother of Colonel Joao Manuel Ingles; (iii) Colonel

---

[8] *See, e.g.*, Mayer Brown, "Guidelines for Due Diligence Checklist"; Gabriel Colwell, *Practical Guide On How To Conduct FCPA Due Diligence*.

[9] Maka Angola, *Kero: Manuel Vicente Goes Shopping with State Money*, January 25, 2012.

[10] Club-K, *Assistente de "Kopelipa" compra Mercedes por meio milhao de dolares*, January 22, 2013.

Jose Manuel Domingos, Kopelipa's chief of staff; and (iv) Colonel Belchior Inocencio Chilembo, Kopelipa's advisor.  In addition to being Angolan government officials connected to Kopelipa, these four individuals also had a history of corrupt association with Vicente, Kopelipa, and Dino. The trio had used the same four frontmen and ownership structure (with Vicente, Kopelipa, and Dino owning approximately 99.96% of the stock, and the four frontmen owning the remainder) in at least two prior companies they established on December 27, 2007: (i) Delta Imobiliaria – Sociedade de Promocao, Gestao e Mediacao S.A., which ultimately made news regarding allegations of corruption involving the Angolan housing project of Kilamba; and (ii) TV Zimbo, which made news involving a TV broadcasting scandal.

66.     In addition to the Nazaki registration documents, the RSAs themselves indicated to Cobalt a connection between Nazaki and Vicente, Kopelipa, and Dino.  While Vicente signed the documents for Sonangol, the signatory for Nazaki was Zandre Campos, who is also known as Zandre Eudenio de Campos Finda.  Vicente, Kopelipa, and Dino were closely affiliated with Zandre Campos, who has been described as their "henchman."[11]  As commentators have observed, Campos "is always on hand when General Dino is involved and represents him in a number of firms."[12]

67.     Campos was connected to Vicente, Kopelipa, and Dino in other publicized instances of corruption.  One of their front companies, Portmill, was headquartered at the Nazaki address and owned by Campos.[13]  Portmill was a subsidiary of Grupo Aquattro (the 99.96% owner of Nazaki) and became embroiled in an international corruption affair in 2009, when Portmill

---

[11] Maka Angola, *Trafigura and the Angolan Presidential Mafia*, January 5, 2013.

[12] The Berne Declaration, *Trafigura's Business in Angola*, February 2013.

[13] *Id.*; Angodiaspora, *Portugal reabre queixa-crime contra "Kopelipa" e Manuel Vicente*, April 2013.

bought 24% of the shares in BESA from Banco Espirito Santo (Portugal), apparently with funds from Kopelipa.[14]  Given the appearance of money laundering, Portuguese authorities launched a criminal investigation.[15]

68.     Zandre Campos was also connected to the trio through the company Cochan S.A. In 2014, it was reported that General Dino – one of Nazaki's shareholders through his ownership stake in Grupo Aquattro – profited through shell companies regarding a contract to which the principal signatories were Sonangol and the multinational company Trafigura.[16]  One of the shell companies through which Dino profited was a local Angola company, Cochan S.A.  Cochan S.A. was partly owned by Zandre Campos and had the same address as Nazaki.[17]

69.     Alper's registration documents, which were also available to Cobalt through its "due diligence," reflected that entity's ties to Angolan governmental officials, as well.  The Alper registration document listed Alper's shareholders as Alberto da Fonseca Abrantes and Antonio do Nascimento Pegado.  These two individuals each held the government positions of "Administrator of Concessions" and "Member Of The Operating Committee" on oil exploration blocks in Angola.

70.     Private due diligence conducted at the time of the Partnership's formation also revealed that Nazaki was controlled by the trio.  For example, the corporate intelligence company Control Risks and a due diligence investigator determined in the first half of 2010 that Nazaki was controlled by Kopelipa.[18]  In addition, a U.S. lawyer who investigated Nazaki in 2008 had been

---

[14] South African Foreign Policy Initiative, *Angola: The next VP and the legalization of corruption*, June 25, 2012; Maka Angola, *Corruption in Angola: An Impediment to Democracy*, 2011.

[15] Angodiaspora, *Portugal reabre queixa-crime contra "Kopelipa" e Manuel Vicente*, April 2013.

[16] Foreign Policy, *The 750 Million Dollar Man: How a Swiss commodities giant used shell companies to make an Angolan general three-quarters of a billion dollars richer*, February 13, 2014.

[17] Maka Angola, *Trafigura and the Angolan Presidential Mafia*, January 5, 2013.

[18] TOM BURGIS, THE LOOTING MACHINE, at 16-17.

told that, contrary to Cobalt's representations, Nazaki was controlled by Vicente and other officials.[19]

71.    Company insiders at Cobalt have confirmed that, contrary to Cobalt's public statements, it was well known by Cobalt that Nazaki was owned by senior Angolan government officials, namely, Vicente, Kopelipa, and Dino.  A Cobalt Shorebase Foreman from February 2013 to June 2014[20] stated that it was "common knowledge" and "[w]e all knew that.  My second or third day there, I learned this."   The Shorebase Foreman recalled that the "first thing" that he thought when he heard about the relationship was "FCPA violations."  As noted above, the FCPA makes it a crime for a company that has operations in the United States to pay or offer money or anything of value to any person while knowing that all or some of it will be offered, given, or promised, directly or indirectly, to a foreign official, in order to induce that foreign official to act or omit actions, to influence the foreign official, or to secure any improper advantage in order to assist in obtaining or obtaining business.  According to Cobalt's Shorebase Foreman from February 2013 to June 2014, when Cobalt employees questioned Cobalt's relationship with Nazaki and Alper, they were told "[t]hat's just the way you do business around here."

72.    Cobalt's Chief Information Officer from June 2012 to April 2014[21] also recalled how Cobalt's Deputy Director in Angola, Antonio Vieira, was "pretty adamant" that there was "no

---

[19] *Id.*

[20] Cobalt's Shorebase Foreman from February 2013 to June 2014, referred to herein, worked for Cobalt in Luanda, Angola starting in mid-April 2013, including in the Cobalt offices in Luanda.  He reported to Shorebase Supervisor John Reiter.

[21] Cobalt's Chief Information Officer (CIO) from June 2012 to April 2014, referred to herein, reported directly to Defendant John Wilkirson.  This former CIO led office build-outs in Angola and supported three deepwater drilling operations in Africa and Gulf of Mexico.  He had over 30 years of experience in engineering, management and capital projects experience in the oil and gas industry by the time of his tenure at Cobalt.  He went to Angola several times during his employment at Cobalt, where he stayed at Cobalt's set of apartments.  As CIO, he was responsible for all Information Systems for the Company and served on all Operations and Management teams.

26

way" Cobalt executives did not know that Vicente, Kopelipa, and Dino had government ties.  The former CIO explained that Vieira was Cobalt's second-in-charge in Angola when the country manager was out.  Cobalt's former CIO further stated that Vieira was a facilitator or an interface between the Company, Sonangol, and the Angolan government and was the person Cobalt needed to have connections.

73.     Through their day-to-day dealings with the Partnership, Cobalt's employees also knew that Nazaki and Alper were sham entities, owned and controlled by Angolan officials.  A former Cobalt driver coordinator in Angola identified numerous and lengthy meetings between Cobalt executives and Nazaki's owners: Vicente, Kopelipa, and Dino.  The former driver coordinator stated that beginning in 2011, he drove Cobalt executives, including Defendant Bryant, Cobalt's Senior Vice President and Country Manager for Angola, Richard Smith, Cobalt's General Manager in Angola, Michael Drennon, Company consultants John Kennedy and Kevin Curry, and others, to over 20 separate meetings to meet with Vicente, Kopelipa, and Dino together.  The former driver coordinator explained that most of the time the Cobalt representatives who met with Vicente, Kopelipa, and Dino were Drennon and Smith, and Defendant Bryant also met with Vicente, Kopelipa, and Dino.  The meetings lasted, the former driver coordinator explained, between three and five hours each and took place on the 17th floor of the China International Fund building – a floor that Nazaki had rented – on the street named "Rua Primeiro Congresso do MPLA."  The former driver coordinator understood that Vicente, Kopelipa, and Dino owned Nazaki, and that these were meetings between Cobalt and Nazaki.  The former driver coordinator further understood that these meetings started in 2010 and continued through the closing of contracts regarding Blocks 9 and 21.

74.     In addition, according to an executive administrative assistant for Cobalt's West Africa division from April 2010 to March 2015,[22] Nazaki representatives did not attend Partnership meetings in Houston, even when requested.  Nor did they call into Partnership meetings when they did not attend in person.  As the former Cobalt executive administrative assistant explained, Nazaki representatives stopped attending meetings in Houston by no later than late 2011, and Alper representatives stopped attending meetings in Houston by mid-2012.  The former Cobalt executive administrative assistant further explained that, in contrast to Nazaki and Alper, Sonangol showed up at every scheduled Houston meeting.  In addition, according to the former Cobalt executive administrative assistant, neither Nazaki nor Alper had access to the file sharing system to which Cobalt uploaded meeting minutes and to which Sonangol had access.

**D.      Cobalt Denies Early Concerns About Its "Partners"**

75.     In 2010, reports surfaced that Cobalt's partners, Nazaki and Alper, were controlled by Angolan government officials.  On May 20, 2010, in a report titled "Goldman Sachs backs Angolan oil deal despite corruption risks," journalists at Global Witness discussed how "many observers believe that [Nazaki and Alper] are used as fronts by top Angolan officials to enrich themselves privately."  The report pointed out that "Alper and Nazaki are obscure companies with no visible industry track record."

---

[22] Cobalt's executive administrative assistant for the Company's West Africa division from April 2010 to March 2015, referred to herein, reported to Michael Drennon, who was Executive Vice President and General Manager Angola from April 2010 through her tenure.  For the first two years of her employment at Cobalt, the assistant also reported to Richard Smith.  Smith was Cobalt's Country Manager for Angola and also Vice President, International Business Development, Commercial and Finance from September 2010 until October 2011; then, subsequent to an internal Cobalt investigation (discussed at ¶¶83-91), was reassigned as Vice President, Investor Relations, Compliance and Risk Management from December 2012 until November 2013; and then returned as Senior Vice President and President of Cobalt Angola from November 2013 to September 2014.  As the executive assistant for Drennon throughout her tenure, and for Smith during her first two years at Cobalt, the assistant's job responsibilities included completing administrative paperwork, filings, answering phone messages, intraoffice errands, securing visas, immunization and anti-malarial medications for representatives across the entire Company, scheduling meetings and making travel arrangements for Drennon and Smith.

76.     Cobalt publicly responded to the Global Witness report that same day, denying the allegations and assuring investors that "we have devoted considerable resources towards mitigating the specific risks identified in the statements that you have included in your letter." Nevertheless, Cobalt refused to identify the true owners of Nazaki and Alper on the grounds that doing so would supposedly "involve selective disclosure of non-public company information and, in some cases, to do so would also be a breach of the confidentiality provisions of agreements by which [Cobalt] are bound."

77.     Two months later, on July 30, 2010, the investigative journalist de Morais published a report in *Maka Angola* on corruption in Angola, which indicated that three top Angolan officials may be the true owners of Nazaki.  The report suggested the true owners may be Vicente, Kopelipa, and Dino.  The report explained how, "[t]hrough their company Nazaki, the trio established a partnership with Sonangol and Cobalt" to extract oil from Blocks 9 and 21 in Angola, and further detailed other instances in which the same three officials – Vicente, Kopelipa, and Dino – used additional fronts to profit privately from government contracts with foreign companies.

78.     De Morais' report meant that Nazaki and Alper were front companies and that Cobalt was in violation of anti-corruption laws in the United States and Angola.  As explained above (*see* ¶71), in the United States, the FCPA makes it a crime for a company that has operations in the United States to funnel money to foreign officials in order to secure a business advantage or influence the officials.  In addition, as detailed in de Morais' report, Cobalt's business dealings, if true, violated Angolan law as well.  As de Morais explained, Angolan law prohibits "influence peddling in terms of the Conventions Against Corruption of the African Union (article 4, 1, f) and the United Nations (article 18 a, b) as well as the [Southern African Development Community] Protocol Against Corruption (article 3, 1, f), all of which define influence peddling as an act of

corruption [and are] incorporated into Angolan law[,] transgression of [which] was made punishable by article 321 of the Angolan Penal Code."  Furthermore, de Morais' report, if true, showed that through Vicente's involvement in Sonangol, Nazaki, and Alper, he effectively controlled three partners in the Partnership (*i.e.*, Sonangol, Nazaki, and Alper) and owned 60% of the Partnership.

### E.   Cobalt Continues To Assure Investors That Its Partners Are Legitimate

79.   The Class Period begins on March 1, 2011, when Cobalt filed its 2010 Form 10-K, which was signed by Defendants Bryant and Wilkirson.  In its 2010 Form 10-K, Cobalt denied knowledge "of a connection between senior Angolan government officials and Nazaki," which Cobalt represented was "a full paying member of the contractor group for Blocks 9 and 21."  Cobalt reassured investors that, "last year we were made aware of allegations" of that connection, which the Company stated it was "continuing to look into."

80.   Ten days later, on March 11, 2011, Cobalt disclosed in a Form 8-K that the SEC had made informal requests to Cobalt regarding allegations of a connection between Nazaki and senior Angolan government officials.  In making this announcement, Cobalt reassured investors that it had conducted "extensive due diligence" into Nazaki and Alper and that "its activities in Angola have complied with all laws, including the Foreign Corrupt Practices Act."  Cobalt's filing nowhere acknowledged a relationship between its partners and the Angolan government or that its "partners" were mere shell entities; instead, it continued to stress that Cobalt was one of four legitimate partners in the Partnership.

81.   The Company capitalized on the reassuring effects of its representations and its rising stock price, which increased by over 127% between March 1, 2011 and February 20, 2012. For example, on April 11, 2011, the Company initiated a secondary public offering of 35.65 million shares of public stock.  The offering materials incorporated by reference the Company's statements

discussed in ¶¶129, 132, including its statement in the 2010 Form 10-K denying knowledge "of a connection between senior Angolan government officials and Nazaki."

82.     In November 2011, the SEC informed Cobalt that it had recommended a formal order of investigation of Cobalt for possible violations of the FCPA focused on the connection between Nazaki and senior Angolan government officials.  Cobalt, however, touted its ongoing Angolan projects.  For instance, on December 20, 2011, Cobalt announced that it had finalized a Production Sharing Contract ("PSC") with Sonangol for Block 20.  As with Blocks 9 and 21, Cobalt would have a 40% working interest to sell any oil drilled in Block 20, but would not have any contractual rights to sell natural gas.  Bryant stated that "Cobalt is extremely pleased to be awarded operatorship of Block 20," which was part of Cobalt's "pre-eminent Pre-salt portfolio in West Africa" and "the most sought after block by industry in the Pre-salt Bid Round."[23]  The Company further noted that, pursuant to the Block 20 PSC, Cobalt was required to pay over $314 million to the Angolan government "for social projects such as the Sonangol Research and Technology Center."

### F.    Cobalt's Board Requires Management To Conduct An Internal Investigation That Shows A History Of Bribes In Angola By A Senior Cobalt Executive

83.     The Company's former Chief Information Officer (see ¶72 n.21) has explained how Cobalt's Board of Directors required the Company to conduct an investigation in late 2011 and 2012 centering on Cobalt's activities in Angola and, in particular, on the activities in Angola of Cobalt's Country Manager, Richard Smith, who was one of Bryant's direct reports.  The

---

[23] The "pre-salt" geological layer exists on the continental shelves (such as the continental shelf in offshore Angola) and refers to the layer of the Earth lying below a salt layer that formed millennia ago.  The pre-salt layer contains oil trapped by the salt above it.

investigation was focused on a large sum of money Smith spent in Angola that Smith "couldn't account for."

84.     According to the Company's former CIO, Smith openly bragged to the former CIO and other Cobalt employees about his connections in the Angolan government.  Cobalt's former CIO understood these connections to the Angolan government to be Smith's value to Cobalt. Smith was involved in the negotiations with Sonangol representatives for Blocks 9 and 21. According to what the former Cobalt CIO learned from Cobalt employees, including Cobalt's Business Services Manager in Angola, Chris Gordy, Smith met with Angolan officials at the time of the RSA negotiations with Sonangol leading up to the February 2010 execution of the RSAs. The CIO explained that Smith would have been the "guy to stir up that business" as the business development manager in Angola, and there was "no question" the negotiations involved Vicente from Sonangol.

85.     Cobalt's former CIO explained how Smith began staying in Angola for longer stretches from 2009 until the time of Cobalt's internal investigation (discussed below), but Smith never stayed in Cobalt's apartments in Luanda.  Angolan investigative journalist de Morais explained that "Cobalt's manager" in Angola was living in a house owned by Vicente and paying "beyond" $30,000 to $40,000 in monthly rent as "bribes."

86.     The former Cobalt CIO was also informed by Gordy that, after the SEC announced its investigation in late 2011, Gordy's driver took Smith and a trusted Cobalt consultant named Kennedy to meetings with, among others, the "Nazaki guy" who was "one of the military owners" and believed to be Kopelipa.  Kennedy, like Smith, was well-connected in Angola and someone upon whom Bryant relied.  According to the former CIO, Bryant and Kennedy traveled together to Angola more than once "to negotiate payments."

32

87.     Cobalt's executive administrative assistant for its West Africa division from April 2010 to March 2015 (*see* ¶74 n.22) similarly described how Cobalt conducted an internal investigation, which involved a series of meetings with Smith and Cobalt's attorneys in a large conference room at Cobalt's headquarters in Houston next to where the executive administrative assistant worked.  According to the executive administrative assistant, Smith met with Cobalt's General Counsel, Jeff Starzec, and three outside attorneys behind closed doors.

88.     Another Cobalt senior administrative assistant in Cobalt's human resources department from November 2009 to August 2013[24] stated that the investigation lasted months and that Cobalt kept the investigation quiet, even though Cobalt executives were involved, including Defendant Bryant, Chief Operating Officer and Executive Vice President Van Whitfield, and the General Manager in Angola, Michael Drennon.  This former senior administrative assistant stated that many of the executive secretaries had to make copies of expense reports in response to the investigation.

89.     The former Cobalt senior administrative assistant understood that it was discovered through the course of Cobalt's internal investigation that Smith had bribed an Angolan official with whom Cobalt had been working to develop business in Angola.  She explained that, when word spread within the Company of what Smith had done, "everything hit the fan" and Company executives travelled to Angola with increased frequency.  She confirmed that around 2011/2012,

---

[24] Cobalt's senior administrative assistant in Cobalt's human resources department from November 2009 to August 2013, referred to herein, was involved in Cobalt's human resources processes for keeping records of employees in Angola.  She also worked closely with the executive administrative assistants in the Company, including Defendant Bryant's assistant Debbie Jackson, Van Whitfield's assistant Sydney Contillo, and the executive administrative assistant for Cobalt's West Africa division from April 2010 to March 2015 (*see* ¶74 n.22).  She heard from Jackson and Contillo information regarding the Company's internal investigation in late 2011 and 2012 into potential bribes to Angolan officials and how Richard Smith was found to have given or authorized those bribes.  In 2012, as part of Cobalt's internal investigation, the senior administrative assistant had to locate, collect and deliver to Cobalt's legal department personnel files and records on Cobalt's officers and executive assistants.

Bryant and a lot of the senior management went to Angola for a week or two at a time in relation to the investigation.

90.     According to the senior administrative assistant, after the investigation, Smith was recalled from Angola to Houston.  Cobalt's former CIO from June 2012 to April 2014 (*see* ¶72 n.21) similarly stated that, following the investigation meetings, Smith got "yanked out of Angola" and was put in another role as Cobalt's Investor Relations manager.  According to the senior administrative assistant, Drennon, Cobalt's general manger in Angola, was sent to clean up the mess.  According to her, Drennon only made the issues in Angola worse in the Company's eyes, and was pushed aside and eventually out of the Company.

91.     Smith, however, ultimately returned to a high-level role in Angola, serving as Cobalt's Senior Vice President and President of Cobalt Angola from November 2013 to September 2014 and Cobalt's Senior Vice President since September 2014.   The senior administrative assistant stated that employees thought Smith's return to Angola was crazy.  According to the former Cobalt CIO, Smith was valuable to Cobalt because Smith "got stuff done with Sonangol," a fact that made Bryant a "big supporter" and was "common knowledge" within Cobalt.  The CIO recalled that when Cobalt appointed Smith as Cobalt's "ethics officer" in 2013 it was "a big joke within Cobalt; *this* is the ethics officer?"  The CIO stated that Cobalt was the "most unethical company I have ever worked for, hands down."

G.     **Additional Questions Arise About Cobalt's
        Partners, And Cobalt's Insiders Sell Their Shares**

92.     On January 6, 2012, de Morais filed a criminal complaint with Angola's Office of the Attorney General against the directors of Cobalt, Defendant Bryant, and the owners of Nazaki: Vicente, Kopelipa, and Dino.  The criminal complaint accused Cobalt of influence peddling and active corruption of leaders in violation of Angola's Criminal Code.  The complaint alleged that

three top government officials – Vicente, Kopelipa, and Dino – each owned 33.32% stakes in Nazaki.  The complaint asked that these three officials be "investigated for evidence of having committed crimes of illicit enrichment . . . through the[ir] receipt of shares in the business," noting that Vicente and Kopelipa had powerful roles in the granting of the RSAs for Blocks 9 and 21 to Cobalt.  The complaint also alleged that Vicente had "decision-making powers for granting contracts" involving Sonangol, and that Kopelipa exercised "considerable influence over the President of the Republic, who, as the head of the Executive, grants the final approval for petroleum block concessions."  The complaint further alleged that Cobalt had failed to comply with Angolan law in obtaining its licenses for Blocks 9 and 21 by not complying with the mandatory public tendering process.

93.     While Cobalt continued to deny the allegations in de Morais' complaint and any relationship between its partners and the Angolan government, it was forced to disclose on February 21, 2012, that United States regulators and the DOJ had commenced formal investigations concerning Nazaki's connections to senior Angolan government officials.  Cobalt, however, continued to mislead investors about its sham partners, the true owners of Nazaki and the government officials' interests in the Partnership.  In its 2011 Form 10-K, Cobalt told investors that Cobalt was still "unfamiliar" with the owners of Nazaki and stressed that it had "conducted an extensive investigation into these allegations and believe[s] that [its] activities in Angola have complied with all laws, including the FCPA."  At the same time, Cobalt continued to tout its Partnership in Angola, which put it in a "pre-eminent position in offshore Angola."  It also highlighted for investors its Lontra and Loengo wells as "high impact," a description that it defined as "the prospects in [Cobalt's] asset portfolio which we believe have the highest possibility of containing the largest amounts of oil in commercially viable quantities."

94.     On the same day that Cobalt filed its 2011 Form 10-K, February 21, 2012, Cobalt announced a securities offering, which it completed two days later, selling 59.8 million shares of its common stock for approximately $1.67 billion.  Through this offering, the Company's directors and its original investors significantly reduced their stakes in the Company, with Goldman Sachs and Cobalt's other insiders unloading their shares worth over $1.1 billion.  Defendant Bryant also sold over 862,500 personal shares of Cobalt as part of the offering, collecting over $24 million in personal proceeds.

H.     The *Financial Times* Identifies The True Owners
       Of Nazaki And Alper, Which Cobalt Continues To Deny

95.     On April 15, 2012, the *Financial Times* published two reports titled "Angola Officials Held Hidden Oil Stakes" and "Spotlight Falls On Cobalt's Angola Partner."  The reports revealed for the first time that Vicente and Kopelipa admitted that they, along with Dino, were the true owners of Nazaki.  The reports stated that "Manuel Vicente, who was the head of state-owned Sonangol until his appointment in January as minister of state for economic co-ordination, and General Manuel Hélder Vieira Dias Júnior, known as Kopelipa, the head of the presidency's military bureau, confirmed their holdings in Nazaki in near-identical letters" provided to the *Financial Times*.   The reports further detailed how Vicente and Kopelipa admitted that "Leopoldino Fragoso do Nascimento, known as General Dino, a former head of communications in the presidency, held shares too" and that Vicente and Kopelipa had stated that all three Angolan officials "held their interests in Nazaki through [the company] Aquattro Internacional."  In support of these admissions, the *Financial Times* cited two Nazaki company registration documents from 2007 and 2010 that it had obtained, which showed that the Angolan officials' ownership of Nazaki stretched back to before the start of the Class Period.

96.     The *Financial Times* also pointed to "a further connection between Nazaki and the three [Angolan] officials through Jose Domingos Manuel," who was not only Nazaki's manager, but also a shareholder in a different Angolan oil company "alongside Mr. Vicente, General Kopelipa, and General Dino."  The report concluded that these revelations "raise[d] questions about [Cobalt's] compliance with US anti-corruption laws, which makes it a crime to pay or offer anything of value to foreign officials to win business."

97.     In response to these disclosures, the price of Cobalt's shares fell the next trading day by over 7%, erasing nearly $800 million of market capitalization.  Analysts were surprised by these revelations, particularly in light of Cobalt's repeated denials and claims of ignorance of any "connection between senior Angolan government officials and Nazaki."  For example, on April 17, 2012, Credit Suisse published an analyst report emphasizing that "FCPA violations are serious and can lead to fines of up to twice the economic gain/avoided loss with the largest fine so far being $450 [million]."

98.     Notwithstanding the *Financial Times* report, Cobalt continued reassuring investors that the allegations about the Partnership were baseless.  For example, in an immediate and direct response to the allegations set forth in the *Financial Times* reports, on April 15, 2012 (i.e., the same day as *Financial Times* issued its report), Cobalt stated publicly that it "strongly refuted any allegations of wrongdoing" and that it had conducted "rigorous due diligence" on this issue as part of "extensive investigations" beginning in 2007.  During an investor conference call for the first quarter of 2012, Defendant Bryant likewise stated that "[t]ransparency is a primary focus at Cobalt," and "[w]e have spent significant human and financial resources to ensure that the appropriate compliance was undertaken as relates to the contracts and agreements we have in place with our Angola partners."  Bryant further stated that "[o]ur compliance efforts began in 2007"

37

and "never end," adding that "[w]e are confident of this process and that we have done everything we can do."

99.    These remarks assuaged analysts' concerns.  In its April 17, 2012 report, Morgan Stanley explained that it felt reassured by the Company's representations in its "previous two 10-Ks," Cobalt's "deni[al]" of the *Financial Times*'s report, and Cobalt's statements that it had "done its own investigation in connection with counsel into its Angola operations."  Based on the Company's reassurances, the analysts rejected any concerns about the Partnership, which could materialize through either of the regulatory investigations to which the Company was subject.  A report issued by J.P.Morgan analysts two days later similarly concluded that the "FCPA issue" would "likely go[] away" given Defendants' reassurances that Cobalt had "no knowledge of Angolan government officials' involvement with Nazaki."

100.    On June 1, 2012, the journalist Ana Silva published a report confirming the *Financial Times* report. Specifically, Silva reported how, during a press conference, "Vicente . . . admitted that Cobalt had violated U.S. anti-corruption laws by partnering with a company whose triumvirate of stakeholders holds the reins on Angola's political and economic power."  Vicente announced during the press conference that, in continuing to conduct business in Angola, Cobalt was, in his words, "disregarding the rules" in the United States.  Vicente also criticized due diligence by companies such as Cobalt on their Angolan partners, saying that such due diligence was "practically to the point of self-parody."  Silva pointed out that "Cobalt's partnership with Nazaki is . . . [a] case[] of flagrant corruption" and rejected Cobalt's representations that it was ignorant of who owned Nazaki, pointing out that Cobalt and Nazaki "share[d] offices in [the city of] Luanda."

101.    Despite Vicente's remarks, Cobalt continued to affirm the propriety of its business dealings in Angola, including in response to an inquiry from the SEC.  On September 13, 2012, the SEC wrote a letter to Cobalt regarding the Company's 2011 Form 10-K.  The SEC requested that Cobalt expand its disclosures regarding Cobalt's reported "social payment obligations," which included the Sonangol Research and Technology Center.  According to the SEC, "it should be clear why these obligations are appropriately differentiated as social."  In response, Cobalt added two references to the Sonangol Research and Technology Center in each of its 2012 and 2013 Forms 10-K, in which it characterized the Center as a "social project[]."  It was only years later, in August 2014, when it was finally revealed that the "Sonangol Research and Technology Center" did not (and still does not) exist.

## I.    Cobalt Deflects Attention From Its "Partners" By Touting Its Wells While Selling More Securities

102.    In addition to denying reports that its "partners" were sham entities and owned by senior Angolan government officials, Defendants misrepresented the purportedly high oil content in their offshore wells in Angola.  Defendants first focused investors' attention on the Lontra prospect in Block 20 in offshore Angola.  Throughout 2011 and 2012, Defendants repeatedly stated that the Lontra well was "oil-focused."  In an investor conference call on October 30, 2012, Bryant told investors that 3-D seismic analysis showed that the Lontra site is "a very large pre-salt structure, significantly larger than Cameia" – which was a large, successful oil well in Angola.  Bryant also emphasized the importance of Block 20 on October 30, 2012, stating that Lontra was part of Cobalt's "all-star lineup of top-tier global exploration prospects, as measured by any standard or in any portfolio."  In a November 2012 presentation to investors, Cobalt again highlighted Lontra as part of its "rich drilling program."

103.    Defendants followed these statements by initiating large offerings of stock and bonds to investors.  On December 12, 2012, within weeks of Bryant's statements on October 30, 2012, Cobalt issued $1.38 billion worth of convertible senior notes.  On January 15, 2013, Cobalt announced another public offering, this time of 40 million shares of Cobalt common stock offered by selling stockholders.  As part of this offering, Defendants continued to highlight Cobalt's Lontra well, stating in the offering materials that it and Loengo (discussed below) were "large [and] oil-focused."  The materials provided to investors in connection with each of Cobalt's offerings during the Class Period also repeated Defendants' representations that Cobalt was "unfamiliar with Nazaki" and continued to claim ignorance of "a connection between senior Angolan government officials and Nazaki."

104.    Defendants' statements touting the Lontra site continued in 2013.  In a February 26, 2013 press release issued by Cobalt, the Company recognized that "a great deal of attention" was being paid to Lontra, which it reiterated to investors was a "massive" prospect.  During a February 26, 2013 investor conference call, Bryant told investors that Cobalt had determined that "Lontra could be several times the size of a Cameia" based on its "all hands on deck strategy there to get the earliest data."  Bryant singled out Lontra as particularly important and lucrative for Cobalt, stating that, out of all of the prospects Cobalt was testing this year, only Lontra could be larger than Cameia and listed Lontra as one of "four of the world's most anticipated wells."  In presentations to investors on February 5, 2013, March 19, 2013, May 21, 2013, June 3, 2013, and August 28, 2013, Cobalt repeatedly stated that "3D seismic [analysis] has confirmed Lontra as a 'super-size' prospect" and described the amount of oil in the Lontra well as having "[g]reater than billion barrel potential."

105.    Analysts focused on Cobalt's characterizations of the Lontra site.  For instance, Deutsche Bank reminded investors to "keep your eyes on the prize," the "super-size Lontra prospect … with well over a billion barrel potential."  On May 29, 2013, Bloomberg similarly reported that "Cobalt, which is part-owned by Goldman Sachs Group Inc., First Reserve Corp., Riverstone Holdings LLC, Carlyle Group LP and KERN Partners Ltd., [] plans to develop the 'super-size' Lontra prospect in Block 20, which it has described as the 'largest four-way structure in the Kwanza Basin.'"

106.    Defendants again followed their statements touting the value of the Lontra well with further securities offerings to investors.  On May 7, 2013, Cobalt announced that affiliates of Goldman Sachs, First Reserve, Carlyle, and KERN would be selling 50 million shares of Cobalt common stock to investors.  As part of this offering, Cobalt reiterated that its Lontra and Loengo wells were "large [and] oil-focused."  Regarding the Nazaki relationship, Defendants again reassured investors that they had "conducted an extensive investigation" into "allegations of a connection between senior Angolan government officials and … Nazaki" and that Defendants' "activities in Angola have complied with all laws, including the FCPA."  In investor presentations dated September 2013, October 2013, and December 2013, Cobalt continued to tout its "world class . . . partners" and "partnerships with leading global deepwater operators" in Angola.

107.    During an investor conference call on October 29, 2013, Defendants further highlighted Cobalt's Lontra well and their Angolan Partnership.  Defendant Farnsworth, Cobalt's Chief Exploration Officer, stated that Cobalt had acquired a new survey of Block 20, "which has been extremely high quality."  Farnsworth also stated that Lontra was "a significant discovery" and that tests had revealed that "we found a very good quality reservoir at Lontra" that was of such high quality that Cobalt was "encourage[d] for the entire block [20]."  Farnsworth concluded that

Lontra "is an oil field plus a very complex gas field."  When asked by a Credit Suisse analyst for "a little about how you are thinking about gas to oil ratios that you have seen, and how it might impact your view of the [Lontra] development," Farnsworth assured investors that "we know there is oil in this structure" and "this is not the big gas field" that Cobalt could not monetize.

J.    **Cobalt Is Forced To Disclose The Truth About Its Lontra "Oil" Well**

108.    The Company was ultimately required to disclose the truth about its supposed "super-size" Lontra well.  On December 1, 2013, the Company announced that, instead of an "oil-focused" site, Lontra "contain[ed] more gas than [Cobalt's] pre-drill estimates."  This was a serious problem for Cobalt because, as discussed above, the Company only had rights to oil, not gas.

109.    Defendants' disclosure that Lontra contained more gas than previously disclosed surprised analysts, who had expected the "Manhattan-sized structure" to be a key oil-filled well for the Company, and resulted in a decline in the price of Cobalt shares.  Analysts at J.P.Morgan noted that Cobalt "management [had] previously characterize[ed] Lontra as an oil field" first, "plus a very complex gas field," and that the December 1, 2013 disclosure is "below investors' expectations."  J.P.Morgan analysts further noted that, in light of the new disclosure and the fact that the Lontra "PSC contract does not include gas rights," "investors likely will question the partners' ability to commercialize the discovery, given the high natural gas content and [Cobalt's] vagueness about potential commercial options."

110.    In its December 2, 2013 report, UBS also noted that Lontra was "gassier than expected" by analysts and that the site's resources were now evaluated as "well below" prior estimates.  Analysts at Credit Suisse similarly downgraded Cobalt's stock on December 3, 2013, reducing its estimation of Lontra's contribution to Cobalt's stock price by over 60% on reduced "volumes" and "liquids."  Analysts at Morgan Stanley stated on December 3, 2013 that "a smaller,

gassier Lontra (Cobalt's largest prospect) drove investor capitulation," prompting Morgan Stanley to remove Cobalt from its "Best Ideas list." Cobalt's December 1, 2013 disclosure caused its stock price to decline over the following two trading days nearly 21.2%, eliminating over $1.9 billion in market capitalization.

111.    Unknown to investors at the time, Cobalt knew well before its disclosures in December 2013 that Lontra held a higher gas content than represented. Cobalt's CIO from June 2012 to April 2014 (*see* ¶72 n.21) explained that, before the Company disclosed in December 2013 that the Lontra well had a high gas content, it had information supporting such a conclusion. He explained that Cobalt knew "fairly early on" that it had hit a gaseous hydrocarbon column at Lontra, but delayed disclosing that information to investors. According to the CIO, Sonangol required Cobalt to "sit on information," including information regarding Angolan wells such as the Lontra well. He stated that this requirement that Cobalt sit on information before releasing it to investors was "openly talked about" at Cobalt. The CIO stated that there were emails going back and forth between Sonangol and Cobalt executives about this, and the one time when Cobalt disclosed something without Sonangol's approval, Cobalt "got in real trouble." The former CIO explained that Cobalt sat on the information regarding the Lontra well "a lot longer than they normally would."

112.    Given the length of time that Cobalt was sitting on information about Lontra, Cobalt executive Van Whitfield expressed internally that Cobalt had obligations to its investors. However, Cobalt's former CIO heard in an executive meeting – which was attended by the CIO, Defendant Farnsworth, Executive Vice President for Execution and Appraisal James Painter, Van Whitfield, Vice President for Government and Public Affairs Lynne Hackedorn, and Mike Drennon, among

others – that the Company decided to delay disclosure.  Cobalt's former CIO stated that the "call to disclose would have been made by" Bryant.

### K.   With Lontra Exposed, Cobalt Focuses On<br>Its Loengo Well And Sells More Securities

113.   Following the Lontra well disclosure, Cobalt emphasized the importance of its Loengo well in Block 9 off the coast of Angola.  For example, during an investor conference call on February 27, 2014, analyst John Malone from Mizuho Securities asked Defendant Farnsworth whether "reservoir quality [was] still an open question" in Block 9.  Defendant Farnsworth responded by distinguishing Block 9 as particularly reliable.  He stated that, based on "a new 3-D survey over the block," it was "much to [Farnsworth's] delight" that Cobalt "found quite a large structure, which we think has a 250- to 500 million-barrel potential.  That's what's called Loengo . . . [which was] <u>certainly in a block that we know there's oil in it</u>."

114.   Cobalt again emphasized its Loengo well in Cobalt's Form 10-Q for the first quarter of 2014, filed on May 1, 2014.  In the Form 10-Q, Cobalt did not modify the "250- to 500 million-barrel" estimate that it had previously given for Loengo's oil content, even after, according to the Form 10-Q, "Loengo was mapped using our 3-D seismic data."

115.   Less than a week after these statements, on May 7, 2014, Cobalt announced to investors an offering of $1.3 billion in convertible senior notes.  The offering materials for these notes reiterated Cobalt's statements promoting its Loengo well in its Form 10-Q for the first quarter of 2014.  The offering materials also included further assurances from Defendants that Cobalt had conducted an "extensive investigation" to ensure that Nazaki, its "partner" in the Loengo project, was not connected to senior Angolan government officials.

116.   Cobalt continued to emphasize the supposedly high oil content in its Loengo well in mid-2014.  For example, during an investor conference call on August 5, 2014, Bryant specified

that Loengo was a "750 million-barrel" prospect.  Unknown to investors at the time, and as stated by the former CIO, there was "not even a question" that Loengo was not a good prospect and that there was "not even a remote chance" of success on the Loengo well, with the former CIO's supposition that Cobalt was "forced" to take Block 9, where it drilled Loengo, to satisfy Angola's state-owned Sonangol.

L.     **The SEC Escalates Its Investigation, Cobalt's "Social Payments" Are Revealed To Be For A Project That Does Not Exist, And Angola Removes Nazaki And Alper**

117.    As noted above, Cobalt represented to investors in its December 2011 and September 2012 filings with the SEC that the "social payments" it made to the Angolan government in connection with Block 20 and the Lontra well were legitimate.  Over half of Cobalt's $607.5 million in "social payments" for Block 20 went to fund the Sonangol Research and Technology Center, which was supposed to be an Angolan "social project" benefitting Angolan residents.  However, on August 5, 2014, it was disclosed that Cobalt's "social payments" for the Sonangol Research and Technology Center went to a research and technology center that did not exist.  An extensive investigation by journalists at Global Witness revealed that, in response to questioning from Global Witness, neither Cobalt, Sonangol, BP, the Norwegian oil company Statoil, nor "well-placed industry insiders" could confirm the existence of the Sonangol Research and Technology Center.

118.    Global Witness's August 5, 2014 report also published a letter from Cobalt dated May 14, 2014.  In that letter, Cobalt stated that it apparently "monitor[ed] the progress of [its] social contributions in Angola," which purportedly were "for the betterment of the country of Angola and its citizens."  Cobalt rejected, however, Global Witness's request "to provide any information that confirms that Sonangol Research and Technology Center exists," instead telling Global Witness that "these inquiries are more appropriately directed to Sonangol."  Sonangol also

did not confirm the existence of the Sonangol Research and Technology Center.  As summarized in an article published on the Angola News Network on August 5, 2014, payments of millions of dollars "<u>for a research center that doesn't exist is an outrage for [] shareholders whose money seems to have evaporated</u>."

119.    Bloomberg also reported on August 5, 2014 that, in addition to the revelations regarding the Sonangol Research and Technology Center and an ongoing DOJ investigation, "the U.S. SEC made a preliminary determination for an enforcement action against the company." Cobalt had received a Wells Notice from the SEC "related to the investigation [the SEC] has been conducting relating to Cobalt's operations in Angola, and the allegations of Angolan government official ownership of Nazaki Oil and Gas."  Cobalt confirmed these reports in a press release, in which it stated that the SEC's Enforcement Division had "recommend[ed] that the SEC institute an enforcement action against the Company, alleging violations of certain federal securities laws."[25]  In response to the August 5, 2014 disclosures, the price of Cobalt securities fell by nearly 11%, erasing hundreds of millions of dollars more in market capitalization.

120.    Financial commentators were surprised by the disclosures regarding the Sonangol Research and Technology Center and the regulators' continued investigations.  The SEC's Wells Notice meant that the regulators, including the DOJ, had evidence of the Company's violations of the FCPA.  For example, on August 6, 2014, Credit Suisse analysts remarked on the regulators' investigation that "[t]he DOJ is the real driver given criminal fines are the danger.  [Cobalt] appears to be discounting a 60+% probability of criminal conviction."  In a report one week later, Credit Suisse again emphasized that the criminal provisions of the FCPA, enforced by the DOJ, "have the

---

[25] Following the close of the Class Period, Cobalt disclosed that the DOJ investigation was ongoing as of February 23, 2015.

most bite – up to '2x the economic gain,'" while the "historical SEC-only FCPA fines (i.e. no DOJ involvement) have been low."  In its August 18, 2014 report, *Quartz* noted that, while "[t]here is supposed to be a research center in Angola, funded by foreign oil companies in exchange for access to some of the country's estimated 9.1 billion barrels of oil reserves," "it's not clear that the center exists, or where the $175 million paid so far to build it wound up."

121.    Financial commentators at *Forbes* similarly emphasized that Cobalt's relationship with Nazaki was a clear sign of corruption, stating on August 17, 2014 that "Cobalt must have known that involvement of state officials was likely: at the time, it was extremely difficult to do business in Angola without the involvement of members of the ruling elite – the dos Santos family, its close associates and senior military figures."  As *Forbes* explained "it [was] hard to believe that Cobalt did not know a complex opaque partnership deal arranged by a corrupt government would probably channel money to members of that government."  It further stated that, "[i]f the only way a company can develop business links with a country is by means of bribery and corruption, then if the potential returns are large enough, bribery and corruption is what the company will do."

122.    On August 26, 2014, on the heels of the August 5, 2014 disclosures, it was announced that Angola had terminated Nazaki's Partnership with Cobalt on Blocks 9 and 21 and transferred Nazaki's working interest to a subsidiary of Sonangol.  On the following day, Cobalt stated that it had "received documentation confirming that Nazaki . . . and Alper . . . are no longer members of the contractor group of Blocks 9 and 21 offshore Angola" and that as a result, Cobalt "no longer ha[d] any relationship with Nazaki or Alper."  As part of the expulsion of Nazaki and Alper from the Partnership, Sonangol assumed their ownership interests, and thus maintained a 60% majority ownership interest, with Cobalt retaining its 40% interest.

47



123.    J.P.Morgan analysts obtained the expulsion decrees and noted that Cobalt's announcement was severely delayed.   J.P.Morgan analysts pointed out that, while "Alper's partnership interest in Blocks 9 and 21 had been terminated five months earlier, on or around March 25, 2014," Cobalt's Form 10-Q for the first quarter of 2014, filed on May 1, 2014, had misrepresented Alper's working interest in the Partnership at that time.   The May 1, 2014 filing stated that Alper still had a 10% interest that Cobalt was carrying when, in fact, they had no interest at the time.   The analysts further revealed something Cobalt's August 27, 2014 announcement did not: the government decrees ejecting Nazaki from the Partnership "declare[d] that Nazaki does not have 'proven competence and financial capacity' to hold the blocks and that it repeatedly had not met its 'economic and financial commitments.'"   The decrees stated that Nazaki had demonstrated that it "did not possess the legal requirements to be associated with the National Concessionary" and that its repeated failure to comply with its economic and financial commitments related to its payment of the costs associated with the operations of the Partnership.   J.P.Morgan analysts noted how it was "curious" that it took years to admit that Nazaki did not have "the competence or financial capacity to be a genuine partner" with Cobalt.

48

124.    On November 4, 2014, Cobalt also revealed that, contrary to Cobalt's descriptions of Loengo as "large," "oil-focused" and "high impact," the Loengo well in fact lacked oil.  Cobalt's Form 10-Q filed on November 4 stated that "the Loengo #1 exploration well . . . did not encounter commercial hydrocarbons" and that "[t]he well has subsequently been plugged and abandoned."  Cobalt dubbed the Loengo well a "noncommercial exploration well in Angola" and reported that the Loengo well resulted in a "dry hole expense and impairment" of $35.2 million.

125.    While Cobalt claimed that it was surprised that Loengo was a "dry hole," the Company's former Chief Information Officer (*see* ¶72 n.21) has explained how Cobalt knew before 2014 that Loengo was not a good prospect.  He stated that there was "not even a question" that Loengo was not a good prospect and that there was "not even a remote chance" of success on the Loengo well.  Analysts responded harshly to the Company's additional disclosure about its Loengo well.  On November 4, 2014, Brean Capital analysts issued a report about the "dry hole" and summarized how Cobalt's disappointing results were "led by unsuccessful drilling efforts at the Loengo #1 pre-salt prospect, giving rise to a[n unanticipated] $55MM impairment charge."  In another report that day, Deutsche Bank analysts also called Loengo a "dry hole" and remarked that the Loengo disclosure was "[n]ot the data point the market was looking for."

126.    Shareholders also suffered when the truth about the Loengo well was revealed.  On November 4, the price of Cobalt's stock fell an additional 11.5% on high-volume trading.

## V.    VIOLATIONS OF THE EXCHANGE ACT

### A.    Defendants' Material Misstatements And Omissions In Violation Of The Exchange Act

127.    Defendants made materially false and misleading statements and/or omissions of material fact during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Among other things, Defendants falsely and misleadingly

represented to investors that:  (i) Nazaki and Alper were legitimate "partners" in the Partnership; (ii) despite its own "extensive due diligence" and "extensive investigations" into that Partnership, Cobalt was unaware of the underlying facts concerning the true nature of Nazaki and Alper, which had created a significant threat of regulatory action; (iii) Cobalt was likewise unaware of any improper connection between Angolan government officials and Nazaki and Alper; (iv) Cobalt's payments for the Sonangol Research and Technology Center were legitimate "social payments"; (v) Alper remained a member of the Partnership well after March 25, 2014; and (vi) the Company had two "key" "oil-focused" wells in Lontra and Loengo, which were significant discoveries for the Company in Angola.

128.    As further explained below, Defendants' representations were materially false and misleading and omitted material facts when made, including that:  (i) Nazaki and Alper were, in fact, controlled by Angolan government officials; (ii) far from a "fully paying" and beneficial partner, Nazaki lacked the "competence and financial capacity" to be a legitimate business partner in Cobalt's oil exploration activities in Angola; (iii) the Sonangol Research and Technology Center for which "customary" social payments were purportedly made does not (and never did) exist; (iv) the Company's Board of Directors ordered the Company to conduct an internal investigation into the activities of Cobalt's Senior Vice President and Country Manager for Angola in response to concerns over a large sum of money spent in Angola that he "couldn't account for," which led to his removal from his post in Angola; (v) Cobalt's "key" Lontra and Loengo wells were not, in fact, "oil-focused" – Lontra contained less oil (and far more gas) than Cobalt had represented, and Loengo was nothing more than a "dry hole," which the Company would later be forced to abandon; and (vi) Sonangol requested, and Cobalt agreed, to delay making timely disclosures of adverse

information to investors about its Angolan wells, including the existence of lower amounts of oil at Lontra than Cobalt had stated, and no oil at Loengo.

### 1. Defendants' Materially False And Misleading Statements And Omissions In 2011

#### a) 2010 Form 10-K

129.    On the first day of the Class Period, March 1, 2011, Cobalt filed with the SEC its Form 10-K for the year ended December 31, 2010.  The 2010 Form 10-K was signed by Defendants Bryant and Wilkirson, among others, and represented that Cobalt's "familiarity with [Nazaki and Alper] is limited" and that "last year we were made aware of allegations, that we are continuing to look into, of a connection between senior Angolan government officials and Nazaki (a full paying member of the contractor group for Blocks 9 and 21)."

130.    The statements in ¶129 were materially false and misleading when made.  Contrary to Defendants' statements that they had "limited" familiarity with Nazaki and Alper, that Nazaki was "a full paying member," and that Defendants knew only of "allegations . . . of a connection between senior Angolan government officials and Nazaki," Defendants knew, or were reckless in not knowing, that Nazaki and Alper were in fact owned by Angolan government officials.

131.    The statements in ¶129 also omitted material facts when made, including that (i) Nazaki and Alper were owned by Angolan government officials; (ii) Nazaki lacked the "competence and financial capacity" to be a legitimate business partner in Cobalt's oil exploration activities in Angola and "did not possess the legal requirements to be associated with the National Concessionary"; (iii) Nazaki had repeatedly failed to comply with its economic and financial commitments related to its payment of the costs associated with the operations of the Partnership; and (iv) Nazaki's and Alper's connections to the Angolan government created a significant risk of FCPA violations and regulatory action.

51

132.    The 2010 Form 10-K also represented that "[a]ll of our prospects are oil-focused." This statement was materially false and misleading, and omitted material facts when made. Cobalt's Lontra and Loengo wells were not "oil-focused"; rather, as Cobalt admitted, Lontra held a higher gas content than represented, and Loengo was a "dry hole."  The statement also omitted that Sonangol required, and Cobalt agreed, to delay providing to investors adverse information regarding its Angolan wells.

<b>b)</b>      <u><b>The March 11, 2011 Form 8-K</b></u>

133.    On March 11, 2011, Cobalt filed a Form 8-K that noted that the SEC made informal requests to Cobalt seeking information regarding the Partnership.  In response, Cobalt stated that it "conducted extensive due diligence with respect to Nazaki [and] Alper" and that Cobalt's "diligence efforts . . . continue."  Cobalt further stated that "Nazaki is a full paying member of the [Partnership]" and that it "believes its activities in Angola have complied with all laws, including the Foreign Corrupt Practices Act," and "takes compliance with the FCPA and other laws very seriously and has devoted considerable resources toward such compliance."

134.    The statements in ¶133 were materially false and misleading when made.  Among other things, a basic review of Nazaki's registration documents showed Nazaki and Alper were shell companies for Angolan government officials.

135.    The statements in ¶133 also omitted material facts when made, including that (i) Nazaki and Alper were owned by Angolan government officials; (ii) Nazaki lacked the "competence and financial capacity" to be a legitimate business partner in Cobalt's oil exploration activities in Angola and "did not possess the legal requirements to be associated with the National Concessionary"; (iii) Nazaki had repeatedly failed to comply with its economic and financial commitments related to its payment of the costs associated with the operations of the Partnership; (iv) Nazaki's and Alper's connections to the Angolan government posed a significant risk of FCPA

violations and regulatory action; and (v) Defendants did not reasonably believe that their "activities in Angola have complied with all laws, including the Foreign Corrupt Practices Act."

### c)       April 2011 Offering Materials

136.    On April 11, 2011, Cobalt initiated a public offering of 35.65 million shares of common stock.  In connection with the Offering, the Company issued and filed with the SEC a Prospectus Supplement and accompanying Prospectus, on April 12, 2011 (the "April 2011 Offering Materials").  The April 2011 Offering Materials incorporated by reference the statements in ¶¶129, 132 from the 2010 Form 10-K, which were materially false and misleading and omitted material facts, for the reasons described above in ¶¶130-32.

### d)       December 20, 2011 Form 8-K

137.    On December 20, 2011, Cobalt filed a Form 8-K with the SEC announcing the execution of a PSC governing the Company's oil exploration and drilling activities in Angolan Block 20.  The Form 8-K stated that, under the PSC, Cobalt was obligated to pay $314 million for "social projects" in Angola, including "the Sonangol Research and Technology Center."  The Form 8-K also stated that Cobalt, Sonangol and "certain other parties" had executed RSAs for Blocks 9 and 21.

138.    The statements in ¶137 were materially false and misleading when made.  The referenced payments were not "social project" payments made to fund "the Sonangol Research and Technology Center," which did not exist.  In addition, the statements in ¶137 omitted material facts, including that: (i) the Sonangol Research and Technology Center did not exist; (ii) Cobalt made improper payments to Angolan government officials and large sums of money could not be accounted for, which led to a Board investigation and the removal of Cobalt's Senior Vice President and Country Manager for Angola; and (iii) Cobalt's payments to Angolan government officials created a significant risk of FCPA violations and regulatory action.

### 2.   Defendants' Materially False And
### Misleading Statements And Omissions In 2012

### a)   2011 Form 10-K

139.   On February 21, 2012, Cobalt filed with the SEC its Form 10-K for the year ended December 31, 2011 (the "2011 Form 10-K"), which was signed by Defendants Bryant and Wilkirson, among others.  In the 2011 Form 10-K, Cobalt again represented that it had "limited" familiarity with Nazaki and Alper.  The Company also represented that it had "conducted an extensive investigation into the[] allegations [concerning its operations in Angola being investigated by the SEC and DOJ] and believe that our activities in Angola have complied with all laws, including the FCPA."  Cobalt further represented that Nazaki was "a full paying member of the [Partnership]."

140.   The statements in ¶139 were materially false and misleading when made.  Among other things, Nazaki's and Alper's foundational documents revealed that they were owned by Angolan government officials.

141.   The statements in ¶139 also omitted material facts when made, including that (i) Nazaki and Alper were owned by Angolan government officials; (ii) Nazaki lacked the "competence and financial capacity" to be a legitimate business partner in Cobalt's oil exploration activities in Angola and "did not possess the legal requirements to be associated with the National Concessionary"; (iii) Nazaki had repeatedly failed to comply with its economic and financial commitments related to its payment of the costs associated with the operations of the Partnership; (iv) Defendants did not reasonably believe that their "activities in Angola have complied with all laws, including the Foreign Corrupt Practices Act"; (v) Cobalt made improper payments to Angolan government officials and large sums of money could not be accounted for, which led to a Board investigation and the removal of Cobalt's Senior Vice President and Country Manager for

Angola; and (vi) Cobalt's  payments to Angolan government officials posed a significant risk of FCPA violations and regulatory action.

142.     The 2011 Form 10-K also stated that Cobalt had made contributions for "social projects," including "the Sonangol Research and Technology Center," and that it was obligated to pay approximately $337 million for these purported "social projects" in Angola.

143.     The statements in ¶142 were materially false and misleading when made.  Cobalt's payments were not "social payment obligations" or "social project" payments made to fund "the Sonangol Research and Technology Center," which did not exist.  These statements also omitted material facts when made, including that (i) the Sonangol Research and Technology Center did not exist; (ii) Cobalt made improper payments to Angolan government officials and large sums of money could not be accounted for, which led to a Board investigation and the removal of Cobalt's Senior Vice President and Country Manager for Angola; and (iii) Cobalt's payments to Angolan government officials posed a significant risk of FCPA violations and regulatory action.

144.     The 2011 Form 10-K also repeated the same statements referenced above in ¶132 regarding Cobalt's purportedly "oil-focused" Angolan oil well prospects.  The 10-K also represented that Cobalt was developing "high impact" prospects in Angola.  These statements were materially false and misleading when made and omitted material facts.  Cobalt's Lontra and Loengo wells were not "high impact" or "oil-focused," and Cobalt was forced to disclose facts showing that Lontra held a higher gas content than represented, and Loengo was a "dry hole." Cobalt also acknowledged the SEC's concern that the "characterization of the [Angolan] prospects as 'high impact' appears to be without the requisite degree of support" by discontinuing the Company's use of that term in later Forms 10-Q and 10-K filed with the SEC.

145.    The statements in ¶144 concerning its Lontra and Loengo wells also omitted material facts when made, including that (i) Sonangol required, and Cobalt agreed, to delay providing adverse information regarding its Angolan wells; and (ii) Loengo was not a good prospect and there was "not even a remote chance" of success on the Loengo well.

**b)       February 2012 Offering Materials**

146.    On February 23, 2012, Cobalt and certain selling shareholders of Cobalt common stock conducted a public offering of 59.8 million shares of Cobalt common stock.  In connection with the Offering, the Company issued and filed with the SEC a Prospectus Supplement, and accompanying Prospectus, on February 24, 2012 (together with the other materials listed in ¶225 n.26, the "February 2012 Offering Materials").  The February 2012 Offering Materials incorporated by reference the statements in the 2011 Form 10-K set forth in ¶¶139, 142, which were materially false and misleading and omitted material facts, for the reasons described above in ¶¶140-41, 143.

147.    The February 2012 Offering Materials also incorporated by reference the statements in the 2011 Form 10-K referenced in ¶144, and further stated that the Lontra and Loengo wells were "large, oil-focused high impact wells."  These statements were materially false and misleading and omitted material facts, for the reasons described above in ¶¶144-45.

**c)       April 16, 2012 Press Release**

148.    On April 16, 2012, Cobalt issued a press release denying the *Financial Times* reports (*see* ¶95) that three government officials – Vicente, Kopelipa and Dino – held interests in Nazaki.  In its press release, Cobalt stated that it "began its investigation into its Angola business relationships in 2007" and "Cobalt has based its decisions and actions on the results of these extensive investigations and will continue to maintain rigorous due diligence in all of its worldwide activities."

149.    The statements in ¶148 were materially false and misleading when made.  Cobalt's assertions that it had begun conducting an "investigation into its Angola business relationships in 2007" and "based its decisions and actions on the results of these extensive investigations" were materially false and misleading when made because, among other things, Nazaki's and Alper's foundational documents revealed that they were owned by Angolan government officials.

150.    The statements in ¶148 also omitted material facts when made, including that (i) Nazaki and Alper were owned by Angolan government officials; (ii) Nazaki lacked the "competence and financial capacity" to be a legitimate business partner in Cobalt's oil exploration activities in Angola and "did not possess the legal requirements to be associated with the National Concessionary"; (iii) Nazaki had repeatedly failed to comply with its economic and financial commitments related to its payment of the costs associated with the operations of the Partnership; (iv) Cobalt made improper payments to Angolan government officials and large sums of money could not be accounted for, which led to a Board investigation and the removal of Cobalt's Senior Vice President and Country Manager for Angola; and (v) Cobalt's  payments to Angolan government officials posed a significant risk of FCPA violations and regulatory action.

### d)      First Quarter 2012 Form 10-Q And Earnings Call

151.    On May 1, 2012, Cobalt issued its Form 10-Q for the quarter ended March 31, 2012 (the "First Quarter 2012 Form 10-Q").  The First Quarter 2012 Form 10-Q incorporated by reference the same statements concerning Cobalt's Partnership set forth in ¶139 above, including that Cobalt: (i) had "limited" familiarity with Nazaki and Alper; (ii) had "conducted an extensive investigation into the[] allegations [concerning its operations in Angola] and believe[d] that [its] activities in Angola . . . complied with all laws, including the FCPA;  and that (iii) Nazaki was "a full paying member of the [Partnership]."   The Form 10-Q also misleadingly described Cobalt's oil prospect inventory in Angola as "high impact," and stated that "[a]ll of our prospects are oil-

57

focused." These statements were materially false and misleading, and omitted material facts when made, for the reasons stated in ¶¶140-41, 144-45 above.

152.    Also on May 1, 2012, Cobalt conducted an earnings conference call in connection with the First Quarter 2012 Form 10-Q.  During the call, Defendant Bryant stated that:

> Transparency is a primary focus at Cobalt and frankly we cannot operate without it. We have spent significant human and financial resources to ensure that the appropriate compliance was undertaken as relates to the contracts and agreements we have in place with our Angola partners. Our compliance efforts began in 2007 . . . . We are confident of this process and that we have done everything we can do. . . . Our compliance efforts never end, and we intend to continue our efforts in this same vein.

153.    The statements in ¶152 were materially false and misleading when made.  Contrary to Defendant Bryant's statement, Cobalt had not "ensure[d] that the appropriate compliance was undertaken as relates to the contracts and agreements we have in place with our Angola partners" because Cobalt's business partners Nazaki and Alper were owned by Angolan governmental officials.  Bryant's statements that the Company's "compliance efforts began in 2007," "we have done everything we can do," and "[o]ur compliance efforts never end" were materially misleading when made because, among other things, Nazaki's and Alper's foundational documents revealed they were owned by Angolan government officials.

154.    The statements in ¶152 also omitted material facts when made, including that (i) Nazaki and Alper were owned by Angolan government officials; (ii) Nazaki lacked the "competence and financial capacity" to be a legitimate business partner in Cobalt's oil exploration activities in Angola and "did not possess the legal requirements to be associated with the National Concessionary"; (iii) Nazaki had repeatedly failed to comply with its economic and financial commitments related to its payment of the costs associated with the operations of the Partnership; (iv) Defendants did not reasonably believe that their "activities in Angola have complied with all

laws, including the Foreign Corrupt Practices Act"; (v) Cobalt made improper payments to Angolan government officials and large sums of money could not be accounted for, which led to a Board investigation and the removal of Cobalt's Senior Vice President and Country Manager for Angola; and (vi) Cobalt's payments to Angolan government officials created a significant risk of FCPA violations and regulatory action.

### e)   Second Quarter 2012 Form 10-Q

155.   On July 31, 2012, Cobalt issued its Form 10-Q for the second quarter ending on June 30, 2012 (the "Second Quarter 2012 Form 10-Q").  The Second Quarter 2012 Form 10-Q incorporated by reference the same statements concerning Cobalt's Partnership set forth in ¶139 above.  The Form 10-Q also misleadingly described Cobalt's oil prospect inventory in Angola as "high impact," and stated that "[a]ll of our prospects are oil-focused."  These statements were materially false and misleading, and omitted material facts when made, for the reasons stated in ¶¶140-41, 144-45 above.

### f)   Third Quarter 2012
### Form 10-Q And Related Earnings Call

156.   On October 30, 2012, Cobalt issued its Form 10-Q for the third quarter ending on September 30, 2012 (the "Third Quarter 2012 Form 10-Q").  The Third Quarter 2012 Form 10-Q incorporated by reference the same statements concerning Cobalt's Partnership set forth in ¶139 above, including that Cobalt: (i) had "limited" familiarity with Nazaki and Alper; (ii) had "conducted an extensive investigation into the[] allegations [concerning its operations in Angola] and believe[d] that [its] activities in Angola . . . complied with all laws, including the FCPA"; and that (iii) Nazaki was "a full paying member of the [Partnership]."  These statements were materially false and misleading, and omitted material facts when made, for the reasons stated in ¶¶140-41 above.

157.    During an investor conference call on October 30, 2012, to discuss Cobalt's quarterly results, Defendant Bryant stated that "[i]n Block 20, we have recently completed our new 3-D seismic over the Lontra prospect, and I'm happy to tell you that the prospect appears to be a very large pre-salt structure, significantly larger than Cameia, for example."  Bryant stated Lontra was part of Cobalt's "all-star lineup of top-tier global exploration projects, as measured by any standard or in any portfolio."

158.    The statements in ¶157 were materially false and misleading, and omitted material facts when made, including that (i) Sonangol required, and Cobalt agreed, to delay providing adverse information regarding its Angolan wells, including Lontra; and (ii) Cobalt knew that the Lontra well had a high gas content well before December 2013, but delayed in disclosing that information to investors at the insistence of Sonangol.

### g)    December 2012 Offering Materials

159.    On December 12, 2012, Cobalt issued to investors $1.38 billion worth of convertible senior notes due 2019 pursuant to a Prospectus Supplement filed with the SEC, and pursuant to the January 4, 2011 Registration Statement (together with the other materials listed in ¶234 n.27, the "December 2012 Offering Materials").  The December 12, 2012 Offering Materials incorporated by reference Cobalt's (i) 2011 Form 10-K and (ii) 2012 Forms 10-Q, which contained the same statements set forth in ¶¶139, 142, and 144.  These statements were materially false and misleading and omitted material facts when made for the reasons set forth in ¶¶140-41, 143-45 above.

### 3.   Defendants' Materially False And Misleading Statements And Omissions In 2013

#### a)   January 2013 Offering Materials

160.    On January 16, 2013, Cobalt selling shareholders offered 40 million  shares of Cobalt common stock to investors pursuant to a Prospectus Supplement, and accompanying Prospectus, and pursuant to the January 4, 2011 Registration Statement (together with the other materials listed in ¶244 n.28, the "January 2013 Offering Materials").  The January 2013 Offering Materials incorporated by reference Cobalt's (i) 2011 Form 10-K and (ii) 2012 Forms 10-Q, which contained the same statements set forth in ¶¶139, 142, and 144 above.  These statements were materially false and misleading and omitted material facts when made for the reasons set forth in ¶¶140-41, 143-45 above.

#### b)   February 5, 2013 Investor Presentation

161.    On February 5, 2013, Cobalt held an investor presentation.  The presentation slides described the potential amount of oil in Cobalt's Lontra prospect as "Greater than [a] Billion" barrels by mid-2013.  The presentation slides further described the Lontra well as being "In A League Of Its Own" and stated that "3D seismic [analysis] has confirmed Lontra as a 'super-size' prospect."  Another slide from the presentation, titled "2013: Exceptional Exposure to High Impact Exploration and Development" listed Lontra as a "high impact" oil well for 2013.   These statements were materially false and misleading because rather than being a "high impact" well with a billion barrel potential, Lontra contained a significant quantity of unmarketable gas.  These statements also omitted material facts when made, including that Sonangol required, and Cobalt agreed, to delay providing adverse information regarding its Angolan wells, including Lontra.

### c) 2012 Form 10-K And Related Statements

162. On February 26, 2013, Cobalt filed with the SEC its Form 10-K for the year ended December 31, 2012 (the "2012 Form 10-K"). The 2012 Form 10-K was signed by Defendants Bryant and Wilkirson, among others. The 2012 Form 10-K contained the same materially false and misleading statements set forth in ¶139, including that Cobalt: (i) had "limited" familiarity with Nazaki and Alper; (ii) had "conducted an extensive investigation into the[] allegations [concerning its operations in Angola] and believe[d] that [its] activities in Angola . . . complied with all laws, including the FCPA"; and that (iii) Nazaki was "a full paying member of the [Partnership]." These statements were materially false and misleading and omitted material facts when made for the reasons set forth in ¶¶140-41 above.

163. The 2012 Form 10-K also stated that "[o]ur oil-focused exploration efforts target pre-salt horizons on Blocks 9, 20 and 21 offshore Angola." On February 26, 2013, Cobalt also issued a press release on Form 8-K in which Defendant Farnsworth stated that "every well we drill this year in Angola . . . will be significant." During an investor conference call on February 26, 2013, and in response to an analyst's question, Bryant further stated that Cobalt had determined that "Lontra could be several times the size of a Cameia" based on its "all hands on deck strategy there to get the earliest data" and "everybody" was focused on finishing up the Lontra analysis. Bryant stated that Lontra was one of "four of the world's most anticipated wells." These statements were materially false and misleading when made because Cobalt's Lontra well was not "oil-focused" or "significant" and the Company was forced to disclose facts showing that Lontra held a higher gas content than represented. These statements also omitted material facts when made, including that Sonangol required, and Cobalt agreed, to delay providing adverse information regarding its Angolan wells.

62

164.   The 2012 Form 10-K also stated that Cobalt had certain "social payment obligations" under the contracts for Blocks 9, 20 and 21, including its contributions for "social projects such as the Sonangol Research and Technology Center."  Cobalt further stated that it was obligated to pay approximately $337 million for these purported "social projects" in Angola.  These statements were materially false and misleading, and omitted material facts when made, for the reasons stated in ¶143.

### d)   First, Second, and Third Quarter 2013 Forms 10-Q

165.   On April 30, 2013, July 30, 2013, and October 29, 2013, Cobalt filed its Forms 10-Q for the first, second, and third quarters of 2013, respectively (the "2013 Forms 10-Q").  Each of the 2013 Forms 10-Q incorporated by reference the same materially false and misleading statements set forth in ¶162 above, including that Cobalt: (i) had "limited" familiarity with Nazaki and Alper; (ii) had "conducted an extensive investigation into the[] allegations [concerning its operations in Angola] and believe[d] that [its] activities in Angola . . . complied with all laws, including the FCPA"; and that (iii) Nazaki was "a full paying member of the [Partnership]."  These statements were materially false and misleading, and omitted material facts when made for the reasons set forth in ¶¶140-41.

166.   Each of the 2013 Forms 10-Q also falsely stated that "[a]ll of the Company's prospects are oil-focused."  In addition, Cobalt's Form 10-Q for the third quarter of 2013 stated that "the Lontra #1 exploratory well had reached total depth and the drilling and evaluation results confirm an oil and gas discovery."  These statements were materially false and misleading when made.  Cobalt's Lontra and Loengo wells were not "oil-focused," and Cobalt was forced to disclose facts showing that Lontra held a higher gas content than represented, and Loengo was a "dry hole."  These statements also omitted material facts when made, including that Sonangol required, and Cobalt agreed, to delay providing adverse information regarding its Angolan wells.

e)   **March 19, 2013, May 21, 2013, June 4, 2013,**
      **And August 28, 2013 Investor Presentations**

167.   On March 19, 2013, May 21, 2013, June 4, 2013, and August 28, 2013, Cobalt held investor presentations in which the Company made the same statements referenced in ¶161.  These statements were materially false and misleading, and omitted material facts when made, for the reasons stated in ¶161.

f)   **May 2013 Offering Materials**

168.   On May 8, 2013, certain Cobalt selling shareholders offered to investors 50 million shares of Cobalt common stock pursuant to Cobalt's Prospectus Supplement and accompanying Prospectus (together with the other materials listed in ¶249 n.29, the "May 2013 Offering Materials").

169.   The May 2013 Offering Materials were issued pursuant to the January 4, 2011 Registration Statement, and incorporated by reference Cobalt's (i) 2012 Form 10-K; (ii) First Quarter 2013 Form 10-Q; and (iii) February 26, 2013 Form 8-K.  Those filings contained the same material misstatements identified above at ¶¶162-64.  These statements which were incorporated by reference in the May 2013 Offering Materials were materially false and misleading, and omitted material facts when made, for the same reasons set forth in ¶¶140-41, 143, and 163 above.

g)   **September 10, 2013, October 29, 2013, And**
      **December 3, 2013 Investor Presentations**

170.   In investor presentations dated September 10, 2013, October 29, 2013, and December 3, 2013, Cobalt stated that it had "world class . . . partners" in Angola, and that it had engaged in "partnerships with leading global deepwater operators" in the country.  These statements were materially false and misleading because Defendants knew, or were reckless in not knowing, that (i) Nazaki lacked the "competence and financial capacity" to be a legitimate partner

in Cobalt's oil exploration activities in Angola and (ii) neither Nazaki nor Alper were "leading global deepwater operators" in Angola.

171.    The statements in ¶170 also omitted material facts when made, including that (i) Nazaki and Alper were owned by Angolan government officials; (ii) Nazaki lacked the "competence and financial capacity" to be a legitimate partner in Cobalt's oil exploration activities in Angola and "did not possess the legal requirements to be associated with the National Concessionary"; (iii) Nazaki had repeatedly failed to comply with its economic and financial commitments related to its payment of the costs associated with the operations of the Partnership; and (iv) Nazaki's and Alper's connections to the Angolan government posed a significant risk of FCPA violations and regulatory action.

h)        <u>October 29, 2013 Form 8-K and Related Statements</u>

172.    In a press release filed on Form 8-K with the SEC on October 29, 2013, Defendant Bryant stated that "it's clear" that Lontra had "been successful in finding and delineating new hydrocarbon resources in the Angolan Pre-salt.  This is a remarkable and highly unusual start to the exploration of such an immense new basin."

173.    During an investor conference call also on October 29, 2013 in connection with Cobalt's Form 10-Q for the third quarter of 2013, Defendant Farnsworth stated that Cobalt had acquired a new survey of Block 20, "which has been extremely high quality."  Farnsworth stated that Lontra "is an oil field plus a very complex gas field."  When asked by a Credit Suisse analyst for "a little about how you are thinking about gas to oil ratios that you have seen, and how it might impact your view of the [Lontra] development," Farnsworth assured investors that "we know there is oil in this structure" and "this is not the big gas field" that Cobalt could not monetize.  Defendant Bryant stated that "we found a very good quality reservoir at Lontra, which encourages us for the entire block [Block 20]. . . ."

65

174.    These statements were materially false and misleading, and omitted material facts when made, including that (i) Sonangol required, and Cobalt agreed, to delay providing adverse information regarding its Angolan wells, including Lontra; and (ii) Cobalt knew that the Lontra well had a high gas content well before December 2013, but delayed in disclosing that information to investors at the insistence of Sonangol.

i)      **December 2013 Registration Statement**

175.    On December 30, 2013, Cobalt filed with the SEC a Form S-3 "shelf" Registration Statement and Prospectus (the "December 30, 2013 Registration Statement") that allowed the Company to make subsequent securities offerings.   This Registration Statement was signed by Defendants Bryant and Wilkirson, among others.  The December 30, 2013 Registration Statement incorporated Cobalt's (i) 2012 Form 10-K and (ii) 2013 Forms 10-Q by reference, and contained the same materially false statements and omissions identified in ¶¶162-64, including: (i) that Cobalt had "limited" familiarity with Nazaki and Alper; (ii) that Cobalt had "conducted an extensive investigation into the[] allegations [concerning its operations in Angola] and believe[d] that [its] activities in Angola . . . complied with all laws, including the FCPA"; (iii) that Nazaki was "a full paying member of the [Partnership]"; (iv) that "[o]ur oil-focused exploration efforts target pre-salt horizons on Blocks 9, 20 and 21 offshore Angola."; (v) that Cobalt had certain "social payment obligations" under the contracts for Blocks 9, 20 and 21, including its contributions for "social projects such as the Sonangol Research and Technology Center; and (vi) that Cobalt was obligated to pay approximately $337 million for these purported "social projects" in Angola  These statements were materially false and misleading, and omitted material facts when made, for the reasons set forth in ¶¶140-41 and 143 above.

### 4.   Defendants' Materially False And Misleading Statements And Omissions In 2014

#### a)   The 2013 Form 10-K and Related Statements

176.   On February 27, 2014, Cobalt filed with the SEC its Form 10-K for the year ended December 31, 2013 (the "2013 Form 10-K").  The 2013 Form 10-K was signed by Defendants Bryant and Wilkirson, among others.  The 2013 Form 10-K contained the same materially false and misleading statements set forth in ¶¶139 and 162, including that Cobalt: (i) had "limited" familiarity with Nazaki and Alper; (ii) had "conducted an extensive investigation into the[] allegations [concerning its operations in Angola] and believe[d] that [its] activities in Angola . . . complied with all laws, including the FCPA"; and that (iii) Nazaki was "a full paying member of the [Partnership]."  These statements were materially false and misleading and omitted material facts when made for the reasons set forth in ¶¶140-41 above.

177.   The 2013 Form 10-K further stated that Cobalt had certain "social payment obligations" under the contracts for Blocks 9, 20 and 21, including its contributions for "social projects such as the Sonangol Research and Technology Center."  Cobalt also stated that it was obligated to pay approximately $337 million for these purported "social projects" in Angola. These statements were materially false and misleading, and omitted material facts when made, for the reasons stated in ¶143.

178.   Also on February 27, 2014, Cobalt held an investor conference call.  During the call, analyst John Malone from Mizuho Securities asked whether "reservoir quality [was] still an open question there" in Block 9 (one of the two blocks, along with Block 21, involved in the Partnership).  Defendant Farnsworth responded by distinguishing Block 9 as particularly reliable. He stated that, based on "a new 3-D survey over the block" that Cobalt "required," it was "much to [Farnsworth's] delight" that Cobalt "found quite a large structure, which we think has a 250- to

500 million-barrel potential.  That's what's called Loengo . . . . [which was] certainly in a block that we know there's oil in it."

179.    The statements in ¶178 were materially false and misleading, and omitted material facts when made.  As Cobalt disclosed just eight months later, the Loengo well was a dry hole with no oil.  The statements in ¶178 also omitted that: (i) Sonangol required, and Cobalt agreed, to delay providing to investors adverse information regarding its Angolan wells; and (ii) Loengo was not a good prospect and there was "not even a remote chance" of success on the Loengo well.

### b)    The First Quarter 2014 Form 10-Q

180.    On May 1, 2014, Cobalt issued its Form 10-Q for the quarter ended March 31, 2014 (the "First Quarter 2014 Form 10-Q").  The First Quarter 2014 Form 10-Q incorporated by reference the same materially false and misleading statements set forth in ¶176 above.  In the Form 10-Q, Cobalt did not modify the "250- to 500 million barrel" estimate that it had previously given for Loengo's oil content.  These statements were materially false and misleading and omitted material facts when made for the reasons set forth in ¶¶140-41 and 179 above.

181.    Additionally, the First Quarter 2014 Form 10-Q included an "Operational Highlights" section which described Cobalt's various drilling projects in Angola and enumerated the Company's partners for each project.  With respect to Cobalt's Cameia and Loengo wells, Cobalt stated that Alper had a "10% working interest."  This statement was materially false and misleading, and omitted material facts when made.  As of March 25, 2014, Alper no longer had a working interest in either project.

### c)    The May 2014 Offering Materials

182.    On May 8, 2014, Cobalt issued to investors $1.3 billion worth of convertible senior notes due 2024 pursuant to, among other filings, a Prospectus Supplement filed with the SEC on May 9, 2014 (together with the other materials listed in ¶255 n.30, the "May 2014 Offering

68

Materials").  The May 2014 Offering Materials were issued pursuant to the December 30, 2013

Registration Statement, and incorporated Cobalt's (i) 2013 Form 10-K and (ii) First Quarter 2014

Form 10-Q by reference.

183.    Through this incorporation by reference, the May 2014 Prospectus contained the

same materially false statements and omissions identified in ¶¶176-77 and 181, including: (i) that

Cobalt had "limited" familiarity with Nazaki and Alper; (ii) that Cobalt had "conducted an

extensive investigation into the[] allegations [concerning its operations in Angola] and believe[d]

that [its] activities in Angola . . . complied with all laws, including the FCPA"; (iii) that Nazaki

was "a full paying member of the [Partnership]"; (iv) that "[o]ur oil-focused exploration efforts

target pre-salt horizons on Blocks 9, 20 and 21 offshore Angola"; (v) that Cobalt had certain "social

payment obligations" under the contracts for Blocks 9, 20 and 21, including its contributions for

"social projects such as the Sonangol Research and Technology Center; (vi) that Cobalt was

obligated to pay approximately $337 million for these purported "social projects" in Angola; and

(v) that Alper had a "10% working interest" in the Partnership.  These statements were materially

false and misleading, and omitted material facts when made, for the reasons set forth in ¶¶140-41,

143, and 181 above.

**d)    Second Quarter 2014<br>Form 10-Q and Related Statements**

184.    On August 5, 2014, Cobalt held an investor conference call in connection with its

Second Quarter 2014 results.  During the call, Bryant specified that Loengo was a "750 million-

barrel" prospect.  These statements were materially false and misleading, and omitted material

facts when made, because Cobalt knew that there was "not even a question" that Loengo was not

a good prospect and there was "not even a remote chance" of success on the Loengo well.  In fact,

Cobalt was "forced" to take Block 9, where it drilled Loengo, to satisfy Angola's state-owned Sonangol.

185.    On August 6, 2014, Cobalt filed its Form 10-Q for the second quarter of 2014 with the SEC (the "Second Quarter 2014 Form 10-Q").  In the Form 10-Q, Cobalt did not modify the "250- to 500 million-barrel" estimate that Cobalt had previously given (¶178) for Loengo's oil content, even after, according to the Form 10-Q, "Loengo was mapped using our 3-D seismic data."  Nor did the Form 10-Q modify the 750 million barrel estimate for Loengo stated by Bryant the day before.  These statements were materially false and misleading, and omitted material facts when made.  As Cobalt disclosed just three months later, the Loengo well was a dry hole with no oil.  These statements also omitted that: (i) Sonangol required, and Cobalt agreed, to delay providing to investors adverse information regarding its Angolan wells; and (ii) Loengo was not a good prospect and there was "not even a remote chance" of success on the Loengo well.

### B.    Additional Allegations of Defendants' Scienter

186.    As alleged herein, numerous facts, in addition to those discussed above, raise a strong inference that Defendants knew or were reckless in disregarding the true facts concerning Cobalt's operations in Angola.  Because scienter is not an element of Plaintiffs' claims under the Securities Act, the allegations set forth in this section pertain only to Plaintiffs' claims under the Exchange Act.

187.    *The Executive Defendants repeatedly denied specific accusations that Nazaki had a connection with the Angolan government, and repeatedly touted the quality of the Lontra and Loengo wells, assuring investors that they knew what they were speaking about.*  Accusations were made both before and throughout the Class Period that Cobalt's "partners" were, in fact, sham entities owned by Angolan government officials, including in a Global Witness report in 2010 and in a criminal complaint and *Financial Times* articles in 2012.  Defendants repeatedly denied all

allegations of any connection between Nazaki and senior Angolan government officials due to their supposed "extensive investigation," "extensive due diligence," and their expenditure of "significant human and financial resources to ensure that the appropriate compliance was undertaken."  In addition, Bryant stated that "[o]ur compliance efforts began in 2007," and "never end," adding that Cobalt had done "everything we can do."  Furthermore, as explained above (*see* ¶¶102-04, 106-07), Defendants repeatedly spoke about the oil content in the Lontra and Loengo wells, making specific comparisons to other Cobalt wells and providing specific figures regarding the wells' oil content.  Defendants' false representations repeated <u>over a period of years</u> that Cobalt was investigating Nazaki and found no connection to any Angolan officials, and with respect to the quality of the Lontra and Loengo wells, support a strong inference that Defendants acted with scienter.

188.   *It was widely known within Cobalt that Nazaki was owned by senior Angolan officials*.  Several former Cobalt employees explained that the Company and its executives knew during the Class Period that Nazaki was owned by senior Angolan officials.  For instance, Cobalt's Shorebase Foreman from February 2013 to June 2014 (see ¶71 n.20) stated that it was "common knowledge" at Cobalt that Nazaki was owned by three senior-level Angolan officials, explaining that "We all knew that.  My second or third day there, I learned this."  Further, according to the Shorebase Foreman, when Cobalt employees questioned that relationship, they were told "[t]hat's just the way you do business around here."  The Company's former CIO (*see* ¶72 n.21) also explained that Cobalt's Deputy Director in Angola, Antonio Vieira, was "pretty adamant" that there was "no way" Cobalt executives did not know that Vicente, Kopelipa, and Dino had government ties.  In addition, a former Cobalt chauffeur in Angola – who understood that Vicente, Kopelipa, and Dino owned Nazaki – explained that, beginning in 2011, he drove Cobalt executives including

Defendant Bryant, Richard Smith, Michael Drennon, John Kennedy, Kevin Curry, and others to over 20 separate meetings to meet with Vicente, Kopelipa, and Dino together, with these meetings happening before and after the closing of the contracts regarding the Blocks 9 and 21 and occurring on a floor of a building that Nazaki had rented.

189.    When Cobalt refused to identify the true owners of Nazaki and Alper, it was not because Cobalt did not know their identity, but instead on the grounds that doing so would supposedly "involve selective disclosure of non-public company information and, in some cases, to do so would also be a breach of the confidentiality provisions of agreements by which [Cobalt] are bound."  The widespread knowledge inside Cobalt of Nazaki's ownership by senior Angolan officials, and the Company's response to employees recognizing that fact, are further indicia of Defendants' scienter.

190.    *The Executive Defendants had access to information showing that the Angolan governmental officials owned Nazaki and Alper*.  As the Partnership's operator and one of the partners, and with offices, extensive contacts, and various employees located in Angola, the Company had access to various sources of information regarding the connection between Nazaki, Alper, and senior Angolan officials.  For instance, Cobalt had access to the basic corporate records for Nazaki and Alper.  As discussed above at ¶¶63-70, those documents showed that Nazaki and Alper were owned by Angolan governmental officials.  In addition, Cobalt had a long-standing relationship with Vicente, one of the owners of Nazaki and the head of one of Cobalt's partners, Sonangol.  When the *Financial Times* asked Vicente whether he owned Nazaki, he said he did.  Further, Vicente announced during a press conference in 2012 that, in continuing to conduct business in Angola, Cobalt was "disregarding the rules" in the United States.  The fact that Defendants had access to records and people who readily revealed the true owners of Nazaki and

Alper shows that Defendants knew, or were reckless in not knowing, those individuals' ownership interest.

191.     *Nazaki's and Alper's failures to comply with their responsibilities under the RSAs further demonstrated that they were sham entities.*  The RSAs for Blocks 9 and 21 required Nazaki and Alper to take certain actions.  These entities, along with Cobalt and Sonangol, were required to collectively coordinate and supervise the activities of exploration, appraisal, development, and production, "which constitute[d] the object of the" Partnership.  Among other things, they were obligated to establish an Operating Committee, which was to meet regularly to make operational and other decisions on Blocks 9 and 21.  However, as discussed above, Nazaki representatives stopped attending meetings in Houston by no later than late 2011, and Alper representatives stopped attending meetings in Houston by mid-2012.  Nazaki and Alper were also not given access to Partnership documents.  That Cobalt continued to represent that these entities were legitimate partners, notwithstanding the facts showing otherwise, is evidence of scienter.

192.     *Cobalt's Board of Directors insisted that the Company conduct an internal investigation of missing funds in Angola, leading to the demotion of Cobalt's Angola Country Manager.*  Multiple former Cobalt employees have explained that Cobalt conducted a bribery investigation in late 2011 and 2012.  According to the Company's former CIO, the Cobalt Board of Directors insisted that Cobalt conduct the investigation.  As discussed above in ¶¶83-91, the bribery investigation, which centered on Bryant's direct report – Cobalt's Senior Vice President and Country Manager for Angola, Richard Smith – focused on a large sum of money Smith spent in Angola that was "missing" and that Smith "couldn't account for."  The former CIO explained that Smith, who was involved in the negotiations with Sonangol representatives for Blocks 9 and 21, openly bragged to him and other Cobalt employees about his connections in the Angolan

government.  Angolan journalist de Morais has stated that Cobalt's Country Manager – who was Smith until late 2011 – was living in a house owned by Vicente, and paying "beyond" $30,000 to $40,000 in monthly rent as "bribes."  Cobalt's senior administrative assistant in Cobalt's human resources department from November 2009 to August 2013 (*see* ¶88 n.24) similarly understood that it was discovered through the course of Cobalt's internal investigation that Smith had bribed an Angolan official with whom Cobalt had been working to develop business in Angola, yet Smith was not fired.  The Executive Defendants knew, or were reckless in not knowing, through the findings of the Board's investigation, and any other things, that their statements to investors about their business practices in Angola were false and omitted material facts.

193.  *The Company discussed the delay of disclosing the truth about its wells at the insistence of Sonangol.*  Former Cobalt employees have revealed how executives were aware that Cobalt was intentionally delaying release of the disclosure that Lontra held a higher gas content than represented, and that Bryant ultimately decided when to release that information.  The Company's former CIO (*see* ¶72 n.21) stated Sonangol required Cobalt to "sit on information" prior to releasing it to investors regarding Angolan wells and it was a dynamic that was "openly talked about" at Cobalt.  The former CIO stated that there were emails going back and forth between Sonangol and Cobalt executives about this, and that one time when Cobalt disclosed something without Sonangol's approval, Cobalt "got in real trouble."  According to Cobalt's former CIO, Cobalt sat on the information regarding the Lontra well "a lot longer than they normally would."

194.  *Cobalt's operations in Angola were "core" operations for the Company.*  Cobalt is a small company, with only approximately 35 employees.  As Cobalt's Chief Financial Officer and Executive Vice President from June 2009 to June 2010 (*see* ¶61 n.7) has explained, Angola was a

key part of Cobalt's strategy and the Company laid out its Angolan strategy for banks and investors, and said that Angola was one of the Company's two core operations.  Cobalt's top officers, the Executive Defendants, controlled the Company's day-to-day operations and were informed of and responsible for monitoring important developments concerning Angola.  Indeed, throughout the Class Period, these Defendants were among those responsible for making specific communications to analysts and the press in response to specific questions concerning the Company's operations in Angola, the value of the Company's wells and prospects and the nature of the Company's Partnership.  Moreover, as explained by Cobalt's Chief Financial Officer and Executive Vice President from June 2009 to June 2010 (*see* ¶61 n.7), Bryant was "a very hands-on manager; he was very involved in all the details of the Gulf of Mexico [and] Angola."  In addition, as Cobalt has stated, because it has "a very small employee base compared to [its] competitors . . . each of [its] executives assumes greater responsibilities than they otherwise would" while working elsewhere.

195.   That Angola was a "core" operation for Cobalt is corroborated by the Company's repeated statements in its filings with the SEC, which stated that the Company had a "focus" in offshore Angola and highlighted the importance of its Angolan wells by describing them as, for instance, "world class" and "high impact."  In addition, while Cobalt has not yet reported any revenues from its operations in Angola, during the Class Period Cobalt attributed as much as 46% of its operating costs and expenses to its West Africa operations.  The importance of the Partnership and the offshore Angolan wells to the Company's bottom line further raises a strong inference that the Executive Defendants knew, or were reckless in not knowing, that their representations about the Partnership and its Angolan operations were false and omitted material facts.

196.   *Bryant's extensive experience in Angola and personal connections to senior Angolan officials raise a strong inference of scienter.*   Bryant had a long-standing connection to senior Angolan officials, including Vicente, which enabled Cobalt to obtain the rights to explore and drill in the Angolan Blocks 9, 20, and 21.   Prior to Cobalt's inception, Bryant had lived in Angola and established close relationships with many of the important figures at Sonangol, including the most powerful Sonangol representative: Vicente.   As explained by Cobalt's Chief Financial Officer and Executive Vice President from June 2009 to June 2010 (*see* ¶61 n.7), Bryant was the Cobalt employee with the longest relationships in Angola and Bryant's "in-country experience with [BP] in working with Sonangol gave him the ability [ ] to sell Cobalt's expertise to [Sonangol]."   Meanwhile, Vicente has admitted – when asked – that he knew Bryant "very well."   Accordingly, Bryant knew or was reckless in not knowing that Vicente, Kopelipa and Dino, owned, and would profit from, Nazaki's stake in the Partnership.

197.   *Cobalt delayed five months in disclosing that the Angolan government had terminated Alper's interest in the Partnership.*   Although the Angolan decree terminating Alper's interest in the Partnership was effective March 25, 2014, Cobalt's Form 10-Q for the first quarter of 2014, filed on May 1, 2014, had stated that Alper still had a 10% interest that Cobalt was carrying, and Cobalt did not disclose Alper's termination until August 27, 2014.   In addition, in Cobalt's August 27, 2014 disclosure of Nazaki's interest in the Partnership, Cobalt omitted that the government decrees ejecting Nazaki from the Partnership declared that Nazaki did not have "proven competence and financial capacity" to hold the blocks and that it repeatedly had not met its "economic and financial commitments."   Furthermore, all of Alper's and Nazaki's interests in the Partnership reverted to Sonangol, which was owned by the Angolan government.   As analysts at J.P. Morgan noted, it was "curious" that it took years to admit that Nazaki did not have "the

competence or financial capacity to be a genuine partner" with Cobalt.  Cobalt's failures to timely disclose the Angolan government's takeover of its partners, Nazaki's lack of "competence and financial capacity," and Nazaki's failures to meet its economic and financial commitments, are further strong indicia of the Executive Defendants' scienter.

### C.    <u>Loss Causation</u>

198.    Because loss causation is not an element of Plaintiffs' claims under the Securities Act, the allegations set forth in this section pertain only to Plaintiffs' claims under the Exchange Act.  In connection with Plaintiffs' Exchange Act claims, Defendants' misrepresentations and omissions of material fact alleged above in Section V.A. artificially inflated the price of Cobalt's securities during the Class Period.

199.    The artificial inflation created by Defendants' alleged misrepresentations and omissions was removed from the prices of Cobalt common stock, 2019 Bonds, and 2024 Bonds in direct response to information revealed in the disclosures alleged in this Section, through which facts that partially corrected Defendants' prior misrepresentations and omissions of material fact were revealed and/or the risks concealed by such misrepresented and omitted material facts partially materialized.

200.    On April 15, 2012, after the NYSE closed for trading, the *Financial Times* issued articles entitled "Spotlight falls on Cobalt's Angola partner" and "Angola officials held hidden oil stakes."  These articles stated that "Mr. Vicente and Manuel Hélder Vieira Dias Júnior, head of the military bureau in the presidency and known as General Kopelipa, confirmed to the FT last week that they had held shares in Nazaki.  They said Leopoldino Fragoso do Nascimento, known as General Dino, a former head of communications in the presidency, held shares too."  According to the *Financial Times*, Vicente and Kopelipa further stated that "their interests and those of General Leopoldino Fragoso do Nascimento were held through Grupo Aquattro Internacional. Aquattro is

named as a Nazaki shareholder in two company documents from 2007 and 2010 obtained by the FT."

201.    Following these revelations, the price of Cobalt common stock tumbled over 11% at the start of trading on April 16, 2012.  During the trading day, however, Cobalt issued a press release denying the allegations and refuting the truthfulness of the information set forth in the *Financial Times* articles.  The Company's immediate denial of wrongdoing contained the decline in Cobalt's stock price.  For example, analysts at J.P.Morgan stated on April 19, 2012 that based upon Defendants' representations, "Cobalt appears to have made no payments to Nazaki."  The report further stated that J.P. Morgan's analysts believed the issue would "likely go[] away."

202.    Following Defendants' denials, as set forth above in Section V.A., Defendants continued to make positive statements about Cobalt's Angolan oil wells from April 2012 through late 2013.  Then, on Sunday, December 1, 2013, Cobalt issued a press release reporting that the previously represented "massive" and "oil-focused" Lontra well, in fact, contained "more gas than [Cobalt's] pre-drill estimates" and was only economically viable for condensate/oil sales.  As a result of this partial disclosure, the Company announced that it was temporarily abandoning Lontra.

203.    The market was surprised by these disclosures.  For example, J.P. Morgan issued a December 2, 2013 report stating that "investors likely will question the partners' ability to commercialize the discovery, given the high natural gas content [of the Lontra exploration] and the vagueness about potential commercial options."  In response to the Company's December 1, 2013 disclosures about Lontra, Cobalt's stock price declined by approximately 21.2% (or $4.72 per share) from a close of $22.23 per share on November 29, 2013, to close at $17.51 per share on December 3, 2013, on heavier than usual trading volume of more than 35.4 million shares.

204.   These disclosures, however, did not fully reveal the misrepresented and concealed facts and risks concerning the value and prospects of the Company's Angolan wells.  Instead, Cobalt directed investors' attention to the Company's Loengo oil well.  Based upon the Company's positive representations, investors were led to believe that the impact of the Lontra failure on Cobalt's financial condition would not be significant.  For example, analysts at Credit Suisse reported on December 3, 2013 that Cobalt "still has plenty of inventory running room in Angola," while Morgan Stanley reported on December 3, 2013 that Cobalt was "Down Not Out" given that "[l]arge, high-impact prospects remain and are being drilled in 2014," including Loengo.

205.   On August 5, 2014, additional facts were disclosed that corrected Cobalt's representations throughout the Class Period about the Partnership and its supposedly legitimate "social payments."  Specifically, *Bloomberg* reported that Cobalt's "social payments" included substantial funding for an Angolan research center that did not exist.

206.   Also on August 5, 2014, Cobalt disclosed that the SEC's Enforcement Division had "recommend[ed] that the SEC institute an enforcement action against the Company, alleging violations of certain federal securities laws."  In this regard, the Company revealed that it had received a Wells Notice from the SEC "related to the investigation [the SEC] has been conducting relating to Cobalt's operations in Angola, and the allegations of Angolan government official ownership of Nazaki."  Cobalt further announced that as part of the SEC's potential enforcement action, the agency may seek remedies that include monetary penalties.

207.   In direct response to the August 5, 2014 disclosures concerning Cobalt's alleged illicit payments to Angolan officials, the prices of Cobalt securities fell dramatically.  Cobalt's common stock price declined by $1.75 per share, or more than 11%, from a close of $15.97 per

share on August 4, 2014, to close at $14.22 per share on August 5, 2014, on heavier than usual trading volume of more than 17 million shares.

208.    In the wake of the August 5, 2014 disclosures, Credit Suisse reported on August 14, 2014, that it was the ongoing DOJ action that was the "wildcard" for Cobalt.  Explaining that the market could not know the extent of the DOJ's investigation until "the SEC processes [Cobalt's] response to the [Wells] Notice (e.g. potentially next year)," the analyst explained that FCPA fines were typically larger when coming from the DOJ and directed investors to the DOJ's resolutions and "Principles of Prosecution" set forth in *A Resource Guide to the U.S. Foreign Corrupt Practices Act* (available at http://www.justice.gov/criminal/fraud/fcpa/guide.pdf), which differ from those of the SEC's civil investigation.  The DOJ investigation is ongoing.

209.    The risks concealed by Defendants' materially false and misleading statements and omissions of material fact concerning the Company's Angolan wells materialized on November 4, 2014.  At the beginning of trading that day, the Company announced that the "oil-focused" "very large prospect of Loengo" was nothing more than "a dry hole" devoid of any commercial hydrocarbons, and that Loengo had been "plugged and abandoned."  Cobalt further disclosed a $55 million impairment charge related to Loengo.  The Company further admitted that Loengo had been the "primary target in Block 9" and that Cobalt had not yet identified what, if any, were the next prospects in Block 9.

210.    Following the news about Loengo and Cobalt's negatively impacted financial results, Brean Capital, LLC reported on November 4, 2014 that "[t]he negative result was led by unsuccessful drilling efforts at the Loengo #1 pre-salt prospect, giving rise to a $55MM impairment charge that we had not anticipated, and higher-than-expected other exploration

expenses of $38MM compared to our estimates of $10MM." UBS similarly reported on November 4, 2014, that "Disappointing Loengo Results Hurt Already Discounted Shares."

211.   In direct response to the November 4, 2014 disclosures, the price of Cobalt's common securities declined in value. The price of the Company's common stock declined by 11.5% from $11.38 per share at the close of trading on November 3, 2014, to $10.07 per share at the close of trading on November 4, 2014 on heavier than usual trading volume of more than 15 million shares.

212.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiffs and other Class members. Had Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Plaintiffs and other Class members would not have purchased or otherwise acquired Cobalt's securities, or would not have purchased or otherwise acquired these securities at the artificially inflated prices that they paid. It was also entirely foreseeable to Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of Cobalt securities and that the ultimate disclosure of this information, and/or the materialization of the risks concealed by Defendants' material misstatements and omissions, would cause the price of Cobalt securities to decline.

213.   The economic loss, i.e., damages, suffered by Plaintiffs and other Class members directly resulted from Defendants' materially false and misleading statements and omissions of material fact, which artificially inflated the price of the Company's securities when the truth was revealed and/or the risks previously concealed by Defendants' material misstatements and omissions materialized. As a result of the previously misrepresented and concealed material information and risks that were disclosed on April 15, 2012, December 1, 2013, August 5, 2014

and November 4, 2014, and the corresponding substantial decline in the price of Cobalt securities as the market absorbed this information, Plaintiffs and other Class members have suffered economic loss.

**D.     Presumption of Reliance**

214.     Because reliance is not an element of Plaintiffs' claims under the Securities Act, the allegations set forth in this section pertain only to Plaintiffs' claims under the Exchange Act.  At all relevant times, the market for Cobalt's common stock was efficient for the following reasons, among others:

(a) Cobalt's stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b) As a regulated issuer, Cobalt filed periodic reports with the SEC and the New York Stock Exchange;

(c) Cobalt regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Cobalt was followed by numerous securities analysts employed by major brokerage firms, including Credit Suisse and Brean Capital, LLC, and who wrote reports which were distributed to those brokerage firms' sales force and certain customers.  Each of these reports was publicly available and entered the public market place.

215.     As a result of the foregoing, the market for Cobalt's common stock reasonably promptly digested current information regarding Cobalt from all publicly available sources and reflected such information in the price of Cobalt's common stock. All purchasers of Cobalt common stock during the Class Period suffered similar injury through their purchase of Cobalt common stock at artificially inflated prices, and a presumption of reliance applies.

216.     A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S.

128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## VI.    VIOLATIONS OF THE SECURITIES ACT

217.    Plaintiffs' claims under the Securities Act do not sound in fraud and Plaintiffs expressly disavow and disclaim any allegations of fraud, scheme or intentional conduct as part of their claims under the Securities Act.  Any allegations of fraud, fraudulent conduct, or motive are specifically disclaimed from the following allegations for the purposes of Plaintiffs' claims under the Securities Act, which do not have scienter, fraudulent intent or motive as required elements. To the extent that these allegations incorporate factual allegations elsewhere in this Complaint, those allegations are incorporated only to the extent that such allegations do not allege fraud, scienter, or intent of the Defendants to defraud Plaintiffs or members of the Class.

218.    As alleged below, Cobalt and other Defendants made a series of materially untrue statements and omissions of material facts in Cobalt's registration statements, prospectuses and prospectus supplements in connection with the Company's five securities Offerings during the Class Period, and in the Company's public filings incorporated by reference into and therefore deemed part of the registration statements, prospectuses and prospectus supplements for the Offerings.

219.    Defendants' untrue statements of material fact included, among other things, that: (i) Nazaki and Alper were legitimate "partners" in the Partnership; (ii) despite its own "extensive due diligence" and "extensive investigations" into that Partnership, Cobalt was unaware of the underlying facts concerning the true nature of Nazaki and Alper, which had created a significant risk of regulatory action; (iii) Cobalt was likewise unaware of any improper connection between Angolan government officials and Nazaki and Alper; (iv) Cobalt's payments for the Sonangol

Research and Technology Center were legitimate "social payments"; (v) Alper remained a member of the Partnership well after March 25, 2014; and (vi) the Company had two "key" "oil-focused" wells in Lontra and Loengo, which would be significant discoveries for the Company in Angola.

220.    Defendants' representations were untrue and omitted material facts when made, including that:  (i) Nazaki and Alper were, in fact, controlled by Angolan government officials; (ii) far from a "fully paying" and beneficial partner, Nazaki lacked the "competence and financial capacity" to be a legitimate business partner in Cobalt's oil exploration activities in Angola; (iii) the Sonangol Research and Technology Center for which "customary" social payments were purportedly made does not (and never did) exist; (iv) the Company's Board of Directors ordered the Company to conduct an internal investigation into the activities of Cobalt's Senior Vice President and Country Manager for Angola in response to concerns over a large sum of money spent in Angola that he "couldn't account for," which led to his removal from his post in Angola; (v) Cobalt's "key" Lontra and Loengo wells were not, in fact, "oil-focused" – Lontra contained less oil (and far more gas) than Cobalt had represented and Loengo was nothing more than a "dry hole," which the Company would later be forced to abandon; and (vi) Sonangol requested, and Cobalt agreed, to delay making timely disclosures of adverse information to investors about its Angolan wells, including the existence of lower amounts of oil at Lontra than Cobalt had stated, and no oil at Loengo.

### A.    The February 2012 Common Stock Offering

221.    On February 23, 2012, Cobalt and certain selling shareholders of Cobalt common stock offered to investors 59.8 million shares of Cobalt common stock (including a 7.8 million over-allotment option granted to the underwriters) at a price of $28.00 per share (the "February 2012 Common Stock Offering").  The underwriters of the February 2012 Common Stock Offering

were Goldman Sachs, Morgan Stanley, Credit Suisse, CGMI, J.P. Morgan, Tudor, Deutsche Bank, RBC, UBS, Howard Weil, Stifel Nicolaus, and Capital One.

222.    In the February 2012 Common Stock Offering, Cobalt offered at least 18.1 million shares of Cobalt common stock for sale, and the following selling shareholders sold at least the number of shares of Cobalt common stock identified below:

| | |
|---|---:|
| The Carlyle/Riverstone Funds | 11,907,228 |
| The First Reserve Funds | 11,799,154 |
| The Goldman Sachs Group, Inc. | 11,908,050 |
| The KERN Fund | 5,095,298 |
| Joseph H. Bryant | 862,500 |
| James H. Painter | 32,770 |
| Van P. Whitfield | 100,000 |
| Jack E. Golden | 45,000 |

223.    The February 2012 Common Stock Offering was conducted pursuant to the "shelf" Registration Statement and Prospectus filed with the SEC on Form S-3 on January 4, 2011 (the "January 2011 Registration Statement and Prospectus").  The January 2011 Registration Statement and Prospectus was signed by Defendants Bryant, Wilkirson, Coneway, Cornell, Golden, Lancaster, Marshall, Moore, Murchison, Pontarelli, Scoggins, van Steenbergen, and Young, each of whom was a Director of Cobalt.

224.    The January 2011 Registration Statement and Prospectus characterized "information incorporated by reference [as] an important part of th[e] prospectus." The January 2011 Registration Statement and Prospectus expressly incorporated by reference, among other Cobalt public filings, the Company's (i) Annual Report on Form 10-K for the year ended December 31, 2009, (ii) Quarterly Reports on Form 10-Q for the quarters ended March 31, 2010, June 30,

85

2010 and September 30, 2010, and (iii) Current Reports on Form 8-K dated January 29, 2010, February 24, 2010, May 4, 2010, May 12, 2010, May 24, 2010 and June 16, 2010 (collectively, "Cobalt's 2010 Section 13(a) Filings").

225.   The January 2011 Registration Statement stated that information Cobalt later filed with the SEC would "automatically update and supersede this information."  It also incorporated "all documents subsequently filed with the SEC pursuant to Section 13(a) . . . of the Securities Exchange Act of 1934, as amended, prior to the termination of the offering under th[e] prospectus." Accordingly, documents Cobalt thereafter publicly filed with the SEC pursuant to Section 13(a), including its subsequent annual reports on Forms 10-K, quarterly reports on Forms 10-Q, and current reports on Forms 8-K, updated and superseded Cobalt's 2010 Section 13(a) Filings and became part of the January 2011 Registration Statement and Prospectus and the February 2012 Offering Materials.[26]

226.   The February 2012 Offering Materials therefore incorporated by reference Cobalt's (i) 2010 Form 10-K; (ii) March 11, 2011 Form 8-K; (iii) December 20, 2011 Form 8-K; and (iv) 2011 Form 10-K. Through the incorporation by reference of these filings, the February 2012 Offering Materials contained untrue statements and omissions of material fact concerning  Cobalt's Angolan operations, including that: (i) Cobalt had "limited" familiarity with its Angolan partners Nazaki and Alper; (ii) Cobalt knew only of "allegations . . .of a connection between senior Angolan government officials and Nazaki"; (iii) Nazaki was a "full paying member of the contractor group for Blocks 9 and 21"; (iv) Cobalt had "conducted an extensive investigation into the[] allegations

---

[26] The January 4, 2011 Registration Statement; Cobalt's Preliminary Prospectus Supplement Subject to Completion, and accompanying Prospectus, filed with the SEC on February 21, 2012; and Cobalt's Prospectus Supplement, and accompanying Prospectus, filed with the SEC on February 24, 2012, as well as Cobalt's public filings incorporated by reference therein, are referred to collectively herein as the "February 2012 Offering Materials."

[concerning its operations in Angola] and believe[d] that [its] activities in Angola . . . complied with all laws, including the FCPA"; and (v) Cobalt had paid millions in purported "social payment obligations" to fund "social projects" in Angola, including the Sonangol Research and Technology Center.

227.    These statements were untrue because (i) contrary to Defendants' statements that they had "limited" familiarity with Nazaki and Alper, and that Defendants knew only of "allegations . . . of a connection between senior Angolan government officials and Nazaki," that entity was in fact owned by Angolan government officials; (ii) Nazaki's and Alper's foundational documents revealed that they were owned by Angolan government officials; and (iii) Cobalt's payments were not "social payment obligations" or "social project" payments to fund the Sonangol Research and Technology Center, but rather illegitimate payments made in exchange for Cobalt's access to Blocks 9, 20, and 21.

228.    These statements also omitted material facts when made, including that (i) Nazaki and Alper were owned by Angolan government officials; (ii) Nazaki lacked the "competence and financial capacity" to be a legitimate business partner in Cobalt's oil exploration activities in Angola; (iii) Nazaki had repeatedly failed to comply with its economic and financial commitments for the costs associated with the operations of the Partnership; (iv) Nazaki's and Alper's connections to the Angolan government posed a significant risk of FCPA violations and regulatory action; (v) Defendants did not reasonably believe that their "activities in Angola have complied with all laws, including the Foreign Corrupt Practices Act"; (vi) the Sonangol Research and Technology Center did not exist; (vii) Cobalt made improper payments to Angolan government officials and large sums of money could not be accounted for, which led to a Board investigation and the removal of Cobalt's Senior Vice President and Country Manager for Angola; and (viii)

Cobalt's  payments to Angolan government officials posed a significant risk of FCPA violations and regulatory action.

229.    Through the incorporation by reference of the (i) 2010 Form 10-K; (ii) March 11, 2011 Form 8-K; (iii) December 20, 2011 Form 8-K; and (iv) 2011 Form 10-K, the February 2012 Offering Materials also contained untrue statements and omissions of material fact concerning Cobalt's Angolan wells, including that: (i) "[a]ll of [Cobalt's] prospects are oil-focused"; and (ii) Cobalt "continue[d] to mature high impact prospects in [its] portfolio for upcoming exploratory drilling in . . .the deepwater offshore Angola."  The February 2012 Offering Materials further stated that the Lontra and Loengo wells were "large, oil-focused high impact wells."

230.    The statements identified in ¶229 were untrue because (i) Cobalt's Lontra and Loengo wells were not "high impact" or "oil-focused," and Cobalt was forced to disclose facts showing that Lontra held a higher gas content than represented, and Loengo was a "dry hole"; and (ii) Cobalt acknowledged the SEC's concern that the "characterization of the [Angolan] prospects as 'high impact' appears to be without the requisite degree of support" by discontinuing the Company's use of that term in later Forms 10-Q and 10-K filed with the SEC.

231.    The statements identified in ¶229 also omitted material facts when made, including that:  (i) Sonangol required Cobalt to "sit on" information regarding its Angolan wells; and (ii) Loengo was not a good prospect and there was "not even a remote chance" of success on the Loengo well.

**B.**       **The December 2012 Bond Offering**

232.    On December 12, 2012, Cobalt issued to investors $1.38 billion worth of convertible senior notes due 2019 (including a $180 million over-allotment granted to the

underwriters) (the "December 2012 Bond Offering").  The underwriters for Cobalt's December 12, 2012 Bond Offering were Defendants Goldman Sachs and Morgan Stanley.

233.    The December 2012 Bond Offering was conducted pursuant to the January 2011 Registration Statement and Prospectus signed by Defendants Bryant, Wilkirson, Coneway, Cornell, Golden, Lancaster, Marshall, Moore, Murchison, Pontarelli, Scoggins, van Steenbergen, and Young.

234.    In connection with the December 2012 Bond Offering, Cobalt also filed with the SEC the December 2012 Offering Materials.[27]  The December 2012 Offering Materials characterized "information incorporated by reference [as] an important part of th[e] prospectus."  The December 2012 Offering Materials also expressly incorporated by reference, among other Cobalt public filings, the Company's (i) 2011 Form 10-K and (ii) 2012 Forms 10-Q, which became part of the January 2011 Registration Statement and December 2012 Offering Materials.

235.    Through the incorporation by reference of the (i) 2011 Form 10-K; and (ii) 2012 Forms 10-Q, the December 2012 Offering Materials contained untrue statements and omissions of material fact concerning Cobalt's Angolan operations, including that (a) Cobalt had "limited" familiarity with its Angolan partners Nazaki and Alper; (b) Cobalt knew only of "allegations . . .of a connection between senior Angolan government officials and Nazaki"; (c) Nazaki was a "full paying member of the contractor group for Blocks 9 and 21"; (d) Cobalt had "conducted an extensive investigation into the[] allegations [concerning its operations in Angola] and believe[d] that [its] activities in Angola . . . complied with all laws, including the FCPA"; and (e) Cobalt had

---

[27] The January 4, 2011 Registration Statement; Cobalt's Preliminary Prospectus Supplement Subject to Completion, and accompanying Prospectus, filed with the SEC on December 11, 2012; and Cobalt's Prospectus Supplement, and accompanying Prospectus, filed with the SEC on December 13, 2012, as well as Cobalt's public filings incorporated by reference therein, are referred to collectively herein as the "December 2012 Offering Materials."

paid millions in purported "social payment obligations" to fund "social projects" in Angola, including the Sonangol Research and Technology Center.

236.    These statements were untrue because (i) contrary to Defendants' statements that they had "limited" familiarity with Nazaki and Alper, and that Defendants knew only of "allegations … of a connection between senior Angolan government officials and Nazaki," that entity was in fact owned by Angolan government officials; (ii) Nazaki's and Alper's foundational documents revealed that they were owned by Angolan government officials; and (iii) Cobalt's payments were not "social payment obligations" or "social project" payments to fund the Sonangol Research and Technology Center, but rather illegitimate payments made in exchange for Cobalt's access to Blocks 9, 20, and 21.

237.    These statements also omitted material facts when made, including that (i) Nazaki and Alper were owned by Angolan government officials; (ii) Nazaki lacked the "competence and financial capacity" to be a legitimate business partner in Cobalt's oil exploration activities in Angola; (iii) Nazaki had repeatedly failed to comply with its economic and financial commitments for the costs associated with the operations of the Partnership; (iv) Nazaki's and Alper's connections to the Angolan government posed a significant risk of FCPA violations and regulatory action; (v) Defendants did not reasonably believe that their "activities in Angola have complied with all laws, including the Foreign Corrupt Practices Act"; (vi) the Sonangol Research and Technology Center did not exist; (vii) Cobalt made improper payments to Angolan government officials and large sums of money could not be accounted for, which led to a Board investigation and the removal of Cobalt's Senior Vice President and Country Manager for Angola; and (viii) Cobalt's  payments to Angolan government officials posed a significant risk of FCPA violations and regulatory action.

238.    Through the incorporation by reference of the (i) 2011 Form 10-K and (ii) 2012 Forms 10-Q, the December 2012 Offering Materials also contained untrue statements and omissions of material fact concerning Cobalt's Angolan wells, including that (a) "[a]ll of [Cobalt's] prospects are oil-focused"; and (b) Cobalt "continue[d] to mature high impact prospects in [its] portfolio for upcoming exploratory drilling in . . . the deepwater offshore Angola."

239.    The statements identified in ¶238 were untrue because (i) Cobalt's Lontra and Loengo wells were not "high impact" or "oil-focused," and Cobalt was forced to disclose facts showing that Lontra held a higher gas content than represented, and Loengo was a "dry hole"; and (ii) Cobalt acknowledged the SEC's concern that the "characterization of the [Angolan] prospects as 'high impact' appears to be without the requisite support" by discontinuing the Company's use of that term in later Forms 10-Q and 10-K filed with the SEC.

240.    The statements identified in ¶238 also omitted material facts when made, including that (i) Sonangol required Cobalt to "sit on" information regarding its Angolan wells; and (ii) Loengo was not a good prospect and there was "not even a remote chance" of success on the Loengo well.

**C.    The January 2013 Common Stock Offering**

241.    On January 16, 2013, certain Cobalt selling shareholders conducted a common stock offering pursuant to which they collectively offered to investors 40 million shares of Cobalt common stock at a price of $25.15 per share (the "January 2013 Common Stock Offering").  The underwriters of the January 2013 Common Stock Offering were Defendants Morgan Stanley and CGMI.

242.    In the January 2013 Common Stock Offering, the following selling shareholders sold at least the identified number of shares of Cobalt common stock:

| | |
|---|---|
| The Carlyle/Riverstone Funds | 13,049,550 |
| The First Reserve Funds | 10,000,000 |
| The Goldman Sachs Group, Inc. | 13,050,450 |
| The KERN Fund | 3,900,000 |

243.    The January 2013 Common Stock Offering was conducted pursuant to the January 2011 Registration Statement and Prospectus signed by Defendants Bryant, Wilkirson, Coneway, Cornell, Golden, Lancaster, Marshall, Moore, Murchison, Pontarelli, Scoggins, van Steenbergen, and Young.

244.    In connection with the January 2013 Common Stock Offering, Cobalt also filed with the SEC the January 2013 Offering Materials.[28]  The January 2013 Offering Materials characterized "information incorporated by reference [as] an important part of th[e] prospectus."  The January 2013 Offering Materials also expressly incorporated by reference, among other Cobalt public filings, the Company's (i) 2011 Form 10-K, and (ii) 2012 Forms 10-Q, which became part of the January 2011 Registration Statement and January 2013 Offering Materials.

245.    Through the incorporation by reference of the (i) 2011 Form 10-K and (ii) 2012 Forms 10-Q, the January 2013 Offering Materials contained the untrue statements and omissions of material fact identified in ¶¶235 and 238 concerning Cobalt's Angolan operations and the quality of Cobalt's Angolan wells.  These statements identified in ¶¶235 and 238 were untrue and omitted material facts when made for the reasons set forth in ¶¶236-37 and 239-40.

---

[28] The January 4, 2011 Registration Statement; Cobalt's Preliminary Prospectus Supplement Subject to Completion, and accompanying Prospectus, filed with the SEC on January 16, 2013; and Cobalt's Prospectus Supplement, and accompanying Prospectus, filed with the SEC on January 17, 2013, as well as Cobalt's public filings incorporated by reference therein, are referred to collectively herein as the "January 2013 Offering Materials."

### D.   <u>The May 2013 Common Stock Offering</u>

246.   On May 8, 2013, certain Cobalt selling shareholders conducted a common stock offering pursuant to which they collectively offered to investors 50.0 million shares of Cobalt common stock (including a 7.5 million over-allotment option granted to the underwriters) at a price of $26.62 per share (the "May 2013 Common Stock Offering").  The underwriter of the May 2013 Offering was CGMI.

247.   In the May 2013 Common Stock Offering, the following selling shareholders sold at least the identified number of shares of Cobalt common stock:

| | |
|---|---|
| The Carlyle/Riverstone Funds | 15,083,328 |
| The First Reserve Funds | 15,832,304 |
| The Goldman Sachs Group, Inc. | 15,084,368 |
| The KERN Fund | 4,000,000 |

248.   The May 2013 Common Stock Offering was conducted pursuant to the January 2011 Registration Statement and Prospectus signed by Defendants Bryant, Wilkirson, Coneway, Cornell, Golden, Lancaster, Marshall, Moore, Murchison, Pontarelli, Scoggins, van Steenbergen, and Young.

249.   In connection with the May 2013 Common Stock Offering, Cobalt also filed with the SEC the May 2013 Offering Materials.[29]   The May 2013 Offering Materials characterized "information incorporated by reference [as] an important part of th[e] prospectus."  The May 2013

---

[29] The January 4, 2011 Registration Statement; Cobalt's Free Writing Prospectus filed with the SEC on May 7, 2013; Cobalt's Preliminary Prospectus Supplement Subject to Completion, and accompanying prospectus, filed with the SEC on May 8, 2013; and Cobalt's Prospectus Supplement, and accompanying Prospectus, filed with the SEC on May 9, 2013, as well as Cobalt's public filings incorporated by reference therein, are referred to collectively herein as the "May 2013 Offering Materials."

Offering Materials also expressly incorporated by reference, among other Cobalt public filings, the Company's (i) 2012 Form 10-K, and (ii) First Quarter 2013 Form 10-Q. Cobalt's Form 8-K filed on February 26, 2013 was also incorporated by reference in the May 2013 Offering Materials. These SEC filings all became part of the January 2011 Registration Statement and May 2013 Offering Materials.

250. Through the incorporation by reference of the (i) 2012 Form 10-K and (ii) First Quarter 2013 Form 10-Q, the May 2013 Offering Materials contained the untrue statements and omissions of material fact identified in ¶235 about Cobalt's Angolan operations. These statements identified in ¶235 were untrue and omitted material facts when made for the reasons set forth in ¶¶236-37.

251. Additionally, the May 2013 Offering Materials stated that "[a]ll of [Cobalt's] prospects are oil-focused." The May 2013 Offering Materials also incorporated by reference the February 26, 2013 Form 8-K, wherein Defendant Farnsworth stated that "every well we drill this year in Angola . . . will be significant." These statements were untrue because Cobalt's Lontra and Loengo wells were not "oil-focused" or "significant," and Cobalt was forced to disclose facts showing that Lontra held a higher gas content than represented, and Loengo was a "dry hole." These statements also omitted material facts when made, including that (i) Sonangol required Cobalt to "sit on" information regarding its Angolan wells; and (ii) Loengo was not a good prospect and there was "not even a remote chance" of success on the Loengo well.

### E.    The May 2014 Bond Offering

252. On May 8, 2014, Cobalt issued to investors $1.3 billion worth of convertible senior notes due 2024 (including a $150 million over-allotment granted to the underwriters) (the "May

2014 Bond Offering"). The underwriters for Cobalt's May 2014 Bond Offering were Defendants Goldman Sachs, RBC, Credit Suisse, CGMI, and Lazard.

253.   The May 2014 Bond Offering was conducted pursuant to another "shelf" Registration Statement and Prospectus that Cobalt filed with the SEC on December 30, 2013 (the "December 2013 Registration Statement and Prospectus"), which was signed by Cobalt Directors Bryant, Wilkirson, Coneway, Golden, Marshall, Moore, Scoggins, van Steenbergen, Utt, and Young.

254.   The December 2013 Registration Statement and Prospectus characterized "information incorporated by reference [as] an important part of th[e] prospectus." The December 2013 Registration Statement and Prospectus also expressly incorporated by reference, among other Cobalt public filings, the Company's (i) 2012 Form 10-K and (ii) 2013 Forms 10-Q.

255.   In connection with the May 2014 Bond Offering, Cobalt also filed with the SEC the May 2014 Offering Materials.[30] The May 2014 Offering Materials also characterized "information incorporated by reference [as] an important part of th[e] prospectus." The May 2014 Offering Materials expressly incorporated by reference, among other Cobalt public filings, the Company's (i) 2013 Form 10-K and (ii) First Quarter 2014 Form 10-Q, which became part of the December 2013 Registration Statement and May 2014 Offering Materials.

256.   Through the incorporation by reference of the 2013 Form 10-K, the May 2014 Offering Materials contained untrue statements and omissions of material fact concerning Cobalt's

---

[30] The December 30, 2013 Registration Statement; Cobalt's Preliminary Prospectus Supplement Subject to Completion, and accompanying Prospectus, filed with the SEC on May 7, 2014; and Cobalt's Prospectus Supplement, and accompanying Prospectus, filed with the SEC on May 9, 2014, as well as Cobalt's public filings incorporated by reference therein, are referred to collectively herein as the "May 2014 Offering Materials" (together with the February 2012 Offering Materials, the December 2012 Offering Materials, the January 2013 Offering Materials, and the May 2013 Offering Materials, the "Offering Materials").

Angolan operations, including that (i) Cobalt had "limited" familiarity with its Angolan partners Nazaki and Alper; (ii) Cobalt knew only of "allegations . . .of a connection between senior Angolan government officials and Nazaki"; (iii) Nazaki was a "full paying member of the contractor group for Blocks 9 and 21"; (iv) Cobalt had "conducted an extensive investigation into the[] allegations [concerning its operations in Angola] and believe[d] that [its] activities in Angola . . .complied with all laws, including the FCPA"; and (v) Cobalt had paid millions in purported "social payment obligations" to fund "social projects" in Angola, including the Sonangol Research and Technology Center.

257.    These statements were untrue because (i) contrary to Defendants' statements that they had "limited" familiarity with Nazaki and Alper, and that Defendants knew only of "allegations … of a connection between senior Angolan government officials and Nazaki," that entity was in fact owned by Angolan government officials; (ii) Nazaki's and Alper's foundational documents revealed that they were owned by Angolan government officials; and (iii) Cobalt's payments were not "social payment obligations" or "social project" payments to fund the Sonangol Research and Technology Center, but rather illegitimate payments made in exchange for Cobalt's access to Blocks 9, 20, and 21.

258.    These statements also omitted material facts when made, including that (i) Nazaki and Alper were owned by Angolan government officials; (ii) Nazaki lacked the "competence and financial capacity" to be a legitimate business partner in Cobalt's oil exploration activities in Angola; (iii) Nazaki had repeatedly failed to comply with its economic and financial commitments for the costs associated with the operations of the Partnership; (iv) Nazaki's and Alper's connections to the Angolan government posed a significant risk of FCPA violations and regulatory action; (v) Defendants did not reasonably believe that their "activities in Angola have complied

with all laws, including the Foreign Corrupt Practices Act"; (vi) the Sonangol Research and Technology Center did not exist; (vii) Cobalt made improper payments to Angolan government officials and large sums of money could not be accounted for, which led to a Board investigation and the removal of Cobalt's Senior Vice President and Country Manager for Angola; and (viii) Cobalt's payments to Angolan government officials posed a significant risk of FCPA violations and regulatory action.

259.   The May 2014 Offering Materials further stated that "our oil-focused below-salt exploration efforts have been successful. . . ."  This statement was untrue because Cobalt's Loengo well was not "oil-focused" or "successful," and Cobalt was forced to disclose facts showing that Loengo was a "dry hole."  These statements also omitted material facts when made, including that: (i) Sonangol required Cobalt to "sit on" information regarding its Angolan wells; and (ii) Loengo was not a good prospect and there was "not even a remote chance" of success on the Loengo well.

260.   The First Quarter 2014 Form 10-Q incorporated by reference in the May 2014 Offering Materials also included an "Operational Highlights" section which described Cobalt's various drilling projects in Angola and enumerated the Company's partners for each project.  With respect to Cobalt's Cameia and Loengo wells, Cobalt stated that Alper had a "10% working interest."  This statement was untrue and omitted material facts when made.  As of March 25, 2014, Alper no longer had a working interest in either project.

## VII.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

261.   The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint.  None of the statements complained of herein was a forward-looking statement.  Rather, they were historical statements or statements of purportedly current

facts and conditions at the time the statements were made, including statements about Cobalt's current and historical Partnership, its payments for the Sonangol Research and Technology Center, and its Lontra and Loengo wells.

262.    To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.   As set forth above in detail, then-existing facts contradicted Defendants' statements regarding Cobalt's Partnership and the Lontra and Loengo wells, among others.   Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Cobalt were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

263.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was authorized and approved by an executive officer of Cobalt who knew that the statement was false when made.

## VIII.   CLASS ACTION ALLEGATIONS

264.    This securities class action is brought on behalf of purchasers of Cobalt's securities between March 1, 2011 and November 3, 2014, inclusive (the "Class Period"), including persons who purchased or otherwise acquired:   (i) Cobalt securities on the open market; (ii) Cobalt's common stock pursuant and/or traceable to registered public offerings conducted on or about February 23, 2012, January 16, 2013 and May 8, 2013 (the "Stock Offerings"); and/or (iii) Cobalt's

2.625% Convertible Senior Notes due 2019, pursuant and/or traceable to the registered public offering conducted on or about December 12, 2012, and/or Cobalt 3.125% Convertible Senior Notes due 2024, pursuant and/or traceable to the registered public offering conducted on or about May 8, 2014 (the "Bond Offerings"; collectively with the Stock Offerings, the "Offerings") (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of Cobalt and their families and affiliates.

265.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Cobalt has more than 412 million shares of common stock outstanding, owned by hundreds or thousands of investors.

266.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a)      Whether Defendants violated the Securities Act;

b)      Whether Defendants violated the Exchange Act;

c)      Whether Defendants misrepresented material facts;

d)      Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

e)      Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

f)      Whether the prices of Cobalt's securities were artificially inflated;

g)      Whether Defendants' conduct caused the members of the Class to sustain damages; and

h)      The extent of damage sustained by Class members and the appropriate measure of damages.

267.    Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

268.    Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.

269.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy

## IX.    CLAIMS FOR RELIEF

### COUNT I

#### For Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5 Against Cobalt And The Executive Defendants

270.    Plaintiffs repeat and reallege each and every allegation contained above (other than disclaimers of fraud claims) as if fully set forth herein.

271.    During the Class Period, Cobalt and the Executive Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Cobalt securities at artificially inflated prices.

272.    Cobalt and the Executive Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Cobalt's securities in violation of Section

10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

273.    Cobalt and the Executive Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operation and prospects.

274.    During the Class Period, Cobalt and the Executive Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

275.    Cobalt and the Executive Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  Cobalt and the Executive Defendants engaged in this misconduct to conceal Cobalt's true condition from the investing public and to support the artificially inflated prices of the Company's securities.

276.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Cobalt's securities.  Plaintiffs and the Class would not have purchased the Company's securities at the prices they paid, or at all, had they been aware that the market prices for Cobalt's securities had been artificially inflated by Cobalt and the Executive Defendants' fraudulent course of conduct.

277.    As a direct and proximate result of Cobalt and the Executive Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered economic loss and damages in

connection with their respective purchases of the Company's securities during the Class Period as the prior artificial inflation in the price of Cobalt's securities was removed over time.

278.    By virtue of the foregoing, Cobalt and the Executive Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violations Of Section 20(a) Of The Exchange Act Against The Executive Defendants

279.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above (other than disclaimers of fraud claims) as if fully set forth herein.

280.    As alleged above, Cobalt and the Executive Defendants each violated Section 10(b) and Rule 10b-5 thereunder by their acts and omissions as alleged in this Complaint.

281.    The Executive Defendants acted as controlling persons of Cobalt within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control the materially false and misleading public statements about Cobalt during the Class Period, the Executive Defendants had the power and ability to control the actions of Cobalt and its employees.  By reason of such conduct, the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## COUNT III

### For Violations Of Section 11 Of The Securities Act Against Cobalt, The Director Defendants And The Underwriter Defendants

282.    Plaintiffs repeat and reallege ¶¶217-60 as if fully set forth herein only to the extent, that such allegations do not allege fraud, scheme, motive, scienter or intentional conduct by the Defendants to defraud Plaintiffs or members of the Class.  This Section 11 claim does not sound

in fraud and Plaintiffs expressly disavow and disclaim any allegations of fraud, scheme, motive, scienter or intentional conduct as part of this claim, which does not have scienter or fraudulent intent as required elements.  To the extent that these allegations incorporate factual allegations elsewhere in this Complaint, those allegations are incorporated only to the extent that such allegations do not allege fraud, scheme, motive, scienter or intentional conduct to defraud Plaintiffs or members of the class.  This count is predicated upon Defendants' liability for making untrue statements and omissions of material fact in the Registration Statements.

283.    This claim is brought against Cobalt and the Director and Underwriter Defendants pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all proposed Class members who purchased or otherwise acquired Cobalt's common stock or convertible notes in or traceable to the Registration Statements for the Offerings, and were damaged thereby.

284.    At the time of each Offering, the applicable Registration Statement for each Offering, contained untrue statements of material fact, omitted to state facts necessary to make the statements made therein not misleading, and failed to disclose required material information, as set forth above in Section VI.

285.    Cobalt is the issuer of the common stock and convertible notes sold pursuant to the January 4, 2011 Registration Statement and is the issuer of the convertible notes sold pursuant to the December 30, 2013 Registration Statement.  The January 4, 2011 Registration Statement and the December 30, 2013 Registration Statement are referred to collectively herein as the "Registration Statements."  As the issuer of such stock and bonds, Cobalt is strictly liable to Plaintiffs and the other members of the Class who purchased common stock and/or bonds in or traceable to the Offerings for the materially untrue statements and omissions that appeared in or were omitted from the Registration Statements and Offering Materials.

286.   The following Director Defendants were the signatories of the untrue and misleading January 4, 2011 Registration Statement as directors of Cobalt and are liable for the Offerings made pursuant to such Registration Statement:  Bryant, Wilkirson, Coneway, Cornell, Golden, Lancaster, Marshall, Moore, Murchison, Pontarelli, Scoggins, van Steenbergen, and Young.

287.   The following Director Defendants were the signatories of the untrue and misleading December 30, 2013 Registration Statement as directors of Cobalt and are liable for the Offerings made pursuant to such Registration Statement:  Bryant, Wilkirson, Coneway, Golden, Marshall, Moore, Scoggins, van Steenbergen, Utt, and Young.

288.   Director Defendants Lebovitz and France were members of the Cobalt Board of Directors at the time of the filing of the Prospectus Supplements with respect to which liability is asserted in this action for the Offerings (other than the May 8, 2014 Bond Offering, as both Lebovitz and France resigned from the Cobalt Board of Directors on May 28, 2013).

289.   Each of the Director Defendants is unable to establish an affirmative defense based on a reasonable and diligent investigation of the statements contained in the Registration Statements.  These Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Registration Statements were true and not misleading, and that there were no omissions of any material fact.  Accordingly, these Defendants acted negligently, and are liable to Plaintiffs and the other members of the Class who purchased or otherwise acquired the Cobalt common stock and convertible notes in or traceable to the Offerings.

290.   The underwriters of the February 23, 2012 Cobalt Stock Offering were Defendants Goldman Sachs, Morgan Stanley, Credit Suisse, CGMI, J.P. Morgan, Tudor, Deutsche Bank, RBC, UBS, Howard Weil, Stifel Nicolaus, and Capital One.

291.    The underwriters of the December 12, 2012 Cobalt Bond Offering were Defendants Goldman Sachs and Morgan Stanley.

292.    The underwriters of the January 16, 2013 Cobalt Stock Offering were Defendants Morgan Stanley and CGMI.

293.    The underwriter of the May 8, 2013 Cobalt Stock Offering was Defendant CGMI.

294.    The underwriters of the May 8, 2014 Cobalt Bond Offering were Defendants Goldman Sachs, RBC, Credit Suisse, CGMI, and Lazard.

295.    Each of the Underwriter Defendants is unable to establish an affirmative defense based on a reasonable and diligent investigation of the statements contained in the Registration Statements.  The Underwriter Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Offering Materials were true and not misleading, and that there were no omissions of any material fact.  Accordingly, the Underwriter Defendants acted negligently, and are liable to Plaintiffs and the other members of the Class who purchased or otherwise acquired the common stock and convertible notes in or traceable to the Offerings.

296.    Plaintiffs and other members of the Class purchased Cobalt common stock and/or convertible notes issued under or traceable to the Registration Statements.

297.    Plaintiffs and members of the Class did not know, or in the exercise of reasonable diligence could not have known, of the untrue statements and omissions of material fact contained in the Registration Statements when they purchased or otherwise acquired the common stock and/or convertible notes of Cobalt.

298.    Plaintiffs and other members of the Class who purchased the common stock and/or convertible notes pursuant to the Registration Statements suffered substantial damages as a result

of the untrue statements and omissions of material facts in the Registration Statements, as they either sold these shares at prices below the Offering prices or still held shares as of November 30, 2014, when the prices and trading value of the common stock and convertible notes were below the Offering prices and values.

299.   This claim is brought within the applicable statute of limitations.  Throughout the Class Period, Defendants concealed the truth about Nazaki's owners, Cobalt's investigation regarding Nazaki's owners, and the Lontra and Loengo wells.

300.   By reason of the foregoing, the Defendants named in this Count have violated Section 11 of the Securities Act.

## COUNT IV

### For Violations Of Section 15 Of The Securities Act
### Against The Control Person Defendants

301.   Plaintiffs repeat and reallege ¶¶217-60 as if fully set forth herein only to the extent, that such allegations do not allege fraud, scheme, motive, scienter or intentional conduct by the Defendants to defraud Plaintiffs or members of the Class.  This Section 11 claim does not sound in fraud and Plaintiffs expressly disavow and disclaim any allegations of fraud, scheme, motive, scienter or intentional conduct as part of this claim, which does not have scienter or fraudulent intent as required elements.  To the extent that these allegations incorporate factual allegations elsewhere in this Complaint, those allegations are incorporated only to the extent that such allegations do not allege fraud, scheme, motive, scienter or intentional conduct to defraud Plaintiffs or members of the class.  This count is predicated upon Defendants' liability for making false and materially misleading statements in the Offering Materials.

302.   This Count is asserted against the Control Person Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of all members of the Class who

purchased or otherwise acquired Cobalt common stock and/or convertible notes issued pursuant to the Registration Statements.

303.    At all relevant times, these Defendants were controlling persons of the Company within the meaning of Section 15 of the Securities Act.  Defendant Bryant, at the time of the filing of the Registration Statements and the Offerings, served as Chairman of the Board of Directors and CEO.  Defendant Farnsworth, at the time of the filing of the Registration Statements and the Offerings, served as Cobalt's Chief Exploration Officer.  Defendant Wilkirson, at the time of the filing of the Registration Statements and the Offerings, served as Cobalt's CFO.  The Cobalt Board of Directors approved the Offerings and reviewed and approved the Registration Statements and Prospectuses at the time that each Director Defendant was a member of the Board.  The Controlling Entity Defendants exercised control over Cobalt through their financing of the Company, significant share ownership of the Company during the Class Period and having their own senior executives, and executives over which they exercise control, on the Cobalt Board during the Class Period.

304.    Defendant Goldman Sachs and the Controlling Entity Defendants were also controlling persons of their agents on the Cobalt Board of Directors because they were the employers of these individuals and controlled the manner in which these individuals voted as Cobalt Directors.  Specifically:

a)    Defendant Pontarelli was a Managing Director and agent of Goldman Sachs and a member of the Cobalt Board at the same time he signed the January 4, 2011 Registration Statement, and at the time of the Company's February 23, 2012, December 12, 2012, January 16, 2013, and May 8, 2013 securities offerings.

b)    Defendant Lebovitz was a Managing Director and agent of Goldman Sachs and a member of the Cobalt Board at the time of the Company's February 23, 2012, December 12, 2012, January 16, 2013, and May 8, 2013 securities offerings.

c)      Defendant Coneway was a Managing Director and agent of Riverstone and a member of the Cobalt Board at the same time he signed the January 4, 2011 and December 30, 2013 Registration Statements, and at the time of the Company's February 23, 2012, December 12, 2012, January 16, 2013, and May 8, 2013 securities offerings.

d)      Defendant Lancaster was a Managing Director and agent of Riverstone and a member of the Cobalt Board at the same time he signed the January 4, 2011 Registration Statement, and at the time of the Company's February 23, 2012, December 12, 2012, January 16, 2013, and May 8, 2013 securities offerings.

e)      Defendant Moore was a Managing Director and agent of First Reserve and a member of the Cobalt Board at the same time he signed the January 4, 2011 and December 30, 2013 Registration Statements, and at the time of the Company's February 23, 2012, December 12, 2012, January 16, 2013, May 8, 2013, and May 8, 2014 securities offerings.

f)      Defendant Murchison was a consultant, former Managing Partner, and agent of First Reserve and a member of the Cobalt Board at the same time he signed the January 4, 2011 Registration Statement.

g)      Defendant France was a Managing Director and agent of First Reserve and a member of the Cobalt Board at the time of the Company's February 23, 2012, December 12, 2012, January 16, 2013, and May 8, 2013 securities offerings.

h)      Defendant van Steenbergen was the Co-Founder and Managing Partner of Defendant KERN and a member of the Cobalt Board at the same time he signed the January 4, 2011 and December 30, 2013 Registration Statements, and at the time of the Company's February 23, 2012, December 12, 2012, January 16, 2013, May 8, 2013, and May 8, 2014 securities offerings.

305.    By reason of their control over Cobalt Board members Pontarelli, Lebovitz, Coneway, Lancaster, Moore, Murchison, France and van Steenbergen, Defendant Goldman Sachs and the Controlling Entity Defendants were able to:  (i) gain access to all Cobalt reports, agendas and other information available to Pontarelli, Lebovitz, Coneway, Lancaster, Moore, Murchison, France and van Steenbergen as members of the Cobalt Board of Directors;  (ii) participate in the preparation and dissemination of the materially misstated Offering Materials through Pontarelli,

Lebovitz, Coneway, Lancaster, Moore, Murchison, France and van Steenbergen; and (iii) otherwise exercise control over Cobalt's public filings and Offerings.

306.    The Director Defendants and Goldman Sachs Group, Inc., prior to and at the time of the IPO, participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Cobalt's business affairs, including the Offerings.

307.    As officers and/or directors of a company engaging in offerings of its securities, the Director Defendants had a duty to disseminate accurate and truthful information with respect to Cobalt's business, financial condition and results of operations.  These Defendants participated in the preparation and dissemination of the Registration Statements and Prospectuses, and otherwise participated in the process necessary to conduct the Offerings.  Because of their positions of control and authority as senior officers and/or directors of Cobalt, these Defendants were able to, and did, control the contents of the Registration Statements and Prospectuses, which contained materially untrue information and failed to disclose material facts.

308.    By reason of the aforementioned conduct, the Control Person Defendants are liable under Section 15 of the Securities Act jointly and severally with and to the same extent as Cobalt and Director Defendants Pontarelli, Lebovitz, Coneway, Lancaster, Moore, Murchison, France and van Steenbergen are liable under Section 11 of the Securities Act, to Plaintiffs and members of the Class who purchased or otherwise acquired common stock and/or convertible notes issued pursuant to the Registration Statements.

## COUNT V

### For Violations Of Section 12(a)(2) Of The Securities Act
### Against The Underwriter Defendants

309.    Plaintiffs repeat and reallege ¶¶217-60 as if fully set forth herein only to the extent, that such allegations do not allege fraud, scheme, motive, scienter or intentional conduct by the Defendants to defraud Plaintiffs or members of the Class.  This Section 12 claim does not sound in fraud and Plaintiffs expressly disavow and disclaim any allegations of fraud, scheme, motive, scienter or intentional conduct as part of this claim, which does not have scienter or fraudulent intent as required elements.  To the extent that these allegations incorporate factual allegations elsewhere in this Complaint, those allegations are incorporated only to the extent that such allegations do not allege fraud, scheme, motive, scienter or intentional conduct to defraud Plaintiffs or members of the class.  This count is predicated upon Defendants' liability for making false and materially misleading statements in the Offering Materials.

310.    This claim is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of Plaintiffs and all other members of the Class who purchased Cobalt common stock and/or convertible notes in the Offerings, against the Underwriter Defendants.

311.    Each of the Underwriter Defendants was a seller, offeror, and/or solicitor of sales of the common stock and/or convertible notes offered pursuant to the Registration Statements and their corresponding Prospectuses in or traceable to the Offerings.

312.    The Underwriter Defendants sold Cobalt common stock and/or convertible notes pursuant to the Prospectuses directly to Plaintiffs and/or members of the Class.

313.    The Underwriter Defendants transferred title to Cobalt stock and convertible notes to Plaintiffs and/or members of the Class who purchased such securities in the Offerings, and transferred title of such Cobalt securities to other underwriters and/or broker-dealers that sold those

securities as agents for the Underwriter Defendants.  The Underwriter Defendants also solicited the purchase of Cobalt stock and convertible notes in the Offerings by Plaintiffs and/or members of the Class who purchased in the Offerings by means of the Prospectuses, motivated at least in part by the desire to serve the Underwriter Defendants' own financial interests and the interests of Cobalt, including but not limited to earning commissions on the sale of Cobalt stock and convertible notes in the Offerings.

314.    The Prospectuses contained untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, as set forth more fully above in Section VI.

315.    Plaintiffs and/or members of the Class who purchased Cobalt stock and/or convertible notes from the Underwriter Defendants and/or their duly authorized agents in the Offerings made such purchases pursuant to the materially untrue and misleading Prospectuses, and did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained therein.

316.    Plaintiffs and/or members of the Class who purchased the Cobalt stock and/or convertible notes in the Offerings from the Underwriter Defendants and/or their duly authorized agents pursuant to the Prospectuses suffered substantial damages as a result of the untrue statements and omissions of material facts therein, as they either sold these shares at prices below the Offering prices or still held such securities as of the date of this Complaint, when the prices and trading value of the common stock and convertible notes are below the Offering prices.

317.    Plaintiffs and/or members of the Class who purchased the Cobalt common stock and/or convertible notes pursuant to the Prospectuses and still hold those securities have sustained substantial damages as a result of the untrue statements of material facts and omissions contained

therein, for which they hereby elect to rescind and tender their common stock to the Underwriter Defendants in return for the consideration paid with interest.  Those members of the Class who have already sold their stock and/or convertible notes acquired in the Offerings pursuant to the materially untrue and misleading Registration Statements and Prospectuses are entitled to damages from the Underwriter Defendants.

318.   This claim is brought within the applicable statute of limitations.  Throughout the Class Period, Defendants concealed the truth about Nazaki's owners, Cobalt's investigation regarding Nazaki's owners, and the Lontra and Loengo wells.

319.   By virtue of the foregoing, the Underwriter Defendants violated Section 12(a)(2) of the Securities Act.

## X.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

A.   Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.   Awarding compensatory damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.   Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.   Awarding such equitable/injunctive or other further relief (including, but not limited to, rescission) as the Court may deem just and proper.

## XI.   <u>JURY DEMAND</u>

320.   Plaintiffs hereby demand a trial by jury.

DATED: May 1, 2015                          Respectfully submitted,

**AJAMIE LLP**

*/s/ Thomas R. Ajamie*
Thomas R. Ajamie

Thomas R. Ajamie
Attorney-in-Charge
(Texas Bar No. 00952400)
Pennzoil Place - South Tower
711 Louisiana, Suite 2150
Houston, TX 77002
Telephone: (713) 860-1600
Facsimile: (713) 860-1699
E-mail: tajamie@ajamie.com

*Liaison Counsel for the Class*

**ENTWISTLE & CAPPUCCI LLP**

*/s/ Andrew J. Entwistle*
Andrew J. Entwistle

Andrew J. Entwistle
(Texas Bar No. 24038131)
Vincent R. Cappucci (admitted *pro hac vice*)
Jonathan H. Beemer (admitted *pro hac vice*)
280 Park Avenue, 26th Floor West
New York, NY 10017
Telephone: 212-894-7200
Facsimile: 212-894-7272
aentwistle@entwistle-law.com
vcappucci@entwistle-law.com
jbeemer@entwistle-law.com

*Counsel for GAMCO Global Gold, Natural*
*Resources & Income Trust and GAMCO*
*Natural Resources, Gold & Income Trust and*
*Co-Lead Counsel for the Class*

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**

*/s/ David R. Stickney*
David R. Stickney

David R. Stickney (admitted *pro hac vice*)
Jonathan D. Uslaner (admitted *pro hac vice*)
12481 High Bluff Drive, Suite 300
San Diego, CA 92030-3582
Telephone: (858) 793-0070
Facsimile: (858) 793-0323
E-mail: davids@blbglaw.com
E-mail: jonathanu@blbglaw.com
    --and--
Gerald H. Silk
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
E-mail: jerry@blbglaw.com

*Co-Lead Counsel for the Class*


**MOTLEY RICE LLC**
Christopher Moriarty
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9245
Facsimile:  (843) 216-9450
E-Mail:  cmoriarty@motleyrice.com

*Counsel for Plaintiff Universal Investment*
*Gesellschaft m.b.H.*


**KESSLER TOPAZ MELTZER**
  **& CHECK, LLP**
Johnston de F. Whitman, Jr. (admitted *pro hac vice*)
280 King of Prussia Road
Radnor, PA 19087
Telephone:  (610) 667-7706
Facsimile:  (610) 667-7056
E-Mail:  jwhitman@ktmc.com

*Counsel for Plaintiff Sjunde A-Fonden*

114

**KLAUSNER KAUFMAN JENSEN & LEVINSON**
Robert D. Klausner
Bonni Jensen
10059 Northwest 1st Court
Plantation, FL 33324
Telephone: (954) 916-1202
Facsimile: (954) 916-1232

*Additional Counsel for St. Lucie County Fire District Firefighters' Pension Trust Fund*


**MARTIN & DROUGHT, P.C.**
Frank B. Burney
300 Convent St.
Bank of America Plaza, 25th Floor
San Antonio, TX  78205-3789
Telephone: (210) 227-7591
Facsimile: (210) 227-7924

*Additional Counsel for Fire and Police Retiree Health Care Fund, San Antonio*

## CERTIFICATION

I, David Goldman, on behalf of GAMCO Global Gold, Natural Resources & Income Trust ("GGN"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am General Counsel of Gabelli Funds, LLC, and am authorized to execute this Certification on behalf of GGN. I have reviewed the Consolidated Amended Class Action Complaint filed in this matter. GGN has authorized the filing of the Consolidated Amended Class Action Complaint.

2. GGN did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. GGN has been appointed to serve as Lead Plaintiff on behalf of the Class.

4. GGN's transactions in Cobalt International Energy Inc. securities during the Class Period are set forth in the chart attached hereto.

5. GGN has not sought to serve as a lead plaintiff or representative party on behalf of a class in any action under the federal securities laws filed during the three-year period preceding the date of this Certification.

6. GGN will not accept any payment for serving as a representative party on behalf of the Class beyond GGN's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 29th day of April 2015.

David Goldman
General Counsel
Gabelli Funds, LLC

*GAMCO Global Gold, Natural Resources & Income Trust*

**GAMCO Global Gold, Natural Resources & Income Trust
Transactions in Cobalt International Energy, Inc. ("CIE")**

**Cobalt Common Stock, CUSIP 19075F106**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 3/15/2012 | 250,000 | 30.4633 |
| Purchase | 4/17/2012 | 100,000 | 27.7000 |
| Purchase | 1/16/2013 | 40,000 | 25.1500 |
| Purchase | 5/8/2013 | 400,000 | 26.9445 |
| Purchase | 12/17/2013 | 2,500 | 22.5000 |
| Purchase | 12/18/2013 | 11,000 | 22.5014 |
| Purchase | 12/19/2013 | 68,700 | 22.5002 |
| Purchase | 12/19/2013 | 8,200 | 20.0018 |
| Purchase | 12/30/2013 | 2,500 | 20.0060 |
| Purchase | 12/30/2013 | 5,000 | 22.5030 |
| Purchase | 1/7/2014 | 7,500 | 22.5000 |
| Purchase | 1/15/2014 | 12,500 | 20.0012 |
| Purchase | 1/17/2014 | 76,800 | 20.0002 |
| Purchase | 1/17/2014 | 105,300 | 22.5001 |
| Sale | 7/19/2013 | (40,000) | 27.4990 |

**GAMCO Global Gold, Natural Resources & Income Trust**
**Transactions in Cobalt International Energy, Inc. ("CIE")**

**Options**

| Description | Transaction | Date | Contracts | Price |
|---|---|---|---|---|
| CIE 07/12 C 35 | Sale | 3/15/2012 | (2,500) | 2.6462 |
| CIE 07/12 C 35 | Purchase | 6/29/2012 | 2,500 | 0.2240 |
| | | | | |
| CIE 10/12 P 20 | Sale | 4/19/2012 | (2,000) | 1.5854 |
| CIE 10/12 P 20 | Expiration | 10/19/2012 | 2,000 | 0.0000 |
| | | | | |
| CIE 10/12 C 30 | Sale | 6/29/2012 | (2,500) | 2.0907 |
| CIE 10/12 C 30 | Expiration | 10/19/2012 | 2,500 | 0.0000 |
| | | | | |
| CIE 10/12 C 35 | Sale | 4/17/2012 | (1,000) | 2.3897 |
| CIE 10/12 C 35 | Purchase | 10/2/2012 | 1,000 | 0.0603 |
| | | | | |
| CIE 11/12 C 27.5 | Sale | 10/2/2012 | (1,000) | 0.2397 |
| CIE 11/12 C 27.5 | Expiration | 11/16/2012 | 1,000 | 0.0000 |
| | | | | |
| CIE 12/12 C 25 | Sale | 11/19/2012 | (1,000) | 0.1997 |
| CIE 12/12 C 25 | Purchase | 12/6/2012 | 1,000 | 3.7076 |
| | | | | |
| CIE 01/13 P 20 | Sale | 8/31/2012 | (4,000) | 2.1897 |
| CIE 01/13 P 20 | Expiration | 1/18/2013 | 4,000 | 0.0000 |
| | | | | |
| CIE 01/13 C 27.5 | Sale | 10/19/2012 | (2,500) | 0.6347 |
| CIE 01/13 C 27.5 | Purchase | 12/12/2012 | 2,500 | 0.7703 |
| | | | | |
| CIE 03/13 P 22.5 | Sale | 12/12/2012 | (2,500) | 1.3347 |
| CIE 03/13 P 22.5 | Expiration | 3/15/2013 | 2,500 | 0.0000 |
| | | | | |
| CIE 03/13 C 30 | Sale | 12/6/2012 | (1,000) | 2.3457 |
| CIE 03/13 C 30 | Purchase | 2/19/2013 | 1,000 | 0.1153 |
| | | | | |
| CIE 04/13 P 20 | Sale | 10/19/2012 | (3,000) | 2.1947 |
| CIE 04/13 P 20 | Expiration | 4/19/2013 | 3,000 | 0.0000 |
| | | | | |
| CIE 07/13 C 25 | Sale | 1/16/2013 | (400) | 3.2021 |
| CIE 07/13 C 25 | Purchase | 4/30/2013 | 400 | 4.1704 |
| | | | | |
| CIE 07/13 C 27.5 | Sale | 4/30/2013 | (400) | 2.4296 |
| CIE 07/13 C 27.5 | Expiration | 7/19/2013 | 400 | 0.0000 |
| | | | | |
| CIE 07/13 C 30 | Sale | 2/19/2013 | (1,000) | 1.0945 |
| CIE 07/13 C 30 | Expiration | 7/19/2013 | 1,000 | 0.0000 |
| | | | | |
| CIE 10/13 C 27.5 | Sale | 5/8/2013 | (4,000) | 2.8765 |
| CIE 10/13 C 27.5 | Expiration | 10/18/2013 | 4,000 | 0.0000 |

**GAMCO Global Gold, Natural Resources & Income Trust**
**Transactions in Cobalt International Energy, Inc. ("CIE")**

**Options**

| Description | Transaction | Date | Contracts | Price |
|---|---|---|---|---|
| CIE 10/13 C 30 | Sale | 3/11/2013 | (600) | 2.3696 |
| CIE 10/13 C 30 | Expiration | 10/18/2013 | 600 | 0.0000 |
| | | | | |
| CIE 10/13 C 32.5 | Sale | 7/19/2013 | (1,000) | 1.7447 |
| CIE 10/13 C 32.5 | Purchase | 10/14/2013 | 1,000 | 0.1654 |
| | | | | |
| CIE 11/13 C 30 | Sale | 10/14/2013 | (1,000) | 0.9096 |
| CIE 11/13 C 30 | Expiration | 11/15/2013 | 1,000 | 0.0000 |
| | | | | |
| CIE 01/14 P 20 | Sale | 8/19/2013 | (1,000) | 1.3396 |
| CIE 01/14 P 20 | Exercised | 12/19/2013 | 82 | 0.0000 |
| CIE 01/14 P 20 | Exercised | 12/30/2013 | 25 | 0.0000 |
| CIE 01/14 P 20 | Exercised | 1/15/2014 | 125 | 0.0000 |
| CIE 01/14 P 20 | Exercised | 1/17/2014 | 768 | 0.0000 |
| | | | | |
| CIE 01/14 P 22.5 | Sale | 5/8/2013 | (2,000) | 2.0396 |
| CIE 01/14 P 22.5 | Exercised | 12/17/2013 | 25 | 0.0000 |
| CIE 01/14 P 22.5 | Exercised | 12/18/2013 | 110 | 0.0000 |
| CIE 01/14 P 22.5 | Exercised | 12/19/2013 | 687 | 0.0000 |
| CIE 01/14 P 22.5 | Exercised | 12/30/2013 | 50 | 0.0000 |
| CIE 01/14 P 22.5 | Exercised | 1/7/2014 | 75 | 0.0000 |
| CIE 01/14 P 22.5 | Exercised | 1/17/2014 | 1,053 | 0.0000 |
| | | | | |
| CIE 01/14 C 30 | Sale | 4/26/2013 | (1,900) | 3.7695 |
| CIE 01/14 C 30 | Expiration | 1/17/2014 | 1,900 | 0.0000 |
| | | | | |
| CIE 02/14 C 27.5 | Sale | 10/18/2013 | (2,500) | 1.4646 |
| CIE 02/14 C 27.5 | Expiration | 2/21/2014 | 2,500 | 0.0000 |
| | | | | |
| CIE 03/14 C 27.5 | Sale | 11/15/2013 | (1,000) | 1.0796 |
| CIE 03/14 C 27.5 | Expiration | 3/21/2014 | 1,000 | 0.0000 |
| | | | | |
| CIE 04/14 C 30 | Sale | 10/18/2013 | (2,100) | 1.2322 |
| CIE 04/14 C 30 | Expiration | 4/17/2014 | 2,100 | 0.0000 |
| | | | | |
| CIE 07/14 C 20 | Sale | 4/17/2014 | (2,100) | 0.5396 |
| CIE 07/14 C 20 | Expiration | 7/17/2014 | 2,100 | 0.0000 |

## CERTIFICATION

I, David Goldman, on behalf of GAMCO Natural Resources, Gold & Income Trust ("GNT"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the General Counsel of Gabelli Funds, LLC, and am authorized to execute this Certification on behalf of GNT. I have reviewed the Consolidated Amended Class Action Complaint filed in this matter. GNT has authorized the filing of the Consolidated Amended Class Action Complaint.

2. GNT did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. GNT has been appointed to serve as Lead Plaintiff on behalf of the Class.

4. GNT's transactions in Cobalt International Energy Inc. securities during the Class Period are set forth in the chart attached hereto.

5. GNT has not sought to serve as a lead plaintiff or representative party on behalf of a class in any action under the federal securities laws filed during the three-year period preceding the date of this Certification.

6. GNT will not accept any payment for serving as a representative party on behalf of the Class beyond GNT's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 29th day of April 2015.

David Goldman
General Counsel
Gabelli Funds, LLC

*GAMCO Natural Resources, Gold & Income Trust*

**GAMCO Natural Resources, Gold & Income Trust (GNT)**
**Transactions in Cobalt International Energy, Inc. ("CIE")**

**Cobalt Common Stock, CUSIP 19075F106**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 5/8/2013 | 50,000 | 26.9445 |
| Purchase | 10/14/2013 | 100,000 | 23.7200 |

**Options**

| Description | Transaction | Date | Contracts | Price |
|---|---|---|---|---|
| CIE 10/13 C 27.5 | Sale | 5/8/2013 | (500) | 2.8765 |
| CIE 10/13 C 27.5 | Expiration | 10/18/2013 | 500 | 0.0000 |
| CIE 02/14 C 27.5 | Sale | 10/18/2013 | (500) | 1.4646 |
| CIE 02/14 C 27.5 | Expiration | 2/21/2014 | 500 | 0.0000 |
| CIE 04/14 C 27.5 | Sale | 10/14/2013 | (1,000) | 2.2846 |
| CIE 04/14 C 27.5 | Expiration | 4/17/2014 | 1,000 | 0.0000 |
| CIE 07/14 C 20 | Sale | 4/17/2014 | (1,000) | 0.5396 |
| CIE 07/14 C 20 | Expiration | 7/17/2014 | 1,000 | 0.0000 |

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Ron Parrish, on behalf of St. Lucie County Fire District Firefighters' Pension Trust Fund ("St. Lucie FF"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Chairman of the Board of Trustees of St. Lucie FF.  I have reviewed the consolidated complaint and authorize its filing.

2. St. Lucie FF did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. St. Lucie FF is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. St. Lucie FF's transactions in the Cobalt International Energy, Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5. St. Lucie FF has not sought to serve as a lead plaintiff or representative party on behalf of a class in any action under the federal securities laws filed during the three-year period preceding the date of this Certification, other than in this action.

6. St. Lucie FF will not accept any payment for serving as a representative party on behalf of the Class beyond St. Lucie FF's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 28 day of April , 2015.

_____
Ron Parrish
Chairman
*St. Lucie County Fire District Firefighters'*
*Pension Trust Fund*

**St. Lucie County Fire District Firefighters' Pension Trust Fund
Transactions in Cobalt International Energy, Inc.**

**Cobalt 2% Convertible Senior Notes Due 12/01/19, CUSIP 19075FAA4**

| Transaction | Date | Face Value | Price (% of Par) |
|---|---|---|---|
| Purchase | 12/12/2012 | 48,000 | 99.2500 |
| Purchase | 12/12/2012 | 36,000 | 99.2500 |
| Purchase | 1/16/2013 | 36,000 | 103.8106 |
| Purchase | 3/8/2013 | 4,000 | 106.0000 |
| Purchase | 3/21/2013 | 8,000 | 109.7000 |
| Purchase | 3/21/2013 | 8,000 | 110.0455 |
| Purchase | 4/4/2013 | 9,000 | 109.6252 |
| Purchase | 4/15/2013 | 8,000 | 109.1875 |
| Purchase | 4/19/2013 | 15,000 | 108.2588 |
| Purchase | 5/1/2013 | 8,000 | 111.3125 |
| Purchase | 5/8/2013 | 5,000 | 111.9375 |
| Purchase | 5/8/2013 | 6,000 | 111.9700 |
| Purchase | 8/1/2013 | 24,000 | 113.3767 |
| Purchase | 8/19/2013 | 11,000 | 105.0052 |
| Sale | 12/12/2012 | (6,000) | 102.0625 |
| Sale | 12/12/2012 | (7,000) | 101.0000 |
| Sale | 4/17/2013 | (11,000) | 108.4560 |
| Sale | 11/21/2013 | (14,000) | 100.2500 |
| Sale | 12/19/2013 | (35,000) | 82.1900 |
| Sale | 12/19/2013 | (7,000) | 82.5000 |
| Sale | 12/19/2013 | (27,000) | 83.1522 |
| Sale | 1/9/2014 | (58,000) | 89.0227 |
| Sale | 2/4/2014 | (15,000) | 88.2500 |
| Sale | 3/11/2014 | (23,000) | 94.0000 |
| Sale | 3/14/2014 | (23,000) | 94.2500 |

**Cobalt 3⅛ Convertible Senior Notes due 05/15/24, CUSIP 19075FAB2**

| Transaction | Date | Face Value | Price (% of Par) |
|---|---|---|---|
| Purchase | 5/8/2014 | 10,000 | 100.0000 |
| Purchase | 5/8/2014 | 9,000 | 100.0000 |
| Purchase | 5/8/2014 | 60,000 | 103.8214 |
| Purchase | 6/23/2014 | 10,000 | 109.3463 |
| Purchase | 6/27/2014 | 9,000 | 107.0830 |
| Purchase | 7/7/2014 | 14,000 | 106.2040 |
| Sale | 10/10/2014 | (19,000) | 74.8706 |
| Sale | 10/14/2014 | (24,000) | 70.6270 |

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, James Bounds, on behalf of Fire and Police Retiree Health Care Fund, San Antonio ("San Antonio Health"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Executive Director of San Antonio Health.  I have reviewed the consolidated complaint and authorize its filing.

2. San Antonio Health did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. San Antonio Health is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. San Antonio Health's transactions in the Cobalt International Energy, Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5. San Antonio Health has not sought to serve as a lead plaintiff or representative party on behalf of a class in any action under the federal securities laws filed during the three-year period preceding the date of this Certification, other than in this action.

6. San Antonio Health will not accept any payment for serving as a representative party on behalf of the Class beyond San Antonio Health's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 28 day of April , 2015.

James Bounds
Executive Director
*Fire and Police Retiree Health Care Fund,*
*San Antonio*

**Fire and Police Retiree Health Care Fund, San Antonio**
**Transactions in Cobalt International Energy, Inc.**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 3/26/2013 | 1,850 | 27.7728 |
| Purchase | 12/9/2013 | 4,175 | 17.0018 |
| Sale | 8/6/2014 | (6,025) | 14.0306 |

## CERTIFICATION

Sjunde AP-Fonden ("AP7" or "Plaintiff"),[1] declares, as to the claims asserted in this action under the federal securities laws that:

1.     Plaintiff did not purchase any of the securities that are the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

2.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

3.     Plaintiff's Class Period purchase and sale transactions in the Cobalt International Energy, Inc. securities that are the subject of this action are identified in the attached Schedule A.

4.     AP7 has full power and authority to bring suit to recover for its investment losses.

5.     Plaintiff has reviewed the facts and allegations of a complaint filed in this action, including those set forth in the complaint filed with this Certification.

6.     I, Richard Gröttheim, Chief Executive Officer of AP7, am authorized to make legal decisions on behalf of AP7.

7.     Plaintiff intends to actively monitor and vigorously pursue this action for the benefit of the Class.

8.     Plaintiff will endeavor to provide fair and adequate representation and work directly with the efforts of Class counsel to ensure that the largest recovery for the Class consistent with good faith and meritorious judgment is obtained.

9.     AP7 is currently serving as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this certification in *United Union of*

---

[1] AP7 is acting on behalf of the AP7 Equity Fund in this litigation. All references to "Sjunde AP-Fonden" or "AP7" in this litigation, including herein, are to AP7 acting on behalf of the AP7 Equity Fund.



*Roofers, Waterproofers & Allied Workers Local No. 8 v. Ocwen Financial Corporation, et al.*, No. 14-81057 (S.D. Fla.) ("*United Union*"), and *In re JPMorgan Chase & Company Securities Litigation*, No. 12-3852 (S.D.N.Y.).

10.     AP7 has sought to serve (and either withdrew its motion or was not appointed) as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this Certification in *In re Cobalt International Energy, Inc. Securities Litigation*, No. 14-3428 (S.D. Tex.), *Ciraulu v. American Realty Capital Properties, Inc., et al.*, No. 14-8659 (S.D.N.Y.), *In re Genworth Financial, Inc. Securities Litigation*, No. 14-682 (E.D. Va.) and *Elm Tree Investment L.P. v. Ocwen Financial Corporation, et al.*, No. 1:14-cv-61 (D.V.I.) (transferred to the U.S. District Court for the Southern District of Florida for consolidated and/or coordinated proceedings with *United Union*).

11.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed this ___30___ day of ___April___, 2015.

Sjunde AP-Fonden

By: _____

Richard Gröttheim
Chief Executive Officer

## SCHEDULE A

| Security | Buy/Sell | Date | Quantity | Price |
|---|---|---|---|---|
| Com Stk | Buy | 2/29/2012 | 33,100 | $30.05 |
| Com Stk | Buy | 3/9/2012 | 11,800 | $29.92 |
| Com Stk | Buy | 3/22/2012 | 44,200 | $30.66 |
| Com Stk | Buy | 11/30/2012 | 8,831 | $23.32 |
| Com Stk | Buy | 12/10/2012 | 7,600 | $27.71 |
| Com Stk | Buy | 1/11/2013 | 3,899 | $26.65 |
| Com Stk | Buy | 1/16/2013 | 15,268 | $24.84 |
| Com Stk | Buy | 1/31/2013 | 9,582 | $24.21 |
| Com Stk | Buy | 2/7/2013 | 15,600 | $24.69 |
| Com Stk | Buy | 5/8/2013 | 22,910 | $26.70 |
| Com Stk | Buy | 5/14/2013 | 2,050 | $27.14 |
| Com Stk | Buy | 5/17/2013 | 20,700 | $27.42 |
| Com Stk | Buy | 12/9/2013 | 18,370 | $16.99 |

