**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

IN RE COBALT INTERNATIONAL
ENERGY, INC. SECURITIES LITIGATION

LEAD CASE NO. 4:14-cv-03428

**THE COBALT DEFENDANTS' MOTION TO DISMISS**

TABLE OF CONTENTS

Table of Authorities.................................................................................................ii

Statement of the Issues ..........................................................................................1

Introduction and Summary of the Argument..........................................................1

Background Facts ....................................................................................................2

    I.     Cobalt and Its Operations..........................................................................3

    II.    Cobalt Obtains its Angolan Interests ........................................................4

        A.    Blocks 9 and 21 ..............................................................................6

        B.    Block 20 ...........................................................................................8

    III.   Allegations Emerge Concerning Nazaki...................................................8

    IV.   Sonangol Reclaims Nazaki's and Alper's Interests, and the SEC Terminates
        Its Investigation Without Action Against Cobalt .............................................10

    V.    Cobalt's Lontra and Loengo Exploration Wells ...............................................11

        A.    Lontra...............................................................................................12

        B.    Loengo ............................................................................................14

    VI.   The CAC and Its Allegations...................................................................15

Standard of Review ..............................................................................................15

    I.     Pleading and Dismissal Standards ..........................................................15

    II.    Standards under the Exchange Act ..........................................................16

    III.   Standards under the Securities Act ..........................................................18

Argument and Authorities ....................................................................................19

Exchange Act Claims ...........................................................................................20

    I.     The CAC suffers from foundational infirmities. .....................................20

        A.    Confidential Witnesses ...................................................................20

B.      Articles..........................................................................................23

C.      Plaintiffs' Selective Editing.............................................................25

II.      The CAC fails to plead facts sufficient to demonstrate that any of the
         challenged statements were false or misleading when made............................26

    A.      The CAC fails to adequately plead that any FCPA-related
            statement was false or rendered misleading by the omission of material
            facts.........................................................................................26

        1.      The CAC fails to plead facts making false or misleading Cobalt's
                opinion that its Angolan activities complied with the FCPA...........28

            a.      The CAC's claim that Nazaki and Alper were owned by
                    government officials does not allege an FCPA violation. .......29

            b.      The CAC's claim of improper payments to Angolan
                    government officials does not allege an FCPA violation. .......30

            c.      The CAC does not identify an omitted material fact that
                    renders Cobalt's opinion misleading. ..................................32

        2.      The CAC fails to plead facts rendering any of the other FCPA-
                related statements false or misleading.................................................34

    B.      The CAC fails to adequately plead that any well-related statement
            was false or rendered misleading by the omission of material facts.........43

        1.      The CAC lacks particularized facts showing that the challenged
                opinions about the wells' potential oil content are actionable. .........44

            a.      The statements are forward-looking statements protected
                    by the PSLRA's safe harbor. ..................................................45

            b.      The statements were inactionable opinions. ...........................49

        2.      The CAC fails to allege that October 29, 2013 statements about
                Lontra's gas content were false or misleading...............................50

        3.      The CAC fails to plead facts rendering any of the other well-related
                statements false or misleading. ..........................................................52

III.     The CAC fails to establish the requisite strong inference of scienter..............55

A.    The absence of any apparent motive for the Executive Defendants' alleged fraud weighs heavily against any inference of scienter. .............. 56

B.    The CAC's scienter allegations are insufficient. ...................................... 58

    1.    The CW allegations add nothing to the scienter analysis. .............. 58

    2.    The allegations about Nazaki's and Alper's purported owners do not give rise to an inference of scienter.................................................... 59

    3.    None of the CAC's specific allegations with respect to Lontra and Loengo give rise to an inference of scienter. .................................. 63

    4.    The Executive Defendants' positions are insufficient to create an inference of scienter. ........................................................................ 63

    5.    Bryant's prior business experience in Angola does not give rise to an inference of scienter. ........................................................................ 65

IV.    The CAC fails to adequately plead loss causation............................................ 65

V.    The CAC fails to plead reliance as to any bond offering. .............................. 69

VI.    The CAC's Section 20 claims also must be dismissed.................................... 70

Securities Act Claims ...................................................................................................... 71

I.    The CAC fails to adequately plead that any of the challenged statements were false or rendered misleading by omission........................................................ 71

II.    The Section 15 claims also must be dismissed. ............................................... 75

Conclusion ........................................................................................................................ 75

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ABC Arbitrage Pls. Grp. v. Tchuruk,*
    291 F.3d 336 (5th Cir. 2002)...............................................................16, 48

*Abrams v. Baker Hughes Inc.,*
    292 F.3d 424 (5th Cir. 2002).........................................................57, 58, 64

*Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.,*
    597 F.3d 330 (5th Cir. 2010)....................................................65, 66, 67, 69

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ..............................................................................15

*Bamburg v. Axis Onshore LP,*
    No. CIV. A 08-1466, 2009 WL 1579512 (W.D. La. June 4, 2009) .................45, 65

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988) ..........................................................................18, 27

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ..............................................................................15

*Brody v. Transitional Hosps. Corp.,*
    280 F.3d 997 (9th Cir. 2002)........................................................27, 38, 54

*Catogas v. Cyberonics, Inc.,*
    292 F. App'x 311 (5th Cir. 2008).............................................................18

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc.,*
    497 F.3d 546 (5th Cir. 2007) ..................................................................58

*City of Brockton Ret. Sys. v. Avon Prods., Inc.,*
    No. 11-civ-4665 PGG, 2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014)........................24

*Coates v. Heartland Wireless Commc'ns, Inc.,*
    100 F. Supp. 2d 417 (N.D. Tex. 2000) ........................................................56

*Dawes v. Imperial Sugar Co.,*
    975 F. Supp. 2d 666 (S.D. Tex. 2013) ........................................................65

*Fin. Acquisition Partners LP v. Blackwell,*
    440 F.3d 278 (5th Cir. 2006) ........................................................3, 4, 7, 47

*Firefighters Pension & Relief Fund of New Orleans v. Bulmahn*,
  No. Civ. A. 13-3935, 2014 WL 6638793 (E.D. La. Nov. 21, 2014) ......................................49

*Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*,
  565 F.3d 200 (5th Cir. 2009) ...................................................................58

*Goldstein v. MCI WorldCom*,
  340 F.3d 238 (5th Cir. 2003) ...................................................................58

*Griffin v. GK Intelligent Sys., Inc.*,
  196 F.R.D. 298 (S.D. Tex. 2000) (Atlas, J.) ...................................................70

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  134 S. Ct. 2398 (2014)...........................................................................70

*Hershey v. Energy Transfer Partners, L.P.*,
  610 F.3d 239 (5th Cir. 2010)...................................................................15

*Higginbotham v. Baxter Int'l., Inc.*,
  495 F.3d 753 (7th Cir. 2007)...................................................................20

*In re Alamosa Holdings, Inc.*,
  382 F. Supp. 2d 832 (N.D. Tex. 2005) .........................................................48

*In re Anadarko Petrol. Corp. Class Action Litig.*,
  957 F. Supp. 2d 806 (S.D. Tex. 2013) .........................................................48

*In re Azurix Corp. Sec. Litig.*,
  198 F. Supp. 2d 862 (S.D. Tex. 2002) .........................................................64

*In re Baker Hughes Sec. Litig.*,
  136 F. Supp. 2d 630 (S.D. Tex. 2001) .........................................................64

*In re BearingPoint, Inc. Sec. Litig.*,
  525 F. Supp. 2d 759 (E.D. Va. 2007) ..........................................................60

*In re BP p.l.c. Sec. Litig.*,
  843 F. Supp. 2d 712 (S.D. Tex. 2012) ......................................................41, 45

*In re Career Educ. Corp. Sec. Litig.*,
  No. 03-C-8884, 2006 WL 999988 (N.D. Ill. Mar. 28, 2006) .................................21

*In re Ceridian Corp. Sec. Litig.*,
  542 F.3d 240 (8th Cir. 2008) ...................................................................60

*In re Dell Inc. Sec. Litig.*,
  591 F. Supp. 2d 877 (W.D. Tex. 2008) .....................................23, 57, 59, 64, 66, 67

*In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*,
  463 F. Supp. 2d 628 (S.D. Tex. 2006) ................................................................. 75

*In re Ex Parte Application of Jommi*,
  No. C-13-80212, 2013 WL 6058201 (N.D. Cal. Nov. 15, 2013) ............................. 7

*In re Franklin Bank Corp. Sec. Litig.*,
  782 F. Supp. 2d 364 (S.D. Tex. 2011) ........................................................... 54, 55

*In re FX Energy, Inc. Sec. Litig.*,
  No. 2:07-CV-874 CW, 2009 WL 1812828 (D. Utah June 25, 2009) ..................... 63

*In re Huntington Bancshares Inc. Sec. Litig.*,
  674 F. Supp. 2d 951 (S.D. Ohio 2009) ............................................................... 61

*In re Initial Pub. Offering Sec. Litig.*,
  No. 21-MC-92, 2004 WL 60290 (S.D.N.Y. Jan. 12, 2004) ................................... 10

*In re Intelligroup Sec. Litig.*,
  527 F. Supp. 2d 262 (D.N.J. 2007) ......................................................... 25, 49, 62

*In re Metawave Commc'ns Corp. Sec. Litig.*,
  298 F. Supp. 2d 1056 (W.D. Wash. 2003) ..................................................... 21, 23

*In re Michaels Stores, Inc. Sec. Litig.*,
  No. 3:03-CV-0246, 2004 WL 2851782 (N.D. Tex. Dec. 10, 2004) ....................... 45

*In re MoneyGram Int'l, Inc. Sec. Litig.*,
  626 F. Supp. 2d 947 (D. Minn. 2009) ................................................................. 60

*In re NVIDIA Corp. Secs. Litig.*,
  768 F.3d 1046 (9th Cir. 2014) ...................................................................... 32, 49

*In re Superior Offshore Int'l, Inc. Sec. Litig.*,
  No. CIV A H-08-0687, 2009 WL 82064 (S.D. Tex. Jan. 12, 2009) ....................... 75

*In re UBS AG Sec. Litig.*,
  No. 07-Civ-11225, 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) ....................... 60

*In re Wet Seal, Inc. Sec. Litig.*,
  518 F. Supp. 2d 1148 (C.D. Cal. 2007) ......................................................... 24, 25

*Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*,
  537 F.3d 527 (5th Cir. 2008) ......................................... 16, 17, 21, 27, 48, 55, 58, 59, 70

*Kapps v. Torch Offshore Inc.*,
  379 F.3d 207 (5th Cir. 2004) .................................................................. 18, 19, 74

*Kurtzman v. Compaq Computer Corp.*,
  No. CIV. A. 99-1011, 2002 WL 32442832 (S.D. Tex. Mar. 30, 2002) .................25, 38

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009).........................................................47, 48, 55, 65

*Lovelace v. Software Spectrum, Inc.*,
  78 F.3d 1015 (5th Cir. 1996) ......................................................................54

*Material Yard Workers Local 1175 Benefit Funds v. Men's Wearhouse Inc.*,
  No. H-09-3265, 2011 WL 3059229 (S.D. Tex. July 22, 2011).....................................20

*McCasland v. FormFactor, Inc.*,
  No. 07-cv-5545 SI, 2008 WL 2951275 (N.D. Cal. July 25, 2008) ...............................58

*Meyer v. Greene*,
  710 F.3d 1189 (11th Cir. 2013) .............................................................66, 68

*N. Port Firefighters' Penson–Local Option Plan v. Temple-Inland, Inc.*,
  936 F. Supp. 2d 722 (N.D. Tex. 2013) ..........................................................24

*Nathenson v. Zonagen Inc.*,
  267 F.3d 400 (5th Cir. 2001)...............................................................17, 64

*Norris v. Hearst Trust*,
  500 F.3d 454 (5th Cir. 2007) ...................................................................7

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  135 S. Ct. 1318 (2015)...........................................18, 19, 28, 33, 34, 40, 50, 72

*Owens v. Jastrow*,
  No. 13-10928, 2015 WL 3649823 (5th Cir. June 12, 2015) .........................21, 23, 49, 57

*Pipefitters Local No. 636 Defined Benefit Plan v. Zale Corp.*,
  499 F. App'x 345 (5th Cir. 2012) ..............................................................57

*Pub. Ret. Sys. of Miss., P.R. Teachers Ret. Sys. v. Amedisys, Inc.*,
  769 F.3d 313 (5th Cir. 2014)...................................................................68

*Pyramid Holdings, Inc. v. Inverness Med. Innovations, Inc.*,
  638 F. Supp. 2d 120 (D. Mass. 2009) ..........................................................75

*R2 Invs. LDC v. Phillips*,
  401 F.3d 638 (5th Cir. 2005)........................................................15, 17, 56, 58

*Regents of Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.*,
    482 F.3d 372 (5th Cir. 2007)...........................................................................70

*Rosenzweig v. Azurix Corp.*,
    332 F.3d 854 (5th Cir. 2003)..........................................18, 19, 24, 25, 48, 58

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*,
    365 F.3d 353 (5th Cir. 2004)..........................................16, 41, 45, 54, 56, 57

*Spitzberg v. Houston Am. Energy Corp.*,
    758 F.3d 676 (5th Cir. 2014) ....................................................................45, 46

*Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc.*,
    412 F.3d 103 (2d Cir. 2005)............................................................................70

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
    552 U.S. 148 (2008) .......................................................................................16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) .................................................................................16, 17

*Thomson v. Morgan Stanley Dean Witter & Co.*,
    No. 01 CIV. 7071, 2001 WL 958925 (S.D.N.Y. 2001)...................................24

*Tuchman v DCS Commc'ns Corp.*,
    14 F. 3d 1061 (5th Cir. 1994) .........................................................................57

*United States ex rel. Mikes v. Straus*,
    No. 92 CIV. 2754 (VLB), 1995 WL 6798 (S.D.N.Y. Jan. 3, 1995).................32

*Weisskopf v. United Jewish Appeal-Fed'n of Jewish Philanthropies of N.Y., Inc.*,
    889 F. Supp. 2d 912 (S.D. Tex. 2012) ...........................................................25

*WHX Corp. v. S.E.C.*,
    362 F.3d 854 (D.C. Cir. 2004) .......................................................................68

*Zucco Partners, LLC v. Digimarc Corp.*,
    445 F. Supp. 2d 1201 (D. Or. 2006) ..............................................................49

## STATUTES

15 U.S.C. § 78u-4(b) (2012) ..............................................................16, 17, 30, 55

15 U.S.C. § 78u-5(c) (2012)......................................................................45, 47

15 U.S.C. § 78dd-1(a) (2012) ....................................................................29, 30

**OTHER AUTHORITIES**

17 C.F.R. § 230.405 (2014) .......................................................................19

17 C.F.R. § 240.10b-5 (2014) ....................................................................27

Christopher Zahm, et al., *Exploration*, *in* FUNDAMENTALS OF PETROLEUM 64 (Univ. of
   Tex. at Austin – Petrol. Extension Serv., 5th ed. 2011)....................................12, 13

Cobalt International Energy, Inc. ("Cobalt"); Joseph H. Bryant, James W. Farnsworth, and John P. Wilkirson (the "Executive Defendants"); and Peter R. Coneway, Henry Cornell, Jack E. Golden, N. John Lancaster, Jon A. Marshall, Kenneth W. Moore, J. Hardy Murchison, Michael G. France, Kenneth A. Pontarelli, Scott L. Lebovitz, Myles W. Scoggins, D. Jeff van Steenbergen, Martin H. Young, Jr., and William P. Utt (together with Bryant, the "Director Defendants"; and, together with Cobalt and the Executive Defendants, the "Cobalt Defendants") file this motion to dismiss.

## STATEMENT OF THE ISSUES

1.  Whether Plaintiffs' claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") should be dismissed under Rule 12(b)(6) for failure to plead (i) an actionable false or misleading statement, (ii) scienter with particularity as required by Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), or (iii) loss causation.

2.  Whether Plaintiffs' claims under Sections 11 and 15 of the Securities Act of 1933 ("Securities Act") should be dismissed under Rule 12(b)(6) for failure to plead an actionable false or misleading statement.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Plaintiffs' 132-page Consolidated Amended Complaint ("CAC") boils down to three claims:

- Because the Securities and Exchange Commission ("SEC") and the Department of Justice ("DOJ") commenced investigations into whether Cobalt violated the Foreign Corrupt Practices Act ("FCPA"), Cobalt must have violated the FCPA, and Cobalt's senior officers must have known of those violations when the Company made statements professing its belief that it had not violated the FCPA;

- Because a drill stem test ultimately showed that Cobalt's exploratory Lontra well had more gas than Cobalt previously estimated, Cobalt's senior officers must have known the gas content before the drill stem test was conducted and, thus, must have known that the well would be, according to Plaintiffs, a failure; and

- Because Cobalt's exploratory Loengo well proved to be unsuccessful, Cobalt's senior officers must have known all along that the well would be a dry hole.

These claims cannot even be reconciled with the admitted facts, much less the exacting pleading standards of the PSLRA:

- No regulatory body has found that Cobalt violated the FCPA, nor has an enforcement action been brought against Cobalt alleging a violation; indeed, as Plaintiffs well know but the CAC never deigns to acknowledge, the SEC terminated its investigation without recommending such an action;

- Lontra, which Cobalt spent tens of millions of dollars drilling and testing, was a successful commercial discovery that is now in the early stages of project development in tandem with another successful Angolan well; and

- Loengo proved to be unsuccessful only after Cobalt applied for and received an extension of its license to drill there and then spent over $50 million drilling and testing it.

Leaving aside the total implausibility of its claims, the CAC fails to meet the PSLRA's pleading standards in multiple respects.  It fails to plead with particularity that any Cobalt statement was false or materially misleading when made.  It fails to allege any inference of scienter, much less the requisite strong inference, as to any of Cobalt's senior officers.  And it fails to adequately allege loss causation.  For each of these reasons, the Section 10(b) and Rule 10b-5 claims against all of the Cobalt Defendants must be dismissed.  The Section 11 claims likewise fail because no materially misleading statement is alleged, and the control person claims must necessarily be dismissed as well.

## BACKGROUND FACTS[1]

Cobalt is an independent[2] exploration and production company with operations in

---

[1] Full citations to exhibits appear in Appendix 2 filed with this motion and are short-cited herein for ease of reading. Also, unless otherwise noted, all internal quotation marks from quoted material have been omitted.

the deepwater U.S. Gulf of Mexico and offshore Angola and Gabon in West Africa. CAC ¶ 46; Ex. 47, 2/27/14 10-K, 3.[3]  It was formed as a private company in 2005 and taken public in December 2009.  CAC ¶ 45.  Its stock is traded on the New York Stock Exchange.  CAC ¶ 22.

## I.  Cobalt and Its Operations

When CEO Joe Bryant founded Cobalt, he sought to recruit the world's most experienced geologists, geophysicists, and engineers.  Ex. 37, July 2013 EY Article, 3. Cobalt's original technical team had an average of over 27 years of industry experience. Ex 3, 10/30/09 S-1/A, 8.[4]  The management team was led by Bryant and then-General Counsel Sam Gillespie—two individuals with more than 25 years of industry experience apiece, including significant international experience.[5]  *Id.* at 103, 105.  With its core personnel in place, Cobalt focused its exploration efforts on the deepwater Gulf of Mexico and offshore Angola and Gabon.  *Id.* at 2.

In the ten years since Cobalt's founding, it has seen its team and discoveries grow. It has four times as many employees as it did in 2009—increasing from 54 to 205.  *Id.* at

---

[2] In the oil and gas industry, the term "independent" is synonymous with non-integrated—it describes those oil and gas companies that are exclusively engaged in the exploration and production segment of the industry, with no downstream marketing or refining within their operations.  Independent Petroleum Association of America, at http://www.ipaa.org/economics-analysis-international/economic-reports.

[3] "[I]n securities actions, the court may . . . rely on public . . . documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit, without, pursuant to Rule 12(b), converting the motion into one for summary judgment."  *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006).  The index of exhibits to this motion identifies the paragraphs in which the CAC relies on each cited document or source.

[4] Plaintiffs quote Cobalt's 10/30/09 S-1/A in CAC ¶ 59, though they fail to include a cite acknowledging the source. Regardless, the Court may consider it deciding this motion.  *See Blackwell*, 440 F.3d at 286.

[5] When Cobalt went public, Bryant had more than 32 years of experience in the oil and gas industry.  Ex. 3, 10/30/09 Form S-1/A, 103.  Before founding Cobalt, he served as President and COO of UNOCAL and had significant experience in Angola as President of BP Exploration (Angola) Limited.  *Id.*  Gillespie had over 29 years of experience in the oil and gas industry, including as Chief Legal Officer of UNOCAL and General Counsel of Mobil Corporation.  *Id.*

102; Ex. 67, 2/23/15 10-K, 38.[6]  And its efforts have resulted in ten discoveries out of seventeen exploration prospects drilled across its three operating areas, with six of those discoveries located offshore West Africa.  Ex. 67, 2/23/15 10-K, 3.

## II.    Cobalt Obtains its Angolan Interests

By 2006, Cobalt had become interested in the deepwater "pre-salt" potential of Angola's Kwanza Basin.[7]  *See* Ex. 3, 10/30/09 S-1/A, 63–65.  As the CAC acknowledges, before founding Cobalt, Bryant gained significant experience working in Angola.  *See* CAC ¶ 57; *see also* Ex. 3, 10/30/09 S-1/A, 103.  Through his work as President of BP Exploration (Angola), Bryant developed business relationships with numerous representatives of Angola's national oil company, Sonangol E.P. ("Sonangol"), including the then-President of Sonangol, Manuel Vicente.[8]  *See, e.g.*, CAC ¶ 57.

Through Sonangol, Angola enters into exploration and development agreements with a wide range of foreign companies.  Sonangol often partners with "oil majors" like BP, Statoil, and ExxonMobil, which have been working in Angola for as long as 40 years.  *See* CAC ¶ 51.  Many other oil majors, including Chevron, Total, Petrobras, Maersk Oil, and Marathon, have interests in Angola.  *See* Ex. 11, OSISA Article, 25.  Angola is also accessible to companies outside of the oil majors—Vaalco, Svenska, and Inter Oil all hold interests in Angola.  *Id.*

---

[6] Because Plaintiffs include in CAC ¶ 119 n.25 information that could only be gleaned from the 2/23/15 10-K, the Court may consider that document in deciding this motion notwithstanding Plaintiffs' failure to cite that source.  *Cf. Blackwell*, 440 F.3d at 286.

[7] "Pre-salt potential" refers to an exploration play designed to look for oil trapped underneath large salt bodies that exist in certain basins around the world.  *Accord* CAC ¶ 82 n.23.

[8] In 2012, Manuel Vicente left Sonangol to take a position as Angola's Minister of State of Economic Cooperation.  Later that year, he became the Vice President of Angola.  CAC ¶ 52.

Cobalt saw untapped pre-salt potential and was a "first mover" in Angola's emerging Kwanza Basin. Ex. 33, 3/19/13 Investor Deck, 11. Based on the rifting that occurred when plate tectonics separated South America from Africa, Cobalt believed the geology offshore Angola was analogous to the geology offshore Brazil, Ex. 3, 10/30/09 S-1/A, 6, which, in 2007, was beginning to emerge as a significant pre-salt opportunity. Although other oil companies had explored the Kwanza Basin for post-salt purposes— and largely failed—Cobalt believed that success was possible in the pre-salt. *Id.*

As in most developing countries, the Angolan government retains all ownership of oil and gas rights and determines how and to whom those interests are allocated. *See* Ex. 11, OSISA Article, 6. A concession decree granted by the Angolan government and published in the Official Gazette typically sets out the operational terms of any oil and gas activity. *Id.* Typically, the government will retain an interest for Sonangol's production arm, Sonangol Pesquisa e Producao ("Sonangol P&P"). *Id.* at 6, 12. Additionally, as is common in emerging markets, the Angolan government is required by the 2004 Petroleum Activities Law to promote Angolan-owned companies in contracting for the oil industry services to build national capacity in the oil sector. *Id.* at 7.

From the outset, Cobalt disclosed the risks and challenges associated with operating in Angola, including Cobalt's inability to guarantee FCPA compliance and the risks associated with potential FCPA violations:

- "We do business and may do additional business in the future in countries and regions in which we may face, directly or indirectly, corrupt demands by officials, tribal or insurgent organizations, or private entities. Thus, we face the risk of unauthorized payments or offers of payments by one of our employees or consultants, given that these parties may not always be

subject to our control."

- "Our existing safeguards and any future improvements may prove to be less than effective, and our employees and consultants may engage in conduct for which we might be held responsible."

- "Violations of the FCPA may result in severe criminal or civil sanctions, and we may be subject to other liabilities, which could negatively affect our business, operating results and financial condition."[9]

However, to mitigate these risks as much as possible, in conjunction with its decision to enter Angola, Cobalt engaged Vinson & Elkins ("V&E") and O'Melveny & Myers ("O'Melveny") to represent and advise the Company on FCPA compliance in Angola. Ex. 9, 3/11/11, 8-K, 2.

### A.   Blocks 9 and 21

Cobalt obtained its contractual rights to its interests in Angola in September 2007 when the Company entered into a Participation Agreement ("PA") with Sonangol, acquiring a 40% interest in three exploration "blocks" offshore Angola—Blocks 9, 20, and 21.  Ex. 3, 10/30/09 S-1/A 7, 42–43.  In consideration for these interests, Cobalt paid Sonangol $24 million in signature bonuses and agreed to finance the participation of—or "carry"—Sonangol P&P and a to-be-named local partner that would own a 10% interest.[10]  *Id.* at 42; Ex. 47, 2/27/14 10-K, 23.

In July 2008, in furtherance of the PA, the Angolan Council of Ministers approved concession decrees, *see* Ex. 9, 3/11/11 8-K, obviating the need for Blocks 9 and 21 to

---

[9] Ex. 8, 3/1/11 10-K, 47–48; Ex. 5, 3/30/10 10-K, 51; Ex. 3, 10/30/09 S–1/A, 28.

[10] Carried members are not required to make any payments in connection with the initial exploration activities on the block, but those expenditures ultimately are recouped by the paying members upon production of oil from the blocks.  *See* Ex. 9, 3/11/11 8-K, 2.  Inclusion of carried members in oil and gas consortia is standard in developing countries, where empowerment and growth of indigenous exploration and production companies is a high priority.

proceed through a licensing round.  The decrees were published in the Official Gazette on June 11, 2009, after an April resolution from the Angolan parliament.[11]  These laws appointed Cobalt as the operator on Blocks 9 and 21, alongside Sonangol P&P's carried interest and a full-paying member, Nazaki Oil & Gáz ("Nazaki").  Ex. 13, 2/21/12 10-K, 21.  While the decrees were a necessary step to progress the blocks' development, they did not modify in any way Cobalt's 40% interest that it had bought and paid for in 2007.

The concession decrees—approved almost a year *after* Cobalt acquired its interest from Sonangol—marked the first time that Nazaki was identified to Cobalt.  Ex. 9, 3/11/11 8-K, 2.  Shortly thereafter, Sonangol identified Alper Oil, Limitada ("Alper") as the local carried partner.  *Id.*  V&E and O'Melveny, on Cobalt's behalf, subsequently conducted extensive due diligence with respect to Nazaki and Alper.  Ex. 9, 3/11/11 8-K, 2.  Because it had not worked with Nazaki or Alper in the past, however, Cobalt disclosed that its "familiarity with these companies" was limited.  *See, e.g.*, Ex. 5, 3/30/10 10-K, 51; Ex. 4, 11/27/09 S-1/A, 30.[12]

The concession decrees also authorized Sonangol to execute licensing agreements with the Block 9 and 21 contractor groups.  To that end, in February 2010, Cobalt and the other members (Nazaki, Alper, and Sonangol P&P) signed Risk Services Agreements ("RSAs") with Sonangol, defining the economic framework and operating agreement

---

[11] *See* Ex. 13, 2/21/12 10-K, 21; Ex. 1, Decree Law No. 14/09; Ex. 2, Decree Law No. 15/09.  The Court may consider the Angolan decrees because they are a matter of Angolan public record.  *See Norris v. Hearst Trust*, 500 F.3d 454, 461 (5th Cir. 2007) ("[I]t is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record."); *see also In re Ex Parte Application of Jommi*, No. C-13-80212, 2013 WL 6058201, at *1 n.1 (N.D. Cal. Nov. 15, 2013) (approving judicial notice of authoritative sources of foreign law).

[12] Plaintiffs quote Cobalt's 11/27/09 S-1/A in CAC ¶ 59, though they fail to include a cite acknowledging the source.  Regardless, the Court may consider it deciding this motion.  *See Blackwell*, 440 F.3d at 286.

7

with Sonangol as concessionaire.  Ex. 13, 2/21/12 10-K, 21; Ex. 9, 3/11/11 8-K, 2.

### B.      Block 20

On December 20, 2011, as part of the 2011 Pre-Salt Licensing Round, Sonangol finalized awards of eleven pre-salt exploration blocks, including Cobalt's award of a 40% interest in and operatorship of Block 20.  Ex. 13, 2/21/12 10-K, 3.  The same day, Sonangol and the Block 20 contractor group (Sonangol P&P, BP, China Sonangol, and Cobalt) entered into a Production Sharing Contract ("PSC"), which formed the basis for the parties' "exploration, development and production operations on Block 20 offshore Angola." *Id.* at 4.

The PSC obligates Cobalt and BP to make certain contributions for bonuses, scholarships, and social projects, including the Sonangol Research and Technology Center ("SRTC").[13]  *Id.* at 22.  Consistent with these obligations and Angola's Petroleum Activities Law, the payments are made directly to Sonangol, which is responsible for the actual planning and construction of the SRTC.  *See* Ex. 55, 5/14/14 Global Witness Letter.  Cobalt has no role in the creation of the SRTC beyond funding these amounts ear-marked for its development.  Other companies awarded interests through the 2011 Pre-Salt Licensing Round, such as Statoil and BP, have similar obligations to fund social projects, including the SRTC.  *See* Ex. 56, 8/4/14 Global Witness Article.

## III.   Allegations Emerge Concerning Nazaki

On July 30, 2010, an Angolan blogger named Rafael Marques de Morais

---

[13] China Sonangol assigned its interest and all associated rights and obligations to BP shortly after the parties signed the PSC.  Ex. 29, 2/26/13 10-K, 15.

published an article on his online blog, *Maka Angola*, claiming that three allegedly "top" Angolan officials—Vicente, General Manuel Helder Vieira Dias Junior ("Kopelipa"), and General Leopoldino Fragoso do Nascimento ("Dino")—were the owners of Nazaki. *See* Ex. 7, 7/30/10 Maka Angola Article.[14]   De Morais claimed all three men were connected to other companies allegedly set up as fronts for personal gain. *Id.*[15]

In its annual filing for 2010, Cobalt disclosed that it had been made aware of and was continuing to investigate allegations of a connection between senior Angolan government officials and Nazaki.  Ex. 8, 3/1/11 10-K, 47–48.  Ten days later, Cobalt disclosed that the SEC had commenced an informal inquiry into the allegations, and that Cobalt had voluntarily contacted the DOJ.  Ex. 9, 3/11/11 8-K, 2.  Cobalt later announced that the SEC issued a formal order of investigation related to Cobalt's operations in Angola.  Ex. 13, 2/21/12 10-K, 50.  Cobalt stated that it believed its activities in Angola had complied with all laws, including the FCPA, but that it could not "provide any assurance regarding the duration, scope, developments in, results of or consequences of [the SEC and DOJ] investigations." *Id.* at 50–51.

In April 2012, the *Financial Times* published two articles in which reporters claimed to have received letters from Vicente and Kopelipa confirming that they, along with Dino, had indirectly held shares in Nazaki through a holding company, Grupo Aquattro Internacional ("Aquattro").  *See* Ex. 16, 4/15/12 FT Article 1; Ex. 17, 4/15/12

---

[14] De Morais identified Kopelipa as the head of the Military Bureau of the Presidency and Dino as the head of Telecommunications at the Presidency.  Ex. 7, 7/30/10 Maka Angola Article.  Other articles cited by the CAC identify Dino as "a *former* head of communications in the presidency."  *See* Ex. 16, 4/15/12 FT Article 1 (emphasis added).

[15] De Morais made no allegations regarding Alper's ownership.  *See* Ex. 7, 7/30/10 Maka Angola Article.

FT Article 2.   Vicente and Kopelipa informed the *Financial Times* that Aquattro had since been dissolved.  *Id.*  In response to these stories, Cobalt reaffirmed its belief that it had not violated U.S. or Angolan law by entering into its Angolan transactions.  Ex. 18, 4/16/12 Press Release.

Over the next several years, Cobalt continued to cooperate with the SEC and DOJ investigations related to its Angolan operations.  *See* Ex. 47, 2/27/14 10-K, 55; Ex. 29, 2/26/13 10-K, 57.  Throughout this period, Cobalt routinely disclosed the existence and status of the investigation and the Company's ongoing cooperation.  *Id.*  At the same time, Cobalt continued to caution investors that it was unable to predict the duration, scope or outcome of the investigations.  *Id.*

On August 5, 2014, Cobalt disclosed that it had received a "Wells Notice" from the Staff of the SEC, which stated that the Staff had made a preliminary determination to recommend an SEC enforcement action against the Company.  Ex. 57, 8/5/14 8-K.  As Cobalt's disclosure and SEC policy make clear, the Wells Notice was not even a formal allegation, much less a finding of wrongdoing.  *Id.*[16]

## IV.   Sonangol Reclaims Nazaki's and Alper's Interests, and the SEC Terminates Its Investigation Without Action Against Cobalt

On August 26, 2014, Cobalt disclosed that it had received documents confirming that Nazaki and Alper were no longer members of the contractor group for Blocks 9 and 21.  Ex. 64, 8/26/14 8-K.  Earlier in the year, on March 25, 2014, Angola's Ministry of

---

[16] *In re Initial Pub. Offering Sec. Litig.*, No. 21-MC-92, 2004 WL 60290, at *1 (S.D.N.Y. Jan. 12, 2004) ("The Wells process was implemented so that the Commission would have the opportunity to hear a defendant's arguments before deciding whether to go forward with enforcement proceedings.").

Petroleum had issued two executive decrees declaring that Alper was "authorized to proceed with the assignment of all" of its interest in Blocks 9 and 21.  Ex. 50, Decree No. 88/14; Ex. 51, Decree No. 89/14.  Alper later transferred its interests to Sonangol P&P.  Ex. 64, 8/26/14 8-K.  Pursuant to a similar process, Nazaki also transferred its interests to Sonangol P&P.  *Id.*  As a result of these transfers, Sonangol P&P now holds a 60% working interest in Blocks 9 and 21, while Cobalt has the same 40% interest and operatorship it has continuously held since 2007.

In January 2015, Cobalt received a termination letter from the SEC, advising that its FCPA investigation relating to Cobalt's operations in Angola had concluded, and the Staff did not intend to recommend an enforcement action by the SEC.  Ex. 67, 2/23/15 10-K, 57.  Cobalt continues to fully cooperate with the DOJ investigation.  *Id.*

## V.     Cobalt's Lontra and Loengo Exploration Wells

As part of its Angolan operations, Cobalt planned to drill two exploration wells: Lontra, on Block 20, and Loengo, on Block 9.  *See, e.g.*, Ex. 13, 2/21/12 10-K, 17–18. Before drilling those wells, the Company's efforts had resulted in discoveries on all three of the wells it drilled offshore Angola.  *See*  Ex. 47, 2/27/14 10-K, 5–7.  However, it is well known that any exploration and production activity entails risks, and this is particularly true in complex, ultra-deepwater drilling operations such as these.  Cobalt consistently disclosed those risks to investors:

- "Oil exploration and production activities involve many risks that a combination of experience, knowledge and careful evaluation may not be able to overcome."

- "We have identified prospects based on available seismic and geological

information that indicates the potential presence of oil.  However, the areas
we decide to drill may not yield oil in commercial quantities or quality, or
at all."

- "Exploratory wells bear a much greater risk of financial loss than
  development wells.  In the past we have experienced unsuccessful drilling
  efforts. . . .  Most of the wells we plan to operate or participate in in the
  near term are exploratory wells."

- "Even when properly used and interpreted, 2-D and 3-D seismic data and
  visualization techniques are only tools used to assist geoscientists in
  identifying subsurface structures and hydrocarbon indicators and do not
  enable the interpreter to know whether hydrocarbons are, in fact, present in
  those structures."

- "Undue reliance should not be placed on our limited drilling results or any
  estimates of the characteristics of our projects or prospects, including any
  derived calculations of our potential resources or reserves based on these
  limited results and estimates."[17]

### A.    Lontra

In 2011, Cobalt disclosed that Lontra had been mapped using 2-D seismic data.

Ex. 8, 3/1/11 10-K, 19.  By May 2012, Cobalt acquired 3-D seismic data on Block 20.

Ex. 20, 7/31/12 10-Q, 29.   After processing the data, on October 30, 2012, Cobalt

explained that the 3-D survey indicated that "the [Lontra] prospect appear[ed] to be a

very large pre-salt structure."  Ex. 23, 10/30/12 Call Tr., 3.

Cobalt commenced drilling Lontra on May 21, 2013.  Ex. 38, 7/30/13 10-Q, 27.

On October 29, 2013, Cobalt announced that Lontra had reached total depth, and an oil

and gas discovery had been confirmed; however, further evaluation, including a drill stem

test,[18] was required to assess Lontra's potential.  Ex. 41, 10/29/13 Earnings Release, 1.

---

[17] Ex. 47, 2/27/14 10-K, 41, 44, 50; Ex. 29, 2/26/13 10-K, 42–43, 48; Ex. 13, 2/21/12 10-K, 36–37, 44; Ex. 8, 3/1/11
10-K, 33–34, 41.

[18] A drill stem test "is the principal way to test a formation that has just been drilled."  Christopher Zahm, et al.,

During an investor call that same day, Bryant and Jim Farnsworth, Cobalt's Chief Exploration Officer, continued to remind investors that it was "still early days on [the Company's] analysis of the Lontra data" and that a drill stem test would be required to determine whether Lontra was a commercial discovery.  Ex. 42, 10/29/13 Call Tr., 6.  Though it was clear that both oil and gas were present in Lontra, Bryant explained that "the splits between the oil and the gas" were unclear, which is why Cobalt "need[ed] to do some more work."  *Id.* at 20.[19]

Over the next month, Cobalt committed considerable resources and funds to conduct additional testing on Lontra.  On December 1, 2013, after Cobalt had spent tens of millions of dollars drilling and testing Lontra, *see* Ex. 47, 2/27/14 10-K, 74, Cobalt announced that it had "successfully tested its previously announced Lontra #1 Pre-salt discovery well," and that, while the "field contains more gas than [its] pre-drill estimates," the "exceptional reservoir system that [Cobalt] ha[d] discovered ranks among the best [it] ha[s] seen."  Ex. 45, 12/1/13 Press Release, 1.  On December 20, 2013, the Company "submitted a declaration of commercial well to Sonangol regarding the Lontra #1 exploration well."  Ex. 47, 2/27/14 10-K, 6.  Since then, Cobalt has continued to process and evaluate Lontra and has plans to drill an initial appraisal well to facilitate the ultimate development of the oil from Lontra in tandem with Orca, another of its successful wells.  Ex. 67, 2/23/15 10-K, 7.

---

*Exploration*, *in* FUNDAMENTALS OF PETROLEUM 64 (Univ. of Tex. at Austin – Petrol. Extension Serv., 5th ed. 2011), which includes producing the hydrocarbons to the surface.  The drill stem test "gives accurate data about a formation's pressure and the composition of fluids the formation contains."  *Id.*

[19] As Cobalt consistently disclosed, it does not have gas rights on Blocks 9 and 21.  *See* Ex. 13, 2/21/2012 10-K, 21–22.

### B.    Loengo

In February 2013, Cobalt announced plans to drill Loengo in 2014.  Ex. 29, 2/26/13 10-K, 17.  Cobalt was particularly interested in drilling Loengo because oil previously had been discovered in Block 9.  Ex. 48, 2/27/14 Call Tr., 9.  In addition, Maersk Oil, a Danish international oil and gas company, had recently drilled a successful well just west of Block 9.  *Id.*  As Cobalt warned, however, "the analogies drawn by [Cobalt] from available data from other wells, more fully explored prospects or producing fields may not prove valid in respect of [its] drilling prospects."[20]

The RSA for Block 9, which includes the Loengo prospect, provided an initial exploration period of four years, which was scheduled to expire on March 1, 2014.[21] Given this impending deadline, Cobalt applied for and received a two-year extension from the Angolan Ministry of Petroleum to facilitate drilling Loengo.  Ex. 47, 2/27/14 10-K, 8; Ex. 52, 5/1/14 10-Q, 26.  Shortly thereafter, Cobalt announced that it would start drilling Loengo upon completing operations on a nearby well.  Ex. 57, 8/5/14 8-K, Ex. 99.1, 1.

Cobalt drilled Loengo in 45 days, costing over $50 million to complete.  *See* Ex. 67, 2/23/15 10-K, 78; Ex. 66, 11/4/14 Earnings Release, 1.  On November 4, 2014, Cobalt announced that the well had been drilled to total depth.  Ex. 66, 11/4/14 Earnings Release, 1.  However, as often happens in deepwater exploration and production, *see, e.g.*, Ex. 47, 2/27/14 10-K, 52, the Loengo well "did not encounter commercial

---

[20] Ex. 47, 2/27/14 10-K, 41; Ex. 29, 2/26/13 10-K, 48; Ex. 13, 2/21/12 10-K, 36; Ex. 8, 3/1/11 10-K, 33.

[21] Ex. 47, 2/27/14 10-K, 15; Ex. 29, 2/26/13 10-K, 26, 47; Ex. 8, 3/1/11 10-K, 21–22; Ex. 5, 3/30/10 10-K, 30.

hydrocarbons." Ex. 66, 11/4/14 Earnings Release, 1.

## VI.     The CAC and Its Allegations

On May 1, 2015, Plaintiffs filed the CAC, alleging that the Cobalt Defendants made numerous false and misleading statements during the class period that constitute violations of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 thereunder, and Sections 11 and 15 of the Securities Act.

## STANDARD OF REVIEW

## I.     Pleading and Dismissal Standards

A Rule 12(b)(6) motion to dismiss tests whether the plaintiff has pleaded sufficient facts to "state a claim to relief that is plausible on its face." *Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 245 (5th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A claim has "facial plausibility" only when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  While properly pleaded material allegations in the complaint are accepted as true for purposes of the motion, a court should not "strain to find inferences favorable to the plaintiffs" or "accept conclusory allegations, unwarranted deductions, or legal conclusions." *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005).  Instead, the complaint must contain "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  "Naked assertions devoid of further factual enhancement" fall short. *Iqbal*, 556 U.S. at 678.

## II.      Standards under the Exchange Act

To state a claim under Section 10(b) and Rule 10b-5, Plaintiff must plead:  (1) a material misrepresentation or omission; (2) a defendant acting with scienter concerning the fraud; (3) reliance; (4) damages; and (5) loss causation.  *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008); *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 532 (5th Cir. 2008).

In addition to meeting the requirements of Rule 12(b)(6), a case brought under Section 10(b) and Rule 10b-5 must satisfy the heightened pleading standards of Rule 9(b) and the PSLRA.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–24 (2007).  Rule 9(b) requires that the complaint state "with particularity the circumstances constituting fraud."   The PSLRA further enhances the "particularity" requirement for pleading securities fraud under Rule 9(b) in two ways.

First, the PSLRA requires that a plaintiff not only specify each allegedly false or misleading statement or omission, but also the time, place, and content of the alleged misrepresentation; the identity of the speaker; "the reason or reasons why the statement is misleading"; and, "if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1) (2012); *see, e.g.*, *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir. 2004).  Where the allegations in a complaint are not made on the basis of the plaintiff's personal knowledge, they are necessarily made on information and belief, triggering the requirement that a sufficient factual basis be alleged to support a claim that a statement was false when made.  *ABC Arbitrage Pls.*

*Grp. v. Tchuruk*, 291 F.3d 336, 351 (5th Cir. 2002).

Second, for each alleged misrepresentation or omission, the PSLRA requires the plaintiff to state with particularity facts giving rise to a strong inference that *each* defendant acted with scienter with respect to *each* alleged misrepresentation.  *See* 15 U.S.C. § 78u-4(b)(2); *Shaw*, 537 F.3d at 533.  Scienter is an "an intent to deceive, manipulate or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it."  *R2 Invs.*, 401 F.3d at 643.  Severe recklessness can satisfy the scienter requirement but is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care."  *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 408–09 (5th Cir. 2001).  The requisite "strong inference" of scienter cannot be met merely with "facts from which an inference of scienter rationally could be drawn," nor will an inference of scienter that is "merely 'reasonable' or 'permissible'" suffice.  *Tellabs*, 551 U.S. at 323–24.  Rather, a 10b-5 claim can survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* at 324.  In making this determination, the court "must consider plausible, nonculpable explanations for the defendant's conduct" as compared to the culpable inferences alleged by Plaintiffs.  *Id.*

Finally, the plaintiff must establish that the alleged misstatements caused the loss for which he seeks recovery.  15 U.S.C. § 78u-4(b)(4).  Specifically, the plaintiff must allege facts showing "that the market reacted negatively to a corrective disclosure, which

revealed the falsity of [the company's] previous representations." *Catogas v. Cyberonics, Inc.*, 292 F. App'x 311, 314 (5th Cir. 2008) (affirming dismissal for failure to adequately allege loss causation, explaining that *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), "made clear that there must be sufficient allegations that the misrepresentations caused plaintiffs' loss").

## III.   Standards under the Securities Act

Section 11 "permits a securities purchaser to recover damages against, among others, signatories to a registration statement and directors of the issuer, if the registration statement 'contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 861 (5th Cir. 2003) (quoting 15 U.S.C. § 77k(a)).  "A *fact* is material 'if there is a substantial likelihood that a reasonable shareholder would consider it important' in making an investment decision." *Kapps v. Torch Offshore Inc.*, 379 F.3d 207, 213–14 (5th Cir. 2004) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988)).  "For an *omission* to be material, 'there must be a *substantial* likelihood that the disclosure of the omitted fact would have been viewed by the *reasonable investor* as having *significantly* altered the total mix of information made available.'" *Id.* at 214 (quoting *Basic*, 485 U.S. at 231–32).

For statements of belief or opinion, "liability under § 11's false-statement provision would follow," "assuming materiality," only if (1) "the speaker did not hold the belief she professed" or (2) "the supporting fact she supplied were untrue." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1327

(2015).  The mere fact that the belief or opinion "turned out to be wrong" will not suffice.  *Id.*  Liability under § 11's omission provision would follow only if a statement "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself," *id.* at 1329—that is, if the omitted facts show the issuer lacked the basis that a reasonable investor would expect for that opinion.  *Id.* at 1333.  The analysis of whether an opinion is misleading "must address the statement's context," which "means the court must take account of whatever facts [the issuer] *did* provide about legal compliance, as well as any other hedges, disclaimers, or qualifications it included."  *Id.*  That is because "an issuer need only divulge an opinion's basis, or else make clear the real tentativeness of its belief," in order "to avoid exposure for omissions under § 11."  *Id.* at 1332.

"Section 15 imposes joint and several liability upon defendants who control persons liable under §[] 11."  *See Rosenzweig*, 332 F.3d at 862 (citing 15 U.S.C. § 77o).  "The term control . . . means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  17 C.F.R. § 230.405 (2014).  As a result, there is no liability under Section 15 where a complaint fails to state a violation of the Securities Act.  *See Kapps*, 379 F.3d at 221.

### ARGUMENT AND AUTHORITIES

The CAC's claims against the Cobalt Defendants should be dismissed in their entirety.  With respect to the Exchange Act claims, the CAC does not adequately plead an

actionable false or misleading statement, scienter, or loss causation.  With respect to the Securities Act claims, the CAC pleads time-barred claims and does not adequately plead an actionable false or misleading statement.

## EXCHANGE ACT CLAIMS

### I.    The CAC suffers from foundational infirmities.

As a threshold matter, in evaluating Plaintiffs' Exchange Act claims, the allegations in the CAC must be deeply discounted because of their dubious origins.  The CAC depends on two principal sources, both of which are suspect:  seven "confidential witnesses" ("CWs"), and stories written by an Angolan blogger and other journalists.  Moreover, the CAC time and again recounts Plaintiffs' characterization of statements by the Cobalt Defendants, rather than the statements themselves, and often in a manner that distorts what was actually said.  These tactics undermine Plaintiffs' claims.

### A.    Confidential Witnesses

Because CWs are unidentified, it is difficult to assess the information supposedly provided or evaluate the strength of any inferences drawn therefrom.  *See, e.g.,* *Higginbotham v. Baxter Int'l., Inc.*, 495 F.3d 753, 756–57 (7th Cir. 2007) (concluding that information provided by CWs must be discounted under *Tellabs*, usually steeply, and noting that "[i]t is hard to see how information from anonymous sources could be deemed compelling or how we could take account of plausible opposing inferences.  Perhaps these confidential sources have axes to grind.  Perhaps they are lying.  Perhaps they don't even exist."); *Material Yard Workers Local 1175 Benefit Funds v. Men's Wearhouse Inc.*, No. H-09-3265, 2011 WL 3059229, at *6 (S.D. Tex. July 22, 2011) ("A party who

presents the stories of unnamed people is neither giving the court nor the defendant a plain statement of the facts.  When [a securities fraud plaintiff] offers facts from people whom it will not name, it is dissembling.  A secret witness is not far above a false witness.").  As a result, courts uniformly recognize that statements attributed to CWs must be discounted.  *See, e.g.*, *Shaw*, 537 F.3d at 535 ("[C]ourts must discount allegations from confidential sources.").  This discounting is even steeper when relying on CWs to plead scienter.  *Id.* (explaining that fact that plaintiff's allegations "derive from confidential sources further detracts from their weight in the scienter analysis").

Before a court can give even discounted weight to CWs, a plaintiff must first demonstrate that the CWs are reliable.  Thus, CW accounts must be accompanied by sufficient particularized allegations to "support the probability that a person in the position occupied by the source . . . would possess the information" ascribed to him.  *Id.* at 535, 539.  In particular, a "[c]ourt must be able to tell whether a [CW] is speaking from personal knowledge, or merely regurgitating gossip and innuendo."  *In re Metawave Commc'ns Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1068–69 (W.D. Wash. 2003).  And, the plaintiff must "allege with sufficient specificity when the allegedly improper activities occurred, how the witnesses learned of these activities or had access to this information, or, even ignoring these other deficiencies, how these activities affected [Cobalt's] statements and omissions."  *In re Career Educ. Corp. Sec. Litig.*, No. 03-C-8884, 2006 WL 999988, at *3 (N.D. Ill. Mar. 28, 2006).  Where plaintiffs fail to plead with the requisite particularity, courts will not consider allegations based on CW accounts.  *Owens v. Jastrow*, No. 13-10928, 2015 WL 3649823, at *10 n.13 (5th Cir.

June 12, 2015) (refusing to "draw any inferences from" CW's allegation that issue was discussed in meetings because complaint did not "plead with particularity the dates of the . . . meetings or the substance of the conversations").

The CAC's allegations fail to meet this standard.  The CAC relies on seven CWs:

- Cobalt's CFO and Executive Vice President from 2006 to October 2008;

- Cobalt's CFO and Executive Vice President from June 2009 to June 2010;

- a senior administrative assistant in Cobalt's Human Resources department from November 2009 to August 2013 (the "HR assistant");

- an executive administrative assistant for Cobalt's West Africa division from April 2010 to March 2015 (the "executive assistant");

- Cobalt's Chief Information Officer ("CIO") from June 2012 to April 2014;

- a Cobalt shorebase foreman in Angola from February 2013 to June 2014 (the "foreman"); and

- a former Cobalt driver coordinator in Angola in 2011 (the "driver").

Except for the former CFOs—neither of whom is alleged to have said anything even remotely indicative of securities fraud[22]—the CWs were not in positions that would have afforded them personal knowledge of the matters attributed to them.

For example, according to the CAC, the administrative assistants provided secretarial support to persons other than the Executive Defendants, and the former CIO

---

[22] Indeed, what the former CFOs did *not* say is far more notable than what they are alleged to have said.  Despite their executive-level positions at Cobalt, neither claims that Cobalt violated the FCPA.  One former CFO simply says that Bryant had a long history of working in Angola, made multiple trips there as CEO, and was involved in negotiations in Angola, and that it is challenging for a start-up company to break into a developing country, CAC ¶¶ 57–58—statements that are hardly indicative of Cobalt knowingly misstating its FCPA compliance.  The other former CFO actually signed SEC filings with disclosures about Nazaki that are virtually identical to later statements that Plaintiffs now contend were false.  *See, e.g.*, Ex. 5, 3/30/10 10-K, 51, 81 ("We have not worked with either of these companies in the past, and, therefore, our familiarity with these companies is limited.").

managed Cobalt's IT systems.[23]  *See CAC* ¶¶ 72 n.21, 74 n.22, 87 n.24.  Yet, the CAC

relies on these CWs for matters that go far beyond their respective areas of responsibility

or personal experience, including FCPA issues, internal investigations, seismic surveys,

and well results.  How those individuals came to possess the information attributed to

them typically is not explained.[24]  And where an explanation is provided, it makes clear

that the CW is not speaking from personal knowledge but rather is "regurgitating gossip

and innuendo."[25]  *Metawave*, 298 F. Supp. 2d at 1068–69; *cf. In re Dell Inc. Sec. Litig.*,

591 F. Supp. 2d 877, 895 (W.D. Tex. 2008) ("[P]laintiffs must allege with particularity

**when** a comment was made *to a confidential source*, or, if the source alleges a

conversation took place, when and where [it] occurred.") (second emphasis added).

All of these issues undermine the value of the CWs and, hence, of the CAC.

### B.    Articles

Plaintiffs also rely heavily on allegations in various articles, many of which trace

back to the Angolan blogger de Morais or the Maka Angola initiative funded and directed

by him.[26]  Other allegations trace back to the non-governmental organization ("NGO")

Global Witness.[27]  These sources cannot form the basis for a securities fraud pleading.

---

[23] Though the former CIO allegedly also "served on all Operations and Management teams," CAC ¶ 72 n.21, the CAC fails to explain what those "teams" were, who else was on them, when they met, and what role the CIO played in them.  Thus, that claim does nothing to bolster the CIO's reliability.  *See Owens*, 2015 WL 3649823, at *10 n.13.

[24] *See, e.g.*, CAC ¶ 111 (attributing the former CIO with stating that Cobalt "sat on" information that Cobalt "had hit a gaseous hydrocarbon column at Lontra" "a lot longer than [Cobalt] normally would," without explaining the source of that purported knowledge).

[25] *See, e.g.*, CAC ¶¶ 88–89 & n.24 (alleging that the HR assistant "understood" that it was discovered through the course of an internal investigation that a Cobalt employee had bribed an Angolan official because she allegedly "heard" from two other assistants "information" about the investigation).

[26] *See, e.g.*, CAC ¶¶ 66 n.11, 67 n.12, 68 n.16.

[27] *See, e.g.*, Ex. 62, 8/12/14 Quartz Article; Ex. 58, 8/5/14 Bloomberg Article.

News articles and journals—even legitimate ones—must meet the same standards that apply to all allegations under the PSLRA.  "Although a plaintiff may use such sources in pleadings, the news articles cited still must indicate particularized facts about a defendant's conduct in order to support the claims."  *City of Brockton Ret. Sys. v. Avon Prods., Inc.*, No. 11-civ-4665 PGG, 2014 WL 4832321, at *23 (S.D.N.Y. Sept. 29, 2014).  As with any other factual allegations, the allegations in the articles can be credited only to the extent that "they are sufficiently particular and detailed to indicate their reliability."  *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1172 (C.D. Cal. 2007).  "Conclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel."  *Id.*; *accord Rosenzweig*, 332 F.3d at 865 (holding that pleadings based on "conclusory statements in newspaper articles" did not "meet the rigorous pleading requirements of the PSLRA"); *cf. Thomson v. Morgan Stanley Dean Witter & Co.*, No. 01 CIV. 7071, 2001 WL 958925, at *1 (S.D.N.Y. 2001) (characterizing articles, reports, and news items from magazines, newspapers, and broadcasts as "jury speeches," which "are hardly what is known as elements of proper pleading of a right to relief" under the PSLRA).  Plaintiffs' articles fall well short.

First, the articles routinely make allegations without explaining how the source learned the information in question, much less whether the veracity of the information was ever determined.[28]  This lack of corroborating detail renders the information unsuitable under the PSLRA.  *See N. Port Firefighters' Penson–Local Option Plan v. Temple-Inland, Inc.*, 936 F. Supp. 2d 722, 746–47 (N.D. Tex. 2013).  Second, many of

---

[28] *See, e.g.*, Ex. 26, 1/5/13 Maka Angola Article.

the allegations are impermissibly conclusory.[29]  *See Rosenzweig*, 332 F.3d at 865; *Wet Seal*, 518 F. Supp. 2d at 1172; *cf. Weisskopf v. United Jewish Appeal-Fed'n of Jewish Philanthropies of N.Y., Inc.*, 889 F. Supp. 2d 912, 926 (S.D. Tex. 2012) (dismissing claim because allegations based on newspaper article "simply do not provide a basis for [it]"). Finally, the opinions set forth in the articles are just that—opinions, not facts.[30]  Such material cannot be credited by the Court in deciding this motion.

## C.     Plaintiffs' Selective Editing

Finally, through selective editing and, in some cases, outright mischaracterization, the CAC twists many cited documents beyond all recognition.  For example, the CAC calls Cobalt's statement that its "oil-focused below-salt exploration efforts have been successful" untrue because Loengo purportedly was not "oil-focused" or "successful." CAC ¶ 259.  Yet, Plaintiffs omit that the purportedly untrue statement described nine specific wells, and *Loengo was not one them*:

> Since our founding in 2005, our oil-focused, below-salt exploration efforts have been successful in each of our three operating areas, resulting in nine discoveries out of the fourteen exploration prospects drilled.  These nine discoveries consist of North Platte, Heidelberg and Shenandoah in the U.S. Gulf of Mexico; Cameia, Lontra, Mavinga, Bicuar and Orca offshore Angola; and Diaman offshore Gabon.

Ex. 54, 5/7/14 424B3, S-1.  The CAC is replete with such mischaracterizations, which casts even further doubt on Plaintiffs' claims.[31]  *Cf. Kurtzman v. Compaq Computer*

---

[29] *See, e.g.*, Ex. 63, 8/17/14 *Forbes* Article at 4, 6 (asserting that the "SEC should throw the book at [Cobalt]" because it "must have known" about Nazaki's ownership); Ex. 62, 8/12/14 Quartz Article (asserting that the money paid by Cobalt and BP for the SRTC—pursuant to their contractual obligations—"smacks of corruption").

[30] *Cf. In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 359–61 (D.N.J. 2007) (holding that "personal opinions void of specific details regarding the basis for [the CW's] personal knowledge" add nothing to falsity or scienter).

[31] Additional examples of Plaintiffs' mischaracterizations are shown in the chart attached as Appendix 1.

*Corp.*, No. CIV. A. 99-1011, 2002 WL 32442832, at *25 (S.D. Tex. Mar. 30, 2002) ("[The] court will not 'parse out factual statements that, when read in context, do not convey what Plaintiffs assert.'").

## II. The CAC fails to plead facts sufficient to demonstrate that any of the challenged statements were false or misleading when made.

Plaintiffs allege that the Cobalt Defendants made two broad categories of false and misleading statements: (1) statements related to Cobalt's compliance with the FCPA, and (2) statements regarding the Company's Lontra and Loengo exploratory wells. But the CAC offers no particularized facts demonstrating that any of the challenged statements were false when made, or that the omission of a material fact rendered any of the challenged statements misleading. These failings doom the Rule 10b-5 claims.

### A. The CAC fails to adequately plead that any FCPA-related statement was false or rendered misleading by the omission of material facts.

Most of Plaintiffs' complaints focus on statements in earnings calls, press releases, and SEC filings about Cobalt's FCPA compliance and the two partners the Angolan government assigned to Cobalt long after it acquired its interests in the blocks. With few exceptions, the CAC does not seriously contend that the challenged statements were false standing alone. Instead, it alleges that they were rendered misleading by omitted "facts"—namely, "facts" about Nazaki and Alper and their owners.[32]

To begin with, the CAC lists the challenged statements in one paragraph and the omitted "facts" in another and leaves it to Defendants and the Court to guess which

[32] For example, Plaintiffs allege that Cobalt's statements about its due diligence were false and misleading not because the due diligence did not occur, but because Cobalt did not disclose that Nazaki was owned by government officials, which due diligence supposedly would have uncovered. *See, e.g.*, CAC ¶¶ 133–35.

omitted facts render which challenged statement misleading and how.  But such parsing is the job of Plaintiffs, not Defendants or this Court, and Plaintiffs' failure to do so is a critical pleading failure under the PSLRA.  *See, e.g.*, *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) ("Rule 10b-5 . . . prohibit[s] *only* misleading and untrue statements, not statements that are incomplete. . . . [T]he plaintiffs' complaint must specify the reason or reasons why the statements made by THC were misleading or untrue, not simply why the statements were incomplete.").

Just as critically, the CAC never explains how the omitted facts were (1) material and (2) necessary to make any specific, material statement not misleading.  17 C.F.R. § 240.10b-5(b) (2014) (making it unlawful "to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading").  A "claim of incomplete disclosure is actionable only if what [was] said is misleading" because it "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists."  *Shaw*, 537 F.3d at 541 (quoting *Brody*, 280 F.3d at 1006).  For example, the only way that the identities of the owners Cobalt's later-assigned non-operator partners might have been material to any of the challenged statements—that is, viewed by the reasonable investor as significantly altering the "total mix" of available information, *Basic*, 485 U.S. at 231–32—is if those facts constituted an FCPA violation.  Yet, Plaintiffs do not plead that such facts constitute an FCPA violation, and, indeed, they cannot.

These pleading deficiencies, like those described at *supra* 20–26, plague each of the challenged FCPA-related statements.

1.    **The CAC fails to plead facts making false or misleading Cobalt's opinion that its Angolan activities complied with the FCPA.**

The CAC challenges Cobalt's statement in several SEC filings that it "believes its activities in Angola have complied with all laws, including the [FCPA]."[33]  According to the CAC, that statement of opinion was materially false and misleading and omitted material facts (though the CAC offers no explanation for how the omitted facts rendered Cobalt's opinion misleading).[34]

Critically, however, the CAC pleads no facts showing that Cobalt's opinion was wrong—that is, the CAC *does not plead an FCPA violation*.  And for good reason—no determination of liability by a regulatory authority or court exists.  Nor does the CAC suggest how Cobalt's opinion could have been false and misleading in light of the SEC's terminating its FCPA investigation without recommending an enforcement action.[35]  The failure to plead an FCPA violation is fatal to both Plaintiffs' falsity theory and their misleading-by-omission theory.  *See Omnicare*, 135 S. Ct. at 1325–27 (recognizing that statement of opinion "*ultimately found incorrect*" may be actionable misstatement, though "only if the speaker did not hold the belief she professed" or "if the supporting fact she supplied were untrue") (emphasis added); *id.* at 1327–30, 1332–33 (explaining that plaintiff must identify specific material facts rather than simply some "[f]acts cutting the other way" to render a statement of opinion misleading).[36]  Indeed, the Cobalt

---

[33] CAC ¶¶ 133, 139, 162, 165, 169, 175, 176, 183.

[34] CAC ¶¶ 135, 141, 162, 165, 175, 176, 183.

[35] Notably absent from the CAC is any reference to the SEC's termination of its investigation, despite the CAC's multitude of allegations about the SEC investigation and Wells Notice.

[36] *Omnicare* expressly addresses § 11 of the Securities Act, not § 10(b) of the Exchange Act, but for purposes of this

Defendants are aware of no case in which an opinion not found to be incorrect served as an adequate basis for a 10b-5 claim.  The CAC thus fails to plead that Cobalt's opinion was false or misleading.

> a. **The CAC's claim that Nazaki and Alper were owned by government officials does not allege an FCPA violation.**

A central theme of the CAC is the assumption that if Nazaki or Alper were owned by government officials, then an FCPA violation must have occurred.[37]  That assumption is mistaken, as the FCPA requires far more than the mere presence of concealed government official ownership in a venture.  Instead, the statute makes it unlawful for a company to "[(i)] corruptly, [(ii)] in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving, [(iii)] of anything of value, [(v)] to any foreign official, [(vii)] for [the] purpose[] of influencing any act or decision of such foreign official in his official capacity, [] inducing such foreign official to do or omit to do any act in violation of the lawful duty of such official, or []securing any improper advantage."  15 U.S.C. § 78dd-1(a) (2012).

As the CAC acknowledges, Cobalt purchased its 40% interests in Blocks 9 and 21 from the Angolan government in 2007, *see* CAC ¶ 58, almost one year *before* the Angolan government—not Cobalt—named Nazaki as a full-paying member of the

---

motion, the Cobalt Defendants assume, *arguendo*, that *Omnicare* applies to the § 10(b) claims.

[37] *See, e.g.*, CAC ¶¶ 133–34 (alleging that Cobalt's opinion on its FCPA compliance was false because "Nazaki's registration documents showed Nazaki and Alper were shell companies for Angolan government officials").

contractor group in 2008.[38]  Plaintiffs cannot claim, and certainly have not pleaded any particularized facts to demonstrate, that as a result of Nazaki's government official ownership, Cobalt gave any thing of value to an Angolan government official, let alone that it did so in order to gain an improper advantage and corruptly.  Thus, even setting aside the conclusory nature of the CAC's allegations regarding Cobalt's supposed knowledge of Angolan government official ownership,[39] Plaintiffs have not pleaded— with particularity or otherwise—that Cobalt violated the FCPA.[40]

### b. The CAC's claim of improper payments to Angolan government officials does not allege an FCPA violation.

The CAC also fails to plead an FCPA violation with the vague allegation that Cobalt omitted that it "made improper payments to Angolan government officials and large sums of money could not be accounted for, which led to a Board investigation and the removal of Cobalt's Senior Vice President and Country Manager for Angola," Rich Smith.  *E.g.*, CAC ¶ 141; *see also* CAC ¶ 85 (alleging that Smith lived in a home owned by Vicente and "pa[id] 'beyond' $30,000 to $40,000 in monthly rent as bribes").

---

[38] *See* CAC ¶ 60; Ex. 3, 10/30/09 S-1/A 7, 42.

[39] For example, the CAC does not contain particularized facts supporting its assertion, *see, e.g.*, CAC ¶ 134, that a basic review of Nazaki's registration documents would have revealed government official ownership.  *Infra* n.40.

[40] The assumption that Alper's ownership somehow gives rise to an FCPA violation is even weaker, given the complete absence of well-pleaded facts plausibly showing that Alper was, in fact, owned by government officials. Although the CAC baldly asserts in an unsourced paragraph that Alper shareholders Alberto da Fonseca Abrantes and Antonio do Nascimento Pegado "held the government positions of 'Administrator of Concessions' and 'Member of the Operating Committee' on oil exploration blocks in Angola," CAC ¶ 69, it does not say when they purportedly held those positions, let alone offer a basis for claiming that the positions were government positions. *See* 15 U.S.C. § 78u-4(b)(1) (requiring, for allegations about allegedly false statements made on information or belief, that complaint "state with particularity all facts on which that belief is formed").  At best, the CAC alleges that Alper's shareholders held government positions at some unspecified point in their careers, but that allegation does not cast doubt on Cobalt's opinion that it was FCPA compliant.  Indeed, even accepting as true the CAC's allegations regarding Alper's ownership, they do not amount to an FCPA violation.  *See* 15 U.S.C. § 78dd-1(a).

As a threshold matter, these allegations rest on unreliable sources and are facially implausible.  With respect to the supposed internal investigation of Rich Smith, the CAC attributes its allegations primarily to two CWs:  the HR assistant and the former CIO.  *See* CAC ¶¶ 83, 88–89.[41]   But the CAC concedes that the HR assistant is merely repeating hearsay from others who, like herself, are not alleged to have participated in any investigation.[42]   And the CAC makes clear that the former CIO—who did not join Cobalt until June 2012 and also is not alleged to have participated in any investigation, CAC ¶ 72 n.21—has no personal knowledge of an investigation that he claims began in 2011 and after which the investigation's subject was inexplicably promoted and named Investor Relations manager.  *See* CAC ¶¶ 83, 90 (attributing former CIO with explaining how Cobalt's Board "required the Company to conduct an investigation in late 2011 and 2012" and, "following the investigation meetings, Smith got 'yanked out of Angola'" and made Cobalt's Investor Relations manager); Ex. 47, 2/27/14 10-K, 41 ("Mr. Smith served as Vice President, Investor Relations and Planning from October 2011 . . . .").

The insinuation that Smith paid Vicente rent as bribes is also deficient.  Once again, the former CIO's allegation that Smith did not stay in apartments Cobalt

---

[41] The CAC also purports to rely on statements made by the executive assistant, but the only statements attributed to her—that an investigation involved a series of meetings between Smith and Cobalt's attorneys, CAC ¶ 87—do not remotely suggest that Cobalt bribed an Angolan official.  She provides no indication of what was being investigated or the outcome of the investigation—omissions that are hardly surprising given that she was not a member of the investigation team and did not have transparency into its findings.  The CAC's strategic placement of the executive assistant's statements between those of the CIO and those of the HR assistant, *see* CAC ¶¶ 86–88, does not transform her statements into anything more than an observation that meetings occurred.

[42] *See, e.g.,* CAC ¶ 88 n.24 ("She *heard* from [Debbie] Jackson and [Syndey] Contillo information regarding the Company's internal investigation in late 2011 and 2012 into potential bribes to Angolan officials and how Richard Smith was found to have given or authorized those bribes.") (emphasis added); *id.* ¶ 89 (stating that the HR assistant "*understood* that it was discovered through the course of Cobalt's internal investigation" that Smith bribed an Angolan government official) (emphasis added).

supposedly had when he travelled to Luanda from 2009 to 2011—years before the CIO joined Cobalt—necessarily rests on hearsay and, in any event, fails to plead the elements of a bribe.  *See* CAC ¶ 85.  And although the CAC claims de Morais said "'Cobalt's manager' in Angola was living in a house owned by Vicente and paying 'beyond' $30,000 to $40,000 in monthly rent as 'bribes,'" *id.*, the CAC, perhaps deliberately, entirely fails to source his statement.  As a result, the CAC fatally omits when de Morais made the statement, on what facts it was based, and, most critically, who his sources were and whether they were in a position to possess the information attributed to them.

These allegations are also implausible.  The notion that Cobalt and its Board determined that Rich Smith bribed Angolan government officials and then promptly put him in charge of investor relations—all while the SEC and DOJ were investigating Cobalt's Angolan operations—is far too implausible to credit in the falsity analysis.  *Cf. In re NVIDIA Corp. Secs. Litig.*, 768 F.3d 1046, 1057–58 (9th Cir. 2014), cert. denied, 2015 WL 582799 (May 14, 2015) (holding that "implausibility of the timing of CW1's account of events" detracted from any inference of scienter).  The PSLRA simply does not countenance unleashing the full fury of discovery based on fantastical allegations made up out of whole cloth.[43]

### c.    The CAC does not identify an omitted material fact that renders Cobalt's opinion misleading.

As discussed, there has been no charge that Cobalt violated the FCPA, much less a

---

[43] *Cf. United States ex rel. Mikes v. Straus*, No. 92 CIV. 2754 (VLB), 1995 WL 6798, at *1 (S.D.N.Y. Jan. 3, 1995) ("[Rule] 9(b) requires more information than otherwise . . . and cautions judicial care in unleashing the full weight of a lawsuit with its potentially intrusive discovery unless an adequate basis for doing so exists.").

finding or adjudication.  This lack of an FCPA violation dooms the CAC's attempt to characterize Cobalt's belief about FCPA compliance as misleading by omission—how could Cobalt's opinion that it complied with the FCPA ever be misleading if, in fact, Cobalt complied with the FCPA?  The CAC never answers that question.

But even if the CAC could somehow make out an omission claim without an FCPA violation, it still fails to identify any particular material fact about the basis for Cobalt's stated belief that, when omitted, made the statement misleading to a reasonable investor reading it fairly and in context.  *See Omnicare*, 135 S. Ct. at 1329, 1332.  The omitted "facts" about Nazaki and Alper, *e.g.*, CAC ¶ 135(i)–(iii), are immaterial to, and do not render misleading, Cobalt's belief that it complied with the FCPA, as they do not, standing alone, constitute an FCPA violation.[44]  *See supra* 29–32.  The same is true of the omitted "fact" that Nazaki's and Alper's purported connections to the Angolan government "posed a significant risk of FCPA violations and regulatory action."  CAC ¶ 135(iv).  And the conclusory assertion that Cobalt "did not reasonably believe" its activities complied with the FCPA, *e.g.*, CAC ¶ 135(v), does not suffice[45]—especially in the face of Cobalt's disclosures, in the very SEC filings challenged by Plaintiffs, that

- "[b]efore Cobalt conducted any activities or operations in Angola, Cobalt

---

[44] Indeed, even if the identities of Nazaki's or Alper's owners qualified as "facts about how [Cobalt] . . . formed [its] opinion—or, otherwise put, about [Cobalt's] basis for holding that view," *Omnicare*, 135 S. Ct. at 1328—and it is not at all clear that they do—they do not "show[] that [Cobalt] lacked the basis for making [its] statement that a reasonable investor would expect," *id.* at 1333, given that Angolan government official ownership would, at best, be relevant to only one essential element for FCPA liability.  As *Omnicare* makes clear, "[a]n opinion statement . . . is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way," as "[a] reasonable investor does not expect that *every* fact known to an issuer supports its opinion statement."  *Id.* at 1329.

[45] *See Omnicare*, 135 S. Ct. at 1333 ("[R]ecitation of the statutory language—that Omnicare 'omitted to state facts necessary to make the statements made not misleading'—is not sufficient; neither is the Funds' conclusory allegation that Omnicare lacked 'reasonable grounds for the belief' it stated respecting legal compliance.").

engaged [V&E] and O'Melveny [], two experienced and well-respected U.S.-based international law firms," which "were engaged specifically to represent Cobalt with respect to the FCPA in connection with establishing its contractual arrangements in Angola and have represented and consulted with Cobalt regularly to date," Ex. 9, 3/11/11 8-K, 2; and

- Cobalt "ha[s] conducted an extensive investigation into these allegations," Ex. 13, 2/21/12 10-K, 50–51.

*See Omnicare*, 135 S. Ct. at 1330 ("[W]hether an omission makes an expression of opinion misleading always depends on context."). Moreover, going forward, Cobalt continued to disclose the SEC and DOJ investigations, cautioning investors that it could not "provide any assurance regarding the duration, scope, developments in, results of or consequences of these investigations." Ex. 47, 2/27/14 10-K, 55; Ex. 29, 2/26/13 10-K, 57; Ex. 13, 2/21/12 10-K, 50–51.

Against this fulsome backdrop, no reasonable investor could misunderstand (1) Cobalt's basis for its belief that it had complied with all laws, including the FCPA; or (2) that Cobalt was providing no guarantees about its FCPA exposure—through Nazaki or otherwise—should the SEC or DOJ take a differing view of Cobalt's Angolan operations. Thus, the omitted "facts" simply do not show that Cobalt lacked the basis that a reasonable investor would expect for its statement that it believed its Angolan activities complied with the FCPA, and the CAC pleads no particular, material fact that, considering the full context, would make Cobalt's opinion misleading.

### 2. The CAC fails to plead facts rendering any of the other FCPA-related statements false or misleading.

Unable to plead that Cobalt misled investors about its opinion on FCPA compliance, the CAC challenges a host of other FCPA-related statements. Specifically, it

calls false and misleading statements about:

- the due diligence that Cobalt conducted on Nazaki and Alper;

- Cobalt's familiarity with Nazaki and Alper;

- the nature of Nazaki's interests;

- the timing of Alper's transfer of its interests to Sonangol; and

- Cobalt's contractual obligation to fund the SRTC.

But the lack of an FCPA violation is fatal to these challenged statements too, as none of the challenged statements could possibly be materially false or rendered materially misleading by the omission of material facts without an underlying FCPA violation. And Plaintiffs do not adequately plead that any of the statements were false or misleading for some other reason.

<u>Cobalt's Due Diligence and FCPA Compliance Efforts</u>.   The CAC complains about Cobalt's description of its due diligence and FCPA compliance efforts,[46] pointing to statements like:

- "Since [Nazaki's July 2008] identification [to Cobalt], Cobalt, in consultation with [V&E and O'Melveny], conducted extensive due diligence with respect to Nazaki," and "[o]ur diligence efforts with respect to Nazaki and these allegations [of government official ownership] continue."

- "Cobalt takes compliance with the FCPA and other laws very seriously and has devoted considerable resources toward such compliance."[47]

- "Cobalt has based its decisions and actions on the results of [its] extensive investigations and will continue to maintain rigorous due diligence in all of

---

[46] CAC ¶¶ 133, 139, 148, 151, 152, 156, 162, 165, 175, 176, 183.

[47] Ex. 9, 3/11/11 8-K, 2.

its worldwide activities."[48]

- "Transparency is a primary focus at Cobalt and frankly we cannot operate without it.  We have spent significant human and financial resources to ensure that the appropriate compliance was undertaken as relates to the contracts and agreements we have in place with our Angola partners.  Our compliance efforts began in 2007. . . . We are confident of this process and that we have done everything we can do. . . . Our compliance efforts never end, and we intend to continue our efforts in this same vein."[49]

The CAC does not plead these statements were literally false—it does not claim, for example, that Cobalt did not actually engage in extensive due diligence, or that it has not devoted considerable resources to its FCPA compliance efforts.

Instead, the CAC asserts the statements are somehow false because "Nazaki's and Alper's foundational documents revealed that they were owned by Angolan government officials."[50]  But the very sources upon which the CAC relies *disprove* the allegation with respect to Nazaki.[51]  And, even accepting that Alper's owners' names appeared in its registration documents, the CAC does not plead that those individuals were government officials *while they owned Alper.  See supra* 30 n.40.

Even if there were any basis for the allegation that registration documents revealed government official ownership of Nazaki or Alper, it would not matter because that "fact" does not contradict or otherwise render untrue anything actually said in the challenged statements.  Nor does its absence render those statements misleading—Cobalt

---

[48] Ex. 18, 4/16/12 Press Release.

[49] Ex. 19, 5/1/12 Call Tr., 4.

[50] CAC ¶ 140; *see also* CAC ¶¶ 134, 149, 151, 153, 156, 162, 165, 175, 176, 183.

[51] *See* Ex. 16, 4/15/12 FT Article 1 ("Three of the most powerful officials in Angola have held *concealed* interests . . . .") (emphasis added); Ex. 17, 4/15/12 FT Article 2 ("The three men's names *do not appear* among the five shareholders in Nazaki listed *in two company registration documents* obtained by the FT, dating from 2007 and 2010.") (emphasis added).

merely told investors that it conducted extensive due diligence and devoted considerable resources to FCPA compliance, and who owned Nazaki or Alper does not affect the meaning of those statements.  And, given that government official ownership does not equate to an FCPA violation, *see supra* 29–30, who owned Nazaki and Alper is immaterial.[52]

"Limited Familiarity" and "Allegations" regarding Nazaki's Owners.  The CAC claims that Cobalt falsely stated in its 2010 10-K that its "familiarity with [Nazaki and Alper] is limited" and that it had learned of "*allegations* . . . of a connection between senior Angolan government officials and Nazaki," which was false and misleading because Cobalt "knew, or w[as] reckless in not knowing, that Nazaki and Alper were in fact owned by Angolan government officials" and omitted material "facts" about Nazaki and Alper.  CAC ¶¶ 129–31 (emphasis added).  What Cobalt actually said—in a paragraph in the "**Risks Relating to Our Business**" caption under the subcaption, "*We may be exposed to liabilities under the [FCPA], and any determination that we violated the [FCPA] could have a material adverse effect on our business.*"—is:

> We are subject to the [FCPA] and other laws that prohibit improper payments or offers of payments to foreign governments and their officials and political parties for the purpose of obtaining or retaining business.  We do business and may do additional business in the future in countries and regions in which we may face, directly or indirectly, corrupt demands by officials, tribal or insurgent organizations, or private entities. . . .  In connection with entering into our [RSAs] for Blocks 9 and 21 offshore Angola, two Angolan-based E&P companies were assigned as part of the contractor group by the Angolan government.  We had not worked with either of these companies in the past, and, therefore, our familiarity with

---

[52] The same analysis applies to the omitted "facts" about Nazaki and Alper, *see* CAC ¶¶ 135, 141, 150, 154, 171, which are not pleaded with particularity in any event.

these companies is limited.  However, last year [2010], we were made aware of allegations, that we are continuing to look into, of a connection between senior Angolan government officials and Nazaki (a full paying member of the contractor group for Blocks 9 and 21).  In the future, we may be partnered with other companies with whom we are unfamiliar. Violations of the FCPA may result in severe criminal or civil sanctions, and we may be subject to other liabilities, which could negatively affect our business, operating results and financial condition.

Ex. 8, 3/1/11 10-K, 47–48.  When read fairly and in context,[53] what Cobalt meant by "limited familiarity" is clear—it did not have past experience working with Nazaki or Alper.  That is true, and the CAC does not claim otherwise.  Nor does it plead facts showing that Cobalt learned of these allegations of a connection between government officials and Nazaki earlier than "last year" (2010), or that the "allegations" were anything more than that at the time.[54]  And, viewed in context, Cobalt's later disclosures using similar language[55] were simply describing from a historical perspective when and how the allegations emerged and the state of its familiarity with Nazaki at the time.[56] Thus, the CAC does not adequately plead that the statements were false when made.

Nor does the CAC plead that Cobalt's statements were rendered misleading by the omission of the supposedly material "facts" about Nazaki and Alper.  *See* CAC ¶ 131;

---

[53] *Cf. Kurtzman*, 2002 WL 32442832, at *25 ("[The] court will not parse out factual statements that, when read in context, do not convey what Plaintiffs assert.").

[54] As explained above, the claim that government official ownership of Nazaki and Alper was apparent from their "foundational documents" is implausible.  *See supra* 36.  Moreover, the CAC's reliance on articles from 2013, *see* CAC ¶ 66 n.11–12, ¶ 68 n.15, does not show that Nazaki's alleged government official ownership was apparent, let alone known by Cobalt, in 2010.  The same is true with respect to the shorebase foreman's allegation that Nazaki's ownership was "common knowledge" at Cobalt when he joined the Company in February 2013.  CAC ¶ 188.

[55] CAC ¶¶ 139, 151, 156, 162, 165, 175, 176, 183.

[56] *E.g.*, Ex. 13, 2/21/12 10-K, 50 ("In connection with entering into our RSAs for Blocks 9 and 21 offshore Angola, two Angolan-based E&P companies were assigned as part of the contractor group by the Angolan government.  We had not worked with either of these companies in the past, and, therefore, our familiarity with these companies was limited.  In the fall of 2010, we were made aware of allegations of a connection between senior Angolan government officials and [Nazaki] . . . . In March 2011, the SEC commenced an informal inquiry into these allegations.").

*Brody*, 280 F.3d at 1006 (holding that allegations did not meet PSLRA because "[a]lthough [plaintiffs] specify what information THC omitted, they do not indicate why the statement THC made was misleading").  Who owned Nazaki and Alper is not material absent an FCPA violation—which Plaintiffs do not and cannot plead.  And, in any event, Cobalt alerted investors to the possibility of government official ownership and the risk of FCPA violations by disclosing the allegations, stating that it was continuing to look into them, and explaining the serious consequences that the finding of an FCPA violation could entail.  Ex. 8, 3/1/11 10-K, 47–48.  These disclosures provided ample context for Cobalt's statements about the Nazaki allegations, adequately conveyed the risks, and left no misimpressions.

    <u>Cobalt's Description of Nazaki as "Full Paying."</u>  The CAC alleges that Cobalt falsely described Nazaki as a "full paying member" of the contractor group for Blocks 9 and 21 because Nazaki's registration documents purportedly revealed it to be a shell company for Angolan government officials.[57]  But it omits critical context showing that Cobalt's statement does not convey what Plaintiffs assert:

> As background, in connection with entering into the [RSAs] for Blocks 9 and 21 . . . , two Angolan-based E&P companies were assigned as part of the contractor group by the Angolan government.  **One of these companies is Nazaki, who is a full paying member of the contractor group and holds a 30% working interest in these blocks. . . . To date, Nazaki has made all payments required of it under the [RSAs] as a 30% working interest owner in these blocks.**  The other company is [Alper], who holds a 10% working interest in these blocks and is a "carried" member of the contractor group, meaning that it is not required to make any payments under the [RSAs] with respect to the initial exploration activities on the blocks, though such payments are ultimately recouped by the other paying

---

[57] CAC ¶¶ 133–34, *see also* CAC ¶¶ 129, 130, 139, 140, 151, 156, 162, 165, 175, 176, 183.

> members of the contractor group upon production of oil from the blocks.  It is customary in Angola to have both paying and carried members of the contractor group.

Ex. 9, 3/11/11 8-K (emphasis added).  In this context, no reasonable investor would have understood Cobalt's use of the phrase "full paying member" as anything other than a description of the nature of Nazaki's non-carried interests in the blocks.  *Cf. Omnicare*, 135 S. Ct. at 1330 (noting that the reasonable investor "takes into account the customs and practices of the relevant industry").  The identities of Nazaki's owners simply has no effect on the type of interests Nazaki held in the blocks.

The CAC also complains that Cobalt failed to disclose Nazaki's purported "lack[] [of] 'competence and financial capacity,'" its "fail[ure] to comply with its economic and financial commitments related to its payment of the costs associated with the operations" on Blocks 9 and 21, and that it "did not possess the legal requirements to be associated with the National Concessionary."  CAC ¶ 135, 141, 150, 154, 171.  In addition to lacking the requisite particularity, these allegations have no bearing on Nazaki's status as a "full-paying" member of the contractor group or its ownership.  Nor does the CAC explain how the status of Nazaki's amounts payable or associated legal status vis-à-vis Sonangol would have been material to Cobalt's statements in any other respect.

"World Class" Partners.  The CAC complains about Cobalt's statements in three investor presentations that it has "world class" partners and "partnerships with leading global deepwater operators," alleging that they were false and misleading because "(i) Nazaki lacked the 'competence and financial capacity' to be a legitimate partner in Cobalt's oil exploration activities in Angola and (ii) neither Nazaki nor Alper were

'leading global deepwater operators' in Angola." CAC ¶ 170. But contrary to the CAC's suggestion, Cobalt never suggested that *Nazaki or Alper* were "world class" partners or "leading global deepwater operators," nor did it say anything about their competence or financial status; in fact, it did not mention those companies at all:[58]



Instead, it described its operations around the globe (not just in Angola)[59] and its partners and partnerships generally (not specifically Alper or Nazaki, neither of which is even an operator). *Id.* In addition to being "puffery," or the sort of generalized statements that are not actionable,[60] Cobalt's descriptions were entirely accurate, given its partnerships with companies like BP, Marathon, Total, and Anadarko. Ex. 47, 2/27/14 10-K, 3, 6, 7, 13. Finally, given what the slides actually say, the CAC's complaint that "facts" about Nazaki and Alper were omitted, CAC ¶ 171, is baseless. Those "facts" were neither material nor necessary to render what Cobalt actually said not misleading.

<u>Alper's Interests</u>. The CAC complains that Cobalt falsely stated in its May 1, 2014 10-Q that Alper had a 10% working interest in the Cameia and Loengo wells when

---

[58] Ex. 40, 9/10/13 Investor Deck, 7 (excerpt); *accord* Ex. 43, 10/29/13 Investor Deck, 7; Ex. 46, 12/3/13 Investor Deck, 7.

[59] Heidelberg, Shenandoah, and North Platte are Gulf of Mexico prospects. Ex. 29, 2/26/13 10-K, 3.

[60] *See, e.g.*, *Southland*, 365 F.3d at 372 ("[G]eneralized, positive statements about the company's competitive strengths, experienced management, and future prospects are not actionable because they are immaterial puffery."); *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 774 (S.D. Tex. 2012) ("Statements about BP's leadership in the deepwater drilling industry are too vague to be actionable.").

Alper no longer had interests as of March 25, 2014.  CAC ¶ 181.  But that allegation rests on a mischaracterization of the Angolan government's March 25, 2014 decrees, which did nothing more than *authorize* the transfer of Alper's interests to Sonangol:  "Alper Oil is authorized to proceed with the assignment of all of its associative share corresponding to 10% (ten percent) of the [RSA] of Block 21[] to Sonangol [P&P]."  Ex. 50, Decree No. 88/14; *see also* Ex. 51, Decree No. 89/14 (same for Block 9).  Accordingly, the CAC fails to plead that Cobalt misstated Alper's interests as of May 2014.

Social Project Payments to Sonangol.  The CAC challenges Cobalt's statements about its obligation under the Block 20 PSC to make payments to Sonangol to fund social projects like the SRTC.  *See* CAC ¶¶ 137, 142, 164, 175, 177, 183.  The CAC does not claim that the payments were not in fact contractually owed to Sonangol or did not in fact occur.  Nor does it claim that they were somehow an FCPA violation.[61]  Rather, it claims that Cobalt's statements were false and misleading because the SRTC did not exist.[62]  But the CAC fails to explain how the existence of the SRTC is even relevant, much less material, to what Cobalt's description of payments that it was contractually obligated—

---

[61] Though the CAC conclusorily asserts—for the first time in CAC ¶ 227—that the SRTC payments were illegitimate payments made in exchange for access to Blocks 9, 20, and 21, it contains no facts, let alone particularized ones, supporting that allegation.  In fact, the allegation is wholly implausible, given that (1) the SRTC payment obligation arises under the Block 20 PSC—a block in which neither Nazaki nor Alper has any interest; (2) the Block 20 PSC is dated December 20, 2011, *after* Cobalt had secured its interests in Blocks 9 and 21, entered into RSAs, and drilled on Block 21; and (3) the payments are made directly to Sonangol.  *See* Ex. 13, 2/21/12 10-K, at Ex. 10.20 arts. 22, 47.  Plaintiffs have alleged no facts indicating that payments made to a state-owned oil company under a concession contract with that company were "illegitimate."  For the same reason, Cobalt's compliance with its contractual obligations did not create "a significant risk" of FCPA violations.  CAC ¶ 138.

[62] *See* CAC ¶¶ 137–38, 142–43.  The CAC also opaquely complains that Cobalt's statements omitted "facts" about the supposed Rich Smith investigation, CAC ¶¶ 138, 143, 150, 154, but the CAC offers no explanation whatsoever for how those implausible allegations, *see supra* 30–31, even relate to Cobalt's contractual obligation to contribute to the SRTC project, much less make what Cobalt said about its contractual obligation misleading.  Cobalt's statements about payments owed and made to Sonangol under the Block 20 PSC simply do not imply anything about the blocks in which Nazaki and Alper held interests—Blocks 9 and 21.

by a PSC that Cobalt publicly disclosed—to make to Sonangol:

- "[P]ursuant to the PSC, [Cobalt], BP, and China Sonangol are required to make certain contributions for bonus, scholarships and for social projects such as the [SRTC]."[63]

- "[O]ur contractual payment obligations [include amounts] for social projects such as the [SRTC] . . . that we were and are contractually obligated to pay in consideration for the Angolan government granting us the licenses to explore for and develop hydrocarbons offshore Angola."[64]

The statements are silent as to whether the SRTC already exists or simply will be created in the future.  The Global Witness article on which the CAC's allegations rest specifically recognizes the latter.  *See* Ex. 56, 8/5/14 Global Witness Article ("BP stated that Sonangol . . . 'has informed BP that the SRTC is still in planning stage.'").  And, more importantly, no reasonable investor would care whether one example of a "social project" that Sonangol had earmarked for payments from Cobalt and others—which is all the SRTC is—already existed, was in the planning stages, or even would not exist.

**B.    The CAC fails to adequately plead that any well-related statement was false or rendered misleading by the omission of material facts.**

The remaining allegedly false and misleading statements relate to the exploratory Lontra and Loengo wells.  But in challenging these statements, the CAC wholly ignores Cobalt's repeated disclosures about the risks inherent in its business, including that

- exploratory wells are riskier than development wells;

- seismic data cannot confirm the presence of hydrocarbons;

- the areas drilled "may not yield oil in commercial quantities or quality, or at all"; and

---

[63] Ex. 13, 2/21/12 10-K, 21; *see also* Ex. 47, 2/27/14 10-K, 80; Ex. 29, 2/26/13 10-K, 78.

[64] Ex. 10, 12/20/11 8-K, 2.

- limited drilling results and estimates are just that, and cannot be relied up on for anything more.[65]

*See also supra* 12.  Against this backdrop, the CAC's allegations fall short.

### 1.   The CAC lacks particularized facts showing that the challenged opinions about the wells' potential oil content are actionable.

The CAC challenges several statements in investor presentations and earnings calls about the potential oil content of Lontra and Loengo, including

- slides listing Lontra as having "[g]reater than [b]illion [barrel] *potential*";[66]

- Farnsworth's statements that "Block 9 is a block that actually has wells in it already. . . and ha[s] oil in those wells"; that upon "acquir[ing] a new 3D survey over the block . . . we found quite a large structure, **which we think has kind of 250 million to 500 million barrel potential.**  That's what's called Loengo"; and that the "only difference between Loengo and the other structures we've drilled thus far is it does have a stratigraphic element of [trapping].  Those **typically have higher risk**.  So . . . [when] we drill Loengo, it's likely to going to be . . . to test [k]ind of a new concept, but within the known stratigraphy that we've been so successful in so far, and certainly in a block that we know there is oil in it";[67] and

- Bryant's statement that "[o]nce operations are finalized on the Cameia #3 well, [Cobalt] will move the Catarina rig to drill [its] **large 750 million barrel Loengo pre-salt prospect** on Block 9.  Loengo is a stratigraphic structure and, **if successful**, will have broad positive implications for numerous similar prospects that we see in the remainder of our Angola pre-salt exploration inventory."[68]

The CAC similarly challenges statements in earnings calls about Lontra's potential size.[69]

---

[65] *See, e.g.*, Ex. 47, 2/27/14 10-K, 41, 44, 50; Ex. 29, 2/26/13 10-K, 42–43, 48; Ex. 13, 2/21/12 10-K, 36–37, 41, 44; Ex. 8, 3/1/11 10-K, 33–34, 41–42.

[66] *See* Ex. 28, 2/5/13 Investor Deck, 4 (emphasis added); *accord* Ex. 33, 3/19/13 Investor Deck, 5; Ex. 35, 5/21/13 Investor Deck 6; Ex. 36, 6/4/13 Investor Deck 6; Ex. 39, 8/28/13 Investor Deck 6; *see* CAC ¶¶ 161, 167;

[67] *See* CAC ¶ 178; Ex. 48, 2/27/14 Call Tr., 9 (emphasis added).

[68] *See* CAC ¶ 184; Ex. 59, 8/5/14 Call Tr., 3 (emphasis added).

[69] *See* CAC ¶ 157 ("In Block 20, we have recently completed our new 3-D seismic over the Lontra prospect, and I'm happy to tell you that the prospect appears to be a very large pre-salt structure, significantly larger than Cameia, for example." (quoting Ex. 23, 10/30/12 Call Tr., 3)); CAC ¶ 163 ("Lontra could be several times the size of a

But such statements are exactly the type of forward-looking statements that are protected by the PSLRA's safe harbor provision.  And, even without the safe harbor, the statements were neither false nor rendered misleading by the omission of material facts.

> a. **The statements are forward-looking statements protected by the PSLRA's safe harbor.**

Under the PSLRA, statements are not actionable when either (1) they are identified as forward-looking statements and accompanied by meaningful cautionary language, or (2) the plaintiff fails to prove that the forward-looking statement was made with actual knowledge that it was false or misleading.  *See* 15 U.S.C. § 78u-5(c)(1) (2012).  These prongs are disjunctive—that is, a statement is inactionable from liability if either is met.[70]  Here, the complained-of statements meet both prongs.[71]

With respect to the first prong, the estimated "[g]reater than a billion barrel potential" of Lontra is indisputably a forward-looking statement—not only is uncertainty inherent in the term "potential,"[72] but the presentations themselves also make clear that the well had not yet been drilled.[73]  Moreover, the presentations contain clear, cautionary language under the caption "**Forward Looking Statements**":

---

Cameia[.]" (quoting Ex. 30, 2/26/13 Call Tr., 10)).

[70] *Southland*, 365 F.3d at 371 ("The safe harbor has two independent prongs:  one focusing on the defendant's cautionary statements and the other on the defendant's state of mind."); *BP p.l.c.*, 843 F. Supp. 2d at 777 ("If a forward-looking statement is identified as forward-looking and accompanied by meaningful cautionary statements, the statement is not actionable and the defendants' state of mind is irrelevant.").

[71] At the pleading stage, dismissal via either prong is appropriate. *See, e.g.*, *Bamburg v. Axis Onshore LP*, No. CIV. A 08-1466, 2009 WL 1579512, at *6 (W.D. La. June 4, 2009); *In re Michaels Stores, Inc. Sec. Litig.*, No. 3:03-CV-0246, 2004 WL 2851782, at *5–6 (N.D. Tex. Dec. 10, 2004).

[72] *See Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 692 (5th Cir. 2014) (stating that words such as "possible" and "estimate" communicate forward-looking statements regarding commercial productibility of wells).

[73] Ex. 28, 2/5/13 Investor Deck 8 ("Lontra # 1 well results expected mid-year 2013 . . . 90 to 120 days to drill."); Ex. 33, 3/19/13 Investor Deck, 15 ("~120 to 150 days to drill . . . [w]ell results expected mid-year 2013"); *accord* Ex. 35, 5/21/13 Investor Deck 17; Ex. 36, 6/4/13 Investor Deck 17; Ex. 39, 8/28/13 Investor Deck 12.

Certain statements, estimates and financial information contained in this summary ("Estimates") constitute forward-looking statements . . . . While presented with numerical specificity, the Estimates are based . . . on certain assumptions that are inherently subject to significant . . . uncertainties, contingencies and risks, including, without limitation, . . . well production performance, . . . and other known and unknown risks, all of which are difficult to predict and many of which are beyond Cobalt's control.

There can be no assurance that the Estimates of the underlying assumptions will be realized and that actual results of operations or future events will not be materially different from the Estimates. . . . Recipients are cautioned that forward-looking statements . . . are not guarantees of future performance, and . . . not to put undue reliance on forward-looking statements . . . due to the inherent uncertainty therein.[74]

These warnings bring the Lontra estimate squarely under the safe harbor's first prong.

The same is true of Bryant's statements about Lontra's size and Farnsworth's and Bryant's statements about Loengo.  Those statements were about Lontra's *potential* size and Loengo's *potential* oil content,[75] and all were made after meaningful, cautionary language was given:

- "This conference call includes forward-looking statements.  The risks associated with forward-looking statements have been outlined in the earnings release and in Cobalt's SEC filings, and we incorporate these by reference for this call."[76]

- "**Forward-Looking Statements**. . . .  [F]orward-looking statements . . . often contain words such as "anticipate," "believe," "intend," "expect," "plan," "will" or other similar words.  These forward-looking statements involve certain risks and uncertainties that ultimately may not prove to be accurate.  Actual results and future events could differ materially from

---

[74] Ex. 28, 2/5/13 Investor Deck 2; Ex. 33, 3/19/13 Investor Deck, 2; Ex. 35, 5/21/13 Investor Deck 2; Ex. 36, 6/4/13 Investor Deck 2; Ex. 39, 8/28/13 Investor Deck 2.

[75] *See* Ex. 48, 2/27/14 Call Tr., 9 ("[Cobalt] acquire[d] a new 3-D survey over [Block 9].  And much to my delight, we found quite a large structure, which we *think* has a 250- to 500 million-barrel *potential* . . . .") (emphases added); Ex. 59, 8/5/14 Call Tr., 3 ("[W]e will move the Catarina rig to drill our large 750 million-barrel Loengo pre-salt *prospect* on Block 9," which, "*if successful*, will have broad positive implications . . . .") (emphases added); *see also Spitzberg*, 758 F.3d at 692.

[76] Ex. 23, 10/30/12 Call Tr., 2; Ex. 30, 2/26/13 Call Tr., 2; Ex. 48, 2/27/14 Call Tr., 2; Ex. 59, 8/5/14 Call Tr., 2.

those anticipated in such statements. . . . You are cautioned not to place undue reliance on these forward-looking statements . . . .[77]

- "**Cautionary Note Regarding Forward-Looking Statements.** . . . This [10-K] contains estimates and forward-looking statements, principally in . . . 'Risk Factors' . . . . Our estimates and forward-looking statements . . . are subject to several risks and uncertainties and are made in light of information currently available to us. . . . [They] may be influenced by the following factors, among others:  the discovery and development of oil and gas reserves; to what extent our and our partners' prospect development and drilling plans are successful; . . . [and] uncertainties inherent in making estimates of our oil and natural gas data . . . ."[78]

Thus, they are protected by the safe harbor's first prong.[79]

All of the challenged statements are also protected by the safe harbor's second prong.  With respect to Lontra, the CAC does not plead that any Executive Defendant actually knew Lontra did not have greater-than-a-billion-barrel potential, or that Lontra was not larger than Cameia when the challenged statements were made; rather, the CAC points to the fact that Lontra turned out to have more gas than expected and therefore concludes fraud must have occurred.  *See* CAC ¶¶ 158, 163.  And with respect to Loengo, rather than alleging Farnsworth and Bryant knew Loengo's make-up when they offered their opinions about its oil content, the CAC merely states that Loengo "was a dry hole with no oil."  CAC ¶¶ 179, 185.  But such allegations amount to impermissible "fraud-by-hindsight"—where "a plaintiff alleges that the fact that something turned out badly must mean defendant knew earlier that it would turn out badly," *Lormand v. US Unwired,*

---

[77] Ex. 22, 10/30/12 Earnings Release, 2; Ex. 31, 2/26/13 Earnings Release, 3; Ex. 49, 2/27/14 Earnings Release, 2; Ex. 57, 8/5/14 8-K, Earnings Release, Ex. 99.1.   The Court may consider Ex. 49 because it is incorporated by reference into Ex. 48, upon which the CAC relies.  *See* CAC ¶¶ 113, 178; *c.f. Blackwell,* 440 F.3d at 286.

[78] Ex. 29, 2/26/13 10-K, 2; *accord* Ex. 71, 10/30/12 10-Q, 3; Ex. 47, 2/27/14 10-K, 2; *accord* Ex. 32, 8/6/14 10-Q, 2.

[79] *See* 15 U.S.C.  § 78u–5(c)(2) (making inactionable oral statements accompanied by an "oral statement that additional information concerning factors that could cause actual results to materially differ from those in the forward-looking statement is contained in a readily available [identified] written document, or portion thereof").

*Inc.*, 565 F.3d 228, 254 (5th Cir. 2009)—which the Fifth Circuit has long rejected.[80]

Hoping to tether their allegations to something more than disappointing well results, Plaintiffs point to statements attributed to the former CIO and then allege that Cobalt, Farnsworth, and Bryant omitted such "material facts."  e.g., CAC ¶¶ 161, 184.  But the CIO's position and period of employment provide no foundation for his allegations, which are also fatally lacking in particularized facts:

- The CAC alleges that "Sonangol required, and Cobalt agreed, to delay providing adverse information regarding its Angolan wells, including Lontra," CAC ¶ 161, based on the CIO's assertion that Sonangol required Cobalt to "sit on information."  CAC ¶ 111.  Even setting aside the failure to plead how or why Cobalt's IT manager had personal knowledge of Cobalt's interactions with Sonangol,[81] he never says what specific information Cobalt withheld, when, or for how long, alleging only that "one time" when Cobalt disclosed "something" it "got in real trouble," CAC ¶ 111—a lack of specificity that is fatal because it leaves no way of knowing whether the information purportedly sat on was material, let alone whether any delay in disclosing it was material.[82]

- The allegations that Cobalt "knew that [Lontra] had a high gas content well before December 2013, but delayed in disclosing that information to investors at the insistence of Sonangol," *see* CAC ¶¶ 158, 174, and "knew 'fairly early on' that it had hit a gaseous hydrocarbon column at Lontra" but "sat on the information regarding [Lontra] 'a lot longer than they normally would,'" CAC ¶ 111, similarly lack essential details, including *who* at Cobalt purportedly learned that Lontra had a more gas than previously thought, and *when*.  They thus fail to show that any Executive Defendant

---

[80] *See, e.g.*, *Lormand*, 565 F.3d at 254; *Rosenzweig*, 332 F.3d at 867–68 (affirming dismissal where certain factual underpinnings on which plaintiffs relied were "plainly a *hindsight* assessment" of the defendants' performance); *In re Anadarko Petrol. Corp. Class Action Litig.*, 957 F. Supp. 2d 806, 821 n.5 (S.D. Tex. 2013) ("[F]raud-by-hindsight is not a valid theory under Rule 10b."); *In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 866 (N.D. Tex. 2005) ("Fraud by hindsight is not an actionable claim under the securities laws.").

[81] *See, e.g.*, *Shaw*, 537 F.3d at 535, 540 (requiring that sufficient particularized allegations to "support the probability that a person in the [CW's position] . . . would possess the information" ascribed to him); *ABC Arbitrage*, 291 F.3d at 353 (requiring sufficient factual basis to support claim that statement was false when made).

[82] The CAC's attempt to transform the former CIO's (deficient) allegation that Cobalt sat on information about *Lontra*, CAC ¶ 111, into an allegation that Cobalt sat on information about *Loengo*, *see* CAC ¶¶ 179, 185—a well that was not drilled until *after* the CIO departed in April 2014, *see* CAC ¶ 72 n.21—is likewise unavailing.

knew Lontra did not have "[g]reater than [a] billion barrel potential" when
Cobalt said that in February, March, May, June, or August 2013.[83]

- The allegations that "there was 'not even a question' that Loengo was not a
  good prospect and that there was 'not even a remote chance' of success on
  the Loengo well," CAC ¶ 179, 184–85, similarly do not show that
  Farnsworth or Bryant knew Loengo would contain no commercial
  hydrocarbons when they described its potential in February and August
  2014—*before* it was drilled.[84]   In addition to offering no basis for the
  former CIO's conclusory assertions,[85] which offer nothing but his
  opinion,[86] the CAC's allegation—that despite somehow knowing Loengo
  would be a dry hole, Cobalt sought and received from the Angolan
  government a two-year extension on its Block 9 license in April 2014 so
  that it could drill Loengo[87] and then spent more than $50 million drilling
  it[88]—simply is not plausible.[89]

## b.     The statements were inactionable opinions.

Even if Plaintiffs could somehow overcome the safe harbor, they still fail to plead

that the statements about Lontra's and Loengo's potential oil content and Lontra's

potential size—all of which were statements of opinion—were false or rendered

misleading by the omission of material facts.  As the prior section shows, the CAC fails

---

[83] And, again, the CAC fails to plead the basis for the former CIO's alleged knowledge, including how or why an IT manager would have been privy to, let alone able to interpret, well results.  His claim to have "heard" in an executive meeting that "the Company decided to delay disclosure," CAC ¶ 112, changes nothing, as the CAC fails to plead when this supposed meeting occurred, what comments were made, by whom, what information Cobalt purportedly decided to delay, and for how long.  *See, e.g.*, *Owens*, 2015 WL 3649823, at *10 n.13.

[84] *See* Ex. 59, 8/5/14 Call Tr., 3 (discussing future plans to drill Loengo).

[85] *See, e.g.*, *Firefighters Pension & Relief Fund of New Orleans v. Bulmahn*, No. Civ. A. 13-3935, 2014 WL 6638793, at *34 n.148 (E.D. La. Nov. 21, 2014) (rejecting CW statement that failed to identify relevant dates or reasonable basis for statement).

[86] *See, e.g.*,  *Intelligroup*, 527 F. Supp. 2d at 359–61 (holding that "personal opinions void of specific details regarding the basis for [the CW's] personal knowledge" add nothing to falsity); *Zucco Partners, LLC v. Digimarc Corp.*, 445 F. Supp. 2d 1201, 1208 (D. Or. 2006) ("[A] shared opinion among confidential witnesses does not necessarily indicate either falsity or a strong inference of scienter if the allegations themselves are not specific enough" (quoting *Metawave*, 298 F. Supp. 2d at 1070)), aff'd, 552 F.3d 981 (9th Cir. 2009).

[87] *See* Ex. 59, 8/5/14 Call Tr., 3.  Cobalt's extension request also refutes the former CIO's bald "supposition" that Cobalt was "forced" to take Block 9.  *See* CAC ¶ 116.

[88] *See* Ex. 67, 2/23/15 10-K, 78; Ex. 66, 11/4/14 Earnings Release.

[89] *Cf. NVIDIA*, 768 F.3d at 1057–58 (holding that "implausibility of the timing of CW1's account of events" detracted from any inference of scienter).

to plead that the Executive Defendants either (1) "did not hold the belief [they] professed," *Omnicare*, 135 S. Ct. at 1327 (describing when opinions "ultimately found incorrect" may be actionable misstatements), or (2) omitted a particular, material fact about the bases for their opinions that made the statements misleading to a reasonable person reading them fairly and in context. *Id.* at 1332–33 (describing when omitted material facts can render opinions misleading). As such, Plaintiffs have not adequately pleaded that the challenged opinions were false or misleading by omission.

### 2. The CAC fails to allege that October 29, 2013 statements about Lontra's gas content were false or misleading.

The CAC also accuses Cobalt, Bryant, and Farnsworth of making false and misleading statements about Lontra in an October 29, 2013 press release and investor call. CAC ¶¶ 172–73. To do so, however, the CAC cherry picks statements out of context and then fails to explain why they were false or misleading. *See* CAC ¶ 174.

For example, the CAC accuses Bryant of falsely stating that "'it's clear' that Lontra had 'been successful in finding and delineating new hydrocarbon resources in the Angolan Pre-salt,'" CAC ¶ 172,[90] but does not explain why that statement was false.[91] Nor does the CAC explain how the omitted "facts"—the former CIO's allegations that Sonangol required Cobalt to "sit on" unspecified Lontra-related information, and that Cobalt knew at some unspecified point before December 2013 that Lontra had a high gas

---

[90] What he actually said was: "*While operations are still continuing at Lontra*, it's clear that *each of Cobalt's four wells to date* has been successful in finding and delineating new hydrocarbon resources in the Angolan Pre-salt." Ex. 44, 10/29/13 8-K, (emphases added).

[91] The same is true of Cobalt's announcement that "the Lontra #1 exploratory well had reached total depth and the drilling and evaluation results confirm an oil and gas discovery." CAC ¶ 166. The CAC never alleges that Cobalt had not reached total depth or that there was no oil or gas discovery, nor could it. *See, e.g.*, Ex. 47, 2/27/14 10-K, 6 (explaining that Cobalt "submitted a declaration of commercial well to Sonangol regarding the Lontra").

content, CAC ¶ 174—rendered what Bryant actually said misleading.  Given that the very same press release expressly cautioned that "[f]urther evaluation, including a drill stem test, is required to assess Lontra's potential," Ex. 44, 10/29/13 8-K, Ex. 99.1, nothing about Bryant's statement would have misled a reasonable investor.

The same is true of Bryant's and Farnsworth's statements during the earnings call.  Although the CAC labors to create the impression that Bryant and Farnworth falsely portrayed Lontra's oil-to-gas ratio, *see* CAC ¶ 173, it does so only by omitting critical context, which makes clear that no such false or misleading statement was made.  *See* Appendix 1.  For instance, the CAC's claim that Farnsworth described Lontra as "not the big gas field" strips away all context from his statement—including the question that precipitated it:

- Crédit Suisse:  "And then gas versus oil.  Obviously, I think, on the call this morning, BP were saying this is a potentially large discovery.  Obviously, it may be a bit gassier relative to, perhaps, some of the other plays.  And obviously the [PSC] terms don't necessarily we have exposure for how to monetize the gas.  But, presumably, that provides some drive as well to the reservoir, which may improve the recovery of the oil.  Maybe just talk a bit about how you're thinking about the gas to oil ratios that you've seen and how that might impact your view of the development, I know, again, very early stage."

  Farnsworth:  Ed, I will try that.  First of all, you are right.  The [PSC] that we have, not only we but virtually everybody else, does not include gas rights.  The issue here is that we know there is some gas in this structure, and we know there is oil in this structure.  What I would say this is not is a nonassociated gas field.  At least, that's our current view.  So this is not the big gas field.  It is an oilfield plus a very complex gas field based on the preliminary data we have.  Notwithstanding that, it [does] appear to be a significant discovery.[92]

---

[92] Ex. 42, 10/29/13 Call Tr. 10–11.

The CAC likewise omits numerous statements by Farnsworth and Bryant, in which they make clear that more testing was necessary before Lontra's makeup could be known:

- "And then as I mentioned, we are encouraged by the reservoir characteristics as well.  But we are holding our judgment until we have the test done.  It will, hopefully, be done by the end of the year."

- "[U]ntil we can actually get a drill stem test done and collaborate and corroborate all of the data that we've got in that area of the basin, the right thing to do is to tell you that we are sure we have hydrocarbons, oil and gas, and we need to get a drill stem test off to tell you more."

- "No, I didn't say – I don't think I did say it was primarily an oilfield.  What I've said is – I hope I've said is that we know there is oil in Lontra.  We know there is some gas in Lontra.  What we don't know is the splits between the oil and the gas, and exactly where it is in the structure at this point and [t]hat's why we need to do more work."

Ex. 42, 10/29/13 Call Tr. 8, 12, 20.

> **3.** **The CAC fails to plead facts rendering any of the other well-related statements false or misleading.**

Unable to plead that Cobalt or the Executive Defendants misled investors with their opinions about Lontra's and Loengo's potential, Plaintiffs resort to attacking more general statements about the nature of wells.  Those efforts also fail.

Cobalt's "Oil-Focused" and "High Impact" Prospects and "Significant" Wells. The CAC repeatedly attacks Cobalt's use of the terms "oil-focused" and "high impact" in describing its prospects, alleging they were false and misleading because of how Lontra and Loengo actually turned out.[93]  Plaintiffs lodge a similar objection to Farnsworth's use of the term "significant" in describing Cobalt's West African drilling in 2013.[94]

---

[93] *See* CAC ¶¶ 132, 144, 147, 151, 155, 161, 163, 166, 175, 183.

[94] *See* CAC ¶ 163.

Embedded in both allegations is a contention that Cobalt's statements guaranteed that every well it drilled would contain oil and only oil, or that it would always succeed in its drilling efforts. That any reasonable investor would actually take Cobalt's statements that way defies logic. And the statements themselves—which describe Cobalt's "prospects," "exploratory wells," and "test well[s]"—disprove that notion:

- "We are an independent, **oil-focused** exploration and production company with a world-class below salt inventory in the deepwater of the U.S. Gulf of Mexico and offshore Angola and Gabon in West Africa. All of our ***prospects*** are **oil-focused**. . . . We continue to mature **high impact *prospects*** in our portfolio for ***upcoming exploratory drilling*** in both the deepwater of the U.S. Gulf of Mexico and the deepwater offshore Angola and Gabon. . . ."[95]

- "We have several near term **high impact *exploratory and appraisal wells*** to be drilled over the next 12 to 18 months. ***Among these*** are several large, **oil-focused high impact** wells in the deepwater U.S. Gulf of Mexico, including our North Platte, Shenandoah, Rum Ramsey, Ardennes, and Aegean prospects, and in the deepwater offshore Angola, including our Bicuar, North Cameia . . ., Lontra and Loengo pre-salt prospects, and in the deepwater offshore Gabon, including our Mango and Mango South pre-salt prospects."[96]

- "2013:   Exceptional Exposure to **High Impact *Exploration*** and Development."[97]

- "Cobalt also continues to ramp-up its Pre-salt program in West Africa in 2013, including a 2 rig, 4 well program in Angola and the drilling of the first deepwater Pre-salt well in Gabon. 'While a great deal of attention is being paid to our planned ***initial test well*** on the massive Lontra prospect, every well we drill this year in Angola and Gabon will be **significant**. Each has the ***potential*** to be as large as, or larger than our 2012 Cameia discovery,' said [Farnsworth]."[98]

---

[95] Ex. 13, 2/21/12 10-K, 2 (emphases added); *accord* Ex. 8, 3/1/11 10-K, 2.

[96] Ex. 14, 2/23/12 Prospectus, S-3.

[97] Ex. 28, 2/5/13 Investor Deck (emphasis added).

[98] Ex. 31, 2/26/13 Earnings Release, 2 (emphasis added).

53

These disclosures, when viewed in conjunction with Cobalt's detailed and repeated warnings of the risks associated with both oil drilling in general and its exploratory drilling program in particular, *see supra* 12, make plain that the challenged statements— which are puffery and too generalized to be actionable in any event—were not misleading, or even material.[99]  *See Southland*, 365 F.3d at 362, 372.

Nor does the CAC attempt to explain how the omitted "facts"—i.e., the former CIO's allegations that Sonangol required Cobalt to "sit on" information, and that Cobalt knew at some unspecified point that Lontra had a high gas content and Loengo would be a dry hole—render Cobalt's use of the generic descriptors misleading.[100]  Instead, the CAC once again improperly leaves Defendants and the Court guessing as to how the alleged omissions even relate to what was actually said.  *See Brody*, 280 F.3d at 1006.

<u>Descriptions of Lontra</u>.   The CAC's challenges to certain Lontra-specific statements are even more farfetched.  Cobalt's statements that Lontra was "In A League Of Its Own," CAC ¶ 161, and was part of Cobalt's "all-star lineup," CAC ¶ 157, "amount to little more than corporate 'cheerleading,'" and, as such, are classic puffery.  *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 381 (S.D. Tex. 2011), aff'd, 464 F. App'x 334 (5th Cir. 2012).  The same is true of Bryant's statement that "[i]n 2013, we'll drill an extraordinary array of world-class exploration wells.  Very shortly, we will

---

[99] The CAC's reliance on the SEC's October 26, 2012 letter questioning Cobalt's use of the term "high-impact," *see* Ex. 21, 10/26/12 Letter, 2, does not change this result.  As Cobalt explained in its response, its disclosures—"which speak extensively to the uncertainty inherent in [its] prospects"—were "adequate to inform investors of the risks and uncertainties associated with [its] prospects."  Ex. 25, 11/20/12 Letter, 7.  Cobalt's discontinuance of its use of the term "high impact" makes no difference.  *See Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1020 n.4 (5th Cir. 1996) ("A corporation does not admit that previous SEC filings are misleading every time that it amends or updates language in new filings.").

[100] CAC ¶¶ 132, 144, 145, 147, 151, 155, 161, 163, 166.

54

simultaneously drilling four of the world's most anticipated wells: the Ardennes, Lontra, Mavinga and Diamond . . . ."  Ex. 30, 2/26/13 Call Tr.  "[N]o reasonable investor would consider such vague statements material."  *Franklin Bank*, 782 F. Supp. 2d at 381.

Moreover, the CAC alleges no facts rendering false or misleading Cobalt's statement that "3D seismic [analysis] has confirmed Lontra as a 'super-size' prospect." CAC ¶ 161 (quoting Ex. 28, 2/5/13 Investor Deck, 8).  The CAC does not claim that Lontra was not, in fact, a super-size prospect, nor does it explain how Lontra's oil-to-gas ratio would have been material to the description of the structure's size.  And, in any event, Cobalt explained that its projections were based on 3D seismic, *see* CAC ¶ 161, which, as Cobalt consistently disclosed, is only a prediction tool and cannot confirm the presence of hydrocarbons.  *See supra* 12.  Finally, the CAC fails to explain how the omitted "facts," *see supra* 48–49, 54, render Cobalt's statements misleading—especially when the statement was made months *before Lontra was even drilled*.  *Compare* CAC ¶ 161, *with* Ex. 38, 7/30/13 10-Q, 27 (disclosing that drilling began on May 21, 2013).[101]

## III.   The CAC fails to establish the requisite strong inference of scienter.

In addition to failing to adequately plead a false or misleading statement, the CAC fails to establish the requisite strong inference of scienter.  *See* 15 U.S.C. § 78u-4(b)(2); *Shaw*, 537 F.3d at 533.  Rather than alleging any particularized facts demonstrating that any particular Executive Defendant[102] knew any particular statement was false or misleading when made, the CAC simply regurgitates its falsity allegations and posits that

---

[101] The CAC's complaints about Bryant's statements about Lontra's size, CAC ¶¶ 157, 163, fail for the same reason.

[102] *See Lormand*, 565 F.3d at 366 ("A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter . . . .").

they show scienter, and points to facts that apply to principal executives of almost any corporation—an approach that does not satisfy the PSLRA.

### A.   The absence of any apparent motive for the Executive Defendants' alleged fraud weighs heavily against any inference of scienter.

Conspicuously absent from the 132-page CAC is any allegation of motive on the part of the Executive Defendants.[103]   "To plead motive, a plaintiff must aver with particularity the concrete benefits that could be recognized by a statement or omission." *Coates v. Heartland Wireless Commc'ns, Inc.*, 100 F. Supp. 2d 417, 431 (N.D. Tex. 2000) (footnote omitted).   "A generalized motive that could be imputed to any publicly-owned, for-profit endeavor, is not sufficiently concrete for purposes of inferring scienter." *Id.*   Conversely, where *no* "clear motive" is apparent, "the strength of [the] circumstantial evidence of scienter must be correspondingly greater." *R2 Invs.*, 401 F.3d at 644.

Despite these well-settled principles, the CAC fails to allege any concrete benefit to the Executive Defendants that would plausibly explain *why* they were motivated to commit securities fraud.   The CAC alleges no motive—be it insider trading or personal profit—for their alleged fraud.   Nor does it allege that any Executive Defendant sold Cobalt stock at suspicious times or in suspicious amounts during the class period.[104]

Without an apparent motive, Plaintiffs "face a more stringent standard for

---

[103] A plaintiff cannot rely upon "the collective knowledge of the corporation's officers and employees acquired in the course of their employment" but instead must plead facts about the state of mind of each defendant.   *See Southland*, 365 F.3d at 365–66.

[104] Although the CAC fact section makes one vague reference to a stock sale by Bryant, CAC ¶ 94, it does not allege that this isolated sale—which constituted only 15.59% of his holdings and occurred *after* Cobalt disclosed that the SEC and DOJ had commenced their investigations, Ex. 15, 3/2/12 Bryant Form 4—was somehow suspect.

establishing fraudulent intent." *Tuchman v DCS Commc'ns Corp.*, 14 F. 3d 1061, 1069 (5th Cir. 1994). They must offer highly particularized circumstantial evidence showing, in detail, that a specific Executive Defendant knew that a specific statement was false when he made the statement. *Southland*, 365 F.3d at 366, 374; *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002). This requires, for example, allegations describing a specific conversation or naming specific documents—including the author or speaker, recipient, date, and contents—that show the Executive Defendant knew he was being untruthful when making a particular challenged statement. *See Owens*, 2015 WL 3649823, at *10 n.13; *Abrams*, 292 F.3d at 432.[105] Allegations of violations of law are insufficient without specific allegations that the defendant knew about them. *See Dell*, 591 F. Supp. 2d at 894 ("Without specific allegations the Individual Defendants themselves actually knew about a specific accounting violation or internal control problem, the pleadings are simply too vague to support a strong inference of scienter.").

As shown below, the CAC is devoid of specific allegations sufficient to infer that the Executive Defendants knew about an undisclosed FCPA violation, or how Lontra and Loengo would ultimately turn out, or any other "fact" that the CAC alleges was misstated or omitted. As such, the CAC is akin to the bevy of cases in which the Fifth Circuit has affirmed dismissal for failure to plead facts giving rise to a strong inference of scienter.[106]

---

[105] "[P]laintiffs' allegations regarding non-specific internal reports are also inadequate. An unsupported general claim about the existence of confidential corporate reports that reveal information contrary to reported accounts is insufficient to survive a motion to dismiss. Such allegations must have corroborating details regarding the contents of allegedly contrary reports, their authors and recipients." *Abrams*, 292 F.3d at 432 (footnote omitted).

[106] *See, e.g., Pipefitters Local No. 636 Defined Benefit Plan v. Zale Corp.*, 499 F. App'x 345, 350–51 (5th Cir. 2012) (affirming dismissal with prejudice where plaintiff relied only on a statement in an SEC complaint and public statements by a company officer, but presented no other documentary evidence that the defendants acted with

## B.     The CAC's scienter allegations are insufficient.

The CAC's scienter allegations, CAC ¶¶ 186–97, do not give rise to a strong inference of scienter.  They do not show that any Executive Defendant knew that a statement was false or misleading when made, nor are they pleaded with particularity.

### 1.     The CW allegations add nothing to the scienter analysis.

The CAC's scienter allegations rely heavily on statements from CWs, but courts must discount allegations from CWs, *Shaw*, 537 F.3d at 535, and, in any case, they fall well short of demonstrating that any Executive Defendant knowingly or recklessly made a false or misleading statement.  Indeed, for three of the CWs—the HR assistant, the executive assistant, and the foreman—the CAC alleges no personal interactions with any of the Executive Defendants.  The CAC likewise alleges no personal interactions between the CFOs or the driver and Wilkirson or Farnsworth.  This fact alone renders those CWs incapable of providing facts relevant to the Executive Defendants' state of mind. *McCasland v. FormFactor, Inc.*, No. 07-cv-5545 SI, 2008 WL 2951275, at *8 (N.D. Cal. July 25, 2008) ("Importantly, none of the CWs is alleged to have had any interaction or

---

scienter); *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 212 (5th Cir. 2009) (affirming dismissal for failure to provide evidence supporting a strong inference of scienter); *Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc.*, 497 F.3d 546, 550–56 (5th Cir. 2007) (affirming dismissal of Rule 10b-5 suit because complaint failed to plead scienter with sufficient particularity despite allegations of GAAP violations that led to the restatement of more than two years of financial reports, false SOX certifications, insider trades, and allegations from a CW that an individual defendant "did not want to know the details of a revenue issue so that he would not be liable"); *Shaw*, 537 F.3d at 538–39 (concluding that district court erred in denying a motion to dismiss where plaintiffs did not supply any documentary or personal sources for the majority of their allegations and failed to plead the necessary factual support for scienter); *R2 Invs.*, 401 F.3d at 644–47 (affirming dismissal where "absent any allegation of motive," plaintiff failed to adequately plead scienter and dismissing the complaint without considering the district court's other grounds for dismissal); *Goldstein v. MCI WorldCom*, 340 F.3d 238, 253 (5th Cir. 2003) (finding the plaintiffs' pleading insufficient to demonstrate a strong inference of scienter); *Rosenzweig*, 332 F.3d at 867–68 (holding that the plaintiffs failed to "identify exactly who supplied the information or when they knew the information"); *Abrams*, 292 F.3d at 432 (affirming dismissal based solely on plaintiff's failure to plead facts giving rise to a strong inference of scienter).

communication with any of the defendants, or to have provided any defendant with information, or to have heard or read any statement by any defendant, that contradicted or even cast doubt on a public statement made during the class period."). Of those who allegedly interacted with Bryant, none provides any information, particularized or otherwise, relevant to his state of mind. In fact, not one describes with particularity any conversation with Bryant. Finally, although the former CIO purports to have interacted with Farnsworth, he makes no allegations as to any specific Executive Defendant, and, as discussed in *supra* 22–23, 31–32, 48–49, the CAC fails to explain how Cobalt's IT manager would have possessed any of the information ascribed to him, especially information regarding time periods outside his tenure at the Company. *See, e.g.*, *Shaw*, 537 F.3d at 535; *Dell*, 591 F. Supp. 2d at 895.

Not a single allegation by any CW sets forth any facts that lead to any inference of scienter, much less a strong one, on the part of any Executive Defendant. Therefore, the CWs' allegations should be given no weight by the Court.

### 2. The allegations about Nazaki's and Alper's purported owners do not give rise to an inference of scienter.

At their core, the CAC's scienter allegations about the purported FCPA-related misstatements and omissions hinge on a single claim—that the Executive Defendants knew Nazaki and Alper were owned by government officials. *See* CAC ¶¶ 187–91. But the identities of Nazaki's or Alper's owners are wholly immaterial absent an FCPA violation. Even if the Executive Defendants knew everything the CAC alleges about Nazaki's and Alper's owners—and the CAC does not plead with particularity that they

did—that does not give rise to an inference that the Executive Defendants knew of an

FCPA violation, or even a significant risk of an FCPA violation. *See supra* 27, 29–30.[107]

But even if the identities of Nazaki's or Alper's owners were relevant to the

scienter analysis, the result would be the same—the CAC still fails to offer a compelling

explanation for how any of the allegedly known "facts" about Nazaki or Alper are

indicative of an intent to commit securities fraud or severe recklessness on the part of the

Executive Defendants:

- The cited articles do not show that Nazaki or Alper were "sham entities."
  CAC ¶ 187.  The 2010 Global Witness article states that Nazaki and Alper
  were not well known—which is entirely consistent with what Cobalt
  disclosed.[108]   The allegations in de Morais's January 2012 criminal
  complaint should be disregarded entirely as they are "nothing more than
  uncorroborated allegations embedded in a complaint in another action".[109]
  And the April 2012 *Financial Times* articles report that undisclosed letters
  from Vicente and Kopelipa revealed that they and Dino had indirectly held
  interests in Nazaki through Aquattro, which had since been dissolved.
  Nothing regarding Nazaki or Alper gives rise to any inference about any
  Executive Defendant's state of mind when any particular statement was

---

[107] To the extent the CAC attempts to impute knowledge of an FCPA violation to the Executive Defendants from the ongoing DOJ investigation, *see* CAC ¶ 187, it has been recognized that "[i]nferring scienter from the mere existence of a [government] investigation would be an end-run around the stringent pleading requirements of the PSLRA, entitling every plaintiff who brought suit against a company under investigation access to discovery."  *In re BearingPoint, Inc. Sec. Litig.*, 525 F. Supp. 2d 759, 777 (E.D. Va. 2007) (finding no inference of scienter from "DOJ investigation where no official findings of fact or legal conclusions have issued"), *aff'd in part, rev'd on other grounds*, 576 F.3d 172 (4th Cir. 2009).  The SEC's termination of its investigation obviously undermines such an inference here.  *See In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 248–49 (8th Cir. 2008) ("[T]he opposing inference[]—that the SEC investigation uncovered no evidence of fraud . . . —[is] more compelling in the absence of particular facts giving rise to a strong inference of fraud."); *In re MoneyGram Int'l, Inc. Sec. Litig.*, 626 F. Supp. 2d 947, 981 (D. Minn. 2009) ("[W]here . . . an ongoing SEC investigation does not result in hearings or adverse findings, an inference 'that the SEC investigation uncovered no evidence of fraud,' is more compelling than an inference of fraud.").

[108] *Compare* Ex. 6, 5/20/10 Global Witness Article, *with* Ex. 5, 3/30/10 10-K, 51.

[109] *See In re UBS AG Sec. Litig.*, No. 07-Civ-11225, 2012 WL 4471265, at *17 n.17 (S.D.N.Y. Sept. 28, 2012) ("[B]ecause such allegations are taken directly from uncorroborated allegations embedded in a complaint in another action, the Court will not consider them."), *aff'd*, 752 F.3d 173 (2d Cir. 2014).  Even if the Court were to consider de Morais's complaint, its allegations lack particularity and thus fall short of the PSLRA.  For example, it relies on de Morais's August 2010 report, which begins with a footnote stating that his allegations are based on unspecified "official records in [his] possession."  Ex. 68, 7/10 Maka Angola Report, 4.

made.

- Despite alleging that Cobalt "denied all allegations of any connection between Nazaki and senior Angolan government officials due to their supposed 'extensive investigation,'[and] 'extensive due diligence'" and repeated *over a period of years* that it found no connection to Angolan officials, CAC ¶ 187, the CAC recites no such statements.  Nor does it offer any particularized facts showing that Cobalt had, in fact, found such a connection when it made any particular challenged statement.  The mere fact that Cobalt conducted due diligence on Nazaki is not sufficient to give rise to an inference of scienter.[110]

- No CW claims to have discussed Nazaki's ownership with any Executive Defendant.  Thus, neither the allegations about what was known by a foreman who joined Cobalt in 2013 (well after Nazaki's prior government official ownership had been confirmed), nor the allegations about what the Angolan driver "understood" about who owned Nazaki and whom he drove Bryant and other Cobalt employees to meet *at Cobalt's offices*,[111] CAC ¶ 188, say anything about any Executive Defendant's state of mind when a particular statement was made.

- Plaintiffs have no particularized facts to support the allegation that there was "widespread knowledge inside Cobalt of Nazaki's ownership by senior Angolan officials."  CAC ¶ 189.  And the 2010 Global Witness article referenced does *not* allege anyone at Cobalt—let alone an Executive Defendant—knew the "true owners" of Nazaki.[112]

- Cobalt's alleged access to records showing the "true owners," CAC ¶ 190, rests on the deficient and implausible allegations that government official owners were apparent from Nazaki's and Alper's "basic corporate records."  *See supra* 30 n.40, 36.  Cobalt's alleged access to Vicente fares no better.  The CAC does not allege that he admitted to an Executive Defendant that he owned Nazaki, nor can it be inferred from his statement to the *Financial Times* in 2012 that he previously revealed such ownership to Cobalt.

---

[110] *See, e.g.*, *In re Huntington Bancshares Inc. Sec. Litig.*, 674 F. Supp. 2d 951, 971 (S.D. Ohio 2009) (holding that allegations about degree of due diligence conducted by defendants were not sufficient to show knowledge).

[111] Although the CAC alleges that the driver "identified numerous and lengthy meetings between Cobalt executives and Nazaki's owners" in Nazaki's offices, CAC ¶ 73, it elsewhere acknowledges that Cobalt and Nazaki shared offices.  CAC ¶ 100.  It also fails to explain the basis for the driver's "understanding" that (1) Vicente, Kopelipa, and Dino owned Nazaki, or (2) the Cobalt employees he drove to Cobalt's offices met with Vicente, Kopelipa, or Dino.  Further, the supposed meetings with Vicente, Kopelipa, and Dino are all alleged to have started more than a year before the driver began driving.

[112] Ex. 6, 5/20/10 Global Witness Article.

61

Vicente's purported remark that Cobalt could continue business in Angola, "dregarding [sic] the rules out there," Ex. 70, 6/1/12 Maka Angola Article, 3, adds nothing to the scienter analysis.[113]

- Nazaki's and Alper's purported failure to attend partnership meetings and lack of access to a file sharing system, CAC ¶¶ 74, 191, are not pleaded with the requisite particularity[114] and say nothing about the Executive Defendants' state of mind with respect to any particular statement. The same is true of allegations that Nazaki did not have "proven competence and financial capacity" and failed to meet its "economic and financial commitments," CAC ¶ 197—they provide no insight into the Executive Defendants' knowledge with respect to any of the alleged misstatements.

- The fantastical allegations about the Board's supposed Rich Smith investigation, CAC ¶ 192, fare no better in the scienter analysis than they did in the falsity analysis. They do not satisfy the PSLRA and are entirely implausible. *See supra* 30–32.

- The transfer of Nazaki's and Alper's interests to Sonangol P&P and Cobalt's purported failure to timely disclose Alper's transfer, CAC ¶ 197, also fail to give rise to an inference of scienter. The fact that Nazaki and Alper ultimately transferred their interests to Sonangol P&P says nothing about Nazaki's and Alper's ownership, let alone the Executive Defendants' knowledge. Nor can any adverse inference be drawn from the timing of the disclosure. Indeed, if, as Plaintiffs claim, the Executive Defendants knew Alper was a "sham entity," then they would have had no incentive to delay disclosing that Alper no longer had any interests in Blocks 9 and 21.

Further, even considering the allegations, none of the CAC's FCPA-related scienter allegations give rise to inferences as compelling as the simplest ones:

- when presented with allegations that Nazaki was owned by government officials, Cobalt disclosed just that—allegations of government official ownership; and

- when Cobalt said that it believed that it had complied with the FCPA, that is precisely what the Company and the Executive Defendants believed.

---

[113] *See, e.g.*, *Intelligroup.*, 527 F. Supp. 2d at 359–61 (holding that "personal opinions void of specific details regarding the basis for [the CW's] personal knowledge" add nothing to scienter).

[114] For instance, the CAC fails to plead when these meetings occurred, what documents were on the system, and that the information was not available to the members of the contractor group via any other method of transmission.

### 3.   None of the CAC's specific allegations with respect to Lontra and Loengo give rise to an inference of scienter.

The CAC first argues that, despite knowing its efforts would be fruitless, Cobalt spent many tens of millions of dollars drilling and testing two wells offshore Angola.  To accept this theory, the Court would have to make two inferential leaps:

- despite already knowing how Lontra would turn out, CAC ¶ 111, Cobalt told investors that a drill stem test, which costs tens of millions of dollars, would be required to evaluate the "splits between the oil and the gas," Ex. 42, 10/29/13 Call Tr., 4, 20, and then conducted that drill stem test, Ex. 45, 12/1/13 Press Release; and

- Cobalt went through the process of extending its license on Block 9, Ex. 47, 2/27/14 10-K, 8, so that it could spend over $50 million drilling Loengo, *see* Ex. 67, 2/23/15 10-K, 78, despite knowing that "there was 'not even a remote chance' of success," CAC ¶ 116.

No reasonable person would deem such an inference of scienter as cogent and compelling as the rational alternative—that, based on the seismic data and analysis available at the time, the Executive Defendants believed that Lontra and Loengo had the potential to be successful, commercial wells, and that additional evaluation in the form of a drill stem test was necessary to confirm just how successful the Lontra well would be.[115]

### 4.   The Executive Defendants' positions are insufficient to create an inference of scienter.

The CAC's rote allegations that the Executive Defendants must have known the truth by virtue of their positions within Cobalt, *see* CAC ¶¶ 194–95, ignore the repeated holding by the Fifth Circuit that "[a] pleading of scienter may not rest on the inference

---

[115] *See In re FX Energy, Inc. Sec. Litig.*, No. 2:07-CV-874 CW, 2009 WL 1812828, at *9 (D. Utah June 25, 2009) ("To accept Plaintiffs' allegations, one would have to believe that Defendants knew that their information on [two wells] was unreliable and actually had strong information that those wells were dry, but nonetheless planned to drill there, repeatedly publicized those plans, and then expended significant resources to actually drill there, all on the chance that taking these actions might artificially inflate stock prices.").

that defendants must have been aware of the misstatement based on their positions within the company," nor can it assume that "their lack of knowledge based on their corporate positions demonstrates recklessness." *Abrams*, 292 F.3d at 432.[116]   The CAC's one attempt at specificity—the former CFO's statement that Bryant was "a very hands-on manager" and was "very involved in all the details of the Gulf of Mexico [and] Angola," CAC ¶ 194—has also been soundly rejected.[117]   Moreover, the CAC fails to explain how the CFO would possess information about Bryant's scienter during the class period when the CFO left Cobalt nine months before the class period began.   *See Dell*, 591 F. Supp. 2d at 895 (statements by sources who were not employed by defendants at the time of the alleged misstatements "could hardly be probative of the Individual Defendants' scienter concerning matters that happened when they were not employed at" the company).

The CAC attempts to circumvent this pleading failure by invoking the "core operations" doctrine, a narrow and rare exception in *Nathenson* under which—in extraordinary circumstances—courts permit the inference that executives "must have known" certain facts.   *See Nathenson*, 267 F.3d at 424–25.   Courts have limited this doctrine to instances in which the "business unit or product"—about which the challenged statements were made—is effectively the only product of a small-scale

---

[116] *Accord Nathenson*, 267 F.3d at 424 ("[N]ormally an officer's position with a company does not suffice to create an inference of scienter."); *see also In re Azurix Corp. Sec. Litig.*, 198 F. Supp. 2d 862, 890 (S.D. Tex. 2002) ("Merely alleging that the defendants knew or had access to information by virtue of their board or managerial positions is not sufficient to plead scienter."), *aff'd sub nom. by Rosenzweig*, 332 F.3d 854.

[117] *See, e.g.*, *In re Baker Hughes Sec. Litig.*, 136 F. Supp. 2d 630, 648 (S.D. Tex. 2001) ("[T]he plaintiffs' recklessness allegations were inadequate where they simply pleaded that the defendants were hands-on managers who monitored performance through detailed reports."), *aff'd sub nom. Abrams*, 292 F.3d 424.

company.[118]   Thus, the CAC's attempt to make out a plausible scienter argument based on the core operations doctrine also fails.

>      **5.      Bryant's prior business experience in Angola does not give rise to an inference of scienter.**

In a last-ditch effort to impugn Bryant, the CAC alleges his prior experience in Angola and relationship with Angolan officials, including Vicente, raise a strong inference that he knew of Nazaki's Angolan ownership.   CAC ¶ 196.   For the same reasons a defendant's position in a company is insufficient to allege scienter, the allegation regarding Bryant's prior experience and relationships in Angola fails.[119] Moreover, the allegations regarding Bryant's relationship with Vicente reflect nothing more than a business relationship.

## IV.   The CAC fails to adequately plead loss causation.

To plead loss causation, Plaintiffs must do more than allege that they purchased Cobalt's securities at inflated prices and that their prices fell following negative news about its operations.   *Lormand*, 565 F.3d at 256; *Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*, 597 F.3d 330, 340–41 (5th Cir. 2010), *vacated on other grounds*, 131 S. Ct. 2179 (2011).   Plaintiff must make a plausible showing that when "the 'relevant truth' about the fraud began to leak out . . . it caused the price of the stock to depreciate and thereby proximately cause the plaintiff's economic loss."   *Lormand*, 565

---

[118] *See, e.g.*, *Dawes v. Imperial Sugar Co.*, 975 F. Supp. 2d 666, 699 (S.D. Tex. 2013) (collecting authority demonstrating that "[t]he Fifth Circuit and other courts have been reluctant to apply *Nathenson*'s limited exception to the particularized pleading required for scienter").

[119] *See Bamberg*, 2009 WL 1579512, at *7 ("[P]laintiffs' attempts to allege scienter based upon defendants' experience in the industry is analogous to alleging scienter premised upon a defendant's position in the company—which does not suffice.").

F.3d at 255.  In particular, Plaintiffs must allege that the price declined in response to "a corrective disclosure," i.e., a statement demonstrating the "the truth 'ma[de] its way into the marketplace.'"  *Archdiocese*, 597 F.3d at 336 (alteration in original) (quoting *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 229 (5th Cir. 2009)); *see also Dell*, 591 F. Supp. 2d at 907 ("Plaintiffs must allege . . . the market reacted negatively to a corrective disclosure, which revealed the falsity of [the] previous representations.").

The CAC suffers from a complete disconnect between the alleged fraud and the disclosures that precipitated the stock price drops at issue.  The CAC alleges five purported corrective disclosures:  (1) an April 15, 2012 Financial Times article; (2) Cobalt's December 1, 2013 Lontra announcement; (3) an August 5, 2014 Bloomberg article regarding the STRC; (4) the Wells Notice; and (5) Cobalt's November 4, 2014 Loengo announcement.  *See* CAC ¶¶ 200–11.  But these alleged disclosures do not represent "truths" that had previously been suppressed or hidden from the marketplace.

*Financial Times*.  To be corrective, a disclosure "must disclose *new* information" not previously known to the market.  *Meyer v. Greene*, 710 F.3d 1189, 1198 (11th Cir. 2013).  The CAC calls the *Financial Times*' reporting on Nazaki a corrective disclosure, CAC ¶ 200, but fails to explain how the information was new, especially given (1) that Cobalt itself had disclosed allegations "of a connection between senior Angolan government officials and Nazaki" over a year earlier, and (2) the ongoing SEC and DOJ investigations.[120]  But even if the information were somehow new, the CAC fails to

---

[120] *See, e.g.*, Ex. 8, 3/1/11 10-K, 47–48; Ex. 9, 3/11/11 8-K; Ex. 13, 2/21/12 10-K, 50–51.

connect the articles to any false or deceptive statement that they purportedly corrected.[121]

<u>Lontra</u>.  The CAC also points to Cobalt's December 1, 2013 press release about its Lontra findings, CAC ¶ 202, but fails to explain how it is in any way corrective of a prior disclosure.  *See Archdiocese*, 597 F.3d at 336; *Dell*, 591 F. Supp. 2d at 907.  The press release explained that Lontra contained "more gas than [Cobalt's] pre-drill estimates." CAC ¶ 202.  However, the bare fact that the well's gas content was not spot on with the Company's pre-drill estimates—which Cobalt consistently disclosed might be the case[122]—is hardly representative of a concealed truth making its way to the marketplace. Indeed, inherent in any estimate is the distinct possibility that the estimate will vary— either lower or higher—from the end result.  No other statement in the press release can be considered "new" information that serves to correct a prior statement.[123]

<u>Bloomberg</u>.  The CAC next points to an August 5, 2014 Bloomberg article, which reported that Global Witness "said in a statement on its website that it was unable to gain information from BP, Cobalt or Angolan state oil company Sonangol confirming that the [SRTC] exists." Ex. 58, 8/5/14 Bloomberg Article.  But, again, the CAC fails to identify what the disclosure corrects, as Cobalt did not state the SRTC had been built.  *See supra* 42–43.  That Sonangol had not yet built the center is hardly corrective of Cobalt's prior

---

[121] *See Archdiocese*, 597 F.3d at 336 ("Causation . . . requires the Plaintiff to demonstrate the joinder between an earlier false or deceptive statement, for which the defendant was responsible, and a subsequent corrective disclosure that reveals the truth of the matter, and that the subsequent loss could not otherwise be explained by some additional factors revealed then to the market.").

[122] *See, e.g.*, Ex. 29, 2/26/13 10-K, 42; Ex. 8, 3/1/11 10-K, 33; Ex. 13, 2/21/12 10-K, 36.

[123] For example, the CAC alleges that the press release reported that Lontra "was only economically viable for condensate/oil sales."  CAC ¶ 202.  Although no such language appears in the press release, even if such a disclosure existed, it could not be considered corrective since the Company's prior disclosures made abundantly clear that it "do[es] not have contractual rights to sell natural gas on [its] Angola blocks, but [that it] ha[s] the right to use the natural gas during lease operations." Ex. 13, 2/21/12 10-K, 21; Ex. 29, 2/26/13 10-K, 15.

disclosure that it—like other companies awarded blocks in the 2011 licensing round—was contractually obligated to pay to Sonangol a social bonus earmarked for the SRTC.

Wells Notice.  The CAC yet again fails to identify how Cobalt's disclosure of the Wells Notice on August 5, 2014 is corrective, especially in light of the fact that Cobalt had disclosed the SEC's investigation three years earlier.[124]   Moreover, Cobalt specifically warned investors that it "cannot provide any assurance regarding the duration, scope, developments in, results of or consequences of" the investigation.[125]

Like a regulatory investigation, the very nature of a Wells Notice—which is *not* a finding of liability but rather a non-authoritative recommendation by the SEC Staff[126]—precludes it from being the basis of a corrective disclosure.  It is well established that the announcement of a government investigation, standing alone, does not constitute a corrective disclosure.  *See, e.g.*, *Pub. Emps.' Ret. Sys. of Miss., P.R. Teachers Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 323 (5th Cir. 2014).  "To be sure, stock prices may fall upon the announcement of an SEC investigation, but that is because the investigation can be seen to portend an added *risk* of future corrective action.  That does not mean that the investigations, in and of themselves, reveal to the market that a company's previous statements were false or fraudulent."  *Meyer*, 710 F.3d at 1201.  That reasoning applies with equal force to disclosure of a Wells Notice.  A Wells Notice, standing alone, cannot be corrective of a prior false statement—a point only underscored by the SEC Staff's

---

[124] Ex. 9, 3/11/11 8-K; Ex. 47, 2/27/14 10-K, 55; Ex. 29, 2/26/13 10-K, 57; Ex. 13, 2/21/12 10-K, 50–51.

[125] Ex. 47, 2/27/14 10-K, 55; Ex. 29, 2/26/13 10-K, 57; Ex. 13, 2/21/12 10-K, 51.

[126] *See, e.g.*, *WHX Corp. v. S.E.C.*, 362 F.3d 854, 860 (D.C. Cir. 2004) (citing 17 C.F.R. § 202.5(c)).

subsequent termination of its investigation without recommending an enforcement action.

Loengo.   The CAC's last alleged corrective disclosure fails for the same fundamental reason:  Cobalt's November 4, 2014 announcement regarding Loengo does not reveal any previously hidden truth.   Indeed, Cobalt consistently and explicitly disclosed the risks of drilling offshore Angola, completely dispelling Plaintiffs' bald assertion that the announcement of a failure to find hydrocarbons in commercial quantities revealed "[t]he risks concealed by Cobalt."  *See, e.g.*, Ex. 47, 2/27/14 10-K, 41 ("The exploration, appraisal and development wells we drill may not yield hydrocarbons in commercial quantities or quality, or at all."); *id.* ("[W]e do not know how many of our development projects, discoveries or exploration prospects will contain hydrocarbons in sufficient quantities or quality to recover drilling and completion costs or to be economically viable.").[127]  A disclosure of the occurrence of a divulged risk is in no way corrective.  *See Archdiocese*, 597 F.3d at 340 (statements about the materialization of risks that company previously disclosed and warned against are not corrective).

Because the CAC fails to allege loss causation, § 10(b) claims must be dismissed.

## V.     The CAC fails to plead reliance as to any bond offering.

Rather than pleading any particularized facts that investors specifically relied on any statement by Cobalt in deciding whether to invest in its stock or bonds, the CAC relies on the fraud-on-the-market theory of reliance with respect to Cobalt's common stock.   CAC ¶ 214.   That theory creates a rebuttable presumption of reliance when a plaintiff demonstrates, *inter alia*, that the security is traded in an efficient market.  *See*

---

[127] *See also, e.g.*, Ex. 29, 2/26/13 10-K, 42; Ex. 13, 2/21/12 10-K, 36; Ex. 8, 3/1/11 10-K, 33.

*Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2408 (2014).  But the CAC fails to allege that the market for Cobalt's bonds was efficient (nor could it); thus, it fails to plead a presumption of reliance as to the Company's bonds.  *See* CAC ¶¶ 214–16.

The *Affiliated Ute* presumption of reliance, CAC ¶ 216, does not save these claims.  A plaintiff may only rely on that presumption where he alleges "a case primarily based on omissions or non-disclosure."  *Regents of Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 383–84 (5th Cir. 2007); *Griffin v. GK Intelligent Sys., Inc.*, 196 F.R.D. 298, 305 (S.D. Tex. 2000) (Atlas, J.) ("The *Affiliated Ute* presumption applies only to allegations that the . . . company 'failed to disclose any information whatsoever relating to material facts about which [it] had a duty to disclose.'").  The claims here are not "primarily" omissions claims; rather, the CAC exclusively focuses on allegedly misleading statements made regarding Cobalt's Angolan operations.  *See, e.g.*, CAC ¶¶ 127–28.  As such, the presumption is inapplicable, and the 10b-5 claims as to Cobalt's bond offerings must be dismissed for failure to allege reliance.[128]

## VI.   The CAC's Section 20 claims also must be dismissed.

Section 20(a) claims for control person liability are derivative of primary claims under Section 10(b); when no viable Section 10(b) claim exists, no Section 20(a) claim can exist.  *See, e.g.*, *Shaw*, 537 F.3d at 545.  Thus, because the Section 10(b) claims must be dismissed, so must the Section 20(a) claims.

---

[128] *See, e.g.*, *Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc.*, 412 F.3d 103, 109 n.5 (2d Cir. 2005) (finding *Affiliated Ute* inapplicable because "[p]laintiff's principal objection to the omissions in the letters is that the omissions exacerbated the misleading nature of the affirmative statements in the letters").

**SECURITIES ACT CLAIMS**

**I.     The CAC fails to adequately plead that any of the challenged statements were false or rendered misleading by omission.**

Plaintiffs also repackage many of their Exchange Act claims as Securities Act claims, alleging they bought securities pursuant to five offerings—(1) a February 2012 stock offering; (2) a December 2012 bond offering; (3) a January 2013 stock offering; (4) a May 2013 stock offering; and (5) a May 2014 bond offering—and claiming that statements in the offering materials about Cobalt's Angolan operations (a subset of the statements at issue in the Exchange Act claims) were false and misleading by omission. *See* CAC ¶¶ 217–60.   Most of these allegations are barred by the relevant statute of limitations and statute of repose.[129]   And none gives rise to a Section 11 claim because, as explained in connection with Plaintiffs' Exchange Act claims, *see supra* 26–55, the CAC fails to identify a single statement of material fact that was false when made or rendered misleading by the omission of a material fact.   Thus, the CAC fails to plead that the challenged statements in the offering materials were false or misleading.

Opinion on FCPA Compliance.   The CAC challenges Cobalt's statement that it believed its Angolan activities complied with the FCPA.[130]   Like the *Omnicare* plaintiffs, however, Plaintiffs cannot "contest that [Cobalt's] opinion was honestly held," given that their complaint "expressly disavow[s] and disclaim[s] any allegations of fraud, scheme or intentional conduct," CAC ¶ 217.   *See* 135 S. Ct. at 1327.   Thus, they cannot make out a

---

[129] The Cobalt Defendants hereby incorporate by reference and join in the Underwriter Defendants' motion to dismiss, which explains why *all* claims arising out of the February 2012 Offering must be dismissed because they were filed after the expiration of the Securities Act's three-year statute of repose (and because Plaintiffs fail to plead actual reliance), and all Nazaki-related claims are barred by the Securities Act's one-year statute of limitations.

[130] CAC ¶¶ 226, 235, 245, 250, 256.

claim under Section 11's misstatement provision.

Nor can they make out a claim under the omission provision.  CAC ¶¶ 228, 237, 258.  To begin with, their disclaimer of allegations sounding in fraud precludes them from alleging that what Cobalt omitted was an actual discovery of, or even a significant risk of, an FCPA violation; to hold otherwise would permit an end-run around the misstatement provision.  Thus, their attempts to rely on the alleged Board investigation[131] are unavailing.[132]  Nor have they pleaded that Cobalt failed to disclose a particular and material fact going to the basis for its opinion whose omission makes the opinion misleading, *Omnicare*, 135 S. Ct. at 1332, particularly since Cobalt disclosed that it was under investigation for FCPA matters, had retained two law firms to assist with compliance and due diligence, and had conducted an extensive investigation.  *See supra* 33–39.  And the alleged omission that Cobalt "did not reasonably believe" its "activities in Angola complied with all laws, including the [FCPA]" is the exact type of conclusory allegation prohibited by *Omnicare*.  135 S. Ct. at 1333.

<u>Cobalt's Due Diligence and FCPA Compliance Efforts</u>.  The CAC complains about Cobalt's description of its due diligence and FCPA compliance efforts, pointing to the same statements discussed in *supra* 35–36.[133]  As explained above, the CAC does not allege that any of those statements were literally false, nor does it offer plausible allegations that diligence revealed that government officials owned Nazaki or Alper.  *See*

---

[131] CAC ¶¶ 228, 237, 245, 250, 258.

[132] Further, the CW allegations about the supposed Board investigation do not withstand scrutiny under even Rule 8(a), nor was any CW in a position at Cobalt to have personal knowledge of such an investigation.  *See supra* 30–32.

[133] *See* CAC ¶¶ 226, 235, 245, 250, 256.

*supra* 36–37.  But even if government official ownership had been uncovered,[134] it would make no difference because the identities of Nazaki's and Alper's owners neither contradict nor render untrue or misleading anything in the challenged statements about Cobalt's due diligence and FCPA compliance efforts.  *See supra* 35–37.

"Limited Familiarity" and "Allegations" regarding Nazaki's Owners.  The CAC complains about statements regarding Cobalt's familiarity with Nazaki and Alper and "allegations" of a connection between Nazaki and government officials.[135]  As explained, when placed in context, the statement regarding Cobalt's "limited familiarity" with Nazaki and Alper was entirely accurate.  *See supra* 38.  Moreover, a later revelation of Angolan government official ownership does not render false or misleading Cobalt's statement in 2010 or 2011 that it "was made aware of allegations" of a connection between Nazaki and government officials the prior year.  Nor does it render Cobalt's historical description of events in subsequent filings inaccurate.  *See supra* 38–39 & 38 n.54.

Cobalt's Description of Nazaki as "Full Paying."  The CAC complains that Cobalt called Nazaki a full-paying member of the contractor group but fails to acknowledge the context in which the statement was made, which shows it was merely a description of the type of interest Nazaki held.[136]  *See supra* 39–40.  And the CAC fails to allege any facts making the allegedly omitted "facts"—Nazaki's purported lack of competence and

---

[134] CAC ¶¶ 228, 237, 245, 250, 258.

[135] CAC ¶¶ 226, 227, 235, 245, 250, 256, 257.

[136] CAC ¶¶ 226, 235, 245, 250, 256.

compliance with its economic commitments—material to a reasonable investor.[137]

Alper's Interests.  The CAC alleges that Cobalt falsely stated on May 1, 2014 that Alper had working interests in Blocks 9 and 21 when those interests had already been transferred to Sonangol, CAC ¶ 260, but that allegation rests on a mischaracterization of the Angolan government's March 25, 2014 decrees.  And the CAC fails to explain how Alper's exit from the contractor group would have been material to a reasonable investor or would have had any bearing on the challenged statements.  *See supra* 41–42.

Social Project Payments to Sonangol.  The CAC alleges that because the SRTC was in a development stage, Cobalt's references to it as an example of the social program payments owed to Sonangol were misleading.[138]  But the CAC fails to plead facts showing that this information rendered any statement false or was material.[139]  *See supra* 42–43.  No reasonable investor would consider the stage of the SRTC's development important in making an investment decision.  *See Kapps*, 379 F.3d at 213–14.

"Oil-Focused" and "High Impact" Prospects and "Significant" Wells.  The CAC attacks Cobalt's description of its prospects as "oil-focused," "high impact," and "significant."[140]  But, as discussed at *supra* 53–54, in context, these statements are classic puffery and could not mislead anyone given Cobalt's many warnings about the speculative nature of oil drilling.[141]  The CAC also fails to explain how the omission of

---

[137] CAC ¶ 228 (alleging Cobalt failed to disclose Nazaki's "competence and financial capacity" and "repeatedly failed to comply with its economic and financial commitments."); *accord* CAC ¶¶ 237, 245, 258.

[138] CAC ¶¶ 226, 228, 235, 237, 245, 250, 256, 258.

[139] Likewise, the CAC's conclusory assertion that the payments were "illegitimate" bribes fails.  *See supra* 41 n.61.

[140] CAC ¶¶ 229, 238, 245, 251.

[141] For the same reasons discussed at *supra* 54 n.99, the SEC's October 26, 2012 letter does not change this result.

the former CIO's allegations—that Sonangol required Cobalt to "sit on" information and knew earlier how Lontra and Loengo would turn out, CAC ¶¶ 230, 231, 239, 240, 245, 251—render the generic descriptors of Cobalt's prospects misleading.  Nor does the CAC plead facts to support the purported omissions.[142]  Finally, the allegation that Cobalt falsely stated that its "oil-focused below-salt exploration efforts have been successful" was untrue because Loengo was neither "oil-focused" or "successful," CAC ¶ 259, fails because Cobalt never referenced Loengo in that statement.  *See supra* 25.

## II.    The Section 15 claims also must be dismissed.

Section 15 claim imposes derivative liability on control persons for acts violating Section 11 of the Securities Act.  *In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*, 463 F. Supp. 2d 628, 632 (S.D. Tex. 2006).  Since the Section 11 claims must be dismissed, so too must the Section 15 claims.  *Id.* at 633–34.

### CONCLUSION

For the foregoing reasons, the Cobalt Defendants respectfully request that the Court grant their motion to dismiss all claims asserted against them.

---

[142]  Indeed, rather than satisfying the requisites of Rule 8(a), the CW allegations lack sufficient specificity and contextualizing information.  *See, e.g.*, *Pyramid Holdings, Inc. v. Inverness Med. Innovations, Inc.*, 638 F. Supp. 2d 120, 127–28 (D. Mass. 2009) (rejecting, in context of Section 11, CW allegation that lacked enough "contextualizing information" for "its true meaning or impact to be discernible," and finding allegation that project was "significantly behind schedule" failed "to provide a meaningful degree of specificity").  They also fail to show that the CW was "well-placed in [a] position[] within [Cobalt]" to know any such information.  *See In re Superior Offshore Int'l, Inc. Sec. Litig.*, No. CIV A H-08-0687, 2009 WL 82064, at *4 (S.D. Tex. Jan. 12, 2009).

Dated:  June 30, 2015

Respectfully submitted,

BAKER BOTTS L.L.P.

Of Counsel:
Danny David
Texas Bar No. 24028267
Russell Lewis
Texas Bar No. 24036968
Federal I.D. No. 569523
Amy Pharr Hefley
Texas Bar No. 24046046
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana St.
Houston, Texas  77002
Tel: (713) 229-1234
Fax: (713) 229-1522
danny.david@bakerbotts.com
russell.lewis@bakerbotts.com
amy.hefley@bakerbotts.com

By:  */s/ David D. Sterling*
     David D. Sterling
     Attorney-In-Charge
     Texas Bar No. 19170000
     Federal I.D. No. 07079
     One Shell Plaza
     910 Louisiana St.
     Houston, Texas  77002
     Tel: (713) 229-1946
     Fax: (713) 229-7946
     david.sterling@bakerbotts.com

Attorneys for Defendants Joseph H. Bryant, James W. Farnsworth, John P. Wilkirson, Peter R. Coneway, Henry Cornell, Jack E. Golden, N. John Lancaster, Jon A. Marshall, Kenneth W. Moore, J. Hardy Murchison, Michael G. France, Kenneth A. Pontarelli, Scott L. Lebovitz, Myles W. Scoggins, D. Jeff van Steenbergen, Martin H. Young, Jr., William P. Utt, and Cobalt International Energy, Inc.

### CERTIFICATE OF SERVICE

     I hereby certify that on this 30th day of June, 2015, a true and correct copy of the foregoing document was served by the Court's CM/ECF system on all counsel of record.

*/s/ Amy Pharr Hefley*
Amy Pharr Hefley