# EXHIBIT 1

TRANSLATION

# COUNCIL OF MINISTERS

## Decree-Law No. 14/09
## of June 11, 2009

Whereas the Constitutional Law and Law No. 10/04, of November 12, 2004, set forth that all liquid and gaseous hydrocarbon deposits existing in the available areas of the surface and subsurface of the national territory, inland waters, territorial sea, exclusive economic zone and continental shelf are public domain property of the State;

Whereas the referred Law No. 10/04 also provides that the mining rights for prospecting, exploration, development and production of liquid and gaseous hydrocarbons will be granted to Sociedade Nacional de Combustíveis de Angola, Empresa Pública [Public Company] (SONANGOL-E.P.);

Whereas Sociedade Nacional de Combustíveis de Angola, Empresa Pública (SONANGOL-E.P.) is interested in executing petroleum operations in the Kwanza Basin, with the purpose of reducing the geological risk and improve the knowledge of the potential of the existing hydrocarbons;

Whereas Block 21 has already been the object of a petroleum concession that had no success, and this situation justifies its framing under Article 11 of Law No. 13/04, of December 31, 2004, on the tax regime of Sociedade Nacional de Combustíveis de Angola, Empresa Pública (SONANGOL-E.P.);

Whereas Sociedade Nacional de Combustíveis de Angola, Empresa Pública (SONANGOL-E.P.) intends to develop such petroleum operations through a risk services contract for prospecting and production of liquid and gaseous hydrocarbons in the concession area;

Now, therefore, under the legislative authorization granted by National Assembly Resolution No. 23/09, of April 2, 2009, the Government, considering the provisions of Article 44 of Law No.10/04, of November 12, 2004, and under the combined provisions of Article 90 paragraph (f) and Article 113 both of the Constitutional Law, decrees the following:

## Article 1
## (Granting of mining rights)

Under the terms of Article 44.2 of Law No. 10/04, of November 12, 2004, Sociedade Nacional de Combustíveis de Angola, Empresa Pública (SONANGOL-E.P.), hereinafter referred to as National Concessionaire, is granted mining rights for prospecting, exploration, development and production of liquid and gaseous hydrocarbons in the concession area, as defined in Article 2 of this decree-law.

## Article 2
## (Concession area)

1. The concession area is described in Annex A and mapped in Annex B, both being an integral part of this decree-law.

2. In the event of any discrepancy between the two Annexes referred to in Article 2.1, the description of the concession area made in Annex A shall prevail.

## Article 3

TRANSLATION

**(Duration of the concession)**

1    The duration of the concession periods is as follows:

    (a)  *Exploration Period*: 8 (eight) years counted from the effective date of the production sharing agreement;

    (b)  *Production Period*: 25 years per development area, counted from the date of declaration of the respective commercial discovery.

2.    Each of the concession periods referred to in paragraph 1 may be exceptionally extended at the request of the National Concessionaire pursuant to Article 14.3 of Law No. 10/04, of November 12, 2004.

**Article 4**
**(Operator)**

1.    Cobalt International Energy, LP, in representation of a consortium to be formed with SONANGOL – Pesquisa e Produção, S.A. and Nazaki Oil & Gás is appointed operator to execute and order the execution of all the work inherent to the petroleum operations of prospecting, exploration, development and production of liquid and gaseous hydrocarbons in the concession area.

2.    The change of operator is subject to prior authorization from the supervising Ministry following a proposal by the National Concessionaire.

3.    The operator must strictly comply with the provisions of this decree-law, other applicable legislation and the Production Sharing Agreement.

**Article 5**
**(National Concessionaire's Tax Regime)**

The National Concessionaire's activities under this decree-law are exempt from Petroleum Production Tax and Petroleum Transaction Tax, but are subject to Petroleum Income Tax at a rate of 50%.

**Article 6**
**(Foreign exchange regime)**

The foreign exchange regime applicable to the petroleum operations provided for herein is set forth in Annex C of this decree-law, which is deemed a part hereof.

**Article 7**
**(Interpretation and insertion of omissions)**

Any doubts or omissions arising from the interpretation and application of this statute shall be resolved by Council of Ministers decree, except for those matters of a tax nature, which shall be resolved by decree-law.

**Article 8**
**(Effectiveness)**

This decree shall take effect on the date of its publication.

TRANSLATION

Seen and approved by the Council of Ministers in Luanda, on January 28, 2009.

The Prime-Minister, *António Paulo Kassoma*.

Promulgated on May 21, 2009.

Published.

The President of the Republic, JOSÉ EDUARDO DOS SANTOS.

---

ANNEX A
**Description of the Concession Area**

The area, set out in Annex B, is limited by the lines defined by points 1 to 8 and is included in the following perimeter:

Beginning with the interception point of Parallel Latitude 9° 55' 00" S and Meridian 12° 10' 00" E, we have point 1 with the Latitude coordinates of 9° 55' 00" S and Longitude 12° 10' 00" E. Starting from this point, towards East, following Parallel Latitude 9° 55' 00" S until it intercepts Meridian 12° 40' 00" E, we have point 2 with the Latitude coordinates of 9° 55' 00" S and Longitude 12° 40' 00" E. Starting from this point, towards South, following Meridian 12° 40' 00" E until it intercepts Parallel Latitude 10° 05' 00" S, we have point 3 with the Latitude coordinates of 10° 05' 00" S and Longitude 12° 40' 00" E. Starting from this point, towards East, following Parallel Latitude 10° 05' 00" S until it intercepts Meridian 12° 55' 00" E, we have point 4 with the Latitude coordinates of 10° 05' 00" S and Longitude 12° 55' 00" E. Starting from this point, towards South, following Meridian 12° 55' 00" E until it intercepts Parallel Latitude 10° 25' 00" S, we have point 5 with the Latitude coordinates of 10° 25' 00" S and Longitude 12° 55' 00" E. Starting from this point, towards East, following Parallel Latitude 10° 25' 00" S until it intercepts Meridian 13° 00' 00" E, we have point 6 with the Latitude coordinates of 10° 25' 00" S and Longitude 13° 00' 00" E. Starting from this point, towards South, following Meridian 13° 00' 00" E until it intercepts Parallel Latitude 10° 30' 00" S, we have point 7 with the Latitude coordinates of 10° 30' 00" S and Longitude 13° 00' 00" E. Starting from this point, towards West, following Parallel Latitude 10° 30' 00" S until it intercepts Meridian 12° 10' 00" E, we have point 8 with the Latitude coordinates of 10° 30' 00" S and Longitude 12° 10' 00" E.

Finally from this point towards North, until it reaches point 1.

The aforementioned coordinates are in respect to the Camacupa Datum, Clark 1880 ellipsoid.

3

ANNEX B
Map of the Concession Area

| ANNEX B | MAP OF THE CONCESSION AREA OF BLOCK 21 |
|---------|---------------------------------------|



| BLOCK 21 | | |
|----------|-----------|-------------|
| POINTS | LATITUDE S | LONGITUDE E |
| 1 | 9° 55' 00'' | 12° 10' 00'' |
| 2 | 9° 55' 00'' | 12° 40' 00'' |
| 3 | 10° 05' 00'' | 12° 40' 00'' |
| 4 | 10° 05' 00'' | 12° 55' 00'' |
| 5 | 10° 25' 00'' | 12° 55' 00'' |
| 6 | 10° 25' 00'' | 13° 00' 00'' |
| 7 | 10° 30' 00'' | 13° 00' 00'' |
| 8 | 10° 30' 00'' | 12° 10' 00'' |
| Area = 4881.9 km² | | |

CLARK ELLIPSOID 1880 – DATUM CAMACUPA

TRANSLATION

## Annex C
## Foreign Exchange Regime

### Article 1
### (Subject matter)

This annex sets forth the foreign exchange regime governing the settlement of operations relating to goods, current invisibles and capital, deriving from liquid and gaseous hydrocarbon prospecting, exploration, development and production activities carried out in the concession area.

### Article 2
### (Scope)

The provisions of this annex, which are of an exceptional nature, shall apply to the Concessionaire, operator and the entities with whom the latter associates with in the execution of petroleum operations carried out in the concession area.

### Article 3
### (Foreign exchange operations)

1 - Operations relating to goods, current invisibles and capital to which the Concessionaire, the operator and the entities with whom the latter associates with shall comply with the legislation in force and with the rules set forth in the following paragraphs.

2 - The operator's associates existing under the laws of Angola shall open accounts in foreign currency with credit institutions domiciled in the country; the operator's associates existing under the laws of a foreign country may hold foreign currency accounts with credit institutions domiciled outside Angola1.

3 - The foreign currency balance in the accounts referred to in the preceding paragraph shall be used, on a priority basis, for the payment of current expenses (cash calls), namely for settlement of the import of goods and services relating to petroleum operations.

### Article 4
### (Escrow account)

The Angolan associates of the operator are granted the foreign exchange prerogative of being able to retain in escrow accounts, authorized in advance by the National Bank of Angola, with banks domiciled abroad or in the country, the foreign exchange needed to service their foreign debt.

### Article 5
### (Finance for investments)

1 – When drawing up their financing strategy for investment projects, the Angolan associates of the operator shall give priority to the use of medium and long term capital.

2 – The operator and its foreign associates shall finance, in full, in foreign currency, their share of the

---

1 Translator's note: "associates existing under the laws of Angola" and "associates existing under the laws of a foreign country" will hereinafter be referred to in short, respectively, as "Angolan associates" and "foreign associates".

investments needed in order to carry out petroleum operations, such finance being their sole responsibility.

3 – The finance referred to in the preceding paragraph shall be repaid through the accounts mentioned in Article 3.2 of this annex.

## Article 6
### (Profits and dividends)

1 – Profits, dividends and other remuneration on capital in relation with the Angolan associates of the operator shall be subject to the foreign exchange legislation in force.

2 – The profits, dividends and other remuneration on capital of the operator and of its foreign associates shall be deposited in the accounts referred to in Article 3.2 of this Annex.

## Article 7
### (Operator's accounts)

1 – The operator may hold, in its own name, on behalf of the entities bearing the costs involved in petroleum operations, one or more foreign currency accounts with credit institutions domiciled in the country or abroad, for the settlement of imports of goods and services connected with petroleum operations, in compliance with the provisions of the foreign exchange legislation in force and of the following paragraph.

2 – The operator shall give priority to the opening of accounts with credit institutions domiciled in the country, for the purposes of settlement of part or all of its imports of goods and services, whenever the competitiveness and efficiency of payments by these institutions is comparable with the conditions offered by credit institutions domiciled abroad.

3 – The operator's accounts are credited with the prepayments from the entities bearing the costs involved in petroleum operations, with interest or other remuneration on the respective balances, and debited in respect of the settlement of imports of goods and services from suppliers domiciled outside Angola.

4 – The operator shall open and operate accounts in national currency with banks domiciled in the country for the purpose of payments for goods and services supplied by entities resident in the country.

## Article 8
### (Agreements for acquisition of goods and services)

1 – The operator, acting on behalf of the entities bearing the costs involved in petroleum operations, shall submit each quarter to the National Bank of Angola, for the purposes of registration, a detailed list of all contracts signed with non-resident suppliers of goods and services.

2 – The National Bank of Angola may, whenever it sees fit, require the submission of a copy of any contracts.

## Article 9
### (Registration of foreign exchange operations)

TRANSLATION

The Concessionaire, the operator and the entities with whom the latter associates with, must register, in accordance with the legislation in force, all their foreign exchange operations, namely the export, re-export and import of goods, the receipt and payment of current invisibles and the import and export of capital, including the opening of accounts outside Angola.

**Article 10**
**(Forecast of tax return and budget of foreign exchange**
**revenues and expenses)**

1 – With a view to the execution of the foreign exchange operations deriving from the regime established herein, the Concessionaire, operator and the entities with whom the latter associates with shall submit to the National Bank of Angola, by November 30, each year, a forecast of its budget of foreign exchange revenues and expenses for the following year.

2 – The Concessionaire shall also submit to the National Bank of Angola, by the date established in the preceding paragraph, a copy of the investment programs relating to the annual program of activities for the following year.

3 – The operator and the entities with whom it associates with shall each submit individually to the National Bank of Angola, by the date established in paragraph 1, their annual projection of the import of funds to cover their respective investment expenses, indicating the presumable sources of finance.

**Article 11**

**(Balance of payments statistics)**

The National Bank of Angola shall issue specific instructions relating to the type, form and frequency of presentation of the information needed for registration and inclusion of the balance of payment.

**Article 12**

**(Final provisions)**

1 – For the purposes of this annex, the exchange rate to be applied by the National Bank of Angola to the purchase and sale of foreign currency shall be the reference rate in force, in accordance with the relevant legislation.

2 – Without prejudice to their autonomy in the conduct of their commercial operations carried out under the terms of this annex, the currency which the Concessionaire, the operator and the entities with whom the latter associates with, shall deliver to the National Bank of Angola must correspond to freely convertible currencies accepted as such by said bank.

The Prime-Minister, *António Paulo Kassoma*.

<u>TRANSLATION</u>

The President of the Republic, JOSÉ EDUARDO DOS SANTOS.



**TRANSPERFECT**

City of San Francisco, State of California, County of San Francisco

I, Dominic Ledda, hereby affirm that the following is to the best of my knowledge and belief, a true and accurate Translation from Portuguese to English of the document "Council of Ministers, Decree Law No. 14/09 of June 11, 2009".

_____
Dominic Ledda

Sworn to before me this
June 22, 2015

_____
Signature, Notary Public

ANTHONY LOPEZ
Commission # 1974633
Notary Public - California
San Francisco County
My Comm. Expires Apr 9, 2016

_____
Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
160 SPEAR STREET, SUITE 1100, SAN FRANCISCO, CA 94105 I T 415.615.9191 I F 415.615.9181 I WWW.TRANSPERFECT.COM
OFFICES IN 75 CITIES WORLDWIDE



**Quinta-feira, 11 de Junho de 2009**

**I Série — N.º 107**

# DIÁRIO DA REPÚBLICA

## ÓRGÃO OFICIAL DA REPÚBLICA DE ANGOLA

### Preço deste número — Kz: 90,00

| | ASSINATURAS | | |
|---|---|---|---|
| Toda a correspondência, quer oficial, quer relativa a anúncio e assinaturas do «*Diário da República*», deve ser dirigida à Imprensa Nacional — E. P., em Luanda, Caixa Postal 1306 — End. Teleg.: «Imprensa» | | **Ano** | O preço de cada linha publicada nos *Diários da República* 1.ª e 2.ª séries é de Kz: 75,00 e para a 3.ª série Kz: 95,00, acrescido do respectivo imposto do selo, dependendo a publicação da 3.ª série de depósito prévio a efectuar na Tesouraria da Imprensa Nacional — E. P. |
| | As três séries ... ... ... ... ... | Kz: 400 275,00 | |
| | A 1.ª série ... ... ... ... ... | Kz: 236 250,00 | |
| | A 2.ª série ... ... ... ... ... | Kz: 123 500,00 | |
| | A 3.ª série ... ... ... ... ... | Kz: 95 700,00 | |

## SUMÁRIO

### Assembleia Nacional

**Resolução n.º 42/09:**

Indica a Deputada Isabel João Miguel Sebastião Peliganga para exercer a função de Presidente do Grupo Parlamentar de Amizade da Europa (excepto Portugal, Federação Russa e Europa do Leste).

**Resolução n.º 43/09:**

Integra os Deputados Palmira Leitão Barbosa no Grupo Nacional da União Interparlamentar e no Grupo Parlamentar de Amizade da Europa (excepto Portugal, Federação Russa e Europa do Leste), Antonino Filipe Tchiyulo Jeremias no Grupo da União Interparlamentar e no Grupo Parlamentar de Amizade da América Central e do Sul e Fernando Jonasse no Grupo Nacional da Assembleia Parlamentar Paritária África, Caraíbas e Pacífico/União Europeia (ACP/UE) e no Grupo Parlamentar de Amizade da Comunidade Económica dos Estados da África Central (CEEAC).

**Resolução n.º 44/09:**

Fixa o valor de Kz: 200 000,00 para o subsídio de deslocação para os Deputados não residentes em Luanda e o montante de Kz: 65 000,00, a abonar a título de despesas de representação.

### Conselho de Ministros

**Decreto-Lei n.º 14/09:**

Concede à Sociedade Nacional de Combustíveis de Angola, Empresa Pública (SONANGOL-E. P.), adiante designada por Concessionária Nacional, os direitos mineiros de prospecção, pesquisa, desenvolvimento e produção de hidrocarbonetos líquidos e gasosos na área da concessão do Bloco 21.

**Decreto-Lei n.º 15/09:**

Concede à Sociedade Nacional de Combustíveis de Angola, Empresa Pública (SONANGOL-E. P.), adiante designada por Concessionária Nacional, os direitos mineiros de prospecção, pesquisa, desenvolvimento e produção de hidrocarbonetos líquidos e gasosos na área da concessão do Bloco 9.

## ASSEMBLEIA NACIONAL

### Resolução n.º 42/09
#### de 11 de Junho

Considerando que através da Resolução n.º 3/09, de 9 de Janeiro, a Assembleia Nacional aprovou a suspensão provisória do mandato do Deputado Frederico Manuel dos Santos e Silva Cardoso;

Considerando que o Deputado com o mandato suspenso exercia a função de Presidente do Grupo Parlamentar de Amizade da Europa (excepto Portugal, Federação Russa e Europa do Leste), cargo que urge prover;

Nestes termos, ao abrigo das disposições combinadas da alínea r) do artigo 88.º e do n.º 6 do artigo 92.º ambos da Lei Constitucional, a Assembleia Nacional emite a seguinte resolução:

1.º — É a Deputada Isabel João Miguel Sebastião Peliganga, indicada para exercer a função de Presidente do Grupo Parlamentar de Amizade da Europa (excepto Portugal, Federação Russa e Europa do Leste).

2.º — A presente resolução entra em vigor à data da sua publicação.

Vista e aprovada pela Assembleia Nacional, em Luanda, aos 21 de Abril de 2009.

Publique-se.

O Presidente da Assembleia Nacional, *Fernando da Piedade Dias dos Santos.*

### Resolução n.º 43/09
#### de 11 de Junho

Considerando que o Grupo Interparlamentar Angolano, constituído no seio da Assembleia Nacional, estabelece no seu regulamento a integração plena nos Grupos Nacionais e nos Grupos de Amizade de todos os Deputados à Assembleia Nacional, em efectividade de funções;

Considerando que os Deputados Antonino Filipe Tchiyulo Jeremias, Fernando Jonasse e Palmira Leitão Barbosa, tomaram oportunamente posse como Deputados à Assembleia Nacional;

DIÁRIO DA REPÚBLICA

Nestes termos, ao abrigo das disposições combinadas da alínea r) do artigo 88.º e do n.º 6 do artigo 92.º ambos da Lei Constitucional, a Assembleia Nacional emite a seguinte resolução:

1.º — É a Deputada Palmira Leitão Barbosa, integrada no Grupo Nacional da União Interparlamentar e no Grupo Parlamentar de Amizade da Europa (excepto Portugal, Federação Russa e Europa do Leste).

2.º — É o Deputado Antonino Filipe Tchiyulo Jeremias, integrado no Grupo da União Interparlamentar e no Grupo Parlamentar de Amizade da América Central e do Sul.

3.º — É o Deputado Fernando Jonasse, integrado no Grupo Nacional da Assembleia Parlamentar Paritária África, Caraíbas e Pacífico/União Europeia (ACP/UE) e no Grupo Parlamentar de Amizade da Comunidade Económica dos Estados da África Central (CEEAC).

4.º — A presente resolução entra em vigor à data da sua publicação.

Vista e aprovada pela Assembleia Nacional, em Luanda, aos 21 de Abril de 2009.

Publique-se.

O Presidente da Assembleia Nacional, *Fernando da Piedade Dias dos Santos.*

———

### Resolução n.º 44/09
#### de 11 de Junho

Havendo necessidade de se atribuir ao Deputado da Assembleia Nacional, não residente em Luanda, um subsídio de deslocação para o seu local de residência habitual, conforme o previsto no n.º 2 do artigo 30.º da Lei n.º 6/08, de 4 de Julho — Lei Orgânica do Estatuto Remuneratório dos Deputados;

Considerando que as reuniões plenárias da Assembleia Nacional passaram a ser realizadas numa determinada semana de cada mês, altura em que os Deputados dos Círculos Provinciais que, obrigatoriamente, devem residir nas respectivas províncias, bem como os Deputados eleitos pelo Círculo Nacional, residentes fora de Luanda, devem permanecer em Luanda, com vista à sua participação nos trabalhos das respectivas Comissões Permanentes de Trabalho;

Nestes termos, ao abrigo das disposições combinadas da alínea r) do artigo 88.º e do n.º 6 do artigo 92.º ambos da Lei Constitucional, a Assembleia Nacional emite a seguinte resolução:

1.º — É fixado o valor de Kz: 200 000,00 para o subsídio de deslocação para os Deputados não residentes em Luanda e o montante de Kz: 65 000,00 a abonar a título de despesas de representação.

2.º — A presente resolução entra imediatamente em vigor.

Vista e aprovada pela Assembleia Nacional, em Luanda, aos 21 de Abril de 2009.

Publique-se.

O Presidente da Assembleia Nacional, *Fernando da Piedade Dias dos Santos.*

———

## CONSELHO DE MINISTROS

### Decreto-Lei n.º 14/09
#### de 11 de Junho

Considerando que a Lei Constitucional e a Lei n.º 10/04, de 12 de Novembro, determinam que todos os jazigos de hidrocarbonetos líquidos e gasosos existentes nas áreas disponíveis da superfície e submersas do território nacional, nas águas interiores, no mar territorial, na zona económica exclusiva e na plataforma continental fazem parte integrante do domínio público do Estado;

Considerando que a referida Lei n.º 10/04, determina também que os direitos mineiros para a prospecção, pesquisa, desenvolvimento e produção de hidrocarbonetos líquidos e gasosos serão concedidos à Sociedade Nacional de Combustíveis de Angola, Empresa Pública (SONANGOL-E.P.);

Considerando que a Sociedade Nacional de Combustíveis de Angola, Empresa Pública (SONANGOL-E.P.) tem interesse em executar operações petrolíferas na Bacia do Kwanza, com o objectivo de diminuir o risco geológico e melhorar o conhecimento sobre o potencial dos hidrocarbonetos existentes;

Considerando que o Bloco 21 já foi objecto de uma cessão petrolífera que não teve sucesso, situação que justifica o seu enquadramento no artigo 11.º da Lei n.º 13/04, de 31 de Dezembro, relativamente ao regime fiscal da Sociedade Nacional de Combustíveis de Angola, Empresa Pública (SONANGOL-E.P.);

Considerando que a Sociedade Nacional de Combustíveis de Angola, Empresa Pública (SONANGOL-E.P.) pretende desenvolver tais operações petrolíferas através de um contrato de serviço com risco para a pesquisa e produção de hidrocarbonetos líquidos e gasosos na área da concessão;

Nestes termos, no uso da autorização legislativa concedida pela Resolução da Assembleia Nacional n.º 23/09, de 2 de Abril, o Governo, tendo em conta o disposto no artigo 44.º da Lei n.º 10/04, de 12 de Novembro e nos termos das disposições combinadas da alínea f) do artigo 90.º e do artigo 113.º, ambos da Lei Constitucional, decreta o seguinte:

ARTIGO 1.º
(Atribuição de direitos mineiros)

São concedidos nos termos do n.º 2 do artigo 44.º da Lei n.º 10/04, de 12 de Novembro, à Sociedade Nacional de

Combustíveis de Angola, Empresa Pública (SONANGOL-
-E.P.), adiante designada por Concessionária Nacional, os
direitos mineiros de prospecção, pesquisa, desenvolvimento
e produção de hidrocarbonetos líquidos e gasosos na área da
concessão, tal como é definida no artigo 2.º do presente
decreto-lei.

ARTIGO 2.º
(Área da concessão)

1. A área da concessão é a descrita no Anexo A e encon-
tra-se cartografada no Anexo B, sendo ambos parte integrante
do presente decreto-lei.

2. No caso de haver qualquer discrepância entre os dois
anexos referidos no número anterior, prevalece a descrição
da área da concessão que é feita no Anexo A.

ARTIGO 3.º
(Duração da concessão)

1. A duração dos períodos de concessão é a seguinte:

*a) Período de pesquisa:* oito anos contados a partir da
data efectiva do contrato de partilha de produção;
*b) Período de produção:* 25 anos por cada área de
desenvolvimento, contados a partir da data da
declaração da respectiva descoberta comercial.

2. Nos termos do n.º 3 do artigo 14.º da Lei n.º 10/04, de
12 de Novembro, cada um dos períodos da concessão referi-
dos no n.º 1 pode ser excepcionalmente prorrogado a reque-
rimento da Concessionária Nacional.

ARTIGO 4.º
(Operador)

1. O operador designado para executar e fazer executar
todos os trabalhos inerentes às operações petrolíferas de pros-
pecção, pesquisa, desenvolvimento e produção de hidrocar-
bonetos líquidos e gasosos na área da concessão é a Cobalt
International Energy, LP, em representação de um consórcio
a formar com a SONANGOL — Pesquisa e Produção, S. A.
e a Nazaki Oil & Gás.

2. A mudança de operador carece de prévia autorização do
Ministério de tutela, sob proposta da Concessionária Nacional.

3. O operador está sujeito ao estrito cumprimento das dis-
posições contidas neste decreto-lei e demais legislação apli-
cável, bem como no contrato de partilha de produção.

ARTIGO 5.º
(Regime fiscal da Concessionária Nacional)

Relativamente às suas actividades no âmbito do presente
decreto-lei, a Concessionária Nacional está isenta do Imposto
sobre a Produção do Petróleo e do Imposto de Transacção do
Petróleo, sendo-lhe aplicada a taxa de 50% relativamente ao
Imposto sobre o Rendimento do Petróleo.

ARTIGO 6.º
(Regime cambial)

O regime cambial aplicável às operações petrolíferas
contempladas neste decreto-lei consta do Anexo C deste
decreto-lei e que dele faz parte integrante.

ARTIGO 7.º
(Interpretação e integração de lacunas)

Quaisquer dúvidas ou omissões resultantes da interpre-
tação e aplicação do presente diploma são resolvidas por
decreto do Conselho de Ministros, com excepção das maté-
rias de natureza fiscal as quais são resolvidas por meio de
decreto-lei.

ARTIGO 8.º
(Entrada em vigor)

O presente decreto-lei entra em vigor na data da sua
publicação.

Visto e aprovado em Conselho de Ministros, em Luanda,
aos 28 de Janeiro de 2009.

O Primeiro Ministro, *António Paulo Kassoma.*

Promulgado aos 21 de Maio de 2009.

Publique-se.

O Presidente da República, JOSÉ EDUARDO DOS SANTOS.

———

ANEXO A
Descrição da Área da Concessão

A área apresentada no Anexo B é limitada pelas linhas
definidas pelos pontos 1 a 8 e está incluída no seguinte perí-
metro:

Começando com o ponto de intercepção do Paralelo
9º 55' 00" S e o Meridiano 12º 10' 00" E, temos o ponto 1
com as coordenadas de Latitude 9º 55' 00" S e Longitude
12º 10' 00" E. Partindo deste ponto para a direcção Este,
seguindo o Paralelo 9º 55' 00" S até interceptar o Meridiano
12º 40' 00" E, temos o ponto 2 com as coordenadas de Lati-
tude 9º 55' 00" S e Longitude 12º 40' 00" E. Partindo deste
ponto para a direcção Sul, seguindo o Meridiano 12º 40' 00"
E até interceptar o Paralelo 10º 05' 00" S, temos o ponto 3
com as coordenadas de Latitude 10º 05' 00" S e Longitude
12º 40' 00" E. Partindo deste ponto para a direcção Este,
seguindo o Paralelo 10º 05' 00" S até interceptar o Meridiano
12º 55' 00" E, temos o ponto 4 com as coordenadas de Lati-
tude 10º 05' 00" S e Longitude 12º 55' 00" E. Partindo deste
ponto para a direcção Sul, seguindo o Meridiano 12º 55' 00"
E até interceptar o Paralelo 10º 25' 00" S, temos o ponto 5
com as coordenadas de Latitude 10º 25' 00" S e Longitude
12º 55' 00" E. Partindo deste ponto para a direcção Este,
seguindo o Paralelo 10º 25' 00" S até interceptar o Meridiano
13º 00' 00" E, temos o ponto 6 com as coordenadas de Lati-
tude 10º 25' 00" S e Longitude 13º 00' 00" E. Partindo deste
ponto em direcção Sul, seguindo o Meridiano 13º 00' 00" E até
interceptar o Paralelo 10º 30' 00" S, temos o ponto 7 com as coor-

**2036**

DIÁRIO DA REPÚBLICA

denadas de Latitude 10º 30' 00" S e Longitude 13º 00' 00" E.
Partindo deste ponto em direcção Oeste, seguindo o Paralelo
10º 30' 00" S até interceptar o Meridiano 12º 10' 00" E, temos
o ponto 8 com as coordenadas de Latitude 10º 30' 00" S e
Longitude 12º 10' 00" E.

Finalmente deste ponto para a direcção Norte até atingir
o ponto 1.

As coordenadas acima citadas referem-se ao Datum de
Camacupa no elipsóide de Clark 1880.

ANEXO B
Mapa da Área da Concessão



| Bloco 21 | | |
|---|---|---|
| **Coordenadas DMS** | | |
| **Pontos** | **Latitude S** | **Longitude E** |
| 1 | 9º 55' 00" | 12º 10' 00" |
| 2 | 9º 55' 00" | 12º 40' 00" |
| 3 | 10º 05' 00" | 12º 40' 00" |
| 4 | 10º 05' 00" | 12º 55' 00" |
| 5 | 10º 25' 00" | 12º 55' 00" |
| 6 | 10º 25' 00" | 13º 00' 00" |
| 7 | 10º 30' 00" | 13º 00' 00" |
| 8 | 10º 30' 00" | 12º 10' 00" |

**Área = 4881.9 Km²**

ELIPSOIDE DE CLARK 1880 - DATUM CAMACUPA

### ANEXO C
#### Regime Cambial

#### ARTIGO 1.º
##### (Objecto)

O presente anexo tem por objecto estabelecer o regime cambial para a liquidação de operações de mercadorias, de invisíveis correntes e de capitais, decorrentes das actividades de prospecção, pesquisa, desenvolvimento e produção de hidrocarbonetos líquidos e gasosos na área da concessão.

#### ARTIGO 2.º
##### (Âmbito)

As disposições do presente anexo, que têm carácter de excepção são aplicáveis à Concessionária, ao operador e às entidades com quem este se associar na execução das operações petrolíferas na área da concessão.

#### ARTIGO 3.º
##### (Operações cambiais)

1. As operações de mercadorias, de invisíveis correntes e de capitais, a que estão sujeitas a Concessionária, o operador e as entidades com quem este se associar, devem obedecer à legislação vigente, bem como às regras estabelecidas nos números seguintes.

2. As entidades de direito angolano associadas do operador devem abrir contas em moeda estrangeira em instituições de crédito domiciliadas no País, podendo, as entidades de direito estrangeiro associadas do operador, ser titulares de contas em instituições de crédito domiciliadas no exterior do País.

3. O saldo em moeda estrangeira das contas referidas no número anterior deve ser prioritariamente utilizado no pagamento de despesas correntes (*cash-calls*), nomeadamente na liquidação de importações de bens e serviços relacionados com as operações petrolíferas.

#### ARTIGO 4.º
##### (Escrow account)

Às entidades de direito angolano associadas do operador é concedida a prerrogativa cambial de poderem reter em contas do tipo «*escrow account*», previamente autorizadas

pelo Banco Nacional de Angola, em bancos domiciliados no exterior ou no País, as divisas necessárias ao reembolso do serviço da dívida externa.

#### ARTIGO 5.º
##### (Financiamento dos investimentos)

1. Na elaboração da sua estratégia de financiamento dos projectos de investimento, as entidades de direito angolano associadas do operador devem dar prioridade ao recurso a capitais de médio e longo prazos.

2. O operador e as suas associadas de direito estrangeiro devem financiar integralmente em moeda estrangeira a sua quota-parte dos investimentos necessários à execução das operações petrolíferas, sendo tais financiamentos da sua exclusiva responsabilidade.

3. O reembolso dos financiamentos mencionados no número anterior deve ser efectuado através das contas referidas no n.º 2 do artigo 3.º do presente anexo.

#### ARTIGO 6.º
##### (Lucros e dividendos)

1. Os lucros, dividendos e outras remunerações de capital a favor das entidades de direito angolano associadas do operador, devem observar o disposto na legislação cambial vigente.

2. Os lucros, dividendos e outras remunerações de capital do operador e das suas associadas de direito estrangeiro devem ser depositados nas contas referidas no n.º 2 do artigo 3.º do presente anexo.

#### ARTIGO 7.º
##### (Contas do operador)

1. O operador pode manter, em seu próprio nome, por conta das entidades que suportam as despesas inerentes às operações petrolíferas, uma ou mais contas, em moeda estrangeira, em instituições de crédito domiciliadas no País ou no exterior, destinadas à liquidação das importações de bens e serviços ligados às operações petrolíferas, com observância do disposto na legislação cambial vigente e no número seguinte.

3038                                                                                                      DIÁRIO DA REPÚBLICA

2. O operador deve dar preferência à abertura de contas junto de instituições de crédito domiciliadas no País, para efeitos de liquidação de parte ou da totalidade das suas importações de bens e serviços sempre que a competitividade e eficiência dos pagamentos por parte destas instituições se revelarem comparáveis às condições oferecidas pelas instituições de crédito domiciliadas no exterior.

3. As contas do operador são creditadas pelos adiantamentos das entidades que suportam as despesas inerentes às operações petrolíferas, pelos juros ou outras remunerações dos respectivos saldos e debitadas pela liquidação das importações de bens e serviços dos fornecedores domiciliados no exterior do País.

4. O operador deve proceder à abertura e movimentação de contas em moeda nacional em bancos domiciliados no País, para efeito de liquidação de bens e serviços fornecidos por entidades residentes no País.

ARTIGO 8.º

(Contratos de aquisição de bens e serviços)

1. O operador, em nome das entidades que suportam as despesas inerentes às operações petrolíferas deve apresentar ao Banco Nacional de Angola, trimestralmente, para efeitos de registo, uma lista detalhada de todos os contratos assinados com entidades não residentes fornecedoras de bens e serviços.

2. O Banco Nacional de Angola pode, sempre que entender necessário, determinar a apresentação da cópia de quaisquer contratos.

ARTIGO 9.º

(Registo das operações cambiais)

A Concessionária, o operador e as entidades com quem este se associar, são obrigadas a proceder, nos termos da legislação vigente, ao registo de todas as suas operações cambiais, nomeadamente a exportação, reexportação e a importação de mercadorias, o recebimento e o pagamento de invisíveis correntes e a importação e a exportação de capitais, incluindo a abertura de contas no exterior do País.

ARTIGO 10.º

(Previsão da declaração fiscal, orçamento de receitas

e despesas cambiais)

1. Com vista à execução das operações cambiais decorrentes do regime definido no presente anexo, a Conces-

sionária, o operador e as entidades com quem este se associar devem apresentar ao Banco Nacional de Angola, até ao dia 30 de Novembro de cada ano, uma previsão do orçamento de receitas e despesas cambiais para o ano seguinte.

2. A Concessionária deve ainda apresentar ao Banco Nacional de Angola, dentro do prazo referido no número anterior, cópias dos programas de investimento referentes ao plano anual das actividades para o ano seguinte.

3. O operador e as entidades com quem este se associar devem apresentar, individualmente, ao Banco Nacional de Angola, no prazo estabelecido no n.º 1 do presente artigo, o orçamento anual de importação de capitais destinados à cobertura das respectivas despesas de investimento, com indicação das presumíveis fontes de financiamento.

ARTIGO 11.º

(Estatísticas da balança de pagamentos)

O Banco Nacional de Angola deve emitir instruções específicas sobre o tipo e forma de apresentação dos elementos de informação necessários ao registo e contabilização da balança de pagamentos e sua periodicidade.

ARTIGO 12.º

(Disposições finais)

1. Para efeitos do disposto no presente anexo, a taxa de câmbio a praticar pelo Banco Nacional de Angola nas operações de compra e venda de moeda estrangeira é a taxa de referência em vigor, nos termos da legislação aplicável.

2. Sem prejuízo de autonomia na condução das suas operações comerciais nos termos deste anexo, as divisas que a Concessionária, o operador e as entidades com quem este se associar venham a entregar ao Banco Nacional de Angola devem corresponder a moedas livremente convertíveis e como tal aceites por esta entidade.

O Primeiro Ministro, *António Paulo Kassoma.*

O Presidente da República, JOSÉ EDUARDO DOS SANTOS.

# EXHIBIT 2

<u>TRANSLATION</u>

# COUNCIL OF MINISTERS

## Decree-Law No. 15/09
## of June 11, 2009

Whereas the Constitutional Law and Law No. 10/04, of November 12, 2004, set forth that all liquid and gaseous hydrocarbon deposits existing in the available areas of the surface and subsurface of the national territory, inland waters, territorial sea, exclusive economic zone and continental shelf are public domain property of the State;

Whereas the referred Law No. 10/04 also provides that the mining rights for prospecting, exploration, development and production of liquid and gaseous hydrocarbons will be granted to Sociedade Nacional de Combustíveis de Angola, Empresa Pública [Public company] (SONANGOL-E.P.);

Whereas Sociedade Nacional de Combustíveis de Angola, Empresa Pública (SONANGOL-E.P.) is interested in executing petroleum operations in the Kwanza Basin, with the purpose of reducing the geological risk and improve the knowledge of the potential of the existing hydrocarbons;

Whereas Block 9 has already been the object of a petroleum concession that had no success, and this situation justifies its framing under Article 11 of Law No. 13/04, of December 31, 2004, on the tax regime of Sociedade Nacional de Combustíveis de Angola, Empresa Pública (SONANGOL-E.P.);

Whereas Sociedade Nacional de Combustíveis de Angola, Empresa Pública (SONANGOL-E.P.) pretends to develop such petroleum operations through a risk services contract for prospecting and production of liquid and gaseous hydrocarbons in the concession area;

Now, therefore, under the legislative authorization granted by National Assembly Resolution No. 23/09, of April 2, 2009, the Government, considering the provisions of Article 44 of Law No.10/04, of November 12, 2004, and under the combined provisions of Article 90 paragraph (f) and Article 113 both of the Constitutional Law, decrees the following:

### Article 1
### (Granting of mining rights)

Under the terms of Article 44.2 of Law No. 10/04, of November 12, 2004, Sociedade Nacional de Combustíveis de Angola, Empresa Pública (SONANGOL-E.P.), hereinafter referred to as National Concessionaire, is granted mining rights for prospecting, exploration, development and production of liquid and gaseous hydrocarbons in the concession area, as defined in Article 2 of this decree-law.

### Article 2
### (Concession area)

1.  The concession area is described in Annex A and mapped in Annex B, both being an integral part of this decree-law.

2.  In the event of any discrepancy between the two Annexes referred to in Article 2.1, the description of the concession area made in Annex A shall prevail.

### Article 3
### (Duration of the concession)

1

TRANSLATION

1      The duration of the concession periods is as follows:

      (a)  *Exploration Period*: 8 (eight) years counted from the effective date of the production sharing agreement;

      (b)  *Production Period*: 25 years per development area, counted from the date of declaration of the respective commercial discovery.

2.      Each of the concession periods referred to in paragraph 1 may be exceptionally extended at the request of the National Concessionaire pursuant to Article 14.3 of Law No. 10/04, of November 12, 2004.

**Article 4**
**(Operator)**

1.      Cobalt International Energy, LP, in representation of a consortium to be formed with SONANGOL – Pesquisa e Produção, S.A. and Nazaki Oil & Gás is appointed operator to execute and order the execution of all the work inherent to the petroleum operations of prospecting, exploration, development and production of liquid and gaseous hydrocarbons in the concession area.

2.      The change of operator is subject to prior authorization from the supervising Ministry following a proposal by the National Concessionaire.

3.      The operator must strictly comply with the provisions of this decree-law, other applicable legislation and the Production Sharing Agreement.

**Article 5**
**(National Concessionaire's Tax Regime)**

The National Concessionaire's activities under this decree-law are exempt from Petroleum Production Tax and Petroleum Transaction Tax, but are subject to Petroleum Income Tax at a rate of 50%.

**Article 6**
**(Foreign exchange regime)**

The foreign exchange regime applicable to the petroleum operations provided for herein is set forth in Annex C of this decree-law, which is deemed a part hereof.

**Article 7**
**(Interpretation and insertion of omissions)**

Any doubts or omissions arising from the interpretation and application of this statute shall be resolved by Council of Ministers decree, except for those matters of a tax nature, which shall be resolved by decree-law.

**Article 8**
**(Effectiveness)**

This decree shall take effect on the date of its publication.

Seen and approved by the Council of Ministers in Luanda, on January 28, 2009.

2

<u>TRANSLATION</u>

The Prime-Minister, *António Paulo Kassoma.*

Promulgated on May 27, 2009.

Published.

The President of the Republic, JOSÉ EDUARDO DOS SANTOS.

―――――――――――

ANNEX A
**Description of the Concession Area**

The area, set out in Annex B, is limited by the lines defined by points 1 to 4 and is included in the following perimeter:

Beginning with the interception point of Parallel Latitude 10° 45' 00" S and Meridian 13° 20' 00" E, we have point 1 with the Latitude coordinates of 10° 45' 00" S and Longitude 13° 20' 00" E. Starting from this point, towards East, following Parallel Latitude 10° 45' 00" S until it intercepts Meridian 13° 44' 30" E, taking into account the average sea level, we have point 2 with the Latitude coordinates of 10° 45' 00" S and Longitude 13° 44' 30" E. Starting from this point, towards South, following the coast line until it intercepts Parallel Latitude 11° 35' 00" S and Meridian 13° 46' 20" E, taking into account the average sea level, we have point 3 with the Latitude coordinates of 11° 35' 00" S and Longitude 13° 46' 20" E. Starting from this point, towards East, following Parallel Latitude 11° 35' 00" S until it intercepts Meridian 13° 20' 00" E, we have point 4 with the Latitude coordinates of 11° 35' 00" S and Longitude 13° 20' 00" E.

Finally from this point towards North, until it reaches point 1.

The aforementioned coordinates are in respect to the Camacupa Datum, Clark 1880 ellipsoid.

ANNEX B
**Map of the Concession Area**

| *ANNEX B* | *MAP OF THE CONCESSION AREA OF BLOCK 9* |
|-----------|------------------------------------------|



| BLOCK 9 | | |
|---------|---|---|
| **DMS COORDINATES** | | |
| **POINTS** | **LATITUDE S** | **LONGITUDE E** |
| 1 | 10° 45' 00'' | 13° 20' 00'' |
| 2 | 10° 45' 00'' | 13° 44' 30'' |
| 3 | 11° 35' 00'' | 13° 46' 20'' |
| 4 | 11° 35' 00'' | 13° 20' 00'' |
| Area = 4001.36 km² | | |
| CLARK ELLIPSOID 1880 – DATUM CAMACUPA | | |

4

TRANSLATION

## Annex C
## Foreign Exchange Regime

### Article 1
### (Subject matter)

This annex sets forth the foreign exchange regime governing the settlement of operations relating to goods, current invisibles and capital, deriving from liquid and gaseous hydrocarbon prospecting, exploration, development and production activities carried out in the concession area.

### Article 2
### (Scope)

The provisions of this annex, which are of an exceptional nature, shall apply to the Concessionaire, operator and the entities with whom the latter associates with in the execution of petroleum operations carried out in the concession area.

### Article 3
### (Foreign exchange operations)

1 - Operations relating to goods, current invisibles and capital to which the Concessionaire, the operator and the entities with whom the latter associates with shall comply with the legislation in force and with the rules set forth in the following paragraphs.

2 - The operator's associates existing under the laws of Angola shall open accounts in foreign currency with credit institutions domiciled in the country; the operator's associates existing under the laws of a foreign country may hold foreign currency accounts with credit institutions domiciled outside Angola1.

3 - The foreign currency balance in the accounts referred to in the preceding paragraph shall be used, on a priority basis, for the payment of current expenses (cash calls), namely for settlement of the import of goods and services relating to petroleum operations.

### Article 4
### (Escrow account)

The Angolan associates of the operator are granted the foreign exchange prerogative of being able to retain in escrow accounts, authorized in advance by the National Bank of Angola, with banks domiciled abroad or in the country, the foreign exchange needed to service their foreign debt.

### Article 5
### (Finance for investments)

1 – When drawing up their financing strategy for investment projects, the Angolan associates of the operator shall give priority to the use of medium and long term capital.

2 – The operator and its foreign associates shall finance, in full, in foreign currency, their share of the

---

1 Translator's note: "associates existing under the laws of Angola" and "associates existing under the laws of a foreign country" will hereinafter be referred to in short, respectively, as "Angolan associates" and "foreign associates".

investments needed in order to carry out petroleum operations, such finance being their sole responsibility.

3 – The finance referred to in the preceding paragraph shall be repaid through the accounts mentioned in Article 3.2 of this annex.

**Article 6**
**(Profits and dividends)**

1 – Profits, dividends and other remuneration on capital in relation with the Angolan associates of the operator shall be subject to the foreign exchange legislation in force.

2 – The profits, dividends and other remuneration on capital of the operator and of its foreign associates shall be deposited in the accounts referred to in Article 3.2 of this Annex.

**Article 7**
**(Operator's accounts)**

1 – The operator may hold, in its own name, on behalf of the entities bearing the costs involved in petroleum operations, one or more foreign currency accounts with credit institutions domiciled in the country or abroad, for the settlement of imports of goods and services connected with petroleum operations, in compliance with the provisions of the foreign exchange legislation in force and of the following paragraph.

2 – The operator shall give priority to the opening of accounts with credit institutions domiciled in the country, for the purposes of settlement of part or all of its imports of goods and services, whenever the competitiveness and efficiency of payments by these institutions is comparable with the conditions offered by credit institutions domiciled abroad.

3 – The operator's accounts are credited with the prepayments from the entities bearing the costs involved in petroleum operations, with interest or other remuneration on the respective balances, and debited in respect of the settlement of imports of goods and services from suppliers domiciled outside Angola.

4 – The operator shall open and operate accounts in national currency with banks domiciled in the country for the purpose of payments for goods and services supplied by entities resident in the country.

**Article 8**
**(Agreements for acquisition of goods and services)**

1 – The operator, acting on behalf of the entities bearing the costs involved in petroleum operations, shall submit each quarter to the National Bank of Angola, for the purposes of registration, a detailed list of all contracts signed with non-resident suppliers of goods and services.

2 – The National Bank of Angola may, whenever it sees fit, require the submission of a copy of any contracts.

**Article 9**
**(Registration of foreign exchange operations)**

TRANSLATION

The Concessionaire, the operator and the entities with whom the latter associates with, must register, in accordance with the legislation in force, all their foreign exchange operations, namely the export, re-export and import of goods, the receipt and payment of current invisibles and the import and export of capital, including the opening of accounts outside Angola.

**Article 10**
**(Forecast of tax return and budget of foreign exchange**
**revenues and expenses)**

1 – With a view to the execution of the foreign exchange operations deriving from the regime established herein, the Concessionaire, operator and the entities with whom the latter associates with shall submit to the National Bank of Angola, by November 30 each year, a forecast of its budget of foreign exchange revenues and expenses for the following year.

2 – The Concessionaire shall also submit to the National Bank of Angola, by the date established in the preceding paragraph, a copy of the investment programs relating to the annual program of activities for the following year.

3 – The operator and the entities with whom it associates with shall each submit individually to the National Bank of Angola, by the date established in paragraph 1, their annual projection of the import of funds to cover their respective investment expenses, indicating the presumable sources of finance.

**Article 11**

**(Balance of payments statistics)**

The National Bank of Angola shall issue specific instructions relating to the type, form and frequency of presentation of the information needed for registration and inclusion of the balance of payment.

**Article 12**

**(Final provisions)**

1 – For the purposes of this annex, the exchange rate to be applied by the National Bank of Angola to the purchase and sale of foreign currency shall be the reference rate in force, in accordance with the relevant legislation.

2 – Without prejudice to their autonomy in the conduct of their commercial operations carried out under the terms of this annex, the currency which the Concessionaire, the operator and the entities with whom the latter associates with, shall deliver to the National Bank of Angola must correspond to freely convertible currencies accepted as such by said bank.

The Prime-Minister, *António Paulo Kassoma*.

<u>TRANSLATION</u>

The President of the Republic, JOSÉ EDUARDO DOS SANTOS.



# TRANSPERFECT

City of San Francisco, State of California, County of San Francisco

I, Dominic Ledda, hereby affirm that the following is to the best of my knowledge and belief, a true and accurate Translation from Portuguese to English of the document "Council of Ministers, Decree Law No. 15/09 of June 11, 2009".

_____
Dominic Ledda

Sworn to before me this
June 22, 2015

_____
Signature, Notary Public

_____
Stamp, Notary Public



LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

160 SPEAR STREET, SUITE 1100, SAN FRANCISCO, CA 94105 I T 415.615.9191 I F 415.615.9181 I WWW.TRANSPERFECT.COM
OFFICES IN 75 CITIES WORLDWIDE



Quinta-feira, 11 de Junho de 2009     I Série — N.º 107

# DIÁRIO DA REPÚBLICA

## ÓRGÃO OFICIAL DA REPÚBLICA DE ANGOLA

Preço deste número — Kz: 90,00

| Toda a correspondência, quer oficial, quer relativa a anúncio e assinaturas do «*Diário da República*», deve ser dirigida à Imprensa Nacional — E. P., em Luanda, Caixa Postal 1306 — End. Teleg.: «Imprensa» | ASSINATURAS Ano | O preço de cada linha publicada nos *Diários da República* 1.ª e 2.ª séries é de Kz: 75,00 e para a 3.ª série Kz: 95,00, acrescido do respectivo imposto do selo, dependendo a publicação da 3.ª série de depósito prévio a efectuar na Tesouraria da Imprensa Nacional — E. P. |
|---|---|---|
| | As três séries ......... ... ... ...   Kz: 400 275,00 | |
| | A 1.ª série ... ... ... ... ...   Kz: 236 250,00 | |
| | A 2.ª série ... ... ... ... ...   Kz: 123 500,00 | |
| | A 3.ª série ... ... ... ... ...   Kz: 95 700,00 | |

## SUMÁRIO

### Assembleia Nacional

**Resolução n.º 42/09:**

Indica a Deputada Isabel João Miguel Sebastião Peliganga para exercer a função de Presidente do Grupo Parlamentar de Amizade da Europa (excepto Portugal, Federação Russa e Europa de Leste).

**Resolução n.º 43/09:**

Integra os Deputados Palmira Leitão Barbosa no Grupo Nacional da União Interparlamentar e no Grupo Parlamentar de Amizade da Europa (excepto Portugal, Federação Russa e Europa do Leste), Antonino Filipe Tchiyulo Jeremias no Grupo da União Interparlamentar e no Grupo Parlamentar de Amizade da América Central e do Sul e Fernando Jonasse no Grupo Nacional da Assembleia Parlamentar Paritária África, Caraíbas e Pacífico/União Europeia (ACP/UE) e no Grupo Parlamentar de Amizade da Comunidade Económica dos Estados da África Central (CEEAC).

**Resolução n.º 44/09:**

Fixa o valor de Kz: 200 000,00 para o subsídio de deslocação para os Deputados não residentes em Luanda e o montante de Kz: 65 000,00, a abonar a título de despesas de representação.

### Conselho de Ministros

**Decreto-Lei n.º 14/09:**

Concede à Sociedade Nacional de Combustíveis de Angola, Empresa Pública (SONANGOL-E. P.), adiante designada por Concessionária Nacional, os direitos mineiros de prospecção, pesquisa, desenvolvimento e produção de hidrocarbonetos líquidos e gasosos na área da concessão do Bloco 21.

**Decreto-Lei n.º 15/09:**

Concede à Sociedade Nacional de Combustíveis de Angola, Empresa Pública (SONANGOL-E. P.), adiante designada por Concessionária Nacional, os direitos mineiros de prospecção, pesquisa, desenvolvimento e produção de hidrocarbonetos líquidos e gasosos na área da concessão do Bloco 9.

## ASSEMBLEIA NACIONAL

### Resolução n.º 42/09
de 11 de Junho

Considerando que através da Resolução n.º 3/09, de 9 de Janeiro, a Assembleia Nacional aprovou a suspensão provisória do mandato do Deputado Frederico Manuel dos Santos e Silva Cardoso;

Considerando que o Deputado com o mandato suspenso exercia a função de Presidente do Grupo Parlamentar de Amizade da Europa (excepto Portugal, Federação Russa e Europa do Leste), cargo que urge prover;

Nestes termos, ao abrigo das disposições combinadas da alínea r) do artigo 88.º e do n.º 6 do artigo 92.º ambos da Lei Constitucional, a Assembleia Nacional emite a seguinte resolução:

1.º — É a Deputada Isabel João Miguel Sebastião Peliganga, indicada para exercer a função de Presidente do Grupo Parlamentar de Amizade da Europa (excepto Portugal, Federação Russa e Europa do Leste).

2.º — A presente resolução entra em vigor à data da sua publicação.

Vista e aprovada pela Assembleia Nacional, em Luanda, aos 21 de Abril de 2009.

Publique-se.

O Presidente da Assembleia Nacional, *Fernando da Piedade Dias dos Santos.*

### Resolução n.º 43/09
de 11 de Junho

Considerando que o Grupo Interparlamentar Angolano, constituído no seio da Assembleia Nacional, estabelece no seu regulamento a integração plena nos Grupos Nacionais e nos Grupos de Amizade de todos os Deputados à Assembleia Nacional, em efectividade de funções;

Considerando que os Deputados Antonino Filipe Tchiyulo Jeremias, Fernando Jonasse e Palmira Leitão Barbosa, tomaram oportunamente posse como Deputados à Assembleia Nacional;

### Decreto-Lei n.º 15/09
#### de 11 de Junho

Considerando que a Lei Constitucional e a Lei n.º 10/04, de 12 de Novembro, determinam que todos os jazigos de hidrocarbonetos líquidos e gasosos existentes nas áreas disponíveis da superfície e submersas do território nacional, nas águas interiores, no mar territorial, na zona económica exclusiva e na plataforma continental fazem parte integrante do domínio público do Estado;

Considerando que a referida Lei n.º 10/04, determina também que os direitos mineiros para a prospecção, pesquisa, desenvolvimento e produção de hidrocarbonetos líquidos e gasosos serão concedidos à Sociedade Nacional de Combustíveis de Angola, Empresa Pública (SONANGOL-E.P.);

Considerando que a Sociedade Nacional de Combustíveis de Angola, Empresa Pública (SONANGOL-E.P.) tem interesse em executar operações petrolíferas na Bacia do Kwanza, com o objectivo de diminuir o risco geológico e melhorar o conhecimento sobre o potencial dos hidrocarbonetos existentes;

Considerando que o Bloco 9 já foi objecto de uma concessão petrolífera que não teve sucesso, situação que justifica o seu enquadramento no artigo 11.º da Lei n.º 13/04, de 31 de Dezembro, relativamente ao regime fiscal da Sociedade Nacional de Combustíveis de Angola, Empresa Pública (SONANGOL-E.P.);

Considerando que a Sociedade Nacional de Combustíveis de Angola, Empresa Pública (SONANGOL-E.P.) pretende desenvolver tais operações petrolíferas através de um contrato de serviço com risco para a pesquisa e produção de hidrocarbonetos líquidos e gasosos na área da concessão;

Nestes termos, no uso da autorização legislativa concedida pela Resolução da Assembleia Nacional n.º 23/09, de 2 de Abril, o Governo, tendo em conta o disposto no artigo 44.º da Lei n.º 10/04, de 12 de Novembro e nos termos das disposições combinadas da alínea f) do artigo 90.º e do artigo 113.º, ambos da Lei Constitucional, decreta o seguinte:

### ARTIGO 1.º
#### (Atribuição de direitos mineiros)

São concedidos nos termos do n.º 2 do artigo 44.º da Lei n.º 10/04, de 12 de Novembro, à Sociedade Nacional de Combustíveis de Angola, Empresa Pública (SONANGOL-E.P.), adiante designada por Concessionária Nacional, os direitos mineiros de prospecção, pesquisa, desenvolvimento e produção de hidrocarbonetos líquidos e gasosos na área da concessão, tal como é definida no artigo 2.º do presente diploma.

### ARTIGO 2.º
#### (Área da concessão)

1. A área da concessão é a descrita no Anexo A e encontra-se cartografada no Anexo B, sendo ambos parte integrante do presente decreto-lei.

2. No caso de haver qualquer discrepância entre os dois anexos referidos no número anterior, prevalece a descrição da área da concessão que é feita no Anexo A.

### ARTIGO 3.º
#### (Duração da concessão)

1. A duração dos períodos de concessão é a seguinte:

   a) *Período de pesquisa*: oito anos contados a partir da data efectiva do contrato de partilha de produção;
   b) *Período de produção*: 25 anos por cada área de desenvolvimento, contados a partir da data da declaração da respectiva descoberta comercial.

2. Nos termos do n.º 3 do artigo 14.º da Lei n.º 10/04, de 12 de Novembro, cada um dos períodos da concessão referidos no n.º 1 pode ser excepcionalmente prorrogado a requerimento da Concessionária Nacional.

### ARTIGO 4.º
#### (Operador)

1. O operador designado para executar e fazer executar todos os trabalhos inerentes às operações petrolíferas de prospecção, pesquisa, desenvolvimento e produção de hidrocarbonetos líquidos e gasosos na área da concessão é a Cobalt International Energy, LP, em representação de um consórcio a formar com a SONANGOL — Pesquisa e Produção, S. A. e a Nazaki Oil & Gás.

**2040**                                                          DIÁRIO DA REPÚBLICA

2. A mudança de operador carece de prévia autorização do Ministério de tutela, sob proposta da Concessionária Nacional.

3. O operador está sujeito ao estrito cumprimento das disposições contidas neste decreto-lei e demais legislação aplicável, bem como no contrato de partilha de produção.

### ARTIGO 5.º
#### (Regime fiscal da Concessionária Nacional)

Relativamente às suas actividades no âmbito do presente decreto-lei, a Concessionária Nacional está isenta do Imposto sobre a Produção do Petróleo e do Imposto de Transacção do Petróleo, sendo-lhe aplicada a taxa de 50% relativamente ao Imposto sobre o Rendimento do Petróleo.

### ARTIGO 6.º
#### (Regime cambial)

O regime cambial aplicável às operações petrolíferas contempladas neste decreto-lei consta do Anexo C deste decreto-lei e que dele faz parte integrante.

### ARTIGO 7.º
#### (Interpretação e integração de lacunas)

Quaisquer dúvidas ou omissões resultantes da interpretação e aplicação do presente diploma são resolvidas por decreto do Conselho de Ministros, com excepção das matérias de natureza fiscal as quais são resolvidas por meio de decreto-lei.

### ARTIGO 8.º
#### (Entrada em vigor)

O presente decreto-lei entra em vigor na data da sua publicação.

Visto e aprovado em Conselho de Ministros, em Luanda, aos 28 de Janeiro de 2009.

O Primeiro Ministro, *António Paulo Kassoma*.

Promulgado aos 27 de Maio de 2009.

Publique-se.

O Presidente da República, JOSÉ EDUARDO DOS SANTOS.

———————

ANEXO A
#### Descrição da Área da Concessão

A área apresentada no Anexo B é limitada pelas linhas definidas pelos pontos 1 a 4 e está incluída no seguinte perímetro:

Começando com o ponto de intercepção do Paralelo 10º 45' 00" S e o Meridiano 13º 20' 00" E, temos o ponto 1 com as coordenadas de Latitude 10º 45' 00" S e Longitude 13º 20' 00" E. Partindo deste ponto para a direcção Este, seguindo o Paralelo 10º 45' 00" S até interceptar o Meridiano 13º 44' 30" E, tendo em conta o nível médio das águas do mar, temos o ponto 2 com as coordenadas de Latitude 10º 45' 00" S e Longitude 13º 44' 30" E. Partindo deste ponto para a direcção Sul, seguindo a linha de costa até interceptar o Paralelo 11º 35' 00" S e o Meridiano 13º 46' 20" E, tendo em conta o nível médio das águas do mar, temos o ponto 3 com as coordenadas de Latitude 11º 35' 00" S e Longitude 13º 46' 20" E. Partindo deste ponto para a direcção Este, seguindo o Paralelo 11º 35' 00" S até interceptar o Meridiano 13º 20' 00" E, temos o ponto 4 com as coordenadas de Latitude 11º 35' 00" S e Longitude 13º 20' 00" E.

Finalmente deste ponto para a direcção Norte até atingir o ponto 1.

As coordenadas acima citadas referem-se ao Datum de Camacupa no elipsóide de Clark 1880.

ANEXO B
Mapa da Área da Concessão



| Bloco 9 | | |
|---------|---|---|
| Coordenadas DMS | | |
| Pontos | Latitude S | Longitude E |
| 1 | 10º 45' 00" | 13º 20' 00" |
| 2 | 10º 45' 00" | 13º 44' 30" |
| 3 | 11º 35' 00" | 13º 46' 20" |
| 4 | 11º 35' 00" | 13º 20' 00" |
| Área = 4001.36 Km² | | |

ELIPSOIDE DE CLARK 1880 - DATUM CAMACUPA

ANEXO C

**Regime Cambial**

ARTIGO 1.º

**(Objecto)**

O presente anexo tem por objecto estabelecer o regime cambial para a liquidação de operações de mercadorias, de invisíveis correntes e de capitais, decorrentes das actividades de prospecção, pesquisa, desenvolvimento e produção de hidrocarbonetos líquidos e gasosos na área da concessão.

ARTIGO 2.º

**(Âmbito)**

As disposições do presente anexo, que têm carácter de excepção são aplicáveis à Concessionária, ao operador e às entidades com quem este se associar na execução das operações petrolíferas na área da concessão.

ARTIGO 3.º

**(Operações cambiais)**

1. As operações de mercadorias, de invisíveis correntes e de capitais, a que estão sujeitas a Concessionária, o operador e as entidades com quem este se associar, devem obedecer à legislação vigente, bem como às regras estabelecidas nos números seguintes.

2. As entidades de direito angolano associadas do operador devem abrir contas em moeda estrangeira em instituições de crédito domiciliadas no País, podendo, as entidades de direito estrangeiro associadas do operador, ser titulares de contas em instituições de crédito domiciliadas no exterior do País.

3. O saldo em moeda estrangeira das contas referidas no número anterior deve ser prioritariamente utilizado no pagamento de despesas correntes (*cash-calls*), nomeadamente na liquidação de importações de bens e serviços relacionados com as operações petrolíferas.

ARTIGO 4.º

**(Escrow account)**

Às entidades de direito angolano associadas do operador é concedida a prerrogativa cambial de poderem reter em contas do tipo «*escrow account*», previamente autorizadas pelo Banco Nacional de Angola, em bancos domiciliados no exterior ou no País, as divisas necessárias ao reembolso do serviço da dívida externa.

ARTIGO 5.º

**(Financiamento dos investimentos)**

1. Na elaboração da sua estratégia de financiamento dos projectos de investimento, as entidades de direito angolano associadas do operador devem dar prioridade ao recurso a capitais de médio e longo prazos.

2. O operador e as suas associadas de direito estrangeiro devem financiar integralmente em moeda estrangeira a sua quota-parte dos investimentos necessários à execução das operações petrolíferas, sendo tais financiamentos da sua exclusiva responsabilidade.

3. O reembolso dos financiamentos mencionados no número anterior deve ser efectuado através das contas referidas no n.º 2 do artigo 3.º do presente anexo.

ARTIGO 6.º

**(Lucros e dividendos)**

1. Os lucros, dividendos e outras remunerações de capital a favor das entidades de direito angolano associadas do operador, devem observar o disposto na legislação cambial vigente.

2. Os lucros, dividendos e outras remunerações de capital do operador e das suas associadas de direito estrangeiro devem ser depositados nas contas referidas no n.º 2 do artigo 3.º do presente anexo.

ARTIGO 7.º

**(Contas do operador)**

1. O operador pode manter, em seu próprio nome, por conta das entidades que suportam as despesas inerentes às operações petrolíferas, uma ou mais contas, em moeda estrangeira, em instituições de crédito domiciliadas no País ou no exterior, destinadas à liquidação das importações de bens e serviços ligados às operações petrolíferas, com observância do disposto na legislação cambial vigente e no número seguinte.

2. O operador deve dar preferência à abertura de contas junto de instituições de crédito domiciliadas no País, para efeitos de liquidação de parte ou da totalidade das suas importações de bens e serviços sempre que a competitividade e eficiência dos pagamentos por parte destas instituições se

revelarem comparáveis às condições oferecidas pelas instituições de crédito domiciliadas no exterior.

3. As contas do operador são creditadas pelos adiantamentos das entidades que suportam as despesas inerentes às operações petrolíferas, pelos juros ou outras remunerações dos respectivos saldos e debitadas pela liquidação das importações de bens e serviços dos fornecedores domiciliados no exterior do País.

4. O operador deve proceder à abertura e movimentação de contas em moeda nacional em bancos domiciliados no País, para efeito de liquidação de bens e serviços fornecidos por entidades residentes no País.

### ARTIGO 8.º
#### (Contratos de aquisição de bens e serviços)

1. O operador, em nome das entidades que suportam as despesas inerentes às operações petrolíferas deve apresentar ao Banco Nacional de Angola, trimestralmente, para efeitos de registo, uma lista detalhada de todos os contratos assinados com entidades não residentes fornecedoras de bens e serviços.

2. O Banco Nacional de Angola pode, sempre que entender necessário, determinar a apresentação da cópia de quaisquer contratos.

### ARTIGO 9.º
#### (Registo das operações cambiais)

A Concessionária, o operador e as entidades com quem este se associar, são obrigadas a proceder, nos termos da legislação vigente, ao registo de todas as suas operações cambiais, nomeadamente a exportação, reexportação e a importação de mercadorias, o recebimento e o pagamento de invisíveis correntes e a importação e a exportação de capitais, incluindo a abertura de contas no exterior do País.

### ARTIGO 10.º
#### (Previsão da declaração fiscal, orçamento de receitas e despesas cambiais)

1. Com vista à execução das operações cambiais decorrentes do regime definido no presente anexo, a Concessionária, o operador e as entidades com quem este se associar devem apresentar ao Banco Nacional de Angola, até ao dia 30 de Novembro de cada ano, uma previsão do orçamento de receitas e despesas cambiais para o ano seguinte.

2. A Concessionária deve ainda apresentar ao Banco Nacional de Angola, dentro do prazo referido no número anterior, cópias dos programas de investimento referentes ao plano anual das actividades para o ano seguinte.

3. O operador e as entidades com quem este se associar devem apresentar, individualmente, ao Banco Nacional de Angola, no prazo estabelecido no n.º 1 do presente artigo, o orçamento anual de importação de capitais destinados à cobertura das respectivas despesas de investimento, com indicação das presumíveis fontes de financiamento.

### ARTIGO 11.º
#### (Estatísticas da balança de pagamentos)

O Banco Nacional de Angola deve emitir instruções específicas sobre o tipo e forma de apresentação dos elementos de informação necessários ao registo e contabilização da balança de pagamentos e sua periodicidade.

### ARTIGO 12.º
#### (Disposições finais)

1. Para efeitos do disposto no presente anexo, a taxa de câmbio a praticar pelo Banco Nacional de Angola nas operações de compra e venda de moeda estrangeira é a taxa de referência em vigor, nos termos da legislação aplicável.

2. Sem prejuízo de autonomia na condução das suas operações comerciais nos termos deste anexo, as divisas que a Concessionária, o operador e as entidades com quem este se associar venham a entregar ao Banco Nacional de Angola devem corresponder a moedas livremente convertíveis e como tal aceites por esta entidade.

O Primeiro Ministro, *António Paulo Kassoma*.

O Presidente da República, José Eduardo dos Santos.

# EXHIBIT 3

Use these links to rapidly review the document
TABLE OF CONTENTS
INDEX TO FINANCIAL STATEMENTS

Table of Contents

**As filed with the Securities and Exchange Commission on October 29, 2009**

Registration No. 333-161734

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## Amendment No. 2
## to

## FORM S-1
### REGISTRATION STATEMENT
### UNDER
### THE SECURITIES ACT OF 1933

# Cobalt International Energy, Inc.
(Exact name of registrant as specified in its charter)

| **Delaware** | **1311** | **27-0821169** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

**Two Post Oak Central**
**1980 Post Oak Boulevard, Suite 1200**
**Houston, TX 77056**
**(713) 579-9100**
(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

**Joseph H. Bryant, Chairman and Chief Executive Officer**
**Two Post Oak Central**
**1980 Post Oak Boulevard, Suite 1200**
**Houston, TX 77056**
**(713) 579-9101**
(Name, address, including zip code, and telephone number, including area code, of agent for service)

**Copies to:**

| **Richard D. Truesdell, Jr., Esq.** | **David J. Beveridge, Esq.** |
|---|---|
| Davis Polk & Wardwell LLP | **Christopher J. Cummings, Esq.** |
| 450 Lexington Avenue | Shearman & Sterling LLP |
| New York, NY 10017 | 599 Lexington Avenue |
| (212) 450-4000 | New York, NY 10022 |
| | (212) 848-4000 |

**Approximate date of commencement of proposed sale to the public:**
As soon as practicable after the effective date of this registration statement.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933 check the following box.  ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the

following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐            Accelerated filer ☐            Non-accelerated filer ☒            Smaller reporting company ☐
                                                                    (Do not check if a smaller
                                                                    reporting company)

**The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the registration statement shall become effective on such date as the Commission, acting pursuant to said Section 8(a), may determine.**

Table of Contents

The information in this prospectus is not complete and may be changed. We may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any state where the offer or sale is not permitted.

SUBJECT TO COMPLETION, DATED OCTOBER 29, 2009

Shares



# Cobalt International Energy, Inc.

## Common Stock

This is an initial public offering of shares of common stock of Cobalt International Energy, Inc. Prior to this offering, there has been no public market for our common stock. The initial public offering price of the common stock is expected to be between $            and $            per share. We have applied to list our common stock on the New York Stock Exchange under the symbol "CIE."

The underwriters have an option to purchase a maximum of            additional shares of common stock from us to cover over-allotments of shares. The underwriters can exercise this option at any time within 30 days from the date of this prospectus.

**Investing in our common stock involves risks. See "Risk Factors" on page 18.**

|  | Price to Public | Underwriting Discounts and Commissions | Proceeds to Us |
|---|---|---|---|
| Per Share | $ | $ | $ |
| Total | $ | $ | $ |

Delivery of the shares of common stock will be made on or about            , 2009.

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

**Credit Suisse**                    **Goldman, Sachs & Co.**                    **J.P. Morgan**

The date of this prospectus is            , 2009

Table of Contents

addition to Heidelberg #2, we plan to participate as non-operator in the drilling of an aggregate of between seven and nine exploratory, appraisal and development wells in the Tahiti Basin Miocene trend through 2012, depending on drilling results.

We believe our prospects within the Adjacent Miocene trend offer substantial, commercially viable resource potential due to similarities in the geologic profile to that of the Tahiti Basin Miocene trend. However, any analogies drawn by us from other wells, prospects or producing fields may not prove to be accurate indicators of the success of developing reserves from our prospects. For further information, reference should be made to the subsection of this prospectus titled, "Risk Factors—We have no proved reserves and areas that we decide to drill may not yield oil in commercial quantities or quality, or at all." Our prospect inventory in this trend benefits from significant seismic delineation via proprietary 3-D reprocessing that indicates large, well-defined subsalt closures. We believe that our data-intensive approach enabled us to obtain a competitive advantage in imaging the region. We have identified 22 prospects in the Adjacent Miocene trend to date. We plan to drill as operator three exploratory wells in the Adjacent Miocene trend through 2012. We also plan to participate as non-operator in the drilling of three exploratory wells in the Adjacent Miocene trend through 2012.

We were an early mover in the inboard Lower Tertiary trend, targeting specific lease blocks as early as 2006. Our technical team's hypothesis regarding the region's potentially higher-quality reservoir properties was supported by the successful result of the Shenandoah #1 well in which we participated. This discovery had reservoir characteristics more similar to Miocene reservoirs. Our technical team has identified 22 prospects in our inboard Lower Tertiary blocks to date, which are characterized by large, well-defined subsalt closures of a similar size to historic outboard Lower Tertiary discoveries, but are differentiated by what we believe to be potentially superior reservoir quality. We plan to drill as operator three exploratory wells in the inboard Lower Tertiary trend through 2012. We also plan to participate as non-operator in the drilling of an aggregate of between two and four exploratory and appraisal wells in the inboard Lower Tertiary trend through 2012.

***Early mover in the emerging pre-salt play offshore Angola and Gabon***

We obtained our position offshore Angola and Gabon after a multi-year assessment of global deepwater hydrocarbon trends and resource potential. Our assessment was driven by our interpretation of seismic data, the international operating experience of our management and technical teams and an in-depth evaluation of regional political risk and economic conditions. In these two countries, we have contractual rights on four blocks comprising approximately 2.2 million net acres, equivalent to approximately 335 blocks in the deepwater U.S. Gulf of Mexico. We currently have a license in the Diaba Block offshore Gabon, and, by year-end, we expect to change our contractual rights into licenses in Blocks 9 and 21 offshore Angola. To date, we have identified 85 prospects on these blocks, the largest of which we estimate from our seismic analysis to have aerial extents similar to the aerial extents of the "Tupi" pre-salt discovery offshore Brazil. However, any analogies drawn by us from other wells, prospects or producing fields may not prove to be accurate indicators of the success of developing reserves from our prospects. We expect to identify additional prospects as our technical team continues to process incremental data. Offshore Angola and Gabon are characterized by the presence of salt formations and oil-bearing sediments located in pre-salt and post-salt horizons.

Given the rifting that occurred when plate tectonics separated the South American and African continents, we believe the geology offshore Angola and Gabon is an analog to the geology offshore Brazil where recent pre-salt discoveries, such as Tupi and "Jupiter", are located. Recent pre-salt discoveries offshore Brazil, coupled with the pre-salt onshore and shallow water discoveries in West Africa and our ongoing analysis of seismic data, including our proprietary reprocessing of 3-D pre-stack, depth-migrated seismic data on Block 21 offshore Angola, further our belief that large-scale resource potential exists on our acreage. However, no exploratory wells have been drilled which have targeted the pre-salt horizon in the deepwater offshore Angola and Gabon. One well, drilled in 1996 which targeted shallower horizons in the deepwater offshore Angola, penetrated the top of a pre-salt horizon and encountered oil.

Table of Contents

By year-end, we anticipate licenses to explore for, develop and produce oil will be issued to us with respect to Blocks 9 and 21 offshore Angola. We will be the operator of these blocks with our primary partner being Sonangol. Offshore Gabon, we have a 21.25% working interest in the Diaba license, which we acquired in February 2008. Total Gabon SA ("Total Gabon") is the operator of the Diaba license with a 63.75% working interest, held pursuant to a Production Sharing Agreement ("PSA").

### *Long-term strategic relationships with industry leading E&P companies*

We have long-term strategic relationships with two leading oil and gas companies, TOTAL and Sonangol, covering interests in both the U.S. Gulf of Mexico and offshore West Africa. Our relationship with Sonangol was originally formed when we entered into a participation agreement with them in September 2007 for the exploration of Blocks 9, 21 and one additional block offshore Angola. The partnership agreement we recently entered into with Sonangol to jointly develop interests in the U.S. Gulf of Mexico has expanded this relationship. Sonangol's recognition of our exploration strengths has provided us with access to high-quality prospects offshore Angola, which we believe is one of the most attractive hydrocarbon exploratory regions in the world.

Our relationship with the TOTAL Group can be traced to November 2007, when we entered into an agreement with Total Gabon for the exploration of eight blocks in the U.S. Gulf of Mexico, and an agreement for the exploration of the Diaba license offshore Gabon. This relationship was significantly expanded upon the formation of our long-term alliance in April 2009. In the near term, this alliance will allow us to drill five key exploratory prospects on existing Cobalt-operated blocks (all of which TOTAL has agreed to participate in) using a 5th generation deepwater drilling rig provided by TOTAL, with a substantial share of our drilling costs to be paid by TOTAL, up to $300 million. Longer-term, the alliance creates an ongoing platform for organic exploration and development activities that combines our internal exploration expertise with the recognized overall expertise of a supermajor oil company and a development strategy aimed at shortening the cycle time between discovery and production.

### *Significant investments in technology and data allow for enhanced prospect maturation*

Our prospect generation approach is predicated upon a thorough, basin-wide understanding of the geologic trends within our focus areas and differs considerably from often-followed industry practice of acquiring more narrowly focused, prospect-specific data on a block-by-block basis. Consistent with our approach, upon our formation in November 2005, we immediately began acquiring the latest regional seismic data to complement our team's experience in the deepwater U.S. Gulf of Mexico and offshore West Africa. Since our inception, we have spent approximately $205 million on the acquisition, reprocessing and analysis of extensive geophysical data. Through these efforts, we have systematically acquired what we believe to be one of the industry's most extensive and current seismic databases in our focus areas, covering approximately 70% of the deepwater U.S. Gulf of Mexico and a substantial portion of our focus area offshore Angola and Gabon. Our approach to data acquisition entails analyzing regional data, such as industry well results, to understand a given trend's specific geology and defining those areas that offer the highest potential for large hydrocarbon deposits. After these areas are identified, we seek to acquire and reprocess the highest resolution subsurface data available in the potential prospect's direct vicinity. This includes advanced imaging information, such as wide-azimuth studies, to further our understanding of a particular reservoir's characteristics, including both trapping mechanics and fluid migration patterns. This advanced data is particularly important in below salt plays where wide-azimuth and other advanced 3-D information can more clearly define the target area, which, with more traditional technologies, is typically obscured by the overlying salt layer. We believe our library of data is among the best in the industry for our particular areas of focus, and rivals that of the supermajor oil companies. For additional information on the use of wide-azimuth studies in subsalt target areas, see "Industry—U.S. Gulf of Mexico."

We believe our investment in this advanced data set, coupled with our technical team's advanced reprocessing capabilities, has allowed us to better interpret seismic data and generate what we believe are among the highest-quality prospects in the regions in which our activities are focused. We believe

Table of Contents

our approach has translated into enhanced performance in terms of the successful acquisition of high-quality prospects and expect that this approach will translate into successful choices of drilling locations, as well as reducing finding and development costs.

### Operating control over the majority of our portfolio

In order to better maintain control over our asset portfolio, we have established a leasehold position comprised primarily of operated properties. This includes operating approximately 75% of our U.S. Gulf of Mexico lease blocks, as well as both of our Angolan blocks. As operator, we have primary control over prospect selection, exploration and development timing and capital allocation, as well as the ability to implement logistical practices that we believe will allow us to shorten the time between resource discovery and first production.

### Experienced management and technical teams with proven expertise

We are led by management and technical teams that have significant experience finding and developing oil and natural gas reserves in our focus regions. Our management team has a track record of developing multi-billion dollar projects worldwide and across the oil and natural gas value chain. In addition, our management team has an established base of relationships with domestic and foreign governments, national and international oil companies, service companies and independent oil and gas companies, all of which we believe enhance our competitiveness. Our technical team consists of geologists, geoscientists, engineers and operators possessing an average of over 27 years of industry experience exploring for and developing oil and natural gas in the U.S. Gulf of Mexico and offshore West Africa. Prior to joining Cobalt, our management and technical teams collectively played a significant role in the exploration and development of approximately 8 Bboe of proved plus probable reserves in the deepwater U.S. Gulf of Mexico, out of an industry total of approximately 17 Bboe of such reserves developed in the last 28 years.

## Our Strategy

Since our inception, we have been singularly focused on locating and acquiring high-potential oil-focused, below salt prospects in the deepwater U.S. Gulf of Mexico and offshore West Africa. To date, we have identified and acquired 132 prospects which we believe have substantial potential hydrocarbon deposits. By employing the significant competitive advantages we believe we possess, our primary objective is to efficiently drill and develop our prospects, to recognize proved reserves, to achieve production and to generate operating cash flow on an accelerated basis, thereby increasing our net asset value. To this end, our strategy includes the following components:

### Leverage our team's expertise in exploring for and developing below salt structures

Our exploration and development efforts across our portfolio focus on structures which are characterized by the presence of salt formations in the deepwater. The hydrocarbon reservoirs we have focused on have not been extensively targeted in the past, given historical imaging difficulties that a salt formation can create in identifying underlying structures. Driven by the quality and quantity of our seismic data, the advent of advanced imaging technologies and our technical team's understanding of the impact of a salt formation on sediment migration and its potential as a hydrocarbon trapping mechanism, we believe we are well-positioned to unlock large potential reservoirs below salt formations in both the U.S. Gulf of Mexico and offshore Angola and Gabon. This differentiated skill set is reflected throughout our near-term drilling program, including our ongoing activities in the Tahiti Basin Miocene and Adjacent Miocene trends as well as our upcoming exploratory wells in the inboard Lower Tertiary trend and offshore Angola and Gabon, all of which are impacted by the presence of salt. We further believe our differentiated ability to image these below salt horizons was instrumental in the formation of both our TOTAL alliance and our Sonangol partnership.

### Focus near-term U.S. Gulf of Mexico activities in the Tahiti Basin Miocene trend

We are focusing our near-term activities in the Tahiti Basin Miocene trend of the U.S. Gulf of Mexico. We are currently evaluating information obtained from drilling Ligurian #1 and will participate

Table of Contents

Environmental, health and safety laws are complex, change frequently and have tended to become increasingly stringent over time. Our costs of complying with current and future environmental, health and safety laws, and our liabilities arising from releases of, or exposure to, regulated substances may adversely affect our results of operations and our financial condition. See "Business—Environmental Matters and Regulation."

***Non-U.S. holders of our common stock, in certain situations, could be subject to U.S. federal income tax upon the sale, exchange or other disposition of our common stock.***

We believe that we are, and will remain for the foreseeable future, a U.S. real property holding corporation for U.S. federal income tax purposes. As a result, under the Foreign Investment in Real Property Tax Act ("FIRPTA"), certain non-U.S. investors may be subject to U.S. federal income tax on gain from the disposition of shares of our common stock, in which case they would also be required to file U.S. tax returns with respect to such gain. Whether these FIRPTA provisions apply depends on the amount of our common stock that such non-U.S. investors hold and whether, at the time they dispose of their shares, our common stock is regularly traded on an established securities market (such as the NYSE) within the meaning of the applicable Treasury Regulations. So long as our common stock is listed on the NYSE, only a non-U.S. investor who has held, actually or constructively, more than 5% of our common stock may be subject to U.S. federal income tax on the disposition of our common stock under FIRPTA. See "Material U.S. Federal Tax Considerations for Non-U.S. Holders—Gain on Disposition of Common Stock."

***We may be exposed to liabilities under the Foreign Corrupt Practices Act, and any determination that we violated the Foreign Corrupt Practices Act could have a material adverse effect on our business.***

We are subject to the Foreign Corrupt Practices Act ("FCPA") and other laws that prohibit improper payments or offers of payments to foreign governments and their officials and political parties for the purpose of obtaining or retaining business. We do business and may do additional business in the future in countries and regions in which we may face, directly or indirectly, corrupt demands by officials, tribal or insurgent organizations, or private entities. Thus, we face the risk of unauthorized payments or offers of payments by one of our employees or consultants, even though these parties are not always subject to our control. Our existing safeguards and any future improvements may prove to be less than effective, and our employees and consultants may engage in conduct for which we might be held responsible. Violations of the FCPA may result in severe criminal or civil sanctions, and we may be subject to other liabilities, which could negatively affect our business, operating results and financial condition. In addition, the government may seek to hold us liable for successor liability FCPA violations committed by companies in which we invest or that we acquire.

***We may incur substantial losses and become subject to liability claims as a result of future oil and natural gas operations, for which we may not have adequate insurance coverage.***

We intend to maintain insurance against risks in the operation of the business we plan to develop and in amounts in which we believe to be reasonable. Such insurance, however, may contain exclusions and limitations on coverage. We may elect not to obtain insurance if we believe that the cost of available insurance is excessive relative to the risks presented. Losses and liabilities arising from uninsured and underinsured events could materially and adversely affect our business, financial condition or results of operations.

28

Table of Contents

## MANAGEMENT'S DISCUSSION AND ANALYSIS
## OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*The following discussion contains forward-looking statements that involve risks and uncertainties. Our actual results may differ materially from those discussed in the forward-looking statements as a result of various factors, including, without limitation, those set forth in "Risk Factors," "Cautionary Note Regarding Forward-Looking Statements," "Business—How We Identify and Analyze Prospects" and the other matters set forth in this prospectus. The following discussion of our financial condition and results of operations should be read in conjunction with our financial statements and the notes thereto included elsewhere in this prospectus, as well the information presented under "Selected Historical and Pro Forma Financial Information." Due to the fact that we have not generated any revenues, we believe that the financial information contained in this prospectus is not indicative of, or comparable to, the financial profile that we expect to have once we begin to generate revenues. Except to the extent required by law, we undertake no obligation to update publicly any forward-looking statements for any reason, even if new information becomes available or other events occur in the future.*

### Overview

We are an independent, oil-focused exploration and production company with a world-class below salt prospect inventory in the deepwater U.S. Gulf of Mexico and offshore Angola and Gabon in West Africa. We have established a portfolio of 132 identified, well-defined prospects, comprised of 47 prospects located in the deepwater U.S. Gulf of Mexico and 85 prospects located in offshore West Africa.

Pursuant to the terms of a corporate reorganization that will be completed prior to or simultaneously with and is contingent upon the completion of the offering described in this prospectus, all of the interests in Cobalt International Energy, L.P. will be exchanged for common stock of Cobalt International Energy, Inc., and as a result Cobalt International Energy, L.P. will become wholly-owned by Cobalt International Energy, Inc.

Since we began our operations in late 2005, we have devoted substantially all of our resources to identifying and acquiring a deepwater prospect inventory in the U.S. Gulf of Mexico and offshore Angola and Gabon in West Africa. In order to identify acreage that we believe has the potential for large hydrocarbon accumulations, we acquire, analyze and develop extensive geophysical data, including 2-D and 3-D seismic data. From our inception on November 10, 2005 through September 30, 2009, we have incurred costs of approximately $211 million on the acquisition, processing and analysis of extensive geophysical data. Using this data we developed a targeted leasing strategy and were successful in acquiring leasehold interests in 113 blocks covering 517,400 net acres in the 2006, 2007 and 2008 MMS Lease Sales in the U.S. Gulf of Mexico for an aggregate of $635 million. In addition, we have acquired additional leasehold interests as a result of our alliance with TOTAL. We are the operator on approximately 75% of our blocks and have varying working interests. Most of our U.S. Gulf of Mexico leases have a 10-year primary term, expiring between 2016 and 2019. In the U.S. Gulf of Mexico, the royalties on our lease blocks range from 12.5% to 18.75% with a lease block weighted average of 16%. Assuming we are able to commence exploration and production activities or successfully exploit our properties during the primary lease term, our leases would extend beyond the primary term, generally for the life of production.

In 2007 we acquired contractual rights to Blocks 9, 21 and one additional block, comprising 1.26 million net acres offshore Angola for which we paid signature bonuses of $4.0 million, $10.0 million and $10.0 million, respectively. By year-end 2009, we anticipate licenses to explore for, develop and produce oil will be issued to us with respect to Blocks 9 and 21 in the form of a RSA for each block. As part of our contractual agreement for Blocks 9, 21 and one additional block, we have agreed to cover the costs of a local partner who holds a 10% interest in the blocks.

42

Table of Contents

On November 29, 2007, we entered into an assignment agreement with Total Gabon and paid approximately $2.0 million for a 21.25% working interest in the Diaba Block offshore Gabon. Through the assignment we became a party to the PSA between the operator, Total Gabon, and the Republic of Gabon. This agreement gives Cobalt and Total Gabon the right to recover costs incurred and receive a share of the remaining profit from any commercial discoveries made on the block.

In early 2008, we acquired a 9.375% working interest in Green Canyon 816, 859, 860 and 903 from an existing owner for $14.5 million.

On May 7, 2008, we acquired a 20% working interest in Walker Ridge 8, 51 and 52 from an existing owner for $25.3 million.

On May 15, 2008, we signed a participation agreement with Sonangol (which we subsequently announced on April 22, 2009) whereby they were assigned a 25% non-operated interest of our pre-TOTAL alliance interest in 11 of our U.S. Gulf of Mexico oil and natural gas exploration leases for $50.1 million and reimbursement of $10.0 million for our exploration and seismic costs related to those leases. The price Sonangol paid us for this interest was based on the price we paid for such leases in the 2007 and 2008 MMS Gulf of Mexico Lease Sales. This transaction resulted in no gain or loss to Cobalt.

On April 6, 2009, we announced a long-term alliance with TOTAL in which, through a series of transactions, we combined our respective U.S. Gulf of Mexico exploratory lease inventory through the exchange of a 40% interest in our leases for a 60% interest in TOTAL's leases, resulting in a current combined alliance portfolio of 216 leases. We will act as operator on behalf of the alliance through the exploration and appraisal phases of development. As part of the alliance, TOTAL committed, among other things to (i) provide a 5th generation deepwater rig to drill a mandatory five-well program on existing Cobalt-operated blocks, (ii) pay up to $300 million to carry a substantial share of Cobalt's costs with respect to the five-well program (above the amounts TOTAL has agreed to pay as owner of a 40% interest), (iii) pay an initial amount of approximately $280 million primarily as reimbursement of our share of historical costs in our contributed properties and consideration under purchase and sale agreements, (iv) pay 40% of the general and administrative costs relating to our operations in the U.S. Gulf of Mexico during the 10-year alliance term, and (v) award us up to $180 million based on the success of the alliance's initial five-well program, in all cases subject to certain conditions and limitations. Additionally as part of the alliance, we formed a U.S. Gulf of Mexico-wide area of mutual interest with TOTAL, whereby each party has the right to participate in any oil and natural gas lease interest acquired by the other party within this area. No gain or loss was recognized as a result of these agreements.

In the U.S. Gulf of Mexico, our exploration program is initially focused in the Tahiti Basin Miocene trend. In addition to Ligurian, our drilling program includes the Heidelberg #2 appraisal well that we expect will commence drilling in late December 2009, the Criollo exploration well, which we expect to commence drilling in November 2009 upon repositioning of the Transocean DD-I rig, the Firefox exploration well, which we expect to commence drilling in 2010, as well as additional appraisal and development wells. In addition, we plan to commence drilling the "Aegean," "North Platte" and "Catalan" prospects in the inboard Lower Tertiary trend in 2010 and 2011. We estimate that the average gross cost to drill and evaluate an exploration well is approximately $100 to $130 million for Miocene prospects and approximately $140 to $170 million for inboard Lower Tertiary prospects, the average gross cost to drill and evaluate an appraisal well is approximately $110 to $140 million for Miocene prospects and approximately $150 to $180 million for inboard Lower Tertiary prospects, while the average gross cost to drill and evaluate a development well is approximately $140 to $170 million for Miocene fields and approximately $180 to $210 million for inboard Lower Tertiary fields.

We currently have agreements to operate two deepwater drilling rigs in the U.S. Gulf of Mexico: the Transocean DD-I rig, which TOTAL delivered to us on July 7, 2009, and the ENSCO 8503, a

43

Table of Contents

The following table presents the most recent data published by the MMS regarding selected industry discoveries in the Lower Tertiary trend [1]:

| Field[2] | Reservoir Depth (ft) | Sand | Total Area (acres)[2] | Net Pay Thickness (feet) | Gas-Oil Ratio (scf/bbl)[3] | Recoverable Oil per Acre-foot (bbl/acre-foot)[4] |
|---|---|---|---|---|---|---|
| St Malo (Walker Ridge 678) | 27,154 | Wilcox1 | 6,438 | 185 | 160 | 128 |
| | 27,741 | Wilcox2 | 6,170 | 121 | 160 | 124 |
| *St Malo Total* | | | | 306 | 160[5] | 126[5] |
| Cascade (Walker Ridge 206) | 25,358 | Sand1 | 973 | 107 | 160 | 173 |
| | 25,669 | Sand2 | 490 | 36 | 160 | 192 |
| | 26,209 | Sand3 | 630 | 56 | 160 | 104 |
| *Cascade Total* | | | | 199 | 160[5] | 157[5] |
| Jack (Walker Ridge 759) | 27,000 | Wilcox1 | 7,502 | 140 | 160 | 141 |
| | 27,669 | Wilcox2 | 4,859 | 84 | 160 | 155 |
| *Jack Total* | | | | 224 | 160[5] | 146[5] |
| Stones (Walker Ridge 508) | 26,826 | Wilcox1 | 4,970 | 210 | 136 | 114 |
| Chinook (Walker Ridge 469) | 25,600 | Sand1 | 1,270 | 201 | 160 | 245 |

(1)   See the MMS' website: *http://www.gomr.mms.gov/homepg/pubinfo/freeasci/Atlas/freeatlas.html.* Although the data published on the MMS website contains information on hundreds of fields in the U.S. Gulf of Mexico, we have included in this table only the deepwater subsalt outboard Lower Tertiary fields. What we refer to in this prospectus as the inboard Lower Tertiary is an emerging trend located to the northwest of existing outboard Lower Tertiary fields such as St. Malo, Jack and Cascade. We believe that discoveries in the inboard Lower Tertiary will exhibit meaningfully better reservoir characteristics than had previously been encountered by the industry in the outboard Lower Tertiary. We believe the results of the Shenandoah #1 well support this hypothesis. The MMS keeps log and well data confidential for two years after receipt from companies drilling in the U.S. Gulf of Mexico. As a result, the most recent 2009 data available from the MMS does not include wells drilled after 2006, including Kaskida and Shenandoah. We do not own interests in any of the fields listed in this table.

(2)   Represents the "gross area" of each field, which includes acreage of the field on all associated blocks. The "gross area" is different than the "net area", which would include only the acreage on which a particular owner holds leasehold title.

(3)   Represents the ratio of the volume of gas that comes out of solution from the volume of oil at standard conditions (expressed in standard cubic feet per barrel of oil).

(4)   Represents the amount of oil that can ultimately be recovered from a volume of rock (expressed in barrels of oil per acre-foot).

(5)   Represents the net pay thickness-weighted average of "gas-oil ratio" and "recoverable oil per acre-foot," as applicable.

**West Africa**

Due to continued commercial above salt discoveries of large hydrocarbon accumulations, the deepwater offshore West Africa is a core focus area for the global oil and gas industry. Nigeria, Angola, Equatorial Guinea and Ghana, have proven to be among the most prolific countries in the region. Nigeria and Angola are particularly meaningful in a global context, producing an estimated aggregate 4 million barrels per day in 2008. Companies with significant operations in the deepwater West Africa region include Anadarko, BP, Chevron, Eni, Exxon Mobil, Noble Energy Inc., Petrobras, Shell, TOTAL and Tullow Oil. No exploratory wells have been drilled which have targeted the pre-salt

Table of Contents

horizon in the deepwater offshore Angola and Gabon. One well, drilled in 1996, which targeted shallower horizons in the deepwater offshore Angola, penetrated the top of a pre-salt horizon and encountered oil.

Similar to the deepwater U.S. Gulf of Mexico, the geology of offshore West Africa is characterized by the presence of salt formations. The vast majority of the deepwater offshore exploration activity in these countries to date has been focused on above salt structures and has yielded world-class finds, including TOTAL's Girassol discovery in 1996, Exxon Mobil's Kizomba discovery in 1998 and BP's Plutonio discovery in 2002, all offshore Angola. While offshore West Africa producers continue to find commercial success exploiting above salt horizons, recent pre-salt discoveries in Brazil, coupled with the underlying geologic symmetry of offshore West Africa and offshore Brazil, have increased focus on the potential extension of the pre-salt play into the deepwater.

The increased interest in offshore pre-salt West Africa is a result of plate tectonics rift basin geologic theory. The basis for this hypothesis is that 150 million years ago, current day South America and Africa were part of a larger continent that broke apart. As these land masses slowly drifted away from each other, rift basins formed. These basins were filled with organic rich material and sediments, which in time became hydrocarbon source rocks and reservoirs. A thick salt layer was subsequently deposited, forming a seal over the reservoirs. Finally the continents continued to drift apart, forming two symmetric geologic areas separated by the Atlantic Ocean. This symmetry in geology is particularly notable in the deepwater areas offshore Gabon, Angola and the Santos and Campos Basins offshore Brazil. From an exploration perspective, we believe this similarity is very meaningful, particularly in the context of recent pre-salt Brazilian discoveries, including the Petrobras-operated Tupi (BM-S-11) find, which has an aerial extent of approximately 93,000 acres (380 square kilometers) and is believed to hold significant oil and natural gas resource accumulations. According to industry sources, Santos Basin pre-salt activity has had a 83% drilling success rate. See "Risk Factors—We have no proved reserves and areas that we decide to drill may not yield oil in commercial quantities or quality, or at all."

### Illustrative Atlantic Rift Play Symmetry[1]



*Source: Wood Mackenzie and internal Cobalt analysis*

(1)     Volumes shown are of proved and probable reserves.

(2)     No exploratory wells have been drilled which have targeted the pre-salt horizon in the deepwater offshore Angola and Gabon. One well, drilled in 1996, which targeted shallower horizons in the deepwater offshore Angola, penetrated the top of a pre-salt horizon and encountered oil. Recent pre-salt hydrocarbon discoveries in Brazil and onshore West Africa, and the successful results of drilling achieved there, cannot assure similar future results offshore West Africa.

### *Angola*

Angola became a member of OPEC in early 2007, and Angola's Minister of Petroleum currently serves as the President of the OPEC Conference. The second largest oil producer in Sub-Saharan

Table of Contents

Africa, with estimated production of 1.9 million barrels of crude oil per day in 2008, the country sits atop three major basins on the west coast of the African continent: the northern Congo Basin, the central Kwanza Basin and the southern Namibe Basin. Although all three basins are thought to have been developed during the formation of the African continent, the Kwanza and Congo Basins are distinct in that they are characterized by a widespread salt layer. Although there has been exploration of the pre-salt horizon onshore Angola and Gabon, no exploratory wells have been drilled which have targeted the pre-salt horizon in the deepwater offshore Angola and Gabon. One well, drilled in 1996, which targeted shallower horizons in the deepwater offshore Angola, penetrated the top of a pre-salt horizon and encountered oil.

Exploration in Angola over the past ten years has been dominated by above salt deepwater activity, primarily driven by very significant discoveries such as Kizomba, Girassol and Greater Plutonio in Blocks 15, 17, and 18. These discoveries, made by Exxon Mobil, TOTAL and BP respectively, have distinguished offshore Angola as one of the most prolific hydrocarbon-bearing regions in the world. Subsequent deepwater activity continues to highlight the potential of the region, including the discovery of large oil accumulations on Blocks 31 and 32, by BP and TOTAL, respectively. Several blocks were made available through licensing rounds held in 2005-2006 and planned (but currently delayed) in 2007-2008, of which deepwater blocks commanded the greatest industry interest.

As a result of the substantial new production from the discoveries mentioned above, Angola's aggregate production levels have been steadily increasing, from approximately 750,000 barrels of crude oil per day in 1999 to 1.9 million barrels of crude oil per day in 2008. This trend is expected to continue over the next several years as additional discoveries begin production.

Following Angola's independence in 1975, the state oil company, Sonangol, was established and a new law regarding petroleum activities was passed that declared all oil the property of the state. Given this control, Sonangol grants the rights to the exploration and production of oil and natural gas in Angola, both onshore and offshore.

### Gabon

Several large pre-salt fields have been discovered in Gabon, but primarily onshore. The country's largest discovery to date, Shell's 1985 Rabi-Kounga field discovery was drilled to pre-salt depths onshore and continues to produce. The country has been producing significant amounts of oil since the 1970s with production peaking in 1997 at 371 thousand barrels of oil per day. Maturing fields and a slower pace of new discoveries have resulted in production declining to 238,000 barrels of crude oil per day in 2008. Proved reserves in Gabon are estimated at approximately 3.2 billion barrels of crude oil. Gabon was a member of OPEC from 1975 to 1994. TOTAL is the largest producer in Gabon, having produced 76,000 barrels of crude oil per day within the country in 2008. The Southern Gabon Coastal Basin covers 53,400 square kilometers (13.2 million acres), two-thirds of which is offshore.

Gabon announced the 10th Gabonese License Round is scheduled to take place between June and December 2010 and may include approximately 27 million acres (110,000 square kilometers) of acreage. The round will focus on the highly prospective deepwater pre-salt regions. In preparation for bidding, Gabon is currently working with Compagnie Generale de Geophysique-Veritas to provide advanced seismic surveys targeting pre-salt depths that will replace older generation seismic data that targeted above salt horizons. The limited availability of advanced seismic data capture and reprocessing methodologies needed to provide insight below the large, complex salt sheet that covers the Southern Gabon Coastal Basin has resulted in an under-explored deepwater region with what is believed to be significant untapped potential.

65

Table of Contents

U.S. Customs Service. Such regulation sets safety standards, authorizes investigations into vessel operations and accidents and governs the passage of vessels into U.S. territory. We are required by these agencies to obtain various permits, licenses and certificates with respect to our operations.

### Laws and Regulations of Angola and Gabon

Our exploration and production activities offshore Angola and Gabon are subject to Angolan and Gabonese regulation, respectively. These regulations may govern licensing for drilling operations, mandatory involvement of local partners in our operations, taxation of our revenues, safety and environmental matters and our ability to operate in such jurisdictions as a foreign participant.

Failure to comply with these laws and regulations also may result in the suspension or termination of our operations and subject us to administrative, civil and criminal penalties. Moreover, these laws and regulations could change in ways that could substantially increase our costs.

## Employees

As of September 30, 2009, we had 54 employees. All employees are currently located in the U.S. None of these employees are represented by labor unions or covered by any collective bargaining agreement. We believe that relations with our employees are satisfactory.

## Offices

We currently lease approximately 22,000 square feet of office space at Two Post Oak Central, 1980 Post Oak Boulevard, Suite 1200, Houston, TX 77056, where our principal offices are located. The lease for this office space expires on August 31, 2011.

## Legal Proceedings

We are not currently party to any legal proceedings. However, from time to time we may be subject to various lawsuits, claims and proceedings that arise in the normal course of business, including employment, commercial, environmental, safety and health matters. It is not presently possible to determine whether any such matters will have a material adverse effect on our consolidated financial position, results of operations, or liquidity.

## Corporate Information

We were incorporated pursuant to the laws of the State of Delaware as Cobalt International Energy, Inc. in August 2009 to become a holding company for Cobalt International Energy, L.P. Cobalt International Energy, L.P. was formed as a limited partnership on November 10, 2005 pursuant to the laws of the State of Delaware. Pursuant to the terms of a corporate reorganization that will be completed prior to or simultaneously with the closing of this offering, all of the interests in Cobalt International Energy, L.P. will be exchanged for common stock of Cobalt International Energy, Inc. and as a result Cobalt International Energy, L.P. will become wholly-owned by Cobalt International Energy, Inc. Our web site is *www.cobaltintl.com.* The information on our web site does not constitute part of this prospectus.

Table of Contents

**MANAGEMENT**

The following table sets forth certain information concerning our board of directors, executive officers and key employees:

| Name | Age | Position |
|---|---|---|
| Joseph H. Bryant | 54 | Chairman of the Board of Directors and Chief Executive Officer |
| Gregory A. Beard | 37 | Director |
| Peter R. Coneway | 65 | Director |
| Henry Cornell | 53 | Director |
| Kenneth W. Moore | 40 | Director |
| J. Hardy Murchison | 37 | Director |
| Kenneth A. Pontarelli | 39 | Director |
| D. Jeff van Steenbergen | 53 | Director |
| Martin H. Young, Jr. | 57 | Director |
| Samuel H. Gillespie | 67 | General Counsel and Executive Vice President |
| Rodney L. Gray | 57 | Chief Financial Officer and Executive Vice President |
| James H. Painter | 52 | Executive Vice President, Gulf of Mexico |
| Van P. Whitfield | 58 | Executive Vice President, Operations and Development |
| James W. Farnsworth | 54 | Chief Exploration Officer |
| Lynne L. Hackedorn | 51 | Vice President, Land |
| Richard A. Smith | 50 | Vice President |
| John P. Wilkirson | 51 | Vice President, Strategy and Planning |

## Biographical information

*Joseph H. Bryant* has been our Chief Executive Officer and Chairman of our Board of Directors since our inception in November 2005. Mr. Bryant has 32 years of experience in the oil and gas industry. Prior to joining Cobalt, from September 2004 to September 2005, he was President and Chief Operating Officer of Unocal Corporation, an oil and gas exploration and production company. From May 2000 to August 2004, Mr. Bryant was President of BP Exploration (Angola) Limited, from January 1997 to May 2000, Mr. Bryant was President of BP Canada Energy Company (including serving as President of Amoco Canada Petroleum Co. between January 1997 and May 2000, prior to its merger with BP Canada), and from 1993 to 1996, Mr. Bryant served as President of a joint venture between Amoco Orient Petroleum Company and the China National Offshore Oil Corporation focused on developing the offshore Liuhua fields. Prior to 1993, Mr. Bryant held executive leadership positions in Amoco Production Company's business units in The Netherlands and the Gulf of Mexico, serving in many executive capacities and in numerous engineering, financial and operational roles throughout the continental United States. Mr. Bryant currently also serves on the board of directors of the Berry Petroleum Company, an independent energy company. Mr. Bryant holds a Bachelor of Science in Mechanical Engineering from the University of Nebraska.

*Gregory A. Beard* has been a member of our Board of Directors since October 2009 and is Chairman of our Compensation Committee. Mr. Beard is a Managing Director of Riverstone LLC. Prior to joining Riverstone in 2000, Mr. Beard was an Associate with Asen and Company, a privately held investment firm. Prior to joining Asen, Mr. Beard was associated with DC Investment Partners, a Nashville, Tennessee-based investment firm, and was also a Financial Analyst at Goldman, Sachs & Co. Mr. Beard serves on the boards of directors (or equivalent governing bodies) of Vantage Energy, LLC, Legend Natural Gas II, L.P., Legend Natural Gas III, L.P., Legend Natural Gas IV, L.P., Phoenix Exploration Company L.P., Virginia Uranium, Inc., Targe Energy LLC, and Canera Resources, Inc. Mr. Beard holds a B.A. from the University of Illinois at Urbana.

103

Table of Contents

Managing Director and co-head of North American Oil and Gas with JP Morgan and Co., and before that was a Managing Director with a leading Canadian investment banking firm. He has been active in the North American and international energy sector for over 30 years and has a broad range of experience as a private equity investor, investment banker, and in operating and operations management roles with Mobil Corporation and with Schlumberger. Mr. van Steenbergen holds a Bachelor of Applied Science in Civil Engineering from Queen's University and a Master of Business Administration from Dalhousie University, and attended executive programs at Harvard Business School and INSEAD.

*Martin H. Young, Jr.* has been a member of our Board of Directors since October 2009 and is Chairman of our Audit Committee. Mr. Young has been the Senior Vice President and Chief Financial Officer of Falcon Seaboard Diversified, Inc. (Falcon) and its predecessor companies, Falcon Seaboard Holdings, L.P. and Falcon Seaboard Resources, Inc., since 1992. Falcon is a private energy company involved in natural gas exploration and production, real estate and private investments. In July 2007, Mr. Young retired as Chairman of the Board (a position he had held for 11 years) and as a member of the Board of the Texas Mutual Insurance Company (a position he had held for 12 years), the largest provider of workers' compensation insurance in the State of Texas. Prior to his employment with Falcon, Mr. Young had 13 years of banking experience, the last 10 working for a major California bank as the Vice President/Area Manager for the corporate banking group. Mr. Young currently also serves as Chairman of the Board of Directors of the Berry Petroleum Company, an independent energy company, a position he has held for five of the past ten years he has served on Berry Petroleum's board. Mr. Young holds a Bachelor of Business Administration from Duquesne University and a MBA from Southern Illinois University.

*Samuel H. Gillespie* has been our General Counsel and Executive Vice President since our inception in November 2005. He served as Vice Chairman of our Board of Directors from our inception until October 2009. Mr. Gillespie has 29 years of experience in the oil and gas industry. Prior to joining Cobalt, from 2003 to 2005, Mr. Gillespie was Senior Vice President and General Counsel of Unocal Corporation. From 2001 to 2003, Mr. Gillespie was Special Counsel at Skadden, Arps, Meagher & Flom, LLP & Affiliates. From 1994 to 2001, Mr. Gillespie was Senior Vice President and General Counsel of Mobil Corporation. While at these companies Mr. Gillespie led key negotiations, including Mobil Corporation's global merger with Exxon Corporation and Unocal Corporation's merger with Chevron Corporation. He was also instrumental in the expansion of Mobil Corporation's and Unocal Corporation's exploration and production opportunities in Kazakhstan, Turkmenistan, Qatar, Indonesia, Thailand, Bangladesh, Russia, Azerbaijan, Nigeria, Cameroon, Vietnam, Venezuela and Peru. Mr. Gillespie holds a Bachelor of Arts from Middlebury College and a J.D. from Vanderbilt University.

*Rodney L. Gray* has been our Chief Financial Officer and Executive Vice President since June 2009. Mr. Gray has more than 30 years of experience in the energy industry, including a number of executive and financial leadership roles. Prior to joining Cobalt, from 2003 to 2009, he served as Chief Financial Officer of Colonial Pipeline Co., an interstate carrier of petroleum products. From October 1992 until his departure from Enron Corporation, an energy company, in July 1998, he served in the positions of Senior VP of Finance and Treasurer, Chairman and CEO of Enron International, Managing Director of Enron Development Corp., Chairman, CEO and President of Enron Global Power and Pipelines, and Executive VP, Finance of Enron International. In various periods from July 1998 to November 1998, Mr. Gray served as a Director and Vice Chairman, Finance, Risk Management and Investments and Chief Financial Officer and Executive Director, Finance, Risk Management and Investments of Azurix Corp., the water services division of Enron Corporation. Mr. Gray has served on the Board of Directors of Regency GP LLC, a midstream natural gas services provider, since February 2008. Mr. Gray holds a Bachelor of Science in Accounting from the University

# EXHIBIT 4

Use these links to rapidly review the document

TABLE OF CONTENTS
INDEX TO FINANCIAL STATEMENTS

Table of Contents

**As filed with the Securities and Exchange Commission on November 27, 2009**

**Registration No. 333-161734**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## Amendment No. 3
to

## FORM S-1
**REGISTRATION STATEMENT**
**UNDER**
**THE SECURITIES ACT OF 1933**

## Cobalt International Energy, Inc.
(Exact name of registrant as specified in its charter)

| **Delaware** | **1311** | **27-0821169** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

**Two Post Oak Central**
**1980 Post Oak Boulevard, Suite 1200**
**Houston, TX 77056**
**(713) 579-9100**
(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

**Joseph H. Bryant, Chairman and Chief Executive Officer**
**Two Post Oak Central**
**1980 Post Oak Boulevard, Suite 1200**
**Houston, TX 77056**
**(713) 579-9101**
(Name, address, including zip code, and telephone number, including area code, of agent for service)

**Copies to:**

| | |
|---|---|
| **Richard D. Truesdell, Jr., Esq.** | **David J. Beveridge, Esq.** |
| Davis Polk & Wardwell LLP | **Christopher J. Cummings, Esq.** |
| 450 Lexington Avenue | Shearman & Sterling LLP |
| New York, NY 10017 | 599 Lexington Avenue |
| (212) 450-4000 | New York, NY 10022 |
| | (212) 848-4000 |

**Approximate date of commencement of proposed sale to the public:**
As soon as practicable after the effective date of this registration statement.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933 check the following box.   ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the

following box and list the securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐          Accelerated filer ☐          Non-accelerated filer ☒          Smaller reporting company ☐

(Do not check if a smaller reporting company)

### CALCULATION OF REGISTRATION FEE

| Title of each Class of Security being registered | Amount to be Registered[1] | Proposed Maximum Offering Price Per Share | Proposed Maximum Aggregate Offering Price[2] | Amount of Registration Fee[3] |
|---|---|---|---|---|
| Shares of Common Stock, $0.01 par value | 72,450,000 | $17.00 | $1,231,650,000.00 | $68,726.07 |

(1)   Includes 9,450,000 shares of common stock which may be issued on exercise of a 30-day option granted to the underwriters to cover over-allotments, if any.
(2)   Estimated solely for the purpose of calculating the registration fee pursuant to Rule 457(a) under the Securities Act of 1933, as amended.
(3)   A registration fee of $64,170.00 was paid previously based on an estimate of the aggregate offering price.

**The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the registration statement shall become effective on such date as the Commission, acting pursuant to said Section 8(a), may determine.**

Table of Contents

The information in this prospectus is not complete and may be changed. We may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any state where the offer or sale is not permitted.

SUBJECT TO COMPLETION, DATED NOVEMBER 27, 2009

63,000,000 Shares



# Cobalt International Energy, Inc.

## Common Stock

This is an initial public offering of shares of common stock of Cobalt International Energy, Inc. Prior to this offering, there has been no public market for our common stock. The initial public offering price of the common stock is expected to be between $15.00 and $17.00 per share. Our common stock has been approved for listing on the New York Stock Exchange under the symbol "CIE."

The underwriters have an option to purchase a maximum of 9,450,000 additional shares of common stock from us to cover over-allotments of shares. The underwriters can exercise this option at any time within 30 days from the date of this prospectus.

**Investing in our common stock involves risks. See "Risk Factors" on page 20.**

|  | Price to Public | Underwriting Discounts and Commissions | Proceeds to Us |
|---|---|---|---|
| Per Share | $ | $ | $ |
| Total | $ | $ | $ |

Delivery of the shares of common stock will be made on or about            , 2009.

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

**Credit Suisse**          **Goldman, Sachs & Co.**          **J.P. Morgan**

**Morgan Stanley**          **Tudor, Pickering, Holt & Co.**          **UBS Investment Bank**

**Deutsche Bank Securities**
**RBC Capital Markets**
**Howard Weil Incorporated**
**FBR Capital Markets**
**Thomas Weisel Partners LLC**
**Natixis Bleichroeder LLC**
**Capital One Southcoast**

The date of this prospectus is            , 2009

Table of Contents

national greenhouse gas regulation, each having proposed bills or rules which would require or result in greenhouse gas emissions reductions. Final laws or regulations could be adopted this or next year. The regulation of greenhouse gases in the areas in which we, our customers and the end-users of our products operate could adversely impact our operations and the demand for our products.

Environmental, health and safety laws are complex, change frequently and have tended to become increasingly stringent over time. Our costs of complying with current and future environmental, health and safety laws, and our liabilities arising from releases of, or exposure to, regulated substances may adversely affect our results of operations and our financial condition. See "Business—Environmental Matters and Regulation."

***Non-U.S. holders of our common stock, in certain situations, could be subject to U.S. federal income tax upon the sale, exchange or other disposition of our common stock.***

We believe that we are, and will remain for the foreseeable future, a U.S. real property holding corporation for U.S. federal income tax purposes. As a result, under the Foreign Investment in Real Property Tax Act ("FIRPTA"), certain non-U.S. investors may be subject to U.S. federal income tax on gain from the disposition of shares of our common stock, in which case they would also be required to file U.S. tax returns with respect to such gain. Whether these FIRPTA provisions apply depends on the amount of our common stock that such non-U.S. investors hold and whether, at the time they dispose of their shares, our common stock is regularly traded on an established securities market (such as the NYSE) within the meaning of the applicable Treasury Regulations. So long as our common stock is listed on the NYSE, only a non-U.S. investor who has held, actually or constructively, more than 5% of our common stock may be subject to U.S. federal income tax on the disposition of our common stock under FIRPTA. See "Material U.S. Federal Tax Considerations for Non-U.S. Holders—Gain on Disposition of Common Stock."

***We may be exposed to liabilities under the Foreign Corrupt Practices Act, and any determination that we violated the Foreign Corrupt Practices Act could have a material adverse effect on our business.***

We are subject to the Foreign Corrupt Practices Act ("FCPA") and other laws that prohibit improper payments or offers of payments to foreign governments and their officials and political parties for the purpose of obtaining or retaining business. We do business and may do additional business in the future in countries and regions in which we may face, directly or indirectly, corrupt demands by officials, tribal or insurgent organizations, or private entities. Thus, we face the risk of unauthorized payments or offers of payments by one of our employees or consultants, even though these parties are not always subject to our control. Our existing safeguards and any future improvements may prove to be less than effective, and our employees and consultants may engage in conduct for which we might be held responsible. The RSAs we expect to enter into concerning Blocks 9 and 21 offshore Angola require us to partner with two Angolan-based E&P companies assigned to us by the Angolan government. We have not worked with either of these companies in the past, and, therefore, our familiarity with these companies is limited. Violations of the FCPA may result in severe criminal or civil sanctions, and we may be subject to other liabilities, which could negatively affect our business, operating results and financial condition. In addition, the government may seek to hold us liable for successor liability FCPA violations committed by companies in which we invest or that we acquire.

***We may incur substantial losses and become subject to liability claims as a result of future oil and natural gas operations, for which we may not have adequate insurance coverage.***

We intend to maintain insurance against risks in the operation of the business we plan to develop and in amounts in which we believe to be reasonable. Such insurance, however, may contain exclusions and limitations on coverage. We may elect not to obtain insurance if we believe that the cost of available insurance is excessive relative to the risks presented. Losses and liabilities arising from

# EXHIBIT 5

Use these links to rapidly review the document
TABLE OF CONTENTS
INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# Form 10-K

(Mark One)

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2009**

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from                    to**

**Commission File Number 001-34579**

# Cobalt International Energy, Inc.
(Exact name of registrant as specified in its charter)

| **Delaware** | **27-0821169** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**Two Post Oak Central**
**1980 Post Oak Boulevard, Suite 1200**
**Houston, TX 77056**
(Address of principal executive offices, including zip code)

**(713) 579-9100**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Securities Act:

| **Title of Each Class** | **Name of Each Exchange on Which Registered** |
|---|---|
| Common stock, $0.01 par value | The New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Securities Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐   No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Securities Act. Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☐   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| Large accelerated filer ☐ | Accelerated filer ☐ | Non-accelerated filer ☒ | Smaller reporting company ☐ |
| --- | --- | --- | --- |
| | | (Do not check if a smaller reporting company) | |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Securities Act). Yes ☐   No ☒

As of June 30, 2009, the last business day of the registrant's most recently completed second fiscal quarter, the registrant's common stock was not listed on any domestic exchange or over-the-counter market. The registrant's common stock began trading on the New York Stock Exchange on December 16, 2009. As of December 31, 2009, the aggregate market value of the registrant's common stock held by non-affiliates was approximately $1,392 million based on the closing price of the registrant's common stock on the New York Stock Exchange on December 31, 2009.

As of March 29, 2010, the registrant had 356,594,544 shares of common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's proxy statement relating to the 2010 Annual Meeting of Shareholders, to be filed within 120 days of the end of the fiscal year covered by this report, are incorporated by reference into Part III of this Annual Report on Form 10-K.

Table of Contents

# PART I

**Cautionary Note Regarding Forward-Looking Statements**

This Annual Report on Form 10-K contains estimates and forward-looking statements, principally in "Business," "Risk Factors," and "Management's Discussion and Analysis of Financial Condition and Results of Operations." Our estimates and forward-looking statements are mainly based on our current expectations and estimates of future events and trends, which affect or may affect our businesses and operations. Although we believe that these estimates and forward-looking statements are based upon reasonable assumptions, they are subject to several risks and uncertainties and are made in light of information currently available to us. Many important factors, in addition to the factors described in this Annual Report on Form 10-K, may adversely affect our results as indicated in forward-looking statements. You should read this Annual Report on Form 10-K and the documents that we have filed as exhibits hereto completely and with the understanding that our actual future results may be materially different from what we expect.

Our estimates and forward-looking statements may be influenced by the following factors, among others:

- uncertainties inherent in making estimates of our oil and natural gas data;

- the volatility of oil prices;

- discovery and development of oil reserves;

- projected and targeted capital expenditures and other costs, commitments and revenues;

- current and future government regulation of the oil and gas industry;

- changes in environmental laws or the implementation of those laws;

- termination of or intervention in concessions, rights or authorizations granted by the United States, Angolan and Gabonese governments to us;

- competition;

- our ability to find, acquire or gain access to other prospects and to successfully develop our current prospects;

- the successful implementation of our and our partners' prospect development and drilling plans;

- the availability and cost of drilling rigs, production equipment, supplies, personnel and oilfield services;

- the availability and cost of developing appropriate infrastructure around and transportation to our prospects;

- military operations, terrorist acts, wars or embargoes;

- the ability to obtain financing;

- our dependence on our key management personnel and our ability to attract and retain qualified personnel;

- our vulnerability to severe weather events, especially tropical storms and hurricanes in the U.S. Gulf of Mexico;

- the cost and availability of adequate insurance coverage; and

- other risk factors discussed in the "Risk Factors" section of this Annual Report on Form 10-K.

The words "believe," "may," "will," "aim," "estimate," "continue," "anticipate," "intend," "expect," "plan" and similar words are intended to identify estimates and forward-looking statements. Estimates and forward-looking statements speak only as of the date they were made, and, except to the extent required by law, we undertake no obligation to update or to review any estimate and/or forward-looking statement because of new information, future events or other factors. Estimates and forward-looking statements involve risks and uncertainties and are not guarantees of future performance. As a result of the risks and uncertainties described above, the estimates and forward-looking statements discussed in this Annual Report on Form 10-K might not occur and our future

Table of Contents

results and our performance may differ materially from those expressed in these forward-looking statements due to, including, but not limited to, the factors mentioned above. Because of these uncertainties, you should not place undue reliance on these forward-looking statements.

**Item 1.**   *Business*

**Overview**

  We are an independent, oil-focused exploration and production company with a world-class below salt prospect inventory in the deepwater of the U.S. Gulf of Mexico and offshore Angola and Gabon in West Africa. We were formed in late 2005 by experienced industry executives and private equity investors who believed that a team of veteran explorationists, equipped with industry-leading data, newly available seismic technologies, industry contacts and adequate funding, could acquire a deepwater prospect inventory that would rival the supermajor oil companies. After considering numerous global oil-producing regions in which to focus our exploration and development efforts, we selected the deepwater U.S. Gulf of Mexico and offshore Angola and Gabon due to the largely unrealized hydrocarbon potential offered by below salt horizons within these regions. We believe that we have been successful in assembling such an inventory and that our asset portfolio would be very difficult to replicate. In December 2009, we completed our initial public offering, which together with a concurrent private offering and the exercise by the underwriters of their overallotment option yielded gross proceeds of $1 billion, and we became a listed company on the New York Stock Exchange. We believe that we are well-positioned, through our prospect maturation efforts, active drilling program, long-term strategic alliances with key industry participants and with the proceeds from our initial public offering, to unlock the potential of and de-risk our prospects on an accelerated basis.

  Primarily through our highly targeted leasing strategy, which was the result of an in-depth, multi-year study of potential regional hydrocarbon accumulations within the deepwater U.S. Gulf of Mexico and select regions offshore West Africa, we have established a current portfolio of 134 identified, well-defined prospects, comprised of 48 prospects located in the deepwater U.S. Gulf of Mexico and 86 prospects located in Blocks 9 and 21 offshore Angola and the Diaba Block offshore Gabon. All of our prospects are oil-focused.

  Our prospect inventory as of December 31, 2009 is summarized in the table below:

| | Identified Prospects[1] | Identified Prospects on which an Initial Exploratory Well is Expected to be Spud by End of 2012[1] |
|---|---|---|
| **U.S. Gulf of Mexico** | | |
| Miocene | | |
| Tahiti Basin | 3 | 3 |
| Adjacent Miocene | 18 | 4 |
| Inboard Lower Tertiary[2] | 21 | 6 |
| Dual Miocene and inboard Lower Tertiary | 6 | 2 |
| *U.S. Gulf of Mexico subtotal* | 48 | 15 |
| **West Africa** | | |
| Angola[3] | 42 | 5 |
| Gabon | 44 | 2 |
| *West Africa subtotal* | 86 | 7 |
| **Total Portfolio** | 134 | 22 |

(1)   See "Risk Factors—We have no proved reserves and areas that we decide to drill may not yield oil in commercial quantities or quality, or at all," "Risk Factors—Our identified drilling locations are scheduled out over several years, making them susceptible to uncertainties that could materially alter the occurrence or timing of their drilling," and "—How We Identify and Analyze Prospects."

Table of Contents

for the commencement of our offshore Angola drilling program, currently planned to begin within the next twelve months.

- Under the Risk Services Agreement for Block 9, in order to preserve our rights in the block, we will be required to drill three wells, as well as acquire approximately 10,764 million square feet (1,000 square kilometers) of seismic data, and find at least one commercial discovery, within four years of its signing, subject to certain extensions. Thereafter, we will be required to commence production within four years of the date of the commercial discovery, subject to certain extensions. In order to guarantee these exploration work obligations under the Risk Services Agreement for Block 9, we and Nazaki are required to post a financial guarantee in the amount of approximately $87.5 million. Our share of this financial guarantee is approximately $54.7 million. In March 2010, we delivered a letter of credit to Sonangol for such amount. As we complete our work obligations under the Risk Services Agreement, the amount of this letter of credit will be reduced accordingly. We have the right to a 20 year production period. As is customary in Angola, we are required to make contributions for Angolan social projects and academic scholarships for Angolan citizens. We made such an initial contribution in March 2010 after the signing of the Risk Services Agreement and will make additional contributions upon each commercial discovery, upon project development sanction and each year after the commencement of production. We have a 40% working interest in Block 9, with Nazaki, Alper and Sonangol P&P holding lesser working interests in the block and sharing in the exploration, development and production costs associated with such block. Proportionate with our working interest in Block 9, we will receive 40% of a variable revenue stream that the Contractor Group will be allocated from Sonangol based on the Contractor Group's rate of return, calculated on a quarterly basis, and then reduced by applicable Angolan taxes and royalties. The Contractor Group's rate of return for each quarter will be determined by the Contractor Group's variable revenue stream from oil production less expenditures and Angolan taxes and royalties from the block. The variable revenue stream paid by Sonangol to the Contractor Group ranges from 72 to 95%, and is inversely related to the size of the applicable rate of return. The Angolan taxes and royalties applicable to the variable revenue stream include the petroleum production tax (at a current tax rate of 20% applied to the Contractor Group's variable revenue stream), the petroleum transaction tax (at a current tax rate of 70% applied to the Contractor Group's variable revenue stream less expenditures less the Contractor Group's specified production allowance, which ranges from 55% to 95% of the Contractor Group's variable revenue stream depending inversely on the Contractor Group's rate of return) and the petroleum income tax (at a current tax rate of 65.75% applied to the Contractor Group's variable revenue stream less expenditures and less petroleum production and petroleum transaction taxes paid).

- Under the Risk Services Agreement for Block 21, in order to preserve our rights in the block, we will be required to drill four wells and find at least one commercial discovery, within five years of its signing, subject to certain extensions. Thereafter, we will be required to commence production within four years of the date of the commercial discovery. In order to guarantee these exploration work obligations under the Risk Services Agreement for Block 21, we and Nazaki are required to post a financial guarantee in the amount approximately $147.5 million. Our share of this financial guarantee is approximately $92.2 million. In March 2010, we delivered a letter of credit to Sonangol for such amount. As we complete our work obligations under the Risk Services Agreement, the amount of this letter of credit will be reduced accordingly. We have the right to a 25 year production period. As is customary in Angola, we are required to make contributions for Angolan social projects and academic scholarships for Angolan citizens. We made such an initial contribution in March 2010 after the signing of the Risk Services Agreement and will make additional contributions upon each commercial discovery, upon project development sanction and each year after the commencement of production. We have a 40% working interest in Block 21, with Nazaki, Alper and Sonangol P&P

30

Table of Contents

   *Richard A. Smith* joined Cobalt in October 2007 and currently serves as a Vice President. Mr. Smith has over 27 years of oil and gas industry experience in North American and international markets. Prior to joining Cobalt, from September 2005 to September 2007, Mr. Smith was Vice President, Joint Venture Development Corporate Affairs for the BP Russia Offshore Strategic Performance Unit, an oil and gas exploration and production unit of BP. From February 2002 to August 2005, he held the position of Vice President and then Executive Director for BP Exploration (Angola) Limited, an oil and gas exploration and production company operating in Angola. Mr. Smith's additional industry experience includes leadership positions at various companies in the oil and gas industry operating in Azerbaijan, Georgia, Turkey, the United Kingdom, the United States and Canada, as such positions pertain to new business strategy and development, commercial negotiation management, asset disposition rationalization, joint venture management, performance management and inter-company reorganizations. Further industry experience includes involvement in negotiations with various national governments, state oil companies and regulatory institutions relating to oil and natural gas operations. Mr. Smith holds a Bachelor of Commerce from the University of Calgary.

   *John P. Wilkirson* joined Cobalt in 2007 and currently serves as Vice President, Strategic Planning and Investor Relations. Mr. Wilkirson has over 25 years of experience in the energy industry. Prior to joining Cobalt, from 1998 to 2005, Mr. Wilkirson was Vice President, Strategic Planning and Economics of Unocal Corporation, where his primary responsibilities included identifying and addressing major strategic issues, managing the global asset and investment portfolio, leading the economic analysis and evaluations function and overseeing performance management. He played an instrumental role as the integration executive for Unocal Corporation's merger into Chevron Corporation. Prior to Unocal Corporation, from 1992 to 1997, Mr. Wilkirson was an Engagement Manager at McKinsey & Company, Inc., a management consulting firm, serving energy clients on strategy and performance improvement engagements. Additional industry experience includes positions at Exxon Company USA from 1980 to 1984 and Sohio Petroleum Company and British Petroleum from 1984 to 1991, in petroleum engineering and commercial assignments. Mr. Wilkirson has a Bachelor of Science with Highest Honors in Petroleum Engineering and a Master of Business Administration from the University of Texas at Austin.

**Item 1A.   *Risk Factors***

   *You should consider and read carefully all of the risks and uncertainties described below, together with all of the other information contained in this Annual Report on Form 10-K, including the consolidated financial statements and the related notes appearing at the end of this Annual Report on Form 10-K. If any of the following risks actually occurs, our business, business prospects, financial condition, results of operations or cash flows could be materially adversely affected. The risks below are not the only ones facing our company. Additional risks not currently known to us or that we currently deem immaterial may also adversely affect us. this Annual Report on Form 10-K also contains forward-looking statements, estimates and projections that involve risks and uncertainties. Our actual results could differ materially from those anticipated in the forward-looking statements as a result of specific factors, including the risks described below.*

**Risks Relating to Our Business**

**We have no proved reserves and areas that we decide to drill may not yield oil in commercial quantities or quality, or at all.**

   We have no proved reserves. We have identified prospects based on available seismic and geological information that indicates the potential presence of oil. However, the areas we decide to drill may not yield oil in commercial quantities or quality, or at all. Most of our current prospects are in various stages of evaluation that will require substantial additional seismic data reprocessing and interpretation. Even when properly used and interpreted, 2-D and 3-D seismic data and visualization

40

Table of Contents

techniques are only tools used to assist geoscientists in identifying subsurface structures and hydrocarbon indicators and do not enable the interpreter to know whether hydrocarbons are, in fact, present in those structures. Exploratory wells have been drilled on only three of our prospects. Accordingly, we do not know if any of our prospects will contain oil in sufficient quantities or quality to recover drilling and completion costs or to be economically viable. Even if oil is found on our prospects in commercial quantities, construction costs of oil pipelines or floating production systems, as applicable, and transportation costs may prevent such prospects from being economically viable.

Additionally, the analogies drawn by us from available data from other wells, more fully explored prospects or producing fields may not prove valid in respect of our drilling prospects. We may terminate our drilling program for a prospect if data, information, studies and previous reports indicate that the possible development of our prospect is not commercially viable and, therefore, does not merit further investment. If a significant number of our prospects do not prove to be successful, our business, financial condition and results of operations will be materially adversely affected.

Furthermore, recent pre-salt hydrocarbon discoveries in Brazil and onshore West Africa, and the successful results of drilling achieved there, may prove not to be analogies for our properties offshore West Africa. To date, no exploratory wells have been drilled which have targeted the pre-salt horizon in the deepwater offshore Angola and Gabon.

The inboard Lower Tertiary trend in the deepwater U.S. Gulf of Mexico, an area in which we intend to focus a substantial amount of our exploration efforts, has only recently been considered as a potentially economically viable production area due to the costs and difficulties involved in drilling for oil at such depths. To date there has not been commercially successful production in the Lower Tertiary trend. We may not be successful in developing commercially viable production in this trend.

***We face substantial uncertainties in estimating the characteristics of our prospects, so you should not place undue reliance on any of our estimates.***

In this Annual Report on Form 10-K we provide estimates of the characteristics of our prospects, such as the mean area (acres) and mean net pay thickness (feet), for the basins in which our prospects are located. These estimates may be incorrect, as the accuracy of these estimates is a function of the available data, geological interpretation and judgment. To date, only three of our prospects have been drilled. Any analogies drawn by us from other wells, prospects or producing fields may not prove to be accurate indicators of the success of developing reserves from our prospects. Furthermore, we have no way of evaluating the accuracy of the data from analog wells or prospects produced by other parties which we may use.

It is possible that none of the drilled wells will find underground accumulations of oil. Any significant variance between actual results and our assumptions could materially affect the quantities of oil attributable to any particular group of properties. In this Annual Report on Form 10-K, we refer to the "mean" of the estimated data. This measurement is statistically calculated based on a range of possible values of such estimates, with such ranges being particularly large in scope. Therefore, there may be large discrepancies between the mean estimate provided in this Annual Report on Form 10-K and our actual results.

***Drilling wells is speculative, often involving significant costs that may be more than our estimates, and may not result in any discoveries or additions to our future production or reserves. Any material inaccuracies in drilling costs, estimates or underlying assumptions will materially affect our business.***

Exploring for and developing oil reserves involves a high degree of operational and financial risk, which precludes definitive statements as to the time required and costs involved in reaching certain objectives. The budgeted costs of drilling, completing and operating wells are often exceeded and can increase significantly when drilling costs rise due to a tightening in the supply of various types of

41

Table of Contents

oilfield equipment and related services. Drilling may be unsuccessful for many reasons, including geological conditions, weather, cost overruns, equipment shortages and mechanical difficulties. Exploratory wells bear a much greater risk of loss than development wells. Moreover, the successful drilling of an oil well does not necessarily result in a profit on investment. With the exception of Heidelberg #2, all of the wells we plan to operate or participate in that are scheduled to be spud through mid-2010 are exploratory wells. A variety of factors, both geological and market-related, can cause a well to become uneconomic or only marginally economic. Our initial drilling sites, and any potential additional sites that may be developed, require significant additional exploration and development, regulatory approval and commitments of resources prior to commercial development. If our actual drilling and development costs are significantly more than our estimated costs, we may not be able to continue our business operations as proposed and would be forced to modify our plan of operation.

***Our identified drilling locations are scheduled out over several years, making them susceptible to uncertainties that could materially alter the occurrence or timing of their drilling.***

Our management team has identified and scheduled drilling locations on our acreage over a multi-year period. Our ability to drill and develop these locations depends on a number of factors, including the availability of equipment and capital, seasonal conditions, regulatory approvals, oil prices, costs and drilling results. The final determination on whether to drill any of these drilling locations will be dependent upon the factors described elsewhere in this Annual Report on Form 10-K as well as, to some degree, the results of our drilling activities with respect to our established drilling locations. Because of these uncertainties, we do not know if the drilling locations we have identified will be drilled within our expected timeframe or at all or if we will be able to economically produce oil from these or any other potential drilling locations. As such, our actual drilling activities may be materially different from our current expectations, which could adversely affect our results of operations and financial condition.

***We will not be the operator on all of our prospects, and, therefore, we will not be able to control the timing of exploration or development efforts, associated costs, or the rate of production of any non-operated assets.***

Currently, we expect that we will not be the operator on approximately 25% of our U.S. Gulf of Mexico blocks, and we will not be the operator on the Diaba Block offshore Gabon. As we carry out our exploration and development programs, we may enter into arrangements with respect to existing or future prospects that result in a greater proportion of our prospects being operated by others. As a result, we may have limited ability to exercise influence over the operations of the prospects operated by our partners. Dependence on the operator could prevent us from realizing our target returns for those prospects. Further, it may be difficult for us to pursue one of our key business strategies of minimizing the cycle time between discovery and initial production with respect to prospects for which we do not operate. The success and timing of exploration and development activities operated by our partners will depend on a number of factors that will be largely outside of our control, including:

- the timing and amount of capital expenditures;

- the operator's expertise and financial resources;

- approval of other participants in drilling wells;

- selection of technology; and

- the rate of production of reserves, if any.

This limited ability to exercise control over the operations of some of our prospects may cause a material adverse effect on our results of operations and financial condition.

42

Table of Contents

***We have no operating history and our future performance is uncertain.***

We are a development stage enterprise and will continue to be so until commencement of substantial production from our oil properties, which will depend upon successful drilling results, additional and timely capital funding, and access to suitable infrastructure. We do not expect to commence production until 2013 to 2015 in the U.S. Gulf of Mexico or until 2014 to 2016 offshore Angola and Gabon, and therefore we do not expect to generate any revenue from production until 2013 at the earliest. Companies in their initial stages of development face substantial business risks and may suffer significant losses. We have generated substantial net losses and negative cash flows from operating activities since our inception and expect to continue to incur substantial net losses as we continue our drilling program. We face challenges and uncertainties in financial planning as a result of the unavailability of historical data and uncertainties regarding the nature, scope and results of our future activities. New companies must develop successful business relationships, establish operating procedures, hire staff, install management information and other systems, establish facilities and obtain licenses, as well as take other measures necessary to conduct their intended business activities. We may not be successful in implementing our business strategies or in completing the development of the infrastructure necessary to conduct our business as planned. In the event that one or more of our drilling programs is not completed, is delayed or terminated, our operating results will be adversely affected and our operations will differ materially from the activities described in this Annual Report on Form 10-K. As a result of industry factors or factors relating specifically to us, we may have to change our methods of conducting business, which may cause a material adverse effect on our results of operations and financial condition.

***We are dependent on certain members of our management and technical team.***

Investors in our common stock must rely upon the ability, expertise, judgment and discretion of our management and the success of our technical team in identifying, discovering and developing oil reserves. Our performance and success are dependent, in part, upon key members of our management and technical team, and their loss or departure could be detrimental to our future success. In making a decision to invest in our common stock, you must be willing to rely to a significant extent on our management's discretion and judgment. The loss of any of our management and technical team members could have a material adverse effect on our results of operations and financial condition, as well as on the market price of our common stock. See "Management."

***Our business plan requires substantial additional capital, which we may be unable to raise on acceptable terms in the future, which may in turn limit our ability to develop our exploration and production plans.***

We expect our capital outlays and operating expenditures to increase substantially over at least the next several years as we expand our operations. Exploration and production plans and obtaining seismic data are very expensive, and we expect that we will need to raise substantial additional capital, through future private or public equity offerings, strategic alliances or debt financing, before we achieve commercialization of any of our properties.

Our future capital requirements will depend on many factors, including:

- the scope, rate of progress and cost of our exploration and production activities;

- oil and natural gas prices;

- our ability to locate and acquire hydrocarbon reserves;

- our ability to produce oil or natural gas from those reserves;

- the terms and timing of any drilling and other production-related arrangements that we may enter into;

43

Table of Contents

- the cost and timing of governmental approvals and/or concessions; and

- the effects of competition by larger companies operating in the oil and gas industry.

While we believe our operations will be adequately funded through 2011, we do not currently have any commitments for future external funding and we do not expect to generate any revenue from production before 2013. Additional financing may not be available on favorable terms, or at all. Even if we succeed in selling additional securities to raise funds, at such time the ownership percentage of our existing stockholders would be diluted, and new investors may demand rights, preferences or privileges senior to those of existing stockholders. If we raise additional capital through debt financing, the financing may involve covenants that restrict our business activities. If we choose to farm-out interests in our prospects, we may lose operating control over such prospects.

Assuming we are able to commence exploration and production activities or successfully exploit our properties during the primary lease term, our leases would extend beyond the primary term, generally for the life of production. If we are unable to drill an initial exploratory well or conduct such activity on such properties during this time, we may be subject to significant non-operating penalties and potential forfeiture of such properties. If we are not successful in raising additional capital, we may be unable to continue our exploration and production activities or successfully exploit our properties, and we may lose the rights to develop these properties upon the expiration of our leases.

***A substantial or extended decline in oil prices may adversely affect our business, financial condition and results of operations.***

The price that we will receive for our oil production will significantly affect our revenue, profitability, access to capital and future growth rate. Historically, the oil markets have been volatile and will likely continue to be volatile in the future. The prices that we will receive for our production and the levels of our production depend on numerous factors. These factors include, but are not limited to, the following:

- changes in supply and demand for oil and natural gas;

- the actions of the Organization of the Petroleum Exporting Countries ("OPEC");

- the price and quantity of imports of foreign oil and natural gas;

- speculation as to the future price of oil and the speculative trading of oil futures contracts;

- global economic conditions;

- political and economic conditions, including embargos, in oil-producing countries or affecting other oil-producing activities, particularly in the Middle East, Africa, Russia and South America;

- the continued threat of terrorism and the impact of military and other action, including U.S. military operations in the Middle East;

- the level of global oil exploration and production activity;

- the level of global oil inventories and oil refining capacities;

- weather conditions and other natural disasters;

- technological advances affecting energy consumption;

- domestic and foreign governmental regulations;

- proximity and capacity of oil pipelines and other transportation facilities;

- the price and availability of competitors' supplies of oil; and

44

Table of Contents

- the price and availability of alternative fuels.

Oil prices have fluctuated dramatically in recent times and will likely continue to be volatile in the future. Lower oil prices may not only decrease our revenues on a per unit basis but also may reduce the amount of oil that we can produce economically. A substantial or extended decline in oil prices may materially and adversely affect our future business, financial condition, results of operations, liquidity or ability to finance planned capital expenditures.

***Our inability to access appropriate equipment and infrastructure in a timely manner may hinder our access to oil markets or delay our production.***

Our ability to market our oil production will depend substantially on the availability and capacity of gathering systems, pipelines and processing facilities owned and operated by third parties. Our failure to obtain such services on acceptable terms could materially harm our business. We also rely on continuing access to drilling rigs suitable for the environment in which we operate. The delivery of the ENSCO 8503 and Ocean Monarch drilling rigs may be delayed or cancelled, and we may not be able to gain continued access to suitable rigs in the future. In addition, we will need to secure a rig in connection with our offshore Angola operations, which will require substantial involvement with Sonangol, who may consider factors other than our drill schedule. We may be required to shut in oil wells because of the absence of a market or because access to pipelines, gathering systems or processing facilities may be limited or unavailable. If that were to occur, then we would be unable to realize revenue from those wells until arrangements were made to deliver the production to market, which could cause a material adverse effect on our results of operations and financial condition.

***We are subject to numerous risks inherent to the exploration and production of oil.***

Oil exploration and production activities involve many risks that a combination of experience, knowledge and careful evaluation may not be able to overcome. Our future success will depend on the success of our exploration and production activities and on the future existence of the infrastructure that will allow us to take advantage of our findings. Additionally, our oil properties are located in deepwater, which generally increases the capital and operating costs, technical challenges and risks associated with oil exploration and production activities. As a result, our oil exploration and production activities are subject to numerous risks, including the risk that drilling will not result in commercially viable oil production. Our decisions to purchase, explore, develop or otherwise exploit prospects or properties will depend in part on the evaluation of seismic data through geophysical and geological analyses, production data and engineering studies, the results of which are often inconclusive or subject to varying interpretations.

Furthermore, the marketability of expected oil production from our prospects will also be affected by numerous factors. These factors include, but are not limited to, market fluctuations of prices, proximity, capacity and availability of pipelines, the availability of processing facilities, equipment availability and government regulations (including, without limitation, regulations relating to prices, taxes, royalties, allowable production, importing and exporting of oil, environmental protection and climate change). The effect of these factors, individually or jointly, may result in us not receiving an adequate return on invested capital.

In the event that our drilling programs are developed and become operational, they may not produce oil in commercial quantities or at the costs anticipated, and our projects may cease production, in part or entirely, in certain circumstances. Drilling programs may become uneconomic as a result of an increase in operating costs to produce oil. Our actual operating costs may differ materially from our current estimates. Moreover, it is possible that other developments, such as increasingly strict environmental, health and safety laws and regulations and enforcement policies thereunder and claims for damages to property or persons resulting from our operations, could result in substantial costs and liabilities, delays, an inability to complete our drilling programs or the abandonment of such drilling programs, which could cause a material adverse effect on our results of operations and financial condition.

Table of Contents

***We are subject to drilling and other operational hazards.***

The oil business involves a variety of operating risks, including, but not limited to:

- blowouts, cratering and explosions;

- mechanical and equipment problems;

- uncontrolled flows of oil or well fluids;

- fires;

- marine hazards with respect to offshore operations;

- formations with abnormal pressures;

- pollution and other environmental risks; and

- natural disasters.

These risks are particularly acute in deepwater drilling and exploration. Any of these events could result in loss of human life, significant damage to property, environmental damage, impairment of our operations and substantial losses. In accordance with customary industry practice, we expect to maintain insurance against some, but not all, of these risks and losses. The occurrence of any of these events whether or not covered by insurance, could have a material adverse effect on our financial position and results of operations.

***The development schedule of oil projects, including the availability and cost of drilling rigs, equipment, supplies, personnel and oilfield services, is subject to delays and cost overruns.***

Historically, some oil projects have experienced delays and capital cost increases and overruns due to, among other factors, the unavailability or high cost of drilling rigs and other essential equipment, supplies, personnel and oilfield services. The cost to develop our projects has not been fixed and remains dependent upon a number of factors, including the completion of detailed cost estimates and final engineering, contracting and procurement costs. Our construction and operation schedules may not proceed as planned and may experience delays or cost overruns. Any delays may increase the costs of the projects, requiring additional capital, and such capital may not be available in a timely and cost-effective fashion.

***Our operations will involve special risks that could adversely affect operations.***

Offshore operations are subject to a variety of operating risks specific to the marine environment, such as capsizing, collisions and damage or loss from hurricanes or other adverse weather conditions. These conditions can cause substantial damage to facilities and interrupt our operations. As a result, we could incur substantial expenses that could reduce or eliminate the funds available for exploration, development or leasehold acquisitions, or result in loss of equipment and properties. In particular, we are not intending to put in place business interruption insurance due to the fact that this is not economically viable, and therefore we may not be able to rely on insurance coverage in the event of such natural phenomena.

Deepwater exploration generally involves greater operational and financial risks than exploration on the shelf. Deepwater drilling generally requires more time and more advanced drilling technologies, involving a higher risk of technological failure and usually higher drilling costs. Such risks are particularly applicable to our deepwater exploration efforts in the Lower Tertiary trend and pre-salt offshore Angola and Gabon, as there has been limited drilling activity in these areas. In addition, there may be production risks of which we are currently unaware. Whether we use existing pipeline infrastructure, participate in the development of new subsea infrastructure or use floating production

46

Table of Contents

systems to transport oil from producing wells, if any, these operations may require substantial time for installation, or encounter mechanical difficulties and equipment failures that could result in significant cost overruns and delays. Furthermore, deepwater operations generally, and operations in the Lower Tertiary and offshore West Africa trends in particular, lack the physical and oilfield service infrastructure present on the shelf. As a result, a significant amount of time may elapse between a deepwater discovery and the marketing of the associated oil, increasing both the financial and operational risk involved with these operations. Because of the lack and high cost of this infrastructure, reserve discoveries we make in the deepwater, if any, may never be economically producible.

***Our operations in the U.S. Gulf of Mexico may be adversely impacted by tropical storms and hurricanes.***

Tropical storms, hurricanes and the threat of tropical storms and hurricanes often result in the shutdown of operations in the U.S. Gulf of Mexico as well as operations within the path and the projected path of the tropical storms or hurricanes. In the future, during a shutdown period, we may be unable to access wellsites and our services may be shut down. Additionally, tropical storms or hurricanes may cause evacuation of personnel and damage to offshore drilling rigs and other equipment, which may result in suspension of our operations. The shutdowns, related evacuations and damage can create unpredictability in activity and utilization rates, as well as delays and cost overruns, which may have a material adverse impact on our financial condition and results of operations.

***The geographic concentration of our properties in the U.S. Gulf of Mexico and offshore Angola and Gabon subjects us to an increased risk of loss of revenue or curtailment of production from factors specifically affecting the U.S. Gulf of Mexico and offshore Angola and Gabon.***

Our properties are concentrated in two regions: the U.S. Gulf of Mexico and offshore Angola and Gabon. Some or all of these properties could be affected should such regions experience:

- severe weather;

- delays or decreases in production, the availability of equipment, facilities, personnel or services;

- delays or decreases in the availability of capacity to transport, gather or process production; and/or

- changes in the regulatory and fiscal environment.

For example, oil properties located in the U.S. Gulf of Mexico were significantly damaged by Hurricanes Katrina and Rita, which required our competitors to spend a significant amount of time and capital on inspections, repairs, debris removal, and the drilling of replacement wells. Furthermore, oil properties offshore Angola and Gabon are subject to higher country risks than those properties under the sovereignty of the United States. We plan to maintain insurance coverage for only a portion of these risks. There also may be certain risks covered by insurance where the policy does not reimburse us for all of the costs related to a loss.

Due to the concentrated nature of our portfolio of properties, a number of our properties could experience any of the same conditions at the same time, resulting in a relatively greater impact on our results of operations than they might have on other companies that have a more diversified portfolio of properties.

***Our non-U.S. operations may be adversely affected by political and economic circumstances in the countries in which we operate.***

Our non-U.S. oil exploration, development and production activities are subject to political and economic uncertainties (including but not limited to changes, sometimes frequent or marked, in energy policies or the personnel administering them), expropriation of property, cancellation or modification of contract rights, foreign exchange restrictions, currency fluctuations, royalty and tax increases and other

47

Table of Contents

risks arising out of foreign governmental sovereignty over the areas in which our operations are conducted, as well as risks of loss due to civil strife, acts of war, guerrilla activities and insurrection. These risks may be higher in the developing countries in which we conduct our activities, namely, Angola and Gabon.

On June 8, 2009, Omar Bongo Ondimba, who had served as president of Gabon since 1967, passed away. While to date there has been little evidence of instability resulting from the succession of political and military power in Gabon, there can be no assurance that instability in the region will not result from Omar Bongo Ondimba's passing.

Our operations in these areas increase our exposure to risks of war, local economic conditions, political disruption, civil disturbance and governmental policies that may:

- disrupt our operations;

- restrict the movement of funds or limit repatriation of profits;

- lead to U.S. government or international sanctions; and

- limit access to markets for periods of time.

Countries in West Africa have experienced political instability in the past. Disruptions may occur in the future, and losses caused by these disruptions may occur that will not be covered by insurance. Consequently, our non-U.S. exploration, development and production activities may be substantially affected by factors which could have a material adverse effect on our financial condition and results of operations. Furthermore, in the event of a dispute arising from non-U.S. operations, we may be subject to the exclusive jurisdiction of courts outside the U.S. or may not be successful in subjecting non-U.S. persons to the jurisdiction of courts in the U.S., which could adversely affect the outcome of such dispute.

***The oil and gas industry, including the acquisition of exploratory acreage in the U.S. Gulf of Mexico and offshore West Africa, is intensely competitive.***

The international oil and gas industry, including the U.S. Gulf of Mexico and West Africa, is highly competitive in all aspects, including the exploration for, and the development of, new sources of supply. We operate in a highly competitive environment for acquiring exploratory acreage and hiring and retaining trained personnel. Many of our competitors possess and employ financial, technical and personnel resources substantially greater than us, which can be particularly important in the areas in which we operate. These companies may be able to pay more for productive oil properties and prospects and to evaluate, bid for and purchase a greater number of properties and prospects than our financial or personnel resources permit. Furthermore, these companies may also be better able to withstand the financial pressures of unsuccessful drill attempts, sustained periods of volatility in financial markets and generally adverse global and industry-wide economic conditions, and may be better able to absorb the burdens resulting from changes in relevant laws and regulations, which would adversely affect our competitive position. Our ability to acquire additional prospects and to find and develop reserves in the future will depend on our ability to evaluate and select suitable properties and to consummate transactions in a highly competitive environment. Also, there is substantial competition for available capital for investment in the oil and gas industry. As a result of these and other factors, we may not be able to compete successfully in an intensely competitive industry, which could cause a material adverse effect on our results of operations and financial condition.

48

Table of Contents

*Participants in the oil and gas industry are subject to complex laws that can affect the cost, manner or feasibility of doing business.*

Exploration and production activities in the oil and gas industry are subject to extensive local, state, federal and international regulations. We may be required to make large expenditures to comply with governmental regulations, particularly in respect of the following matters:

- licenses for drilling operations;

- royalty increases, including retroactive claims;

- drilling and development bonds;

- reports concerning operations;

- the spacing of wells;

- unitization of oil accumulations;

- remediation or investigation activities for environmental purposes; and

- taxation.

Under these and other laws and regulations, we could be liable for personal injuries, property damage and other types of damages. Failure to comply with these laws and regulations also may result in the suspension or termination of our operations and subject us to administrative, civil and criminal penalties. Moreover, these laws and regulations could change in ways that could substantially increase our costs. Any such liabilities, penalties, suspensions, terminations or regulatory changes could have a material adverse effect on our financial condition and results of operations.

*We and our future operations are subject to numerous environmental, health and safety regulations which may result in material liabilities and costs.*

We are, and our future operations will be, subject to various international, foreign, federal, state and local environmental, health and safety laws and regulations governing, among other things, the emission and discharge of pollutants into the ground, air or water, the generation, storage, handling, use and transportation of regulated materials and the health and safety of our employees. We are required to obtain environmental permits from governmental authorities for certain of our operations, including drilling permits for our wells. There is a risk that we have not been or will not be at all times in complete compliance with these permits and the environmental laws and regulations to which we are subject. If we violate or fail to comply with these laws, regulations or permits, we could be fined or otherwise sanctioned by regulators, including through the revocation of our permits or the suspension or termination of our operations. If we fail to obtain permits in a timely manner or at all (due to opposition from community or environmental interest groups, governmental delays, or any other reasons), such failure could impede our operations, which could have a material adverse effect on our results of operations and our financial condition.

We, as the named lessee or as the designated operator under our current and future oil leases, could be held liable for all environmental, health and safety costs and liabilities arising out of our actions and omissions as well as those of our third-party contractors. To the extent we do not address these costs and liabilities or if we are otherwise in breach of our lease requirements, our leases could be suspended or terminated. We have contracted with and intend to continue to hire third parties to perform the majority of the drilling and other services related to our operations. There is a risk that we may contract with third parties with unsatisfactory environmental, health and safety records or that our contractors may be unwilling or unable to cover any losses associated with their acts and omissions. Accordingly, we could be held liable for all costs and liabilities arising out of the acts or omissions of

49

Table of Contents

our contractors, which could have a material adverse effect on our results of operations and financial condition.

As the designated operator of our leases, we are required to maintain bonding or insurance coverage for certain risks relating to our operations, including environmental risks. We maintain insurance at levels that we believe are consistent with industry practices, but we are not fully insured against all risks. Our insurance may not cover any or all environmental claims that might arise from our operations or those of our third-party contractors. If a significant accident or other event occurs and is not fully covered by our insurance, or our third-party contractors have not agreed to bear responsibility, such accident or event could have a material adverse effect on our results of operations and our financial condition. In addition, we may not be able to obtain required bonding or insurance coverage at all or in time to meet our anticipated startup schedule for each well, and if we fail to obtain this bonding or coverage, such failure could have a material adverse effect on our results of operations and financial condition.

Releases to deepwater of regulated substances are possible, and under certain environmental laws, we could be held responsible for all of the costs relating to any contamination caused by us or our contractors, at our facilities and at any third party waste disposal sites used by us or on our behalf. In addition, offshore oil exploration and production involves various hazards, including human exposure to regulated substances, including naturally occurring radioactive materials. As such, we could be held liable for any and all consequences arising out of human exposure to such substances or other damage resulting from the release of hazardous substances to the environment, endangered species, property or to natural resources.

In addition, we expect continued attention to climate change issues. Various countries and U.S. states and regions have agreed to regulate emissions of greenhouse gases, including methane (a primary component of natural gas) and carbon dioxide, a byproduct of oil and natural gas combustion. The U.S. Environmental Protection Agency announced its intention to regulate greenhouse gas emissions beginning in 2011. The U.S. federal government is actively considering national greenhouse gas regulation, having proposed bills which would require greenhouse gas emissions reductions. A final law could be adopted this or next year. The regulation of greenhouse gases and the physical impacts of climate change in the areas in which we, our customers and the end-users of our products operate could adversely impact our operations and the demand for our products.

Environmental, health and safety laws are complex, change frequently and have tended to become increasingly stringent over time. Our costs of complying with current and future environmental, health and safety laws, and our liabilities arising from releases of, or exposure to, regulated substances may adversely affect our results of operations and our financial condition. See "Business—Environmental Matters and Regulation."

***Non-U.S. holders of our common stock, in certain situations, could be subject to U.S. federal income tax upon the sale, exchange or other disposition of our common stock.***

We believe that we are, and will remain for the foreseeable future, a U.S. real property holding corporation for U.S. federal income tax purposes. As a result, under the Foreign Investment in Real Property Tax Act ("FIRPTA"), certain non-U.S. investors may be subject to U.S. federal income tax on gain from the disposition of shares of our common stock, in which case they would also be required to file U.S. tax returns with respect to such gain. Whether these FIRPTA provisions apply depends on the amount of our common stock that such non-U.S. investors hold and whether, at the time they dispose of their shares, our common stock is regularly traded on an established securities market (such as the NYSE) within the meaning of the applicable Treasury Regulations. So long as our common stock is listed on the NYSE, only a non-U.S. investor who has held, actually or constructively, more than 5% of

50

Table of Contents

our common stock may be subject to U.S. federal income tax on the disposition of our common stock under FIRPTA.

***We may be exposed to liabilities under the Foreign Corrupt Practices Act, and any determination that we violated the Foreign Corrupt Practices Act could have a material adverse effect on our business.***

We are subject to the Foreign Corrupt Practices Act ("FCPA") and other laws that prohibit improper payments or offers of payments to foreign governments and their officials and political parties for the purpose of obtaining or retaining business. We do business and may do additional business in the future in countries and regions in which we may face, directly or indirectly, corrupt demands by officials, tribal or insurgent organizations, or private entities. Thus, we face the risk of unauthorized payments or offers of payments by one of our employees or consultants, given that these parties may not always be subject to our control. Our existing safeguards and any future improvements may prove to be less than effective, and our employees and consultants may engage in conduct for which we might be held responsible. In connection with entering into our Risk Services Agreements for Blocks 9 and 21 offshore Angola, two Angolan-based E&P companies were assigned to us as part of the contractor group by the Angolan government. We have not worked with either of these companies in the past, and, therefore, our familiarity with these companies is limited. Violations of the FCPA may result in severe criminal or civil sanctions, and we may be subject to other liabilities, which could negatively affect our business, operating results and financial condition. In addition, the government may seek to hold us liable for successor liability FCPA violations committed by companies in which we invest or that we acquire.

***We may incur substantial losses and become subject to liability claims as a result of future oil and natural gas operations, for which we may not have adequate insurance coverage.***

We intend to maintain insurance against risks in the operation of the business we plan to develop and in amounts in which we believe to be reasonable. Such insurance, however, may contain exclusions and limitations on coverage. We may elect not to obtain insurance if we believe that the cost of available insurance is excessive relative to the risks presented. Losses and liabilities arising from uninsured and underinsured events could materially and adversely affect our business, financial condition or results of operations.

## Risks Relating to our Common Stock

***Our stock price may be volatile, and investors in our common stock could incur substantial losses.***

Our stock price may be volatile. The stock market in general has experienced extreme volatility that has often been unrelated to the operating performance of particular companies. The market price for our common stock may be influenced by many factors, including, but not limited to:

- the price of oil and natural gas;

- the success of our exploration and development operations, and the marketing of any oil we produce;

- regulatory developments in the United States and foreign countries where we operate;

- the recruitment or departure of key personnel;

- quarterly or annual variations in our financial results or those of companies that are perceived to be similar to us;

- market conditions in the industries in which we compete and issuance of new or changed securities;

Table of Contents

- analysts' reports or recommendations;

- the failure of securities analysts to cover our common stock or changes in financial estimates by analysts;

- the inability to meet the financial estimates of analysts who follow our common stock;

- the issuance of any additional securities of ours;

- investor perception of our company and of the industry in which we compete; and

- general economic, political and market conditions.

***A substantial portion of our total outstanding shares may be sold into the market at any time. This could cause the market price of our common stock to drop significantly, even if our business is doing well.***

All of the shares sold in our initial public offering are freely tradable without restrictions or further registration under the federal securities laws, unless purchased by our "affiliates" as that term is defined in Rule 144 under the Securities Act of 1933, as amended (the "Securities Act"). Substantially all the remaining shares of common stock are restricted securities as defined in Rule 144 under the Securities Act. Restricted securities may be sold in the U.S. public market only if registered or if they qualify for an exemption from registration, including by reason of Rules 144 or 701 under the Securities Act. All of our restricted shares will be eligible for sale in the public market in late 2010, subject in certain circumstances to the volume, manner of sale and other limitations under Rule 144. Additionally, we have registered all shares of our common stock that we may issue under our employee and director benefit plans. These shares can be freely sold in the public market upon issuance, unless pursuant to their terms these stock awards have transfer restrictions attached to them. Sales of a substantial number of shares of our common stock, or the perception in the market that the holders of a large number of shares intend to sell shares, could reduce the market price of our common stock.

***The concentration of our capital stock ownership among our largest stockholders, and their affiliates.***

Our four largest stockholders collectively own approximately 76% of our outstanding common stock. Consequently, these stockholders have significant influence over all matters that require approval by our stockholders, including the election of directors and approval of significant corporate transactions. This concentration of ownership will limit your ability to influence corporate matters, and as a result, actions may be taken that you may not view as beneficial.

***Provisions of our certificate of incorporation and by-laws could discourage potential acquisition proposals and could deter or prevent a change in control.***

Some provisions in our certificate of incorporation and by-laws, as well as Delaware statutes, may have the effect of delaying, deferring or preventing a change in control. These provisions, including those providing for the possible issuance of shares of our preferred stock and the right of the board of directors to amend the by-laws, may make it more difficult for other persons, without the approval of our board of directors, to make a tender offer or otherwise acquire a substantial number of shares of our common stock or to launch other takeover attempts that a stockholder might consider to be in his or her best interest. These provisions could limit the price that some investors might be willing to pay in the future for shares of our common stock.

***We are a "controlled company" within the meaning of the NYSE rules and, as a result, we qualify for and rely on exemptions from certain corporate governance requirements.***

Funds affiliated with First Reserve Corporation, Goldman, Sachs & Co., Riverstone Holdings LLC and The Carlyle Group, and KERN Partners Ltd. and certain limited partners in such funds affiliated with KERN Partners Ltd., respectively, control a majority of the voting power of our outstanding

Table of Contents

common stock. Consequently we are a "controlled company" within the meaning of the NYSE corporate governance standards. Under the NYSE rules, a company of which more than 50% of the voting power is held by another person or group of persons acting together is a "controlled company" and may elect not to comply with certain NYSE corporate governance requirements, including the requirements that:

- a majority of the board of directors consist of independent directors;

- the nominating and corporate governance committee be composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities;

- the compensation committee be composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities; and

- there be an annual performance evaluation of the nominating and corporate governance and compensation committees.

We are currently treated as a controlled company and utilize these exemptions, including the exemption for a board of directors composed of a majority of independent directors. In addition, although we have adopted charters for our audit, nominating and corporate governance and compensation committees and intend to conduct annual performance evaluations for these committees, none of these committees are presently composed entirely of independent directors. Accordingly, you may not have the same protections afforded to stockholders of companies that are subject to all of the NYSE corporate governance requirements.

**Item 1B.** *Unresolved Staff Comments*

Not applicable.

**Item 2.** *Properties*

Please refer to the information under the captions "Business—Deepwater U.S. Gulf of Mexico" and "Business—West Africa Deepwater" elsewhere in this Annual Report on Form 10-K.

**Item 3.** *Legal Proceedings*

We are not currently party to any legal proceedings. However, from time to time we may be subject to various lawsuits, claims and proceedings that arise in the normal course of business, including employment, commercial, environmental, safety and health matters. It is not presently possible to determine whether any such matters will have a material adverse effect on our consolidated financial position, results of operations, or liquidity.

**Item 4.** *(Removed and Reserved)*

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**Cobalt International Energy, Inc.**

By:     /s/ JOSEPH H. BRYANT

Name:     Joseph H. Bryant
Title:     *Chairman of the Board of Directors and Chief Executive Officer*

Dated: March 30, 2010

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ JOSEPH H. BRYANT<br>Joseph H. Bryant | Chairman of the Board of Directors and Chief Executive Officer (Principal Executive Officer) | March 30, 2010 |
| /s/ RODNEY L. GRAY<br>Rodney L. Gray | Chief Financial Officer and Executive Vice President (Principal Financial Officer and Principal Accounting Officer) | March 30, 2010 |
| /s/ GREGORY A. BEARD<br>Gregory A. Beard | Director | March 30, 2010 |
| /s/ PETER R. CONEWAY<br>Peter R. Coneway | Director | March 30, 2010 |
| /s/ HENRY CORNELL<br>Henry Cornell | Director | March 30, 2010 |
| /s/ JACK E. GOLDEN<br>Jack E. Golden | Director | March 30, 2010 |

81

Table of Contents

| Signature | Title | Date |
|---|---|---|
| /s/ KENNETH W. MOORE | Director | March 30, 2010 |
| Kenneth W. Moore | | |
| /s/ J. HARDY MURCHISON | Director | March 30, 2010 |
| J. Hardy Murchison | | |
| /s/ KENNETH A. PONTARELLI | Director | March 30, 2010 |
| Kenneth A. Pontarelli | | |
| /s/ MYLES W. SCOGGINS | Director | March 30, 2010 |
| Myles W. Scoggins | | |
| /s/ D. JEFF VAN STEENBERGEN | Director | March 30, 2010 |
| D. Jeff van Steenbergen | | |
| /s/ MARTIN H. YOUNG, JR. | Director | March 30, 2010 |
| Martin H. Young, Jr. | | |

82

# EXHIBIT 6



global witness

**For immediate release: 20th May 2010**

## Goldman Sachs backs Angolan oil deal despite corruption risks

The investment bank Goldman Sachs is backing an oil deal in Angola by U.S. firm Cobalt International Energy, despite a risk that local partners in the deal could expose Cobalt to prosecution for corruption in the United States, Global Witness revealed today.

Goldman Sachs is a major shareholder in Cobalt and two of its executives sit on Cobalt's board. Agreements with the Angolan state oil company, Sonangol, give Cobalt shares in two Angolan oil exploration blocks and assign it two local partners, Alper Oil Limitada and Nazaki Oil and Gáz S.A.[1]

Alper and Nazaki are obscure companies with no visible industry track record. This is a serious concern as Angola is a poor country afflicted by severe corruption: many observers believe that small and little-known companies are used as fronts by top Angolan officials to enrich themselves privately.[2]

Cobalt has gone ahead with the deal, which was executed at the end of February, even though it warned in its own U.S. regulatory filings: "We have not worked with either of these companies in the past, and, therefore, our familiarity with these companies is limited. Violations of the FCPA [Foreign Corrupt Practices Act] may result in severe criminal or civil sanctions, and we may be subject to other liabilities, which could negatively affect our business, operating results and financial condition."[3]

"It seems extraordinary that Goldman Sachs would back this kind of deal in Angola, a notoriously corrupt country, at a time when the bank's own business ethics in the United States are under heavy fire," said Diarmid O'Sullivan of Global Witness. Last month, Goldman Sachs was charged with fraud by U.S. authorities in relation to its dealings with mortgage-backed securities in the United States.[4] The Wall Street bank has denied any wrongdoing.

Cobalt will operate the two blocks, meaning it will be in charge of drilling for oil, with Sonangol, Nazaki Oil and Gáz and Alper Oil as its minority partners. Sonangol declined to explain to Global Witness why it chose these two companies. Alper Oil's website provides little detailed information about its activities, not even a contact phone number. Nazaki Oil and Gáz does not have a website.

Nazaki Oil and Gáz is covering its own costs but Alper Oil's upfront costs are being paid by Cobalt, which aims to recoup them out of future revenues. So Alper Oil could make huge profits if oil is found, without investing any capital upfront or taking any risks, and loses nothing if no oil is found.

Transparent management of the oil sector is crucial to the economic future of Angola, a country so poor that the average life expectancy is a mere 46.5 years.[5] But Sonangol's actions raise serious concerns about whether it is acting in the public interest or the interests of the ruling elite.

In March 2010, Global Witness revealed that Sonangol nominated a son-in-law of President dos Santos of Angola to the board of a key investment vehicle. In August 2009 we revealed that a private company, pre-qualified by Sonangol to bid for oil rights, had shareholders with the same names as top officials, including Sonangol's chairman.[6] Sonangol declined to comment on these cases.

Cobalt replied to written questions from Global Witness on its own behalf and that of its shareholders, including Goldman Sachs. Cobalt's letter said: "Please be assured that we have devoted considerable resources towards mitigating the specific risks identified in the statements that you have included in your letter". Cobalt's letter also said that the company had retained two law firms for the "specific purpose" of addressing these risks and continued to work closely with them.

However Cobalt declined to answer specific questions about the deal, including a request to identify the ultimate beneficial owners of Alper Oil and Nazaki Oil and Gáz, on the grounds that this would

"involve selective disclosure of non-public company information and, in some cases, to do so would also be a breach of the confidentiality provisions of agreements by which [Cobalt] are bound."[7]

So it is not clear whether or not Cobalt and its investors know who the ultimate beneficial owners of these companies are. "In the highly corrupt and predatory environment of Angola, the public is being asked to take it on trust that deals with opaque partners are ethical. After the sharp practices of the credit crunch and the fraud charges levelled against Goldman Sachs in the United States, this is a tall order," said O'Sullivan of Global Witness.

He added: "There is an urgent need for the United States and other major jurisdictions to impose tougher regulations on overseas oil investment. The Energy Security through Transparency Act, currently under consideration in the US Senate, would help satisfy this need."

**/ Ends**

**For further information, please contact:**

**Diarmid O'Sullivan on +44 207 492 5863 or +44 7872 620 955**

**Graham Lee on +44 207 492 5862 or +44 7790 965 397**

Notes

1. Cobalt International Energy. 10-K filing to the Securities and Exchange Commission for 2009. Page 5. 424B1 Prospectus. Page 106. Both accessed at www.sec.gov
2. Global Witness confidential interviews with foreign and domestic observers of the Angolan oil industry. See also United States Department of State, Angola human rights report for 2009, Section 4. Official Corruption and Government Transparency. Accessed at www.state.gov
3. Cobalt International Energy. 10-K filing for 2009. Page 51.
4. Securities and Exchange Commission. SEC Charges Goldman Sachs With Fraud in Structuring and Marketing of CDO Tied to Subprime Mortgages. Press release. 16th April 2010. Accessed at www.sec.gov
5. United Nations Development Programme. Human Development Report 2009. Country Fact Sheet Angola. Accessed at www.undp.org
6. Global Witness. Link between Angolan president's son-in-law and state oil company raises questions about transparency. 15th March 2010. Private oil firm's shareholders have same names as top government officials. 4th August 2009. Accessible at www.globalwitness.org
7. Letter to Global Witness from Cobalt International Energy. 18th May 2010.

Global Witness investigates and campaigns to end natural resource-related conflict and corruption and associated environmental and human rights abuses.

# EXHIBIT 7



WHAT IS MAKA?    CORRUPTION GALLERY    NEWSROOM    CONTACT    Search 

When corruption in Angola is easier than in Nigeria

The Angolan Presidency: the epicentre of corruption



# President's three henchmen lead the plunder of state assets in Angola

by **RAFAEL** on **JULY 30, 2010** · **5 COMMENTS**

Lisbon – In his latest report, "The Angolan Presidency: The Epicentre of Corruption", Angolan journalist and human rights activist Rafael Marques de Morais focuses on the illicit business links of a powerful triumvirate of officials close to President José Eduardo dos Santos.

These officials are the head of the Military Bureau of the Presidency, the head of Telecommunications at the Presidency, and the CEO and chair of national oil company Sonangol, respectively General Manuel Hélder Vieira Dias Júnior "Kopelipa", General Leopoldino Fragoso do Nascimento, and Manuel Vicente.

"Their dealings acknowledge no distinction between public and private affairs, and this has allowed them to channel millions of dollars worth of state assets into their own private businesses," Marques de Morais says.

One of the tools used by these officials for their private operations, according to the report, is the power and the international reputation of Sonangol as well as their influence on the presidential decisions as the head of the executive, which approves all investments worth over five million dollars.  Through their company Nazaki, the trio established a partnership with Sonangol and Cobalt, a US oil company listed in the New York Stock Exchange. This consortium holds the license to

SEJA ASSINANTE | SUBSCRIBE

Seja assinante por e-mail | subscribe e-mail

**Subscreva**

TWITTER UPDATES

*PCA da TPA gere a estaãçÃ£o no aviÃ£o* *http://t.co/WvsL0f0l*

*EspectÃ¡culo dâOs Lambas sob fortes medidas de seguranÃ§a* *http://t.co/2yvay2CV*

*(English) Corruption in Angola: An Impediment to Democracy* *http://t.co/q0IPMK3S*

*Kopelipa e Manuel Vicente â Os vendedores de casas sociais* *http://t.co/rBSBmsoh*

*Angola's youth lead the way to unseat President dos Santos.* *http://t.co/KDzibOys*

LÍNGUA | LANGUAGE

English

Português

CATEGORIES

Corruption

Democracy

explore two deepwater oil blocks ( 9 and 21) in Angola, awarded by the executive without public tender.

With Sonangol and the Brazilian multinational Odebrecht, the group also formed a consortium, through their company Damer, for a  272.3 million dollar project for sugar, ethanol and biofuels production. This project was approved by the Council of Ministers.

The same individuals, according to the report, used senior military officials in the presidency as fronts for a company, Portmill, which paid 375 million dollars for the purchase of 24% of the shares in the Portuguese Banco Espírito Santo. The same company received 40% shares in the recently privatised mobile phone company Movicel. The report questions the origin of the incredible sum of money paid by the military officers, assigned to the presidential staff, to the Portuguese bank. It also raises the question of whether Banco Espírito Santo is willfully involved in laundering money either stolen from the state coffers or of obscure origin.

The author details how the Generals Kopelipa and Dino and Manuel Vicente also built a media empire to strategically control the private media sector, among other business interests.

"These officials break the laws with blatant impunity", says Marques de Morais. He explains that "the law on the Crimes Committed by Public Office Bearers, in force since 1990, forbids public officials from engaging in business deals with the state or even private ones in which they have power of decision or influence, for personal benefit."

The author further argues that while there is a growing pressure on governments and companies to be more transparent, with initiatives such as the Extractive Industries Transparency Initiative (EITI) and Publish What You Pay, "in Angola, such safeguards exist only on paper and the same names of prominent officials and generals come up time and time again in their double life as the country's political and business elite."

Furthermore, according to Marques de Morais, "the complex web of political/military/economic power is lubricated by funds either plundered from the state or of obscure origin, and often in partnership with foreign companies and governments."

Marques de Morais, who has been investigating corruption in his country for years, has little faith in the President's public stand against corruption. "In reality, the zero tolerance policy against corruption, trumpeted by President Dos Santos, stands as a mere mask covering up the plunder of the country by his inner circle," he says.

Human Rights

News flash

Opinion

General Affairs

TAGS

# corruption
Corruption  democracy  football

SOBRE O MAKA ANGOLA | ABOUT MAKA ANGOLA

Maka Angola is dedicated to the struggle against corruption in Angola. It provides news, opinion pieces and analysis of the Angolan political economy.

LIGAÇÕES ÚTEIS | USEFUL LINKS

African Safari: CIF's Grab for Oil and Minerals

Angola's youth lead the way to unseat President dos Santos

Democracy in Africa

ARCHIVES

October 2011

September 2011

November 2010

October 2010

September 2010

July 2010

June 2010

May 2010

March 2010

February 2010

December 2009

November 2009

September 2009

Some western governments, spearheaded by the United States, have been jostling for political influence and access to Angola's oil and other riches, and have paid lip service to the need for good governance in the country. On July 8 2010 The US and Angola signed a Strategic Partnership Dialogue to increase "energy, security, trade and democracy promotion", according to the State Department.

Meanwhile, other major economic players in Angola, such as China, Brazil and Portugal fuel outright corruption through oil-backed loans and opaque economic bilateral agreements. This ensures that nothing much changes in the oil- and resource-rich southern African country, except that the sums of money involved get bigger and bigger.

"The spoils of power in Angola are shared by the few, while the many remain poor," Marques de Morais concludes.

### Contact details

**Rafael Marques de Morais** – Mobile Phone: +351 914 101 323
E-mail: rm_demorais@hotmail.com
Website: www.makaangola.com

*Tagged with: Corruption • corruption*

---

If you enjoyed this article, please consider sharing it!   

## 5 Responses to *president's three henchmen lead the plunder of state assets in angola*

**Helder** says:
Thursday August 5th, 2010 at 09:12 AM

Rafael, Neste momento apenas a parte intelectual da nacao reconhece os teus esforcos + sei que ha de chegar o dia em que te precisaremos para assumir cargos de decisao nesta terra tao marterizada. Nacionalistas de verdade como tu fazem-se ter orgulho de ser Angolano.

Continue o bom Trabalho

Cumprimentos

**Alberto do Uige** says:
Saturday November 6th, 2010 at 06:56 PM

isto mesmo que mostra O verdadeiro filho da terra que ama O seu povo sem pensar nos interces pessoais mais fazem O seu trabalho comforme aprendeu sem se deixar nas corrupsões e eu te dei muita felicitasão mais uma coisa eu como irmão te aconselho cuida-te bem os invejosos vão procurar maneira de

October 2008

RECENT POSTS

(Português) PCA da TPA gere a estação no avião

(Português) Espectáculo d'Os Lambas sob fortes medidas de segurança

Corruption in Angola: An Impediment to Democracy

The ill-gotten gains behind the Kilamba housing development

Mercedes-Benz and influence peddling in Angola

Angolan Parliament splashes over $43 million on BMWs

The Angolan Presidency: the epicentre of corruption

President's three henchmen lead the plunder of state assets in Angola

When corruption in Angola is easier than in Nigeria

Manuel Vicente's raid on Sonangol

Foul Play: Corruption and the 2010 Africa Cup of Nations

UNICER: Brewing corruption in Angola (updated version)

MPLA, Ltd.

The business dealings of Angolan Members of Parliament

The influence-peddling of Grupo Gema

POLL

**How Is My Site?**

○ Good

○ Excellent

se debarrasar de ti que Deus O grande protector te protegem
nos teus passos;

muito Obrigado pelos E.mail
angolano de verdade.

○ Bad

○ Can Be Improved

○ No Comments

[ Vote ]     View Results

**Alberto** says:
Wednesday November 10th, 2010 at 05:30 PM

Rafael, voce faz o modelo de cidadao que Angola muito
precisa, continue a ser um exemplo de coragem, inteligencia e
liberdade de espirito.

Que Deus te abencoe.

Cumprimentos

**Costinha** says:
Sunday November 14th, 2010 at 07:16 PM

Man Rafa,

Na America do Norte nos Angolanos estamos a contar
contigo, saiba que amamos voce, sabemos que es inteligente,
amas o teu pais, e tens vontade de ajudar o teu povo. Deus
tambem esta contigo, e ninguem vai te calar, se te tornares
presidente de um partido, saiba que o meu voto sera para ti.
Um abraco e continuacao de bom trabalho.

Costinha (Vancouver, British Columbia)

**Augusto** says:
Wednesday December 15th, 2010 at 06:56 AM

Meu irmão Rafael, os seus forços de terminar com
delapidação da coisa pública no nosso país por um bando de
insaciáveis pela riqueza na qual o cidadão Zé Eduardo dos
Santos lidera a caravana,qualquer dia seram reconhecidos e
repensados, porque somente um pessoa acima de tudo que
sinta um verdadeiro patriota é capaz de exercer tais
exercícios em defesa do pacato cidadão, avante Rafael e nós
estamos do seu lado, deus ilumine o seu caminho, receba um
forte abraço do guerreiro anonimo desta luta que se chama
CORRUPTUÇÃO do seu amigo AUGUSTO.

*" PCA da TPA gere a estação no avião http://t.co/WvsL0f0l "* — @makaangola



PAGES

What is Maka?
Corruption gallery
Newsroom
Contact

THE LATEST

PCA da TPA gere a
estação no avião
Sorry, this entry is only
available in
Português. […]

MORE

Thanks for dropping
by! Feel free to join
the discussion by
leaving comments,
and stay updated by
subscribing to the

© 2011 Maka Angola

RSS feed.

# EXHIBIT 8

Use these links to rapidly review the document

TABLE OF CONTENTS
TABLE OF CONTENTS 2

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
#### Washington, D.C. 20549

# Form 10-K

**(Mark One)**

☒      **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2010**

**OR**

☐      **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from     to**

**Commission File Number 001-34579**

# Cobalt International Energy, Inc.
(Exact name of registrant as specified in its charter)

| **Delaware** | **27-0821169** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**Two Post Oak Central**
**1980 Post Oak Boulevard, Suite 1200**
**Houston, TX 77056**
(Address of principal executive offices, including zip code)

**(713) 579-9100**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Securities Act:

| **Title of Each Class** | **Name of Each Exchange on Which Registered** |
|---|---|
| Common stock, $0.01 par value | The New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Securities Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Securities Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☐ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐          Accelerated filer ☒                    Non-accelerated filer ☐          Smaller reporting company ☐
                                                                         (Do not check if a
                                                                         smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Securities Act). Yes ☐ No ☒

As of June 30, 2010, the last business day of the registrant's most recently completed second fiscal quarter, the aggregate market value of the registrant's common stock held by non-affiliates was approximately $552 million.

As of February 15, 2011, the registrant had 356,306,804 shares of common stock outstanding.

## DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's proxy statement relating to the 2011 Annual Meeting of Shareholders, to be filed within 120 days of the end of the fiscal year covered by this report, are incorporated by reference into Part III of this Annual Report on Form 10-K.

Table of Contents

## PART I

**Cautionary Note Regarding Forward-Looking Statements**

This Annual Report on Form 10-K contains estimates and forward-looking statements, principally in "Business," "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations." Our estimates and forward-looking statements are mainly based on our current expectations and estimates of future events and trends, which affect or may affect our businesses and operations. Although we believe that these estimates and forward-looking statements are based upon reasonable assumptions, they are subject to several risks and uncertainties and are made in light of information currently available to us. Many important factors, in addition to the factors described in this Annual Report on Form 10-K, may adversely affect our results as indicated in forward-looking statements. You should read this Annual Report on Form 10-K and the documents that we have filed as exhibits hereto completely and with the understanding that our actual future results may be materially different from what we expect.

Our estimates and forward-looking statements may be influenced by the following factors, among others:

- our and our partners' ability to obtain permits and drill (i) in the U.S. Gulf of Mexico in light of the legislative and regulatory response resulting from the Deepwater Horizon drilling rig incident and oil spill and (ii) in West Africa;

- current and future government regulation of the oil and gas industry;

- changes in environmental laws or the implementation or interpretation of those laws;

- the costs and delays associated with complying with additional legislation and regulation of the oil and gas industry;

- the successful implementation of our and our partners' prospect development and drilling plans;

- our ability to obtain financing;

- the timing and execution of our production sharing agreement for Block 20 offshore Angola;

- uncertainties inherent in making estimates of our oil and natural gas data;

- the discovery and development of oil reserves;

- projected and targeted capital expenditures and other costs, commitments and revenues;

- termination of or intervention in concessions, licenses, permits, rights or authorizations granted by the United States, Angolan and Gabonese governments to us;

- competition;

- the volatility of oil prices;

- our ability to successfully develop our current prospects and to find, acquire or gain access to other prospects;

- the availability and cost of drilling rigs, containment resources, production equipment, supplies, personnel and oilfield services;

- the availability and cost of developing appropriate infrastructure around and transportation to our prospects;

- military operations, terrorist acts, wars or embargoes;

- our dependence on our key management personnel and our ability to attract and retain qualified personnel;

- our vulnerability to severe weather events, especially tropical storms and hurricanes in the U.S. Gulf of Mexico;

- the cost and availability of adequate insurance coverage; and

Table of Contents

- other risk factors discussed in the "Risk Factors" section of this Annual Report on Form 10-K.

The words "believe," "may," "will," "aim," "estimate," "continue," "anticipate," "intend," "expect," "plan" and similar words are intended to identify estimates and forward-looking statements. Estimates and forward-looking statements speak only as of the date they were made, and, except to the extent required by law, we undertake no obligation to update or to review any estimate and/or forward-looking statement because of new information, future events or other factors. Estimates and forward-looking statements involve risks and uncertainties and are not guarantees of future performance. As a result of the risks and uncertainties described above, the estimates and forward-looking statements discussed in this Annual Report on Form 10-K might not occur and our future results and our performance may differ materially from those expressed in these forward-looking statements due to, including, but not limited to, the factors mentioned above. Because of these uncertainties, you should not place undue reliance on these forward-looking statements.

## Item 1.  *Business*

### Overview

We are an independent, oil-focused exploration and production company with a world-class below salt prospect inventory in the deepwater of the U.S. Gulf of Mexico and offshore Angola and Gabon in West Africa. Primarily through our highly targeted leasing strategy, which was the result of an in-depth, multi-year study of potential regional hydrocarbon accumulations within the deepwater U.S. Gulf of Mexico and select regions offshore West Africa, we have established a current portfolio of 132 identified, well defined prospects, comprised of 47 prospects located in the deepwater U.S. Gulf of Mexico and 85 prospects located in Blocks 9 and 21 offshore Angola and the Diaba Block offshore Gabon. In addition, on January 24, 2011 we announced that we had been conditionally awarded a 40% working interest and indicated as operator of Block 20 offshore Angola, on which we have identified 37 prospects. See "—Recent Events." All of our prospects are oil-focused.

Our prospect inventory as of December 31, 2010 is summarized in the table below:

| | Identified Prospects(1) |
|---|---|
| **U.S. Gulf of Mexico** | |
| Miocene | 20 |
| Inboard Lower Tertiary(2) | 22 |
| Dual Miocene and inboard Lower Tertiary | 5 |
| *U.S. Gulf of Mexico subtotal* | 47 |
| **West Africa** | |
| Angola | 42 |
| Gabon | 43 |
| *West Africa subtotal* | 85 |
| **Total Current Portfolio** | 132 |
| Block 20 Offshore Angola(3) | 37 |
| **Pro Forma Total Portfolio** | 169 |

(1) See "Risk Factors—We have no proved reserves and areas that we decide to drill may not yield oil in commercial quantities or quality, or at all" and "—How We Identify and Analyze Prospects."

(2) What we refer to as the inboard Lower Tertiary is an emerging trend located to the northwest of existing outboard Lower Tertiary fields such as St. Malo, Jack and Cascade. Based on the drilling results of Shenandoah #1, we believe that discoveries in the inboard Lower Tertiary will exhibit meaningfully better reservoir characteristics than had previously been encountered by the industry in the outboard Lower Tertiary.

Table of Contents

prospects using 2-D seismic data. These prospects have an average estimated mean net area of 8,400 acres and an estimated mean net pay thickness of 330 feet.

### Angola Prospects (Block 20)

In addition to the 85 prospects discussed above located offshore Angola (Blocks 9 and 21) and Gabon (Diaba), we have also identified 37 prospects on Block 20 offshore Angola. See "Risk Factors—We will not have a license for Block 20 offshore Angola and we will not be able to commence our exploration, development and production operations on Block 20 until our Production Sharing Agreement for Block 20 is successfully negotiated and executed."

*Lontra.*   Lontra is a prospect targeting pre-salt horizons, where we are indicated as operator with a 40% working interest. Lontra was mapped using our 2-D seismic data. This prospect has an estimated mean net area of 61,700 acres and an estimated mean net pay thickness of 490 feet.

*Elstar.*   Elstar is a prospect targeting pre-salt horizons, where we are indicated as operator with a 40% working interest. Elstar was mapped using our 2-D seismic data. This prospect has an estimated mean net area of 17,400 acres and an estimated mean net pay thickness of 490 feet.

*Haas.*   Haas is a prospect targeting pre-salt horizons, where we are indicated as operator with a 40% working interest. Haas was mapped using our 2-D seismic data. This prospect has an estimated mean net area of 12,600 acres and an estimated mean net pay thickness of 490 feet.

*Additional Block 20 Prospects.*   We have 15 additional prospects targeting pre-salt horizons and 19 additional prospects targeting Albian horizons on Block 20, in which we have been indicated as operator with a 40% working interest. We mapped all of these prospects using 2-D seismic data. These prospects have an average estimated mean net area of 6,600 acres and an estimated mean net pay thickness of 440 feet.

### Process for Exploration and Development of West Africa Prospects

In Angola, we work in a contractor relationship to the national oil company, Sonangol, with terms and conditions established by the Risk Services Agreements for Blocks 9 and 21 and we aim to work in a contractor relationship with Sonangol with terms and conditions to be established by a Production Sharing Agreement for Block 20. In Gabon, we work in a contractor relationship to the Republic of Gabon with terms and conditions established by the Production Sharing Agreement. The Production Sharing Agreements and Risk Services Agreements, as the case may be, define contractual terms, including fiscal terms, minimum contractor work, investment obligations, the carry of local partner's capital investments, and required progress milestones.

The drilling of exploratory wells in both Angola and Gabon is well within known technological boundaries. The marine and subsurface conditions are anticipated to be normally pressured thus enabling standardization and simplification of well design. Offshore Angola and Gabon, we estimate that the gross cost to drill and evaluate an exploratory well is approximately $80 to $120 million for pre-salt prospects and $30 to $50 million for above salt prospects. The timing of our initial exploratory wells included herein represents our current expectations as to the priority in which prospects will be drilled. Actual timing decisions may differ significantly due to availability of critical equipment, material and staff, drilling results from offset or nearby prospects, government approvals, and funding priorities.

As an operator in Angola, our primary development concept for any discovery will be standardized staged developments. For each discovery, we expect that an early production system incorporating a FPSO system will be implemented, to then be followed by a further standardized FPSO system depending on the size of the discovery and associated development. All FPSOs in Angola are expected to be leased.

19

Table of Contents

permanently anchored host facility to collect and transport oil or natural gas from such development.

### Sonangol Partnership

On May 15, 2008, we entered into a participation agreement with Sonangol, which established the terms of our U.S. Gulf of Mexico partnership with Sonangol. This partnership currently consists of an agreement for Sonangol to participate in the development of certain prospects on 15 of our U.S. Gulf of Mexico leases. In this regard, Sonangol purchased a 25% non-operated interest in the blocks containing our Sulu, Ligurian and Rocky Mountain prospects, among others. Furthermore, in connection with the partnership, Sonangol agreed to purchase their interests in our leases for the price we paid for such leases in the 2007 and 2008 Central Gulf of Mexico Lease Sales, reimburse us $10 million for our share of historical seismic and exploration costs in the subject properties and allow us to act as the operator on all of the subject properties.

### Ensco Rig

We entered into a base drilling contract related to the Ensco 8503 drilling rig with Ensco on May 8, 2008. This contract has a two year term, which would have commenced upon its delivery and acceptance in February 2011 had we not entered into the Standby Agreement and which may be extended by us for one or two additional years. This two year term is not affected by the Standby Agreement and such term is expected to commence at the conclusion of the term of the Standby Agreement at the agreed base operating rate of $510,000 per day, subject to adjustment, which aggregates to approximately $372 million over the two years of the base contract. See "—Drilling Rigs—Ensco 8503 Drilling Rig."

### Angolan Risk Services Agreements

On June 11, 2009, the Council of Ministers of Angola published Decree Law No. 15/09 and Decree Law No. 14/09 which granted the mining rights for the prospecting, exploration, development and production of hydrocarbons on Blocks 9 and 21 offshore Angola, respectively, to Sonangol, as the national concessionaire, and appointed Cobalt as the operator of Blocks 9 and 21, respectively. Pursuant to these Decrees Laws, in October 2009, we completed negotiations with Sonangol and initialed the finalized Risk Services Agreements for Blocks 9 and 21 offshore Angola. On December 16, 2009, the Council of Ministers of Angola approved the terms of the finalized Risk Services Agreements. On February 24, 2010, we executed Risk Services Agreements for Blocks 9 and 21 offshore Angola with Sonangol, as well as Sonangol P&P, Nazaki and Alper. Cobalt, Sonangol P&P, Nazaki and Alper comprise the "Contractor Group" under the Risk Services Agreements. The Risk Services Agreements govern our 40% interest in and operatorship of Blocks 9 and 21 offshore Angola and form the basis of our exploration, development and production operations on these blocks. Their execution is a key milestone that allows for the commencement of our offshore Angola drilling program, currently planned to begin in the second quarter of this year.

- Under the Risk Services Agreement for Block 9, in order to preserve our rights in the block, we will be required to drill three wells, as well as acquire approximately 10,764 million square feet (1,000 square kilometers) of seismic data, and find at least one commercial discovery, within four years of its signing. This four year period may be extended by one successive extension of three years if we notify Sonangol in writing of such extension at least thirty days before the end of the four year period and if we have otherwise fulfilled our obligations under the agreement. After this initial four or seven year period ends, our rights in the block are only preserved with respect to the development areas on the block on which discoveries have been made made and all other portions of the block will be forfeited. After this initial four or seven year period ends, we will also be required to commence production within four years of the date of the

21

Table of Contents

commercial discovery, subject to certain extensions. We have the right to a 20 year production period. In order to guarantee our exploration work obligations under the Risk Services Agreement for Block 9, we and Nazaki are required to post a financial guarantee in the amount of approximately $87.5 million. Our share of this financial guarantee is approximately $54.7 million. In March 2010, we delivered a letter of credit to Sonangol for such amount. As we complete our work obligations under the Risk Services Agreement, the amount of this letter of credit will be reduced accordingly. As is customary in Angola, we are required to make contributions for Angolan social projects and academic scholarships for Angolan citizens. We made such an initial contribution in March 2010 after the signing of the Risk Services Agreement and will make additional contributions upon each commercial discovery, upon project development sanction and each year after the commencement of production. We have a 40% working interest in Block 9, with Nazaki, Alper and Sonangol P&P holding lesser working interests in the block and sharing in the exploration, development and production costs associated with such block. Proportionate with our working interest in Block 9, we will receive 40% of a variable revenue stream that the Contractor Group will be allocated from Sonangol based on the Contractor Group's rate of return, calculated on a quarterly basis, and then reduced by applicable Angolan taxes and royalties. The Contractor Group's rate of return for each quarter will be determined by the Contractor Group's variable revenue stream from oil production less expenditures and Angolan taxes and royalties from the block. The variable revenue stream paid by Sonangol to the Contractor Group ranges from 72% to 95%, and is inversely related to the size of the applicable rate of return. The Angolan taxes and royalties applicable to the variable revenue stream include the petroleum production tax (at a current tax rate of 20% applied to the Contractor Group's variable revenue stream), the petroleum transaction tax (at a current tax rate of 70% applied to the Contractor Group's variable revenue stream less expenditures less the Contractor Group's specified production allowance, which ranges from 55% to 95% of the Contractor Group's variable revenue stream depending inversely on the Contractor Group's rate of return) and the petroleum income tax (at a current tax rate of 65.75% applied to the Contractor Group's variable revenue stream less expenditures and less petroleum production and petroleum transaction taxes paid).

- Under the Risk Services Agreement for Block 21, in order to preserve our rights in the block, we will be required to drill four wells and find at least one commercial discovery, within five years of its signing. This five year period may be extended by one successive extension of three years if we notify Sonangol in writing of such extension at least thirty days before the end of the five year period and if we have otherwise fulfilled our obligations under the agreement. After this initial five or eight year period ends, our rights in the block are only preserved with respect to the development areas on the block on which discoveries have been made made and all other portions of the block will be forfeited. After this initial five or eight year period ends, we will also be required to commence production within four years of the date of the commercial discovery, subject to certain extensions. We have the right to a 25 year production period. In order to guarantee these exploration work obligations under the Risk Services Agreement for Block 21, we and Nazaki are required to post a financial guarantee in the amount approximately $147.5 million. Our share of this financial guarantee is approximately $92.2 million. In March 2010, we delivered a letter of credit to Sonangol for such amount. As we complete our work obligations under the Risk Services Agreement, the amount of this letter of credit will be reduced accordingly. As is customary in Angola, we are required to make contributions for Angolan social projects and academic scholarships for Angolan citizens. We made such an initial contribution in March 2010 after the signing of the Risk Services Agreement and will make additional contributions upon each commercial discovery, upon project development sanction and each year after the commencement of production. We have a 40% working interest in Block 21, with Nazaki, Alper and Sonangol P&P holding lesser working interests in the block

22

Table of Contents

**Item 1A.   *Risk Factors***

*You should consider and read carefully all of the risks and uncertainties described below, together with all of the other information contained in this Annual Report on Form 10-K, including the consolidated financial statements and the related notes appearing at the end of this Annual Report on Form 10-K. If any of the following risks actually occurs, our business, business prospects, financial condition, results of operations or cash flows could be materially adversely affected. The risks below are not the only ones facing our company. Additional risks not currently known to us or that we currently deem immaterial may also adversely affect us. this Annual Report on Form 10-K also contains forward-looking statements, estimates and projections that involve risks and uncertainties. Our actual results could differ materially from those anticipated in the forward-looking statements as a result of specific factors, including the risks described below.*

**Risks Relating to Our Business**

***We have no proved reserves and areas that we decide to drill may not yield oil in commercial quantities or quality, or at all.***

 We have no proved reserves. We have identified prospects based on available seismic and geological information that indicates the potential presence of oil. However, the areas we decide to drill may not yield oil in commercial quantities or quality, or at all. Even when properly used and interpreted, 2-D and 3-D seismic data and visualization techniques are only tools used to assist geoscientists in identifying subsurface structures and hydrocarbon indicators and do not enable the interpreter to know whether hydrocarbons are, in fact, present in those structures. Exploratory wells have been drilled on only four of our prospects. Accordingly, we do not know if any of our prospects will contain oil in sufficient quantities or quality to recover drilling and completion costs or to be economically viable. Even if oil is found on our prospects in commercial quantities, construction costs of oil pipelines or floating production systems, as applicable, and transportation costs may prevent such prospects from being economically viable.

 Additionally, the analogies drawn by us from available data from other wells, more fully explored prospects or producing fields may not prove valid in respect of our drilling prospects. We may terminate our drilling program for a prospect if data, information, studies and previous reports indicate that the possible development of our prospect is not commercially viable and, therefore, does not merit further investment. If a significant number of our prospects do not prove to be successful, our business, financial condition and results of operations will be materially adversely affected.

 Furthermore, recent pre-salt hydrocarbon discoveries in Brazil and prior pre-salt discoveries onshore West Africa, and the successful drilling results there, may not prove to be analogies for our properties offshore West Africa. Additionally, the few wells drilled offshore Angola, including the Baleia well on Block 20, that did not target pre-salt horizons but nevertheless had pre-salt oil shows may not prove analogous to our exploratory wells. To date, no exploratory wells have been drilled which had the primary objective of targeting the pre-salt horizon in the deepwater offshore Angola and Gabon.

 The inboard Lower Tertiary trend in the deepwater U.S. Gulf of Mexico, an area in which we intend to focus a substantial amount of our exploration efforts, has only recently been considered as a potentially economically viable production area due to the costs and difficulties involved in drilling for oil at such depths. To date there has not been commercially successful production in the inboard Lower Tertiary trend. We may not be successful in developing commercially viable production in this trend.

33

Table of Contents

***We face substantial uncertainties in estimating the characteristics of our prospects, so you should not place undue reliance on any of our estimates.***

In this Annual Report on Form 10-K we provide estimates of the characteristics of our prospects, such as the mean area (acres), mean net pay thickness (feet) and hydrocarbon yield (barrels of oil-equivalent per acre-foot), for the basins in which our prospects are located. These estimates may be incorrect, as the accuracy of these estimates is a function of the available data, geological interpretation and judgment. To date, only four of our prospects have been drilled. Any analogies drawn by us from other wells, prospects or producing fields may not prove to be accurate indicators of the success of developing reserves from our prospects. Furthermore, we have no way of evaluating the accuracy of the data from analog wells or prospects produced by other parties which we may use.

It is possible that none of the drilled wells will find accumulations of oil. Any significant variance between actual results and our assumptions could materially affect the quantities of oil attributable to any particular group of properties. In this Annual Report on Form 10-K, we refer to the "mean" of the estimated data. This measurement is statistically calculated based on a range of possible values of such estimates, with such ranges being particularly large in scope. Therefore, there may be large discrepancies between the mean estimate provided in this Annual Report on Form 10-K and our actual results.

***Drilling wells is speculative, often involving significant costs that may be more than our estimates, and may not result in any discoveries or additions to our future production or reserves. Any material inaccuracies in drilling costs, estimates or underlying assumptions will materially affect our business.***

Exploring for and developing oil reserves involves a high degree of operational and financial risk, which precludes definitive statements as to the time required and costs involved in reaching certain objectives. The budgeted costs of drilling, completing and operating wells are often exceeded and can increase significantly when drilling costs rise due to a tightening in the supply of various types of oilfield equipment and related services. Drilling may be unsuccessful for many reasons, including geological conditions, weather, cost overruns, equipment shortages and mechanical difficulties. Exploratory wells bear a much greater risk of financial loss than development wells. Moreover, the successful drilling of an oil well does not necessarily result in a profit on investment. Most of the wells we plan to operate or participate in in the near term are exploratory wells. A variety of factors, both geological and market-related, can cause a well to become uneconomic or only marginally economic. Our initial drilling sites, and any potential additional sites that may be developed, require significant additional exploration and development, regulatory approval and commitments of resources prior to commercial development. If our actual drilling and development costs are significantly more than our estimated costs, we may not be able to continue our business operations as proposed and would be forced to modify our plan of operation.

***The explosion and sinking of the Deepwater Horizon drilling rig in the U.S. Gulf of Mexico, the resulting oil spill and the legislative and regulatory response thereto may materially adversely impact our operations and may have significantly increased certain of the risks we face.***

On April 20, 2010, the Transocean Deepwater Horizon, a semi-submersible offshore drilling rig operating in the deepwater U.S. Gulf of Mexico under contract to BP plc exploded, burned for two days and sank, resulting in loss of life, injuries and a massive oil spill. Hydrocarbons discharged continuously from the well since the time of this disaster until July 15, 2010 when a capping mechanism temporarily stopped the flow of hydrocarbons and until September 19, 2010 when efforts to permanently stop the flow of hydrocarbons from the well were successful. Although we have no economic interest in this well or the Deepwater Horizon, all of our and our partners' plans for exploration and appraisal drilling activities in the U.S. Gulf of Mexico, including our North Platte #1 exploratory well and Anadarko's Heidelberg #3 appraisal well, were suspended and continue to be

34

Table of Contents

significantly delayed as a result of the response by the U.S. government and its regulatory agencies to the Deepwater Horizon incident.

The U.S. government and its regulatory agencies with jurisdiction over oil and gas exploration, including the DOI and the BOEMRE, have responded to this incident by imposing moratoria on drilling operations, by requiring operators to reapply for exploration plans and drilling permits which had previously been approved and by adopting numerous new regulations and new interpretations of existing regulations regarding operations in the U.S. Gulf of Mexico that are applicable to us and with which our new applications for exploration plans and drilling permits must prove compliant. We are diligently working to fully understand and comply with all of these new regulations, recognizing that we will be unable to resume operations until we can do so. Compliance with these new regulations and new interpretations of existing regulations may materially increase the cost of our drilling operations in the U.S. Gulf of Mexico, which could materially adversely impact our business, financial position or results of operations.

We do not know when we will be able to resume drilling operations in the U.S. Gulf of Mexico or at what cost. The uncertainty surrounding the timing and cost of our drilling activities in the U.S. Gulf of Mexico is primarily the result of (i) newly issued regulations by the DOI and BOEMRE, (ii) ongoing clarifications and interpretive guidance often in the form of an NTL issued by the DOI and the BOEMRE relating to these newly issued regulations as well as with respect to existing regulations, (iii) our continuing compliance efforts relating to these regulations, clarifications and guidance, (iv) uncertainty as to the ability of the BOEMRE to timely review submissions and issue drilling permits, (v) the general uncertainty regarding additional regulation of the oil and gas industry's operations in the U.S. Gulf of Mexico and (vi) ongoing and potential third party legal challenges to industry drilling operations in the U.S. Gulf of Mexico.

On January 3, 2011, we received a letter from the BOEMRE describing the conditions under which we may resume our drilling operations that were suspended as a result of the Deepwater Horizon event. At the time of the BOEMRE suspension on May 27, 2010, we were running storm anchors to secure the Ocean Monarch drilling rig to spud our North Platte #1 exploratory well. We understand that twelve other operators received a similar letter. Our letter is only applicable to our North Platte #1 exploratory well that was suspended on May 27, 2010. On February 23, 2011, we received a letter from the BOEMRE notifying us of the BOEMRE's approval of the exploration plan for our North Platte #1 exploratory well. However, we will not be able to restart operations on our North Platte #1 exploratory well until we establish, to the BOEMRE's satisfaction, our compliance with NTL #10 and the BOEMRE approves our application for permit to drill. We are also awaiting responses on the various submissions we have made to the BOEMRE under applicable regulations, including the most recent version of our OSRP that we submitted in advance of the regular expiration of our prior OSRP in December 2010 and submissions regarding our available containment resources that we submitted upon joining the Helix Well Containment Group as required by NTL #10. At this time, we do not know and we are unable to estimate when we will be able to restart our operations at the North Platte #1 exploratory well. In addition, even if we are able to restart our operations at the North Platte #1 exploratory well, we do not know and we are unable to estimate when we will be able to restart the remainder of our U.S. Gulf of Mexico drilling program, including our Ligurian #2 exploratory well, given that the above-mentioned January 3, 2011 and February 23, 2011 BOEMRE letters are applicable only to our North Platte #1 exploratory well.

The successful execution of our U.S. Gulf of Mexico business plan depends on our ability to continue our exploration and appraisal efforts. Given the current restrictions, potential future restrictions and the uncertainty surrounding the availability of any exceptions to any restrictions, we cannot predict when we will be able to continue our exploratory and appraisal program in the U.S. Gulf of Mexico, if at all. A prolonged suspension of or delay in our drilling operations would adversely affect our business, financial position or future results of operations.

Table of Contents

In addition, we cannot predict how federal and state authorities will further respond to the Deepwater Horizon incident or whether additional changes in laws and regulations governing oil and gas operations in the U.S. Gulf of Mexico will result or how the BOEMRE will interpret or enforce the rules and regulations issued in response to the Deepwater Horizon incident. It is possible that additional regulations or limitations may be imposed on us. There are currently numerous bills before the U.S. Congress which seek to impose strict regulations concerning the operations and financial strength of companies involved in the exploration and production of hydrocarbons in the U.S. Gulf of Mexico. Such regulations may require a change in the way we conduct our business, may increase our costs of doing business, may delay our business plans or may ultimately prohibit us (either explicitly or as a result of our inability to meet certain prescribed conditions such as increased minimum insurance or bonding requirements) from drilling for or producing hydrocarbons in the U.S. Gulf of Mexico. We cannot predict with any certainty what form any additional laws or regulations will take, how they will be interpreted or enforced, or the extent to which they may impact our business, financial position or future results of operations.

Furthermore, the Deepwater Horizon incident may have increased certain of the risks we face, including, without limitation, the following:

- increased governmental regulation and enforcement of our and our industry's operations in a number of areas, including health and safety, financial responsibility, environmental, licensing, taxation, equipment specifications and inspections and training requirements;

- increased difficulty in obtaining leases and permits to drill offshore wells, including as a result of any bans or moratoria placed on offshore drilling;

- potential legal challenges to the issuance of permits and the conducting of our operations;

- higher drilling and operating costs;

- higher royalty rates and fees on leases acquired in the future;

- higher insurance costs and increased potential liability thresholds under proposed amendments to environmental regulations;

- decreased access to appropriate equipment, personnel and infrastructure in a timely manner;

- decreased partner participation in wells we operate;

- higher capital costs as a result of any increase to the risks we or our industry face; and

- less favorable investor perception of the risk-adjusted benefits of deepwater offshore drilling.

The occurrence of any of these factors, or their continuation thereof, could have a material adverse effect on our business, financial position or future results of operations.

***We face various risks associated with increased activism against oil and gas exploration and development activities.***

Opposition toward oil and gas drilling and development activity has been growing globally and is particularly pronounced in the United States. Companies in the oil and gas industry are often the target of activist efforts from both individuals and non-governmental organizations regarding safety, human rights, environmental compliance and business practices. Anti-development activists are working to, among other things, reduce access to federal and state government lands and delay or cancel certain operations such as offshore drilling and development. For example, environmental activists have recently challenged decisions to grant air-quality permits in the U.S. Gulf of Mexico for offshore drilling.

36

Table of Contents

Future activist efforts could result in the following:

- delay or denial of drilling permits;

- shortening of lease terms or reduction in lease size;

- restrictions on installation or operation of gathering or processing facilities;

- restrictions on the use of certain operating practices;

- legal challenges or lawsuits;

- damaging publicity about us;

- increased costs of doing business;

- reduction in demand for our products; and

- other adverse affects on our ability to develop our properties.

Our need to incur costs associated with responding to these initiatives or complying with any resulting new legal or regulatory requirements resulting from these activities that are substantial and not adequately provided for, could have a material adverse effect on our business, financial condition and results of operations.

***We have contracted to use the Ensco 8503 drilling rig in the U.S. Gulf of Mexico and are required to make certain payments under such rig agreement even if we cannot use it.***

The Ensco 8503 drilling rig, which we have recently accepted, has departed the U.S. Gulf of Mexico for French Guiana on an approximate five month direct sublet from its owner, Ensco to Tullow, inclusive of mobilization and demobilization. We will only be obligated to pay certain amortized costs associated with certain rig upgrades during the term of the sublet. Upon return of the Ensco 8503 drilling rig to us, a special reduced standby rate of $210,000 per day will become payable by us under the Standby Agreement that we executed with Ensco on November 9, 2010. This special reduced standby rate will be payable until early 2012 or, if earlier, when we are able to resume drilling operations or elect to begin the two year term of the base drilling contract.

We entered into the base drilling contract related to the Ensco 8503 drilling rig with Ensco on May 8, 2008. This contract has a two year term, which would have commenced upon delivery and acceptance had we not entered into the Standby Agreement and which may be extended by us for one or two additional years. This two year term is not affected by the Standby Agreement and such term is expected to commence at the conclusion of the term of the Standby Agreement at the agreed base operating rate of $510,000 per day, subject to adjustment, which aggregates to approximately $372 million over the two years of the base contract. We do not know when or if we will be able to resume any drilling operations in the U.S. Gulf of Mexico and, therefore, we do not know when we will be able to use the Ensco 8503 drilling rig. Absent force majeure circumstances, additional third party sublets and/or an agreement with Ensco to the contrary, we will be required to make the payments discussed above even if we are unable to use the Ensco 8503 drilling rig.

***We will not have a license for Block 20 offshore Angola and we will not be able to commence our exploration, development and production operations on Block 20 until our Production Sharing Agreement for Block 20 is successfully negotiated and executed.***

On January 24, 2011, we announced that we had been conditionally awarded a 40% interest and had been indicated as operator of Block 20 offshore Angola. Along with the other successful companies in this bid round, we are currently negotiating definitive agreements, including the Production Sharing Agreement, that will govern the exploration, development and production operations on Block 20. Our

37

Table of Contents

Block 20 award will not be final and we will not have a license for Block 20 unless and until our Production Sharing Agreement for Block 20 is successfully negotiated and executed. The execution of the Production Sharing Agreement is a key milestone that secures our rights to Block 20 and allows for the commencement of our exploration program on Block 20. As certain terms of our Block 20 award have not been finalized, there is a risk that the Production Sharing Agreement will not be executed and that we may be unable to enforce any contractual rights we have in Block 20 and we will not be able to commence our exploration, development and production operations on Block 20. Further, if the Production Sharing Agreement is executed later than we expect, our planned 2011 activities in Angola could be delayed.

***Our identified drilling locations are scheduled out over several years, making them susceptible to uncertainties that could materially alter the occurrence or timing of their drilling.***

Our management team has identified and scheduled drilling locations on our acreage over a multi-year period. Our ability to drill and develop these locations depends on a number of factors, including the availability of equipment and capital, seasonal conditions, regulatory approvals, oil prices, costs and drilling results. The final determination on whether to drill any of these drilling locations will be dependent upon the factors described elsewhere in this Annual Report on Form 10-K as well as, to some degree, the results of our drilling activities with respect to our established drilling locations. Because of these uncertainties, we do not know if the drilling locations we have identified will be drilled within our expected timeframe or at all or if we will be able to economically produce oil from these or any other potential drilling locations. As such, our actual drilling activities may be materially different from our current expectations, which could adversely affect our results of operations and financial condition.

***We are not, and may not be in the future, the operator on all of our prospects, and do not, and may not in the future, hold all of the working interests in our prospects. Therefore, we will not be able to control the timing of exploration or development efforts, associated costs, or the rate of production of any non-operated and to an extent, any non-wholly owned, assets.***

Currently, we are not the operator on approximately 25% of our U.S. Gulf of Mexico blocks, and we are not the operator on the Diaba Block offshore Gabon. As we carry out our exploration and development programs, we may enter into arrangements with respect to existing or future prospects that result in a greater proportion of our prospects being operated by others. In addition, the terms of our current or future licenses or leases may require at least the majority of working interests to approve certain actions. As a result, we may have limited ability to exercise influence over the operations of the prospects operated by our partners or which are not wholly-owned by us, as the case may be. Dependence on the operator could prevent us from realizing our target returns for those prospects. Further, it may be difficult for us to pursue one of our key business strategies of minimizing the cycle time between discovery and initial production with respect to prospects for which we do not operate or wholly-own. The success and timing of exploration and development activities operated by our partners will depend on a number of factors that will be largely outside of our control, including:

- the timing and amount of capital expenditures;
- the operator's expertise and financial resources;
- approval of other participants in drilling wells;
- selection of technology; and
- the rate of production of reserves, if any.

This limited ability to exercise control over the operations of some of our prospects may cause a material adverse effect on our results of operations and financial condition.

Table of Contents

***Our operations could be adversely impacted by our block partnership with an entity whose affiliate is involved in the Deepwater Horizon incident.***

An affiliate of an oil and gas company which holds a participating interest in the well that the Deepwater Horizon drilling rig was drilling at the time of the incident (the "Macondo Well") also owns participating interests in nine blocks in which we also own participating interests, including the six blocks associated with our two previously announced discoveries of Heidelberg and Shenandoah. As a 25% non-operating interest owner in the Macondo Well, such participant may incur liability under environmental and other laws and may be required to contribute to the significant and ongoing remediation expenses in the U.S. Gulf of Mexico. This event and its aftermath could result in substantial costs to such participant and could in turn affect such participant's ability, desire and timeline related to further exploration, appraisal or development activities on the nine blocks in which we both have interests, including further appraisal and development activities with respect to our two discoveries. This could further delay our commencement of production in the U.S. Gulf of Mexico and cause a material adverse effect on our business, results of operations and financial condition.

***We have a limited operating history and our future performance is uncertain.***

We are a development stage enterprise and will continue to be so until commencement of substantial production from our oil properties, which will depend upon our ability to conduct drilling operations, successful drilling results, additional and timely capital funding, and access to suitable infrastructure and adequate personnel. We do not expect to commence production for at least several years, and therefore we do not expect to generate any revenue from production for a long time. Companies in their initial stages of development face substantial business risks and may suffer significant losses. We have generated substantial net losses and negative cash flows from operating activities since our inception and expect to continue to incur substantial net losses as we continue our drilling program. We face challenges and uncertainties in financial planning as a result of the unavailability of historical data and uncertainties regarding the nature, scope and results of our future activities. New companies must develop successful business relationships, establish operating procedures, hire staff, install management information and other systems, establish facilities and obtain licenses, as well as take other measures necessary to conduct their intended business activities. We may not be successful in implementing our business strategies, in establishing necessary staffing or personnel levels, or in completing the development of the infrastructure necessary to conduct our business as planned. In the event that one or more of our drilling programs is not completed, is delayed or terminated, our operating results will be adversely affected and our operations will differ materially from the activities described in this Annual Report on Form 10-K. As a result of industry factors or factors relating specifically to us, we may have to change our methods of conducting business, which may cause a material adverse effect on our results of operations and financial condition.

***We are dependent on certain members of our management and technical team.***

Investors in our common stock must rely upon the ability, expertise, judgment and discretion of our management and the success of our technical team in identifying, discovering and developing oil reserves. Our performance and success are dependent, in part, upon key members of our management and technical team, and their loss or departure could be detrimental to our future success. In making a decision to invest in our common stock, you must be willing to rely to a significant extent on our management's discretion and judgment. The loss of any of our management and technical team members could have a material adverse effect on our results of operations and financial condition, as well as on the market price of our common stock.

39

Table of Contents

***Our business plan requires substantial additional capital, which we may be unable to raise on acceptable terms in the future, which may in turn limit our ability to develop our exploration and production plans.***

We expect our capital outlays and operating expenditures to increase substantially over at least the next several years as we expand our operations. Exploration and production plans and obtaining additional leases or concessional licenses and seismic data are very expensive, and we expect that we will need to raise substantial additional capital, through future private or public equity offerings, strategic alliances or debt financing, before we achieve commercialization of any of our properties.

Our future capital requirements will depend on many factors, including:

- the scope, rate of progress and cost of our exploration and production activities;

- the extent to which we invest in additional oil leases or concessional licenses;

- oil and natural gas prices;

- our ability to locate and acquire hydrocarbon reserves;

- our ability to produce oil or natural gas from those reserves;

- the terms and timing of any drilling and other production-related arrangements that we may enter into;

- the cost and timing of governmental approvals and/or concessions; and

- the effects of competition by larger companies operating in the oil and gas industry.

While we believe our operations will be adequately funded at least through 2011, we do not currently have any commitments for future external funding and we do not expect to generate any revenue from production before several years after the end 2011. Additional financing may not be available on favorable terms, or at all. Even if we succeed in selling additional securities to raise funds, at such time the ownership percentage of our existing stockholders would be diluted, and new investors may demand rights, preferences or privileges senior to those of existing stockholders. If we raise additional capital through debt financing, the financing may involve covenants that restrict our business activities. If we choose to farm-out interests in our prospects, we may lose operating control over such prospects.

In order to protect our exploration and production rights in our license areas, we must meet various drilling and declaration requirements. Assuming we are able to commence exploration and production activities or successfully exploit our properties during the primary license term, our licenses over the developed areas of a prospect could extend beyond the primary term, generally for the life of production. However, unless we make and declare discoveries within certain time periods specified in the documents governing our licenses, our interests in either the undeveloped parts of our license areas (as is the case in Angola and Gabon) or the whole block (as is the case in the U.S. Gulf of Mexico) may be forfeited, we may be subject to significant penalties or be required to make additional payments in order to maintain such licenses. The costs to maintain licenses may fluctuate and may increase significantly since the original term, and we may not be able to renew or extend such licenses on commercially reasonable terms or at all. If we are not successful in raising additional capital, we may be unable to continue our exploration and production activities or successfully exploit our properties, and we may lose the rights to develop these properties upon the expiration of our licenses.

***A substantial or extended decline in oil prices may adversely affect our business, financial condition and results of operations.***

The price that we will receive for our oil production will significantly affect our revenue, profitability, access to capital and future growth rate. Historically, the oil markets have been volatile

Table of Contents

and will likely continue to be volatile in the future. The prices that we will receive for our production and the levels of our production depend on numerous factors. These factors include, but are not limited to, the following:

- changes in supply and demand for oil and natural gas;

- the actions of the Organization of the Petroleum Exporting Countries ("OPEC");

- the price and quantity of imports of foreign oil and natural gas;

- speculation as to the future price of oil and the speculative trading of oil futures contracts;

- global economic conditions;

- political and economic conditions, including embargoes, in oil-producing countries or affecting other oil-producing activities, particularly in the Middle East, Africa, Russia and South America;

- the continued threat of terrorism and the impact of military and other action, including U.S. military operations in the Middle East;

- the level of global oil exploration and production activity;

- the level of global oil inventories and oil refining capacities;

- weather conditions and other natural disasters;

- technological advances affecting energy consumption;

- domestic and foreign governmental regulations;

- proximity and capacity of oil pipelines and other transportation facilities;

- the price and availability of competitors' supplies of oil; and

- the price and availability of alternative fuels.

Oil prices have fluctuated dramatically in recent times and will likely continue to be volatile in the future. Lower oil prices may not only decrease our revenues on a per unit basis but also may reduce the amount of oil that we can produce economically. A substantial or extended decline in oil prices may materially and adversely affect our future business, financial condition, results of operations, liquidity or ability to finance planned capital expenditures.

***Our inability to access appropriate equipment and infrastructure in a timely manner may hinder our access to oil markets or delay our production.***

Our ability to market our oil production will depend substantially on the availability and capacity of gathering systems, pipelines and processing facilities owned and operated by third parties. Our failure to obtain such services on acceptable terms could materially harm our business. We also rely on continuing access to drilling rigs suitable for the environment in which we operate. We may be required to shut in oil wells because of the absence of a market or because access to pipelines, gathering systems or processing facilities may be limited or unavailable. If that were to occur, then we would be unable to realize revenue from those wells until arrangements were made to deliver the production to market, which could cause a material adverse effect on our results of operations and financial condition.

***We are subject to numerous risks inherent to the exploration and production of oil.***

Oil exploration and production activities involve many risks that a combination of experience, knowledge and careful evaluation may not be able to overcome. Our future success will depend on the success of our exploration and production activities and on the future existence of the infrastructure that will allow us to take advantage of our findings. Additionally, our oil properties are located in

Table of Contents

deepwater, which generally increases the capital and operating costs, technical challenges and risks associated with oil exploration and production activities. As a result, our oil exploration and production activities are subject to numerous risks, including the risk that drilling will not result in commercially viable oil production. Our decisions to purchase, explore, develop or otherwise exploit prospects or properties will depend in part on the evaluation of seismic data through geophysical and geological analyses, production data and engineering studies, the results of which are often inconclusive or subject to varying interpretations.

Furthermore, the marketability of expected oil production from our prospects will also be affected by numerous factors. These factors include, but are not limited to, market fluctuations of prices, proximity, capacity and availability of pipelines, the availability of processing facilities, equipment availability and government regulations (including, without limitation, regulations relating to prices, taxes, royalties, allowable production, importing and exporting of oil, environmental protection and climate change). The effect of these factors, individually or jointly, may result in us not receiving an adequate return on invested capital.

In the event that our drilling programs are developed and become operational, they may not produce oil in commercial quantities or at the costs anticipated, and our projects may cease production, in part or entirely, in certain circumstances. Drilling programs may become uneconomic as a result of an increase in operating costs to produce oil. Our actual operating costs may differ materially from our current estimates. Moreover, it is possible that other developments, such as increasingly strict environmental, health and safety laws and regulations and enforcement policies thereunder and claims for damages to natural resources, property or persons resulting from our operations, could result in substantial costs and liabilities, delays, an inability to complete our drilling programs or the abandonment of such drilling programs, which could cause a material adverse effect on our results of operations and financial condition.

***We are subject to drilling and other operational hazards.***

The exploration and production business involves a variety of operating risks, including, but not limited to:

- blowouts, cratering and explosions;

- mechanical and equipment problems;

- uncontrolled flows of oil or well fluids;

- fires;

- marine hazards with respect to offshore operations;

- formations with abnormal pressures;

- pollution and other environmental risks; and

- natural disasters.

These risks are particularly acute in deepwater drilling and exploration or natural resources. Any of these events could result in loss of human life, significant damage to property, environmental damage, impairment of our operations and substantial losses. In accordance with customary industry practice, we expect to maintain insurance against some, but not all, of these risks and losses. The occurrence of any of these events whether or not covered by insurance, could have a material adverse effect on our financial position and results of operations.

42

Table of Contents

***The development schedule of oil projects, including the availability and cost of drilling rigs, equipment, supplies, personnel and oilfield services, is subject to delays and cost overruns.***

Historically, some oil projects have experienced delays and capital cost increases and overruns due to, among other factors, the unavailability or high cost of drilling rigs and other essential equipment, supplies, personnel and oilfield services. The cost to develop our projects has not been fixed and remains dependent upon a number of factors, including the completion of detailed cost estimates and final engineering, contracting and procurement costs. Our construction and operation schedules may not proceed as planned and may experience delays or cost overruns. Any delays may increase the costs of the projects, requiring additional capital, and such capital may not be available in a timely and cost-effective fashion.

***Our operations will involve special risks that could adversely affect operations.***

Offshore operations are subject to a variety of operating risks specific to the marine environment, such as capsizing, collisions and damage or loss from hurricanes or other adverse weather conditions. These conditions can cause substantial damage to facilities and interrupt our operations. As a result, we could incur substantial expenses that could reduce or eliminate the funds available for exploration, development or leasehold acquisitions, or result in loss of equipment and properties. In particular, we are not intending to put in place business interruption insurance due to the fact that this is not economically viable, and therefore we may not be able to rely on insurance coverage in the event of such natural phenomena.

Deepwater exploration generally involves greater operational and financial risks than exploration on the shelf. Deepwater drilling generally requires more time and more advanced drilling technologies, involving a higher risk of technological failure and usually higher drilling costs. Such risks are particularly applicable to our deepwater exploration efforts in the Lower Tertiary trend and pre-salt offshore Angola and Gabon, as there has been limited drilling activity in these areas. In addition, there may be production risks of which we are currently unaware. Whether we use existing pipeline infrastructure, participate in the development of new subsea infrastructure or use floating production systems to transport oil from producing wells, if any, these operations may require substantial time for installation, or encounter mechanical difficulties and equipment failures that could result in significant cost overruns and delays. Furthermore, deepwater operations generally, and operations in the Lower Tertiary and offshore West Africa trends in particular, lack the physical and oilfield service infrastructure present on the shelf. As a result, a significant amount of time may elapse between a deepwater discovery and the marketing of the associated oil, increasing both the financial and operational risk involved with these operations. Because of the lack and high cost of this infrastructure, reserve discoveries we make in the deepwater, if any, may never be economically producible.

***Our operations in the U.S. Gulf of Mexico may be adversely impacted by tropical storms and hurricanes.***

Tropical storms, hurricanes and the threat of tropical storms and hurricanes often result in the shutdown of operations in the U.S. Gulf of Mexico as well as operations within the path and the projected path of the tropical storms or hurricanes. In the future, during a shutdown period, we may be unable to access wellsites and our services may be shut down. Additionally, tropical storms or hurricanes may cause evacuation of personnel and damage to offshore drilling rigs and other equipment, which may result in suspension of our operations. The shutdowns, related evacuations and damage can create unpredictability in activity and utilization rates, as well as delays and cost overruns, which may have a material adverse impact on our financial condition and results of operations.

43

Table of Contents

***The geographic concentration of our properties in the U.S. Gulf of Mexico and offshore Angola and Gabon subjects us to an increased risk of loss of revenue or curtailment of production from factors specifically affecting the U.S. Gulf of Mexico and offshore Angola and Gabon.***

Our properties are concentrated in three countries: the U.S. Gulf of Mexico and offshore Angola and Gabon. Some or all of these properties could be affected should such regions experience:

- severe weather;

- moratoria on drilling or permitting delays;

- delays or decreases in production;

- delays or decreases in the availability of equipment, facilities, personnel or services;

- delays or decreases in the availability of capacity to transport, gather or process production; and/or

- changes in the regulatory and fiscal environment.

For example, in response to the Deepwater Horizon incident, the U.S. government and its regulatory agencies with jurisdiction over oil and gas exploration, including the DOI and the BOEMRE, have imposed moratoria on drilling operations, required operators to reapply for exploration plans and drilling permits and adopted extensive new regulations, which have effectively halted drilling operations in the deepwater U.S. Gulf of Mexico. Additionally, oil properties located in the U.S. Gulf of Mexico were significantly damaged by Hurricanes Katrina and Rita, which required our competitors to spend a significant amount of time and capital on inspections, repairs, debris removal, and the drilling of replacement wells. We plan to maintain insurance coverage for only a portion of these risks. There also may be certain risks covered by insurance where the policy does not reimburse us for all of the costs related to a loss.

Due to the concentrated nature of our portfolio of properties, a number of our properties could experience any of the same conditions at the same time, resulting in a relatively greater impact on our results of operations than they might have on other companies that have a more diversified portfolio of properties.

***Our non-U.S. operations may be adversely affected by political and economic circumstances in the countries in which we operate.***

Our non-U.S. oil exploration, development and production activities are subject to political and economic uncertainties (including but not limited to changes, sometimes frequent or marked, in energy policies or the personnel administering them), expropriation of property, cancellation or modification of contract rights, foreign exchange restrictions, currency fluctuations, royalty and tax increases and other risks arising out of foreign governmental sovereignty over the areas in which our operations are conducted, as well as risks of loss due to civil strife, acts of war, guerrilla activities and insurrection. These risks may be higher in the developing countries in which we conduct our activities, namely, Angola and Gabon.

Our operations in these areas increase our exposure to risks of war, local economic conditions, political disruption, civil disturbance and governmental policies that may:

- disrupt our operations;

- restrict the movement of funds or limit repatriation of profits;

- lead to U.S. government or international sanctions; and

- limit access to markets for periods of time.

44

Table of Contents

Countries in West Africa have experienced political instability in the past. Disruptions may occur in the future, and losses caused by these disruptions may occur that will not be covered by insurance. Consequently, our non-U.S. exploration, development and production activities may be substantially affected by factors which could have a material adverse effect on our financial condition and results of operations. Furthermore, in the event of a dispute arising from non-U.S. operations, we may be subject to the exclusive jurisdiction of courts outside the U.S. or may not be successful in subjecting non-U.S. persons to the jurisdiction of courts in the U.S., which could adversely affect the outcome of such dispute.

***The oil and gas industry, including the acquisition of exploratory acreage in the U.S. Gulf of Mexico and offshore West Africa, is intensely competitive.***

The international oil and gas industry, including in the U.S. Gulf of Mexico and West Africa, is highly competitive in all aspects, including the exploration for, and the development of, new sources of supply. We operate in a highly competitive environment for acquiring exploratory acreage and hiring and retaining trained personnel. Many of our competitors possess and employ financial, technical and personnel resources substantially greater than us, which can be particularly important in the areas in which we operate. These companies may be able to pay more for productive oil properties and prospects and to evaluate, bid for and purchase a greater number of properties and prospects than our financial or personnel resources permit. Furthermore, these companies may also be better able to withstand the financial pressures of unsuccessful drill attempts, delays, sustained periods of volatility in financial markets and generally adverse global and industry-wide economic conditions, and may be better able to absorb the burdens resulting from changes in relevant laws and regulations, which would adversely affect our competitive position. Our ability to acquire additional prospects and to find and develop reserves in the future will depend on our ability to evaluate and select suitable properties and to consummate transactions in a highly competitive environment. Also, there is substantial competition for available capital for investment in the oil and gas industry. As a result of these and other factors, we may not be able to compete successfully in an intensely competitive industry, which could cause a material adverse effect on our results of operations and financial condition.

***Participants in the oil and gas industry are subject to complex laws that can affect the cost, manner or feasibility of doing business.***

Exploration and production activities in the oil and gas industry are subject to extensive local, state, federal and international regulations. We may be required to make large expenditures to comply with governmental regulations, particularly in respect of the following matters:

- licenses for drilling operations;

- royalty increases, including retroactive claims;

- drilling and development bonds;

- reports concerning operations;

- the spacing of wells;

- unitization of oil accumulations;

- remediation or investigation activities for environmental purposes; and

- taxation.

Under these and other laws and regulations, we could be liable for personal injuries, property damage and other types of damages. Failure to comply with these laws and regulations also may result in the suspension or termination of our operations and subject us to administrative, civil and criminal

45

Table of Contents

penalties. Moreover, these laws and regulations could change in ways that could substantially increase our costs. Any such liabilities, penalties, suspensions, terminations or regulatory changes could have a material adverse effect on our financial condition and results of operations.

***We and our operations are subject to numerous environmental, health and safety regulations which may result in material liabilities and costs.***

We are, and our future operations will be, subject to various international, foreign, federal, state and local environmental, health and safety laws and regulations governing, among other things, the emission and discharge of pollutants into the ground, air or water, the generation, storage, handling, use and transportation of regulated materials and the health and safety of our employees. We are required to obtain various environmental permits from governmental authorities for our operations, including drilling permits for our wells. There is a risk that we have not been or will not be at all times in complete compliance with these permits and the environmental laws and regulations to which we are subject. If we violate or fail to comply with these laws, regulations or permits, we could be fined or otherwise sanctioned by regulators, including through the revocation of our permits or the suspension or termination of our operations. If we fail to obtain permits in a timely manner or at all (due to opposition from community or environmental interest groups, governmental delays, changes in laws or the interpretation thereof or any other reasons), such failure could impede our operations, which could have a material adverse effect on our results of operations and our financial condition.

We, as the named lessee or as the designated operator under our current and future oil leases, could be held liable for all environmental, health and safety costs and liabilities arising out of our actions and omissions as well as those of our third-party contractors. To the extent we do not address these costs and liabilities or if we are otherwise in breach of our lease requirements, our leases could be suspended or terminated. We have contracted with and intend to continue to hire third parties to perform the majority of the drilling and other services related to our operations. There is a risk that we may contract with third parties with unsatisfactory environmental, health and safety records or that our contractors may be unwilling or unable to cover any losses associated with their acts and omissions. Accordingly, we could be held liable for all costs and liabilities arising out of the acts or omissions of our contractors, which could have a material adverse effect on our results of operations and financial condition.

As the designated operator of our leases, we are required to maintain bonding or insurance coverage for certain risks relating to our operations, including environmental risks. We maintain insurance at levels that we believe are consistent with current industry practices, but we are not fully insured against all risks. Our insurance may not cover any or all environmental claims that might arise from our operations or those of our third-party contractors. If a significant accident or other event occurs and is not fully covered by our insurance, or our third-party contractors have not agreed to bear responsibility, such accident or event could have a material adverse effect on our results of operations and our financial condition. In addition, we may not be able to obtain required bonding or insurance coverage at all or in time to meet our anticipated startup schedule for each well, and if we fail to obtain this bonding or coverage, such failure could have a material adverse effect on our results of operations and financial condition.

Releases to deepwater of regulated substances are common, and under certain environmental laws, we could be held responsible for all of the costs relating to any contamination caused by us or our contractors, at our facilities and at any third party waste disposal sites used by us or on our behalf. These costs could be material. In addition, offshore oil exploration and production involves various hazards, including human exposure to regulated substances, including naturally occurring radioactive materials. As such, we could be held liable for any and all consequences arising out of human exposure to such substances or other damage resulting from the release of regulated substances to the environment, endangered species, property or to natural resources.

46

Table of Contents

Particularly since the Deepwater Horizon event in the U.S. Gulf of Mexico, there has been an increased interest in making regulation of deepwater oil and gas exploration and production more stringent in the U.S. If adopted, certain proposals such as to increase significantly or eliminate financial liability caps and require significantly more comprehensive financial assurance requirements under OPA could affect our results of operations and our financial condition.

In addition, we expect continued attention to climate change issues. Various countries and U.S. states and regions have agreed to regulate emissions of greenhouse gases ("GHG"), including methane (a primary component of natural gas) and carbon dioxide, a byproduct of oil and natural gas combustion. Additionally, the U.S. Congress has in the past and may in the future consider legislation requiring reductions in GHG emissions. The U.S. Environmental Protection Agency began regulating GHG emissions from certain stationary sources on January 2, 2011 and has enacted and proposed GHG emissions standards for certain classes of vehicles. The regulation of GHGs and the physical impacts of climate change in the areas in which we, our customers and the end-users of our products operate could adversely impact our operations and the demand for our products.

Environmental, health and safety laws are complex, change frequently and have tended to become increasingly stringent over time. Our costs of complying with current and future environmental, health and safety laws, and our liabilities arising from releases of, or exposure to, regulated substances may adversely affect our results of operations and our financial condition. See "Business—Environmental Matters and Regulation." See "Business—Impact of the U.S. Gulf of Mexico Oil Spill."

***Non-U.S. holders of our common stock, in certain situations, could be subject to U.S. federal income tax upon the sale, exchange or other disposition of our common stock.***

We believe that we are, and will remain for the foreseeable future, a U.S. real property holding corporation for U.S. federal income tax purposes. As a result, under the Foreign Investment in Real Property Tax Act ("FIRPTA"), certain non-U.S. investors may be subject to U.S. federal income tax on gain from the disposition of shares of our common stock, in which case they would also be required to file U.S. tax returns with respect to such gain. Whether these FIRPTA provisions apply depends on the amount of our common stock that such non-U.S. investors hold and whether, at the time they dispose of their shares, our common stock is regularly traded on an established securities market (such as the NYSE) within the meaning of the applicable Treasury Regulations. So long as our common stock is listed on the NYSE, only a non-U.S. investor who has held, actually or constructively, more than 5% of our common stock may be subject to U.S. federal income tax on the disposition of our common stock under FIRPTA.

***We may be exposed to liabilities under the Foreign Corrupt Practices Act, and any determination that we violated the Foreign Corrupt Practices Act could have a material adverse effect on our business.***

We are subject to the Foreign Corrupt Practices Act ("FCPA") and other laws that prohibit improper payments or offers of payments to foreign governments and their officials and political parties for the purpose of obtaining or retaining business. We do business and may do additional business in the future in countries and regions in which we may face, directly or indirectly, corrupt demands by officials, tribal or insurgent organizations, or private entities. Thus, we face the risk of unauthorized payments or offers of payments by one of our employees or consultants, given that these parties may not always be subject to our control. Our existing safeguards and any future improvements may prove to be less than effective, and our employees and consultants may engage in conduct for which we might be held responsible. In connection with entering into our Risk Services Agreements for Blocks 9 and 21 offshore Angola, two Angolan-based E&P companies were assigned as part of the contractor group by the Angolan government. We had not worked with either of these companies in the past, and, therefore, our familiarity with these companies is limited. However, last year we were made aware of allegations, that we are continuing to look into, of a connection between senior Angolan government

47

Table of Contents

officials and Nazaki (a full paying member of the contractor group for Blocks 9 and 21). In the future, we may be partnered with other companies with whom we are unfamiliar. Violations of the FCPA may result in severe criminal or civil sanctions, and we may be subject to other liabilities, which could negatively affect our business, operating results and financial condition. In addition, the government may seek to hold us liable for successor liability FCPA violations committed by companies in which we invest or that we acquire.

***We may incur substantial losses and become subject to liability claims as a result of future oil and natural gas operations, for which we may not have adequate insurance coverage.***

We intend to maintain insurance against risks in the operation of the business we plan to develop and in amounts in which we believe to be reasonable. Such insurance, however, may contain exclusions and limitations on coverage. We may elect not to obtain insurance if we believe that the cost of available insurance is excessive relative to the risks presented. Losses and liabilities arising from uninsured and underinsured events could materially and adversely affect our business, financial condition or results of operations.

***The recent adoption of The Dodd-Frank Wall Street Reform and Consumer Protection Act, or the Dodd-Frank Act, could have an adverse effect on our business.***

The Dodd-Frank Act requires, no later than 270 days after the enactment of the Dodd-Frank Act, the SEC to promulgate rules requiring SEC reporting companies that engage in the commercial development of oil, natural gas or minerals, to include in their annual reports filed with the SEC disclosure about all payments (including taxes, royalties, fees and other amounts) made by the issuer or an entity controlled by the issuer to the United States or to any non-U.S. government for the purpose of commercial development of oil, natural gas or minerals. As these rules are yet to be released and are not yet effective, we are unable to predict what form these rules may take and whether we will be able to comply with them without adversely impacting our business, or at all. Any of these consequences could have a material adverse effect on us, our financial condition and our results of operations.

***Our business could be affected by recent health care reform and potential federal tax increases.***

In March 2010, the Patient Protection and Affordable Care Act ("PPACA") and the Health Care and Education Reconciliation Act of 2010 ("HCERA"), which makes various amendments to certain aspects of the PPACA (the HCERA and, together with PPACA, the "Acts"), were signed into law. Among numerous other items, the Acts reduce the tax benefits available to an employer that receives the Medicare Part D subsidy and impose excise taxes on high-cost health plans. We are not a recipient of the Medicare Part D tax benefit and therefore, we will not be impacted by this part of the new legislation. We will continue to monitor the potential impact of these new regulations as details emerge over the next several months and years. At this point in time, we are not aware of any material impacts to us.

### Risks Relating to our Common Stock

***Our stock price may be volatile, and investors in our common stock could incur substantial losses.***

Our stock price may be volatile. The stock market in general has experienced extreme volatility that has often been unrelated to the operating performance of particular companies. The market price for our common stock may be influenced by many factors, including, but not limited to:

- the price of oil and natural gas;

48

Table of Contents

- the success of our exploration and development operations, and the marketing of any oil we produce;

- regulatory developments in the United States and foreign countries where we operate;

- the recruitment or departure of key personnel;

- quarterly or annual variations in our financial results or those of companies that are perceived to be similar to us;

- market conditions in the industries in which we compete and issuance of new or changed securities;

- analysts' reports or recommendations;

- the failure of securities analysts to cover our common stock or changes in financial estimates by analysts;

- the inability to meet the financial estimates of analysts who follow our common stock;

- the issuance of any additional securities of ours;

- investor perception of our company and of the industry in which we compete; and

- general economic, political and market conditions.

***A substantial portion of our total outstanding shares may be sold into the market at any time. This could cause the market price of our common stock to drop significantly, even if our business is doing well.***

All of the shares sold in our initial public offering are freely tradable without restrictions or further registration under the federal securities laws, unless purchased by our "affiliates" as that term is defined in Rule 144 under the Securities Act of 1933, as amended (the "Securities Act"). Substantially all the remaining shares of common stock are restricted securities as defined in Rule 144 under the Securities Act. Restricted securities may be sold in the U.S. public market only if registered or if they qualify for an exemption from registration, including by reason of Rules 144 or 701 under the Securities Act. All of our restricted shares became eligible for sale in the public market in late 2010, subject in certain circumstances to the volume, manner of sale and other limitations under Rule 144. Additionally, we have registered all shares of our common stock that we may issue under our employee and director benefit plans. These shares can be freely sold in the public market upon issuance, unless pursuant to their terms these stock awards have transfer restrictions attached to them. Sales of a substantial number of shares of our common stock, or the perception in the market that the holders of a large number of shares intend to sell shares, could reduce the market price of our common stock.

***The concentration of our capital stock ownership among our largest stockholders, and their affiliates.***

Our four largest stockholders collectively own approximately 72% of our outstanding common stock. Consequently, these stockholders have significant influence over all matters that require approval by our stockholders, including the election of directors and approval of significant corporate transactions. This concentration of ownership will limit your ability to influence corporate matters, and as a result, actions may be taken that you may not view as beneficial.

***Provisions of our certificate of incorporation and by-laws could discourage potential acquisition proposals and could deter or prevent a change in control.***

Some provisions in our certificate of incorporation and by-laws, as well as Delaware statutes, may have the effect of delaying, deferring or preventing a change in control. These provisions, including those providing for the possible issuance of shares of our preferred stock and the right of the board of

49

Table of Contents

directors to amend the by-laws, may make it more difficult for other persons, without the approval of our board of directors, to make a tender offer or otherwise acquire a substantial number of shares of our common stock or to launch other takeover attempts that a stockholder might consider to be in his or her best interest. These provisions could limit the price that some investors might be willing to pay in the future for shares of our common stock.

***We are a "controlled company" within the meaning of the NYSE rules and, as a result, we qualify for and rely on exemptions from certain corporate governance requirements.***

Funds affiliated with First Reserve Corporation, Goldman, Sachs & Co., Riverstone Holdings LLC and The Carlyle Group, and KERN Partners Ltd. and certain limited partners in such funds affiliated with KERN Partners Ltd., respectively, control a majority of the voting power of our outstanding common stock. Consequently we are a "controlled company" within the meaning of the NYSE corporate governance standards. Under the NYSE rules, a company of which more than 50% of the voting power is held by another person or group of persons acting together is a "controlled company" and may elect not to comply with certain NYSE corporate governance requirements, including the requirements that:

- a majority of the board of directors consist of independent directors;

- the nominating and corporate governance committee be composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities;

- the compensation committee be composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities; and

- there be an annual performance evaluation of the nominating and corporate governance and compensation committees.

We are currently treated as a controlled company and utilize these exemptions, including the exemption for a board of directors composed of a majority of independent directors. In addition, although we have adopted charters for our audit, nominating and corporate governance and compensation committees and conduct annual performance evaluations for these committees, only the audit committee is presently composed entirely of independent directors. Accordingly, you may not have the same protections afforded to stockholders of companies that are subject to all of the NYSE corporate governance requirements.

**Item 1B.**   *Unresolved Staff Comments*

Not applicable.

**Item 2.**   *Properties*

Please refer to the information under the captions "Business—Deepwater U.S. Gulf of Mexico" and "Business—West Africa Deepwater" elsewhere in this Annual Report on Form 10-K.

**Item 3.**   *Legal Proceedings*

We are not currently party to any legal proceedings. However, from time to time we may be subject to various lawsuits, claims and proceedings that arise in the normal course of business, including employment, commercial, environmental, safety and health matters. It is not presently possible to determine whether any such matters will have a material adverse effect on our consolidated financial position, results of operations, or liquidity.

**Item 4.**   *(Removed and Reserved)*

# EXHIBIT 9

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# FORM 8-K

### CURRENT REPORT
**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

Date of Report (Date of Earliest Event Reported): **March 11, 2011**

# Cobalt International Energy, Inc.

(Exact name of registrant as specified in its charter)

| **Delaware** | **001-34579** | **27-0821169** |
|---|---|---|
| (State or other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**Two Post Oak Central**
**1980 Post Oak Boulevard, Suite 1200**
**Houston, Texas**                    **77056**
(Address of Principal Executive Offices)          (Zip Code)

Registrant's telephone number, including area code: **(713) 579-9100**

**N/A**
(Former name or former address if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

---

**Item 8.01.**          **Other Events.**

On March 1, 2011, Cobalt International Energy, Inc. ("Cobalt") filed its Annual Report on Form 10-K (the "Annual Report") with the Securities and Exchange Commission (the "SEC"). In the Annual Report, Cobalt noted that last year it had become aware of allegations of a connection between senior Angolan government officials and Nazaki Oil and Gáz, S.A. ("Nazaki") and that Cobalt was continuing to look into the allegations. Nazaki is a full paying member of the contractor group for Blocks 9 and 21 offshore Angola. Cobalt is also a member of this contractor group holding a 40% working interest in and is the named operator of these blocks.

On March 9, 2011, the SEC contacted Cobalt by telephone informally requesting additional information regarding these allegations. Through further contact with the SEC on March 10, 2011, Cobalt learned that the SEC is seeking to understand the nature of Cobalt's relationships with the members of the contractor group for Blocks 9 and 21 offshore Angola as disclosed in the Annual Report. Cobalt believes its activities in Angola have complied with all laws, including the Foreign Corrupt Practices Act (the "FCPA"), and Cobalt is fully cooperating with the SEC. To avoid non-overlapping information requests, Cobalt voluntarily contacted the U.S. Department of Justice on March 11, 2011 with respect to the SEC's informal request and offered to respond to any requests the U.S. Department of Justice may have.

Cobalt takes compliance with the FCPA and other laws very seriously and has devoted considerable resources towards such compliance. Before Cobalt conducted any activities or operations in Angola, Cobalt engaged Vinson & Elkins LLP and O'Melveny and Myers LLP, two experienced and well-respected U.S.-based international law firms, in 2007. These firms were engaged specifically to represent Cobalt with respect to the FCPA in connection with Cobalt establishing its contractual arrangements in Angola and have represented and consulted with Cobalt regularly to date.

As background, in connection with entering into the Risk Services Agreements for Blocks 9 and 21 offshore Angola, which occurred on

February 24, 2010, two Angolan-based E&P companies were assigned as part of the contractor group by the Angolan government. One of these companies is Nazaki, who is a full paying member of the contractor group and holds a 30% working interest in these blocks. Nazaki was first identified to Cobalt in July 2008 as part of Concession Decrees approved by the Angolan Council of Ministers. Since such identification, Cobalt, in consultation with the two law firms, conducted extensive due diligence with respect to Nazaki. To date, Nazaki has made all payments required of it under the Risk Services Agreements as a 30% working interest owner in these blocks. The other company is Alper Oil, Limitada ("Alper"), who holds a 10% working interest in these blocks and is a "carried" member of the contractor group, meaning that it is not required to make any payments under the Risk Services Agreements with respect to the initial exploration activities on the blocks, though such payments are ultimately recouped by the other paying members of the contractor group upon production of oil from the blocks. It is customary in Angola to have both paying and carried members of the contractor group. Alper was first identified to Cobalt in October 2008 by the national oil company of Angola, Sociedade Nacional de Combustíveis de Angola—Empresa Pública. Since such identification, Cobalt, again in consultation with the two law firms, conducted extensive due diligence with respect to Alper.

Nazaki has denied verbally and in writing the allegations of a connection between senior Angolan government officials and Nazaki. Our diligence efforts with respect to Nazaki and these allegations continue.

2

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Date: March 11, 2011

**Cobalt International Energy, Inc.**

By: /s/ Samuel H. Gillespie
Name: Samuel H. Gillespie
Title: General Counsel and
Executive Vice President

3

# EXHIBIT 10

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 8-K

### CURRENT REPORT
### Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of Earliest Event Reported): **December 20, 2011**

# Cobalt International Energy, Inc.
(Exact name of registrant as specified in its charter)

| **Delaware** | **001-34579** | **27-0821169** |
|---|---|---|
| (State or other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**Two Post Oak Central**
**1980 Post Oak Boulevard, Suite 1200**
**Houston, Texas**                                    **77056**
(Address of Principal Executive Offices)          (Zip Code)

Registrant's telephone number, including area code: **(713) 579-9100**

**N/A**
(Former name or former address if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

---

**Item 1.01.          Entry into a Material Definitive Agreement.**

On December 20, 2011, CIE Angola Block 20 Ltd., a wholly-owned subsidiary of Cobalt International Energy, Inc. (the "Company") executed a Production Sharing Contract (the "PSC") with the national oil company of Angola, Sociedade Nacional de Combustíveis de Angola — Empresa Pública ("Sonangol E.P."), as well as Sonangol Pesquisa e Produção, S.A. ("Sonangol P&P"), BP Exploration Angola (Kwanza Benguela) Limited ("BP") and China Sonangol International Holding Limited ("China Sonangol").  The PSC forms the basis of the Company's exploration, development and production operations on Block 20 offshore Angola.  The Company is the operator of and has a 40% working interest in Block 20 offshore Angola.

Under the PSC, in order to preserve its rights in Block 20, the Company will be required to drill four exploratory wells (with at least one of these wells having a pre-salt objective), acquire approximately 1,500 square kilometers of 3-D seismic data, and make at least one commercial discovery, all within five years of the signing of the PSC, subject to certain extensions.  The Company has the right to a 30-year production period.

In order to guarantee these exploration work obligations under the PSC, the Company, BP and China Sonangol are required to post a financial guarantee of $360 million. The Company's share of this financial guarantee is 57.14%, or approximately $206 million. The Company expects to deliver a letter of credit to Sonangol E.P. for such amount within 30 days of signing the PSC. As the Company completes its work obligations under the PSC, the amount of this letter of credit will be reduced accordingly.

In addition, pursuant to the PSC, the Company, BP, and China Sonangol are required to make certain contributions for social projects such as the Sonangol Research and Technology Center aggregating $225 million upon the signing of the PSC, $75 million on each of the first, second and third anniversaries of the signing of the PSC, and $100 million on the fourth anniversary of the signing of the PSC.  The Company is

obligated to pay 37.14% of the foregoing expenses, or approximately $314 million.

The Company shall recover all exploration, development, production, administration and services expenditures incurred under the PSC by taking up to a maximum amount of 50% of all oil produced from Block 20.  In addition, proportionate with its working interest in Block 20, the Company will receive 40% of a variable revenue stream that the Contractor Group will be allocated from Sonangol E.P. based on the Contractor Group's rate of return, reduced by applicable Angolan taxes, calculated on a quarterly basis.  The variable revenue stream paid by Sonangol E.P. to the Contractor Group ranges from 10 to 70%, and is inversely related to the size of the applicable rate of return.

The consideration to be paid to Sonangol E.P. pursuant to the PSC is based upon the results of Angola's publicly announced 2010 pre-salt licensing bid round.

*Material Relationships*

The Company, Sonangol E.P., Sonangol P&P and certain other parties signatory thereto executed two Risk Services Agreements in February 2010 which govern the exploration, development and production operations on Blocks 9 and 21 offshore Angola.  The Company is the operator of and has a 40% working interest in Blocks 9 and 21 offshore Angola.

In addition, the Company and Sonangol E.P. currently have a partnership in the U.S. Gulf of Mexico pursuant to an agreement whereby Sonangol E.P. acquired a 25% non-operated interest of the Company's pre-Total alliance interests in 11 of its U.S. Gulf of Mexico leases. Sonangol E.P. has also acquired a 15% non-operated interest in four additional U.S. Gulf of Mexico leases pursuant to this partnership bringing the total partnership portfolio to 15 U.S. Gulf of Mexico leases.

These relationships have been previously disclosed in the Company's Securities and Exchange Commission filings.

2

---

**Item 2.01**.              **Completion of Acquisition or Disposition of Assets**.

The information included in Item 1.01 of this Current Report on Form 8-K is incorporated by reference into this Item 2.01 of this Current Report on Form 8-K.

3

---

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Date: December 20, 2011

**Cobalt International Energy, Inc.**

By:      /s/ Samuel H. Gillespie

Name:  Samuel H. Gillespie
Title:   General Counsel and
          Executive Vice President

4

---