# EXHIBIT 11-A


ANGOLA'S
Oil
INDUSTRY
OPERATIONS
OSISA
Open Society Initiative
for Southern Africa

By Maria Lya Ramos

The research presented in this report is drawn from a three-week trip to Angola in November 2011, which included brief visits to Cabinda and Soyo and conversations with journalists, residents of Cabinda and Soyo, academics, and representatives of oil corporations operating in Angola, the United States (US) government and non-governmental organisations (NGOs). Various requests to interview Angolan government officials were declined. Following the field visit, interviews were conducted with US government officials, academics, journalists, and various NGOs based in the US and United Kingdom (UK).

## EXECUTIVE SUMMARY

1. The state-owned oil company, Sonangol, is at the centre of the oil industry in Angola. By law, multinationals that want to do business in Angola must associate with Sonangol in the form of a joint venture or Production Sharing Agreement (PSA). To win contracts, multinationals must pay signature bonuses that can run into billions of dollars – and are not publicly disclosed. Multinationals by law must also contract with Angolan companies for oil services. Evidence points to Angolan public officials' beneficial ownership of, and shareholdings in, Angolan companies that have been awarded oil contracts – in violation of Angolan and international law.

2. Although environmental protection in Angola is enshrined in the Constitution, pollution control legislation and environmental standards are extremely deficient. Technical capacity at the ministerial level is weak and multinationals end up both developing the legislation and monitoring their own activities. Multinationals apply international or home country pollution control standards, but without any real enforcement mechanism by the Environment Ministry. In the absence of regulations, multinationals tout their voluntary practices under the banner of corporate social responsibility – but they often only invest in voluntary efforts for their own cost-effective ends.

3. Sonangol both administers and regulates the oil industry, which creates a clear conflict of interest. Sonangol performs functions that should be under the purview of the Ministry of Finance, or the Central Bank. Sonangol plays a monitoring role, bypassing the Ministries of Petroleum and Environment. Political institutions to provide checks and balances to potential malfeasance in the oil industry are weak – or non-existent. The judiciary is not politically independent. The legislative branch lacks necessary and pertinent information, and is only really accountable to the ruling MPLA party. Other institutions, like the Attorney General's office and the Ombudsman, report directly to the president and do not make their reports public.

4. The principle of confidentiality enshrined in Angolan oil laws encourages corruption and creates a pathway for the diversion of oil revenues, which are legally shielded from the public domain. The Angolan government has taken some initiatives to increase transparency by publishing some oil revenue and production data, but this data is neither consistent, nor comprehensive, nor

independently verified. Sonangol's PSA contracts also allow for some exemptions for disclosure. New United States (US) and European Union (EU) oil revenue transparency legislation will mandate US and EU registered companies to disclose detailed tax and royalty payments to the Angolan government.

5. Although institutions in Angola are weak, public anti-corruption legislation is potentially strong. Utilising existing legislation to lodge citizen's complaints about alleged public corruption and violation of the law – coupled with appropriate political and media monitoring of these complaints – would elevate the issue publicly and begin to promote the rule of law.

6. Sonangol's current structure is porous, providing potential opportunities for corruption and dubious financial transactions. Sonangol is the concessionaire, equity partner and operator in the industry. Sonangol's three distinct roles result in three budget transactions with the national budget:

- Assets that Sonangol generates from equities in oil concession shares are largely reinvested in Sonangol and its subsidiaries;
- As concessionaire, Sonangol signs the contracts and receives a share of the profits from the oil, which are then transferred to the treasury; and
- Sonangol is tasked with an array of quasi-fiscal activities that are funded from oil profits.

Sonangol is aggressively reinvesting in joint ventures and subsidiaries, such as China Sonangol, inside and outside Angola. Sonangol is a player in corporate social responsibility (CSR) through its management of social funds, which are linked to signature bonuses and production sharing agreements.

7. Multinational oil companies do not address governance or transparency issues in Angola. The companies' continued transactions with the government – without calling the terms of the transactions into question – have facilitated patronage problems, rent seeking and exacerbated the resource curse. Some exceptions exist, but these rare efforts are not industry wide. Companies tout their CSR projects, but these projects often lack community input, and never address transparency and human rights issues. In relation to the mitigation of impacts, multinationals get almost a free pass. There have been some efforts to hold multinationals to account, particularly through home-country anti-corruption instruments and civil society advocacy, but these need to be ramped up.

8. In Angola, both the State and the multinational operators are guilty of environmental injustice. The government takes little care in enforcing existing laws to protect the public and environment, and prioritises economic growth over inclusive sustainable development. A depletion of fish stocks is the leading complaint about oil operations in the northern provinces, while coastal residents claim that there are regular oil spills from offshore facilities. Too many spills go unreported, and post-spill compensation procedures are ad hoc. There is a dearth of information on the impact of oil on communities, fisheries and public health. Without independent scientific testing, it is difficult to determine what is depleting fish stocks, damaging crops and affecting the health of local people.

9. Angolans are under-informed about the massive amount of money generated by the extractive industries and about the massive percentage of these revenues that are illicitly siphoned off. Few Angolans make the link between poverty, oil revenue distribution and high-level corruption. The oil producing provinces of Cabinda and Zaire are not receiving 10 percent of the oil produced in the provinces as mandated by law.

10. Avoiding Dutch Disease would entail constraining the political patronage, increasing public spending, and growing the non-oil economy. Public spending from oil revenues is concentrated on large infrastructure projects, with an opaque procurement process. Little funding is going toward social spending and households. The government is doing little to grow the non-oil sector, and agriculture and small and medium enterprises in particular. The Fundo Soberano Angolano (FSA) – Angola's sovereign wealth fund – is no guarantee against corruption, and could just perpetuate it. Sonangol already operates like a sovereign wealth fund by reinvesting oil revenues in domestic and international ventures.

# CONTENTS


04 Background
05 Legal framework of the Angolan oil industry
07 Environmental laws
09 Administrative capacity to manage the oil industry
11 Fiscal regime, transparency and accountability
16 Oil revenue utilisation
19 Policies and practices of Sonangol
20 Policies and practices of multinational oil companies
24 Oil industry and environmental justice
27 Oil industry and economic empowerment of local communities
28 Angola and Dutch Disease
30 Recommendations
33 Conclusion
34 Endnotes
36 List of abbreviations





## BACKGROUND

Oil was first discovered in Angola in 1955 in the onshore Kwanza basin near Luanda. However, the oil did not take off until the 1960s when Cabinda Gulf Oil, now Chevron, discovered the massive reserves off the coast of the northern province of Cabinda. By 1973, oil had overtaken coffee as Angola's principal export. In the late 1970s, the government initiated a programme to attract foreign investment. The Angolan coast, excluding Cabinda, was divided into several exploration blocks, which were leased to foreign oil companies under production-sharing agreements. Production increased steadily throughout the 1980s. In the early 1990s, international oil companies reported major discoveries in the deeper waters further off the coast. In 2007, Angola officially became the 12th member of OPEC.

Today, Angola is the second largest producer of crude oil in sub-Saharan Africa, behind Nigeria. The country produces about 1.6 million barrels per day, and plans to increase this output to 2 million barrels a day by 2014.[1] Angola's crude oil is primarily destined for export. China is the biggest importer of Angola's crude oil – buying around 43 percent of the country's oil exports. The US is the second largest importer. Angola consumes about 74,000 barrels a day. The country boasts about 9.5 billion barrels in proven crude oil reserves.

Angola produces light sweet crude oil containing low volumes of sulphur. It is ideal for producing derivatives like gasoline, kerosene and high quality diesel. Angola's oil industry is dominated by the upstream sector – exploration and production of crude oil and natural gas. The downstream sector – refining and distribution of products derived from crude oil – remains underdeveloped. The one oil refinery in Luanda is currently unable to meet domestic demand so a refinery in Lobito is planned, which will be capable of refining 200,000 barrels per day.

Areas to be explored for oil are normally delimited into blocks averaging 5,000 km2 and each oil concession is generally granted for 20 years. There are 44 oil blocks in Angola, both onshore and offshore. Within each block, there are a number of oil fields in various stages of exploration and production. Of the 34 blocks, 11 are currently in production mode and 33 in exploration mode. The offshore blocks are divided into three bands: shallow water blocks; deepwater blocks; and ultra-deepwater blocks.[2] Angola's most lucrative block is block 0, which is operated by Chevron.

Angola may see a surge of oil production in the coming years. In December 2011, the government granted foreign oil companies 11 new oil licenses in the Kwanza Basin – Angola's deep-sea, pre-salt region. There are high expectations that the region holds major deposits of light oil and gas.

## LEGAL FRAMEWORK OF THE ANGOLAN OIL INDUSTRY

In Angola, the two most important laws relating to the oil and gas sector are the 2004 Petroleum Activities Law[3] and the 2004 Petroleum Taxation Law. The Activities Law establishes that all oil mineral rights belong to the state and that the state oil company Sonangol is the sole concessionaire of rights to all exploration and production activities. Companies – both foreign and domestic – that want to operate in Angola must, by law, enter into association with Sonangol, which can also participate directly in the oil block, either as an operator (the company responsible for carrying out the specific exploration, development or production activity) or as a partner (one of the companies responsible for funding the operation and entitled to receive a share of the profits).

The main contractual agreements used by Sonangol in its associations with other companies are joint ventures and Production Sharing Agreements (PSA). Joint ventures include the older Cabinda block 0, as well as the onshore blocks FS-FST. Under joint ventures, the government cedes ownership of the oil to the companies in return for royalty payments and income taxes. In PSAs, the ownership of the oil remains with the government, while the companies function as contractors to Sonangol. The majority of oil contracts in Angola are covered by PSAs. For the new pre-salt, deep-sea oil blocks, Sonangol has entered into risk shared service agreements. This type of agreement is new in Angola.

The Petroleum Taxation Law lays out the cost recovery regime and profit share calculation for PSAs and corresponding Concession Decrees. Under a PSA, a foreign oil company will make an initial investment to explore or produce oil in a particular block, and can deduct a share of the oil that is produced and sell it to cover their investment costs. This is known as 'cost oil'. This 'cost oil' is deduced from the total crude oil that is produced in the oil block. The oil that remains is then split among the companies and the government according to the terms of the contract. This remaining oil is dubbed 'profit oil'. Some of Sonangol's share of the investment costs can be paid upfront by other oil companies, which can then recoup their money from Sonangol's share of 'cost oil'. The government's share of 'profit oil' is calculated according to the terms of each individual contract and according to the market price of oil and rate of return achieved each quarter – meaning that no two oil blocks will have the same cost and revenue scheme. The market value data to determine 'profit oil' is analysed quarterly by the Ministry of Petroleum and the Ministry of Finance. Once 'profit oil' is calculated, Sonangol can sell the oil. Sonangol calculates its administrative costs and deducts them from the revenues earned from these sales. Sonangol is allowed to deduct 10 percent of the revenue.

Foreign oil companies prefer PSAs because they guarantee rights to the oil reserves, offer an opportunity to earn massive profits, and ensure predictable tax and regulation regimes.[4] The government prefers PSAs because they guarantee the government revenue even in the event that oil extraction is not profitable for the companies. The Petroleum Minister, Jose Botelho Vasconcelos, explained it further, "We are a Third World economy, and have difficulty obtaining capital. We therefore prefer production sharing agreements because government investment is only required once a discovery has been declared economically viable."[5]

Risk Share Service Agreements are new to Angola and cover the 11 pre-salt blocks in the deep-sea. Under this type of contract, a company will finance oil exploration activities. If no oil is found, the company does not get to recover the costs of its investment. This is the risk incurred. But if oil is found, then the company can extract the oil and will be paid out either in cash, oil or through a discount in the purchase of oil, as the oil companies are not entitled to the oil extracted from the particular block. Just like the PSA, the costs and revenues are calculated on a block-by-block basis, according to each particular contract.

To operate an oil block, an oil company also needs a Concession Decree granted by the Angolan government and published in the Official Gazette. Whereas the various other agreements stipulate the financial terms of any oil activity, the Concession Decree primarily outlines the operational terms. These include: approval of work plans, geophysical reports, geological reports, cutting samples[6], and issuance of monthly reports to the Ministry of Petroleum.[7] The Concession Decree also regulates the currency exchange and how to make payments.

Beyond the various contracts and cost and revenue terms, oil companies also pay taxes on their earnings. The oil taxation regime in Angola is complicated and will be explained in

Chapter 5, which will also discuss additional revenue flows from oil companies to the government, including signing bonuses. For the most part, all these revenue flows are paid directly to Sonangol and should, in theory, be tracked by the Ministries of Petroleum and Finance. However, as will be seen later, these figures are not always consistent or reliable.

The Petroleum Activities Law also mandates that oil companies must bid for a concession contract through a public bidding or open tender process. Alternatively, Sonangol, as concessionaire, can decide to directly award the contract to a company, which will be published in the Official Gazette, but only if it receives no bids following an open tender or if it considers the bids unsatisfactory.[8] However, these tenders are often not public. For example, a total of 13 companies participated in the most recent tender for Angola's pre-salt, deep-water blocks, but it was never officially announced. It should be noted this was Angola's first offshore bidding round since 2007.

In an effort to build national capacity in the oil sector, the Petroleum Activities Law[9] stipulates that the government should promote and give preferential treatment to Angolan-owned companies for the contracting of oil industry services by adopting '...measures to guarantee, promote and encourage investment in the petroleum sector by companies held by Angolan citizens.' Meanwhile, new tax incentives signed into law by the President give even more preferential treatment to Angolan-held companies by offering them tax breaks and other exemptions.

For the Angolan government to mandate foreign oil companies to partner with Angolan companies is neither unethical nor even irregular in a global business context. The problem lies in which companies are selected and how. There is increasing evidence that to comply with host country laws, foreign companies are paying massive fees to public officials and other Angolan elites to contract with 'front' companies that all too often lack the technical capacity and financial resources to support the oil operation. The ownership and shareholding structure is often opaque, and the company's actual capacity to develop the license is often inadequate so the work is done by the foreign oil company.

A series of recent investigations by Angolan and international organisations, and US government agencies have documented public officials' ownership of, and shareholdings in, Angolan companies that have been awarded oil contracts. For example, in February 2010, the small Houston-based Cobalt Energy International formed a consortium with two private Angolan companies, Nazaki Oil & Gas and Alper Oil. The companies participate in oil blocks 21/09 and 9/09. Cobalt paid for these companies' signature bonuses and expenditures in relation to the initial work.[10] In a US regulatory filing in late February 2012, Cobalt stated that it was under a formal probe, started in November, by the US Securities and Exchange Commission (SEC) and the US Department of Justice following allegations that 'one of its junior partners in two of the blocks, Nazaki Oil & Gas, is linked to senior Angolan officials'.[11] Nazaki Oil & Gas is owned by the former Chairman and CEO of Sonangol, and by the Minister of State and his top lieutenant.[12]

It is a clear conflict of interest for the former Sonangol Chairman to sign the agreement with Cobalt in his position as chairman, while also partnering with the company as a private businessman. It is also in violation of Angolan corruption laws.

As for Cobalt, the company is trying to dodge any potential violation of home country laws – namely the US Foreign Corrupt Practices Act – by pre-emptively disclosing its partnership with Nazaki Oil & Gas and Alper Oil to the SEC. In its filings, Cobalt claimed that it was pressured into the partnership by the Angolan government, and was ignorant about the local companies and their shareholders.

There have been similar, albeit uncorroborated, reports that the shareholders of Somoil include a former Petroleum Minister and Industry Minister, the former Chairman of Sonangol and other high-ranking public officials. Somoil is a shareholder in block 2/85, which is operated by Sonangol and includes Petrobras and Chevron as shareholders. Two other private Angolan companies, Poliedro and Kotoil, also participate in block 2/85. Similar uncorroborated reports list the Minister of Territorial Administration and the administrator of the Institute for State Business as Poliedro shareholders. Meanwhile, Kotoil shareholders include two Members of Parliament from the ruling MPLA. Yet another uncorroborated report lists a number of former Sonangol directors and a former Sonangol Chairman as shareholders of Initial Oil & Gas, which holds shares in block 6/06 that is operated by Petrobras.

In agreeing to pay huge fees that go straight into the pockets of Angolan elites and in agreeing to be partners in these concessions, foreign companies are supporting and perpetuating rent-seeking and high-level corruption. For foreign oil companies operating in Angola, the prevailing wisdom is that things are easier with the right partners, and given the profits they stand to make, they are willing to look the other way.

## ENVIRONMENTAL LAWS

Environmental protection in Angola is enshrined in Article 39 of the Constitution, which states that, 'Everyone has the right to live in a healthy and non-polluted environment...' and that the '...State shall adopt the necessary measures to protect the environment and the rational exploitation of natural resources within a sustainable development framework'. The Constitution also establishes the important 'polluter pays' principle – reinforced in a recent Presidential Decree, establishing that those who are responsible for producing pollution are also responsible for paying for remediation of the environment.

In Angola, the Ministry of Environment is responsible for the protection of the environment, including the development and implementation of environmental policies, the most important of which is the 1998 General Environmental Law.[13] This law provides the framework for all environmental legislation and regulations in Angola – along with key international sustainable development declarations – and establishes principles for the prevention and mitigation of pollution.[14]

However, in relation to environmental protection from oil activities, responsibility rests with the Ministry of Petroleum (Minpet), which regulates oil and gas exploration and production activities in collaboration with Sonangol. Minpet is mandated to monitor and inspect oil operations and can impose infractions and penalties for pollution and other illegal activities, although the lines are often blurred among the Ministries of Petroleum and Environment and Sonangol, and even oil industry executives are sometimes confused about the division of roles.[15] Minpet's authority to protect the environment rests mainly within the aforementioned 2004 Petroleum Activities Law.

### ENVIRONMENTAL IMPACT ASSESSMENT (EIA) AND ENVIRONMENTAL LICENSE

Prior to the start of any oil activities, companies need to conduct a study of all possible environmental impacts – called an Environmental Impact Assessment (EIA).[16] The Ministry of Environment reviews and provides comments on the EIA and advises the Ministry of Petroleum on the acceptability of proposed projects. The Ministry of Petroleum gives the final approval to the EIA, and then issues an Environmental License.[17] EIA legislation is the most detailed and specific of all environmental legislation in Angola. However, technical capacity is lacking and there is seldom any follow-up in relation to the implementation and monitoring of EIAs. As a result, it is rare that mitigation measures are taken or penalties imposed on projects that do not comply with EIA rules and recommendations.[18] The law also mandates that there is a public consultation process on the EIA.[19] However, reading dense, technical reports is beyond the capacity of most Angolans, who have even less ability to provide comments.

### ENVIRONMENTAL MANAGEMENT SYSTEMS (EMS)

EMS refers to the management of the oil company's environmental programmes in a comprehensive, systematic and documented manner. Apart from broad statements about the government's duty to protect the environment, there are no legal provisions imposing specific EMS in Angola. Instead, foreign oil companies follow their own standards, in accordance with international standards, such as ISO 14001. All the oil majors operating in Angola have an EMS.

### MONITORING AND COMPLIANCE

Angolan laws, including both the Environmental Framework Law (Article 18) and the Petroleum Activities Law (Article 24), require environmental audits, but mention nothing about how often these audits should be conducted. Article 76 of the Petroleum Law does require companies to submit monitoring reports to the Ministry of Petroleum, but the content and frequency of these is spelled out in the concession license, which is not a public document, and there is nothing in the legislation providing for public disclosure of the reports.

### EMISSIONS

There is no legislation in Angola regulating greenhouse gas emissions. The government ratified the UNFCCC, but not the Kyoto Protocol. Article 73 of the Petroleum Activities Law prohibits gas flaring,[20] but leaves it up to the discretion of the Ministry of Petroleum to make exceptions and impose fines. With the development of Angola's liquid natural gas (LNG) plant, the government aims to reduce emissions, as oil companies plan to gather associated gas from oil blocks for export and domestic consumption.

### WASTE

Oil production generates tremendous amounts of hazardous waste, such as produced water (the underground fluid that is brought up with the extracted oil and gas), metal cuttings and drilling fluids. However, Angolan legislation on waste control and standards is weak. There are two waste related

decrees administered by the Ministry of Petroleum: Petroleum Activities Waste Management, Removal and Disposal, Decree No. 8/05 and Management of Operational Discharge During Petroleum Activities, Decree No. 12/05 – but these merely mandate that oil companies have a plan in place to deal with waste. Presidential Decree 194/11, which regulates responsibility for environmental damage, also thinly references "quality standards in force in Angola are those set out by the International Organization for Standardization..." Assuming this refers to ISO 14000 on Environmental Management – this is would just revert to what the oil majors already utilise as standards. The problem, then, is that there is no adequate monitoring of hazardous waste disposal by government, or public information about the amount of hazardous waste produced. Therefore, responsibility for monitoring and reporting falls on the oil companies. For example, in its 2010 Angola Sustainability Report, BP states that it disposed of 426 tons of non-hazardous waste, but makes no mention of the disposal of hazardous waste.

## PENALTIES, LIABILITY AND ACCESS TO JUSTICE

The law establishes the important 'polluter pays' principle, regulation of which rests in Presidential Decree 194/11[21]. The law mandates that operators immediately inform the government of damages; sets five years as limit for reparation and prevention measures; and grants the right of affected person(s) to seek government intervention, as well as the courts. The law does not exempt companies from civil liability,[22] and citizens can seek recourse through the Public Prosecutor for environmental damages.[23] While companies are mandated to have liability insurance[24], the amount is not specified (this issue has been of major concern in the US following the BP Gulf of Mexico disaster).[25] If companies are found to have breached legislative provisions in general, the Ministry of Petroleum will impose a fine, the amount of which is regulated by decree, with 60 percent going to the State and 40 percent to the Ministry of Petroleum.[26]

## RIGHT TO KNOW

Angolan citizens' right to access environmental information is protected in Article 21 of the Environmental Framework Act. Although important, this provision has not been utilised in Angola.

## EMERGENCY PREPAREDNESS

To deal with the potential for an oil disaster, the government approved the National Marine Oil Spill Contingency Plan in 2008. The plan details procedures in the event of an oil spill, establishes communication structures and a chain of command, and identifies high-risk ecosystems. Companies working in Angola are also required to have their own procedures and preparations in the event of a spill from their facilities. However, the Angolan government has no specialised equipment. So if a major spill occurs, the oil majors (BP, Chevron, ENI, ExxonMobil, and Total) have developed a mutual assistance agreement to allow maximum use of each other's resources. As a result of the BP Gulf of Mexico oil spill, the Ministry of Petroleum has been evaluating new procedures. Still, Angolan officials have publicly stated their concern that the four principal petrol-producing zones do not have local contingency plans.[27]

The Gulf of Mexico spill also prompted the Ministry of Petroleum to establish an Incident Management Team (IMT) that responds to emergencies. Various oil companies in Angola cooperate in the IMT, and IMT equipment is stored at the Sonil base in Luanda. In any emergency response, Sonangol, which leads from a legal point of view, has to be notified and must approve any clean-up or other operation by the IMT. The technical operation and implementation is in the hands of the international oil companies through the IMT.

Sonangol granted 11 new oil licenses in December 2010. The licensing round was the first to focus on Angola's pre-salt region. It is believed the area is analogous to pre-salt Brazil, mirroring Brazilian deposits of high-quality light crude, where oil is located below layers of salt under the seabed. In Angola, the pre-salt layer is between 2,000 and 5,000 meters below sea level. Ultra-deepwater drilling seriously increases the risk of a potentially catastrophic spill given the increased complexity of the operations – exemplified by the failure of the blowout preventer on the BP oilrig in the Gulf of Mexico and the subsequent environmental disaster. Risk assessments have not sufficiently accounted for water depth or spill volume and the Angolan government, by its own admission, lacks the technical expertise and resources to deal with such an event.

Overall, pollution control legislation and environmental standards in Angola are weak. The majority of Angolan legislation serves to establish the 'principle' of environmental protection, with few areas where actual quantified standards have been developed. In the meantime, foreign oil companies apply pollution control standards established by the World Bank, the World Health Organization or control standards from their home countries, but with no mechanism for real enforcement by the various ministries. In the absence of regulations, foreign oil companies tout their voluntary practices under the banner of corporate social responsibility, often only investing in voluntary efforts for their cost-effective ends.

*Information on the oil industry tends to be concentrated within the presidency, Sonangol and key ministries – and little information is provided to the legislature in relation to contracts and other oil-related policies and practices.*

## ADMINISTRATIVE CAPACITY TO MANAGE THE OIL INDUSTRY

Political institutions provide the checks and balances that underpin democracy. Without checks and balances, corruption goes unrestrained. Therefore, corruption can be said to be a symptom of weak institutions. Economically, corruption impedes development since funds are not necessarily invested to promote development of the country as a whole, extends politicians' control over the private sector and blocks competition.[28] In Angola, political institutions that provide checks and balances to potential malfeasance in the oil industry are weak – or non-existent.

Within the legislative branch, Angolan law does not grant the National Assembly the power to investigate state-owned companies, like Sonangol. The state oil company is accountable to the president, and not the National Assembly. Budgetary resources for Assembly members are low. Legislative staff are poorly trained and thinly stretched. The perception of the sector's complexity can serve as a psychological barrier, in as much as legislators do not take advantage of simplified information that is available in the public domain.[29] As a matter of course, legislators receive final audited accounts more than two years after the end of the fiscal year, and the Assembly itself does not regularly receive financial information about the oil sector. In November 2005, for example, Angola's National Bank, for the first time, issued a financial report on the 2003-2004 fiscal year to the National Assembly. Information on the oil industry tends to be concentrated within the presidency, Sonangol and key ministries – and little information is provided to the legislature in relation to contracts and other oil-related policies and practices. On the few occasions that the Assembly has tried to exercise its legislative oversight, the Executive has not responded, or the initiative has been quashed.

In addition, Angolan politics are extremely partisan and legislators often prioritise party loyalty ahead of the public interest. Furthermore, legislators are not directly elected but are appointed through party lists so they do not represent specific constituencies. As a result, they face fewer demands from their 'constituents'. Legislators' reluctance to challenge ministerial counterparts from the same party also limits legislative oversight.

As for the judicial branch, the president appoints all judges on the Constitutional Court, the Supreme Court and the Court of Audits. The prosecutor general also reports to the president. So the judicial branch is institutionally unable to provide the necessary checks and balances.

Institutional capacity at the ministerial level is also weak. Angola's minimalist environmental regulations are partly deliberate, as a means of attracting oil corporations, and partly the result of a dearth of technical capacity within the Ministry of Environment.[30] There is simply not enough local technical knowledge and resources. As a result, oil companies have played a leading role in advising both the Ministries of Petroleum and Environment on the formulation of regulations – something to which even oil company officials will admit.[31] Enforcement is also weak and the Ministry of Environment lacks the political power and resources to ensure compliance. In the event of an oil spill, for example, the Ministry of Environment must rely on Sonangol's helicopters, SonAir, to take staff to the offshore spill site. Meanwhile, water and fish samples are collected by the oil companies themselves and taken to foreign laboratories of their choosing since independent laboratories capable of testing them do not exist in Angola.

Regulatory oversight by the Ministry of Petroleum is also weak when compared to the political power exerted by Sonangol. Every oil block has a chairman from Sonangol, who may communicate further with the Ministry of Petroleum.[32] A report commissioned by Norad, the Norwegian development agency, is illuminating. It states, 'The institutional cooperation between NPD (the Norwegian Petroleum Directorate) and Minpet was started under the assumption that Angola would see a legal institutional change, and that Minpet, or a separate body under Minpet, would assume regulatory functions similar to those of NPD. This development did not take place, as Sonangol was unwilling to reduce its power. It appears evident in retrospect that the anticipated reduced role of Sonangol and increased role of Minpet was not anchored in political reality'.[33]

On fiscal matters, the Ministry of Finance has limited access to Sonangol's accounts. A 2002 IMF-mandated audit of the oil sector by the auditing firm KPMG revealed that the Central Bank was 'unaware of the values of export sales by Sonangol and the foreign

currency generated and the related effect on Angola's balance of payments'.[34] The KPMG audit found that revenues routinely bypassed the Ministry of Finance and the central bank and went directly to Sonangol and the presidency.

Structurally, Sonangol performs functions that should be under the purview of the Ministry of Finance or the central bank. A large share of income and expenditure is executed outside the ordinary budgetary framework and a parallel state finance system exists, which makes it very difficult to track monetary transactions between the various institutions representing the state – such as the treasury, the central bank, Sonangol and the Banco Africano de Investimentos (a private Angolan bank whose largest shareholder is Sonangol). From 1997-2003, unaccounted funds amounted to US$4.22 billion, while from 2007-2010, unaccounted funds amounted to a massive US$32 billion. A World Bank report notes that this 'multifarious work program creates conflicts of interest and characterizes a complex relationship between Sonangol and the government that weakens the formal budgetary processes and creates uncertainty as regards the actual fiscal stance of the state'.[35]

When it comes to management of the oil industry, Sonangol is at the centre. All revenues the government generates from oil production in one way or another go through Sonangol. As concessionaire, Sonangol signs contracts with lease holders and receives a share of profit oil, markets that oil and transfers the earnings to the Treasury. The company holds equity shares in oil fields, which generate income that is then largely reinvested in subsidiaries, joint ventures and other businesses Sonangol oversees. The company also manages other 'quasi-fiscal' activities paid from profit oil earnings due to the Treasury.[36]

Within the international oil sector, Sonangol is regarded as competent, professional and well run. According to a report from the UK's Department for International Development (DFID), 'Even during Angola's civil war, Sonangol repaid its oil-backed loans and stuck to its contracts. It has also negotiated some of the most favourable terms of any African country for its contracts with oil companies. Sonangol employees are the most talented professionals in the country'.[37]

Overall, efforts to strengthen Angola's administrative capacity to manage the oil industry have been limited. Inside the country, institutions that should provide critical checks and balances, particularly on Sonangol, are weak. Meanwhile, the governments of industrialised countries have been unwilling to pressure the Angolan government over issues of governance and redistribution, and have chosen instead to prioritise their own national interests and protect their own business interests and national oil supply.

The Norwegian government, in particular, has been providing technical assistance to strengthen the role of the Ministry of Petroleum since 1987; today that assistance is under the Oil for Development banner. The aim of their most recent 2008-2010 funding tranche of US$2.7 million to the Ministry of Petroleum was to 'promote improved management of national petroleum resources as one of the tools for sustainable economic and social development in Angola. This includes improving the capability to exercise regulatory control and to develop policies and strategies for ensuring better administration of the Angolan petroleum resources'.[38] But Norway's Oil for Development programme adopts a state-centric approach that works within the political economy structures in Angola; it does not address these as the source of the problem.

# FISCAL REGIME, TRANSPARENCY AND ACCOUNTABILITY

## FISCAL REGIME

The oil tax regime is the government's conduit for collecting revenues from oil production. The 2004 Petroleum Tax Law was Angola's first law on taxation of the oil sector. The law harmonises the many disparate fiscal regimes that previously governed oil concessions. In a global sense, Angola's taxation regime is relatively attractive, particularly in comparison to other African oil-producing countries. For example, whereas Nigeria takes in around 80 percent of total oil production and both Gabon and Cameroon take over 70 percent, Angola takes in between 50 and 65.75 percent. But while the taxes may be lower, Angola's tax regime is complex. Below is a breakdown of the tax regime and the government's revenue stream based on the type of contract agreement and company.

| OIL COMPANIES WITH PRODUCTION SHARING AGREEMENTS (COVERS MOST OIL BLOCKS) | OIL COMPANIES WITH JOINT VENTURES (COVERS THE CABINDA AND FS-FST ONSHORE BLOCKS) | SONANGOL |
|---|---|---|
| Petroleum Income Tax: Set at 50% (on the company's share of the 'profit oil'). Paid to Sonangol, which should then revert it to the Treasury Account. | Petroleum Income Tax: Set at 65.75% (on revenues minus expenses). Paid to Sonangol, which should then revert it to the Treasury Account. | Concessionary receipts/revenues: The State's share of 'profit oil'. Sonangol sells this oil in the name of the government and should revert sales to the Treasury Account on a quarterly basis. This is the government's most important revenue stream. |
| Price Cap Excess Fee: This fee is collected when the market price of oil (as established by the Ministries of Petroleum and Finance) rises above a certain cap established in the PSA. The excess is multiplied by the number of barrels of profit oil the company/companies have netted each month. Paid to Sonangol, which should then revert it to the Treasury Account. | Production Tax/Royalty: Calculated as total oil produced minus oil used in operations. Can be paid out in cash or in oil. If paid in oil, Sonangol is responsible for selling the oil and delivering the receipts to the government. Set at 20% (with a possible reduction to 10%). Paid to Sonangol, which should then revert it to the Treasury Account. | Dividends: Paid by Sonangol EP to the State for its shares in Sonangol. |
| | Petroleum Transaction Tax: Payable on the exploration, production, transportation and storage of oil. Set at 70%. Paid to Sonangol, which should revert it to the Treasury Account. | Sonangol may retain up to 10% of the revenues to cover expenses related to the control and supervision of companies. (This includes all revenues except bonuses and possibly the production tax, as the 2004 Taxation Law does not specify). |
| Surface Fees: This is set at US$300 per square kilometre of the area being developed. Paid out to the relevant tax office. | Surface Fees: This is set at US $300 per square kilometre per year of the area being developed. Paid to Sonangol. Paid out to the relevant tax office. | |
| Bonuses: Signature bonuses are paid on the award of a contract to explore and produce oil. These can run into billions of US dollars and are one-off payments. Other bonuses include exploration, first oil and annual production bonuses. These are smaller than signature bonuses and can run into millions of US dollars. Paid to Sonangol, which should then revert them to the Treasury Account. | Bonuses: Signature bonuses are paid on the award of a contract to explore and produce oil. These can run into billions of US dollars and are one-off payments. Other bonuses include exploration, first oil and annual production bonuses. These are smaller than signature bonuses and can run into millions of US dollars. Paid to Sonangol, which should then revert them to the Treasury Account. | |
| Training of Angolan Personnel: Specific amount stipulated by decree. Paid into the National Treasury. | Training of Angolan Personnel: Specific amount stipulated by decree. Paid into the National Treasury. | |

The Ministry of Finance posted annual oil revenues of US$37.99 billion for 2011. The bulk of this – US$25.26 billion – was from Sonangol. Of the remainder, US$6.68 billion came from the petroleum income tax, US$2.56 billion from the petroleum production tax, and US$3.49 billion from the petroleum transition tax.[39]

Companies also make direct tax payments to provincial governments – set at 10 percent of the oil tax income stemming from oil produced in the provinces of Cabinda and Zaire.[40] The idea is that the tax revenue will help offset some of the costs of hosting facilities in the province.

Previously, oil companies operating in Angola were not required to use Angolan banks in lieu of foreign banks to make their financial transactions. Legislation, enacted early this year now[41] requires oil companies (starting May 2013) to use local banks to make all payments related to their oil operations – including tax payments, payment of bills owed to local providers, and even payments to foreign suppliers.

It should be noted that the tax rate for the oil industry is the highest for any industry in Angola. As a basis of comparison, the standard rate of Angola corporate tax is 35 percent. Mining is taxed at a slightly higher rate of 40 percent,[42] while agriculture and forestry enjoy a reduced corporate tax rate of 20 percent.[43]

Until recently, the tax rate for the oil industry applied across the board, but the recent Presidential Legislative Decree 3/12 favours the national oil industry. The new tax regime reduces the oil income tax rate for Angolan oil companies whose capital is held entirely by Angolan individuals from 50 percent for companies engaged in PSAs with Sonangol to 35 percent, and from 65.75 percent for companies in joint ventures to 35 percent – the standard corporate tax rate. The law also grants Angolan companies exemptions from paying signing bonuses and contributions to social programmes.

## TRANSPARENCY

Transparency is a fundamental and necessary, but not sufficient, condition for successful management of the oil industry, and for the efficient and accountable taxation of oil industry rents. For Angolan citizens, journalists, members of the National Assembly and watchdog groups to hold the Angolan government to account for the responsible use of oil rents, there must be public information about the sector. But in Angola, there is little transparency regarding the public management of oil wealth. The country ranks 168th out of 183 countries in Transparency International's 2011 Corruption Perception Index. The oil industry is the backbone of the Angolan economy, accounting for around 80 percent of public revenues, yet the government has kept oil accounts, revenues, expenditures and contracting procedures concealed. In particular, the relationship between the government and Sonangol is secretive and complex. Most oil revenues flow through Sonangol, which feeds a vast patronage system with these revenues. This patronage system, overseen by the President, has kept the ruling MPLA party and the government in check by rewarding elite public officials, family members and the military.

However, in response to increasing public scrutiny, the government has taken some steps since 2004 to increase transparency by publishing data on the production and export of oil, as well as taxes and royalties and other revenues to the government. There is undoubtedly more information disclosed now than ever before. The Ministry of Finance publishes block-by-block oil prices, taxes, royalties and export data, as well as the revenues of Sonangol on a monthly basis on its website. Likewise, the Ministry of Petroleum publishes data on oil production and export on a monthly basis on its website. Sonangol also publishes audited annual financial statements on its website. But while there is more information publicly available, this has not necessarily led to increased transparency. As OSISA's own reporting with Global Witness[44] has concluded, the information published by the Ministries of Petroleum and Finance and Sonangol is not consistent, comprehensive, reliable or independently verified. Without accurate information, Angolan citizens cannot hold the government to account for responsible usage of public funds. The report flagged some of the biggest gaps in the data, including:

- The sum totals of concessionary payments reported by the Ministry of Finance and Sonangol are similar, but when broken down by block, they disagree in a way that cannot be explained from the reports themselves;
- There are substantial discrepancies between the receipts reported for petroleum income tax paid to the Angolan government by the Ministries of Finance and Petroleum. Both report higher receipts of income tax from Sonangol than Sonangol reports in its own accounts;
- There is a large discrepancy between the petroleum transaction tax figures from the Ministries of Petroleum and Finance that cannot be explained;
- Sonangol records large dividend payments that do not appear to be accounted for in other government reports; and
- Signature and other bonuses paid by oil companies to the government appear to be poorly reported when compared to what has been reported in the media and in government accounts.[45]

Picking up where that earlier report left off, a partial review of currently published data records similar discrepancies. For example, concessionary revenues for the year 2010 (the latest annual figures published by Sonangol) reported by Sonangol and the Ministry of Finance vary on a block-by-block basis and in total.

| OIL BLOCK | CONCESSIONARY REVENUES MINISTRY OF FINANCE (IN DOLLARS AND KWANZAS) | CONCESSIONARY REVENUES SONANGOL (IN DOLLARS* AND KWANZAS |
|---|---|---|
| Block 2-05 | 56,796,054 USD<br>5,090,119,182 AKZ | 52,956,039 USD<br>4,918,239,235 AKZ |
| Block 2-85 | 45,527,183 USD<br>4,133,349,277 AKZ | 45,445,054 USD<br>4,220,664,034 AKZ |
| Block 3-05 | 433,586,420 USD<br>37,122,517,786 AKZ | 444,904,870 USD<br>41,320,094,957 AKZ |
| Block 3-85 | 172,726,591 USD<br>13,051,860,788 AKZ | 157,313,340 USD<br>14,610,319,214 AKZ |
| Block 3-91 | 125,821,053 USD<br>9,424,819,544 AKZ | 118,501,246 USD<br>11,005,684,724 AKZ |
| Block 4 | 18,039,260 USD<br>1,652,375,616 AKZ | 21,954,612 USD<br>2,039,012,642 AKZ |
| Block 14 | 2,115,075,178 USD<br>182,010,766,467 AKZ | 2,320,033,670 USD<br>215,470,807,080 AKZ |
| Block 15 | 7,770,321,179 USD<br>655,312,869,902 AKZ | 7,573,691,091 USD<br>703,398,986,441 AKZ |
| Block 17 | 5,223,258,488 USD<br>426,3,74,560,096 AKZ | 5,198,820,822 USD<br>482,835,285,097 AKZ |
| Block 18 | 429,178,728 USD<br>33,639,181,455 AKZ | 367,314,441 USD<br>34,113,961,437 AKZ |
| **TOTAL** | **16,390,330,114 USD**<br>**1,367,812,420,115 AKZ** | **16,300,935,190 USD**<br>**1,513,933,054,862 AKZ** |

Likewise, total oil exports reported by the Ministry of Finance and Ministry of Petroleum vary.

| | MINISTRY OF FINANCE | MINISTRY OF PETROLEUM |
|---|---|---|
| Total oil exports (barrels) | 52,324,030 | 50,889,569 |

The discrepancies in the data can amount to massive sums. In 2002, as a pre-condition of the International Monetary Fund (IMF) for eventual lending, the international accounting firm KPMG initiated a monitoring system and an assessment of Angola's oil revenues. This Oil Diagnostic highlighted major mismanagement of oil revenues, and raised a series of serious issues, including US$4.2 billion of unaccounted oil revenues for the years 1997-2002. Eventually, in 2009, the IMF agreed to a stand-by agreement and granted Angola a loan of US$1.4 billion to stabilise its balance of payments after a drop in the price of oil and improve transparency in the government's accounting process. More recently, in December 2011, the IMF issued a report that highlighted an unexplained US$32 billion discrepancy in the Angolan government's 2007-2010 fiscal accounts linked to Sonangol's quasi-fiscal activities. This figure amounts to a quarter of Angola's gross domestic product.

These quasi-fiscal activities are financed out of oil revenues, but are not recorded in the national budget and thus lie completely outside the official process. These activities include fuel subsidies and the servicing of the national debt. Responding to the IMF, the Angolan government stated it would release Sonangol from this function in the future.

Beyond oil revenues, there is even less transparency around expenditures and credit lines for investment projects. The public procurement process is lax and the National Assembly has little oversight over major investments. For example, the government is investing billions of dollars in infrastructure projects – financed by oil-backed Chinese bank loans – that have been controlled by the National Reconstruction Cabinet (GRN), which was originally created by President Jose Eduardo dos Santos to deal with the country's massive reconstruction projects. But the institution is ad hoc, reports only to the president and has been run by a retired general. Since September 2010, Sonangol's housing arm, Sonip, succeeded GRN in relation to the construction of housing and infrastructure – yet there has been no thorough reporting of GRN's accounts to the National Assembly.

### DODD-FRANK 1504 AND THE EXTRACTIVE INDUSTRIES TRANSPARENCY INITIATIVE (EITI)

Outside Angola, there are efforts to increase transparency around reporting of oil payments from companies to governments and ensure these are not aiding corruption. In July 2010, the US Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act, which included an important transparency provision, Section 1504. The law mandates oil, gas and mining companies registered with the US Securities and Exchange Commission (SEC) to publicly report their payments to foreign governments for access to the country's oil, gas and minerals. This provision follows years of lobbying by international human rights and transparency groups. Payments to be disclosed include taxes, royalties, fees (i.e. license fees), dividends, production entitlements, in-kind payments, infrastructure improvements and bonuses. The data will be provided in a disaggregated manner, on a project-by-project basis, and includes data from all companies, their subsidiaries and other entities under their control. Companies will disclose annual payments over US$100,000 and will report this on an annual basis. The data will be publicly available on the SEC website. Partial reporting will begin after September 30th, 2013.

The US Congress mandated that the SEC make the rules for the law and the SEC finally announced the rules in August 2012, following almost two years of intense lobbying by industry groups – namely the American Petroleum Institute and the US Chamber

## ACCOUNTABILITY

In Angola, the most powerful institution is the presidency, followed by Sonangol. Their complex and secretive relationship has created a sort of parallel government, wherein oil revenues that flow from Sonangol feed a patronage system that rewards an elite few and keeps the government and MPLA in check, while completely bypassing the formal structures of government that could provide needed checks and balances.

Accountability laws are mixed. There are some strong anti-corruption laws in the statute books, while other legislation serves to perpetuate state secrecy. However, the institutions to enforce the laws are weak. Without institutions to enforce the laws and, more importantly, break the political hold that the presidency and Sonangol have over the country, real democracy will not be possible.

There is nothing in Angolan legislation that protects illegal acts in business, but existing legislation does perpetuate secrecy and creates a loophole for the mismanagement of oil revenues. Article 77(1) of the Petroleum Law states that '...all finance related information provided by oil companies should be confidential'. The Petroleum Taxation Law states in article 68 (1) that '...all revenues received from oil companies should be kept confidential'.

However, the template for Sonangol's Production Sharing Agreements (Article 34 and 33 for Cabinda and all other blocks respectively) states, 'Unless otherwise agreed by Sonangol... all technical, economic, accounting or any other information... shall be held strictly confidential...either party may, without such approval, disclose the aforementioned data: to the extent required by any applicable law, regulation or rule (including without limitation, any regulation or rule of any regulatory agency, securities commission or securities exchange on which the securities of such Party or of any such Party's affiliates are listed)'. And the Angolan government does provide this authorisation. For example, Norway's Statoil discloses payment information from all the countries where it operates, including Angola, as required by Norwegian law. The Brazilian company Petrobras also discloses payment information from countries where it operates.

Beyond this, the Angolan Constitution explicitly establishes the right to freedom of information. Constitutional Article 40(1) states, 'Everyone shall have the right...to inform themselves and to be informed, without hindrance or discrimination'. In 2002, the National Assembly passed the Law on Access to Administrative Documents, which grants open access to public documents and the right to request information. But implementation of the law is unclear and it was eventually subverted by the State Secrets Law,[46] which preserves the government's right

of Commerce, which had been pressing the SEC to weaken the rules. In particular, industry groups claim that such transparency will hurt their ability to compete. They pushed for the project-by-project disclosure requirement to be scrapped and for exemptions in countries whose laws and contracts prohibit such disclosure. Industry groups had cited Angola as such a country – although exemptions in Angolan contracts do allow for such disclosure.

Similar transparency legislation in other countries is closing the transparency loop with even stricter requirements. In mid September of this year the European Parliament's Legal Affairs Committee voted to require EU-registered oil, gas, mining and forestry companies, as well as large private companies, to disclose all payments of €80,000 or more to governments – also country by country and project by project. If the European Commission and individual member states vote for the final directive, these new transparency requirements would apply to hundreds of companies not covered by the Dodd-Frank requirements, including state-owned companies. The final vote is anticipated early next year.

Interestingly, many the companies that have been lobbying for weaker transparency rules also support the Extractive Industries Transparency Initiative (EITI). The EITI is a ten-year old multilateral process that establishes a set of voluntary global standards for transparency in oil, gas and mining – transparency over payments by companies to governments, as well as transparency over revenues by host country governments. Companies operating in countries that are implementing the EITI have to publish what they pay to the government. Currently about a dozen countries are EITI compliant countries and two-dozen others are EITI candidate countries. The crux is that while US and EU legislation is mandatory, the EITI is a voluntary process that is not binding and lacks enforcement mechanisms. Data standards also vary among countries that have signed up and the data is often imprecise and unverifiable. Angola is not a participant in the EITI process.

to classify information with high discretion. It states that '... financial, economic and commercial interests of the State can be classified as secrets'. The law also grants the government the authority to imprison anyone who releases information that could be regarded as damaging to State interests.

At the international level, Angola is also party to the International Convention on Civil and Political Rights, which states in Article 19, 'Everyone shall have the right to hold opinions without interference. Everyone shall have the right of freedom of expression; this right shall include freedom to seek, receive and impart information and ideas of all kinds'.

As per anti-corruption laws, the Benefits of Public Office Bearers, Decree 23/90, prohibits public officials from engaging in business activities involving the state for personal benefit. Decree 24/90 also deals with Rules for Gifts to Public Office Bearers. The Law of Crimes Against the Economy criminalises extortion, as well as passive corruption: Section 49(1) deals with active corruption, Section 17 deals with illegal appropriation of goods, and Section 19 deals with improper use of goods and services. These laws have since been harmonised under the new Public Probity Law.

Since November 2009, President dos Santos has been calling for a 'zero tolerance' approach to tackle public corruption. In response, the National Assembly approved a law on Public Probity in March 2010, which regulates the use of public funds and goods in Angola. The law penalises corruption and obliges top public officials to declare their personal wealth at home and abroad. Although the law is transparent and clear, it never mentions the word 'corruption'. The law allows anyone to denounce abuses by public figures, but severely penalises anyone making accusations that are deemed to be false. Important articles include:

- Article 18: Prohibits public officials from receiving gifts, either directly or indirectly, from Angolan or foreign entities'
- Article 25(1a): Prohibits officials from receiving money, assets or other economic benefits, either directly or indirectly, in business deals where they have decision powers or influence; and
- Article 25(1h): Forbids public officials from pursuing jobs or consulting services that may pose a conflict of interest.

At the international level, Angola is also a signatory to the Convention Against Corruption of the African Union, the United Nations Convention Against Corruption and the SADC Protocol Against Corruption.

However, Angola does not have a politically independent anti-corruption institution with a mandate to investigate

and prosecute corruption cases. There are agencies with some level of accounting mandate, but many of these report to the president.

In July 2010, the National Assembly passed the Money Laundering and Combating the Financing of Terrorism, Law No. 12/10, although implementation of the law is largely deficient. The 2002 Audit Law, which requires audits for all 'large' companies, has also failed to make a difference since the lack of a professional accounting oversight body has impeded its enforcement, and because the law does not require audit results to be made public.[47] There is also no legislation in Angola that protects whistle-blowers from retaliation – neither in the public nor private sector.

As previously mentioned, the president appoints all judges to the Court of Audits, which is Angola's supreme audit office. This agency has the authority to conduct audits of public agencies, including the Ministry of Finance and Ministry of Petroleum. Although the Court has recently started to audit the accounts of some ministries and provincial governments, it generally struggles to operate in the face of large unaccounted funds and a restrictive political environment. The findings and recommendations of the Court are not discussed inside the National Assembly and are not disclosed to the public.

Angola also has an Attorney General and any citizen can lodge a complaint if there is evidence of corruption. This is enshrined in the Constitution. The office has 20 days to decide on the merits of a case, and 3 months to make a determination. Once that time expires, the citizen can then seek international remedy. The Attorney General reports to the president.

In 2005, Angola established the Office of the Ombudsman. However, it is not sufficiently protected from political interference to be wholly efficient, nor does the government take heed of its reports. The Ombudsman reports to the Commission of the National Assembly twice a year, but these reports are not publicly available.

A High Authority Against Corruption was supposed to be created, as per the 2005 Law of the High Authority Against Corruption. However, this mechanism has not yet been established. Section 8 of the law provides for the President to propose the creation of mechanisms to the National Assembly.

Although judicial institutions in Angola lack the political independence, means and technical expertise to hold the oil industry to account, civil society in Angola is using existing legislation to lodge citizens' complaints about alleged public corruption. For example, in January 2012, an Angolan transparency activist filed suit under the Public Probity Law against the head of Sonangol, the Minister of State and his advisor – as partners of Nazaki Oil – and the directors of Cobalt for illicit enrichment (art. 25,1,a) and for failing to comply with a mandatory public tendering process (Petroleum Law No. 10/04). Cobalt's partners were also accused of influence peddling and active corruption of leaders (as per Criminal Code Art. 321). Angola's Attorney General did not properly responded within the 20 allotted days, but the investigation – coupled with a US Department of Justice and SEC investigation – did garner international attention.

## OIL REVENUE UTILISATION

### HUMAN CAPITAL

The oil industry provides more than 85 percent of total government revenue.[48] Effective revenue distribution mechanisms are a condition for the effective use of revenues. In Angola, revenue distribution mechanisms are insufficient. This insufficiency results in high levels of poverty and inequality. Angola ranks 148th of 187 countries in the UN Human Development Index and two-thirds of Angolans live on less than US$2 per day.

The government's 2004 Poverty Reduction Strategy Paper is loaded with terms like social equity and redistribution.[49] But this strategy was never adopted. Instead of pro-poor development, Angola's political economy is characterised by a development model that is controlled by a narrow state-based elite and redistributes wealth upwards and outwards.[50] Public services are portrayed not as citizens' rights and legal entitlements, but as commodities that citizens must pay for or as gifts that they must show gratitude for.

*The oil industry provides more than 85 percent of total government revenue.*

Government spending accounts for around 33 percent of GDP.[51] Yet, when it is broken down, the share spent on social sectors is low. In Angola, one of the greatest deficiencies is human capital. For example, from Angola's 2011 annual budget of US$45 billion, only 13.5 percent was earmarked for education and health – with education receiving just 8.37% (3.76 million) and health 5.14% (2.31 million).[52]

Conversely, 41.7 percent of the budget was earmarked for 'general public services', which include the executive branch, fiscal and finance issues, external relations, general services, basic investigation. And the distribution of public expenditure on social sectors is even more biased when it comes to spending on different regions.

## NATIONWIDE REVENUE DISTRIBUTION

By law, the provinces of Zaire and Cabinda are assigned the equivalent of 10 percent of the tax income from the oil activity in each province. This revenue is allocated to public investment expenditures, with a view to enabling these provinces to benefit more directly from oil activities. It is unclear whether these funds represent additional money for Zaire and Cabinda or whether they simply replace money earmarked for regional budgets. What's more, the 10 percent is unreliable and the distribution policy does not account for the inflated cost of living resulting from an inflated local market because of the industry's presence in the regions. Among the remaining provinces, the revenue distribution policy has increased inequality and animosity, as there is no nationwide revenue distribution mechanism. These stark inequalities are evident when distribution is broken down per province as a percentage of the US$45 billion 2012 state budget[53]:




*Central government:* ***82.62%***
*Luanda province:* ***3.88%***
*Remaining 17 provinces:* ***13.50%***

| PROVINCE | ANNUAL BUDGET (IN US DOLLARS) |
|---|---|
| Bengo | 258,288,306 |
| Benguela | 647,289,723 |
| Bié | 337,183,308 |
| Cabinda | 459,715,178 |
| Central government | 37,187,032,267 |
| Exterior | 340,959,555 |
| Huambo | 520,976,879 |
| Huíla | 505,330,464 |
| Kuando Kubango | 281,068,038 |
| Kuanza Norte | 247,148,660 |
| Kuanza Sul | 297,377,050 |
| Kunene | 233,299,042 |
| Luanda | 1,745,717,950 |
| Lunda-Norte | 232,830,112 |
| Lunda-Sul | 231,032,284 |
| Malanje | 359,040,541 |
| Moxico | 314,180,943 |
| Namibe | 205,654,510 |
| Uíge | 384,228,275 |
| Zaire | 222,709,811 |

