# EXHIBIT 11-B



Instead of pro-poor development, Angola's political economy is characterised by a development model that is controlled by a narrow state-based elite and redistributes wealth upwards and outwards.

James Oatway/Sunday Times

Angola's oil industry operations    21

## SMALL AND MEDIUM ENTERPRISES

Beyond this, the government should facilitate employment by supporting micro, small and medium-sized enterprises (SMEs). Earlier in 2012, the government announced that it would invest US$1.8 billion – financed through the state budget, national development fund and others – to help create SMEs, develop existing ones and reduce the economy's dependence on the state. The government is the country's biggest employer and support for SMEs, particularly through credit extension, would go a long way towards enabling sustainable development in Angola. The Catholic University of Angola's socio-economic research centre, CEIC, records unemployment at around 25 percent, but notes more than half of the population relies on the informal sector to generate

## INFRASTRUCTURE INVESTMENTS

Instead of direct investments in the provision of social services and lines of credit for the development of Angola's non-oil private sector, the government has largely utilised oil revenues to fund large infrastructure projects, including railway lines, airports, road construction and housing. But the country's lax procurement policies have led to suspicions that significant leakage and corruption occur through these large-scale projects. As stated previously, these projects have been administered through the National Reconstruction Office (GRN), which was created to manage large investment projects, and in direct response to political rivalries within the state[56]. The GRN is exclusively accountable to the president and

allocated among projects and how much money has been spent so far. What's more, since September 2010, Sonangol's housing arm, Sonip, has succeeded the GRN in relation to the construction of social housing and infrastructure. However, the transfer of these GRN activities was not preceded by a clarification of finances, nor have GRN competences returned to appropriate ministries.

Interestingly, in March 2011 the government established the Petroleum Development Fund by Presidential Decree 48/11. This new fund, financed from oil revenues, is expected to promote the development of energy and water projects. The government, for example, is expecting to invest around US$20 billion in the

*The President's son and nephew were appointed to the fund's board, and the presidential economic advisor will head the fund.*

income, and in rural areas most remain dependent on subsistence farming.[54] Beyond human capital and social capital constraints, poor entrepreneurs in Angola are financially constrained. A 2008 survey commissioned by the Angolan Central Bank and UNDP found that 'only 0.4 percent of micro, small and medium-sized enterprises in Angola have obtained credit' and that 'most banks limit their lending to a select group of customers whom they know and trust', while 'most businesses and households continue to lack access to financing for investment'.[55]

does not operate within the formal structures of government. The GRN was headed by the president's top military advisor and Head of the Military House. The GRN managed a 2005 US$2.9 billion oil-backed line of credit from the China International Fund for infrastructure projects, which were to be carried out by Chinese construction companies. Although GRN's financial flows should officially pass through the Ministry of Finance's accounts,[57] it is unclear how much money is directly managed by the GRN, how funds are

construction of new hydroelectric dams over the next five years. The fund has a legal status, owns property and assets and has administrative and financial autonomy. It is seen as a public relations initiative in response to criticisms that the oil sector lacks transparency and revenues are not invested on poverty alleviation. The President's son and nephew were appointed to the fund's board, and the presidential economic advisor will head the fund.

## POLICIES AND PRACTICES
## OF SONANGOL

Behind the presidency, Sonangol is the most economically and politically important institution in Angola. Sonangol is at the centre of the country's financial strategy. Billions of dollars in oil rents pass through Sonangol and are reinvested and doled out to feed the vast patronage system that helps the presidency and party maintain political power.

Sociedade Nacional de Combustíveis de Angola (Sonangol E.P.) was established in 1976 and is the largest company in Angola. Its roles are various. It is the country's sole concessionaire, and the lead negotiator for every oil exploration and production license. The company also produces petroleum, and has exploration and production capacity. Sonangol funds its share of production through oil-backed borrowing. It collects oil revenues and sells oil on behalf of the state. It regulates the oil industry. But Sonangol reaches beyond oil, with a diverse portfolio, under the banner of Grupo Sonangol, which consists of dozens of subsidiaries that have Sonangol as their primary client. Sonangol has been acclaimed as the country's most competent institution and, through strategic global investments, it is a primary vehicle used to control Angola's image abroad.[58] Sonangol reported US$33.78 billion in sales and US$3.3 billion in net profits for 2011.[59]

Sonangol's current structure and control of oil rents provide major vehicles for potential mismanagement of state funds, including:[60]

- Like other oil companies operating in Angola, Sonangol is liable for taxes. The core of its assets consists of the equity shares in the oil concessions that the government has entrusted to it – meaning, its partnership in oil blocks. These assets generate a net income that, in theory, should go to the State as the exclusive shareholder in Sonangol, but in practice, these funds are largely reinvested in Sonangol and its subsidiaries. In 2009, for example, these funds amounted to US$2.8 billion.

- As concessionaire, or government fiscal agent, Sonangol signs the production sharing agreements with foreign oil operators in Angola and receives a share of the profits from that oil, which are then transferred to the national treasury.

- Sonangol is tasked with an array of quasi-fiscal activities (QFAs), which are paid from the aforementioned oil profits that are transferred to the treasury. These activities, for example, include free supply of fuel to certain agencies. Yet these QFAs are not fully included in the government budget, nor are they explicit in Sonangol's financial statements. For example, the 2010 budget includes US$9.8 billion to cover the 'general subsidisation and free supply of retail petroleum products to select agencies'. It is these quasi-fiscal expenditures that account for the missing US$32billion, as reported by the IMF in its December 2011 report.

- Sonangol receives signature bonuses – as mandated by the Petroleum Law and PSAs – paid by foreign oil companies on the award of a concession. Signature bonuses are standard practice around the world. They are leveraged during the public bidding process for granting an oil concession and weighed against other offers. The amounts of these one-time payments are largely undisclosed, but can range in the billions. For example, industry media reported that in 2006 Petrobras paid US$50 million for oil block 26, while Petrobras paid US$1.1 billion for oil block 18 and Total also paid US$1.1 billion for oil block 17.[61] These funds should also be reverted to the national treasury.

- Oil companies, as per their PSAs, also pay a contribution to Sonangol for social projects. The amount of these is stipulated each contract and is also largely undisclosed. There is no public information about what types of social activities oil companies finance under PSAs or their selection criteria. Sonangol dictates the use of these funds in dialogue with the operator of each block and Sonangol controls the use of the funds. Also, as per the Petroleum Activities Law, a portion of the aforementioned signature bonus is also earmarked for social purposes. There is little information on how the funds for social purposes are used, and, again, Sonangol has the final decision on the use of these funds.[62]

And it does not end there. Sonangol is currently at the forefront of several key sectors of the economy, and its interests are expanding. The taxes Sonangol pays to the state are largely reinvested in Sonangol, its subsidiaries and other projects – which are growing and diversifying. On its website, Sonangol claims to have approximately 30 subsidiaries. Sonangol's Sonagas, for example, is developing Angola's natural gas, while Sonangol Shipping and Sonangol Distribuidora transport crude oil and supply downstream petroleum products to domestic markets respectively. Sonangol is involved in housing via Sonip, which is currently overseeing development of the Special Economic Zone outside Luanda as well as several housing projects in Lobito and others. Sonip's main partner is China's CITIC[63] construction company.[64] Sonangol will be involved in manufacturing, via the newly created Sonangol Investimentos Industriais, particularly in the economic zone of Luanda Bengo. Sonangol is also involved in telecommunications via MSTelcom, in air transportation via SonAir[65], and in health care via Clínica Girassol. Beyond these, Sonangol has a dozen other oil-related subsidiaries and projects.[66]

Sonangol has also been acutely involved in the banking sector – and some Angolan banks were first established with Sonangol as the main shareholder, such as the Banco Africano de Investimento (BAI). BAI currently ranks as Angola's top bank with assets of US$7 billion.[67] In 2010, it was the subject of a money-laundering inquiry by a US Senate panel. The panel analysed the ties between the multinational bank, HSBC, and Angola, alleging that HSBC provided US banking services to politically connected officials of Sonangol through BAI without designating the transactions as potentially high risk. Sonangol also has an indirect share of the Portuguese oil company, Galp Energia, through a joint venture with the president's eldest daughter and BAI. Sonangol is also a major shareholder in Millennium BCP, Portugal's biggest private bank.

Furthermore, Sonangol's reach outside Angola is growing. Sonangol maintains Sonangol USA Company (for US markets), Sonangol Limited (for UK markets), and China Sonangol. Sonangol has operations, exploration ventures and equity in oil projects in Cape Verde, Congo-Brazzaville, São Tomé and Príncipe,[68] Brazil, Cuba, Venezuela and the Gulf of Mexico. The company withdrew from Iraq last December and recently announced withdrawal from Iran because of international sanctions.

Set up in Hong Kong in 2004, China Sonangol is a key joint venture for the company. Sonangol maintains a 30 percent share, while private Hong Kong investors own the remaining 70 percent. China Sonangol is part of what a US agency has dubbed 'The 88 Queensway Group' – a series of Chinese firms operating in Angola and elsewhere with headquarters in the same Hong Kong address, which includes China International Fund.[69] Until September 2011, the chairman of Sonangol also served as chairman of China Sonangol. China Sonangol is shrouded in secrecy and has been at the centre of global investigations.[70] The company and its subsidiaries[71] have 'pledged to invest billions of dollars across sub-Saharan African, Latin America and South East Asia, largely as part of resource for deals in Guinea and Zimbabwe'. China Sonangol currently holds shares in 4 oil blocks in Angola. China Sonangol is also a partner in Sonangol Sinopec International (SSI), which is joint venture with the state-owned China Petroleum and Chemical Corporation (Sinopec).[72] SSI holds shares in 4 oil blocks. The Economist reports that China Sonangol buys oil from Angola at a low price that was fixed in 2005 and sells it to China at today's market price – a US$50/barrel difference (although the contract is a secret). In return, the China syndicate is involved in housing, infrastructure, roads, railways, hydroelectric plants and other projects.[73]

When the price of oil dropped in 2009, the Angolan government turned to the IMF for financing (the government owed US$9 billion in arrears to foreign construction firms in the country[74]) and the IMF agree to a US$1.4 billion loan. Ironically, shortly after this agreement, Sonangol bought a 20 percent share of Marathon's stake in offshore block 32 for US$1.3 billion.[75] The Sonangol Chairman was quoted in a Sonangol magazine as saying, "We will add this share in block 32 to a joint venture we have with the Chinese called China Sonangol."[76]

## POLICIES AND PRACTICES OF MULTINATIONAL OIL COMPANIES

In Angola, oil production is increasingly taking place in deep and ultra-deep water. The technology involved in drilling is complex, and the field development costs are extremely high, as are the risks. Small players cannot participate without linking up with large multinationals – and even Chinese companies, although partners, are not operators in these oil concessions. Therefore, multinationals are irreplaceable and this increases their leverage and ability to influence government policies. Beyond this, foreign companies have market power and technical capacity that could potentially be directed towards boosting Angola's overall development. Instead, in Angola, as across the globe, multinationals' influence has primarily been directed at ways to maximize their profit.

Angola's multinational oil operators include: Chevron (US), ExxonMobil (US), BP (UK), Total (France), Petrobras (Brazil), Cobalt (US), Tullow (UK), Vaalco (US), Pluspetrol (Argentina), Maersk Oil (Denmark), Eni (Italy); and those awarded licences to operate in the most recent pre-salt deep-sea concessions: Statoil (Norway) and Repsol (Spain). Beyond these, a number of other foreign oil companies are partners in oil blocks, including: Galp (Portugal), SSi (China), Marathon (US), Falcon Oil (US), Prodoil (Norway), Ajoco (Japan), Svenksa (Sweden), Tenenge (Brazil) and Partex Oil & Gas (Portugal). Other companies include Acrep, Inter Oil, Geminas, Initial Oil & Gas, Ina-Nafta, Naftagas, Force Petroleum, Alper Oil, Nazaki Oil & Gas, and Somoil. Chevron has the longest history in Angola, beginning its operations in the late 1950s. Meanwhile, BP has been in Angola for almost 40 years, Statoil for almost 20 and ExxonMobil since the mid-1990s.

On the whole, oil companies do not touch governance or transparency issues in Angola and this has historically always been the case. Multinational companies have been drilling for oil in Angola for decades and, in general, securing their access to the state-controlled commodity means that they have needed to remain on good terms with each government in turn. In Angola, this translated into oil financing and fuelling the post-independence civil war – through weapons procurement, dubious charitable donations, and other forms of assistance.[77] While UNITA forces had access to diamonds, the MPLA exploited the oil revenues.

Co-operation among the oil majors would make it difficult for the Angolan government to threaten to or even expel firms on purported violation of domestic laws. Instead, companies' continued transactions with the government – without calling the terms of the transactions into question – has facilitated patronage problems, encouraged rent seeking and exacerbated the resource curse.

However, there are some exceptions. In 2001, BP announced that it would publish its total production by block, its payments to Sonangol, the taxes it paid to the Angolan government and its signature bonuses. But this attempt at transparency was met with an aggressive response from Sonangol and a threat to revoke its licence. Ironically, this is the same level of revenue reporting under the US Dodd Frank Act that BP – and other multinational members of the American Petroleum Institute – lobbied to try and prevent.

Among the oil majors, Norwegian companies lead in transparency efforts. Statoil has been disclosing information, such as that now mandated by the Dodd Frank Act, in Norway as per Norwegian securities regulations. The company uses the disclosure exemption provision in its Production Sharing Agreement with Sonangol, whereby Sonangol will authorise foreign operators to publish such information if mandated by home-country laws.[78] Outside of the Norway, Angola is the largest source of oil for Statoil – relying on Angolan crude for over 170,000 barrels of its 2 million barrels per day portfolio.[79] Meanwhile, another Norwegian firm, Norsk Hydro, has tried

*companies' continued transactions with the government ... has facilitated patronage problems, encouraged rent seeking and exacerbated the resource curse.*

to include anti-corruption provisions in its contracts. After singing a PSA with Sonangol in 2005, Norsk Hydro attempted to incorporate in its joint operating agreement a 'warranty that the parties would not make corrupt payments and a requirement that any public officials with an ownership interest in one of the partners would not participate in governmental decisions affecting the venture (as already required by Angolan law)'.[80] Although laudable, these efforts are singular and have not been copied by others in the industry.

On its part, Chevron has been consistently complacent in efforts to address governance problems. In Cabinda, in particular, where the company has the biggest presence, community groups have for years been calling on the company to use its economic power as leverage with the Angolan government – and for years, Chevron has stated that it does not get involved in democracy or governance issues.[81] Chevron is the most important market player in Angola's oil industry and the oldest foreign operator. The company has been drilling for oil in Angola since 1958, through its subsidiary Cabinda Gulf Oil Company. It is the lead operator in Angola's most profitable oil blocks (namely block 0), and it is the largest foreign oil industry employer.[82] It is one of Angola's largest oil producers, with shares in deep-water and shallow-water oil wells and in Angola LNG. The company also invests millions of dollars in CRS projects, but none of this money is directed at democracy building initiatives.

However, Chevron is not the exception. Multinationals often tout their CSR projects as a means of improving the livelihoods of the communities where they operate. In Angola, multinationals contribute to social activities through three different channels, two of which are required by law and one of which is voluntary:[84]

Production Sharing Agreements broadly require companies to support CSR projects, although what these projects consist of and how exactly they are developed is not clear. Nor is there information on how the effectiveness and efficiency of the projects will be evaluated. And since Sonangol controls the use of the funds, projects related to improving governance are highly unlikely.

The Petroleum Law also requires that part of the signature bonus be earmarked for social purposes. Again, there is little information on how the funds for social purposes are used, and just like PSAs, Sonangol has the final decision on the use of the funds, which, again means no funding for projects to promote good governance.

Projects funded by post-tax voluntary contributions are what are normally thought of as CSR – and it is these projects that are most widely promoted by multinationals. Oil companies manage these on their own. Projects are either run directly by company managers or through partnerships with NGOs and church organisations, which implement the projects. Chevron plays a leading role in these partnership arrangements. Once again, no partnerships directly address governance and democracy issues. Instead, voluntary projects focus on the provision of basic services.

On the protection of the environment and mitigation of impacts, multinationals operating in Angola get a free pass. The Ministry of Environment lacks the technical, resource and staff capacity to properly monitor the oil industry. Local capacity is so weak that the oil industry practically writes the environmental laws and monitors its own activities and impacts. And although multinationals may claim that they follow global environmental, health and safety policies, they often take advantage of weak host-country laws. For example, to

deal with spills, the Angolan government has approved oil companies' use of the chemical dispersants, Corexit and Inipo, even though there are safer alternatives available. Corexit and Inipo have been linked to serious neurological damage and cancers and are extremely hazardous to marine life. The UK's Marine Management Organization banned Corexit over a decade ago; so if there were a spill in the UK's North Sea, BP is banned from using Corexit. But in Angola, BP uses Corexit. Indeed, Corexit is clearly included in the country's national oil spill plan.[85]

However, there have been some efforts recently to hold multinationals to account. Since 2009, OSISA has been participating in the True Cost of Chevron Network, and has addressed the company's senior management, board and shareholders about the company's operations in Angola during Chevron's annual meetings. Cabindan residents and environmental groups, such as Gremio ABC, have also for years demanded that Chevron end its environmental and human rights abuses and called for improved compensation and revenue distribution mechanisms. In a unique turn of events, the Angolan government, for the first time, imposed a fine on Chevron in 2002 after poorly maintained pipelines used to transport crude oil from its platforms leaked. International transparency watchdogs like Global Witness have also called out the majors, including BP, for failure to disclose payments to the Angolan government.

Still, multinationals in Angola have not found themselves ensnared in major international human rights or environmental scandals, or litigation – unlike in other countries where they operate. The majority of Angola's oil reserves are offshore reducing their accessibility and visible impact and requiring much less security to protect the facilities than is required, for

example, by Shell or Chevron in their onshore fields in Nigeria. In addition, the majority of Angolans are uninformed about the realities of the oil industry and its impacts on governance, corruption, the environment and human rights.

Multinationals may on the whole be skirting by governance issues in Angola, but they are increasingly – albeit slowly – being called to task by their home country governments in relation to corruption allegations. For example, the US Foreign Corrupt Practices Act (FCPA) was enacted to counter the bribery of foreign officials. The anti-bribery provisions of the FCPA make it 'unlawful for a US person and certain foreign issuers of securities to make a payment to a foreign official for the purpose of obtaining or retaining business for or with, or directing business to, any person'. Since 1998, the anti-bribery provisions also apply to 'foreign firms and persons who take any act in furtherance of such a corrupt payment while in the United States'. The Department of Justice (DOJ) has jurisdiction over all related criminal violations under the act, and the SEC tracks civil violations committed by US companies. Companies have found that the most effective way to mitigate punishment and lessen penalties is through self-disclosure. So rather than being dragged into a high-profile court case, companies will settle out of court.

Texas-based oil and gas services giant Halliburton, as per its disclosure to the DOJ and the SEC, is currently conducting an internal investigation into possible FCPA violations in Angola after the company received an anonymous email in December 2010 alleging FCPA violations 'principally through the use of an Angolan vendor, including conflicts of interest and self dealing'.[86] In February 2009, Halliburton paid out US$579 million to settle FCPA violations after pleading guilty to paying Nigerian officials at least US$182 million in bribes

for contracts awarded to build liquefied natural gas facilities in Nigeria.[87]

Similarly, Cobalt International Energy disclosed a potential FCPA violation in its March 2011 10K report filed with the SEC, suggesting that the company was forced by the Angolan government to partner with two local oil and gas exploration and production companies (Alper Oil and Nazaki Oil & Gas) that Cobalt knew nothing about, stating 'In connection with entering into our Risk Services Agreements for blocks 9 and 21 offshore Angola, two Angolan-based E&P companies were assigned as part of the contractor group by the Angolan government. We had not worked with

either of these companies in the past, and, therefore, our familiarity with these companies is limited'.[88] As previously stated, Nazaki Oil & Gas is owned by the (now former) Chairman and CEO of Sonangol, and by the Minister of State, and his top lieutenant.[89]

For multinationals operating in Angola, the standard assumption should be that 'good' institutions are in their best interest. Instead, multinationals, for the most part, are choosing to actively perpetuate rent seeking and patronage systems. Instead of seeing this as a collective problem, there is collective complacency and collective avoidance of governance issues.

### CHEVRON IN ANGOLA

In 2002, Chevron launched the Angola Partnership Initiative (API) – incidentally, two years before a major decrease in USAID's funding for humanitarian assistance to Angola. Chevron allocated US$25 million for the five-year duration of the programme. In its reporting on the Initiative, Chevron states it 'chose to treat API as not just a responsibility but also an investment that could serve to deepen stability and build capacity in the host country'. The company claims 'API also strengthened Chevron's reputation within the United States government'.[83] To a company that made a profit of US$27 billion in 2011, US$25 million over a five-year period is a paltry amount. But this small contribution was worth a tremendous amount in terms of the company's public relations efforts. In particular, it helped to:

(1) Secure a 'social license' to operate in Angolan communities without fear of sustained local protest;
(2) Present itself globally as a company that cares; and
(3) Associate itself with American democratic values despite contributing to an autocratic regime in Angola.

Following the five-year Initiative, Chevron's CSR has become much wilier. Chevron has shifted from a regional focus to a national focus. And the company has shifted its 'philanthropic' giving to a 'development model' of assistance – meaning that Chevron is creeping into spaces traditionally occupied by development organisations, engaging in capacity building initiatives while really ensuring the community's dependency on the company. By expanding nationally to regions outside the company's geographical sphere of operations, Chevron is also buying broad community acceptance and cementing its favourable relations with the government – especially by addressing development and reconstruction needs in areas where the government is largely absent.



Joana Cotony/Sunday Times

## OIL INDUSTRY AND ENVIRONMENTAL JUSTICE

In Angola, the link between the oil industry and environmental justice is twofold. It pertains to the State's responsibility to ensure that the extraction of the country's natural resources is done in a sustainable manner, respects local people and the environment, and the benefits are distributed equally; and it pertains to the oil companies' corporate responsibility in ensuring environmental safety and sustainability in their practices. In Angola, both the State and the multinationals are guilty of environmental injustice. The government takes little care in enforcing laws that protect the public and environment, and prioritises economic growth over inclusive sustainable development. In Cabinda, in particular, the prevailing 'security' discourse often serves to ignore the real economic and environmental problems faced by vulnerable populations. For their part, multinationals are guilty of double standards: they collaborate with a kleptocratic government and hide behind weak host country laws.

The damage from oil and gas operations is chronic and cumulative. The risk of damage occurs at every stage of the oil cycle: exploration, production, transportation, refining and consumption. In Angola, the risks and damage to the environment, public health and livelihoods of residents have been very poorly addressed.

## PROJECT CYCLE IMPACTS

Fishing communities and residents along the Angolan coast claim that oil spills from offshore facilities are constant. Anecdotal information abounds. However, hard data is difficult to obtain and there do not appear to be any estimates of spillage – at least none that are publicly available. The Angolan government and oil companies do not necessarily report all spills, while some spills are underreported and others are reported long after the fact. The source of the spills is also at times unclear. For example, Chevron will sometimes claim that spills reaching Cabindan waters originate in the Democratic Republic of Congo (DRC) or the Republic of Congo. Chevron claims to have the capability to conduct environmental 'fingerprinting' analysis – a technique for identifying the composition and origin of oil.[90]

Angola has not suffered a major oil disaster since 1991, when 260,000 tons of oil spilled into the ocean after the ABT Summer oil tanker exploded 1,300 kilometres off the coast. There was no clean-up of the spill, as it was believed that the high seas would disperse the oil naturally. Since then, there have a number of smaller spills, including the 1999 spill at the Malongo terminal, which resulted in Chevron compensating victims with around US$2,000, and the aforementioned Chevron spill in 2002, when poorly maintained pipelines used to transport crude from the platforms leaked, leading the government to impose a US$2 million fine on the company. Other reported spills at Chevron facilities include one in August 2010, another in February 2011 (4,000 barrels at its Malongo base) and yet another in December 2011. Many more spills go unreported, as per local anecdotal information.

Beyond oil spills, artisanal fisher folk in Cabinda have complained that seismic testing has also driven away the fish. Operators perform seismic testing during the oil exploration phase. It involves a series of high-intensity and low frequency sounds emitted to develop graphic representation of subterranean oil deposits. For marine creatures, it can be akin to a cannonball blast next to the eardrum. Seismic testing can disturb migration patterns, damage the auditory capacity of certain fish species, harm shellfish and drive away fish.[91]

The exploration and production phase both generate waste in the form of metal cuttings, drilling fluids and produced water. Drilling fluids (or drilling muds) are used for the lubrication and cooling of the drill bit and pipe. They can release toxic chemicals, like methyl mercury, that can also affect marine life and bio-accumulate in fish. One drilling platform normally drills between seventy and one hundred wells and discharges more than 90,000 metric tons of drilling fluids and metal

cuttings into the ocean.[92] The older the well, the more produced water it will generate. These produced waters contain hydrocarbons that are dangerous to marine life. As previously mentioned, there is no adequate government monitoring of hazardous waste disposal, or public information about the amount of hazardous waste produced.

Companies in Angola also employ hydraulic fracturing to increase production. Hydraulic fracturing injects water and chemicals (like 2-butoxy ethanol, benzene and others) into wells at high pressure to fracture subsurface rocks and push oil and gas to the surface. Fracturing can challenge the structural stability of aquifers and can provoke saltwater intrusion. For its fracturing activities, Halliburton uses 2-butoxy ethanol, which is odourless and tasteless in low concentrations. This process can potentially endanger domestic water wells near fracturing sites.[93]

Gas flaring is also used by operators in Angola as a means of getting rid of gas that is released as an associated by-product of oil production. Gas flaring produces greenhouse gas emissions, including carbon dioxide, methane, sulphur dioxide, nitrogen dioxide, and other carcinogens. The most recent figures show that Angola flared 3.1 billion cubic meters of gas – or 69 percent of its production – in 2008.[94] The 5-million-tons per year LNG plant near Soyo was built to capture and market this natural gas.

For LNG, the liquefaction of natural gas involves the freezing of liquid gas so it can be shipped to markets in refrigerated tankers, where it can be warmed back into a gas to be injected into local pipelines. Although the impact of leaked oil exceeds the impact of leaked gas and although gas does not contribute as much as oil to global warming, the potential risk of an explosion at the LNG terminal – given that natural gas is highly flammable and that there is a genuine risk of tanker collisions – is real. Yet this has not been fully disclosed to local Soyo residents.

## HEALTH AND ECOSYSTEM IMPACTS

Oil seeps, leaks and spills release polycyclic aromatic hydrocarbons (PAHs) and other volatile components into the marine environment in high concentrations. PAHs are some of the most persistent and toxic components in crude oil. Volatile components of oil can burn eyes and skin, and irritate or damage sensitive membranes in the nose, eyes and mouth. Hydrocarbons can trigger pneumonia if they enter the lungs. Benzene and other light hydrocarbons can damage red blood cells, suppress immune systems, and strain the liver, spleen and kidneys. Oil workers in particular are at risk of injury and chronic disease from exposure to PAHs and other chemicals, such as cadmium, arsenic, cyanide and lead. People who clean up shorelines from oil spills are also at risk of injury. Residents in Cabinda have complained of rashes

and respiratory problems.[95] This may or may not be related to oil exposure – since there have not been any public health studies conducted in Angola's main oil producing regions to help make that determination.

In terms of marine life, chronic exposure to PAHs can shorten life spans, interrupt important breeding physiology and behaviour, and result in population level effects. In Cabinda, there is concern about the degradation of mangroves. In the village of Landana – the location of the largest regional mangroves – Chevron and the Ministry of Environment have done studies, including water sampling, to determine the cause of mangrove degradation, but with no clear conclusion.

As with the majority of environmental problems along the northern coast, there have been no independent studies conducted. Similarly, communities complain of crops drying up. Hydraulic fracking offshore in Cabinda, and onshore and offshore in Soyo could lead to a salinisation of crops. But again, no independent scientific studies have ever been conducted in the region.

## FISHERIES

The depletion of fish stocks is the leading complaint about oil operations in the northern provinces. Artisanal fisher folk in Cabinda insist that there has been a steady decline in fish stocks for the better part of a decade. They claim that they now have to travel much further out to sea, only to return with a small catch. Fisher folk attest that explosive charges from seismic testing have affected fish in the area. They complain that oil spills are far more frequent than the region's main operator, Chevron, formally reports and that these have contributed to a decline in fish stocks. They also contest the limitations the government and companies have set that prevent fishing near oil platforms. The government contends this is a preventative security measure.

In response, the Angolan government has claimed that industrial fishing is responsible for the depletion in stocks. Another theory is that the number of artisanal fishermen has increased. If there is an increase in the number of people fishing, this may be due in part to an increase in the number of people registered with the Institute for the Development of Artisanal Fishers and Aquaculture (IPA) – the main government body dealing with artisanal fisheries, and not necessarily to an increase in the actual number of artisanal fisher folk. Chevron has incentivised registration by favouring those who are registered when doling out compensation following a spill. Yet another theory points to the Benguela current and climate change contributing to nutrient poor

water and oxygen depletion, which harm various species. The Benguela Current is also characterized by currents, which rapidly dissipate pollution.

In the absence of unbiased scientific testing and laboratory facilities, however, it is difficult to determine what is depleting the fish populations. For example, if a spill occurs and Chevron accepts responsibility (following their 'fingerprinting' test) then the company will collect water and fish samples, which are sent to overseas laboratories of their choice since there are no laboratories in Angola equipped for that level of testing. Chevron has not made the results of these tests publicly available. Chevron did commit itself to establishing a water-testing laboratory in Cabinda following the 2002 spill, but to date, the laboratory is still not operational.

Interestingly, in September 2007, BP began the DELOS project – with the aim of understanding the deepwater areas around BP facilities, particularly block 18. The project will monitor the ocean floor for 25 years. The DELOS project is led by the University of Aberdeen. Other vessels, which are funded by the Norwegian aid agency Norad, are also monitoring deep-sea fish stocks, as fisheries are of great

*The depletion of fish stocks is the leading complaint about oil operations in the northern provinces.*

importance to the Angolan government. But they are only collecting data on fish stocks and species, not on heavy metal contamination in fish.

## COMPENSATION

Procedurally, when oil reaches the shore and a spill is acknowledged by, for example, Chevron, the company will send a clean-up crew to the area. Chevron will dole out compensation to those claiming damages. In Cabinda, fisher folk are organised into associations – including the leading two, YOPESCA in the north and APESCAB in the south of the province. To receive compensation, fisher folk need to be registered with IPA. Fisher folk argue that Chevron favours wealthier registered fisher folk over informal, day labourers, while disregarding the wider affected community, including women fish traders. People claim that Chevron used to deal directly with fisher folk but that compensation negotiations are now carried out indirectly. People complain that there is no transparency in the compensation process and that compensation criteria are non-existent, which is consistent with the absence of any national regulations establishing compensation criteria. Moreover, Chevron is transitioning from doing our direct compensation,

to contracting NGOs, such as World Vision, to implement 'development projects', such the 'Tuenda Tubuika' project, which includes the distribution of fishing nets and boat motors.

An effective environmental justice movement in Angola would involve providing communities with independent, scientific information on the status of oil-related impacts on fisheries, mangroves, waterways and public health, particularly those in the northern provinces. But without unbiased laboratory facilities, it is difficult to determine what is depleting the fish stocks, damaging the crops and affecting the health of local people, beyond anecdotal information. The movement would also need to develop a community-based environmental monitoring programme, which works in tandem with broader efforts to increase the local knowledge base on a range of rights issues, such as citizens' 'right to know' laws, oil revenue distribution, the legislative and regulatory structures of the oil industry, and environmental protection. Finally, a successful environmental justice movement would need to create linkages and solidarity networks across the country and internationally in order to share experiences and build relationships, which would lead to a wider knowledge base, more effective collaboration and greater collective power.





James Conway/Sunday Times

## OIL AND ECONOMIC EMPOWERMENT OF LOCAL COMMUNITIES

*In Angola, economic empowerment starts with information – information about oil revenues and communities' entitlement to these revenues, and information about citizens' economic and social rights.*

Oil producing-provinces of Zaire and Cabinda are entitled to 10 percent of the revenue from taxes collected on the oil produced in each province. Payments are made directly by oil companies, via the Ministry of Finance. But these transfers are not commensurate with the amount of oil produced. For example, basing calculations on the most prolific oil blocks, in 2011, Blocks 0 and 14 in Cabinda province yielded a total of 1.08 trillion Kwanzas in ordinary revenue, while Blocks 15 and 17 in Zaire province yielded a total of 2.2 trillion Kwanzas in ordinary revenue.[96] However, in 2011, total annual transfers to Cabinda were budgeted at 0.95 percent of total regional transfers – equal to 39 billion Kwanzas, while total annual transfers to Zaire province were budgeted at 0.39 percent of total regional transfers – equal to just 16 billion Kwanzas.[97] Therefore, an effective economic empowerment programme would need to begin by calculating exactly how much revenue the most affected provinces are entitled to, and subsequently – through budget monitoring training – analyse how provincial and municipal governments are spending it.

Although corruption concerns dominate the national oil advocacy landscape, most civil society engagement around oil impacts and beneficiation has been confined

to the province of Cabinda, where the majority of the offshore oil is being produced. Compared to the rest of the country, Cabinda's population is naturally more engaged on the issues, as they bear the burden of oil extraction and because they supposedly receive additional benefits in the form of extra revenue, employment and social services. This is typical of oil production across the globe, where the localised tensions created by the industry are often not shared with the rest of the country. It becomes a marginalised issue, and the struggles and protestations of the local population are ignored, minimised and sometimes framed by the national government as impediments to development.

According to OSISA's own national survey on citizens' perceptions about natural resource and transparency, Angolans are under-informed about the massive amount of money generated by the extractive industries and about the massive amount that is siphoned off. [98] Few Angolans make the link between poverty, oil revenue distribution and high-level corruption. When asked what problems the government should resolve in the near future, poverty and unemployment were at the forefront of people's concerns – not transparency or corruption.

Therefore, an economic empowerment programme at the local level should start here – by addressing community concerns about poverty and unemployment and making the linkages to unfair oil revenue distribution. Arming communities with knowledge about their economic and social rights, their rights to access information (and how to access this information), their public entitlements and the realities about oil revenues would help to foster a genuine national debate on the oil industry and generate public demand for the fairer distribution of its wealth and benefits.

# ANGOLA AND DUTCH DISEASE

Broadly speaking, Dutch Disease refers to the decline of other economic sectors — usually manufacturing and agriculture — associated with the increased exploitation of natural resources. The basic premise is that increased resource revenue will inflate the value of the local currency and make other exports less competitive, while at the same time, economic emphasis on that sole sector will undermine development in other sectors. Angola is vulnerable to Dutch Disease – as are other oil producers that are dependent on oil-backed consumption booms, especially when oil prices decline. In the summer of 2009, Angola turned to the IMF because the plummeting price of oil was threatening the country's balance of payments.

Nigeria is a classic example of a resource boom gone wrong. A narrow economic focus on oil exploitation through the latter half of the last century led to a steep decline in agriculture and other economic sectors – with the result that the country's GDP today is actually in the range of what it was in the 1960s. While there has been little net gain in overall national wealth, considerable wealth has been – and is being – generated but it is concentrated around the oil industry, leaving the vast majority of the country much worse off than before the resource boom. Conversely, Norway is cited as a role model for avoiding Dutch Disease. The Norwegian government has used its resource rents to expand the public sector, adopted labour market policies to avert a decline in the manufacturing sector, and set up the Government Pension Fund – a sovereign wealth fund – with some of its oil profits.

In Angola, avoiding Dutch Disease would entail constraining political patronage, increasing public spending, and growing the non-oil economy. However, currently, the government doles out oil-backed patronage to a small number of supporters, rather than delivering proper public services to the population as a whole. Public spending from oil revenues is centred on large infrastructure projects with a low rate of return and shady procurement processes – with few funds going toward social spending and households. Growing the non-oil sector – agriculture, in particular – does feature

in public discourse, but the government is doing little to incentivise growth.

SOVEREIGN WEALTH FUNDS

Many resource-rich countries and regions have established sovereign wealth funds and stabilisation funds to combat Dutch Disease. The idea is to set aside part of the earnings from oil production, which can be invested abroad or held in bonds and which can be drawn from when oil income falls. [99] When asked how to avoid the booms and busts of the commodity cycle, Chile's Finance Minister said, "Spend that which is permanent and save that which is transitory." [100]

In November 2008, President dos Santos announced the creation of Angola's own sovereign wealth fund, Fundo Soberano Angolano (FSA), which was praised by the IMF. In theory, the FSA will be sourced from oil revenues, specifically from all revenues over US$58 a barrel. It is expected that the FSA will replicate the investment strategy of Norway's Government Pension Fund by purchasing small stakes of common stock in international companies – and the Norwegian government has supported Angolan in planning this.

Yet the FSA is no guarantee against corruption. Indeed, it could just perpetuate corruption if it is not set up with appropriate accountability mechanisms in place. As it stands, the FSA would be accountable to the

president. Additionally, Sonangol already operates much like a sovereign wealth fund by reaping money through dubious oil-related transactions and investing it around the world. For example, China Sonangol is a joint venture between Sonangol and private investors based in Hong Kong, and the company has committed itself to investing billions of dollars across Africa, Latin America and Southeast Asia. Until September 2011, Manual Vicente (the Chairman of Sonangol) served as the Chairman of China Sonangol. Where the Angolan government is concerned, keeping money outside the country is hardly a guarantee of transparency. So, if not a sovereign wealth fund, what then?

As mentioned earlier, constraining Angola's political patronage will involve setting up systems to contain corruption and ensure transparency and accountability. These checks and balances include the transparency of public revenues and expenditures, a free and informed media, an informed citizenry and a vibrant civil society. But public officials in Angola are currently benefiting too greatly to set up legitimate checks and balances, while the government is doing little to invest in social spending and ensure a fair distribution of oil revenues. Finally, the Angolan government could take broad steps to grow the non-oil economy, but seems unwilling to do so and risk relinquishing economic control.

## DIVERSIFYING THE ECONOMY

Diversification of oil-dependent economies is of great concern to new oil producing countries across Africa, such as Uganda and South Sudan, which are looking to their peers in Algeria, Mauritania, Botswana and South Africa for successful diversification strategies. Diversification of Angola's economy would not only reduce Dutch Disease, it would reduce rent seeking and spur the

development of impartial institutions. Economists, such as Paul Collier, point to three policies to grow the non-oil economy[100] - namely de-tax the non-oil economy, encourage SMEs and support the agricultural sector.

The private sector in Angola remains excessively regulated in order to facilitate taxation. The corporate income tax is 35 percent. But Angola does not need to raise tax revenue from sectors other than oil and diamonds. Deregulation would support the growth of micro, small and medium-sized firms.

Support for SMEs would not only diversify the economy, it would create employment, and grow the economic and political power of the non-oil private sector. Interestingly, the government recently announced that it would distribute some US$220 million as investment credits for SMEs and provide incentives and training – through the newly created Programme for Development of Small and Medium Enterprises. The funds will be made available to the two state banks to support small businesses. Although a positive step, it is unclear how the programme will be operationalized, or how it will fit into the approved national budget.

Oil and war explains why once big employers, such as coffee, cotton and maize, have been neglected since independence. Oil production is an enclave economy in Angola with few links to the rest of the economy. Before oil took over as Angola's primary export in the early 1970s, Angola depended on agricultural products, such as coffee, sugarcane, bananas and palm oil. These provided a great source of employment and the country was self-sufficient in most foods. Today, the agricultural sector accounts for less than 10 percent of Angola's GDP and the country imports about 80 percent of its consumable

goods. Unreliable electricity, poor transport networks, and limited access to finance have pushed up the cost of local production, so that it is still cheaper to import goods at skyrocketing prices than it is buy them from local sources. Small-scale farmers have reverted to subsistence farming, and two thirds of the population is reliant on subsistence agriculture for food, income and employment. As such, development of the agricultural sector holds far greater importance for the majority of people than the oilrigs offshore.

The Ministry of Agriculture has stated it is keen to encourage colonial-era 'cash crops' alongside essential staple crops for domestic consumption. And a US$1.2 billion loan from the China Development Bank in 2009 was supposed to finance agricultural development over the following four years. But it is unclear whether this financing even came through – let alone what it might have been used for. What is more, while the country relies heavily on food imports, the government has set its sights on the development of biofuels – calling into question the allocation of fertile land for crops that are not intended to produce food for domestic consumption. In March 2010, the government passed a law regulating the country's biofuel industry. The law stipulates that foreign companies producing biofuel in Angola will have to sell some of the product to Sonangol to supply the local market.[102]

Finally, with Angola importing huge amounts of food for domestic consumption it has been claimed that various members of the political elite have heavily vested interests in the importation business. These powerful individuals stand to lose from Angola growing increasingly self-sufficient in food.[103]

## RECOMMENDATIONS

### 1.
### PROMOTE PUBLIC DEBATE AND
### CIVIC ENGAGEMENT ON TRANSPARENCY

At the forefront of OSISA's mission is opening spaces for civil society participation. The Angolan oil industry is shrouded in secrecy and Angolans have the right to know exactly where government oil revenues and expenditures are going. However, some information is publicly available but citizens may not be accessing it or may not know how to access it. Roving town hall meetings, which create open spaces for debate and participation both in Luanda and across the country, would stimulate discussion and the provision of information about transparency, oil impacts and citizens' right to know laws. These meetings would also promote active civic engagement – such as citizen groups to promote citizen-led legislation to be taken up by the National Assembly.

### 2.
### PROMOTE CITIZEN-LED CALLS
### FOR FAIR DISTRIBUTION OF REVENUES

Civil society should advocate for the government to pursue sustainable development, which prioritises the fair distribution of revenues and the investment of these revenues in income and employment generating sectors, like agriculture, to diversify the economy. It will be necessary to start by producing economic studies on the cost of living in oil-producing regions in comparison to other provinces, and viability studies on economic alternatives for the country – and to fully understand how much revenue is being generated by the oil industry and how much of it reaches the provinces.

### 3.
### STRENGTHEN IMPLEMENTATION
### OF CURRENT LEGISLATION

There is nothing in Angolan legislation that protects illegal acts in business. Laws relating to public corruption, in particular, are quite clear. Angolan citizens have at their disposal a series of laws with which to push back against economic, environmental and public corruption. If the authorities do not want to enforce the law, it is up to citizens to use the laws and litigate. Understandably given the partiality of Angolan courts, enforcing accountability through judicial means has been underutilised up until now. The Angolan Constitution

may provide for an independent judiciary, but in practice the judicial system lacks the means, experience, training and political backing to assert its independence. Nonetheless, lodging citizens' complaints could help to foster widespread societal support for the rule of law. Of equal importance, the mere act of filing complaints would send a message to those culpable of public corruption. This strategy should be coupled with a strong media component. This programme would entail training a small group of lawyers, legal scholars and law students to jump-start the process.

### 4.
### PROMOTE MECHANISMS TO HOLD
### SONANGOL TO ACCOUNT

Sonangol wields tremendous political and economic influence in Angola – and increasingly, Sonangol is expending its business interests both inside and outside the country. There is an obvious conflict of interest in relation to Sonangol since it both administers and regulates the oil sector. There has been concerted pressure on the government for years to address this conflict of interest. However, this pressure has largely been external – from foreign governments and donors, such as the IMF under its stand-by arrangement loan to Angola. More recently, there have also been efforts to expose Sonangol's business operations. But there has not been a concerted push inside Angola to expose Sonangol and call for a major overhaul of its structure – such as demanding the creation of an independent regulator for the oil industry. Similarly, there has not been a concerted call for Sonangol's audits to be made public. Elevating these discussions in the national discourse would work in tandem with current international advocacy efforts.

### 5.
### EXPAND ANGOLAN TRANSPARENCY
### DEMANDS INTERNATIONALLY

The US authorities have softened their public stance on government corruption in Angola recently either because of a conflict of interest with US business interests in Angola, or a perceived decline in their influence in Luanda, or the lack of a strategy, or a general disinterest in engaging. However, the reality is that – although the Angolan government has smartly positioned itself vis-a-vis a range of public and private actors – the US government still retains considerable leverage in the country. Angola must be put back onto the agenda of US government officials who can ruffle the feathers of their Angolan counterparts merely by asking questions, holding hearings or making public statements. It should also extend to

aid – namely channelling USAID funding to democracy and governance initiatives. This strategy will ensure that issues of transparency and beneficiation are always on the agenda when it comes to US–Angola relations. However, advocacy should also extend to the governments of other countries, whose companies are engaged in Angola, such as Norway, to provide grants to civil society organisations to promote fiscal transparency and monitor revenue flows.

## 6.
### PROMOTE MECHANISMS TO HOLD MULTINATIONALS TO ACCOUNT

There have been a few local and international efforts to shine a spotlight on the practices and policies of multinationals operating in Angola – such as OSISA's participation in the True Cost of Chevron Network, international transparency campaigns by groups like Global Witness and direct engagement between Cabinda residents and Chevron. However, multinationals in Angola continue to operate with total impunity. The promotion of mechanisms to hold multinationals to account would include the provision of information about their activities, production levels, impacts and resources they channel to government – as well as building bridges to engage company officials directly.

## 7.
### STRENGTHEN INSTITUTIONAL CAPACITY

Angolan institutions with a mandate to regulate the industry are weak. They lack trained, skilled employees, who understand the laws and can implement them. This work would focus on providing members of the National Assembly and some of its critical committees, as well as key institutions, with access to credible information and technical assessments, as well as advice on how to utilise existing information – including Angola's own laws – in an effort to enhance oversight.

## 8.
### PROMOTE USAGE OF INTERNATIONAL ANTI-CORRUPTION INSTRUMENTS

Anti-bribery, money laundering and corruption laws, like the US Foreign Corrupt Practices Act, the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions and various EU laws are important tools for holding corrupt public officials to account, and holding

companies based in those countries to account. Information gathered from investigative reports could be passed along to security commissions and departments of justice to hold multinationals and Angolan elites to account. Building on Dodd-Frank requirements, international advocacy would also include calling on financial institutions to harmonise transparency requirements for extractive industries in major stock exchanges.

## 9.
### PROMOTE ANGOLAN-LED, MEDIA-DRIVEN INVESTIGATIVE REPORTING

When in doubt, follow the money! Global Witness, Human Rights Watch, the Centro de Estudos e Investigação Científica da Universidade Católica de Angola, and Angolan transparency activists have performed impactful investigative and documentation work on police corruption, and have utilised the media as a tool for strategic dissemination. There is tremendous need for additional investigative reporting and exposés on the oil money trail. Where are Angolan elites investing? Where are these companies doing business? Which banks are holding these funds and which are issuing lines of credit? A small team of Angolan-based, professionally-trained, low-profile, dedicated investigators could uncover additional information to buttress national and international transparency initiatives and advocacy campaigns.

## 10.
### PROMOTE ALTERNATIVE REPORTING AND ACCESS TO INFORMATION

Public access to information in Angola is challenged by the government's control of traditional mechanisms of mass communication. Although not a focus of this report, social media has served as an important organising tool and as a great equaliser with regards to access to information. Urban-based Angolans, in particular, are increasingly using Facebook, Twitter and texting. A guerrilla marketing or wild postings campaign could also be effective in Luanda. [Guerrilla marketing is an advertising strategy that utilises unconventional means to generate buzz. Wild postings are temporary, highly engaging forms of street-level advertising]. In the provinces, the provision of independent radio programmes could be expanded and it could include political and economic literacy programming on the oil industry. Similarly, video is a powerful medium with which to reach a broad audience. Advocacy videos on Angolan inequities are few, and even fewer are videos that can break down the numbers for people and juxtapose the riches of Angola's elites with living conditions across the rest of the country.

*Millions of dollars are being diverted from the state treasury, either through institutionalised or straight up corruption.*

## CONCLUSION

Angola's oil production drives an enclave economy that enriches wealthy political elites and leaves the masses in dire poverty. Sonangol exerts undue political and economic power, and institutions to provide checks and balances are weak. Sonangol is accountable only to the president. There is an obvious conflict of interest in that it both administers and regulates the oil sector. The company's transactions with the national budget are porous and allow for state funds to be siphoned off. Millions of dollars are being diverted from the state treasury, either through institutionalised or straight up corruption. Angolan elites and public officials are reaping huge profits from the legal obligations of multinational companies to contract with Angolan companies. Multinational companies, for their part, turn a blind eye to corruption. Oil revenues, which should be invested in social sectors and in diversifying the economy to support

the country's long term sustainable development, are instead reinvested by Sonangol in joint ventures and subsidiary businesses, which benefit just an elite few. Environmental impacts of the industry go largely unmitigated, while communities in oil producing provinces receive no real benefits.

A well-functioning governance system involves political, economic and legal constraints designed to limit misconduct by those in power. In Angola, people are poor because the country's institutions are dysfunctional and have not provided the needed checks and balances. Corruption is just a symptom of the deeper malady of weak, failed or missing institutions. A kleptocracy is unlikely to reform itself voluntarily. It must be prodded. Even if the government does change, it may not be replaced by a better one unless sound governance institutions

are put in place. Recent events in Angola show that if the circumstances are right, external actors can help to kick-start the process of reform. NGOs, international organisations, and some foreign governments have all played a role in pressing the Angolan government to make itself more open. In initiating the process of building checks and balances, pressure from overseas complemented the activities of Angolan civil society. Transparency is necessary for accountability. But the ultimate constraint on any government – democratic or authoritarian – is its citizenry, the power of the people. Transparency informs the citizenry of abuses. It does not in and of itself solve corruption, but it goes a long way towards speeding up the search for a solution. By building up knowledge, and broadly disclosing information, about government misdeeds, transparency can empower the citizenry to take action.

# ENDNOTES

**1.** US Energy Information Administration, latest figures 2010

**2.** Sonangol website: www.sonangol.co.ao/ accessed September 2012.

**3.** Petroleum Activities Law of 2004, Law No. 10/04. The Law supersedes the 1978 Petroleum Law.

**4.** Reed, Kristin. Crude Existence: Environment and the Politics of Oil in Northern Angola. 2009. University of California Press. California.

**5.** Gentile, Carme. "Analysis: Angolan Oil Piques Interest." UPI. 20 September 2007.

**6.** Cutting samples are taken from the geological formations penetrated by the drill in the oil wells.

**7.** Norwegian Oil and Gas Partners INTSOK. "How to do Business in Angola." Detailed Guide. 2011 Edition.

**8.** Petroleum Activities Law of 2004, Article 44.

**9.** Law No. 10/04, Article 26(1). The law harmonizes the Law on the Promotion of Angolan Private Entrepreneurship, Law No. 14/03 and the Contracting Services from Local Companies in the Oil Industry Decree, Decree No. 127/03.

**10.** Marques de Morais, Rafael. "Corruption in Angola: An Impediment to Democracy." 2011.

**11.** Burgis, Tom. "US to Probe Cobalt Oil Links in Angola." Financial Times. 21 February 2012.

**12.** Ibid.

**13.** General Environmental Law, Law No. 5/98, also known as the Environmental Framework Act. Concurrent to this is the National Environmental Management Plan that identifies key priority areas for the conservation and sustainable use of natural resources. Although completed, the plan has not yet been approved.

**14.** Development Bank of Southern Africa and Southern Africa Institute for Environmental Assessment. "Handbook on Environmental Assessment Legislation in the SADC Region." November 2007. South Africa.

**15.** Interviews with ExxonMobil, BP and Chevron representatives, November 2011.

**16.** Environmental Framework Act, Article 16

**17.** Environmental Framework Act, Article 17.

**18.** Personal interview, Angolan environmental consultant.

**19.** Environmental Framework Act, Article 10.

**20.** Gas flaring is also used by operators in Angola as a means of getting rid of gas that is released as an associated byproduct of oil production. Gas flaring produces greenhouse gas emissions, including carbon dioxide, methane, sulphur dioxide, nitrogen dioxides, and other carcinogens. The most recent World Bank figures show Angola flared 3.1 billion cubic meters of gas, or 69% of its production, in 2008.

**21.** Decreto Presidencial No 194/11 de 7 de Julho.

**22.** 2004 Petroleum Activities Law, Article 25.

**23.** Environmental Framework Act, Article 23.

**24.** Environmental Framework Act, Article 28.

**25.** Following the BP Gulf of Mexico oil spill, there has been a push in the US to increase the liability insurance cap from $75 million.

**26.** 2004 Petroleum Activities Law, Article 88.

**27.** Walls Street Journal. November 7th 2011. "Angola Worries About Lack of Local Crude Spill Plan – Deputy Oil Minister".

**28.** McMillan, John. "The Main Institution in the Country is Corruption: Creating Transparency in Angola." Stanford University, Center on Democracy, Development and the Rule of Law. 7 February, 2005.

**29.** Bryan, Shari and Barrie Hoffman. "Transparency and Accountability in Africa's Extractive Industries: The Role of the Legislature." National Democratic Institute for International Affairs. 2007

**30.** Interview with environmental consultant, November 2011.

**31.** Interview with BP, November 2011.

**32.** Chatham House. "The Effects of Oil Companies' Activities on the Environment, Health and Development in Sub-Saharan Africa." 08, August 2011. Study requested by the European Parliament's Committee on Development.

**33.** Norsk Energi. "Norwegian Assistance to the Petroleum Sector. A State-of-the-art-study." Final Report. Prepared for Norad. 12 December 2005.

**34.** Bryan, Shari and Barrie Hoffman. "Transparency and Accountability in Africa's Extractive Industries: The Role of the Legislature." National Democratic Institute for International Affairs. 2007

**35.** World Bank. "Angola, Oil, Broad-based Growth, and Equity." World Bank Country Report. 2007.

**36.** Sourced from the IMF. "IMF Country Report No. 11/346." December 2011.

**37.** Hanson, Stephanie. "Angola's Political and Economic Development." Council on Foreign Relations. 21 July 2008.

**38.** Norwegian Petroleum Directorate website: www.npd.no/en/Publications/Reports/Oil-for-development-2010/OfD-projects-Core-countries/Angola/

**39.** Ministry of Finance website: www.minfin.gv.ao/docs/dspOrcaCorren.htm

**40.** As per Dispatches 29/96 of March 8th and 38/96 of March 29th.

**41.** Lei No. 2/12, de 13 de Janeiro de 2012, Lei sobre o Regime Cambial Aplicável ao Sector Petrolífero.

**42.** Law No. 1/92 of January 17th, Decree No. 4-B/96 of May 31st, D.R. No. 22/96-Supplement.

**43.** Legislative Diploma No. 35/72 of April 29th modified by Law No. 18/92 of July 3rd, Law No. 7/96 of April 19th, Executive Decree No. 84/99 of June 11th, Law No. 5/99 of August 6th.

**44.** Global Witness and OSISA-Angola. "Oil Revenues in Angola. Much More Information But Not Enough Transparency." February 2011.

**45.** Global Witness and OSISA-Angola, "Oil Revenues in Angola. Much More Information But Not Enough Transparency" February 2011.

**46.** State Secrets Law, No. 10/02

**47.** US Embassy in Angola. "Angola: 2011 Investment Climate Statement." http://angola.usembassy.gov/pol-econ-section/investment-climate-statement-2010.html

**48.** Based on the 2011 state budget, Ministry of Finance website: http://www.minfin.gv.ao/docs/dspOrcaPass.htm

**49.** "Estratégia de Combate à Pobreza ECP: Reinserçao Social, Reabilitaçao e Reconstruçao e Estabilizaçao Económica." Luanda, Ministério do Planeamento, February 2004.

**50.** Sogge, David. "Angola: Reinventing Pasts and Futures." Transnational Institute. June 2010.

**51.** Based on the 2012 national budget found on the Ministry of Finance website: www.minfin.gv.ao/docs/dspOrcaCorren.htm

**52.** Ministério das Finanças. Orçamento Geral do Estado para o Ano de 2012, Resumo Da Despesa Por Função: http://www.minfin.gv.ao/docs/dspOrcaCorren.htm

**53.** Ministry of Finance website: www.minfin.gv.ao/docs/dspOrcaCorren.htm

**54.** Redvers, Louise. "Rich and Poor – One Country but World Apart." IPS. 2009.

**55.** Marques Morais, Rafael. "Corruption in Angola: An Impediment to Democracy." 2011. Citing a 2008 report by The Services Group, Inc. and Nathan Associates.

**56.** Levkowitz, Lee, Marta McLellan Ross and J.R. Warner. "The 88 Queensway Group. A Case Study in Chinese Investors' Operations in Angola and Beyond." US-China Economic & Security Review Commission. 10 July 2009.



57. ibid.
58. Roque, Paula Cristina. "Angola: Parallel governments, oil and neopatrimonial system reproduction." Institute for Security Studies. Situation Report. 6 June 2011.
59. Reuters. "Sonangol posts $3.3 bln net profit for 2011." 24 February 2012.
60. What follows has been partially sourced from the IMF. "IMF Country Report No. 11/346." December 2011.
61. Global Witness and OSISA-Angola. "Oil Revenues in Angola. Much More Information But Not Enough Transparency." February 2011.
62. Wiig, Arne & Madalena Ramalho. "Corporate Social Responsibility in the Angolan Oil Industry." Chr. Michelsen Institute. 2005.
63. CITIC is a large Chinese state-owned conglomerate incorporating some 44 subsidiaries, including construction.
64. Sonip is also involved in construction of middle class housing via Kora. Kora is a new company owned 51% by Sonip and 40% by the Israeli group LR.
65. Among others, Sonair will acquire at least 51% of Sao Tome and Principe's STP Air. Sonangol currently has investments in the fuel, port and airport sectors in the island.
66. Sonangol's most recently published 2010 annual report includes: Sonangol Pesquisa & Produção, Sonangol Gás Natural, Sonangol Shipping, Sonaref-Refinaria de Luanda, Sonaref-Refinação (Projecto), Sonangol Logística, Sonangol Distribuidora, Sonangol Limited (UK), Sonangol USA Company, Sonangol Asia Limited, Sonangol Finance Limited, ESSA, Sonangol Holdings, Lda, Sonangol Hidrocarbonetos, Solo properties (Knightsbridge) Ltd, PUAÇA – Administração e Gestão, S.A..
67. Marques Morais, Rafael. "Corruption in Angola: An Impediment to Democracy." 2011.
68. Angola and Congo Brazzaville recently signed an agreement for an oil field on their border. The revenues will be shared equally and the money will be deposited in an Angolan bank account. The oil field will be operated by Chevron and will go into production in 2015.
69. Levkowitz, Lee, Marta McLellan Ross and J.R. Warner. "The 88 Queensway Group. A Case Study in Chinese Investors' Operations in Angola and Beyond." US–China Economic & Security Review Commission. 10 July 2009.
70. China Sonangol (as well as CITIC) is a client of international consulting firm Pierson Asia, which is owned and directed by Mr. Pierre Falcone.
71. These include: China Sonangol Engineering & Construction, China Sonangol Finance International, China Sonangol Gas International, China Sonangol EP, China Sonangol International Investment, China Sonangol International Holding, China Sonangol Natural Resources International, and China Sonangol Asset Management.
72. Levkowitz, Lee, Marta McLellan Ross and J.R. Warner. "The 88 Queensway Group. A Case Study in Chinese Investors' Operations in Angola and Beyond." US–China Economic & Security Review Commission. 10 July 2009.
73. The Economist. "China International Fund. The Queensway Syndicate and the Africa Trade." 13 August 2011.
74. Global Witness. "Rigged. The Scramble for Africa's Oil, Gas and Minerals." January 2012.
75. Reuters. "Sonangol to buy Marathon's 20 pct stake in Block 32." 24 September 2009.
76. Sonangol Universo. "Questions for Manuel Vicente." June 2010.
77. Frynas, Jedrzej George and Geoffrey Wood. "Oil & War in Angola." Review of African Political Economy. No. 90:587–606. ROAPE Publications Ltd., 2001.
78. Sonangol Model PSA for Deep Water Blocks, Article 33. Current model contract and February 1992 model contract.
79. Weimer, Markus. "Angola: Slick Business Deals." Chatham House. 23 November, 2011.
80. Global Witness. "Rigged. The Scramble for Africa's Oil, Gas and Minerals." January 2012.
81. Personal conversation with Chevron executives. November 2011.82 Chevron Angola website: www.chevroninangola.com.
83. Chevron. "Angola Partnership Initiative, A Case Study." June 2010.
84. Wiig, Arne & Madalena Ramalho. "Corporate Social Responsibility in the Angolan Oil Industry." Chr. Michelsen Institute. 2005.
85. "Plano Nacional De Contingencia Contra Derrames De Petróleo No Mar" published in Diario da Republica. 22 December 2008.
86. Halliburton 10Q filing, October 21, 2011 for the period ending September 30, 2011.
87. The FCPA Blog. "Halliburton Investigating Angola Operations." 22 October 2011. http://www.fcpablog.com/blog/2011/10/22/halliburton-investigating-angola-operations.html
88. The FCPA Blog. "Cobalt's Blind Date." 7 March, 2011. http://www.fcpablog.com/blog/2011/3/7/cobalts-blind-date.html
89. Marques de Morais, Rafael. "The Angolan Presidency. Epicentre of Corruption." August 2010.
90. Cabinda Gulf Oil Company Limited. 2010 Corporate Responsibility Report.
91. Peterson, David for the British Columbia Seafood Alliance. "Seismic Survey Operations: Impacts on Fish, Fisheries, Fisher and Aquaculture." February 2004.
92. OCEANA. www.oceana.org. "Impacts of Offshore Drilling." Accessed January 2012.
93. Reed, Kristin. Crude Existence: Environment and the Politics of Oil in Northern Angola. 2007. University of California Press, California.
94. The World Bank, "World Bank, GGFR Partners Unlock Value of Wasted Gas." The World Bank. 14 December 2009.
95. Delgado, Albertina. Field notes from Cabinda visit, May 2010.
96. Ministério das Finanças. Exportações e Receitas de Petróleo 2011. http://www.minfin.gv.ao/docs/dspPetrolDiamond.htm
97. Ministério das Finanças. Orçamento Geral do Estado para o Ano de 2011 http://www.minfin.gv.ao/docs/dspOrcaPass.htm
98. Weszkalnys, Gisa, Albertina Delgado, David Boio. OSISA. "Assessment Report: Citizens' Perceptions on Transparency and Natural Resources Management." 2010.
99. Venezuela's oil-sourced 'Fondo de Inversión Para la Estabilización Macroeconómica' has about $800 million in assets. Malaysia's oil-sourced 'Terengganu Investment Authority' has about $2.8 billion in assets. Botswana's diamond-sourced Pula Fund has about $6.9 billion in assets. The US state of Alaska's oil-sourced 'Alaska Permanent Fund' holds $29 billion in assets. In 1985 Chile set up the Copper Stabilization Fund, which holds about $21 billion in assets, and in 2006 created two new sovereign wealth funds. Source: Sovereign Wealth Fund Institute. Updated 2009.
100. David, Bob. "Can Copper-Rich Chile Avoid Surplus-Cash Pitfalls?" The Wall Street Journal. May 14, 2007.
101. Collier, Paul. "Angola: Options for Prosperity." Department of Economics, Oxford University. May 2006.
102. Angola Today: Agriculture, accessed at: www.angola-today.com/key-industries/agriculture/
103. ibid.

## LIST OF ABBREVIATIONS

| | |
|---|---|
| APESCAB | Associação dos Pescadores de Cabinda |
| API | Angola Partnership Initiative |
| BAI | Banco Africano de Investimento |
| BNA | Banco Nacional de Angola |
| CEO | Chief Executive Officer |
| CITIC | China International Trust and Investment Corporation |
| CRS | Corporate Social Responsibility |
| DFID | Department for International Development |
| DOJ | Department of Justice |
| EIA | Environmental Impact Assessment |
| EMS | Environmental Management System |
| EITI | Extractive Industries Transparency Initiative |
| FCPA | Foreign Corrupt Practices Act |
| FSA | Fundo Soberano Angolano |
| IMF | International Monetary Fund |
| IMT | Incident Management Team |
| IPA | Instituto de Pesca Artesanal e Aquicultura |
| MPLA | Movimento Popular de Libertação de Angola |
| Minpet | Ministry of Petroleum |
| NGO | Non-Governmental Organization |
| NPD | Norwegian Petroleum Directorate |
| OPEC | Organization of the Petroleum Exporting Countries |
| PAH | Polycyclic Aromatic Hydrocarbons |
| PLD | Presidential Legislative Decree |
| PSA | Production Sharing Agreement |
| QFA | Quasi-Fiscal Activities |
| SADC | Southern African Development Community |
| SEC | Securities and Exchange Commission |
| SIIND | Sonangol Investimentos Industriais |
| Sinopec | China Petroleum and Chemical Corporation |
| SME | Small and Medium Enterprises |
| Sonangol | Sociedade Nacional de Combustíveis de Angola |
| Sonip | Sonangol Imobiliária e Propriedades |
| SSI | Sonangol Sinopec International |
| UK | United Kingdom |
| UNDP | United Nations Development Program |
| UNFCC | United Nations Framework Convention on Climate Change |
| UNITA | União Nacional para a Independência Total de Angola |
| US | United States of America |
| USAID | United States Agency for International Development |
| VOPESCA | Voz do Pescador |

**The Open Society Initiative for Southern Africa (OSISA) is a growing African institution committed to deepening democracy, protecting human rights and enhancing good governance in southern Africa. OSISA's vision is to promote and sustain the ideals, values, institutions and practice of open society, with the aim of establishing a vibrant southern African society, in which in which people, free from material and other deprivation, understand their rights and responsibilities and participate democratically in all spheres of life.**

**www.osisa.org**



OSISA
Open Society Initiative
for Southern Africa

