# EXHIBIT 58

Case 4:14-cv-03428   Document 87-5   Filed in TXSD on 06/30/15   Page 2 of 114

# Bloomberg

## BP, Cobalt Angola Money Shows More Transparency Needed, NGO Says

By Nidaa Bakhsh - Aug 5, 2014

Global Witness, a group campaigning against corruption, said Angola's use of payments by BP Plc (BP/) and its partners for a project in the country shows the need to improve transparency in resource industries.

BP and partners including Cobalt International Energy Inc. (CIE)agreed to contribute $350 million, in installments, to be used for a research and technology center, Global Witness said today in a statement, citing a Securities and Exchange Commissionfiling. The non-governmental organization said in a statement on its website that it was unable to gain information from BP, Cobalt or Angolan state oil company Sonangol confirming that the research center exists.

"A signature bonus was paid for interests in various new blocks," BP said in an e-mailed response to Bloomberg queries on the oil deal. "Such payments 'revert in full favor of the state.' How Sonangol ultimately spends that money is the prerogative of the Angolan state. The money was paid directly to Sonangol with the state as ultimate beneficiary."

Lynne Hackedorn, a spokeswoman at Cobalt International in Houston, the operator of the oil blocks, didn't immediately respond to a voice message seeking comment. Mateus Cristovao, a spokesman in the Angolan capital of Luanda for Sonangol, said by phone today he couldn't immediately comment on the report.

Cobalt International said separately today that the U.S. SEC made a preliminary determination for an enforcement action against the company. Cobalt received a Wells Notice from the SEC alleging violations of certain securities laws regarding its activities in Angola, the company said in a filing.

The company said it is cooperating with the SEC and believes its activities in Angola have complied with all laws.

## Mineral Resources

Cobalt fell 9 percent to $14.53 by 11:32 a.m. in New York.

Global Witness is seeking U.S. transparency rules allowing the public to see how money from mineral resources is used.

"Many resource-rich countries including Angola are still failing to adequately disclose where billions of dollars are going from oil revenues paid by these companies," Simon Taylor, director of Global Witness, said in the statement.

The NGO report comes as African heads of state meet President Barack Obama in Washington for the first U.S.-Africa Leaders Summit. Topics include corruption and womens' rights.

To contact the reporter on this story: Nidaa Bakhsh in London at nbakhsh@bloomberg.net

To contact the editors responsible for this story: Will Kennedy at wkennedy3@bloomberg.netTony Barrett

---

©2014 BLOOMBERG L.P. ALL RIGHTS RESERVED.

# EXHIBIT 59

THOMSON REUTERS STREETEVENTS

# EDITED TRANSCRIPT
## CIE - Q2 2014 Cobalt International Energy Inc Earnings Call

EVENT DATE/TIME: AUGUST 05, 2014 / 3:00PM GMT

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2014 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

THOMSON REUTERS

## AUGUST 05, 2014 / 3:00PM, CIE - Q2 2014 Cobalt International Energy Inc Earnings Call

### CORPORATE PARTICIPANTS

**Joe Bryant** *Cobalt International Energy Inc - Chairman & CEO*

**John Wilkerson** *Cobalt International Energy Inc - CFO*

**James Farnsworth** *Cobalt International Energy Inc - Chief Exploration Officer & EVP, Exploration and New Ventures*

**Van Whitfield** *Cobalt International Energy Inc - EVP & COO*

### CONFERENCE CALL PARTICIPANTS

**Evan Calio** *Morgan Stanley - Analyst*

**Bob Brackett** *Sanford C. Bernstein & Co. - Analyst*

**Joseph Allman** *JPMorgan Chase & Co. - Analyst*

**Ed Westlake** *Credit Suisse - Analyst*

**Richard Tullis** *Capital One Southcoast, Inc. - Analyst*

**Mike Scialla** *Stifel Nicolaus - Analyst*

**Al Stanton** *RBC Capital Markets - Analyst*

**Curtis Trimble** *Brean Capital, LLC - Analyst*

### PRESENTATION

**Operator**

Good day, everyone, and welcome to the Cobalt International Energy's second-quarter 2014 conference call. Just a reminder, today's call is being recorded.

Before we get started, one housekeeping matter. This call includes forward-looking statements. The risks associated with forward-looking statements have been outlined in the earnings release and in Cobalt's SEC filings, and we incorporate these by reference in this call.

At this time, for opening remarks and introduction, I would like to turn the call over to Chairman and Chief Executive Officer of Cobalt, Mr. Joe Bryant. Please go ahead, sir.

---

**Joe Bryant** *- Cobalt International Energy Inc - Chairman & CEO*

Good morning, and thank you for joining us for the Cobalt International Energy second-quarter 2014 earnings and operations update call. Joining me on today's call are several members of our executive team, including John Wilkerson, our Chief Financial Officer.

I'll start by making a few introductory comments, and then I'll turn the call over to John, who will discuss our second-quarter financial results. Of course, then, we'll be happy to answer any questions that you may have.

Cobalt has had a very active and impactful second-quarter. Our operational and financial second-quarter results continue to align with our vision and build on our strength, delivering exceptional long-term shareholder value.

I'll begin by discussing our West Africa operations, followed by a discussion on our Gulf of Mexico operations. In addition, I'll briefly touch on our new venture strategy. I'll then summarize the results of our highly successful convertible notes offering, which we finalized in early May. And, I'll discuss our successful Analyst Day event, which we held in June.

2

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2014 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## AUGUST 05, 2014 / 3:00PM, CIE - Q2 2014 Cobalt International Energy Inc Earnings Call

Our West Africa operations continue to deliver extraordinary results. In May, we announced the exceptional results of the drill stem test we performed on our Orca #1 well, which is our largest discovery to date, with a resource rage of 400 million to 700 million barrels of oil. Orca is also likely to be one of the largest oil discoveries by the industry worldwide in some time. Orca represented our fifth pre-salt discovery in the deepwater Angola Kwanza Basin.

Following our Orca operations, we moved the SSV Catarina rig to drill our Cameia #3 appraisal and development well in Block 21. We have reached total depth, and have performed the drill stem tests on the Cameia #3 well. I'm very pleased to confirm that the well and the drill stem test were successful and consistent with, if not have exceeded, our pre-drill expectations.

As anticipated, we found a very thick, high-quality reservoir, which contains some of the best rock that we have seen or drilled in the Kwanza Basin. The flow test, which was the longest duration test conducted to date in the Kwanza Basin, confirms that this reservoir will flow at very high rates once on production, and it goes a long way to confirm the scale of the field's reserves.

As we have mentioned, we plan to utilize the Cameia #3 well as a development well in the Cameia field development. We and our Block 21 partners are actively pursuing the sanction of our Cameia field development project, and in May we submitted the integrated field development plan for Cameia to the concessionaire for their approval, and we are still targeting sanction by the end of 2014. Based on all conversations that we have had with our partners, the concessionaire and the government of Angola, we're all aligned on achieving first production in 2017.

As we shared with you in our Analyst Day presentation, we continue to consider Cameia as a hub development, which could include Mavinga, and potentially Bicuar, in addition to Cameia. Our current design basis for the Cameia hub is a nominal 100,000 barrels per day development, capable of generating $400 million to $600 million of operating cash per year to Cobalt.

Also in Angola, in early April, the Angola Minister of Petroleum granted Cobalt a two-year extension of our Block 9 license. Once operations are finalized on the Cameia #3 well, we will move the Catarina rig to drill our large, 750 million-barrel Loengo pre-salt prospect on Block 9.

Loengo is a stratigraphic structure, and if successful, will have broad, positive implications for numerous, similar prospects that we see in the remainder of our Angola pre-salt exploration inventory. We look forward to sharing the results of our Loengo well by year-end. Following the Loengo well, we will drill either our Mupa exploration well on Block 21, or our first Orca appraisal well on Block 20, or as I will mention later, we may drill both wells simultaneously.

In addition to our ongoing drilling operations, we are actively pursuing a strategy to accelerate the appraisal and development from the greater Orca/Lontra development for the gold project in Block 20. This strategy could include optimizing recovery of hydrocarbons from Orca and Lontra discoveries, which would result in the development of up to 1 billion barrels of oil in this single development.

Our objective is to bring the gold project on production as soon as possible after the Cameia project in the 2018-2019 time frame. Since we are early in the gold project planning process, it's too early to describe the production capacity of the project, but I expect that it will be a phased hub development, similar to our Cameia project.

As has always been our strategy, we will roll forward many, if not all, of the design parameters utilized in our Cameia project to our gold project. This will reduce both cycle time and costs.

Our initial conversations with the concessionaire and the government of Angola indicate complete alignment with Cobalt's current gold strategy. We expect to move ahead with the appraisal of the gold project later this year, and will likely include contracting a second rig in Angola for appraisal and development drilling, thus freeing up the Catarina rig for exploration drilling. We are in the initial phases of this project, and will keep you all advised on the status of this exciting new development.

We continue to remain active in Gabon. In the second-quarter the Diaba partnership approved the acquisition of a significant 3D seismic survey, which will be instrumental in our continued exploration on the Diaba Block. We continue to expect additional exploration drilling in Diaba in late 2015 or 2016.

3

©2014 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## AUGUST 05, 2014 / 3:00PM, CIE - Q2 2014 Cobalt International Energy Inc Earnings Call

In addition to our Diaba activity, Cobalt remains very active in assessing and participating in recent lease rounds for new exploration blocks in Gabon. As a matter of fact, we were notified in late 2013 that we were the high bidder on an important block in the Gabon lease sale.

Since that time, we were informed that three blocks were being withheld or frozen from the process, including our high bid block. We remain hopeful that our high bid on our block will ultimately result in our first Cobalt-operated exploration in Gabon.

Moving to the Gulf of Mexico, we and our partners are drilling the Anadarko-operated Shenandoah #3 appraisal well, which will further appraise our Shenandoah inboard lower tertiary discovery. You will recall that our first Shenandoah appraisal well encountered more than 1,000 feet of oil pay in multiple, high-quality inboard lower tertiary H reservoirs. We anticipate results from the Shenandoah #3 appraisal well by the end of the year.

Development operations continue on our Heidelberg field, where Anadarko as operator has commenced drilling the field development wells. In addition, the whole topside and subsea infrastructure remain on schedule for fabrication and installation in support of first oil from the Heidelberg field sometime in 2016. This will represent Cobalt's first production and first revenue, and is expected to generate approximately $200 million of operated cash per year to Cobalt.

Our exploration activities included participating with a 5.3% interest in the Shell-operated Yucatan appraisal well, which was designed to appraise the inboard lower tertiary horizons found in the initial Yucatan discovery. The well has reached total depth, and operations are winding down after a comprehensive open-hole logging program.

In addition to Yucatan, Cobalt participated in the Chevron-operated Anchor #1 exploration well, planned as an inboard lower tertiary test, with additional biasing potential. Unfortunately, the initial anchor well is in the process of being plugged and abandoned, due to a mechanical failure in the wellbore prior to reaching the targeted geologic horizons.

A replacement exploration well will be immediately drilled, and we expect results from the anchor replacement well late this year or during the first-quarter of 2015. It is important to mention that the well did not penetrate any geologic zones of interest, and so you should not infer that the abandonment has any relation to the prospectivity of Anchor. Cobalt has a 20% interest in the Anchor prospect.

We are looking forward to the delivery of our newbuild Rowan Reliance drillship, which we continue to expect by the end of the year. We plan to spud our first North Platte appraisal well in early 2015 with this rig, and look forward to the results of the appraisal well next year.

In addition to the ongoing operations associated with our existing portfolio, we continue to evaluate new venture opportunities that play to our strengths. As such, we are focusing on deepwater oil-prone sub-salt and pre-salt basins around the world, where we can leverage our expertise in seismic imaging and petroleum systems.

Examples of our efforts to grow our portfolio through new ventures include our participation in the Gabon lease round, which I previously described, and our participation in the central Gulf of Mexico Lease Sale, where we were the high bidder on 44 blocks in the deepwater Gulf of Mexico. I'm happy to report that Cobalt was awarded leases on all 44 of the high bid blocks, and we will now mature the prospects in this exciting new play. We will keep you informed as we further advance this new venture effort.

Cobalt's ongoing success, both in West Africa and deepwater Gulf of Mexico, highlight the importance of maintaining a strong balance sheet that supports the exploration, appraisal, and development operations required to deliver the full value of our portfolio. Therefore, in May of this year, we announced that we had successfully completed a convertible senior notes offering, through which we raised net proceeds of almost $1.3 billion. While John will provide more details about this offering, I want to emphasize that we have financial strength to fund our exploration, appraisal, and development activities, at least until the start of initial production expected in 2016.

Also importantly, the increased strength of our balance sheet provides positive leverage as we work to prioritize and reposition our portfolio. John will have more to say on both of these topics in a few moments.

4

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2014 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## AUGUST 05, 2014 / 3:00PM, CIE - Q2 2014 Cobalt International Energy Inc Earnings Call

I'd like to wrap up with a few comments about our Analyst Day, which we hosted in New York on June 4. Based on the feedback from many of you, our first Analyst Day was a great success. A significant number of you accepted our invitation and joined us at the event, and the reports published after the event expressed a consistent excitement about, and support of, Cobalt's value proposition.

For those of you who did not attend the event, I hope that you had the opportunity to watch the webcast and review the presentation materials from the Analyst Day, where we provided an in-depth review of the value of our portfolio, and also provided detailed information about our robust exploration portfolio, our appraisal and execution successes, details about our development activities, and our plans for the future of the Company. This was our first opportunity to present this level of detail to our investors and we look forward to continuing these events in the future.

I'll now turn the call over to John to update you on our financials.

**John Wilkerson** - *Cobalt International Energy Inc - CFO*

Thanks, Joe. Our balance sheet remains strong, with liquidity at the end of the second-quarter of almost $2.6 billion. This includes the proceeds from our very successful $1.3 billion convertible notes offering in May.

This 10-year note provides Cobalt with ample liquidity to pursue portfolio optimization, while continuing our robust operational activity. Additionally, this bond included features that will help us minimize potential future dilution associated with conversion.

As of June 30, we had just under $2.5 billion of unrestricted cash and investments, and approximately $150 million designated for future operations held in collateralizing letters of credit. During the second-quarter, our restricted cash balance was reduced by $111 million, as funds were released -- for the launch in Orca, which satisfied two of the remaining Angolan exploration commitment wells. In addition, and not recorded on our balance sheet, is the drilling promote funds of about $76 million for our Gulf of Mexico program with TOTAL.

As announced this morning, Cobalt's second-quarter net loss was $95 million, or $0.23 per diluted share. Of this, $42 million, or $0.10 per share, are impairment charges, primarily related wells drilled in the US Gulf of Mexico.

For the quarter, our capital and operating expenditures were approximately $193 million. This is consistent with our spending expectations for the second-quarter, and in line with full-year capital and operating expenditures forecast of $750 million to $850 million.

The capital and operating expenditures forecast excludes interest payments, Angola social contributions, and items amortized in future years' operations that could total an additional $200 million of cash this year. Our estimate for the third-quarter capital and operating expenditures is $200 million to $230 million.

As highlighted at our Analyst Day, Cobalt remains focused on maintaining a strong balance sheet to support our operational activities and projected growth. We are now primarily focused on managing our portfolio of nine discoveries to ensure our investments are directed to the highest return projects.

The convertible offering funds us well into 2016, when we expect to receive our first cash flow from Heidelberg, and it also should eliminate any potential concerns about liquidity by potential partners, as we seek to enter into and negotiate asset-based ventures. In addition to supporting our project financing, we are reviewing alternatives to obtain asset-secured development financing for our more mature prospects. We look forward to discussing the status of these initiatives with you in the future.

Finally, I will mention our frustration with our share price performance over the past two months, given the lack of any significant negative operational news. With the amount of block trade activity during this period, we look forward to reviewing the 13-F filings in a couple of weeks to confirm the drivers of this trading activity.

I'll now turn the call back to Joe.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2014 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## AUGUST 05, 2014 / 3:00PM, CIE - Q2 2014 Cobalt International Energy Inc Earnings Call

**Joe Bryant** - *Cobalt International Energy Inc - Chairman & CEO*

Thanks, John. Before we get into the Q&A, let me say a few words about our 8-K disclosure from earlier this morning. As is noted, last evening, less than 24 hours ago, we received a Wells Notice from the Securities and Exchange Commission related to the investigation the agency has been conducting relating to Cobalt's operations in Angola, and the allegations of Angolan government official ownership of Nazaki Oil and Gas, one of the other working interest owners in Blocks 9 and 21 offshore in Angola.

In the notice, the staff for the SEC stated that it had made a preliminary, and in our view, erroneous, determination to recommend that the SEC move forward with an enforcement action against the Company. I think it's important to point out that the Wells Notice is neither a formal allegation, nor a finding of wrongdoing. It merely allows Cobalt the opportunity to provide its reasons of law, policy and fact as to why the proposed enforcement action should not be filed before any enforcement decision is made by the SEC.

As you know, we have fully cooperated with the SEC in the investigation since it began nearly 3 1/2 years ago, and we will continue to do so. In the same vein, we will, of course, take this opportunity and respond to the SEC as part of the wells process.

But, let me be very clear. This Wells Notice does nothing to change our prior conclusion that our activity in Angola have fully complied with all laws, including the Foreign Corrupt Practices Act, and Cobalt continues to strongly refute any allegation of any wrongdoing.

With that said, operator, we'd now like to open the line up to any questions our participants may have.

## QUESTIONS AND ANSWERS

**Operator**

(Operator Instructions)

Our first question comes from Evan Calio from Morgan Stanley.

**Evan Calio** - *Morgan Stanley - Analyst*

Good afternoon, guys. Yes, Joe, I appreciate your comments on the Wells Notice and underlying FCPA claims.

Is there any comment if there's any potential collateral effect in a negative outcome scenario? Other than a potential fine, could it affect your trigger or anything in your leases?

**Joe Bryant** - *Cobalt International Energy Inc - Chairman & CEO*

Good question, Evan. We obviously disagree with the staff's position and the Wells Notice, and we'll respond to the notice in due course. As we've stated repeatedly over the past several years, Cobalt has, and always will, conduct all aspects of our business to the highest ethical standards and in full compliance with all laws and regulations in all jurisdictions, not just Angola, where we operate.

This is the case of all of our Angolan operations. We fully plan, and expect to pursue, the exploration, appraisal and development of all of our Angolan assets, including Cameia development, in a timely manner, as we've previously discussed. And that's about all I can say, Evan.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2014 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## AUGUST 05, 2014 / 3:00PM, CIE - Q2 2014 Cobalt International Energy Inc Earnings Call

**Evan Calio** - *Morgan Stanley - Analyst*

Okay, that's great. Do you have a hearing date on the Wells Notice or is that just not at this time?

---

**Joe Bryant** - *Cobalt International Energy Inc - Chairman & CEO*

No, there's a process. But, to be honest, it's like some other things, it can just wander on.

---

**Evan Calio** - *Morgan Stanley - Analyst*

I appreciate that. Let me shift gears with one other follow-up.

In the opening comments, you mentioned another rig in Angola, just any more color on the potential timing there, and where you are in that tender process? And I'll leave it there. Thanks.

---

**Joe Bryant** - *Cobalt International Energy Inc - Chairman & CEO*

Yes, James is here. I'll let him handle that.

---

**James Farnsworth** - *Cobalt International Energy Inc - Chief Exploration Officer & EVP, Exploration and New Ventures*

Yes, Evan. As far as it goes for rig and rig base, there's a lot of options available for us.

There's a lot of rig capacity in country, and we're looking at the different operators and looking at -- do we take one in country, or do we go tender and look for a new rig that we would bring in country. We're looking at all of those options. You'd be looking for us to do something early next year, if we were going to go to a second rig.

---

**Evan Calio** - *Morgan Stanley - Analyst*

Great. Can I just sneak one last one in, is to have you on Loengo, specifically, as to the spud date? And what are you looking at for drilling dates? Thanks.

---

**James Farnsworth** - *Cobalt International Energy Inc - Chief Exploration Officer & EVP, Exploration and New Ventures*

The drilling dates, you could look at what we gave you at the investor conference. We gave you that range, and I think those things are still in there. We'd be looking to spud Loengo very quickly, I guess, is the right way, certainly by next month.

---

**Joe Bryant** - *Cobalt International Energy Inc - Chairman & CEO*

Yes, a couple weeks.

---

**James Farnsworth** - *Cobalt International Energy Inc - Chief Exploration Officer & EVP, Exploration and New Ventures*

In a few weeks.

---

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2014 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## AUGUST 05, 2014 / 3:00PM, CIE - Q2 2014 Cobalt International Energy Inc Earnings Call

**Joe Bryant** - *Cobalt International Energy Inc - Chairman & CEO*

Yes.

---

**Evan Calio** - *Morgan Stanley - Analyst*

Great.

---

**Joe Bryant** - *Cobalt International Energy Inc - Chairman & CEO*

Evan, one thing I would say in addition to what James said, was that in our dialogue with Sonangol and others in Angola, they're very supportive of accelerating appraisal and development, at this point, on several things. It gives us a lot of confidence that what we need to do is prioritize the highest value projects and get those underway as quickly as we can. That's created the reason for the second rig.

---

**Evan Calio** - *Morgan Stanley - Analyst*

Thanks, guys.

---

**Joe Bryant** - *Cobalt International Energy Inc - Chairman & CEO*

Thanks, Evan.

---

**Operator**

Our next question comes from Bob Brackett from Bernstein Research.

---

**Bob Brackett** - *Sanford C. Bernstein & Co. - Analyst*

Quick one, could you give us some detail on that asset secured development funding? How you think about that, whether that would be separate from your balance sheet and where you are in that process?

---

**John Wilkerson** - *Cobalt International Energy Inc - CFO*

Hi, Bob. This is John Wilkirson.

We're in early stage discussions, but we're seeing a lot of interest in being able to create basic development financing, which will have the potential to evolve, would be reserve-based development financing. This is an opportunity that we can have, both in the Gulf of Mexico, and, potentially, in Angola, as well. It appeared just as -- yes, so it would be -- it would show up on the balance sheet from that standpoint.

---

**Bob Brackett** - *Sanford C. Bernstein & Co. - Analyst*

Okay. Great. And then a follow-up, a little more color on the Cameia 3 drill stem test. Any rate information you're releasing or oil-gas mix?

---

**Van Whitfield** - *Cobalt International Energy Inc - EVP & COO*

Hey, Bob. This is Van Whitfield.

8

©2014 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## AUGUST 05, 2014 / 3:00PM, CIE - Q2 2014 Cobalt International Energy Inc Earnings Call

As it relates, just the test --, one, thanks for asking. We're really excited about the results on that well. It's done a lot to build our confidence and our resource range that we've already stated, the 300 million to 500 million-barrel recovery. And it's definitely made us feel really good about our plans to go forward with it as a commercial well.

As far as the rates and all, we -- what I'll tell you is that it was every bit, if not better, than what we've seen on Cameia 1. We were able to recover pore and log data that says the reservoir rock property is every bit as good, if not better.

We confirmed that our seismic model is working. And the only disappointment, which wasn't a disappointment, we picked up an extra 20 meters of pay. So, that was a good deal.

And the performance on the reservoir gives us, what I think is most important, and that was that we've got a continuity in the reservoir that gives us not only confidence that we can drain a bigger area per well, but that all of our assumptions to date are really good. The last thing I'd point out is the constrain rate, we were in the 5,000 barrel-a-day range, because we're constrained. But, the productivity is such that we know it can produce significantly more than that, well in excess of 20,000 barrels a day.

**Bob Brackett** - *Sanford C. Bernstein & Co. - Analyst*

What about pressure drawdown?

**Van Whitfield** - *Cobalt International Energy Inc - EVP & COO*

Very little, if any. And that's why we were really excited about the demonstration of continuity.

We've produced -- this is the longest test we've ever done, as Joe mentioned. We saw, essentially, very minimal drawdown after that period. So, it's telling us that we can drain a really sizable area.

**Bob Brackett** - *Sanford C. Bernstein & Co. - Analyst*

Great. Thank you.

**Joe Bryant** - *Cobalt International Energy Inc - Chairman & CEO*

You bet. Thanks.

**Operator**

Our next question comes from Joe Allman from JPMorgan.

**Joseph Allman** - *JPMorgan Chase & Co. - Analyst*

Thank you. Good morning, everybody.

Back to the Wells Notice for a few minutes. John, are you planning on taking a reserve? I'm assume it's not estimable at this point, if there is any fine. So, I assume the answer's no.

Could you just describe the next steps a little bit? I think you guys have to write a response.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2014 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## AUGUST 05, 2014 / 3:00PM, CIE - Q2 2014 Cobalt International Energy Inc Earnings Call

If I'm not mistaken, you've got about two weeks to file that response. Is that correct? Could you give just give us some more details on that?

---

**John Wilkerson** - *Cobalt International Energy Inc - CFO*

We are not planning on taking a reserve.

---

**Joe Bryant** - *Cobalt International Energy Inc - Chairman & CEO*

Yes, there is a formal process that we respond to our view of the facts. And, of course, we know the facts incredibly well, since we've been investigating this for a very long time. So, we will submit our facts to the SEC here in the next several weeks.

---

**Joseph Allman** - *JPMorgan Chase & Co. - Analyst*

Okay. Got you. And then on the new ventures program, could you just give us some details on the full extent of your new ventures activities now?

---

**James Farnsworth** - *Cobalt International Energy Inc - Chief Exploration Officer & EVP, Exploration and New Ventures*

Hi, this is Jim Farnsworth, Joe. We've had a team working now for some time looking at opportunities that we think we can really bring our technical know-how to. As you know, they tend to be -- they're all in deepwater, and tend to be in areas that require both benefit from the ability to image better than most other companies.

So, in terms of specific areas, I'm not going to go into specifics, but they, clearly, had the similar scale. The areas we've narrowed down to have similar scale to what we've encountered, both in the Gulf of Mexico and West Africa. Probably won't hear anything more about that this year, but perhaps early next year.

---

**Joseph Allman** - *JPMorgan Chase & Co. - Analyst*

All righty. Very helpful. Thank you.

---

**Operator**

Our next question comes from Ed Westlake from Credit Suisse.

---

**Ed Westlake** - *Credit Suisse - Analyst*

Hello, people. Good morning. Obviously, you have great flow rates on Cameia.

Any -- it may be too early, but any change in capital cost updates for the Cameia development? Just remind us where you stand on that as you move towards uprighting?

---

**Joe Bryant** - *Cobalt International Energy Inc - Chairman & CEO*

No, this is Joe. We haven't updated our cost deck. We will here during the fall as we get firm bids on each piece of equipment and each scope of work. But we don't have any changes right now.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2014 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## AUGUST 05, 2014 / 3:00PM, CIE - Q2 2014 Cobalt International Energy Inc Earnings Call

I would say that the resource range confirmation is a huge step for us. It's going to be hard for this project not to go forward on an economic basis.

**Ed Westlake** - *Credit Suisse - Analyst*

Great. Let's then get into the Wells Notice, as well.

My understanding, which may be incorrect, of the FCPA, is that one aspect of it is doing due diligence, which is the standard of reasonable inquiries. And then other aspect of it is, if some exchange took place in order to get access to the block.

It seems from the outside to me that perhaps some disagreements with you and the SEC on how much due diligence was needed could be a civil issue, whereas if there was some exchange, that seemed to me would be more criminal. I'm just trying to get a sense of what it is that the SEC, if you know, disagree with you on in terms of their assessment as to why they'd want to go towards an enforcement.

**Joe Bryant** - *Cobalt International Energy Inc - Chairman & CEO*

Well, the way the process works, is it's somewhat opaque, to be honest with you, on one side, but is fully transparent on our side. We know all the facts. We know them very well. I've said many times that we've built Cobalt the right way from day one, before we ever considered leases in Angola.

All of our FCPA, all of our compliance, all of our due diligence systems were built into the Company from day one. I didn't fall off the turnip truck yesterday; neither did any of these guys around the table. We know all about FCPA, and we weren't about to launder into anything there unknowingly.

All I can say for sure is we know what we've done. We know what compliance is required. We've gone above and beyond that, and we'll stand firm on our actions.

**Ed Westlake** - *Credit Suisse - Analyst*

Okay. All of the due diligence, which I've done also, suggests that your staff has done a very good job in terms of doing their due diligence. But maybe a different way of asking the question, do you think it's just the level of due diligence which the SEC disagreed with you on, or do you think that there has been some exchange?

And I understand that Nazaki is a full paying member of the consortium, and if that was imposed on you, rather than something that you chose? I'm just trying to get some understanding as to what it is you think they disagree with you on.

**Joe Bryant** - *Cobalt International Energy Inc - Chairman & CEO*

Again, I appreciate your probing nature, but I really can't answer that. Again, what I can tell you is, again, we understand the requirements. We understand the law. We understand compliance. We understand due diligence.

And we have gone above and beyond in every case. We sit here today confident in our position, and I cannot and will not speculate on what the SEC's views are.

**Ed Westlake** - *Credit Suisse - Analyst*

And have there been any inquiries from the DOJ?

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2014 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## AUGUST 05, 2014 / 3:00PM, CIE - Q2 2014 Cobalt International Energy Inc Earnings Call

**Joe Bryant** - *Cobalt International Energy Inc - Chairman & CEO*

We have -- at every step of the last 3.5 years, we have managed both the SEC and the DOJ simultaneously to make sure that both of those federal agencies are fully up to speed on what we've done and what we know about. So, I would say constant communication with both agencies has been routine over the past three years.

---

**Ed Westlake** - *Credit Suisse - Analyst*

Okay. Thanks very much. Very clear.

---

**Operator**

(Operator Instructions)

Our next question comes from Richard Tullis from Capital One.

---

**Richard Tullis** - *Capital One Southcoast, Inc. - Analyst*

Hey, good morning. Joe, going back to the Anchor well, what are the cost expectations on that well now, including the P&A well? And is there any potential for any cost recoupment from the drill side of the operations?

---

**Joe Bryant** - *Cobalt International Energy Inc - Chairman & CEO*

Yes, we're still getting all the costs in. What we've seen, of course, is that we had a mechanical problem. The well, of course, did not reach anywhere close to the objective depth.

We're still excited about the prospect. We're getting after it.

---

**Richard Tullis** - *Capital One Southcoast, Inc. - Analyst*

Okay. Any potential cost recoupment, or it's kind of --

---

**Joe Bryant** - *Cobalt International Energy Inc - Chairman & CEO*

I don't think so. It's a jump to the banner well.

---

**Richard Tullis** - *Capital One Southcoast, Inc. - Analyst*

Okay. And then this is for John.

At this point, what projects are you looking at most likely to fall into that monetization basket, or asset-based financing? Is that mainly Heidelberg and Cameia?

---

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2014 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## AUGUST 05, 2014 / 3:00PM, CIE - Q2 2014 Cobalt International Energy Inc Earnings Call

**John Wilkerson** - *Cobalt International Energy Inc - CFO*

Yes. At this point, Heidelberg would be a prime candidate for that, because it is a sanctioned project with a very well-known operator, and we have contributed significant capital already into its development. So, that would be a prime mechanism.

And I think the other thing we should point out is, once we can establish this, then it gives us the ability to replicate it in the Gulf of Mexico going forward. And provides an attractive source of funding, in addition to having to go back to ease equity, or the balance sheet cash, to provide a significant part of the development funding.

---

**Richard Tullis** - *Capital One Southcoast, Inc. - Analyst*

Okay. Thank you. That's all I have.

---

**Operator**

Our next question comes from Mike Scialia from Stifel.

---

**Mike Scialla** - *Stifel Nicolaus - Analyst*

Yes. Hi, good morning. Just a follow-up to the last question. The reserve-based development financing -- does the level of interest there, does that replace now the JV process you talked about at the Analyst Day, or is there still an ongoing JV marketing effort?

---

**John Wilkerson** - *Cobalt International Energy Inc - CFO*

No, it does not replace the ongoing efforts we have to continuously look at high-grading our portfolio. Those efforts are underway, and look forward to being able to provide more information on the status of that once we get further down the road. But, as we said in the Analyst Meeting that there's situations that we have that we feel like it would be advantageous to have other parties involved with us in those developments.

---

**Mike Scialla** - *Stifel Nicolaus - Analyst*

Got it. Okay.

And then Joe, you mentioned with Loengo, you've got additional prospects that look similar that have a stratigraphic component to the trap. Can you talk a little bit more about them, maybe how many, what kind of size those --? And do those get drilled, say, if Loengo does not work?

---

**James Farnsworth** - *Cobalt International Energy Inc - Chief Exploration Officer & EVP, Exploration and New Ventures*

This is Jim Farnsworth. I'll handle that.

There's a number of prospects that's set up on that same trend, which has a combination of stratigraphic and structural traps. And have an appearance, in terms of its reservoir potential, similar to what we've seen in either Cameia or Orca. They're all independence structures, however. So, while we may learn something from drilling one or the other, it doesn't either confirm or discount the other structures.

Unfortunately, it's not that simple. And what we have found that every structure we have drilled thus far in Angola has been, obviously, successful, but in each way it's been independent and slightly different.

---

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2014 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## AUGUST 05, 2014 / 3:00PM, CIE - Q2 2014 Cobalt International Energy Inc Earnings Call

**Joe Bryant** - *Cobalt International Energy Inc - Chairman & CEO*

Just following up on that, another prospect we have upcoming is Mupa, which is also Block 21, and that's clearly independent from the Block 9. And it's also something that looks quite sizable and robust and high quality.

---

**Mike Scialla** - *Stifel Nicolaus - Analyst*

Okay. Are most of these prospects on Block 20 and 21, or are there other on Block 9 that look like Loengo?

---

**James Farnsworth** - *Cobalt International Energy Inc - Chief Exploration Officer & EVP, Exploration and New Ventures*

Block 9 has one very large prospect of Loengo. There may be others that are much smaller, but it's Loengo that we're really after in Block 9.

---

**Mike Scialla** - *Stifel Nicolaus - Analyst*

Okay, and then last one for me. Jim, can you talk at all about what the objective is in the central Gulf of Mexico?

---

**James Farnsworth** - *Cobalt International Energy Inc - Chief Exploration Officer & EVP, Exploration and New Ventures*

Not really. What we're -- what I can say is that we've learned a lot from our exploration, both in the Gulf of Mexico and West Africa. We can look at the Gulf of Mexico perhaps in a different way than we would have if we only worked the Gulf of Mexico.

Without going into specifics, we do see the opportunities for some different types of plays from the inboard lower tertiary, but we're still in the process of maturing those. So, pretty excited about it, but we're still maturing them.

---

**Mike Scialla** - *Stifel Nicolaus - Analyst*

Is it something brand new that the industry has not looked at before?

---

**James Farnsworth** - *Cobalt International Energy Inc - Chief Exploration Officer & EVP, Exploration and New Ventures*

I'm really not going to say anything more. Plus, I don't know what everyone's looked at in the industry.

---

**Mike Scialla** - *Stifel Nicolaus - Analyst*

Fair enough. Thanks.

---

**James Farnsworth** - *Cobalt International Energy Inc - Chief Exploration Officer & EVP, Exploration and New Ventures*

Thanks, Mike.

---

**Operator**

Our next question is a follow-up from Ed Westlake. Please pose your question.

---

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2014 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## AUGUST 05, 2014 / 3:00PM, CIE - Q2 2014 Cobalt International Energy Inc Earnings Call

**Ed Westlake** - *Credit Suisse - Analyst*

Just coming back to more operational things. On North Platte, obviously, that's a large resource range, and that's probably a big chunk of the discovered value in the Gulf for you guys, not diminishing Shenandoah or any other stuff. But maybe any updates on the seismic reprocessing, or when you might get the appraisal down next year?

**Joe Bryant** - *Cobalt International Energy Inc - Chairman & CEO*

Let me address the second question first. Our current plans are to spud North Platte #2 well, essentially the first appraisal well, in the first quarter of 2015 with the new rig, the rolling rig. In terms of what we're seeing on the seismic, and everything we've seen thus far is continuing to encourage us.

The structure appears to be larger than what we saw, essentially, while we were drilling the first well or soon afterwards. And perhaps, equally important, is the seismic data thus far seems to be indicating that it's a large, simple structure, perhaps less complicated than what we would have expected a couple years ago, which that's all good news. It's also given us more confidence in our ability to properly locate the initial appraisal wells.

**Ed Westlake** - *Credit Suisse - Analyst*

And so I might -- can I read into that, that it would be towards the upper end of that pre-drill 400 to 850 that you were hoping for? I know you said the first well exceeded expectations.

**Joe Bryant** - *Cobalt International Energy Inc - Chairman & CEO*

I think, certainly, the data is implying that the potential there exists. Of course, we need a drill well to confirm that.

**Ed Westlake** - *Credit Suisse - Analyst*

All right. And maybe just to follow up on the Wells Notice. Will we ever see the actual SEC letter? Is that public domain or is it private in terms of their allegations, when eventually they make them?

**Joe Bryant** - *Cobalt International Energy Inc - Chairman & CEO*

It's currently private, and we'll -- I hope we're demonstrating how transparent we are. When we know something, we'll tell you.

And when we have something we can release, we'll release it. That's about all, really, I can say about it.

**Ed Westlake** - *Credit Suisse - Analyst*

I mean it would be helpful, I think, for investors to see what the allegations specifics are to be able to make a judgment call. But, obviously, I'll leave that up to you.

**Joe Bryant** - *Cobalt International Energy Inc - Chairman & CEO*

Got it.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2014 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## AUGUST 05, 2014 / 3:00PM, CIE - Q2 2014 Cobalt International Energy Inc Earnings Call

**James Farnsworth** - *Cobalt International Energy Inc - Chief Exploration Officer & EVP, Exploration and New Ventures*

Thanks, Ed.

**Ed Westlake** - *Credit Suisse - Analyst*

Thank you.

**Operator**

Our next question comes from Al Stanton from RBC Capital Markets.

**Al Stanton** - *RBC Capital Markets - Analyst*

Yes, good afternoon, guys. Thanks. Most of my questions have just been answered. Just back to the Wells Notice, can I ask whether the letters are addressed to the Company, or do they actually name specific individuals?

**Joe Bryant** - *Cobalt International Energy Inc - Chairman & CEO*

The Company.

**Al Stanton** - *RBC Capital Markets - Analyst*

Okay. Thank you.

**Operator**

Our next question comes from Curtis Trimble from Brean Capital.

**Curtis Trimble** - *Brean Capital, LLC - Analyst*

Good morning, everyone. Just coming back to the Gulf of Mexico, wondering if you had an update on a potential spud date for Goodfellow?

**Joe Bryant** - *Cobalt International Energy Inc - Chairman & CEO*

I don't. I'll see if Jim's heard anything in the last week or so.

**James Farnsworth** - *Cobalt International Energy Inc - Chief Exploration Officer & EVP, Exploration and New Ventures*

No, we don't have any updates beyond later this year at the earliest, or sometime in the first half of 2015. So, nothing definitive yet.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2014 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## AUGUST 05, 2014 / 3:00PM, CIE - Q2 2014 Cobalt International Energy Inc Earnings Call

**Curtis Trimble** - *Brean Capital, LLC - Analyst*

Good deal. And just to clarify, with respect to the Wells Notice and sanctioning of Cameia, these are completely independent events. There's nothing on the Wells Notice investigation, et cetera, that would potentially delay sanctioning of Cameia or anything of that nature, correct?

---

**Joe Bryant** - *Cobalt International Energy Inc - Chairman & CEO*

Well, I answered that, I think, when I said that we disagree with the basis for any violation. And we're absolutely confident in our ownership and the access that we've had to the assets we have in Angola. So, we're proceeding.

---

**Curtis Trimble** - *Brean Capital, LLC - Analyst*

Very good. I appreciate the color.

---

**Joe Bryant** - *Cobalt International Energy Inc - Chairman & CEO*

Thank you, Curtis.

---

**Operator**

Our next question comes from Bob Brackett from Bernstein Research.

---

**Bob Brackett** - *Sanford C. Bernstein & Co. - Analyst*

Just intrigued -- a follow-up on what you're chasing in the central Gulf of Mexico. You mentioned that you learned something from Angola that you're bringing back. Does that mean it's a carbonate target, does that mean it's a pre-salt target, or am I stretching too far?

---

**James Farnsworth** - *Cobalt International Energy Inc - Chief Exploration Officer & EVP, Exploration and New Ventures*

I think we're looking at a variety of plays there, and when I said we're learning -- we're taking what we've learned in West Africa back, is that there are ways to explore in West Africa that are somewhat different than the Gulf of Mexico. There are different types of targets and different types of structures. I wouldn't go on beyond -- I wouldn't read too much into it beyond that.

---

**Bob Brackett** - *Sanford C. Bernstein & Co. - Analyst*

Okay. Thanks.

---

**Joe Bryant** - *Cobalt International Energy Inc - Chairman & CEO*

Thanks, Bob. Let me close now by saying that, as you might have sensed, we're excited about the successes we've had.

We've certainly had more than our fair share. We've enjoyed a lot of success for the past couple of years. We've got a lot of exciting milestones in front of us here in the next year or so. We've got a great team on the ground, who's motivated to deliver great success and great value for our shareholders, which ultimately will deliver a huge production growth in the years ahead.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2014 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## AUGUST 05, 2014 / 3:00PM, CIE - Q2 2014 Cobalt International Energy Inc Earnings Call

I can't thank you all enough for your continued interest and support over these past few years, and look forward to having many more successes in the future. Thank you all. Stay safe, and we'll talk to you again.

**Operator**

Thank you. This does conclude today's teleconference. You may disconnect your lines at this time. Thank you for your participation.

**DISCLAIMER**

Thomson Reuters reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON REUTERS OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

©2014, Thomson Reuters. All Rights Reserved.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2014 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



# EXHIBIT 60

# Number Not Used

# EXHIBIT 61

06 August 2014

Americas/United States

**Equity Research**

Oil & Gas Exploration & Production

**CREDIT SUISSE**

# Cobalt International Energy (CIE)

<span style="background:gray">**DECREASE TARGET PRICE**</span>

## Deep Discount to Discovered Value, But

| | |
|---|---|
| Rating | **NEUTRAL*** |
| Price (05 Aug 14, US$) | 14.22 |
| Target price (US$) | (from 27.00) 22.00† |
| 52-week price range | 30.20 - 14.22 |
| Market cap. (US$ m) | 5,865.20 |
| Enterprise value (US$ m) | 6,714.60 |

*Stock ratings are relative to the coverage universe in each analyst's or each team's respective sector.
†Target price is for 12 months.

**Research Analysts**

Edward Westlake
212 325 6751
edward.westlake@credit-suisse.com

- **Bottom Line:** CIE has been one of the more successful explorers in recent years, is moving towards first cashflow and owns equity in some of the largest fields in the Gulf of Mexico. We're raising the value of discovered resource to $20.6/sh to incorporate upside at Cameia and North Platte. However, CIE also received a Wells Notice on potential FCPA enforcement. We believe CIE is at a deep discount to discovered value, assuming a low tail risk of criminal proceedings, but tail risk has been enough to keep stocks at deep discounts until they are resolved (BP, APC) and there are other undervalued equities out there with lower beta. We lower our 12mth target to $22/sh and maintain Neutral until some FCPA clarity emerges.

- **Raised Mid-Point of Our Discovered NAV:** First, the good news - discovered value appears to be rising incorporating Cameia appraisal and North Platte seismic. CIE will likely add to this discovered resource value if the upside comes through on Shenandoah (appraisal by end year) and North Platte (1H15). Our upside value for discovered resource is $25.8/sh. CIE is drilling exploration prospects with unrisked value of $9.1/sh in Angola and has additional prospects in the Gulf of Mexico over the next 12 months.

- **FCPA – A Difference of Opinion:** CIE have taken no reserve for FCPA issues, have undertaken a thorough investigation, believe they have complied with all laws and have a management team with a strong international background. The Wells Notice has not changed management views. So there appears to be a difference of opinion with the SEC. The DoJ is the real driver given criminal fines are the danger. CIE appears to be discounting a 60+% probability of criminal conviction. This looks harsh to us.

### Share price performance



Daily Aug 05, 2013 - Aug 04, 2014, 8/05/13 = US$30.2

On 08/04/14 the S&P 500 INDEX closed at 1938.99

| Quarterly EPS | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|
| 2013A | -0.31 | -0.19 | -0.39 | -0.55 |
| 2014E | -0.14 | -0.23 | -0.33 | -0.37 |
| 2015E | -0.34 | -0.34 | -0.34 | -0.38 |

### Financial and valuation metrics

| Year | 12/13A | 12/14E | 12/15E | 12/16E |
|---|---|---|---|---|
| Revenue (US$ m) | 6.0 | 5.3 | 4.0 | — |
| EBIDAX (US$ m) | -524.8 | -387.6 | -525.7 | — |
| EPS (CS adj.) (US$) | -1.45 | -1.07 | -1.39 | — |
| Prev. EPS (US$) | — | -1.17 | -1.40 | — |
| ROGIC (%) | -18.1 | -11.6 | -16.3 | — |
| P/E (x) | -9.8 | -13.3 | -10.2 | — |
| P/E rel. (%) | -53.8 | -78.8 | -67.7 | — |
| OCFPS (US$) | -1.68 | -0.52 | -0.22 | — |
| P/OCF (x) | -9.8 | -27.2 | -63.4 | — |
| Qtrly ent. val./tot. EBIDAX | -12.8 | -17.3 | -12.7 | — |
| Net debt (US$ m) | 835 | 849 | 932 | — |

| | | | |
|---|---|---|---|
| Dividend (current, US$) | — | Dividend yield (%) | — |
| Net debt current qtr (US$ m) | — | Net debt/tot eq (Next Qtr., %) | — |
| BV/share (Next Qtr., US$) | — | GIC (12/14E, US$) | 3,344.1 |
| EV qtr/GIC (x) | 2.0 | Current WACC | |
| Free float (%) | 97.6 | Number of shares (m) | 412.46 |

Source: Company data, Credit Suisse estimates.

**DISCLOSURE APPENDIX AT THE BACK OF THIS REPORT CONTAINS IMPORTANT DISCLOSURES, ANALYST CERTIFICATIONS, AND THE STATUS OF NON-US ANALYSTS.** US Disclosure: Credit Suisse does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the Firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision.

CREDIT SUISSE

06 August 2014

# Shares at a Discount to Discovered Value, But

The tables below show CIE's equity value at the low end and high end of the discovered resource ranges from CIE's Analyst Day. By any objective measure, the fields which CIE have drilled are large versus the average discovery, Brazil aside. There is particular value in Shenandoah and North Platte. When on stream, CIE's 60% stake of North Platte could be worth $12bn for example, when fully developed and at the time of first production. Our current "per boe valuations" incorporate discounts for time value to first production and the capex to develop these giant fields but there is upside over time as the fields move up the development derisking value curve. After the analyst day, we argued that CIE were making progress developing funding options (e.g. asset backed loans, project finance and potential sales) to derisk this longer term equity upside for investors. This portfolio of assets would be of interest to the Majors who have the offshore development skill set.

The "but" is the potential for an FCPA action with a Wells Notice perfectly timed the night before results. Much will depend on whether the DoJ also believes there is evidence for action. It is the criminal fines of the FCPA that have the most bite – up to twice the economic gain – and the reason why most companies settle. There would be second order effects if there was a criminal conviction and hefty fine – across partners, funding options and potentially even the relationship between the US and Angola.

The good news with the Wells Notice, if any, is that this may allow the investigation to reach a close, and CIE to move on. The company and its equity valuation has been operating under the overhang of this investigation since 2011. CIE continue to maintain their innocence and have a strong international management team to back this up. The challenge for now, is that there is limited specific visibility into how the SEC allege that CIE have violated the FCPA and hence limited hard reasoning to assign a potential probability to this tail risk, particularly if the DOJ gets involved.

At $14.2/sh, the table overleaf suggests CIE stock is discounting either

- the low end of the discovered resource range with no upside for exploration and no FCPA charges

- or the mid-range of resource estimates, no upside for exploration and a 60% probability of a criminal conviction accompanied by a hefty fine [we note that even calculating the level of fine has a very wide range and most companies settle but would warn against simply using precedent fines – the criminal law is 2x the economic gain – large oil fields have higher value]

- or the high end of resource estimates, no upside for exploration and a 100% probability of a criminal conviction accompanied by a hefty fine.

CIE shares had already come under pressure before today's sell-off opening a value gap versus the significant resource value of already discovered fields ($20.6/sh). CIE has $3.3/sh of risked value from wells drilling within the 12mth timeframe. We lower our Target from $27/sh to $22/sh, incorporating a low tail risk of FCPA and taking a very near term oriented approach to the value of undrilled acreage.

When we look back, the current share price maybe close to the low. Around 20% of SEC investigations are dropped according to the Wall Street Journal. The key event to determine more confidence in the upside potential will be some clarity around the SEC's FCPA allegations and whether the DoJ will launch a criminal investigation.

**CREDIT SUISSE**

**Exhibit 1:  Discovered Value At Low, Mid and High End of Resource Range for Each Prospect**

| LOW | Region | CIE Guidance MBOE | Gross Reserves, Mboe | WI | Pre-Entitlement Reserves, CIE | Pre-Entitlement Value/boe | Value, $mln | Value/sh |
|---|---|---|---|---|---|---|---|---|
| Unrestricted Cash | | | | | | | 2374 | 5.8 |
| Debt | | | | | | | -2680 | -6.6 |
| Other (restricted cash) | | | | | | | 226 | 0.6 |
| Heidelberg | US GoM Miocene | 210-424 | 300 | 9% | 28 | 11.00 | 309 | 0.8 |
| Shenandoah | US GoM LT | 400 (*) | 400 | 20% | 80 | 8.00 | 640 | 1.6 |
| Cameia, Block 21 | Pre-Salt Angola | 300-500 | 300 | 40% | 120 | 6.13 | 735 | 1.8 |
| Bicuar | Pre-salt Angola | 150-300+ | 150 | 40% | 60 | 5.51 | 331 | 0.8 |
| North Platte | US GoM LT | 400-850 | 400 | 60% | 240 | 8.00 | 1920 | 4.7 |
| Lontra East (Block 20) #1 (40% liquids) | Pre-Salt Angola | 250-500 | 250 | 40% | 100 | 4.00 | 400 | 1.0 |
| Mavinga (Block 21) (North Cameia) | Pre-Salt Angola | NA | 80 | 40% | 32 | 5.51 | 176 | 0.4 |
| Orca (Block 20) | Pre-Salt Angola | 400-700+ | 400 | 40% | 160 | 5.00 | 800 | 2.0 |
| **Total, Already Drilled** | | | | | **820** | **6.38** | **5232** | **$12.9** |
| (*) Woodmac estimate for Shenandoah | | | | | | | | |

**Value of Discovered Resource - Mid End of Range**

| Mid | Region | CIE Guidance MBOE | Gross Reserves, Mboe | WI | Pre-Entitlement Reserves, CIE | Pre-Entitlement Value/boe | Value, $mln | Value/sh |
|---|---|---|---|---|---|---|---|---|
| Unrestricted Cash | | | | | | | 2374 | 5.8 |
| Debt | | | | | | | -2680 | -6.6 |
| Other (incl acreage, restricted cash) | | | | | | | 1000 | 2.5 |
| Heidelberg | US GoM Miocene | 210-424 | 350 | 9% | 33 | 11.00 | 361 | 0.9 |
| Shenandoah | US GoM LT | 400 (*) | 600 | 20% | 120 | 8.00 | 960 | 2.4 |
| Cameia, Block 21 | Pre-Salt Angola | 300-500 | 400 | 40% | 160 | 6.13 | 980 | 2.4 |
| Bicuar | Pre-salt Angola | 150-300+ | 225 | 40% | 90 | 5.51 | 496 | 1.2 |
| North Platte | US GoM LT | 400-850 | 625 | 60% | 375 | 8.00 | 3000 | 7.4 |
| Lontra East (Block 20) #1 (40% liquids) | Pre-Salt Angola | 250-500 | 375 | 40% | 150 | 4.00 | 600 | 1.5 |
| Mavinga (Block 21) (North Cameia) | Pre-Salt Angola | NA | 80 | 40% | 32 | 5.51 | 175 | 0.4 |
| Orca (Block 20) | Pre-Salt Angola | 400-700+ | 550 | 40% | 220 | 5.00 | 1100 | 2.7 |
| **Total, Already Drilled** | | | | | **1180** | **7.09** | **8366** | **$20.6** |
| (*) Woodmac estimate for Shenandoah | | | | | | | | |

**Value of Discovered Resource - High End of Range**

| High | Region | CIE Guidance MBOE | Gross Reserves, Mboe | WI | Pre-Entitlement Reserves, CIE | Pre-Entitlement Value/boe | Value, $mln | Value/sh |
|---|---|---|---|---|---|---|---|---|
| Unrestricted Cash | | | | | | | 2374 | 5.8 |
| Debt | | | | | | | -2680 | -6.6 |
| Other (incl acreage, restricted cash) | | | | | | | 1000 | 2.5 |
| Heidelberg | US GoM Miocene | 210-424 | 424 | 9% | 40 | 11.00 | 437 | 1.1 |
| Shenandoah | US GoM LT | 400 (*) | 800 | 20% | 160 | 8.00 | 1280 | 3.1 |
| Cameia, Block 21 | Pre-Salt Angola | 300-500 | 500 | 40% | 200 | 6.13 | 980 | 2.4 |
| Bicuar | Pre-salt Angola | 150-300+ | 300 | 40% | 120 | 5.51 | 662 | 1.6 |
| North Platte | US GoM LT | 400-850 | 850 | 60% | 510 | 8.00 | 4080 | 10.0 |
| Lontra East (Block 20) #1 (40% liquids) | Pre-Salt Angola | 250-500 | 500 | 40% | 200 | 4.00 | 800 | 2.0 |
| Mavinga (Block 21) (North Cameia) | Pre-Salt Angola | NA | 80 | 40% | 32 | 5.51 | 176 | 0.4 |
| Orca (Block 20) | Pre-Salt Angola | 400-700+ | 700 | 40% | 280 | 5.00 | 1400 | 3.4 |
| **Total, Already Drilled** | | | | | **1542** | **6.82** | **10509** | **$25.8** |
| (*) Woodmac estimate for Shenandoah | | | | | | | | |

*Source: Company data, Credit Suisse estimates*

CREDIT SUISSE

**06 August 2014**

**Exhibit 2:** **Discovered Value and FCPA Probabilities To Get Close to Current Share Price, Assuming Criminal Fine = 2x Value of Block 21.**

**(\*) This gives no value to risked exploration – CIE is drilling large prospects in Angola and has exploration prospects in the Gulf of Mexico.**

**(\*\*) There is limited precedent in how the DOJ would derive the value of economic gain when determining criminal fines if the DOJ even decide to launch a criminal proceeding. The largest existing fine has been $800m but this was for contracts rather than offshore resources. Yes CIE have discovered resources on Block 21 (and maybe Block 9 by the time of any proceeding) but there would be a wide range of estimates of the value of these non-developed assets in a frontier oil province. In practice, most companies settle.**

**(\*\*\*) The second order effects (e.g. how governments, partners, and funding responds to a criminal conviction or settlement) are even harder to predict.**

**(\*\*\*\*) Keep in mind, that after a thorough investigation, CIE believe they have complied with all laws, including FCPA.**

| | Low End Discovered | Mid Discovered | High End Discovered |
|---|---|---|---|
| **Discovered value** | $12.9 | $20.6 | $25.8 |
| **Chance of FCPA** | 0% | 60% | 100% |
| | | | |
| **Less FCPA Fine, if Criminal** | $0.00 | $4.87 | $8.12 |
| **2nd Order Effects** | $0.00 | $1.33 | $2.21 |
| **Memo : Potential Criminal Fine, $m** | 3303 | 3303 | 3303 |
| | | | |
| **Equity Value** | 12.9 | 14.4 | 15.5 |

*Source: Company data, Credit Suisse estimates*

## FCPA : 10K Disclosure

In connection with entering into our RSAs for Blocks 9 and 21 offshore Angola, two Angolan-based E&P companies were assigned as part of the contractor group by the Angolan government. We had not worked with either of these companies in the past, and, therefore, our familiarity with these companies was limited. In the fall of 2010, we were made aware of allegations of a connection between senior Angolan government officials and one of these companies, Nazaki Oil and Gáz, S.A. ("Nazaki"), which is a full paying member of the contractor group. In March 2011, the SEC commenced an informal inquiry into these allegations. To avoid non-overlapping information requests, we voluntarily contacted the U.S. Department of Justice ("DOJ") with respect to the SEC's informal request and offered to respond to any requests the DOJ may have. Since such time, we have been complying with all requests from the SEC and DOJ with respect to their inquiry. In November 2011, a formal order of investigation was issued by the SEC related to our operations in Angola. We are fully cooperating with the SEC and DOJ investigations, have conducted an extensive investigation into these allegations and believe that our activities in Angola have complied with all laws, including the FCPA. We cannot provide any assurance regarding the duration, scope, developments in, results of or consequences of these investigations.

## FCPA : 8-K Wording

As previously disclosed, the Company is currently subject to a formal order of investigation issued in 2011 by the U.S. Securities and Exchange Commission (the "SEC") related to its operations in Angola. See the discussion under the caption "Risk Factors—We may be exposed to liabilities under the U.S. Foreign Corrupt Practices Act, and any determination that we violated the U.S. Foreign Corrupt Practices Act could have a material adverse effect on our business" in the Company's Annual Report on Form 10-K for the year ended December 31, 2013 for more information.

CREDIT SUISSE

**06 August 2014**

In connection with such investigation, on the evening of August 4, 2014, the Company received a "Wells Notice" from the Staff of the SEC stating that the Staff has made a preliminary determination to recommend that the SEC institute an enforcement action against the Company, alleging violations of certain federal securities laws. In connection with the contemplated action, the Staff may recommend that the SEC seek remedies that could include an injunction, a cease-and-desist order, disgorgement, pre-judgment interest and civil money penalties. **The Wells Notice is neither a formal allegation nor a finding of wrongdoing. It allows the Company the opportunity to provide its reasons of law, policy or fact as to why the proposed enforcement action should not be filed and to address the issues raised by the Staff before any decision is made by the SEC on whether to authorize the commencement of an enforcement proceeding**. The Company intends to respond to the Wells Notice in the form of a "Wells Submission" in due course.

The Company has fully cooperated with the SEC in this matter and intends to continue to do so. The Company has conducted an extensive investigation into these allegations and **the receipt of the Wells Notice does not change the Company's belief that its activities in Angola have complied with all laws, including the U.S. Foreign Corrupt Practices Act**. The Company is unable to predict the outcome of the SEC's investigation or any action that the SEC may decide to pursue.

CREDIT SUISSE

06 August 2014

**Companies Mentioned** *(Price as of 05-Aug-2014)*

**Anadarko Petroleum Corp.** (APC.N, $108.1)
**BP** (BP.L, 482.3p)
**Cobalt International Energy** (CIE.N, $14.22, NEUTRAL, TP $22.0)

## Disclosure Appendix

### Important Global Disclosures

I, Edward Westlake, certify that (1) the views expressed in this report accurately reflect my personal views about all of the subject companies and securities and (2) no part of my compensation was, is or will be directly or indirectly related to the specific recommendations or views expressed in this report.

### 3-Year Price and Rating History for Cobalt International Energy (CIE.N)

| CIE.N | Closing Price | Target Price | |
|-------|---------------|--------------|--------|
| Date | (US$) | (US$) | Rating |
| 02-Nov-11 | 9.95 | 17.00 | O |
| 04-Jan-12 | 16.33 | 20.00 | |
| 21-Feb-12 | 31.97 | | R |
| 12-Mar-12 | 29.71 | 40.00 | O |
| 03-Dec-13 | 17.51 | 26.00 | N |
| 28-Feb-14 | 19.28 | 27.00 | |
| 07-May-14 | 18.45 | | R |
| 08-May-14 | 18.45 | 27.00 | N |

*Asterisk signifies initiation or assumption of coverage.*



### Trading Alerts for Cobalt International Energy (CIE.N) were produced on

| Date |
|------|
| 23-Jan-2014 |

The analyst(s) responsible for preparing this research report received Compensation that is based upon various factors including Credit Suisse's total revenues, a portion of which are generated by Credit Suisse's investment banking activities

### As of December 10, 2012 Analysts' stock rating are defined as follows:

**Outperform (O) :** The stock's total return is expected to outperform the relevant benchmark*over the next 12 months.

**Neutral (N) :** The stock's total return is expected to be in line with the relevant benchmark* over the next 12 months.

**Underperform (U) :** The stock's total return is expected to underperform the relevant benchmark* over the next 12 months.

*Relevant benchmark by region: As of 10th December 2012, Japanese ratings are based on a stock's total return relative to the analyst's coverage universe which consists of all companies covered by the analyst within the relevant sector, with Outperforms representing the most attractive, Neutrals the less attractive, and Underperforms the least attractive investment opportunities. As of 2nd October 2012, U.S. and Canadian as well as European ratings are based on a stock's total return relative to the analyst's coverage universe which consists of all companies covered by the analyst within the relevant sector, with Outperforms representing the most attractive, Neutrals the less attractive, and Underperforms the least attractive investment opportunities. For Latin American and non-Japan Asia stocks, ratings are based on a stock's total return relative to the average total return of the relevant country or regional benchmark; prior to 2nd October 2012 U.S. and Canadian ratings were based on (1) a stock's absolute total return potential to its current share price and (2) the relative attractiveness of a stock's total return potential within an analyst's coverage universe. For Australian and New Zealand stocks, 12-month rolling yield is incorporated in the absolute total return calculation and a 15% and a 7.5% threshold replace the 10-15% level in the Outperform and Underperform stock rating definitions, respectively. The 15% and 7.5% thresholds replace the +10-15% and -10-15% levels in the Neutral stock rating definition, respectively. Prior to 10th December 2012, Japanese ratings were based on a stock's total return relative to the average total return of the relevant country or regional benchmark.*

**Restricted (R) :** In certain circumstances, Credit Suisse policy and/or applicable law and regulations preclude certain types of communications, including an investment recommendation, during the course of Credit Suisse's engagement in an investment banking transaction and in certain other circumstances.

**Volatility Indicator [V] :** A stock is defined as volatile if the stock price has moved up or down by 20% or more in a month in at least 8 of the past 24 months or the analyst expects significant volatility going forward.

Analysts' sector weightings are distinct from analysts' stock ratings and are based on the analyst's expectations for the fundamentals and/or valuation of the sector* relative to the group's historic fundamentals and/or valuation:

CREDIT SUISSE

**Overweight :** The analyst's expectation for the sector's fundamentals and/or valuation is favorable over the next 12 months.

**Market Weight :** The analyst's expectation for the sector's fundamentals and/or valuation is neutral over the next 12 months.

**Underweight :** The analyst's expectation for the sector's fundamentals and/or valuation is cautious over the next 12 months.

*\*An analyst's coverage sector consists of all companies covered by the analyst within the relevant sector. An analyst may cover multiple sectors.*

Credit Suisse's distribution of stock ratings (and banking clients) is:

## Global Ratings Distribution

| Rating | Versus universe (%) | Of which banking clients (%) |
|---|---|---|
| Outperform/Buy* | 44% | (53% banking clients) |
| Neutral/Hold* | 40% | (50% banking clients) |
| Underperform/Sell* | 13% | (47% banking clients) |
| Restricted | 3% | |

*For purposes of the NYSE and NASD ratings distribution disclosure requirements, our stock ratings of Outperform, Neutral, and Underperform most closely correspond to Buy, Hold, and Sell, respectively; however, the meanings are not the same, as our stock ratings are determined on a relative basis. (Please refer to definitions above.) An investor's decision to buy or sell a security should be based on investment objectives, current holdings, and other individual factors.*

Credit Suisse's policy is to update research reports as it deems appropriate, based on developments with the subject company, the sector or the market that may have a material impact on the research views or opinions stated herein.

Credit Suisse's policy is only to publish investment research that is impartial, independent, clear, fair and not misleading. For more detail please refer to Credit Suisse's Policies for Managing Conflicts of Interest in connection with Investment Research: http://www.csfb.com/research and analytics/disclaimer/managing_conflicts_disclaimer.html

Credit Suisse does not provide any tax advice. Any statement herein regarding any US federal tax is not intended or written to be used, and cannot be used, by any taxpayer for the purposes of avoiding any penalties.

**Price Target: (12 months) for Cobalt International Energy (CIE.N)**

**Method:**   Our $22 target price for Cobalt is based on parity to our risk-weighted 'proved-developed plus' Net Asset Value (NAV), which in turn is based on a 12% discount rate and long-term prices of $90 per barrel (bbl) and $4.50 per million Btu (MMBtu) in 2015 and beyond.

**Risk:**   Risks to our $22 target price for Cobalt are (1) unsuccessful exploratory drilling in the Gulf of Mexico and West Africa, (2) international risk, and (3) commodity price risk. Ongoing opacity regarding FCPA proceedings is also a key risk.

Please refer to the firm's disclosure website at https://rave.credit-suisse.com/disclosures for the definitions of abbreviations typically used in the target price method and risk sections.

*See the Companies Mentioned section for full company names*

The subject company (CIE.N) currently is, or was during the 12-month period preceding the date of distribution of this report, a client of Credit Suisse.

Credit Suisse provided investment banking services to the subject company (CIE.N) within the past 12 months.

Credit Suisse has managed or co-managed a public offering of securities for the subject company (CIE.N) within the past 12 months.

Credit Suisse has received investment banking related compensation from the subject company (CIE.N) within the past 12 months

Credit Suisse expects to receive or intends to seek investment banking related compensation from the subject company (CIE.N) within the next 3 months.

As of the date of this report, Credit Suisse makes a market in the following subject companies (CIE.N).

## Important Regional Disclosures

Singapore recipients should contact Credit Suisse AG, Singapore Branch for any matters arising from this research report.

The analyst(s) involved in the preparation of this report have not visited the material operations of the subject company (CIE.N) within the past 12 months

Restrictions on certain Canadian securities are indicated by the following abbreviations: NVS--Non-Voting shares; RVS--Restricted Voting Shares; SVS--Subordinate Voting Shares.

Individuals receiving this report from a Canadian investment dealer that is not affiliated with Credit Suisse should be advised that this report may not contain regulatory disclosures the non-affiliated Canadian investment dealer would be required to make if this were its own report.

For Credit Suisse Securities (Canada), Inc.'s policies and procedures regarding the dissemination of equity research, please visit http://www.csfb.com/legal_terms/canada_research_policy.shtml.

Credit Suisse has acted as lead manager or syndicate member in a public offering of securities for the subject company (CIE.N) within the past 3 years.

CREDIT SUISSE

06 August 2014

As of the date of this report, Credit Suisse acts as a market maker or liquidity provider in the equities securities that are the subject of this report.

Principal is not guaranteed in the case of equities because equity prices are variable.

Commission is the commission rate or the amount agreed with a customer when setting up an account or at any time after that.

CS may have issued a Trade Alert regarding this security. Trade Alerts are short term trading opportunities identified by an analyst on the basis of market events and catalysts, while stock ratings reflect an analyst's investment recommendations based on expected total return over a 12-month period relative to the relevant coverage universe. Because Trade Alerts and stock ratings reflect different assumptions and analytical methods, Trade Alerts may differ directionally from the analyst's stock rating.

The author(s) of this report maintains a CS Model Portfolio that he/she regularly adjusts. The security or securities discussed in this report may be a component of the CS Model Portfolio and subject to such adjustments (which, given the composition of the CS Model Portfolio as a whole, may differ from the recommendation in this report, as well as opportunities or strategies identified in Trading Alerts concerning the same security). The CS Model Portfolio and important disclosures about it are available at www.credit-suisse.com/ti.

For Credit Suisse disclosure information on other companies mentioned in this report, please visit the website at https://rave.credit-suisse.com/disclosures or call +1 (877) 291-2683.

CREDIT SUISSE

References in this report to Credit Suisse include all of the subsidiaries and affiliates of Credit Suisse operating under its investment banking division. For more information on our structure, please use the following link: https://www.credit-suisse.com/who_we_are/en/ This report may contain material that is not directed to, or intended for distribution to or use by, any person or entity who is a citizen or resident of or located in any locality, state, country or other jurisdiction where such distribution, publication, availability or use would be contrary to law or regulation or which would subject Credit Suisse AG or its affiliates ("CS") to any registration or licensing requirement within such jurisdiction. All material presented in this report, unless specifically indicated otherwise, is under copyright to CS. None of the material, nor its content, nor any copy of it, may be altered in any way, transmitted to, copied or distributed to any other party, without the prior express written permission of CS. All trademarks, service marks and logos used in this report are trademarks or service marks or registered trademarks or service marks of CS or its affiliates. The information, tools and material presented in this report are provided to you for information purposes only and are not to be used or considered as an offer or the solicitation of an offer to sell or to buy or subscribe for securities or other financial instruments. CS may not have taken any steps to ensure that the securities referred to in this report are suitable for any particular investor. CS will not treat recipients of this report as its customers by virtue of their receiving this report. The investments and services contained or referred to in this report may not be suitable for you and it is recommended that you consult an independent investment advisor if you are in doubt about such investments or investment services. Nothing in this report constitutes investment, legal, accounting or tax advice, or a representation that any investment or strategy is suitable or appropriate to your individual circumstances, or otherwise constitutes a personal recommendation to you. CS does not advise on the tax consequences of investments and you are advised to contact an independent tax advisor. Please note in particular that the bases and levels of taxation may change. Information and opinions presented in this report have been obtained or derived from sources believed by CS to be reliable, but CS makes no representation as to their accuracy or completeness. CS accepts no liability for loss arising from the use of the material presented in this report, except that this exclusion of liability does not apply to the extent that such liability arises under specific statutes or regulations applicable to CS. This report is not to be relied upon in substitution for the exercise of independent judgment. CS may have issued, and may in the future issue, other communications that are inconsistent with, and reach different conclusions from, the information presented in this report. Those communications reflect the different assumptions, views and analytical methods of the analysts who prepared them and CS is under no obligation to ensure that such other communications are brought to the attention of any recipient of this report. Some investments referred to in this report will be offered solely by a single entity and in the case of some investments solely by CS, or an associate of CS or CS may be the only market maker in such investments. Past performance should not be taken as an indication or guarantee of future performance, and no representation or warranty, express or implied, is made regarding future performance. Information, opinions and estimates contained in this report reflect a judgment at its original date of publication by CS and are subject to change without notice. The price, value of and income from any of the securities or financial instruments mentioned in this report can fall as well as rise. The value of securities and financial instruments is subject to exchange rate fluctuation that may have a positive or adverse effect on the price or income of such securities or financial instruments. Investors in securities such as ADR's, the values of which are influenced by currency volatility, effectively assume this risk. Structured securities are complex instruments, typically involve a high degree of risk and are intended for sale only to sophisticated investors who are capable of understanding and assuming the risks involved. The market value of any structured security may be affected by changes in economic, financial and political factors (including, but not limited to, spot and forward interest and exchange rates), time to maturity, market conditions and volatility, and the credit quality of any issuer or reference issuer. Any investor interested in purchasing a structured product should conduct their own investigation and analysis of the product and consult with their own professional advisers as to the risks involved in making such a purchase. Some investments discussed in this report may have a high level of volatility. High volatility investments may experience sudden and large falls in their value causing losses when that investment is realised. Those losses may equal your original investment. Indeed, in the case of some investments the potential losses may exceed the amount of initial investment and, in such circumstances, you may be required to pay more money to support those losses. Income yields from investments may fluctuate and, in consequence, initial capital paid to make the investment may be used as part of that income yield. Some investments may not be readily realisable and it may be difficult to sell or realise those investments, similarly it may prove difficult for you to obtain reliable information about the value, or risks, to which such an investment is exposed. This report may provide the addresses of, or contain hyperlinks to, websites. Except to the extent to which the report refers to website material of CS, CS has not reviewed any such site and takes no responsibility for the content contained therein. Such address or hyperlink (including addresses or hyperlinks to CS's own website material) is provided solely for your convenience and information and the content of any such website does not in any way form part of this document. Accessing such website or following such link through this report or CS's website shall be at your own risk. This report is issued and distributed in Europe (except Switzerland) by Credit Suisse Securities (Europe) Limited, One Cabot Square, London E14 4QJ, England, which is authorised by the Prudential Regulation Authority and regulated by the Financial Conduct Authority and the Prudential Regulation Authority. This report is being distributed in Germany by Credit Suisse Securities (Europe) Limited Niederlassung Frankfurt am Main regulated by the Bundesanstalt fuer Finanzdienstleistungsaufsicht ("BaFin"). This report is being distributed in the United States and Canada by Credit Suisse Securities (USA) LLC; in Switzerland by Credit Suisse AG; in Brazil by Banco de Investimentos Credit Suisse (Brasil) S.A or its affiliates; in Mexico by Banco Credit Suisse (México), S.A. (transactions related to the securities mentioned in this report will only be effected in compliance with applicable regulation); in Japan by Credit Suisse Securities (Japan) Limited, Financial Instruments Firm, Director-General of Kanto Local Finance Bureau (Kinsho) No. 66, a member of Japan Securities Dealers Association, The Financial Futures Association of Japan, Japan Investment Advisers Association, Type II Financial Instruments Firms Association; elsewhere in Asia/ Pacific by whichever of the following is the appropriately authorised entity in the relevant jurisdiction: Credit Suisse (Hong Kong) Limited, Credit Suisse Equities (Australia) Limited, Credit Suisse Securities (Thailand) Limited, regulated by the Office of the Securities and Exchange Commission, Thailand, having registered address at 990 Abdulrahim Place, 27th Floor, Unit 2701, Rama IV Road, Silom, Bangrak, Bangkok 10500, Thailand, Tel. +66 2614 6000, Credit Suisse Securities (Malaysia) Sdn Bhd, Credit Suisse AG, Singapore Branch, Credit Suisse Securities (India) Private Limited (CIN no. U67120MH1996PTC104392) regulated by the Securities and Exchange Board of India (registration Nos. INB230970637; INF230970637; INB010970631; INF010970631), having registered address at 9th Floor, Ceejay House, Dr.A.B. Road, Worli, Mumbai - 18, India, T- +91-22 6777 3777, Credit Suisse Securities (Europe) Limited, Seoul Branch, Credit Suisse Taipei Securities Branch, PT Credit Suisse Securities Indonesia, Credit Suisse Securities (Philippines ) Inc., and elsewhere in the world by the relevant authorised affiliate of the above. Research on Taiwanese securities produced by Credit Suisse AG, Taipei Securities Branch has been prepared by a registered Senior Business Person. Research provided to residents of Malaysia is authorised by the Head of Research for Credit Suisse Securities (Malaysia) Sdn Bhd, to whom they should direct any queries on +603 2723 2020. This report has been prepared and issued for distribution in Singapore to institutional investors, accredited investors and expert investors (each as defined under the Financial Advisers Regulations) only, and is also distributed by Credit Suisse AG, Singapore branch to overseas investors (as defined under the Financial Advisers Regulations). By virtue of your status as an institutional investor, accredited investor, expert investor or overseas investor, Credit Suisse AG, Singapore branch is exempted from complying with certain compliance requirements under the Financial Advisers Act, Chapter 110 of Singapore (the "FAA"), the Financial Advisers Regulations and the relevant Notices and Guidelines issued thereunder, in respect of any financial advisory service which Credit Suisse AG, Singapore branch may provide to you. This research may not conform to Canadian disclosure requirements. In jurisdictions where CS is not already registered or licensed to trade in securities, transactions will only be effected in accordance with applicable securities legislation, which will vary from jurisdiction to jurisdiction and may require that the trade be made in accordance with applicable exemptions from registration or licensing requirements. Non-U.S. customers wishing to effect a transaction should contact a CS entity in their local jurisdiction unless governing law permits otherwise. U.S. customers wishing to effect a transaction should do so only by contacting a representative at Credit Suisse Securities (USA) LLC in the U.S. Please note that this research was originally prepared and issued by CS for distribution to their market professional and institutional investor customers. Recipients who are not market professional or institutional investor customers of CS should seek the advice of their independent financial advisor prior to taking any investment decision based on this report or for any necessary explanation of its contents. This research may relate to investments or services of a person outside of the UK or to other matters which are not authorised by the Prudential Regulation Authority and regulated by the Financial Conduct Authority and the Prudential Regulation Authority or in respect of which the protections of the Prudential Regulation Authority and Financial Conduct Authority for private customers and/or the UK compensation scheme may not be available, and further details as to where this may be the case are available upon request in respect of this report. CS may provide various services to US municipal entities or obligated persons ("municipalities"), including suggesting individual transactions or trades and entering into such transactions. Any services CS provides to municipalities are not viewed as "advice" within the meaning of Section 975 of the Dodd-Frank Wall Street Reform and Consumer Protection Act. CS is providing any such services and related information solely on an arm's length basis and not as an advisor or fiduciary to the municipality. In connection with the provision of the any such services, there is no agreement, direct or indirect, between any municipality (including the officials, management, employees or agents thereof) and CS for CS to provide advice to the municipality. Municipalities should consult with their financial, accounting and legal advisors regarding any such services provided by CS. In addition, CS is not acting for direct or indirect compensation to solicit the municipality on behalf of an unaffiliated broker, dealer, municipal securities dealer, municipal advisor, or investment adviser for the purpose of obtaining or retaining an engagement by the municipality for or in connection with Municipal Financial Products, the issuance of municipal securities, or of an investment adviser to provide investment advisory services to or on behalf of the municipality. If this report is being distributed by a financial institution other than Credit Suisse AG, or its affiliates, that financial institution is solely responsible for distribution. Clients of that institution should contact that institution to effect a transaction in the securities mentioned in this report or require further information. This report does not constitute investment advice by Credit Suisse to the clients of the distributing financial institution, and neither Credit Suisse AG, its affiliates, and their respective officers, directors and employees accept any liability whatsoever for any direct or consequential loss arising from their use of this report or its content. Principal is not guaranteed. Commission is the commission rate or the amount agreed with a customer when setting up an account or at any time after that.

Copyright © 2014 CREDIT SUISSE AG and/or its affiliates. All rights reserved.

Investment principal on bonds can be eroded depending on sale price or market price. In addition, there are bonds on which investment principal can be eroded due to changes in redemption amounts. Care is required when investing in such instruments.

When you purchase non-listed Japanese fixed income securities (Japanese government bonds, Japanese municipal bonds, Japanese government guaranteed bonds, Japanese corporate bonds) from CS as a seller, you will be requested to pay the purchase price only.

**Cobalt International Energy (CIE)**

# EXHIBIT 62

The absence of a mysterious research center in
Angola could be evidence of oil corruption

Tim Fernholz | August 12, 2014

Not included in Angola foreign minister Rebelo Chicoti's recent tour for top US
diplomat John Kerry: A research center that should have been built with foreign
oil money.  (AP Photo/Saul Loeb)

There is supposed to be a research center in Angola, funded by foreign oil companies
in exchange for access to some of the country's estimated 9.1 billion barrels of oil
reserves. That center is supposed to be training Angolans in the skills they need to
work in and profit from extracting the country's vast natural resources.

But it's not clear that the center exists, or where the $175 million paid so far to build
it wound up.

The cash came from BP and Cobalt, UK and American firms that have partnered
with Angola's state-owned oil company, Sonangol. The situation smacks of
corruption, according to Global Witness, the NGO that is calling attention to the
project, or lack thereof, in an effort to increase the information that multi-national
companies must disclose about their dealings with states.

Angola has been relying on its large oil reserves to recover from a civil war that
ended in 2002, but the quasi-authoritarian government of president Jose Eduardo
dos Santos has come under criticism for failing to fairly or wisely distribute natural
resource revenues. In 2011, some $32 billion in oil revenues was found to be missing
by Human Rights Watch and the International Monetary Fund. IMF auditors later
found that the "most" of the money was being spent by Sonangol rather than
transferred to the government.

It may be the same story here: BP and Cobalt agreed in 2011, as part of an oil
concession contract, to pay $350 million for the creation of the Sonangol Research
and Technology Center, with the intention of training Angolans in the highly skilled
aspects of natural resource extraction. Neither BP nor Cobalt have any knowledge of

whether the center was ever built, despite making the first of three installment payments, according to letters the companies sent to Global Witness. Sonangol and Cobalt had not responded to requests for comment by press time.

"Having the right relationship with the state oil company is important to us, but as far as the signature bonus goes, it's like paying taxes—once you've paid your tax, you can't tell your government what to do with it," a BP spokesman told Quartz.

Anti-corruption groups have a different take. They are currently fighting to preserve US rules, included in the post-crisis financial regulation overhaul, that require US companies to report the specific payments they make to foreign governments. The first version of the rule, drafted by the Securities and Exchange Commission, was overturned last year in a challenge from oil trade associations. The only reason the Angola payments have been disclosed is that Cobalt was required to do so by the SEC because it is a small company and the contract represents a significant share of its business. Larger oil firms such as BP or the American majors Exxon and Chevron would not publicly share such payments unless the law requires them to do so.

Oil companies say this helps them get business in countries such as Angola, China, Cameroon and Qatar, which prohibit disclosure of payments to their governments. **(Update, 8/12:** Simon Taylor, a Global Witness spokesperson, notes that there is little evidence the four countries listed actually prohibit legally mandated disclosures;  Cameroon is even a participant in EITI, a project dedicated to payment transparency.**)**  But these opaque deals allow governments selling oil concessions to hide payments from their own citizens as well as officials in other countries, fueling the development dilemma that has left so many resource-rich countries deep in poverty.

Cobalt is now under investigation by the SEC for its business practices in Angola, so perhaps there's more to learn before the next payment of $75 million is due, in January of 2016.

# EXHIBIT 63

# Forbes

http://onforb.es/VwU3fx



**Frances Coppola** Contributor

*I write about banking, finance and economics.*

Opinions expressed by Forbes Contributors are their own.

**INVESTING**   8/17/2014 @ 12:43PM | 10,198 views

# Cobalt International Energy: Oil, Angola and Corruption

**Comment Now**

The US oil company Cobalt International Energy Inc. has been issued with a Wells Notice by the U.S. Securities and Exchange Commission in relation to its operations in Angola. The Wells Notice formally warns Cobalt that it may face enforcement action for breaches of "certain federal securities laws":

> In connection with such investigation, on the evening of August 4, 2014, the Company received a "Wells Notice" from the Staff of the SEC stating that the Staff has made a preliminary determination to recommend that the SEC institute an enforcement action against the Company, alleging violations of certain federal securities laws. In connection with the contemplated action, the Staff may recommend that the SEC seek remedies that could include an injunction, a cease-and-desist order, disgorgement, pre-judgment interest and civil money penalties. The Wells Notice is neither a formal allegation nor a finding of wrongdoing. It allows the Company the opportunity to provide its reasons of law, policy or fact as to why the proposed enforcement action should not be filed and to address the issues raised by the Staff before any decision is made by the SEC on whether to authorize the commencement of an enforcement proceeding. The Company intends to respond to the Wells Notice in the form of a "Wells Submission" in due course.

It is thought that the laws breached include the Foreign Corrupt Practices Act (FCPA).

Cobalt's exploration in Angolan offshore waters started in 2008, in partnership with the state-owned oil company Sonangol and two other local companies, Alper Oil and Nazaki Oil & Gas. The SEC commenced investigation into Cobalt's Angolan operations in 2011 following claims by an investigative journalist, Rafael Marques de Morais, that Nazaki was secretly owned by government officials. In 2012, the three officials concerned confirmed to the Financial Times that they had indeed owned shares in Nazaki via another company at the time that Cobalt's involvement started. The intermediate company has now been dissolved, though that does not necessarily mean the officials themselves have disposed of their indirect holdings.

The three officials concerned are Manuel Vicente; General Manuel Helder Vieira Dias Junior (nicknamed "Kopelipa"); and General Leopoldino Fragoso do Nascimento, known as Dino. All three are senior figures in the Angolan Government. Manuel Vicente, currently Vice-President, is favorite to succeed Eduardo dos Santos as President.

Now where have we heard those names before? Recently I wrote about the failure of Banco Espirito Santo Angola in a web of corruption involving loans to unknown figures thought to be connected to the government. And I noted

Case 4:14-cv-03428   Document 87-5   Filed in TXSD on 06/30/15   Page 39 of 114

that indirectly the "triumvirate" of Vicente, Kopelipa and Dino appeared to own or control a minority interest in BESA. It seems it is not just banks in which this unholy trinity have an interest.

Cobalt 's management claim that they had no say over Nazaki's involvement. They say that Cobalt was assigned to a contractor group including Nazaki by the Angolan government via its state-owned oil company Sonangol, and did not find out about the involvement of the government officials until 2010.

The Angolan state-owned oil company Sonangol issues all licenses for oil exploration and receives license payments (rents) and taxes from foreign oil companies, supposedly channeling those revenues to the Angolan government – although the IMF notes that the timing of the transfers is unpredictable and there are unexplained differences between the payments recorded by Sonangol, the Ministry for Petroleum and the Finance Ministry. It is not possible for foreign oil companies to explore Angolan waters without Sonangol's involvement. Sonangol has close (though opaque) links with the Presidential elite, including the President's daughter who has a significant shareholding in Sonangol. Direct ownership of state and private enterprises by Angolan politicians is outlawed under Angolan law – but beneficial ownership via friends and family is not. It is difficult to see therefore how any oil company could operate in Angola without in some way being complicit in Angolan conflicts of interest and even outright corruption.



*Sonangol building in Luanda, Angola (Photo credit: Wikipedia)*

Case 4:14-cv-03428   Document 87-5   Filed in TXSD on 06/30/15   Page 40 of 114

So Cobalt's partnership with Sonangol, Alper and Nazaki was dictated by Sonangol. Cobalt is arguing that it could not reasonably have asked for, and expected to receive, information on the ownership structures of the companies with which it was required to partner. As Cobalt is the lead company in the consortium, it would be reasonable to expect it to conduct due diligence on its prospective partners as it would in an acquisition, including identifying beneficial owners. But in this case the government officials' shareholding was via a third company; could due diligence reveal arms'-length relationships of this kind without the co-operation of the company concerned? At that time, Manuel Vicente, one of the ultimate owners of Nazaki, was also CEO of Sonangol – an obvious conflict of interest and probably illegal under both Angolan and international law. It seems highly unlikely that Cobalt would have been given this information willingly. It is therefore unclear whether due diligence on the part of Cobalt would have disclosed this conflict of interest. And it is even less clear whether, had this conflict of interest been disclosed, it would have deterred Cobalt from going ahead with the deal. I suspect not.

Litigation costs, regulatory fines and reputational damage are business risks that companies assess when considering potentially lucrative business ventures in countries where there are known to be high levels of corruption or other obstacles to legitimate business. Cobalt must have known that involvement of state officials was likely: at the time, it was extremely difficult to do business in Angola without the involvement of members of the ruling elite – the dos Santos family, its close associates and senior military figures. I would guess that Cobalt decided the potential returns from the oil exploration venture outweighed the risk of potential fines, litigation costs and reputational damage arising from breaches of the FCPA. If the only way a company can develop business links with a country is by means of bribery and corruption, then if the potential returns are large enough, bribery and corruption is what the company will do.

Nor is Cobalt the only oil exploration company that appears to have connived at Angolan corruption for business reasons. In 2011, the giant Texan oil and gas company Halliburton announced an internal investigation into possible breaches of the FCPA following similar allegations from a whistleblower: for Halliburton this was particularly embarrassing, occurring not long after it received a record fine for bribery and conspiracy in relation to its Nigerian operations. And there are allegations about Chevron's operations in Angola too, though so far no action against it by regulatory bodies.

There also remains an open question regarding how much of this is known to Goldman Sachs, which finances Cobalt's Angolan operations. Just as I find it hard to believe that Cobalt did not know a complex opaque partnership deal arranged by a corrupt government would probably channel money to members of that government, so I find it hard to believe that Goldman knew nothing, and asked no questions, about the purposes for which its money was being used. The Angolan venture has been exceedingly lucrative for Goldman

Case 4:14-cv-03428   Document 87-5   Filed in TXSD on 06/30/15   Page 41 of 114

and its financing partners, even though according to the Financial Times it
has "not produced a single drop of crude". It seems Goldman's pecuniary
interests trump business ethics, as usual.

In this report from 2011 into Angola's oil industry, the Open Source Initiative
observed that oil companies are more interested in their own profits than the
political and social consequences of doing business with corrupt
governments, though they indulge in window-dressing to conceal this:

> " Multinational oil companies do not address governance or transparency issues in
> Angola. The companies' continued transactions with the government – without calling the
> terms of the transactions into question – have facilitated patronage problems, rent seeking
> and exacerbated the resource curse. Some exceptions exist, but these rare efforts are not
> industry wide. Companies tout their CSR projects, but these projects often lack community
> input, and never address transparency and human rights issues. In relation to the
> mitigation of impacts, multinationals get almost a free pass. There have been some efforts
> to hold multinationals to account, particularly through home-country anti-corruption
> instruments and civil society advocacy, but these need to be ramped up.

The SEC's proposed enforcement action against Cobalt will no doubt be seen
by some as unwarranted intrusion by a US regulator into a company's foreign
operations. In that respect it is similar to the recent fine imposed on BNP
Paribas by US regulators for money-laundering – though Cobalt is a US
company and therefore should be subject to US regulation in all its
operations. But just as the long reach of US regulation in the BNP Paribas
case should help to ensure that companies in future comply with sanctions
against countries with appalling human rights records and/or involved in
international terrorism and warfare, so action by the SEC against Cobalt
should encourage international oil companies to behave more responsibly
towards countries with poor records on corruption, exploitation and
environmental damage.

Cobalt says it will fight any enforcement action on the grounds that it did not
know about Angolan government officials' involvement in Nazaki. Ignorance
is indeed a legitimate defense in this case. But naivety is not. Cobalt knew the
risks and chose to take them. The SEC should throw the book at it.



*Cobalt drilling rig offshore Angola. Photo credit: Offshore Energy Today*

This article is available online at: http://onforb.es/VwU3fx          2015 Forbes.com LLC™   All Rights Reserved

# EXHIBIT 64

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 8-K

### CURRENT REPORT
**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

Date of Report (Date of Earliest Event Reported): **August 26, 2014**

# Cobalt International Energy, Inc.
(Exact name of registrant as specified in its charter)

| | | |
|---|---|---|
| **Delaware** | **001-34579** | **27-0821169** |
| (State or other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**Cobalt Center**
**920 Memorial City Way, Suite 100**
**Houston, Texas**                                        **77024**
(Address of Principal Executive Offices)                     (Zip Code)

Registrant's telephone number, including area code: **(713) 579-9100**

**N/A**
(Former name or former address if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

---

**Item 7.01.**          **Regulation FD Disclosure.**

On August 26, 2014, Cobalt International Energy, Inc. (including its subsidiaries, the "Company") received documentation confirming that Nazaki Oil and Gaz ("Nazaki") and Alper Oil Limitada ("Alper") are no longer members of the contractor group of Blocks 9 and 21 offshore Angola. Pursuant to a series of Executive Decrees passed by the Republic of Angola, the working interests previously held by Nazaki and Alper in Blocks 9 and 21 have been transferred to and are now held by Sonangol Pesquisa e Produção, S.A. ("Sonangol P&P"). As a result, the Company no longer has any relationship with Nazaki or Alper.

The contractor groups for Blocks 9 and 21 offshore Angola now consist only of Sonangol P&P (60% working interest) and the Company (40% working interest). The obligation of the Company to carry and pay for Alper's 10% working interest terminated immediately with the transfer of Alper's interest to Sonangol P&P pursuant to the terms of the Company's 2010 agreements with Alper. As a result, the Company's paying interest in these blocks has been reduced from 62.5% to 52.5% during the initial exploration period, with Sonangol P&P being obligated to pay the remaining 47.5%. In addition, all historical costs of the Company's carry of Alper will be recouped by the Company from Sonangol P&P's share of production revenues from these blocks. The Company continues to expect formal sanction of the Cameia project in late 2014 or early 2015 and production from the Cameia project in 2017.

The composition and paying interests of the contractor group for Block 20 remain unchanged.

*Forward-Looking Statements*

This Current Report on Form 8-K includes "forward-looking statements" within the meaning of the safe harbor provisions of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934 — that is, statements related to future, not past, events. Forward-

looking statements are based on current expectations and include any statement that does not directly relate to a current or historical fact. In this context, forward-looking statements often address the Company's expected future business and financial performance, and often contain words such as "estimate," "anticipate," "believe," "intend," "expect," "plan," "will" or other similar words. These forward-looking statements involve certain risks and uncertainties that ultimately may not prove to be accurate. Actual results and future events could differ materially from those anticipated in such statements. For further discussion of risks and uncertainties, individuals should refer to the Company's other filings with the U.S. Securities and Exchange Commission. The Company undertakes no obligation and does not intend to update these forward-looking statements to reflect events or circumstances occurring after this Current Report on Form 8-K, other than as required by law. You are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date of this Current Report on Form 8-K. All forward-looking statements are qualified in their entirety by this cautionary statement.

2

---

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Date: August 27, 2014

**Cobalt International Energy, Inc.**


By:      /s/ Jeffrey A. Starzec
Name:    Jeffrey A. Starzec
Title:   Senior Vice President and General Counsel

3

---

# EXHIBIT 65

# Number Not Used

# EXHIBIT 66

Cobalt International Energy, Inc. Announces Third Quarter 2014 Results and Provides Operational Upda | Cob...    Page 1 of 5

Case 4:14-cv-03428    Document 87-5    Filed in TXSD on 06/30/15    Page 48 of 114



# PRESS RELEASES

# Cobalt International Energy, Inc. Announces Third Quarter 2014 Results and Provides Operational Update

HOUSTON--(BUSINESS WIRE)--Nov. 4, 2014-- Cobalt International Energy, Inc. ("Cobalt") (NYSE:CIE) today announced a net loss of $143 million, or $0.35 per basic and diluted share for the third quarter of 2014, compared to a net loss of $160 million, or $0.39 per basic and diluted share, for the third quarter of 2013. The net loss for the third quarter of 2014 includes $55 million of impairment charges associated primarily with the Loengo well drilled offshore Angola and wells previously announced in the Gulf of Mexico. Capital and operating expenditures (excluding changes in working capital) for the quarter ending September 30, 2014 were approximately $189 million. Cash, cash equivalents, and investments at the end of the third quarter were approximately $2.4 billion. This includes about $150 million designated for future operations held in escrow and collateralizing letters of credit, but excludes approximately $76 million in the TOTAL drilling fund for the Gulf of Mexico.

**Operational Update**

In Angola, Cobalt drilled to total depth and performed a drill stem test on the Cameia #3 appraisal well with successful results that exceeded Cobalt's pre-drill expectations. These well results confirm the existence of a large reservoir and support Cobalt's plan to obtain approval of the integrated field development plan later this year or in early 2015. Cobalt anticipates formal award of major project facilities, including the FPSO and subsea trees and manifolds, umbilicals, risers and flowlines in the first quarter of 2015, subject to obtaining necessary approvals and the financing for the Cameia FPSO. Cobalt, as operator, owns a 40% working interest in the Cameia project.

Following Cameia #3, Cobalt moved the Petroserv SSV Catarina rig to drill the Loengo #1 Pre-salt exploration well on Block 9. The well was drilled to total depth in record time of 45 days but did not encounter commercial hydrocarbons despite confirming the presence of world class reservoir rock. The well has been plugged and abandoned and the Petroserv SSV Catarina rig has moved to and spud the Mupa #1 Pre-salt exploration well on Block 21. Cobalt expects results from Mupa #1 by early 2015.

Cobalt International Energy, Inc. Announces Third Quarter 2014 Results and Provides Operational Upda | Cob...   Page 2 of 5

Case 4:14-cv-03428   Document 87-5   Filed in TXSD on 06/30/15   Page 49 of 114

Also in Blocks 9 and 21 Cobalt announced that Nazaki Oil and Gas and Alper are no longer members of the Contractor Group of these Blocks, as their working interests have been transferred to Sonangol P&P. Working interest ownership across Blocks 9 and 21 includes Cobalt with 40% working interest and Sonangol P&P with 60% working interest. As a result of this change, Cobalt's paying interest during the exploration phase has decreased from 62.5% to 52.5% and after the exploration phase, Cobalt's paying interest equals its 40% working interest.

Cobalt also announced that development drilling is under way at the Heidelberg field in the deepwater Gulf of Mexico. The first development well has been drilled and development operations continue with the hull having recently been transported from Pori, Finland to Ingleside, Texas, where construction on the main topsides module is almost 60% complete. Heidelberg remains on schedule for initial production in 2016. Cobalt, as non-operator, owns a 9.375% working interest in Heidelberg. In addition, Cobalt announced that it continues its efforts for a development phase Reserve Based Lending facility to partially finance its remaining investments in Heidelberg.

Also in the Gulf of Mexico, drilling operations are continuing on the Shenandoah #3 appraisal well, which will further appraise Cobalt's Shenandoah Inboard Lower Tertiary discovery. Shenandoah #3 is being drilled approximately 2.5 miles east and structurally down-dip from the Shenandoah #2 appraisal well, which encountered more than 1,000 net feet of high-quality oil pay in the Inboard Lower Tertiary. Results are expected from this well in late 2014 or early 2015. Cobalt, as non-operator, owns a 20% working interest in Shenandoah.

In addition, Cobalt is participating in the non-operated Anchor exploration well in the Gulf of Mexico, which targets Inboard Lower Tertiary horizons as well as a secondary Miocene horizon. Cobalt expects results from this well in late 2014 or early 2015. Cobalt owns a 20% working interest in Anchor.

Cobalt anticipates taking delivery of the Rowan Reliance rig in early 2015, following the satisfactory completion of deepwater acceptance procedures. The Rowan Reliance is a new build, ultra-deepwater dynamically positioned drillship. Cobalt will utilize the Rowan Reliance to drill the North Platte #2 appraisal well, which is expected to commence late in the first quarter of 2015. Cobalt, as operator, owns a 60% working interest in the North Platte discovery.

**Conference Call**

A conference call for investors will be held today at 10:00 a.m. Central Time (11:00 a.m. Eastern Time) to discuss Cobalt's Third Quarter 2014 results. Hosting the call will be Joseph H. Bryant, Chairman and Chief Executive Officer, and John P. Wilkirson, Chief Financial Officer.

The call can be accessed live over the telephone by dialing (877) 705-6003, or for international callers (201) 493-6725. A replay will be available shortly after the call and can be accessed by dialing (877) 870-5176, or for international callers (858) 384-5517. The passcode for the replay is 13593780. The replay will be available until November 18, 2014.

Interested parties may also listen to a simultaneous webcast of the conference call by accessing the Newsroom-Events & Speeches section of Cobalt's website at www.cobaltintl.com. A replay of the webcast will also be available for approximately 30 days following the call.

Cobalt International Energy, Inc. Announces Third Quarter 2014 Results and Provides Operational Upda | Cob...   Page 3 of 5

Case 4:14-cv-03428   Document 87-5   Filed in TXSD on 06/30/15   Page 50 of 114

**About Cobalt**

Cobalt is an independent exploration and production company active in the deepwater U.S. Gulf of Mexico and offshore Angola and Gabon. Cobalt was formed in 2005 and is headquartered in Houston, Texas.

**Forward-Looking Statements**

This press release includes "forward-looking statements" within the meaning of the safe harbor provisions of the Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934 — that is, statements related to future, not past, events. Forward-looking statements are based on current expectations and include any statement that does not directly relate to a current or historical fact. In this context, forward-looking statements often address Cobalt's expected future business and financial performance, and often contain words such as "anticipate," "believe," "intend," "expect," "plan," "will" or other similar words. These forward-looking statements involve certain risks and uncertainties that ultimately may not prove to be accurate. Actual results and future events could differ materially from those anticipated in such statements. For further discussion of risks and uncertainties, individuals should refer to Cobalt's SEC filings. Cobalt undertakes no obligation and does not intend to update these forward-looking statements to reflect events or circumstances occurring after this press release, other than as required by law. You are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date of this press release. All forward-looking statements are qualified in their entirety by this cautionary statement.

**Consolidated Statement of Operations Information:**

|  | For Three Months Ended September 30, | | For Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
|  | **2014** | **2013** | **2014** | **2013** |
|  | *($ in thousands except per share data)* | | | |
| Oil and gas revenue | $ — | $ — | $ — | $ — |
| Operating costs and expenses |  |  |  |  |
| Seismic and exploration | 38,333 | 14,555 | 59,291 | 41,430 |
| Dry hole expense and impairment | 55,259 | 108,321 | 110,740 | 212,199 |
| General and administrative | 26,315 | 22,347 | 72,576 | 68,507 |
| Depreciation and amortization | 1,054 | 440 | 3,236 | 1,345 |
| Total operating costs and expenses | 120,961 | 145,663 | 245,843 | 323,481 |
| Operating income (loss) | (120,961 ) | (145,663 ) | (245,843 ) | (323,481 ) |
| Other income (expense) |  |  |  |  |

Cobalt International Energy, Inc. Announces Third Quarter 2014 Results and Provides Operational Upda | Cob...   Page 4 of 5

Case 4:14-cv-03428   Document 87-5   Filed in TXSD on 06/30/15   Page 51 of 114

| | | | | |
|---|---|---|---|---|
| Gain on sale of assets | — | — | — | 2,993 |
| Interest income | 1,895 | 1,465 | 4,274 | 4,610 |
| Interest expense | (23,463 ) | (15,802 ) | (52,630 ) | (51,027 ) |
| Total other income (expense) | (21,568 ) | (14,337 ) | (48,356 ) | (43,424 ) |
| Net income (loss) before income tax | (142,529 ) | (160,000 ) | (294,199 ) | (366,905 ) |
| Income tax expense | — | — | — | — |
| Net income (loss) | $ (142,529 ) | $ (160,000 ) | $ (294,199 ) | $ (366,905 ) |
| | | | | |
| Basic and diluted income (loss) per share | $ (0.35 ) | $ (0.39 ) | $ (0.72 ) | $ (0.90 ) |
| Weighted average common shares outstanding | 407,095,514 | 406,941,392 | 407,058,930 | 406,803,860 |

**Consolidated Balance Sheet Information:**

| | September 30, 2014 | December 31, 2013 |
|---|---|---|
| | *($ in thousands)* | |
| Cash and cash equivalents | $ 168,980 | $ 192,460 |
| Short-term restricted funds | 24,141 | 200,339 |
| Short-term investments | 1,568,295 | 1,319,380 |
| Total current assets | 2,042,051 | 1,967,443 |
| Total property, plant and equipment | 1,878,523 | 1,476,275 |
| Long-term restricted funds | 125,444 | 104,496 |
| Long-term investments | 506,274 | 14,661 |
| Total assets | 4,632,269 | 3,633,673 |
| Total current liabilities | 296,267 | 340,967 |
| Total long-term liabilities | 2,013,813 | 1,163,560 |
| Total stockholders' equity (407,095,514 and 406,949,839 shares issued and outstanding as of September 30, 2014 and December 31, 2013, respectively) | 2,322,189 | 2,129,146 |
| Total liabilities and stockholders' equity | 4,632,269 | 3,633,673 |

**Consolidated Statement of Cash Flows Information:**

Case 4:14-cv-03428   Document 87-5   Filed in TXSD on 06/30/15   Page 52 of 114

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2014 | 2013 |
| | *($ in thousands)* | |
| **Net cash provided by (used in):** | | |
| Operating activities | $ (139,836 ) | $ (239,983 ) |
| Investing activities | (1,152,824 ) | (964,328 ) |
| Financing activities | 1,269,180 | (992 ) |

Source: Cobalt International Energy, Inc.

Cobalt International Energy, Inc.
Investor Relations:
John P. Wilkirson, +1 713-452-2322
Chief Financial Officer
or
Media Relations:
Lynne L. Hackedorn, +1 713-579-9115
Vice President, Government and Public Affairs

**Cobalt International Energy, Inc**   ©2013 All rights reserved.

# EXHIBIT 67

Use these links to rapidly review the document

TABLE OF CONTENTS
Item 15. Exhibits and Financial Statement Schedules
INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# Form 10-K

**(Mark One)**

☒      **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2014**

**OR**

☐      **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from**      **to**

**Commission File Number 001-34579**

# Cobalt International Energy, Inc.
(Exact name of registrant as specified in its charter)

| **Delaware** | **27-0821169** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**Cobalt Center**
**920 Memorial City Way, Suite 100**
**Houston, Texas 77024**
(Address of principal executive offices, including zip code)

**(713) 579-9100**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Securities Act:

| **Title of Each Class** | **Name of Each Exchange on Which Registered** |
|---|---|
| Common stock, $0.01 par value | The New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Securities Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒    No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Securities

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☒          Accelerated filer ☐          Non-accelerated filer ☐          Smaller reporting company ☐
                                                                  (Do not check if a
                                                                  smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Securities Act). Yes ☐   No ☒

As of June 30, 2014, the last business day of the registrant's most recently completed second fiscal quarter, the aggregate market value of the registrant's common stock held by non-affiliates was approximately $5.8 billion.

As of December 31, 2014, the registrant had 411,296,254 shares of common stock outstanding.

## DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's proxy statement relating to the 2015 Annual Meeting of Shareholders, to be filed within 120 days of the end of the fiscal year covered by this report, are incorporated by reference into Part III of this Annual Report on Form 10-K.

Table of Contents

## PART I

**Cautionary Note Regarding Forward-Looking Statements**

This Annual Report on Form 10-K contains estimates and forward-looking statements, principally in "Business," "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations." Our estimates and forward-looking statements are mainly based on our current expectations and estimates of future events and trends, which affect or may affect our businesses and operations. Although we believe that these estimates and forward-looking statements are based upon reasonable assumptions, they are subject to several risks and uncertainties and are made in light of information currently available to us. Many important factors, in addition to the factors described in this Annual Report on Form 10-K, may adversely affect our results as indicated in forward-looking statements. You should read this Annual Report on Form 10-K and the documents that we have filed as exhibits hereto completely and with the understanding that our actual future results may be materially different from what we expect.

Our estimates and forward-looking statements may be influenced by the following factors, among others:

- our ability to successfully and efficiently execute our project appraisal, development and exploration activities;

- our liquidity and ability to finance our exploration, appraisal, development, and acquisition activities;

- oil and gas prices;

- lack or delay of partner, government and regulatory approvals related to our operations;

- projected and targeted capital expenditures and other costs and commitments;

- uncertainties inherent in making estimates of our oil and natural gas data;

- our dependence on our key management personnel and our ability to attract and retain qualified personnel;

- current and future government regulation of the oil and gas industry and our operations;

- changes in environmental, safety and health laws and regulations or the implementation or interpretation of those laws and regulations;

- our and our partners' ability to obtain permits and licenses and drill and develop our prospects and discoveries in the U.S. Gulf of Mexico and offshore West Africa;

- termination of or intervention in concessions, licenses, permits, rights or authorizations granted by the United States, Angolan and Gabonese governments to us;

- competition;

- our ability to find, acquire or gain access to new prospects and renew our exploration portfolio;

- the availability, cost and reliability of drilling rigs, containment resources, production equipment and facilities, supplies, personnel and oilfield services;

- the ability of the containment resources we have under contract to perform as designed or contain or cap any oil spill, blow-out or uncontrolled flow of hydrocarbons;

- the availability and cost of developing appropriate infrastructure around and transportation to our prospects, discoveries and appraisal and development projects;

- military operations, civil unrest, disease, piracy, terrorist acts, wars or embargoes;

Table of Contents

- our vulnerability to severe weather events, especially tropical storms and hurricanes in the U.S. Gulf of Mexico;

- the cost and availability of adequate insurance coverage;

- the results or outcome of any legal proceedings or investigations we may be subject to;

- our ability to meet our obligations under the agreements governing our indebtedness; and

- other risk factors discussed in the "Risk Factors" section of this Annual Report on Form 10-K.

The words "believe," "may," "will," "aim," "estimate," "continue," "anticipate," "intend," "expect," "plan" and similar words are intended to identify estimates and forward-looking statements. Estimates and forward-looking statements speak only as of the date they were made, and, except to the extent required by law, we undertake no obligation to update or to review any estimate and/or forward-looking statement because of new information, future events or other factors. Estimates and forward-looking statements involve risks and uncertainties and are not guarantees of future performance. As a result of the risks and uncertainties described above, the estimates and forward-looking statements discussed in this Annual Report on Form 10-K might not occur and our future results and our performance may differ materially from those expressed in these forward-looking statements due to, including, but not limited to, the factors mentioned above. Because of these uncertainties, you should not place undue reliance on these forward-looking statements.

**Item 1.** *Business*

**OVERVIEW**

We are an independent exploration and production company with operations in the deepwater U.S. Gulf of Mexico and offshore Angola and Gabon in West Africa. Since our founding in 2005, our oil-focused, below-salt exploration efforts have been successful in each of our three operating areas, resulting in ten discoveries out of the seventeen exploration prospects drilled. These ten discoveries consist of North Platte, Heidelberg, Shenandoah and Anchor in the U.S. Gulf of Mexico; Cameia, Lontra, Mavinga, Bicuar and Orca offshore Angola; and Diaman offshore Gabon. In addition, we have an interest in the Yucatan discovery in the U.S. Gulf of Mexico.

With these discoveries, our primary focus areas are:

1. **Project Appraisal and Development**—to progress our discoveries, which are currently in various stages of appraisal and development, toward project sanction and into proved reserves, production, and cash flow;

2. **Continued Exploration**—to simultaneously maintain an ongoing exploration program on our current acreage; and

3. **New Ventures**—to seek the renewal of our worldwide exploration portfolio in locations applicable to our deepwater and below-salt exploration strength.

Since inception, we have focused primarily on drilling exploration wells on our extensive below-salt exploration portfolio, which has resulted in the ten discoveries referenced above. With these discoveries in hand, our focus has now shifted towards selectively developing these discoveries and establishing production from them. Thus, our current strategy is to direct the majority of our capital expenditures toward project appraisal and development activities with the aim to increase our proved reserves and establish production and cash flow while continuing exploration on our existing acreage and seeking new venture opportunities for long-term growth.

Table of Contents

and syn-rift reservoirs. A DST was conducted on the Orca #1 exploration well, and the well was successfully tested at a facility-constrained rate of 3,700 barrels of oil per day and 16.3 million cubic feet of gas per day with minimal drawdown (approximately 1%) in the upper sag section of the discovery. The results of this DST confirm that the Orca #1 exploration well is capable of substantial sustained oil production rates. On April 28, 2014, we submitted a declaration of commercial well to Sonangol regarding the Orca #1 exploration well. In late 2014, we spud the Orca #2 appraisal well, and operations on this well are ongoing.

On December 1, 2013, we announced that our Lontra #1 exploration well had been drilled to a total depth of 13,763 feet (4,195 meters) and encountered approximately 250 feet (75 meters) of net pay in a very high quality reservoir section. The Lontra #1 exploration well encountered both a high liquids content gas interval and an oil interval. A DST was performed on the high liquids content gas interval and successfully produced a sustained flow rate of 2,500 barrels per day of condensate and 39 million cubic feet per day of gas. The DST did not test the oil interval. On December 20, 2013, we submitted a declaration of commercial well to Sonangol regarding the Lontra #1 exploration well.

Given the geographical proximity of the Lontra discovery and the Orca discovery, both on Block 20 offshore Angola, our initial development concept is to tie-back the Lontra field to the Orca field as part of a hub development and to proceed with the development of the oil and condensate from the Orca and Lontra fields. The Greater Orca Lontra Development (GOLD) project is in the early stages of the project development life-cycle and will require substantial additional evaluation and analysis, including additional appraisal drilling, prior to preparing a development plan and seeking formal project sanction. We are the operator of the GOLD project with a 40% working interest. Our partners in the GOLD project include BP Exploration Angola (Kwanza Benguela) Limited ("BP") and Sonangol P&P, with each partner holding a 30% working interest.

*Bicuar Discovery (Block 21).*    On January 22, 2014, we announced that the Bicuar #1A exploration well was successfully drilled to a total depth of 18,829 feet (5,739 meters) and encountered approximately 180 feet (56 meters) of net pay from multiple pre-salt intervals. Results of an extensive logging, coring and fluid acquisition program confirmed the existence of both oil and condensate in multiple intervals. No free gas zones or water contacts were observed. The results from the Bicuar #1A exploration well are significant because they confirm the first discovery of mobile hydrocarbons tested in the pre-salt syn-rift geologic interval offshore Angola. On February 13, 2014, we submitted a declaration of commercial well to Sonangol regarding the Bicuar #1A exploration well. The Bicuar discovery is in the early stages of the project development life-cycle and will require substantial additional evaluation and analysis, including appraisal drilling, prior to preparing a development plan and seeking formal project sanction. We are the operator of and have a 40% working interest in the Bicuar discovery. Our partner in Bicuar is Sonangol P&P, with a 60% working interest.

*Mavinga Discovery (Block 21).*    On October 29, 2013, we announced that the Mavinga #1 exploration well had reached total depth and encountered approximately 100 feet (30 meters) of net oil pay. This discovery was confirmed by the successful production of oil from mini DSTs, direct pressure and permeability measurements and log and core analysis. Efforts to establish a sustained flow rate from a full DST were not successful. We believe that operational issues associated with the DST prevented the production from the oil reservoir during the production test. We estimate a gross oil column of up to 650 feet (200 meters) at the crest of the Mavinga structure updip of the Mavinga #1 exploration well. Additional drilling will be required to confirm the ultimate gross thickness of the crest of the Mavinga structure and Mavinga's reservoir quality. On November 12, 2013, we submitted a declaration of commercial well to Sonangol regarding the Mavinga #1 exploration well. The Mavinga discovery is in the very early stages of the development life-cycle and will require substantial additional evaluation and analysis, potentially including appraisal drilling, prior to preparing a development plan and seeking formal project sanction. Given the results of the Mavinga #1 exploration well and its proximity to the location of our Cameia project, our initial development concept for the Mavinga

7

Table of Contents

With respect to gas, the State shall enjoy exclusive marketing rights for non-associated gas while any non-commercial share of associated gas remains the property of the State.

Hydrocarbons agreements entered into prior to the Hydrocarbon Law's publication remain in force and should continue to be governed by their own provisions. Our understanding is that the Hydrocarbons Law applies to any issues not expressly dealt with in these contracts' provisions.

Our EPSC governing our license to the Diaba block offshore Gabon was entered into before the publication of the Hydrocarbon Law. The Diaba EPSC contains a stabilization clause, which provides for the stability of the legal, tax, economic and financial conditions in force at the signing of the EPSC. Pursuant to the Diaba EPSC, these conditions may not be adversely altered during the term of the agreement, however, we can make no assurance that the Hydrocarbon Law will not adversely affect our operations or assets in Gabon. See "Risk Factors—Risks Related to Our Business—Participants in the oil and gas industry are subject to complex laws that can affect the cost, manner or feasibility of doing business."

## EMPLOYEES

As of December 31, 2014, we had 205 employees. None of these employees are represented by labor unions or covered by any collective bargaining agreement. We believe that relations with our employees are satisfactory. In addition, as of December 31, 2014, we had 150 contractors, consultants and secondees working in our offices and field locations.

## CORPORATE INFORMATION

We were incorporated pursuant to the laws of the State of Delaware as Cobalt International Energy, Inc. in August 2009 to become a holding company for Cobalt International Energy, L.P. Cobalt International Energy, L.P. was formed as a limited partnership on November 10, 2005 pursuant to the laws of the State of Delaware. Pursuant to the terms of a corporate reorganization that we completed in connection with our initial public offering, all of the interests in Cobalt International Energy, L.P. were exchanged for common stock of Cobalt International Energy, Inc. and, as a result, Cobalt International Energy, L.P. is wholly-owned by Cobalt International Energy, Inc.

## AVAILABLE INFORMATION

We make certain filings with the SEC, including our Annual Report on Form 10-K, proxy statements, quarterly reports on Form 10-Q, current reports on Form 8-K, and all amendments and exhibits to those reports. We make such filings available free of charge through our website, *http://www.cobaltintl.com*, as soon as reasonably practicable after they are filed with the SEC. The filings are also available through the SEC at the SEC's Public Reference Room at 100 F Street, N.E., Washington, D.C. 20549 between the hours of 10 a.m. and 3 p.m. on official business days or by calling 1-800-SEC-0330 for further information on the operation of the Public Reference Room. Also, these filings are available on the internet at http://www.sec.gov. Our press releases and recent analyst presentations are also available on our website. The information on our website does not constitute a part of this Annual Report on Form 10-K and shall not be deemed to be a part hereof or incorporated into this or any our filings with the SEC.

Table of Contents

**Item 1A.   *Risk Factors***

*You should consider and read carefully all of the risks and uncertainties described below, together with all of the other information contained in this Annual Report on Form 10-K, including the consolidated financial statements and the related notes appearing at the end of this Annual Report on Form 10-K. If any of the following risks actually occurs, our business, business prospects, stock price, financial condition, results of operations or cash flows could be materially adversely affected. The risks below are not the only ones facing our company. Additional risks not currently known to us or that we currently deem immaterial may also adversely affect us. This Annual Report on Form 10-K also contains forward-looking statements, estimates and projections that involve risks and uncertainties. Our actual results could differ materially from those anticipated in the forward-looking statements as a result of specific factors, including the risks described below.*

**Risks Relating to Our Business**

***Failure to effectively execute our appraisal and development projects could result in significant delays and/or cost over-runs, including the delay of any future production, which could negatively impact our operating results, liquidity and financial position.***

We currently have an extensive inventory of appraisal and development projects, all of which are in the early stages of the project development life-cycle, except for our Heidelberg project. Our development projects and discoveries will require substantial additional evaluation and analysis, including appraisal drilling and the expenditure of substantial amounts of capital, prior to preparing a development plan and seeking formal project sanction. First production from these development projects and discoveries is not expected for several years, with the exception of our Heidelberg project. All of our development projects and discoveries are located in challenging deepwater environments and, given the magnitude and scale of the initial discoveries, will entail significant technical and financial challenges, including extensive subsea tiebacks to an FPSO or production platform, pressure maintenance systems, gas re-injection systems, and other specialized infrastructure. This may include the advancement of technology and equipment necessary to withstand the higher pressures associated with producing oil and gas from Inboard Lower Tertiary horizons.

This level of development activity and complexity requires significant effort from our management and technical personnel and places additional requirements on our financial resources and internal financial controls. In addition, we have increased dependency on third-party technology and service providers and other supply chain participants for these complex projects. We may not be able to fully execute these projects due to:

- inability to obtain sufficient and timely financing;

- inability to attract and/or retain sufficient quantity of personnel with the skills required to bring these complex projects to production on schedule and on budget;

- significant delays in delivery of essential items or performance of services, cost overruns, supplier insolvency, or other critical supply failure could adversely affect project development;

- inability to advance certain technologies;

- lack of partner or government approval for projects;

- civil disturbances, anti-development activities, legal challenges or other interruptions which could prevent access; and

- drilling hazards or accidents or natural disasters.

We may not be able to compensate for, or fully mitigate, these risks.

42

Table of Contents

***Our business plan requires substantial additional capital, which we may be unable to raise on acceptable terms in the future, which may in turn limit our ability to execute our development projects and achieve production, conduct exploration activities or renew our exploration portfolio.***

We do not currently generate any revenue from operations. We expect our capital outlays and operating expenditures to increase substantially over at least the next several years as we expand our operations. Developing major offshore oil and gas projects, especially in complex and challenging environments, continuing exploration activities and obtaining additional leases or concessional licenses and seismic data are very expensive, and we expect that we will need to raise substantial additional capital, through future private or public equity offerings, asset sales, strategic alliances or debt or project financing, before we generate any revenue from operations. The recent significant decline in oil and natural gas prices may make it more difficult for us to obtain additional financing.

Our future capital requirements will depend on many factors, including:

- the scope, rate of progress and cost of our project appraisal and development activities;

- the scope, rate of progress and cost of our exploration activities;

- the success of our exploration activities;

- the extent to which we invest in additional oil leases or concessional licenses;

- oil and natural gas prices;

- our ability to locate and acquire hydrocarbon reserves;

- our ability to produce oil or natural gas from those reserves;

- our ability to attract and retain adequate personnel;

- our ability to meet the timelines for development set forth in our license agreements;

- the terms and timing of any drilling and other production-related arrangements that we may enter into;

- the timing of partner and governmental approvals and/or concessions; and

- the effects of competition by other companies operating in the oil and gas industry.

While we believe our operations will be adequately funded at current working interests through at least 2016, we do not currently have any commitments for future external funding and we do not expect to generate any revenue from production for several years. Additional financing may not be available on favorable terms, or at all. Even if we succeed in selling additional securities to raise funds, at such time the ownership percentage of our existing stockholders could be diluted, and new investors may demand rights, preferences or privileges senior to those of existing stockholders. If we raise additional capital through debt financing, the financing may involve covenants that restrict our business activities. If we choose to farm-out interests in our leases or licenses, we would dilute our ownership interest subject to the farm-out and any potential value resulting therefrom, and we may lose operating control over such prospects.

In order to protect our exploration and production rights in our license areas, we must meet various drilling and declaration requirements. Assuming we are able to commence exploration and production activities or successfully exploit our properties during the primary license term, our licenses over the developed areas of a prospect could extend beyond the primary term, generally for the life of production. However, unless we make and declare discoveries within certain time periods specified in the documents governing our licenses, our interests in either the undeveloped parts of our license areas (as is the case in Angola and Gabon) or the whole block (as is the case in the deepwater U.S. Gulf of Mexico) may be forfeited, we may be subject to significant penalties or be required to make additional

43

Table of Contents

payments in order to maintain such licenses. The costs to maintain licenses may fluctuate and may increase significantly since the original term, and we may not be able to renew or extend such licenses on commercially reasonable terms or at all. If we are not successful in raising additional capital, we may be unable to execute our development projects, continue our exploration activities or successfully exploit our properties, and we may lose the rights to develop these properties upon the expiration of our licenses.

***A substantial or extended decline in oil and natural gas prices may adversely affect our business, financial condition and results of operations.***

The price that we will receive for our oil and natural gas production will significantly affect our revenue, profitability, access to capital and future growth rate. The market price of oil and natural gas affects the valuation of our business and price of our common stock despite the fact that we currently do not produce or sell oil or natural gas. Historically, the oil and natural gas markets have been volatile and will likely continue to be volatile in the future. Oil and natural gas prices depend on numerous factors. These factors include, but are not limited to, the following:

- changes in supply and demand for oil and natural gas;

- the actions of the Organization of the Petroleum Exporting Countries;

- the price and quantity of imports of foreign oil and natural gas;

- speculation as to the future price of oil and the speculative trading of oil futures contracts;

- global economic conditions;

- political and economic conditions, including embargoes, in oil-producing countries or affecting other oil-producing activities, particularly in the Middle East, Africa, Russia and South America;

- the continued threat of terrorism and the impact of military and other action, including U.S. military operations in the Middle East;

- the level of global oil and natural gas exploration and production activity;

- the level of global oil and natural gas inventories and oil and natural gas refining capacities;

- weather conditions and other natural disasters;

- technological advances affecting energy consumption;

- domestic and foreign governmental regulations;

- proximity and capacity of oil and natural gas pipelines and other transportation facilities;

- the price and availability of competitors' supplies of oil and natural gas; and

- the price and availability of alternative fuels.

Significant declines in oil and natural gas prices for an extended period may have the following effects on our business:

- limiting our financial condition, liquidity, ability to finance our capital expenditures and results of operations;

- reducing the amount of oil and natural gas that we can produce economically;

- causing us to delay, postpone or terminate our exploration, appraisal and development activities;

- reducing any future revenues, operating income and cash flows;

- reducing the carrying value of our crude oil and natural gas properties; or

44

Table of Contents

- limiting our access to sources of capital, such as equity and long-term debt.

Oil and natural gas prices have recently declined dramatically and will likely continue to be volatile in the future. A substantial or extended decline in oil and natural gas prices may materially and adversely affect our future business, financial condition, and the market price of our common stock, results of operations, liquidity or ability to finance planned capital expenditures.

***We have limited proved reserves and areas that we decide to drill may not yield hydrocarbons in commercial quantities or quality, or at all.***

We have limited proved reserves and our exploration portfolio consists of identified yet unproven exploration prospects based on available seismic and geological information that indicates the potential presence of hydrocarbons. The exploration, appraisal and development wells we drill may not yield hydrocarbons in commercial quantities or quality, or at all. In addition, while our exploration efforts are oil-focused, any well we drill may discover gas or other hydrocarbons, which we may not have rights to develop or produce. Our current appraisal and development projects and exploration prospects are in various stages of evaluation that will require substantial additional analysis and interpretation. Even when properly used and interpreted, 2-D and 3-D seismic data and visualization techniques are only tools used to assist geoscientists in identifying subsurface structures and hydrocarbon indicators and do not enable the interpreter to know whether hydrocarbons are, in fact, present in those structures. Exploration wells have been drilled on a limited number of our exploration prospects. In addition, we have drilled a limited number of appraisal wells on our discoveries. Undue reliance should not be placed on our limited drilling results or any estimates of the characteristics of our projects or prospects, including any derived calculations of our potential resources or reserves based on these limited results and estimates. Additional appraisal wells, other testing and production data from completed wells will be required to fully appraise our discoveries, to better estimate their characteristics and potential resources and reserves and to ultimately understand their commerciality and economic viability. Accordingly, we do not know how many of our development projects, discoveries or exploration prospects will contain hydrocarbons in sufficient quantities or quality to recover drilling and completion costs or to be economically viable. Even if hydrocarbons are found on our exploration prospects in commercial quantities, construction costs of oil pipelines, production platforms, facilities or subsea infrastructure or FPSO vessels, as applicable, and transportation costs may prevent such prospects from being economically viable development projects. We will require various regulatory approvals in order to develop and produce from any of our discoveries, which may not be forthcoming or may be delayed.

Additionally, the analogies drawn by us from available data from other wells, more fully explored prospects or producing fields may not prove valid in respect of our drilling prospects. We may terminate our drilling program for a prospect if data, information, studies and previous reports indicate that the possible development of our prospect is not commercially viable and, therefore, does not merit further investment. If a significant number of our prospects do not prove to be successful, our business, financial condition and results of operations will be materially adversely affected.

To date, there has been limited exploration, appraisal and development drilling which has targeted the pre-salt horizon in the deepwater offshore West Africa and the Inboard Lower Tertiary trend in the deepwater U.S. Gulf of Mexico, areas in which we intend to focus a substantial amount of our exploration and development efforts.

***Our discoveries and appraisal and development projects remain subject to varying degrees of additional evaluation, analysis and partner and regulatory approvals prior to official project sanction and production.***

Our use of the term "development project" in this Annual Report on Form 10-K in relation to our appraisal and development activities refers to our Heidelberg, Shenandoah, North Platte, Orca and Cameia projects. Our use of the term "discoveries" in this Annual Report on Form 10-K in relation to

45

Table of Contents

our exploration efforts refers to our existing discoveries: North Platte, Heidelberg, Shenandoah, Anchor, Yucatan, Cameia, Mavinga, Lontra, Bicuar, Orca and Diaman and is not intended to refer to (i) our exploration portfolio as a whole, (ii) prospects where drilling activities have not discovered hydrocarbons or (iii) our undrilled exploration prospects. A discovery made by the initial exploration well on a prospect does not ensure that we will ultimately develop or produce hydrocarbons from such prospect or that a development project will be economically viable or successful. Following a discovery by an initial exploration well, substantial additional evaluation, analysis, expenditure of capital and partner and regulatory approvals will need to be performed and obtained prior to official project sanction and development, which may include (i) the drilling of appraisal wells, (ii) the evaluation and analysis of well logs, reservoir core samples, fluid samples and the results of production tests from both exploration and appraisal wells, and (iii) the preparation of a development plan which includes economic assumptions on future oil and gas prices, the costs of drilling development wells, and the construction or leasing of offshore production facilities and transportation infrastructure. Regulatory approvals are also required to proceed with certain development plans. Relatively more testing and evaluation of our exploration, appraisal and development wells will be required for our projects and discoveries offshore West Africa than our projects in the U.S. Gulf of Mexico given the limited amount of drilling that has taken place in pre-salt horizons offshore West Africa. There is currently no oil or gas production in the pre-salt Kwanza Basin offshore Angola, an area in which we intend to devote a substantial amount of our appraisal and development activities.

Any of the foregoing steps of evaluation and analysis may render a particular development project uneconomic, and we may ultimately decide to abandon the project, despite the fact that the initial exploration well, or subsequent appraisal or development wells, discovered hydrocarbons. We may also decide to abandon a project based on forecasted oil and gas prices or the inability to obtain sufficient financing. We may not be successful in obtaining partner or regulatory approvals to develop a particular discovery, which could prevent us from proceeding with development and ultimately producing hydrocarbons from such discovery, even if we believe a development would be economically successful.

***We do not currently generate any revenue from operations and our future performance is uncertain.***

We do not currently generate any revenue from production and the commencement of production from our oil and gas properties will depend upon our ability to execute the appraisal and development of our projects and progress our projects through the project appraisal and development life-cycle, including the approval of development plans, obtaining formal project sanction, achieving successful appraisal and development drilling results and constructing or leasing production facilities and related subsea infrastructure. Our ability to commence production will also depend upon us being able to obtain substantial additional capital funding on a timely basis and attract and retain adequate personnel. We do not expect to commence production for at least another year, and therefore we do not expect to generate any revenue from production in the near future. Companies in their initial stages of development face substantial business and financial risks and may suffer significant losses. We have generated substantial net losses and negative cash flows from operating activities since our inception and expect to continue to incur substantial net losses as we continue our project appraisal and development activities, our exploration drilling program and our new venture activities. We face challenges and uncertainties in financial and commercial planning as a result of the complex nature of our business, the unavailability of historical data (particularly offshore West Africa) and uncertainties regarding the nature, scope and results of our future activities and financial commitments. In the event that our appraisal, development or exploration drilling schedules are not completed, or are delayed, modified or terminated, our operating results will be adversely affected and our operations will differ materially from the activities described in this Annual Report on Form 10-K. As a result of industry factors or factors relating specifically to us, we may have to change our methods of conducting business, which may cause a material adverse effect on our results of operations and financial condition.

46

Table of Contents

***Drilling wells is speculative, often involving significant costs that may be more than our estimates, and may not result in any discoveries or additions to our future production or reserves. Any material inaccuracies in drilling costs, estimates or underlying assumptions will materially affect our business.***

Exploring for and developing oil reserves involves a high degree of operational and financial risk, which precludes definitive statements as to the time required and costs involved in reaching certain objectives. The budgeted costs of drilling, completing and operating exploration, appraisal and development wells are often exceeded and can increase significantly when drilling costs rise due to a tightening in the supply of various types of oilfield equipment and related services. Drilling may be unsuccessful for many reasons, including geological conditions, weather, cost overruns, equipment shortages and mechanical difficulties. Exploration wells bear a much greater risk of financial loss than development wells. In the past we have experienced unsuccessful drilling efforts. Moreover, the successful drilling of an oil well does not necessarily result in a profit on investment. A variety of factors, both geological and market-related, can cause a well or an entire development project to become uneconomic or only marginally economic. Our initial drilling sites, and any potential additional sites that may be developed, require significant additional exploration and appraisal, regulatory approval and commitments of resources prior to commercial development. We face additional risks in the Inboard Lower Tertiary Trend in the U.S. Gulf of Mexico and in the Kwanza basin offshore Angola and offshore Gabon due to a general lack of infrastructure and, in the case of offshore Angola and Gabon, underdeveloped oil and gas industries and increased transportation expenses due to geographic remoteness. Thus, this may require either a single well to be exceptionally productive, or the existence of multiple successful wells, to allow for the development of a commercially viable field. If our actual drilling and development costs are significantly more than our estimated costs, we may not be able to continue our business operations as proposed and would be forced to modify our plan of operation.

We contract with third parties to conduct drilling and related services on our development projects and exploration prospects for us. Such third parties may not perform the services they provide us on schedule or within budget. The recent decline in oil and gas prices may have an adverse impact on certain third parties from which we contract drilling, development and related oilfield services, which in turn could affect such companies' ability to perform such services for us and result in delays to our exploration, appraisal and development activities. Furthermore, the drilling equipment, facilities and infrastructure owned and operated by the third parties we contract with is highly complex and subject to malfunction and breakdown. Any malfunctions or breakdowns may be outside our control and result in delays, which could be substantial. Any delays in our drilling campaign caused by equipment, facility or equipment malfunction or breakdown could materially increase our costs of drilling and cause an adverse effect on our business, financial position and results of operations.

***Our proved reserves are estimates. Any material inaccuracies in our reserves estimates or assumptions underlying our reserves estimates could cause the quantities and net present value of our reserves to be overstated or understated.***

There are numerous uncertainties inherent in estimating oil and natural gas reserves and their value. Reservoir engineering is a subjective process of estimating underground accumulations of crude oil and natural gas that cannot be measured in an exact manner. Because of the high degree of judgment involved, the accuracy of any reserve estimate is inherently imprecise, and a function of the quality of available data and the engineering and geological interpretation. Our reserves estimates are based on 12-month average prices; therefore, reserves quantities will change when actual prices increase or decrease. In addition, results of drilling, testing, and production may substantially change the reserve estimates for a given reservoir over time. The estimates of our proved reserves and estimated future net revenues also depend on a number of factors and assumptions that may vary considerably from actual results, including:

- historical production from an area compared with production from similar producing areas;

Table of Contents

- assumed effects of regulation by governmental agencies and court rulings;

- assumptions concerning future oil and natural-gas prices, future operating costs and capital expenditures; and

- estimates of future severance and excise taxes, workover costs, and remedial costs.

For these reasons, estimates of the economically recoverable quantities of oil and natural gas attributable to any particular group of properties, classifications of those reserves and estimates of the future net cash flows expected from them prepared by different engineers or by the same engineers but at different times may vary substantially. Accordingly, reserves estimates may be subject to upward or downward adjustment, and actual production, revenue and expenditures with respect to our reserves likely will vary, possibly materially, from estimates. Additionally, because our reserves estimates are calculated using volumetric analysis, those estimates are less reliable than the estimates based on a lengthy production history. Volumetric analysis involves estimating the volume of a reservoir based on the net feet of pay of the structure and an estimation of the area covered by the structure. In addition, realization or recognition of proved undeveloped reserves will depend on our development schedule and plans. A change in future development plans for proved undeveloped reserves could cause the discontinuation of the classification of these reserves as proved.

***Development drilling may not result in commercially productive quantities of oil and gas reserves.***

Our exploration success has provided us with a number of major development projects on which we are moving forward. We must successfully execute our development projects, including development drilling, in order to generate future production and cash flow. However, development drilling is not always successful and the profitability of development projects may change over time.

For example, in new development projects available data may not allow us to completely know the extent of the reservoir or choose the best locations for drilling development wells. Therefore, a development well we drill may be a dry hole or result in noncommercial quantities of hydrocarbons. Projects in frontier areas may require the development of special technology for development drilling or well completion and we may not have the knowledge or expertise in applying new technology. All costs of development drilling and other development activities are capitalized, even if the activities do not result in commercially productive quantities of hydrocarbon reserves. This puts a property at higher risk for future impairment if commodity prices decrease or operating or development costs increase.

***Our drilling and development plans are scheduled out over several years, making them susceptible to uncertainties that could materially alter their occurrence or timing.***

Our drilling and development plans on our acreage are scheduled our over a multi-year period. Our drilling and development plans depend on a number of factors, including the availability of capital and equipment, qualified personnel, seasonal and weather conditions, regulatory and block partner approvals, civil and political conditions, oil prices, costs and drilling results. The final determination on whether to drill any exploration, appraisal, or development well, including the exact drilling location as well as the successful development of any discovery, will be dependent upon the factors described elsewhere in this Annual Report on Form 10-K as well as, to some degree, the results of our drilling activities. Because of these uncertainties, we do not know if the drilling locations we have identified or targeted will be drilled in the location we currently anticipate, within our expected timeframe or at all or if we will be able to economically produce oil or gas from these or any other potential drilling locations. As such, our actual drilling and development plans and locations may be materially different from our current expectations, which could adversely affect our results of operations and financial condition.

48

Table of Contents

***We are not, and may not be in the future, the operator on all of our acreage, and do not, and may not in the future, hold all of the working interests in our acreage. Therefore, we will not be able to control the timing of exploration or development efforts, associated costs, or the rate of production of any non-operated and to an extent, any non-wholly owned, assets.***

Currently, we are not the operator on approximately 11% of our deepwater U.S. Gulf of Mexico blocks, and we are not the operator on the Diaba Block offshore Gabon. As we carry out our exploration and development programs, we may enter into arrangements with respect to existing or future prospects that result in a greater proportion of our prospects being operated by others. In addition, the terms of our current or future licenses or leases may require at least the majority of working interests to approve certain actions. As a result, we may have limited ability to exercise influence over the operations of the prospects operated by our partners or which are not wholly-owned by us, as the case may be. Dependence on the operator or our partners could prevent us from realizing our target returns for those prospects. Further, it may be difficult for us to minimize the cycle time between discovery and initial production with respect to prospects for which we do not operate or wholly-own. The success and timing of exploration and development activities operated by our partners will depend on a number of factors that will be largely outside of our control, including:

- the timing and amount of capital expenditures;

- the operator's expertise and financial resources;

- partner, government and regulatory approvals;

- selection of technology; and

- the rate of production of reserves, if any.

Furthermore, even though we are the operator of Blocks 9, 20 and 21 offshore Angola, we are required to obtain the prior approval of Sonangol for most of our operational activities. This limited ability to exercise control over the operations of some of our prospects may cause a material adverse effect on our results of operations and financial condition.

***The inability of one or more third parties who contract with us to meet their obligations to us may adversely affect our financial results.***

We may be liable for certain costs if third parties who contract with us are unable to meet their commitments under such agreements. We are currently exposed to credit risk through joint interest receivables from our block and/or lease partners. As a result of our exploration success, we have a large inventory of development projects which will require significant capital expenditures and have long development cycle times. Our partners, both in the U.S. Gulf of Mexico and West Africa, must be able to fund their share of investment costs through the lengthy development cycle, through cash flow from operations, external credit facilities, or other sources, including project financing arrangements. Our partners may not be successful in obtaining such financing, which could negatively impact the progress and timeline for development. In addition to project development costs, our partners must also be able to fund their share of exploration and other operating expenses. If any of our partners in the blocks or leases in which we hold interests are unable to fund their share of the exploration and development expenses, we may be liable for such costs. In response to the recent decline in oil and gas prices, certain of our partners have announced capital expenditure reductions, which may cause such partners to elect not to participate in the drilling of a particular exploration or appraisal well with us. This could increase our share of the costs of such operation and may cause us to cancel or delay certain exploration or appraisal drilling programs.

In addition, if any of the service providers we contract with to conduct development or exploration activities file for bankruptcy or are otherwise unable to fulfill their obligations to us, we may face increased costs and delays in locating replacement vendors. The recent decline in oil and gas prices may have an adverse impact on certain third parties from which we contract drilling, development and

49

Table of Contents

related oilfield services, which in turn could affect such companies' ability to perform such services for us and result in delays to our exploration, appraisal and development activities. The inability or failure of third parties we contract with to meet their obligations to us or their insolvency or liquidation may adversely affect our business, results of operations or financial condition.

***We are dependent on certain members of our management and technical team and our inability to retain or recruit qualified personnel may impair our ability to grow our business.***

Our investors must rely upon the ability, expertise, judgment and discretion of our management and the success of our technical team in identifying, discovering and developing oil reserves and progressing our development projects toward first production. Our performance and success are dependent, in part, upon key members of our management and technical team, and their loss or departure could be detrimental to our future success. You must be willing to rely to a significant extent on our management's discretion and judgment. In addition, a significant portion of our employee base is at or near retirement age. Furthermore, we utilize the services of a number of individual consultants for contractually fixed periods of time. Our inability to retain or recruit qualified personnel may impair our ability to grow our business and develop our discoveries, which could have a material adverse effect on our results of operations and financial condition, as well as on the market price of our common stock.

***Under the terms of our various license agreements, we are required to drill wells, declare any discoveries and conduct certain development activities in order to retain exploration and production rights and failure to do so may result in substantial license renewal costs or loss of our interests in the undeveloped parts of our license areas.***

In order to protect our exploration and production rights in our license areas, we must meet various drilling and declaration requirements. In general, unless we make and declare discoveries within certain time periods specified in our various license agreements and leases, our interests in the undeveloped parts of our license (as is the case in Angola and Gabon) or the whole block (as is the case in the deepwater U.S. Gulf of Mexico) areas may lapse and we may be subject to significant penalties or be required to make additional payments in order to maintain such licenses. For example, pursuant to the terms of the Block 21 RSA, the initial exploration period with respect to Block 21 offshore Angola will terminate on March 1, 2015 and, on such date we will lose our exploration rights on Block 21. We have applied for an extension of the initial exploration period for Block 21 to enable us to continue our exploration efforts, however, this extension is currently pending approval by Sonangol and the Angola Ministry of Petroleum. We can make no assurances that we will receive an extension of the initial exploration period on Block 21 or what the terms of the extension might be. Under the Block 20 PSC, in order to preserve our rights in the block, we will be required to drill four exploration wells within five years of the signing of the Block 20 PSC, or January 1, 2017, subject to certain extensions. Currently, we have drilled two exploration wells on Block 20.

Furthermore, as required by our license agreements, within thirty days following a successful exploration well, we are required to submit a declaration of commercial well to Sonangol. Within two years after the date of the declaration of commercial well, we must submit to Sonangol a formal declaration of commercial discovery. Within three months from the declaration of commercial discovery, we are required to submit a development plan to Sonangol and the Angola Ministry of Petroleum for review and approval. Within forty-two months after the formal declaration of commercial discovery, we are required to commence first production from such discovery. Given our exploration success, we now have five complex appraisal and development projects offshore Angola, including Cameia, Mavinga, Lontra, Orca and Bicuar, each of which we must progress through the project development life-cycle in order to comply with the deadlines outlined above. Our failure or inability to meet these deadlines could jeopardize our production rights or result in forfeiture of our production

50

Table of Contents

rights with respect to these projects, which would have a material adverse effect on our results of operations and financial condition, as well as on the market price of our common stock.

In addition, most of our deepwater U.S. Gulf of Mexico blocks have a 10-year primary term, expiring between 2016 and 2024. Generally, we are required to commence exploration activities or successfully exploit our properties during the primary lease term in order for these leases to extend beyond the primary lease term. A portion of the leases covering our Shenandoah and Anchor discoveries are beyond their primary term, and the operator must conduct continuous operations or obtain a Suspension of Production in order to maintain such leases. Accordingly, we and our partners may not be able to drill all of the prospects identified on our leases or licenses prior to the expiration of their respective terms and we can make no assurances that the operator of the discoveries in which we hold a non-operated interest will be able to successfully perpetuate leases through continuous operations or obtaining a Suspension of Production. Should the prospects we have identified under the licenses or leases currently in place yield discoveries, we cannot assure you that we will not face delays in drilling these prospects or otherwise have to relinquish these prospects. The costs to maintain licenses over such areas may fluctuate and may increase significantly since the original term, and we may not be able to renew or extend such licenses on commercially reasonable terms or at all. Our actual drilling activities may therefore materially differ from our current expectations, which could adversely affect our business. For each of our blocks and license areas, we cannot assure you that any renewals or extensions will be granted or whether any new agreements or leases will be available on commercially reasonable terms, or, in some cases, at all.

***We may be subject to risks in connection with acquisitions and the integration of significant acquisitions may be difficult.***

We periodically evaluate acquisitions of prospects and licenses, reserves and other strategic transactions that appear to fit within our overall business strategy. The successful acquisition of these assets requires an assessment of several factors, including:

- recoverable reserves;

- future oil and natural gas prices and their appropriate differentials;

- development and operating costs; and

- potential environmental, safety, health and other liabilities.

The accuracy of these assessments is inherently uncertain. In connection with these assessments, we perform a review of the subject assets that we believe to be generally consistent with industry practices. Our review will not reveal all existing or potential problems nor will it permit us to become sufficiently familiar with the assets to fully assess their deficiencies and potential recoverable reserves. Inspections may not always be performed on every well, and environmental problems are not necessarily observable even when an inspection is undertaken. Even when problems are identified, the seller may be unwilling or unable to provide effective contractual protection against all or part of the problems. We may not be entitled to contractual indemnification for environmental, safety, and health liabilities and could acquire assets on an "as is" basis. Significant acquisitions and other strategic transactions may involve other risks, including:

- diversion of our management's attention to evaluating, negotiating and integrating significant acquisitions and strategic transactions;

- the challenge and cost of integrating acquired operations, information management and other technology systems and business cultures with those of ours while carrying on our ongoing business;

- difficulty associated with coordinating geographically separate organizations; and

- the challenge of attracting and retaining personnel associated with acquired operations.

51

Table of Contents

The process of integrating operations could cause an interruption of, or loss of momentum in, the activities of our business. Members of our senior management may be required to devote considerable amounts of time to this integration process, which will decrease the time they will have to manage our business. If our senior management is not able to effectively manage the integration process, or if any significant business activities are interrupted as a result of the integration process, our business could suffer.

***If we fail to realize the anticipated benefits of a significant acquisition, our results of operations may be adversely affected.***

The success of a significant acquisition will depend, in part, on our ability to realize anticipated growth opportunities from combining the acquired assets or operations with those of ours. Even if a combination is successful, it may not be possible to realize the full benefits we may expect in estimated proved reserves, production volume, cost savings from operating synergies or other benefits anticipated from an acquisition or realize these benefits within the expected time frame. Anticipated benefits of an acquisition may be offset by operating losses relating to changes in commodity prices, increased interest expense associated with debt incurred or assumed in connection with the transaction, adverse changes in oil and gas industry conditions, or by risks and uncertainties relating to the exploration prospects of the combined assets or operations, or an increase in operating or other costs or other difficulties, including the assumption of environmental, safety and health or other liabilities in connection with the acquisition. If we fail to realize the benefits we anticipate from an acquisition, our results of operations may be adversely affected.

***We are subject to numerous risks inherent to the exploration and production of oil and natural gas.***

Oil and natural gas exploration and production activities involve many risks that a combination of experience, knowledge and careful evaluation may not be able to overcome. Our future success will depend on the success of our exploration and production activities and on the future existence of the infrastructure and technology that will allow us to take advantage of our findings. Additionally, our properties are located in deepwater, which generally increases the capital and operating costs, technical challenges and risks associated with exploration and production activities. As a result, our exploration and production activities are subject to numerous risks, including the risk that drilling will not result in commercially viable production. Our decisions to purchase, explore, develop or otherwise exploit prospects or properties will depend in part on the evaluation of seismic data through geophysical and geological analyses, production data and engineering studies, the results of which are often inconclusive or subject to varying interpretations.

Furthermore, the marketability of expected production from our prospects will also be affected by numerous factors. These factors include, but are not limited to, market fluctuations of oil and gas prices, proximity, capacity and availability of pipelines, the availability of processing facilities, equipment availability and government regulations (including, without limitation, regulations relating to prices, taxes, royalties, allowable production, importing and exporting of hydrocarbons, environmental, safety, health and climate change). The effect of these factors, individually or jointly, may result in us not receiving an adequate return on invested capital.

***We are subject to drilling and other operational hazards.***

The exploration and production business involves a variety of operating risks, including, but not limited to:

- blowouts, cratering and explosions;

- mechanical and equipment problems;

- uncontrolled flows or leaks of oil or well fluids, natural gas or other pollution;

- fires and gas flaring operations;

- marine hazards with respect to offshore operations;

Table of Contents

- formations with abnormal pressures;

- pollution, other environmental risks and geological problems; and

- weather conditions and natural disasters.

These risks are particularly acute in deepwater drilling and exploration for natural resources. Any of these events could result in loss of human life, significant damage to property, environmental damage, impairment of our operations, delays in our drilling operations, increased costs and substantial losses. In accordance with customary industry practice, we maintain insurance against some, but not all, of these risks and losses. We do not carry business interruption insurance. The occurrence of any of these events, whether or not covered by insurance, could have a material adverse effect on our results of operations and financial condition, as well as on the market price of our common stock.

We are members of several industry groups that provide general and specific oil spill and well containment resources in the U.S. Gulf of Mexico and offshore West Africa. Through these industry groups, as described under "Business—Containment Resources", we have contractual rights to access certain oil spill and well containment resources. We can make no assurance that these resources will perform as designed or be able to fully contain or cap any oil spill, blow-out or uncontrolled flow of hydrocarbons. Furthermore, our contracts for the use of oil spill and well containment resources contain strict indemnity provisions that generally require us to indemnify the contractor for all losses incurred as a result of assisting us in our oil spill and well containment efforts, subject to certain exceptions and limitations. In the event we experience a subsea blowout, explosion, fire, uncontrolled flow of hydrocarbons or any of the other operational risks identified above, the oil spill and well containment resources which we have contractual rights to will not prevent us from incurring losses or shield us from liability, which could be substantial and have a material adverse effect on our results of operations and financial condition, as well as on the market price of our common stock.

***The high cost or unavailability of drilling rigs, equipment, transportation, personnel, oil field services and infrastructure could adversely affect our ability to execute our exploration and development plans on a timely basis and within budget.***

Our industry is cyclical and, from time to time, there is a shortage of drilling rigs, equipment, transportation, supplies or qualified personnel, often during periods of higher oil prices or in emerging areas of exploration. During these periods and within these areas, the costs of drilling rigs, equipment, transportation, supplies and personnel are substantially greater and their availability may be limited. Additionally, these services may not be available on commercially reasonable terms. The high cost or unavailability of drilling rigs, equipment, transportation, supplies, personnel and other oil field services could adversely affect our ability to execute our exploration and development plans on a timely basis and within budget, which could have a material adverse effect on our business, financial condition or results of operations.

Our ability to produce hydrocarbons will depend substantially on the availability and capacity of gathering systems, pipelines, processing facilities and tanker transportation owned and operated by third parties. Additionally, such infrastructure may not be available on commercially reasonable terms. We may be required to shut in oil wells because of the absence of a market or because access to pipelines, gathering systems, processing facilities or tanker transportation may be limited or unavailable. If that were to occur, then we would be unable to realize revenue from those wells until arrangements were made to deliver the production to market, which could have a material adverse effect on our business, financial condition or results of operations.

***Our operations will involve special risks that could adversely affect operations.***

Offshore operations are subject to a variety of operating risks specific to the marine environment, such as capsizing, collisions and damage or loss from hurricanes or other adverse weather conditions.

53

Table of Contents

These conditions can cause substantial damage to facilities and interrupt our operations. As a result, we could incur substantial expenses that could reduce or eliminate the funds available for exploration, development or leasehold acquisitions, or result in loss of equipment and properties.

Deepwater exploration generally involves greater operational and financial risks than exploration on the shelf. Deepwater drilling generally requires more time and more advanced drilling technologies, involving a higher risk of technological failure and usually higher drilling costs. Such risks are particularly applicable to our deepwater exploration efforts in the Inboard Lower Tertiary trend and pre-salt offshore Angola and Gabon. In addition, there may be production risks of which we are currently unaware. Whether we use existing pipeline infrastructure, participate in the development of new subsea infrastructure or use floating production systems to transport oil from producing wells, if any, these operations may require substantial time for installation, or encounter mechanical difficulties and equipment failures that could result in significant cost overruns and delays. Furthermore, deepwater operations generally, and operations in the Inboard Lower Tertiary and offshore West Africa trends in particular, lack the physical and oilfield service infrastructure present on the shelf. As a result, a significant amount of time may elapse between a deepwater discovery and the marketing of the associated hydrocarbons, increasing both the financial and operational risk involved with these operations. Because of the lack and high cost of this infrastructure, oil and gas discoveries we make in the deepwater, if any, may never be economically producible.

In addition, in the event of a well control incident, containment and, potentially, cleanup activities for offshore drilling are costly. The resulting regulatory costs or penalties, and the results of third party lawsuits, as well as associated legal and support expenses, including costs to address negative publicity, could well exceed the actual costs of containment and cleanup. As a result, a well control incident could result in substantial liabilities for us, and have a significant negative impact on our earnings, cash flows, liquidity, financial position, and stock price.

***Our operations in the U.S. Gulf of Mexico may be adversely impacted by tropical storms and hurricanes.***

Tropical storms, hurricanes and the threat of tropical storms and hurricanes often result in the shutdown of operations in the U.S. Gulf of Mexico as well as operations within the path and the projected path of the tropical storms or hurricanes. In the future, during a shutdown period, we may be unable to access wellsites and our services may be shut down. Additionally, tropical storms or hurricanes may cause evacuation of personnel and damage to offshore drilling rigs and other equipment, which may result in suspension of our operations. The shutdowns, related evacuations and damage can create unpredictability in activity and utilization rates, as well as delays and cost overruns, which may have a material adverse effect on our results of operations and financial condition, as well as on the market price of our common stock.

***The geographic concentration of our properties in the U.S. Gulf of Mexico and offshore Angola and Gabon subjects us to an increased risk of loss of revenue or curtailment of production from factors specifically affecting the U.S. Gulf of Mexico and offshore Angola and Gabon.***

Our properties are concentrated in three countries: the U.S. Gulf of Mexico and offshore Angola and Gabon. Some or all of these properties could be affected should such regions experience:

- severe weather or natural disasters;

- moratoria on drilling or permitting delays;

- delays in or the inability to obtain regulatory approvals;

- delays or decreases in production;

- delays or decreases in the availability of drilling rigs and related equipment, facilities, personnel or services;

54

Table of Contents

- delays or decreases in the availability of capacity to transport, gather or process production; and/or

- changes in the regulatory, political and fiscal environment.

For example, in response to the Deepwater Horizon incident in 2010, the U.S. government and its regulatory agencies with jurisdiction over oil and gas exploration, including the DOI and the BOEM and the BSEE, imposed moratoria on drilling operations, required operators to reapply for exploration plans and drilling permits and adopted extensive new regulations, which effectively had halted drilling operations in the deepwater U.S. Gulf of Mexico for a period of time. Additionally, oil and gas properties and facilities located in the U.S. Gulf of Mexico were significantly damaged by Hurricanes Katrina and Rita in 2005, which required our competitors to spend a significant amount of time and capital on inspections, repairs, debris removal, and the drilling of replacement wells. We maintain insurance coverage for only a portion of these risks. There also may be certain risks covered by insurance where the policy does not reimburse us for all of the costs related to a loss. We do not carry business interruption insurance.

Due to the concentrated nature of our portfolio of properties, a number of our properties could experience any of the same conditions at the same time, resulting in a relatively greater impact on our results of operations than they might have on other companies that have a more diversified portfolio of properties.

***Regulations enacted as a result of the Deepwater Horizon drilling rig accident and resulting oil spill may have significantly increased certain of the risks we face and increased the cost of operations in the U.S. Gulf of Mexico.***

On April 20, 2010, the Transocean Deepwater Horizon, a semi-submersible offshore drilling rig operating in the deepwater U.S. Gulf of Mexico under contract to BP plc exploded, burned for two days and sank, resulting in loss of life, injuries and a large oil spill. The U.S. government and its regulatory agencies with jurisdiction over oil and gas exploration, including the DOI, the BOEM and the BSEE, responded to this incident by imposing moratoria on drilling operations and adopting numerous new regulations and new interpretations of existing regulations regarding operations in the U.S. Gulf of Mexico. Compliance with these new regulations and interpretations has increased the cost of our drilling operations in the U.S. Gulf of Mexico.

The successful execution of our U.S. Gulf of Mexico business plan depends on our ability to continue our exploration and appraisal efforts. A prolonged suspension of or delay in our drilling operations would adversely affect our business, financial position or future results of operations.

Furthermore, the Deepwater Horizon incident has increased and may further increase certain of the risks we face, including, without limitation, the following:

- increased governmental regulation and enforcement of our and our industry's operations in a number of areas, including health and safety, financial responsibility, environmental, licensing, taxation, equipment specifications and inspections and training requirements;

- increased difficulty in obtaining leases and permits to drill offshore wells, including as a result of any bans or moratoria placed on offshore drilling;

- potential legal challenges to the issuance of permits and the conducting of our operations;

- higher drilling and operating costs;

- higher royalty rates and fees on leases acquired in the future;

- higher insurance costs and increased potential liability thresholds under proposed legislation and regulations;

55

Table of Contents

- decreased partner participation in wells we operate;

- higher capital costs as a result of any increase to the risks we or our industry face; and

- less favorable investor perception of the risk-adjusted benefits of deepwater offshore drilling.

The occurrence of any of these factors, or their continuation, could have a material adverse effect on our business, financial position or future results of operations.

***We face various risks associated with increased activism against oil and gas exploration and development activities.***

Opposition toward oil and gas drilling and development activity has been growing globally and is particularly pronounced in the United States. Companies in the oil and gas industry are often the target of activist efforts from both individuals and non-governmental organizations regarding safety, human rights, environmental matters, sustainability, and business practices. Anti-development activists are working to, among other things, reduce access to federal and state government lands and delay or cancel certain operations such as offshore drilling and development. For example, environmental activists have recently challenged lease sales and decisions to grant air-quality permits in the U.S. Gulf of Mexico for offshore drilling.

Future activist efforts could result in the following:

- delay or denial of drilling permits;

- shortening of lease terms or reduction in lease size;

- restrictions or delays on our ability to obtain additional seismic data;

- restrictions on installation or operation of gathering, processing or production facilities;

- restrictions on the use of certain operating practices;

- legal challenges or lawsuits;

- damaging publicity about us;

- increased regulation;

- increased costs of doing business;

- reduction in demand for our products; and

- other adverse effects on our ability to develop our properties.

Our need to incur costs associated with responding to these initiatives or complying with any resulting new legal or regulatory requirements resulting from these activities that are substantial and not adequately provided for, could have a material adverse effect on our business, financial condition and results of operations.

***We may be exposed to liabilities under the U.S. Foreign Corrupt Practices Act, and any determination that we violated the U.S. Foreign Corrupt Practices Act could have a material adverse effect on our business.***

We are subject to the U.S. Foreign Corrupt Practices Act ("FCPA") and other laws that prohibit improper payments or offers of payments to foreign governments and their officials and political parties for the purpose of obtaining or retaining business. We do business and may do additional business in the future in countries and regions in which we may face, directly or indirectly, corrupt demands by officials, tribal or insurgent organizations, or private entities. Thus, we face the risk of unauthorized payments or offers of payments by one of our employees or consultants, given that these parties may not always be subject to our control. Our existing safeguards and any future improvements may prove

Table of Contents

to be less than effective, and our employees and consultants may engage in conduct for which we might be held responsible.

In connection with entering into our RSAs for Blocks 9 and 21 offshore Angola, two Angolan-based E&P companies were assigned as part of the contractor group by the Angolan government. We had not worked with either of these companies in the past, and, therefore, our familiarity with these companies was limited. In the fall of 2010, we were made aware of allegations of a connection between senior Angolan government officials and one of these companies, Nazaki Oil and Gáz, S.A. ("Nazaki"), which was a full paying member of the contractor group but is no longer a member of such group. In March 2011, the SEC commenced an informal inquiry into these allegations. To avoid non-overlapping information requests, we voluntarily contacted the U.S. Department of Justice ("DOJ") with respect to the SEC's informal request and offered to respond to any requests the DOJ may have. Since such time, we have complied with all requests from the SEC and DOJ with respect to their inquiry. In November 2011, a formal order of investigation was issued by the SEC related to our operations in Angola. In August 2014, we received a Wells Notice from the SEC related to this investigation. In January 2015, we received a termination letter from the SEC advising us that the SEC's FCPA investigation has concluded and the Staff does not intend to recommend any enforcement action by the SEC. This letter formally concluded the SEC's investigation. We continue to cooperate with the DOJ with regard to its ongoing parallel investigation. We have conducted an extensive investigation into these allegations and believe that our activities in Angola have complied with all laws, including the FCPA. We are unable to predict the outcome of the DOJ's ongoing investigation or any action that the DOJ may decide to pursue, or otherwise provide any assurance regarding the duration, scope, developments in, results of or consequences of its investigation.

In the future, we may be partnered with other companies with whom we are unfamiliar. Violations of the FCPA may result in severe criminal or civil sanctions, and we may be subject to other liabilities, which could negatively affect our business, operating results and financial condition. In addition, the government may seek to hold us liable for successor liability FCPA violations committed by companies in which we invest or that we acquire.

***A change in U.S. energy policy could have a significant impact on our operations and profitability.***

U.S. energy policy and laws and regulations could change quickly, and substantial uncertainty exists about the nature of many potential rules and regulations that could impact the sources and uses of energy in the United States. For example, new CAFE standards enacted in 2012 will result in a significant increase in the fuel economy of cars and light trucks and will reduce the future demand for crude oil for road transport use. GHG emissions regulations may increase the demand for natural gas as fuel for power generation.

We design our exploration and development strategy and related capital investment programs years in advance. As a result, we are impacted in our ability to plan, invest and respond to potential changes in our business. This can result in a reduction of our cash flows and profitability to the extent we are unable to respond to sudden or significant changes in our operating environment due to changes in U.S. energy policy.

Our need to incur costs associated with responding to these initiatives or complying with any resulting new legal or regulatory requirements resulting from these activities that are substantial and not adequately provided for, could have a material adverse effect on our business, financial condition and results of operations.

***We operate in a litigious environment.***

Some of the jurisdictions within which we operate have proven to be litigious environments. Oil and gas companies, such as us, can be involved in various legal proceedings, such as title, royalty, or contractual disputes, in the ordinary course of business.

Table of Contents

We are currently, and from time to time we may become, involved in various legal and regulatory proceedings arising in the normal course of business. See "Legal Proceedings." We are vigorously defending against the current lawsuits and do not believe it will have a material adverse effect on our business. However, we cannot predict the occurrence or outcome of these proceedings with certainty, and if we are unsuccessful in these litigations and any loss exceeds our available insurance, this could have a material adverse effect on our results of operations.

Because we maintain a diversified portfolio of assets that includes both U.S. and international projects, the complexity and types of legal proceedings with which we may become involved may vary, and we could incur significant legal and support expenses in different jurisdictions. If we are not able to successfully defend ourselves, there could be a delay or even halt in our exploration, development or production activities or other business plans, resulting in a reduction in reserves, loss of production and reduced cash flows. Legal proceedings could result in a substantial liability and/or negative publicity about us and adversely affect the price of our common stock. In addition, legal proceedings distract management and other personnel from their primary responsibilities.

***Our operations may be adversely affected by political and economic circumstances in the countries in which we operate.***

Our oil and gas exploration, development and production activities are subject to political and economic uncertainties (including but not limited to changes, sometimes frequent or marked, in energy policies or the personnel administering them), expropriation of property, cancellation or modification of contract rights, changes in laws and policies governing operations of foreign-based companies, unilateral renegotiation of contracts by governmental entities, redefinition of international boundaries or boundary disputes, foreign exchange restrictions, currency fluctuations, royalty and tax increases and other risks arising out of governmental sovereignty over the areas in which our operations are conducted, as well as risks of loss due to civil strife, acts of war, acts of terrorism, piracy, disease, guerrilla activities, insurrection and other political risks, including tension and confrontations among political parties. Some of these risks may be higher in the developing countries in which we conduct our activities, namely, Angola and Gabon.

Our operations are exposed to risks of war, local economic conditions, political disruption, civil disturbance and governmental policies that may:

- disrupt our operations;

- restrict the movement of funds or limit repatriation of profits;

- in the case of our non-U.S. operations, lead to U.S. government or international sanctions; and

- limit access to markets for periods of time.

Disruptions may occur in the future, and losses caused by these disruptions may occur that will not be covered by insurance. Consequently, our exploration, development and production activities may be substantially affected by factors which could have a material adverse effect on our financial condition and results of operations. Furthermore, in the event of a dispute arising from non-U.S. operations, we may be subject to the exclusive jurisdiction of courts outside the U.S. or may not be successful in subjecting non-U.S. persons to the jurisdiction of courts in the U.S., which could adversely affect the outcome of such dispute.

Our operations may also be adversely affected by laws and policies of the jurisdictions, including Angola, Gabon, the United States, the Cayman Islands and other jurisdictions, in which we do business, that affect foreign trade and taxation. Changes in any of these laws or policies or the implementation thereof, could have a material adverse effect on our results of operations and financial position, as well as on the market price of our common stock.

58

Table of Contents

***Outbreaks of disease in the geographies in which we operate may adversely affect our business operations and financial condition.***

Many of our operations are currently, and will likely remain in the near future, in developing countries which are susceptible to outbreaks of disease and may lack the resources to effectively contain such an outbreak quickly. Such outbreaks may impact our ability to explore for oil and gas, develop or produce our license areas by limiting access to qualified personnel, increasing costs associated with ensuring the safety and health of our personnel, restricting transportation of personnel, equipment, supplies and oil and gas production to and from our areas of operation and diverting the time, attention and resources of government agencies which are necessary to conduct our operations. In addition, any losses we experience as a result of such outbreaks of disease which impact sales or delay production may not be covered by our insurance policies.

An epidemic of the Ebola virus disease is currently ongoing in parts of West Africa. A substantial number of deaths have been reported by the World Health Organization ("WHO") in West Africa, and the WHO has declared it a global health emergency. It is impossible to predict the effect and potential spread of the Ebola virus in West Africa and surrounding areas. Should the Ebola virus continue to spread, including to the countries in which we operate, or not be satisfactorily contained, our exploration, development and production plans for our operations could be delayed, or interrupted after commencement. Any changes to these operations could significantly increase costs of operations. Our operations require contractors and personnel to travel to and from Africa as well as the unhindered transportation of equipment and oil and gas production (in the case of our producing fields). Such operations also rely on infrastructure, contractors and personnel in Africa. If travel bans are implemented or extended to the countries in which we operate, including Angola or Gabon, or contractors or personnel refuse to travel there, we could be adversely affected. If services are obtained, costs associated with those services could be significantly higher than planned which could have a material adverse effect on our business, results of operations, and future cash flow.

***The oil and gas industry, including the acquisition of exploration acreage worldwide, is intensely competitive.***

The international oil and gas industry is highly competitive in all aspects, including the exploration for, and the development of, new sources of oil and gas. We operate in a highly competitive environment for acquiring exploration acreage and hiring and retaining trained personnel. Many of our competitors possess and employ financial, technical and personnel resources substantially greater than us, which can be particularly important in the areas in which we operate. These companies may be able to pay more for productive or prospective properties and prospects and to evaluate, bid for and purchase a greater number of properties and prospects than our financial or personnel resources permit. Furthermore, these companies may also be better able to withstand the financial pressures of unsuccessful drill attempts, delays, sustained periods of volatility in financial markets and generally adverse global and industry- wide economic conditions, and may be better able to absorb the burdens resulting from changes in relevant laws and regulations, which would adversely affect our competitive position. Our ability to acquire additional exploration prospects and to find and develop reserves in the future will depend on our ability to evaluate and select suitable properties and to consummate transactions in a highly competitive environment. Also, there is substantial competition for available capital for investment in the oil and gas industry. As a result of these and other factors, we may not be able to compete successfully in an intensely competitive industry, which could have a material adverse effect on our results of operations and financial condition, as well as on the market price of our common stock.

59

Table of Contents

*Participants in the oil and gas industry are subject to complex laws that can affect the cost, manner or feasibility of doing business.*

Exploration and production activities in the oil and gas industry are subject to extensive local, state, federal and international regulations. We may be required to make large expenditures to comply with governmental regulations, particularly in respect of the following matters:

- licenses and leases for drilling operations;

- foreign exchange and banking;

- royalty increases, including retroactive claims;

- drilling and development bonds and social payment obligations;

- reports concerning operations;

- the spacing of wells;

- unitization of oil accumulations;

- environmental remediation or investigation; and

- taxation.

Under these and other laws and regulations, we could be liable for personal injuries, property damage and other types of damages for which we may not maintain, or otherwise be protected by, insurance coverage. Failure to comply with these laws and regulations also may result in the suspension or termination of our operations and subject us to administrative, civil and criminal penalties. Moreover, these laws and regulations could change in ways that could substantially increase our costs. Any such liabilities, penalties, suspensions, terminations or regulatory changes could have a material adverse effect on our results of operations and financial condition, as well as on the market price of our common stock.

For example, Angola has enacted a new Foreign Exchange Law for the Petroleum Sector, which requires, among other things, that all foreign exchange operations be carried out through Angolan banks, that oil and gas exploration and production companies open local bank accounts in foreign currencies in order to pay local taxes and to pay for goods and services supplied by non-resident suppliers and service providers, and also that oil and gas exploration and production companies open local bank accounts in local currency in order to pay for goods and services supplied by resident suppliers and service providers. See "Business—Laws and Regulations of Angola and Gabon—Angola" for more information. These new rules require additional compliance efforts and costs on our and other industry participants' part, and may in some cases cause delay or other issues in connection with the acquisition of or payments for goods and services. Any of these consequences could have a material adverse effect on our results of operations.

*A cyber incident could result in information theft, data corruption, operational disruption, and/or financial loss.*

The oil and gas industry has become increasingly dependent on digital technologies to conduct day-to-day operations including certain exploration, development and production activities. For example, software programs are used to interpret seismic data, manage drilling rigs, conduct reservoir modeling and reserves estimation, and to process and record financial and operating data.

We depend on digital technology, including information systems and related infrastructure as well as cloud application and services, to process and record financial and operating data, communicate with our employees and business partners, analyze seismic and drilling information, estimate quantities of oil and gas reserves and for many other activities related to our business. Our business partners, including

60

Table of Contents

vendors, service providers, purchasers of our production, and financial institutions, are also dependent on digital technology. The complexity of the technologies needed to explore for and develop oil and gas in increasingly difficult physical environments, such as below-salt deepwater, and global competition for oil and gas resources make certain information more attractive to thieves.

As dependence on digital technologies has increased, cyber incidents, including deliberate attacks or unintentional events, have also increased. A cyber-attack could include gaining unauthorized access to digital systems for purposes of misappropriating assets or sensitive information, corrupting data, or causing operational disruption, or result in denial-of-service on websites. For example, in 2012, a wave of network attacks impacted Saudi Arabia's oil industry and breached financial institutions in the US. Certain countries, including China, Russia and Iran, are believed to possess cyber warfare capabilities and are credited with attacks on American companies and government agencies.

Our technologies, systems, networks, and those of our business partners may become the target of cyber-attacks or information security breaches that could result in the unauthorized release, gathering, monitoring, misuse, loss or destruction of proprietary and other information, or other disruption of our business operations. In addition, certain cyber incidents, such as surveillance, may remain undetected for an extended period. A cyber incident involving our information systems and related infrastructure, or that of our business partners, could disrupt our business plans and negatively impact our operations. Although to date we have not experienced any cyber-attacks, there can be no assurance that we will not be the target of cyber-attacks in the future or suffer such losses related to any cyber-incident. As cyber threats continue to evolve, we may be required to expend significant additional resources to continue to modify or enhance our protective measures or to investigate and remediate any information security vulnerabilities.

***We and our operations are subject to numerous environmental, health and safety regulations which may result in material liabilities and costs.***

We are, and our future operations will be, subject to various international, foreign, federal, state and local environmental, health and safety laws and regulations governing, among other things, the emission and discharge of pollutants into the ground, air or water, the generation, storage, handling, use and transportation of regulated materials and the health and safety of our employees. We are required to obtain various environmental permits from governmental authorities for our operations, including drilling permits for our wells. There is a risk that we have not been or will not be at all times in complete compliance with these permits and the environmental laws and regulations to which we are subject. If we violate or fail to comply with these laws, regulations or permits, we could be fined or otherwise sanctioned by regulators, including through the revocation of our permits or the suspension or termination of our operations. If we fail to obtain permits in a timely manner or at all (due to opposition from community or environmental interest groups, governmental delays, changes in laws or the interpretation thereof or any other reasons), such failure could impede our operations, which could have a material adverse effect on our results of operations and our financial condition.

We, as the named lessee or as the designated operator under our current and future oil leases and licenses, could be held liable for all environmental, health and safety costs and liabilities arising out of our actions and omissions as well as those of our third-party contractors. To the extent we do not address these costs and liabilities or if we are otherwise in breach of our lease or license requirements, our leases or licenses could be suspended or terminated. We have contracted with and intend to continue to hire third parties to perform the majority of the drilling and other services related to our operations. There is a risk that we may contract with third parties with unsatisfactory environmental, health and safety records or that our contractors may be unwilling or unable to cover any losses associated with their acts and omissions. Accordingly, we could be held liable for all costs and liabilities arising out of the acts or omissions of our contractors, which could have a material adverse effect on our results of operations and financial condition.

61

Table of Contents

As the designated operator of certain of our leases and licenses, we are required to maintain bonding or insurance coverage for certain risks relating to our operations, including environmental risks. We maintain insurance at levels that we believe are consistent with current industry practices, but we are not fully insured against all risks. Our insurance may not cover any or all environmental claims that might arise from our operations or those of our third-party contractors. If a significant accident or other event occurs and is not fully covered by our insurance, or our third-party contractors have not agreed to bear responsibility, such accident or event could have a material adverse effect on our results of operations and our financial condition. In addition, we may not be able to obtain required bonding or insurance coverage at all or in time to meet our anticipated startup schedule for each well, and if we fail to obtain this bonding or coverage, such failure could have a material adverse effect on our results of operations and financial condition.

Releases to deepwater of regulated substances are common, and under certain environmental laws, we could be held responsible for all of the costs relating to any contamination caused by us or our contractors, at our facilities and at any third party waste disposal sites used by us or on our behalf. These costs could be material. In addition, offshore oil exploration and production involves various hazards, including human exposure to regulated substances, including naturally occurring radioactive materials. As such, we could be held liable for any and all consequences arising out of human exposure to such substances or other damage resulting from the release of regulated substances to the environment, endangered species, property or to natural resources.

Particularly since the Deepwater Horizon event in the U.S. Gulf of Mexico in 2010, there has been an increased interest in making regulation of deepwater oil and gas exploration and production more stringent in the U.S. If adopted, certain proposals such as a significant increase or elimination of financial liability caps for economic damages, could significantly raise daily penalties for infractions and require significantly more comprehensive financial assurance requirements under OPA which could affect our results of operations and our financial condition.

In addition, we expect continued attention to climate change issues. Various countries and U.S. states and regions have agreed to regulate emissions of greenhouse gases ("GHG"), including methane (a primary component of natural gas) and carbon dioxide, a byproduct of oil and natural gas combustion. Additionally, the U.S. Congress has in the past and may in the future consider legislation requiring reductions in GHG emissions. The EPA began regulating GHG emissions from certain stationary sources in January 2011 and has enacted GHG emissions standards for certain classes of vehicles. The EPA has adopted rules requiring the reporting of GHG emissions, including from certain offshore oil and natural gas production facilities on an annual basis. In addition, in accordance with the Obama Administration's June 2013 Climate Action Plan ("CAP"), the EPA published proposed rules in January 2014 and June 2014 to regulate GHG emissions from new power plants and GHG emissions applicable to existing power plants, respectively. EPA announced it will finalize these proposals by summer 2015. The CAP also calls upon EPA and other governmental agencies to identify ways in which to reduce methane emissions from various sectors, including the oil and gas industry. On January 14, 2015, the White House unveiled these plans which, among other things directs the EPA to propose rules to regulate methane emissions from the oil and gas industry from new and modified sources by summer 2015, with a finalized rule in 2016. The EPA is also directed to expand the GHG Reporting Rule to cover all segments of the oil and gas industry. The regulation of GHGs and the physical impacts of climate change in the areas in which we, our customers and the end-users of our products operate could adversely impact our operations and the demand for our products.

Environmental, health and safety laws are complex, change frequently and have tended to become increasingly stringent over time. Our costs of complying with current and future environmental, health and safety laws, and our liabilities arising from releases of, or exposure to, regulated substances may adversely affect our results of operations and our financial condition. See "Business—Environmental Matters and Regulation."

Table of Contents

***Non-U.S. holders of our common stock, in certain situations, could be subject to U.S. federal income tax upon the sale, exchange or other disposition of our common stock.***

Our assets consist primarily of interests in U.S. oil and gas properties (which constitute U.S. real property interests for purposes of determining whether we are a U.S. real property holding corporation) and interests in non-U.S. oil and gas properties, the relative values of which at any time may be uncertain and may fluctuate significantly over time. Therefore, we may be, now or at any time while a non-U.S. investor owns our common stock, a U.S. real property holding corporation. As a result, under the Foreign Investment in Real Property Tax Act ("FIRPTA"), certain non-U.S. investors may be subject to U.S. federal income tax on gain from the disposition of shares of our common stock, in which case they would also be required to file U.S. tax returns with respect to such gain. Whether these FIRPTA provisions apply depends on the amount of our common stock that such non-U.S. investors hold and whether, at the time they dispose of their shares, our common stock is regularly traded on an established securities market (such as the New York Stock Exchange ("NYSE")) within the meaning of the applicable Treasury Regulations. So long as our common stock is listed on the NYSE, only a non-U.S. investor who has held, actually or constructively, more than 5% of our common stock may be subject to U.S. federal income tax on the disposition of our common stock under FIRPTA.

***We may incur substantial losses and become subject to liability claims as a result of future oil and natural gas operations, for which we may not have adequate insurance coverage.***

Several external factors could arise which would significantly impact our ability to effectively insure our oil and natural gas exploration and development operations. Should legislation be passed to increase the minimum insurance limit of the OSFR policy required for future U.S. Gulf of Mexico oil and natural gas exploration, there is no assurance that we will be able to obtain this insurance. The insurance markets may not provide products to financially insure us against all operational risks. For instance, civil and criminal penalties for environmental pollution can be very severe and may not be insurable. For some risks, we may not obtain insurance if we believe the market price of available insurance is excessive or prohibitive relative to the risks presented. For instance, we do not purchase business interruption or wind insurance due to the market pricing.

Even when insurance is purchased, exclusions in coverage, unanticipated circumstances and potentially large indemnity obligations may have a material adverse effect on our operations and financial condition. Because third-party contractors and other service providers are used in our offshore operations, we may not realize the intended protections of worker's compensation laws in dealing with their employees. Generally, under our contracts with drilling and other oilfield service contractors, we are obligated, subject to certain exceptions and limitations, to indemnify such contractors for all claims arising out of damage to our property, injury or death to our employees and pollution emanating from the well-bore, including pollution resulting from blow-outs and uncontrolled flows of hydrocarbons.

***Our level of indebtedness may increase and thereby reduce our financial flexibility.***

We have issued $2.68 billion aggregate principal amount of convertible senior notes (the "notes"). The notes do not contain restrictive covenants, and we may incur significant additional indebtedness in the future in order to make investments or acquisitions or to explore, appraise or develop our oil and natural gas assets. Our level of indebtedness could affect our operations in several ways, including the following:

- a significant portion or all of our cash flows, if and when generated, could be used to service our indebtedness;

- a high level of indebtedness could increase our vulnerability to general adverse economic and industry conditions;

Table of Contents

- a high level of indebtedness may place us at a competitive disadvantage compared to our competitors that are less leveraged and therefore, may be able to take advantage of opportunities that our indebtedness could prevent us from pursuing; and

- a high level of indebtedness may impair our ability to obtain additional financing in the future for our development projects, exploration drilling program, working capital, capital expenditures, acquisitions, general corporate or other purposes.

A high level of indebtedness increases the risk that we may default on our debt obligations. Our ability to meet our debt obligations and to reduce our level of indebtedness depends on our future performance. General economic conditions, risks associated with exploring for and producing oil and natural gas, oil and natural gas prices and financial, business and other factors affect our operations and our future performance. Many of these factors are beyond our control. We may not be able to generate sufficient cash flows to pay the interest on our indebtedness and future working capital, borrowings or equity financing may not be available to pay or refinance such indebtedness. Factors that will affect our ability to raise cash through an offering of our equity securities or a refinancing of our indebtedness include financial market conditions, the value of our assets and our performance at the time we need capital.

*The conditional conversion feature of our 3.125% senior convertibles notes due 2024, if triggered, may adversely affect our financial condition and operating results.*

If the conditional conversion feature of our 3.125% senior convertibles notes due 2024 is triggered, holders of such notes will be entitled to convert these notes at any time during specified periods outlined in the indenture governing such notes, at their option. If one or more holders elect to convert their notes, unless we elect to satisfy our conversion obligation by delivering solely shares of our common stock (other than cash in lieu of any fractional share), we would be required to settle a portion or all of our conversion obligation through the payment of cash, which could adversely affect our liquidity. In addition, even if holders do not elect to convert their notes, we could be required under applicable accounting rules to reclassify all or a portion of the outstanding principal of these notes as a current rather than long-term liability, which would result in a material reduction of our net working capital.

*Conversions of the notes may adversely affect our financial condition and operating results.*

Holders of notes will be entitled to convert the notes at their option at any time up until the maturity date, being December 1, 2019 for the 2.625% convertible senior notes due 2019 and May 15, 2024 for the 3.125% senior convertible notes due 2024. If one or more holders elect to convert their notes, unless we elect to satisfy our conversion obligation by delivering solely shares of our common stock (other than cash in lieu of any fractional share), we would be required to settle a portion or all of our conversion obligation through the payment of cash, which could adversely affect our liquidity. In addition, even if holders do not elect to convert their notes, we could be required under applicable accounting rules to reclassify all or a portion of the outstanding principal of the notes as a current rather than long-term liability, which would result in a material reduction of our net working capital.

*The accounting method for convertible debt securities that may be settled in cash, such as the notes, could have a material effect on our reported financial results.*

Under Accounting Standards Codification 470-20, Debt with Conversion and Other Options, which we refer to as ASC 470-20, an entity must separately account for the liability and equity components of the convertible debt instruments (such as the notes) that may be settled entirely or partially in cash upon conversion in a manner that reflects the issuer's economic interest cost. The effect of ASC 470-20 on the accounting for the notes is that the equity component is required to be included in the

64

Table of Contents

additional paid-in capital section of stockholders' equity on our consolidated balance sheet, and the value of the equity component would be treated as original issue discount for purposes of accounting for the debt component of the notes. As a result, we will be required to record a greater amount of non-cash interest expense in current periods presented as a result of the amortization of the discounted carrying value of the notes to their face amount over the term of the notes. We will report lower net income in our financial results because ASC 470-20 will require interest to include both the current period's amortization of the debt discount and the instrument's coupon interest, which could adversely affect our reported or future financial results, the trading price of our common stock and the trading price of the notes.

We may account for the notes utilizing the treasury stock method. The effect of this method is that the shares issuable upon conversion of convertible securities are not included in the calculation of diluted earnings per share except to the extent that the conversion value of such securities exceeds their principal amount. Under the treasury stock method, for diluted earnings per share purposes, the notes would be accounted for as if the number of shares of common stock that would be necessary to settle such excess, if we elected to settle such excess in shares, are issued.

However, we cannot be sure that the accounting standards in the future will continue to permit the use of the treasury stock method. If we are unable to use the treasury stock method in accounting for the shares issuable upon conversion of the notes, for whatever reason, then we would have to apply the if-converted method, the effect of which is that conversion will not be assumed for purposes of computing diluted earnings per share if the effect would be antidilutive. Under the if-converted method, for diluted earnings per share purposes, convertible debt is antidilutive whenever its interest, net of tax and nondiscretionary adjustments, per common share obtainable on conversion exceeds basic earnings per share. Dilutive securities that are issued during a period and dilutive convertible securities for which conversion options lapse, or for which related debt is extinguished during a period, will be included in the denominator of diluted earnings per share for the period that they were outstanding. Likewise, dilutive convertible securities converted during a period will be included in the denominator for the period prior to actual conversion. Moreover, interest charges applicable to the convertible debt will be added back to the numerator.

### Risks Relating to our Common Stock

***Our stock price may be volatile, and investors in our common stock could incur substantial losses.***

Our stock price may be volatile. The stock market in general has experienced extreme volatility that has often been unrelated to the operating performance of particular companies. The market price for our common stock may be influenced by many factors, including, but not limited to:

- to what extent our exploration wells are successful;

- the price of oil and natural gas;

- the success of our development operations, and the marketing of any oil and gas we produce;

- regulatory developments in the United States and foreign countries where we operate;

- the recruitment or departure of key personnel;

- quarterly or annual variations in our financial results or those of companies that are perceived to be similar to us;

- market conditions in the industries in which we compete and issuance of new or changed securities;

- increases in operating costs, including cost overruns associated with our exploration and development activities;

Table of Contents

- analysts' reports or recommendations;

- the failure of securities analysts to cover our common stock or changes in financial estimates by analysts;

- the inability to meet the financial estimates of analysts who follow our common stock;

- the issuance or sale of any additional securities of ours;

- investor perception of our company and of the industry in which we compete and areas in which we operate; and

- general economic, political and market conditions.

***A substantial portion of our total outstanding shares may be sold into the market at any time. This could cause the market price of our common stock to drop significantly, even if our business is doing well.***

All of the shares sold in our public offerings are freely tradable without restrictions or further registration under the federal securities laws, unless purchased by our "affiliates" as that term is defined in Rule 144 under the Securities Act of 1933, as amended (the "Securities Act"). Substantially all the remaining shares of common stock are restricted securities as defined in Rule 144 under the Securities Act. Restricted securities may be sold in the U.S. public market only if registered or if they qualify for an exemption from registration, including by reason of Rules 144 or 701 under the Securities Act. All of our restricted shares are eligible for sale in the public market, subject in certain circumstances to the volume, manner of sale limitations with respect to shares held by our affiliates, and other limitations under Rule 144. Additionally, we have registered all shares of our common stock that we may issue under our employee and director benefit plans. These shares can be freely sold in the public market upon issuance, unless pursuant to their terms these stock awards have transfer restrictions attached to them. Sales of a substantial number of shares of our common stock, or the perception in the market that the holders of a large number of shares intend to sell shares, could reduce the market price of our common stock.

***Conversion of the notes may dilute the ownership interest of existing stockholders, including holders who have previously converted their notes.***

The conversion of some or all of the notes may dilute the ownership interests of existing stockholders. Any sales in the public market of any shares of our common stock issuable upon such conversion could adversely affect prevailing market prices of our common stock. In addition, the anticipated conversion of the notes into shares of our common stock or a combination of cash and shares of our common stock could depress the price of our common stock.

***Holders of our common shares will be diluted if additional shares are issued.***

We may issue additional shares of common stock, preferred stock, warrants, rights, units and debt securities for general corporate purposes, including, but not limited to, repayment or refinancing of borrowings, working capital, capital expenditures, investments and acquisitions. We may issue additional shares of common stock in connection with complementary or strategic acquisitions of assets or businesses. We also issue restricted stock to our executive officers, employees and independent directors as part of their compensation. If we issue additional shares of common stock in the future, it may have a dilutive effect on our current outstanding stockholders.

***Ownership of our capital stock is concentrated among our largest stockholders and their affiliates.***

A small number of stockholders hold a majority of our common stock. These stockholders have influence over all matters that require approval by our stockholders, including the election of directors

Table of Contents

and approval of significant corporate transactions. This concentration of ownership may limit your ability to influence corporate matters, and as a result, actions may be taken that you may not view as beneficial. Furthermore, these stockholders may sell their shares of common stock at any time. Such sales could be substantial and adversely affect the market price of our common stock.

***Provisions of our certificate of incorporation and by-laws could discourage potential acquisition proposals and could deter or prevent a change in control.***

Some provisions in our certificate of incorporation and by-laws, as well as Delaware statutes, may have the effect of delaying, deferring or preventing a change in control. These provisions, including those providing for the possible issuance of shares of our preferred stock and the right of the board of directors to amend the by-laws, may make it more difficult for other persons, without the approval of our board of directors, to make a tender offer or otherwise acquire a substantial number of shares of our common stock or to launch other takeover attempts that a stockholder might consider to be in his or her best interest. These provisions could limit the price that some investors might be willing to pay in the future for shares of our common stock.

***Provisions of the notes could discourage an acquisition of us by a third party.***

Certain provisions of the notes could make it more difficult or more expensive for a third party to acquire us, or may even prevent a third party from acquiring us. For example, upon the occurrence of a fundamental change, holders of the notes will have the right, at their option, to require us to repurchase all of their notes or any portion of the principal amount of such notes in integral multiples of $1,000. In addition, the acquisition of us by a third party could require us, under certain circumstances, to increase the conversion rate for a holder who elects to convert its notes in connection with such acquisition. By discouraging an acquisition of us by a third party, these provisions could have the effect of depriving the holders of our common stock of an opportunity to sell their common stock at a premium over prevailing market prices.

***We do not intend to pay dividends on our common shares and, consequently, your only opportunity to achieve a return on your investment is if the price of our shares appreciates.***

We do not plan to declare dividends on shares of our common stock in the foreseeable future. Consequently, investors must rely on sales of their shares of common stock after price appreciation, which may never occur, as the only way to realize a return on their investment.

## Item 1B.   *Unresolved Staff Comments*

Not applicable.

## Item 2.   *Properties*

Please refer to the information under the caption "Business" in this Annual Report on Form 10-K.

## Item 3.   *Legal Proceedings*

We are currently, and from time to time we may become, involved in various legal and regulatory proceedings arising in the normal course of business.

On November 30, 2014, two purported stockholders, St. Lucie County Fire District Firefighters' Pension Trust Fund and Fire and Police Retiree Health Care Fund, San Antonio, filed a class action lawsuit in the U.S. District Court for the Southern District of Texas on behalf of a putative class of all purchasers of our securities from February 21, 2012 through November 4, 2014 (the "*St. Lucie* lawsuit"). The *St. Lucie* lawsuit, filed against us and certain officers, former and current members of

67

Table of Contents

***West Africa Segment:***

*Oil and gas revenue.*   We have not yet commenced production activities in West Africa. Therefore, we did not realize any oil and gas revenue during the years ended December 31, 2014 and 2013.

*Operating costs and expenses.*   Our operating costs and expenses for our West Africa operations consisted of the following during the years ended December 31, 2014 and 2013:

*Seismic and exploration.*   Seismic and exploration costs increased by approximately $28.5 million during the year ended December 31, 2014, as compared to the year ended December 31, 2013. The increase was primarily attributed to an increase of $37.6 million in exploration expenses, offset by a decrease of $9.1 million in seismic costs. During the year ended December 31, 2014, seismic and exploration expenses included $34.4 million in standby costs associated with the Ocean Confidence and SSV Catarina drilling rig, $5.6 million associated with the early contract termination of support vessels and helicopters, $1.4 million in custom fees and freight charges and $12.6 million in seismic costs. During the year ended December 31, 2013, seismic and exploration expenses included $3.8 million in standby costs associated with acceptance testing and drilling equipment issues with the Ocean Confidence drilling rig and $21.7 million in seismic costs.

*Dry hole expense and impairment.*   Dry hole expense and impairment decreased by $40.3 million during the year ended December 31, 2014 as compared to the year ended December 31, 2013. The decrease is due to dry hole expense during the years ended December 31, 2014 and 2013 as reflected in the following table:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2014** | **2013** | **Increase (Decrease)** |
| | ($ in thousands) | | |
| ***Impairment of Unproved Leasehold:*** | | | |
| Block 9 prospect | $ 2,500 | $ — | $ 2,500 |
| ***Dry Hole Expense(1):*** | | | |
| Cameia #2 drill stem test(2) | 2,046 | 81,607 | (79,561 ) |
| Diaman #1 exploration well | — | 17,066 | (17,066 ) |
| Mavinga #1 exploration well | — | 12,520 | (12,520 ) |
| Lontra #1 exploration well | — | 32,247 | (32,247 ) |
| Loengo #1 exploration well | 52,672 | — | 52,672 |
| Mupa #1 exploration well | 46,489 | — | 46,489 |
| ***Other Impairment:*** | | | |
| Obsolete inventory | — | 571 | (571 ) |
| | $ 103,707 | $ 144,011 | $ (40,304 ) |

(1)   The amounts listed above and charged to dry hole expense for our Lontra #1 and Mavinga #1 exploration wells only relate to the costs associated with drilling the lowest intervals beneath the pay zones. The majority of the well costs associated with our Lontra #1 and Mavinga #1 exploration wells were capitalized as of December 31, 2013 and will remain suspended pending further evaluation of these wells. The amounts listed above for our Cameia #2 Drill Stem Test and Diaman #1, Loengo #1 and Mupa #1 exploration wells were abandoned and were charged to dry hole expense.

(2)   The amounts listed above and charged to dry hole expense for the Cameia #2 drill stem test only relate to the costs associated with the testing of a geologic zone beneath the pay zone reservoirs encountered by the Cameia #1 and Cameia #2 wells.

# EXHIBIT 68



# The Angolan Presidency: The Epicentre of Corruption

Rafael Marques de Morais

# Index

Movicel ........................................................................................................................... 4

    Portmill, Investimentos e Telecomunicações (40%) ................................................. 6

    Modus Comunicare - Telecomunicações (19%) ......................................................... 6

    Ipang – Indústria de Papel e Derivados, Limitada (10%) ......................................... 7

    Lambda (6%) ............................................................................................................. 7

    Novatel (5%) ............................................................................................................. 8

    Notes on Movicel ..................................................................................................... 9

Banco Espírito Santo Angola .......................................................................................... 11

Biocom – The Angolan Bio-Energy Company ................................................................. 14

Nazaki Oil ....................................................................................................................... 16

Media Nova .................................................................................................................... 21

World Wide Capital ........................................................................................................ 22

Lumanhe ........................................................................................................................ 23

Conclusions .................................................................................................................... 24

## Introduction

This report shows how the Presidency of the Republic of Angola has become the site of shady business deals, a fact that has consequences for citizens' freedom and development, as well as for the country's political and economic stability. The text responds President José Eduardo dos Santos's call, on 21 November 2009, for a zero tolerance policy against corruption.

For the sake of clarity, this investigation limits itself to a small demonstration of the business practices employed by the minister of State and head of the Military Bureau (*Casa Militar*) in the Presidency, General Manuel Hélder Vieira Dias Júnior "Kopelipa". This is the man responsible for co-ordinating the defence and security sectors of the state. General Kopelipa is one of the triumvirate that today dominates Angola's political economy, along with General Leopoldino Fragoso do Nascimento "Dino", the presidency's head of telecommunications, and Manuel Vicente, the chairman and CEO of the national oil company, Sonangol. Their dealings acknowledge no distinction between public and private affairs. Manuel Vicente is the link that connects the considerable powers accumulated by the generals, to Sonangol and to his own position as one of the most powerful members of the MPLA Political Bureau, for being the president's protégé, and in charge of overseeing the private business dealings of the ruling party.

Sonangol is the biggest company in the country and the state's major source of revenue. Several analysts have viewed Sonangol as the most important factor in ensuring the survival of President Dos Santos's regime – in the worlds of finance, politics and diplomacy as well as the main source of illegal self-enrichment for the top state officials.

In some instances the report refers to the relationships of mutual interest and complicity with other members of the government and public officials in carrying out

business, that involves the looting of state assets, and other acts that go against the law of the land.

Key sectors such as petroleum, telecommunications, banking, media and diamonds form part of the business empire built by these figures. The firms involved include Movicel, Biocom, Banco Espírito Santo Angola, Nazaki Oil & Gás, Media Nova, World Wide Capital and Lumanhe.[1]

The report frequently refers to the Law on Public Probity, even in cases that date from before it was signed into law in March 2010 and consolidated various anti-corruption provisions that had been in force since 1989.[2] All of the articles contained within the Law on Public Probity can be found among this earlier body of law. In the interests of greater clarity, this text therefore refers to the Law on Public Probity as an overarching reference to the laws in force since 1989. For instance, the Law on the Crimes Committed by Public Office Bearers (Law 21/90) prohibits public office bearers from entering into business deals over which they would have influence or decision-making powers in the course of their official duties (art. 10, 2).

## Movicel

There are currently only two mobile phone operators in the country, Unitel and Movicel. As a private operator, Unitel started its services in 2001, as a joint-venture between Sonangol, Portugal Telecom and two Angolan private companies GENI and Vidatel, each one with 25% of the shares.

Last year, through Resolution 67/09 of 26 August, the Council of Ministers ordered, without a public tender process, that Movicel be privatised and sold off to a

---

[1] The cases disclosed in this paper are based on official records in my possession. Otherwise, the secondary sources used are identified in the footnotes.

[2] The Decree 23/90 (On the Patrimonial Benefits of Public Office Bearers), the Decree 24/90 (On the Rules for Gifts to Public Office Bearers), the Law 22/90 (Law on the State Discipline), the 13/96 (Statutory Law for Members of Government and their Salaries) constitute the body of legislation harmonised in the Law on Public Probity, and thus by the latter revoked.

consortium of Angolan businessmen at a cost of US$200 million. The Council of Ministers tried to justify the decision by referring to the difficulty in finding investors for the privatisation of the company, and to the urgency to raise funds for the government coffers "in the face of the global financial crisis".  This decision, according to the government, had been made possible by the identification of "national private investors who can guarantee the essential financial resources for the immediate implementation of Movicel's investment plan, and to boost the financial reserves hoped for by the national treasury".

In the meantime, 59% of Movicel's capital was transferred to two companies formally belonging to high-ranking officers subordinate to General Kopelipa: Portmill and Modus Comunicare. On 10 June 2009, General Kopelipa, General Dino and Manuel Vicente, formally left Portmill Investimentos e Telecomunicações, of which they had been the owners with 99,96% of the capital, split evenly among themselves. They gave up their shares, through Portuguese business manager Ismênio Coelho Macedo, to a group of high-ranking officers in the Presidential Guard. This is a unit which falls under the Military Bureau. Regarding Portmill, Lieutenant-Colonel Leonardo Lidinikeni, officer of the president's security detail, holds 99,96% of the shares in the company. Lieutenant-Colonel Tadeu Agostinho dos Santos Hikatala, officer of the presidential security detail, holds 99.92% of the shares in Modus Comunicare.

Ismênio Coelho Macedo also had the task of buying and restructuring a small communications, advertising and marketing company Modus Comunicare – Comunicação e Imagem Ltd, whose shares were never sold publicly, but rather divided out among top officers in the Presidential Guard. On 14 August 2009 the company was transformed into a limited company dedicated to telecommunications. This date shows that the legal process to change the company's status was concluded only two weeks after Dos Santos's government had granted it 19% of Movicel's capital.

On 29 July 2009, the Council of Ministers approved the privatisation of 80% of Movicel's capital by the Angolan companies Portmill Investimentos e Telecomunicações (40%), Modus Comunicare (19%), Ipang – Indústria de Papel e Derivados (10%), Lambda (6%) and Novatel (5%). The remainder of Movicel's capital is held by the state enterprises Angola Telecom and Empresa Nacional de Correios e Telégrafos de Angola, with 18% and 2% respectively.

These tables show the companies that benefited, and their shareholders.

### Portmill, Investimentos e Telecomunicações (40%)

| Shareholder | Role |
| --- | --- |
| Lieutenant-Colonel Leonardo Lidinikeni | Officer of the President's Security Detail, Presidential Guard |
| Francisco Ndeufeta | |
| Manuel dos Santos Rodrigues Cardoso | |
| Nelson Paulo António | |
| Lieutenant Colonel Francisco Mbava | Psychological Action Department  Military Bureau of the Presidency |

### Modus Comunicare - Telecomunicações (19%)

| Shareholder | Role |
| --- | --- |
| Lieutenant Colonel Tadeu Agostinho dos Santos Hikatala | Officer of the President's Security Detail, Presidential Guard |
| João Ricardo Belarmino | |
| Lieutenant Colonel João José António Soares | Adviser to the head of the Presidential Guard, General Alfredo Tyaunda |
| José Kakonda | |
| Colonel José Luís Alves | Military Bureau of the Presidency |

## Ipang – Indústria de Papel e Derivados, Limitada (10%)

| Shareholder | Role |
|---|---|
| N'datembu – Comércio Geral, Importação e Exportação Ltda. | |

Ipang is the only beneficiary company that has businessmen in its shareholding structure. These are Miguel Domingos Martins and his three children, lawyer Ildeberto Manuel Teixeira and the Portuguese national José Mamade Etbal. Another businessman associated with Ipang is Spanish national Óscar Ouersagasti Soraluce. Ipang's only publicly known business activity is its shareholding participation in Movicel.

More information about Ipang and its other potential investors will be updated in due time.

## Lambda (6%)

| Shareholders | Role |
|---|---|
| José Carvalho da Rocha | Minister of Telecomunications and Information Tecnologies |
| Aristides Safeca | Deputy minister of Telecomunications |
| Zulmira Mitange da Rocha | Wife of minister José Carvalho da Rocha |
| Arminda Vireya Safeca de Sá | Relative of deputy minister Aristides Safeca |
| Antónia Dias dos Santos Caxinda | |

While serving as National Director of Telecommunications, Aristides Cardoso Frederico Safeca took part in Movicel's Privatisation Board, in accordance with Despatch 67/07 by Finance Minster José Pedro de Morais, dated 19 January 2007. This commission was headed by the then economic advisor to President dos Santos, Archer Mangueira.

Since October 2006, Aristides Safeca has also been chairman and chief executive of a Belgian company Parisa. Aristides Safeca and his brothers Alcides Safeca, who is secretary of State for the Budget in the Finance Ministry, and Amílcar Safeca, the director of the mobile phone operator Unitel, hold a majority share in Trans Omnia, where they are in partnership with General Fernando Vasquez Araújo, head of the Chief Directorate for Weapons and Technology of the Joint Chiefs of Staff of the Angolan Armed Forces (FAA). Trans Omnia has benefited from multimillion-dollar contracts for supplying foodstuffs to the FAA, a topic that will be dealt with on another occasion.

In spite of the new Law on Probity, Aristides Safeca still enjoys impunity as he muddles up his public duties with his private affairs. While deputy minister of Telecommunications he is also chairman and administrator of Parisa, a foreign enterprise, and continues to do numerous business deals with the state to his own self-enrichment and that of his family and associates.

## Novatel (5%)

| Shareholder | Role |
|---|---|
| Hélder Bruno da Gama Bento | Former head of Movicel's legal department |
| Paula Sammer Pinto Jorge | |
| Aurélio Vimbuando Muelecumbi | |
| Onezandro Catinhe Mauro | |
| Santos Piedade | |
| Marília da Conceição dos Santos Kissuá | |

The transfer of 5% shares of Movicel to Novatel is yet another example of the misappropriation of state property. Novatel was created on 29 April 2009 after the report from Movicel's Privatisation Board and three months before the Council of Ministers announced the beneficiaries of the privatisation process.

At the time Movicel was formally privatised, the shareholders of Novatel had no private or collective assets which could have qualified them as entrepreneurs. One person involved with Novatel denied being the real beneficiary. However, even though there are legal loopholes to conceal the names of beneficiaries, the names stated above are of the registered shareholders who, in accordance to the statutes of Novatel (art. 5, 1) are the real owners. Thus, by all means, these individuals are formally responsible for the legal rights and obligations entitled to the registered shareholders.

## Notes on Movicel

The names among the shareholders in the businesses that were granted shares as a result of the privatisation of Movicel clearly illustrate the government's dishonesty. Contrary to the official explanation, this was not a deal that involved a group of national private investors, and certainly not one with the kind of financial resources that the treasury so needed in the light of "the global financial crisis". There has been no public or official confirmation that the sum of US$200 million has been paid to the state. Moreover, several economists have estimated that Movicel is worth a few times more than that sum. The deal was simply a case of handing out state assets to individuals, in which General Kopelipa, with the connivance other influential bodies close to the presidency, and the Telecommunications and Information Technology Ministry are the main beneficiaries.

In terms of the Law on Public Probity, members of the government and high officials in the presidency are breaking the law in various ways. The principle of public

probity prohibits any public servant from accepting loans, favours or gifts that might affect "the independence of his or her judgement and the credibility and authority of the public administration and its institutions and services".

The privatisation of Movicel can be seen as an unscrupulous act by the head of government, President Dos Santos, in granting favours to his subordinates. One lawyer, who preferred to write anonymously, describes the privatisation of Movicel as "an administrative act suffering from the vice of abusing power for the sake of private interest". According to the lawyer, this abuse of power occurs "when the administration does not pursue the ends of public interest but rather of private interest, for reasons of family relationships, friendship… corruption, or any other motives of a private nature". [3]

Movicel under public ownership was one of the most profitable and well organised of the state businesses, with more than 2.5 million customers. The privatisation of Movicel did not make it more efficient, or bring in more money for the state. At the same time the privatisation undermined market competitiveness and further weakened the standing of the private sector, by strengthening the grip that government officials, doubling as businessmen, have over the private sector as a result of the plundering of state assets.

The same lawyer discusses the legal invalidity of the privatisation of Movicel. "The absence of public tender, as required by the law, renders null the procedure and subsequent contracts, owing to the omission of an essential element" (Articles 76(2) line f and 127 of Legal Decree 16A/95 of 15 December).

---

[3]  See *Semanário Angolense*, "A (i)legalidade do processo de privatização da Movicel", http://semanario-angolense.com/home/semanario_angolense_333.pdf,       Number   333,   12-19 September 2010, page 29.

According to the lawyer's arguments:

> Article 77 of the same law establishes that:  1. A null act has no judicial effect, independent of the declaration of nullity. 2. Nullity may be invoked at any time by any interested party, and can be declared at any time by any administrative body or by any court.

Likewise, the public servants who benefited from the privatisation of Movicel are committing an act conducive to illegal enrichment in terms of the Law on Public Probity (article 25, a), by receiving percentages in a private business deal with the state. The same public servants are committing deeds harmful to public patrimony, in terms of the Law on Public Probity (article 26, 2, a) by incorporating a public business into their private portfolios.

Another serious question with respect to the privatisation of Movicel has to do with the nature of the regime that is highly dependent on the security services, contrary to the precepts of the rule of law. Telecommunications are a very sensitive area for the intelligence services and are fundamental to the process of keeping watch on relationships between citizens. Through its private control of both the mobile phone operators in the country, the presidential inner circle is in a position to arbitrarily spy on citizens and limit their freedom of expression for private ends. General Leopoldino Fragoso do Nascimento, the head of the president's telecommunications, is a shareholder of Geni, which controls 25% of shares in Unitel.

## Banco Espírito Santo Angola

On 10 December 2009, the company Portmill, Investimentos e Telecomunicações, headed by high-ranking officials of the Military Bureau of the Presidency and the Presidential Guard bought 24% of the shares in Banco Espírito Santo Angola (BESA)

for US$375 million.[4] Banco Espírito Santo (BES Portugal), the seller, retains the majority shareholder, with 51.94% of the shares.

The Portuguese bank has so far avoided commenting on its relationship with Portmill's shareholders, and it has not replied to questions submitted by the Portuguese daily newspaper *Público* on the subject.[5] On July 19, after a brief phone call the author emailed the following questions to BES media department: "How could BES accept a business deal worth 375 million dollars tabled by military officers on duty? Did it question the source of the funds involved and the legality of the act?" BES media office replied that the questions should be directed to BES Angola, as it is an autonomous institution. However, the author insisted with BES, without success, because the holder of the shares sold to Portmill was BES, as reported in the statement the latter sent to the Portuguese regulation authority (CMVM) and public statements by BES CEO, Ricardo Espírito Santo Salgado.[6]

This deal raises two pressing questions about the origin of the funds that serving soldiers, as the legitimate owners of the business, paid as part of the transaction. Second, it means the Portuguese bank, headed by Ricardo Salgado, is effectively laundering money acquired illegally through the plunder of Angolan state assets.

The officials of the Military Bureau and the Presidential Guard have two ways of raising capital: through holding private assets, or through a bank loan. From the legal point of view these two options call attention to the limitations prescribed in law. Public servants are prohibited from soliciting or accepting loans "that might call into question their liberty of action, the independence of their judgement and the credibility and authority of the public administration and its institutions and services" (Law on Public Probity, article 5).

---

[4] See statement by Banco Espírito Santo: http://web3.cmvm.pt/sdi2004/emitentes/docs/FR26301.pdf
[5] The article *Chefe da Casa Militar de Eduardo dos Santos é o novo accionista do BES Angola,* printed by the daily Público, Issue 7197, pp. 23, refers to BES' unresponsiveness to comment on the deal.
[6] See Ricardo Espírito Santo Salgado's editorial at http://www.bes.pt/sitebes/cms.aspx?plg=46f992b2-8aa2-48ba-9469-d9495957dc95

It is not publicly known whether the new partners in the Banco Espírito Santo are the heirs to family fortunes or whether they have got rich through private careers. Assuming they do not have assets of hundreds of millions of dollars, the other possibility is a loan. According to the legal provisions mentioned above, the granting of a bank loan to high officials of the Angolan army, whose task is the physical protection of the President of the Republic and of the Presidency in general, raises serious questions about national security and the physical security of the nation's highest official. This question deserves further consideration in this article's conclusions.

The Law on Public Probity (article 25 g) defines illegal enrichment as "acquiring for oneself or for another, in the exercise of one's duties, responsibilities, employment or public function, goods of any nature whose value is disproportionate to the capital gains or income of the public servant."

Neither Banco Espírito Santo, an institution of international repute, nor the Military Bureau of the Presidency are in a position to explain the proportionality between the earnings of the military officers in question, and the size of the deal that was signed.

Nevertheless, General Kopelipa, General Dino and Manuel Vicente must respond publicly to the question of the transfer of the Portmill shares. For what reason did they, as the owners, transfer title in Portmill to members of the Presidential Guard? Also worth noting in this operation is the executive role of Ismênio Coelho Macedo, who is also chief executive of Banco Privado Atlântico (BPA), a private institution in which Sonangol has a 19.5% shareholding. Until the year 2000, Macedo was the director in Angola of Banco Português do Atlântico (BPA).

At the same time it should be noted that the Presidency and the presidential family have perfected the practice of promiscuity between public duty and private interests. For example, in 2004 President dos Santos allowed the setting up of the business management company Luzy, involving his daughter Tchizé dos Santos, the head of the Presidential Guard, general Alfredo Tyaunda, and the then presidential

advisor, general Clemente Cunjuca. The latter is currently deputy minister for War Veterans.

Similarly, on 30 May 2001, Generals Kopelipa, Alfredo Tyaunda, and Clemente Cunjuca, set up a company called Lunha Imobiliária, with José Leitão who at the time was the chief of staff of President Dos Santos. This group of high officials brought in other shareholders in the persons of the president's uncle (godfather) and nephew, José Pereira dos Santos Van-Dúnem and Catarino Avelino dos Santos. In 2002, Lunha partnered with four offshore companies, namely Valuta Investimentos, Landon Holdings, Oakleigh Holdings e Osmond Investimentos, in the creation of Lunha Investimentos. The latter recently built a condominium with 58 luxury residences, priced at up to four million dollars per unit, on a site linked to the Military Bureau in the Morro Bento neighbourhood of Luanda.


## Biocom – The Angolan Bio-Energy Company

On 24 July 2009 the Council of Ministers approved the Unidade Agro-Industrial de Cacuso project in Malanje province, to grow and process sugar cane. Valued at US$272.3 million, the project aims to produce sugar, alcohol and biofuel.

Companhia de Bionergia de Angola (Biocom) had already been set up on 25 October 2007, by the Brazilian multinational Odebrecht, the Angolan private company Damer Indústria S.A., (each with a 40% share) and Sonangol Holdings (with 20%).

Odebrecht Angola offered to respond to questions about its dealings in Biocom, but could not do it on time as its director in charge of the project was on holiday.

As has become normal with the investments approved by the Council of Ministers that involve partnerships between foreign multinationals and Angolan private companies, a considerable amount of the shareholding was allocated to political

leaders. Damer Indústria, created on 26 July 2010, is owned jointly by General Kopelipa and General Dino in partnership with Manuel Vincente of Sonangol. In the document that officially approved the project, Resolution 63/09 of 18 August, the Council of Ministers once again spoke of the desire to promote Angolan private business initiatives. Damer was created three months before Biocom, and its owners are not entrepreneurs but public servants. The Law on Public Probity defines a public servant as "a person who exercises duty, responsibility, employment or function in a public entity, by virtue of election, nomination or contract (…)". The law explicitly applies to members of central government (article 2 d), those who control the public assets of the armed forces (article 2,h) and the managers of public enterprises (article 2,i) as public servants.

So, the Biocom project involves various acts of corruption. First, Odebrecht is involved in influence peddling and the corruption of Angolan officials. The bribery and corruption of public officials are defined and criminalised in articles 318 to 323 of the Angolan Penal Code, with penalties laid down in the Law on Economic Crimes (Law 13/03).

The Conventions against Corruption of the African Union (article 4, 1, f) and the United Nations (article 18, a, b) as well as the SADC Protocol against Corruption (article 3, 1, f) all clearly define influence peddling as an act of corruption. These international agreements were incorporated into Angolan law and transgression of their provisions was made punishable by article 321 of the Angolan Penal Code.

Secondly, Sonangol's chairman, Manuel Vicente, is using its subsidiary Sonangol Holdings and public funds in establishment of Biocom, in which he is a private shareholder: an act contrary to the law. Moreover, according to the weekly newspaper *O País*,[7] the Banco Africano de Investimentos (BAI) is at the head of a syndicate that is to finance the project to the tune of US$168 million. BAI is a private bank whose main shareholder is Sonangol, a public entity, and which has Manuel

---

[7] http://www.opais.net/pt/opais/?det=4818

Vincente as its vice-chairman. Manuel Vicente is also a private shareholder in BAI, holding 5% of its share through his offshore company ABL.[8] By using his position in Sonangol to gain control of 5% of BAI's shareholding for his own personal enrichment, Manuel Vicente is involved in an act of corruption as defined in article 321 of the Angolan Penal Code.

Thirdly, the deal involves President dos Santos himself. During his visit to Brazil from 22 to 25 June 2010, Dos Santos met the chairman of Odebrecht, Marcelo Odebrecht. They discussed Biocom and Odebrecht's desire to expand its investments in Angola. In his official speech during his meeting with President Lula da Silva, Dos Santos asked for Brazil's support for "projects that seek to create alternative sources of energy, both solar and from biofuels, for which Brazil's already significant experience in these areas may be of great help". His concern for a deal that was made possible by the corruption of the two generals closest to him and on whom the security of his continued rule depends, puts Dos Santos in the dubious position as either the patron of these acts or a hostage of his generals.

**Nazaki Oil**

Through Legal Decrees 14/09 and 15/09 of 11 June 2009, the Council of Ministers granted to Sonangol, as national concession holder, "the mining rights for prospecting, research, development and production of liquid and gaseous hydrocarbons" in the deepwater blocks 21 and 9, respectively. This decision was taken in accordance with Law 10/04 (article 44, 2) according to which all such rights shall be granted by the State to Sonangol.

To this end, the government ratified the consortium set up between Sonangol, the Angolan private company Nazaki Oil & Gas and the American company Cobalt International Energy, the latter being designated as the operator of blocks 9 and 21.

---

[8] See *Angola Case Study: Exploiting Poor PEP Controls,* page 310, section inserted into the report of the US Senate Permanent Subcommittee on Investigations, titled *Keeping Foreign Corruption out of the United States: Four Case Histories – Angola Case Study,* published 3 February 2010.

Cobalt International Energy's founders and main shareholders are Goldman Sachs, and a partnership between the Carlyle Group and Riverstone Holdings, with an initial investment of US$500 million in 2005.[9] To a certain extent, these latter two shareholders are investing Angolan public money in the business, since Sonangol has invested about US$500 million in the Carlyle Group and Riverstone Holdings energy fund.[10]

According to Global Witness, Cobalt has refused to name the owners of Alper Oil – which became involved in the deal at a later stage – and Nazaki, arguing that this would "involve selective disclosure of non-public company information and, in some cases, to do so would also be a breach of the confidentiality provisions of agreements by which [Cobalt] are bound".[11] This argument is fallacious since Angolan law does not provide for corrupt acts to be protected by confidentiality or by any other juridical mechanism, since corruption is clearly defined as an illegal and criminal act.

Cobalt has gone ahead with the deal, which was executed at the end of February, even though it warned in its own U.S. regulatory filings: "We have not worked with either of these companies in the past, and, therefore, our familiarity with these companies is limited. Violations of the FCPA [Foreign Corrupt Practices Act] may result in severe criminal or civil sanctions, and we may be subject to other liabilities, which could negatively affect our business, operating results and financial condition."[12]

---

[9] See The Carlyle Group (2005) "Carlyle/Riverstone and Goldman Sachs to invest $500 million in Cobalt International Energy, a New Oil & Gas Exploration and Production Company"
http://www.carlyle.com/media%20room/news%20archive/2005/item7059.html

[10] See the column referring to other active financers in Sonangol's Financial Statements (*Demonstrações Financeiras da Sonangol*) mentioned in the Ernst and Young Auditor's Report, 2008.
http://www.sonangol.co.ao/wps/wcm/connect/a996d180424f8abe883c9ad909a3036f/SEPFinancialStatements08.pdf?MOD=AJPERES

[11] See Global Witness press statement on the risks of corruption in the negotiations around blocks 9 and 21
http://www.globalwitness.org/media_library_detail.php/970/en/goldman_sachs_backs_angolan_oil_deal_despite_corruption_risks

[12] Cobalt International Energy. 10-K filing for 2009. Page 51.

In fact, Cobalt's top executives, including its director general Joseph Bryant, have plenty of experience of working in Angola as managers for BP in the country, and their argument appears like an attempt to justify themselves in terms of American laws, and demonstrates arrogance in relation to Angolan laws.

The ownership of Nazaki Oil & Gas is shared equally among the same three men whose names have occurred repeatedly in this investigation: General Kopelipa, General Dino, the head of telecommunications at the presidency, and Manuel Vicente, the chairman and CEO of Sonangol. Four subordinates of General Kopelipa, who front the company, hold each 0,01% of the shares. They are namely Colonel José Manuel Domingos "Tunecas", his chief of staff, Colonel João Manuel Inglês, his logistics officer, Colonel Belchior Inocêncio Chilembo, his advisor, and Domingos Manuel Inglês, his private business assistant.

The company has three subsidiaries, created on 23 July 2008: Nazaki Distribuição – Sociedade de Distribuição de Combustível e Lubrificantes SA (distribution), Nazaki Refinaria – Sociedade de Refinação e Petróleo SA (refineries), and Nazaki Petroquímica – Sociedade Petroquímica SA (petrochemical).

On 24 February 2010, Cobalt International Energy signed the Risk Services Agreements for exploration, research and production in offshore blocks 9 and 21. The agreements were signed by Sonangol, Sonangol Pesquisa e Produção (research and production), Nazaki, and a further Angolan company, Alper Oil, which initially had not been expected to receive government authorisation. The shareholding structure is identical for blocks 9 and 21: Cobalt (40%), Nazaki (30%), Sonangol Pesquisa & Produção (20%) and Alper Oil (10%).

According to Cobalt, it "obtained a written approval from Sonangol dated March 3, 2010 for expenditures incurred for technical work on Blocks 9 and 21 offshore Angola as pre-RSA expenditures for future tax deductibility. As a result, Nazaki will

reimburse the Company for its share of the leasehold bonus and related pre-RSA seismic expenditures incurred on these Blocks".[13]  Cobalt paid the US$3.7 million signature bonuses owed by Nazaki (article 21, 1 of the contract for Block 21) plus 1.5 million (article 21, 1 of the contract for Block 9) to Sonangol.[14] How can a company listed on the New York Stock Exchange and which employs the services of two reputable legal firms justify making payments on behalf of a private company (Nazaki) that is owned by the inner circle of the Angolan presidency?

The allocation of Blocks 9 and 12 to the consortium led by Colbalt, without public tender, was ratified by the then Prime Minister and current Speaker of the National Assembly, Paulo Kassoma, and promulgated by President dos Santos. Both these men were therefore fully aware of who the beneficiaries of the deal were. From the legal point of view, these figures at the very top of government gave their assent to an act of corruption. Angolan law, as this article has already demonstrated, forbids political leaders and public officials from carrying out business with the state for their own personal benefit and enrichment.

Cobalt is also involved in criminal acts. What it has done can be described as influence peddling in terms of the Conventions Against Corruption of the African Union (article 4, 1, f) and the United Nations (article 18, a, b) as well as the SADC Protocol Against Corruption (article 3, 1, f), all of which define influence peddling as an act of corruption. These international agreements were incorporated into Angolan law and transgression of their provisions was made punishable by article 321 of the Angolan Penal Code. As an illustration, Cobalt was involved in a business deal with Manuel Vicente, who as the chairman CEO of Sonangol, is a representative of the state. Nazaki's partnership with Manuel Vicente and Generals Dino and Kopelipa – the latter extremely close to the president – amounts not only to

---

[13] See Risk Services Agreement between Sonangol, Cobalt, Sonangol Pesquisa & Produção, Nazaki and Alper Oil for block 21 (pp. 33) at http://sec.edgar-online.com/cobalt-international-energy-inc/s-1a-securities-registration-statement/2009/10/30/section63.aspx  and for block 9 (pp. 27) at http://www.secinfo.com/dVut2.r2t6.b.htm
[14] Ibid.

influence peddling but also to active corruption of officials, according to the Angolan Penal Code (article 321).

The lack of transparency in Angola, particularly in the petroleum sector, has been brought to international attention by western governments and NGOs. The Soros Foundation and the Open Society Institute, founded by the American billionaire philanthropist, George Soros, have been particularly bold in persuading the government to promise better scrutiny in the sector. After months of negotiations, on 13 November 2003 Soros was expecting to sign an agreement with Sonangol and the Angolan government to guarantee transparency in government and in particular in the petroleum sector. However, at the last moment the government pulled out of the agreement.

Seven years later, Soros has emerged as a notable shareholder in Cobalt through Soros Fund Management, which holds 5.9 million Cobalt shares, valued at US$81.1 million. Soros's proposed transparency agreement would have offered technical and financial assistance to the Angolan authorities and to Sonangol in exchange for the implementation of reforms. It would also have included measures to improve the government's and Sonangol's international image, to allow benefits that would have included greater access to international capital markets. In the last seven years, members of the government and the managers of Sonangol have become more transparent only in their continued corruption and the pillage of state assets, causing ever greater poverty and disillusionment among most Angolans.

The Soros example alongside many others, shows how the global powers are in thrall to the spells of petroleum and corruption in Angola. Soros is also one of the driving forces behind international initiatives such as Publish What you Pay, Revenue Watch Institute and the Extractive Industries Transparency Initiative, which oblige the corrupt governments of the weakest developing countries to be more transparent. His office did not reply to calls for comment.

**Media Nova**

On 14 December 2008, TV Zimbo began broadcasting amid great publicity as the first private television channel in Angola, despite the fact that the necessary legal framework has never been set up. According to the Press Law (article 59), television broadcasting requires a licence that should be granted only after a process of public tender. The same law (article 60, 3) states that television broadcasting is subject to a "special law regulating the licensing mechanisms and other conditions."  This "special law" has never been passed, which leaves TV Zimbo's activities on the margins of the law.

The lack of public information about the ownership of TV Zimbo has deepened the public's suspicion and led people to speculate, correctly, that only the presidential circle could get away with flouting the law in such a way. Created on 27 December 2007, TV Zimbo has as its shareholders Manuel Vicente, General Kopelipa and General Dino, who between them hold 99,96% of the TV station's shares. Kopelipa made a symbolic gift of the remaining 0,04% to his most loyal officers, namely Colonel José Manuel Domingos "Tunecas", his chief of staff, Colonel João Manuel Inglês, his logistics officer, Colonel Belchior Inocêncio Chilembo, his advisor, and Domingos Manuel Inglês, his private business assistant.

TV Zimbo is part of the Media Nova holding. Also, Rádio Mais, which broadcasts in three provinces, namely Luanda, Huambo e Benguela is also part of the Media Nova group. The expansion of this radio has happened at the time when the government has blocked, for years, the Catholic-run Rádio Ecclésia to extend its signal to beyond Luanda, through FM repeaters installed in 10 provinces. Media Nova in turn plays a crucial role in the editorial control strategy for the private media sector in Angola, including in its ownership the weekly papers *O País* and *Semanário Económico*, the magazines *Revista Exame* and *Chocolate*, Media Nova Distribuidora (distribution) and Media Nova Marketing.

The journalist João Van-Dúnem, formerly editor of the BBC Portuguese for Africa Service, is chairman of the board of Media Nova.

As owners of Damer Indústrias the triumvirate of Kopelipa, Dino and Manuel Vicente, apportioned a public investment of up to 30 million dollars for the setting up of a state of the art printing press in the country, which is now part of their private portfolio as Gráfica Damer. This is the largest printing press in the country, and started operating in November 13 2008.

The Media Nova group began with an investment of over US$70 million, and has the same shareholding structure as its subsidiaries. Once again, Manuel Vicente and Generals Kopelipa and Dino are equal shareholders. Kopelipa's four underlings, colonels José Manuel  Domingos, João Manuel Inglês e Belchior Inocêncio Chilembo, and private assistant Manuel Domingos Inglês each have a token shareholding of between 0,01% or 0,02% as in the case of Nova Media Marketing, the company designed to control the advertisement market.

## World Wide Capital

General Kopelipa also holds a range of major investments outside the country, especially in Portugal, with funds of obscure origin. It is worth mentioning one of these investments for it shows the president's henchman also holding private office abroad.

To date, general Kopelipa is a member of the board of directors of World Wide Capital, S.A, a holding that shares the same address with the residence of his main business partner in Portugal, Filipe Vilaça Barreiros Cardoso, in Avenida da Liberdade, Lisbon. This company, in which the general is the main shareholder, is the fourth largest shareholder of Portuguese bank BIG, with 7,9% of shares. The chairman and CEO of Sonangol, Manuel Vicente, until recently personally held 4,9%

of the shares of the same bank, having transferred them now to his stepson Mirco Martins, according to the Portuguese daily Público, on May 20 2010. BIG holds, in custody, the 469 million shares Sonangol has in the largest Portuguese bank Millenium BCP, which corresponds to 9,6% of bank's total shares.[15]

The laws of the land do no allow for Angolan leaders to accumulate public duties with private ones for personal profit, lest in business ventures abroad.


## Lumanhe

General Kopelipa has made his mark on the diamond trade as well. On February 13 2004 group of six generals had to cede shares that they held in the mining company Lumanhe, in favour of General Kopelipa. This happened at a time when Kopelipa's power and greater personal control over the Angolan Armed Forces (FAA) was on the rise, and currently each of the seven generals holds 14.28% of the shares in the company.

Three of the generals concerned, Armando da Cruz Neto, Carlos Hendrick Vaal da Silva and Adriano Makevela Mackenzie, remain on official duty respectively as governor of Benguela, chief inspector of the Joint Chiefs of Staff of the Angolan Armed Forces (FAA), and head of the Directorate for Troops' Training and Instruction of the Joint Chiefs of Staff. The other three generals are currently in business only, and they are the former head of the Joint Chiefs of Staff of FAA, the chief of staff of the Army, and the head of commandos, namely João de Matos, and the brothers Luís and António Faceira.

---

[15] See Sonangol's Financial Statements (*Demonstrações Financeiras da Sonangol*) mentioned in the Ernst and Young Auditor's Report, 2008.
http://www.sonangol.co.ao/wps/wcm/connect/a996d180424f8abe883c9ad909a3036f/SEPFinancialStatements08.pdf?MOD=AJPERES

On February 18 2004, five days later after General's Kopelipa admission as a shareholder, General Carlos Hendrick Vaal da Silva, signed, on behalf of Lumanhe, a joint-venture agreement with state company Endiama and ITM Mining for the establishment of Sociedade Mineira do Chitotolo, a profitable alluvial mining concession in the north-eastern province of Lunda-Norte. As an officer on active duty and inspector at the Joint Chiefs of Staff, General Vaal da Silva doubled his public duty with that of being Lumanhe's manager. Thus, the state through Endiama transferred 15% of the Chitotolo shareholding to the band of generals. Lumanhe also holds 21% shares in Sociedade Mineira do Cuango (SMC), in a joint venture with Endiama (41%) and ITM Mining (38%). SMC is responsible for systematic human rights abuses in the town of Cafunfo, in the Cuango Valley, where it holds a major alluvial concession. Killings, torture, destruction of farms, and arbitrary policing are part of the company's routine against the villagers and artisanal miners. SMC enjoys the same degree of impunity as the generals who profit from it, and a new report on these events is due soon.

The Portuguese government also finds itself entangled in the shady business procurements of the generals. On June 30 2009, the consortium formed between ITM Mining and Lumanhe, ended its contract for operating the diamond concession of Sociedade Mineira do Calonda, where it held 50% of the shares. As a concession-holder Sociedade Mineira do Lucapa (SML), held the other half of the shares. The Portuguese state, through Parpública SGPS, is the minority shareholder of SML, with 49% while the Endiama controls 51% of the stakes.[16]

## Conclusions

The consequences of the private control of the presidency reflects, to a certain extent, the manner in which President Eduardo dos Santos has systematically

---

[16] See the 2009 Report and Financial Statements of Sociedade Portuguesa de Empreendimentos (SPE) available at http://www.parpublicasgps.com/file/RC2009.pdf.

weakened the state and its institutions to concentrate more power around himself. To assure his grip on power, President Dos Santos only gives real power to figures of his choosing, regardless of the post, and has encouraged a cult of personality that overwhelms the functionality of state institutions. An apt example of this is the excessive powers that have been granted to General Kopelipa.

The status of the the Military Bureau of the Presidency (art. 21, 1, d) confers on General Kopelipa the right to be able to represent the President of the Republic. Constitutionally, these are rights that belong to the vice president and the president of the National Assembly.

For years, General Kopelipa, through the Office of National Reconstruction, has been the chief negotiator for the Chinese oil-backed loans and contracts with its companies, which have been estimated to be around ten billion dollars.[17] General Kopelipa has been working closely with the chairman and CEO of Sonangol Manuel Vicente, whose responsibility is to ensure payments in oil. Both, as the cases above demonstrate, are business partners in several enterprises.

Until he was relieved of his duty, last April, as head of the Office of National Reconstruction, there is no public information about how this institution he was managing funds from the Chinese and other operations, either in the country or abroad, which also engage Sonangol.

The highly significant role of the Portuguese national Ismênio Coelho Macedo, in facilitating the illegal operations of General Kopelipa enables him to have much influence on the presidential decisions regarding Angola's political economy. Macedo also heads the Banco Privado Atlântico, in which Sonangol has 19,5% shares.

---

[17] See Campos, Indira and Alex Vines (2007) *Angola and China: A Paradigmatic Relationship.* Working Paper Presented at a CSIS Conference,"Prospects for Improving U.S.-China-Africa Cooperation", December 5, Washington D.C. http://www.csis.org/media/csis/pubs/080306_angolachina.pdf

In reality, the zero tolerance policy against corruption that was trumpeted by President Dos Santos is nothing more than a mask covering up the plunder of the country by his inner circle. The official discourse against corruption has served as a window dressing for business to remain as usual while garnering more international legitimacy for the *status quo*. Thus the looting of the country by the ruling elite has international support.

This state of affairs stems from the lack of moral and political authority by the President José Eduardo dos Santos to restrain his closest aides, who have vulgarised the office of the president, and give it an image similar to that of a den of thieves.

The levels of corruption in the presidency are unsustainable, and the overwhelming involvement of the presidential security apparatus in the process poses a major threat to the sovereignty of the country and to the president himself.  The state and the president, in this case, have become hostages to what the Cameroonian academic, Achille Mbembe, has described as private indirect government.  In other words, the state apparatus and the civil service are all used for the benefit of private interests by private operators. [18]

Furthermore, the private control of telecommunications and media by the president's henchmen represents a serious blow to the possibility of democracy in the country, beyond the rubber stamping of elections.

The dealings of General Kopelipa, General Dino and Manuel Vicente can only thrive in a society where the public are fighting for basic survival, thus paying little or no attention to the functionality of the state. However, the distraction of society to the consequences of corruption and the privatisation of the Presidency of the Republic also has the potential to create a vacuum for institutional power.

---

[18] See Mbembe, Achille (2001:80) On the Postcolony. University of California Berkeley.

# EXHIBIT 69

# Number Not Used