**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| IN RE COBALT INTERNATIONAL ENERGY, INC. SECURITIES LITIGATION | Lead Case No. 4:14-cv-3428 (NFA) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR CLASS CERTIFICATION AND APPOINTMENT**
**OF CLASS REPRESENTATIVES AND CLASS COUNSEL**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................ 1

   A. Nature And Stage Of The Proceedings ........................................................ 4

   B. Statement Of The Issues .............................................................................. 4

II. ARGUMENT ..................................................................................................... 5

   A. The Action Satisfies The Requirements Of Rule 23(a) ............................... 5

      1. Numerosity Is Established ..................................................................... 5

      2. Commonality Is Established .................................................................. 6

      3. Typicality Is Established ........................................................................ 8

      4. Adequacy Is Established ........................................................................ 8

   B. The Action Satisfies The Requirements Of Rule 23(b)(3) ........................ 10

      1. Predominance Is Established ............................................................... 10

         a) Predominance Is Established For The Securities Act Claims ................................................................................ 11

         b) Predominance Is Established For The Exchange Act Claims ................................................................................ 13

      2. The Market For The Cobalt Securities Was Efficient ....................... 14

         a) High Trading Volume Supports Market Efficiency ............. 15

         b) Extensive Analyst Coverage Supports Market Efficiency .......................................................................... 16

         c) Cobalt's NYSE Listing And Numerous Market Makers Support Market Efficiency .................................... 17

         d) Cobalt's Eligibility To File A Short Form Registration Supports Market Efficiency ................................ 18

         e) The Price Of Cobalt Securities Reacted To New, Company-Specific Information............................................ 18

         f) Other Considerations Support Market Efficiency ................ 20

      3. Plaintiffs' Damages Theory Satisfies *Comcast* ................................ 21

   C. Superiority Is Established Under Rule 23(b)(3) .......................................... 23

i

     D.     The Court Should Approve Co-Lead Counsel As Class Counsel .................................................................................... 25

III.     CONCLUSION ........................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    133 S. Ct. 1184 (2013) ..............................................................3, 5, 12, 13

*ASARCO LLC v. Americas Mining Corp.*,
    396 B.R. 278 (S.D. Tex. 2008).......................................................16, 17

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) .............................................................................14

*Buettgen v. Harless*,
    No. 3:09-cv-791-K, 2011 WL 1938130 (N.D. Tex. May 19, 2011) .........9

*Cammer v. Bloom*,
    711 F. Supp. 1264 (D.N.J. 1989)........................................................15

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426 (2013) ...................................................................21, 23

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011).......................................................................11, 13

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    134 S. Ct. 2398 (2014) .....................................................10, 12, 14, 19

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983).............................................................................11

*In re BP, Plc Sec. Litig.*,
    No. 10-md-2185, 2014 WL 2112823 (S.D. Tex. May 20, 2014)............23

*In re Comput. Scis. Corp. Sec. Litig.*,
    288 F.R.D. 112 (E.D. Va. 2012).........................................................17

*In re Constar Int'l Inc. Sec. Litig.*,
    585 F.3d 774 (3d Cir. 2009) ...............................................................12

*In re DVI Inc. Sec. Litig.*,
    249 F.R.D. 196 (E.D. Pa. 2008) *aff'd*, 639 F.3d 623 (3d 2011).........17, 20

*In re Dynegy, Inc. Sec. Litig.*,
    226 F.R.D. 263 (S.D. Tex. 2005) .................................................*passim*

*In re Elec. Data Sys. Corp. Sec. Litig.*,
226 F.R.D. 559 (E.D. Tex. 2005),
*aff'd* 429 F.3d 125 (5th Cir. 2005) ..................................................................*passim*

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
529 F. Supp. 2d 644 (S.D. Tex. 2006)..................................................................*passim*

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
No. MDL-1446, 2005 WL 3704688 (S.D. Tex. Dec. 5, 2005) ............................ 11

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
312 F.R.D. 332 (S.D.N.Y. 2015)............................................................................ 22

*In re First RepublicBank Sec. Litig.*,
No. 88-0641-H, 1989 WL 108795 (N.D. Tex. Aug. 1, 1989).................................. 13

*In re FirstPlus Fin. Grp., Inc., Sec. Litig.*,
No. 3:98-cv-2551-m, 2002 WL 31415951
(N.D. Tex. Oct. 28, 2002)....................................................................... 13, 14, 24

*In re HealthSouth Corp. Sec. Litig.*,
261 F.R.D. 616 (N.D. Ala. 2009) .......................................................................... 17

*In re Reliant Energy ERISA Litig.*,
No. H-02-2051, 2005 WL 2000707 (S.D. Tex. Aug. 18, 2005) ............... 7, 8, 11, 24

*In re Reliant Sec. Litig.*,
No. H-02-1810, 2005 U.S. Dist. LEXIS 9716 (S.D. Tex. Feb. 18, 2005) ................ 5

*KB Partners I, L.P. v. Barbier*,
No. A-11-CA-1034-SS, 2013 WL 2443217 (W.D. Tex. June 4, 2013) ....... 7, 16, 18, 21

*Krogman v. Sterritt*,
202 F.R.D. 467 (N.D. Tex. 2001)........................................................................... 21

*Lehocky v. Tidel Techs, Inc.*,
220 F.R.D. 491 (S.D. Tex. 2004) .........................................................................*passim*

*Ludlow v. BP, P.L.C.*,
800 F.3d 674 (5th Cir. 2015) *cert. denied*, 136 S. Ct. 1824 (2016) ............. 19, 21, 23

*Marcus v. J.C. Penney Co.*,
No. 13-cv-736-MHS, 2016 U.S. Dist. LEXIS 115795
(E.D. Tex. Aug. 29, 2016).....................................................................................*passim*

*Mullen v. Treasure Chest Casino, LLC,*
    186 F.3d 620 (5th Cir. 1999) ...................................................................6

*Torres v. S.G.E. Mgmt., L.L.C.,*
    No. 14-20128, 2016 WL 5746309 (5th Cir. Sept. 30, 2016) ..................11

*Unger v. Amedisys Inc.,*
    401 F.3d 316 (5th Cir. 2005) ...........................................................14, 21

**Statutes**

15 U.S.C. § 77k .......................................................................................4, 22

15 U.S.C. § 77k(e) .........................................................................................22

15 U.S.C. § 77l .................................................................................................4

15 U.S.C. § 77l(a)(2) .....................................................................................22

15 U.S.C. § 78j ..........................................................................4, 13, 22, 23

15 U.S.C. § 78t .................................................................................................4

**Rules**

Fed. R. Civ. P. 23.........................................................................................5, 7

Fed. R. Civ. P. 23(a) ................................................................................*passim*

Fed. R. Civ. P. 23(a)(1) ....................................................................................5

Fed. R. Civ. P. 23(a)(2) ....................................................................................7

Fed. R. Civ. P. 23(a)(3) ....................................................................................8

Fed. R. Civ. P. 23(a)(4) ...........................................................................8, 9, 25

Fed. R. Civ. P. 23(b)(3) ...........................................................................*passim*

Fed. R. Civ. P. 23(g)..........................................................................1, 3, 4, 25

Fed. R. Civ. P. 23(g)(1) ..................................................................................25

Court-appointed Lead Plaintiffs, GAMCO Global Gold, Natural Resources & Income Trust and GAMCO Natural Resources, Gold & Income Trust (the "GAMCO Funds"), together with the four Additional Plaintiffs[1] (collectively with the GAMCO Funds, "Plaintiffs"), respectfully move, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) for: (1) certification of the above-captioned case (the "Action") as a class action; (2) appointment of Plaintiffs as Class Representatives; and (3) appointment of Co-Lead Counsel as Class Counsel pursuant to Rule 23(g).

## I.     INTRODUCTION

This Action arises out of Cobalt International Energy Inc.'s ("Cobalt" or the "Company") misstatements during the Class Period (March 1, 2011 through November 3, 2014) regarding the fact that (i) its partners in oil exploration deals in Angola were owned by Angolan government officials; (ii) the Loengo well in Angola contained no oil despite Cobalt's representations to the contrary; and (iii) the Lontra well predominantly contained gas for which Cobalt had no marketing rights. Specifically, Cobalt repeatedly told investors that it had conducted an "extensive investigation" and "extensive due diligence" into its Angolan partner Nazaki, and denied "allegations . . . of a connection between senior Angolan government officials and Nazaki." Complaint ¶¶133, 139, 148, 152. Cobalt also misrepresented the oil content of its Angolan wells, which Cobalt claimed were "oil-focused" and "high impact" (*id*. ¶¶132, 144, 147, 151), and repeatedly touted the

---

[1] Unless otherwise noted: (i) all capitalized terms herein have the same meanings ascribed to them in the Consolidated Amended Class Action Complaint filed May 1, 2015 (the "Complaint") (ECF No. 72); (ii) all emphasis is added; and (iii) internal citations and quotations are omitted.

Company's success in its Lontra and Loengo wells in Angola. *Id.* ¶¶161, 163, 173, 178, 184-85. Cobalt's stock price climbed significantly, or was maintained at artificially inflated prices, in response to these specific misstatements, and remained artificially inflated during the Class Period. *Id.* ¶81.

A series of subsequent public disclosures, however, revealed the truth that Loengo was in fact a "dry hole," and Lontra primarily contained gas, for which Cobalt had no contractual rights. *Id.* ¶¶58, 82, 202-03, 209. Cobalt's stock and bond prices fell sharply after these disclosures. *Id.* ¶¶203, 211.[2] Cobalt's stock and bond prices also substantially declined as investors learned the truth about Cobalt's Angolan partners. *Id.* ¶¶200-01, 205-07; *see also* Hartzmark Rpt., at Exhibits XIV and XXVII. Pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), Plaintiffs move to certify the following Class:

> All persons and entities who purchased or otherwise acquired Cobalt securities between March 1, 2011 and November 3, 2014, inclusive and were damaged thereby. Included within the Class are all persons and entities who purchased shares of Cobalt common stock on the open market and/or pursuant or traceable to the registered public offerings on or about (i) February 23, 2012; (ii) January 16, 2013; and (iii) May 8, 2013. Also included within the Class are all persons and entities who purchased Cobalt convertible senior notes on the open market and/or pursuant or traceable to registered public offerings on or about (i) December 12, 2012; and (ii) May 8, 2014.[3]

Plaintiffs further request that the Court appoint them to serve as Class Representatives, and

---

[2] *See also* Declaration of Andrew J. Entwistle In Support of Plaintiffs' Motion for Class Certification ("Entwistle Decl."), Exhibit 1 (Report of Michael L. Hartzmark, Ph.D. ("Hartzmark Rpt."), at Exhibits XIV and XXVII).

[3] The entities and persons excluded from the Class are identified in the accompanying Motion and [Proposed] Order.

appear Co-Lead Counsel as Class Counsel pursuant to Fed. R. Civ. P. 23(g).

The Supreme Court has affirmed the importance of class actions as an integral component in enforcing the federal securities laws, *see Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*, 133 S. Ct. 1184, 1201-1202 (2013), as have courts in this District, *see In re Enron Corp. Sec., Derivative & "ERISA" Litig. (Enron I)*, 529 F. Supp. 2d 644, 670 (S.D. Tex. 2006). This Action fulfills these purposes and is ideally suited for class certification because all of Rule 23(a) and 23(b)(3)'s requirements are met:

**Numerosity** is established. During the Class Period, Cobalt had over 350 million shares outstanding and is believed to have had tens-of-thousands of shareholders, including 599 institutions that held shares on behalf of hundreds or thousands of their client investors. In addition, over 149 million shares of Cobalt common stock and $2.68 billion in Cobalt bonds were sold to investors in the registered Offerings at issue.

**Common questions of law or fact** abound in this Action, including (i) whether Cobalt's statements were false or misleading; (ii) whether those statements were material; and, for the Exchange Act claims (iii) whether Cobalt's executives acted with scienter.

**Adequacy** and **typicality** are satisfied because (i) Plaintiffs and the Class assert identical claims arising from the same misstatements and course of events; and (ii) Plaintiffs have no conflict with the Class, have been actively monitoring and supervising this Action, and have retained experienced counsel with proven track records in securities class actions like this one.

**Predominance** is met because Plaintiffs will establish through common proof that Cobalt's representations to investors were materially false or misleading, which is an

objective question with a common answer for all Class members. This core question, along with the other common questions in this case, predominate over any individualized ones. In addition, as to Plaintiffs' Exchange Act claims, Michael L. Hartzmark, Ph.D., has demonstrated that the markets for Cobalt common stock and bonds were efficient during the Class Period, entitling Class members to a presumption of reliance on Defendants' misstatements. Finally, *superiority* is satisfied because a class action is superior to any other method for adjudicating this controversy.

For these reasons, Plaintiffs respectfully request that the Court grant the Motion.

## A.   Nature And Stage Of The Proceedings

On May 1, 2015, Plaintiffs filed the Complaint alleging that Defendants violated (i) Sections 10(b) and 20(a) of the Exchange Act, and (ii) Sections 11, 12(a)(2) and 15 of the Securities Act. (ECF No. 72). On January 19, 2016, this Court denied, in large part, Defendants' motions to dismiss the Complaint. (ECF No. 108). Defendants' motions for interlocutory appeal of that order were denied by the Court on March 14, 2016. (ECF No. 125). Pursuant to the schedule set forth in the Court's Docket Control Order (ECF No. 138), Plaintiffs now request certification of this Action as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure.

## B.   Statement Of The Issues

1.   Whether this Action should be certified as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure.

2.   Whether Plaintiffs should be appointed as Class Representatives in the certified class action pursuant to Rule 23(a).

3.   Whether Co-Lead Counsel should be appointed as Class Counsel pursuant to Rule 23(g).

4

## II.   ARGUMENT

"Rule 23 is a remedial rule which should be construed liberally to permit class actions, especially in the context of securities fraud suits, where the class action device can prove effective in deterring illegal activity." *Enron I*, 529 F. Supp. 2d at 670. Indeed, "in securities fraud cases, . . . when a court is in doubt as to whether or not to certify a class action, the court should err in favor of allowing the class to go forward." *In re Reliant Sec. Litig.*, No. H-02-1810, 2005 U.S. Dist. LEXIS 9716, at *13 (S.D. Tex. Feb. 18, 2005).

In deciding whether to certify a class, the question is merely whether the Rule 23 requirements are satisfied. *See In re Dynegy, Inc. Sec. Litig.*, 226 F.R.D. 263, 268 (S.D. Tex. 2005) ("[T]he question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met."). As the Supreme Court has explained, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered … only to the extent[] that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *See Amgen*, 133 S. Ct. at 1194-95.

### A.   The Action Satisfies The Requirements Of Rule 23(a)

As detailed below, this action satisfies each of the four prerequisites of Rule 23(a).

#### 1.   Numerosity Is Established

To satisfy the numerosity requirement, the proposed class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). This requirement "is generally assumed to have been met in class action suits involving nationally traded securities." *Enron I*, 529 F. Supp. 2d at 672. Courts are also "quite willing to accept common sense assumptions in

order to support findings of numerosity." *Marcus v. J.C. Penney Co.*, No. 13-cv-736-MHS, 2016 U.S. Dist. LEXIS 115795, at *8 (E.D. Tex. Aug. 29, 2016).

Here, the proposed Class easily satisfies the numerosity requirement. During the Class Period, Cobalt had over 350 million shares outstanding and is believed to have had tens-of-thousands of shareholders, with shares held by approximately 107 to 192 record holders (exclusive of "street name" shareholders who held shares on behalf of other investors). *See* Hartzmark Rpt. ¶¶27, 34 and n. 59; *see also Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999) (numerosity presumed when class consists of 100 or more members). Additionally, there were 599 institutional investors during the Class Period that likely held Cobalt shares for hundreds or thousands of their client investors. *See* Hartzmark Rpt. ¶67; and Exhibit VI.[4]

With respect to the Securities Act claims, over 149 million shares of Cobalt common stock was sold in the Class Period stock Offerings, as well as $2.68 billion of convertible senior notes in the Class Period bond Offerings, which plainly establishes numerosity. *See id.* ¶¶29-33; *see also Dynegy*, 226 F.R.D. at 275 (numerosity established for offering of 25 million shares).

## 2.    Commonality Is Established

"The test for commonality is not demanding and is met where there is at least one issue, the resolution of which will affect all or a significant number of the putative class

---

[4] There were also at least 181 reporting institutional investors that held one or both of Cobalt's bonds at issue. Many of these holders served as investment advisors for possibly hundreds or thousands of clients who were the beneficial owners. *See* Hartzmark Rpt. ¶189 n.223.

members." *In re Reliant Energy ERISA Litig. (Reliant Energy)*, No. H-02-2051, 2005 WL 2000707, at *2 (S.D. Tex. Aug. 18, 2005) (Atlas J.); *see also Lehocky v. Tidel Techs, Inc.*, 220 F.R.D. 491, 499 (S.D. Tex. 2004) ("The threshold of 'commonality' is not high."). The presence of "some plaintiffs having different claims or claims that require some individualized analysis does ***not*** defeat commonality." *Dynegy*, 226 F.R.D. at 269.

Here, there are numerous common questions of law and fact, including:

i)  whether Defendants made false and misleading statements and omissions concerning Cobalt's Angolan partners and the oil content of the Lontra and Loengo wells;

ii)  whether Defendants' alleged false statements and omissions were material;

iii)  whether the Exchange Act Defendants knowingly or recklessly disregarded that their statements were materially false and misleading; and

iv)  whether the Control Person Defendants had control over Cobalt.

Common questions of law and fact such as these satisfy Rule 23's "commonality" requirement. *See, e.g.*, *Marcus*, 2016 U.S. Dist. LEXIS 115795, at **9-10 (common issues in securities class action included "whether Defendants' acts or omissions violated the Exchange Act, whether Defendants' affirmative statements were material and misleading, whether Defendants' omissions were material and misleading, and whether Defendants acted knowingly or recklessly."); *KB Partners I, L.P. v. Barbier*, No. A-11-CA-1034-SS, 2013 WL 2443217, at *11 (W.D. Tex. June 4, 2013) (commonality established because "every class member's allegations of securities fraud arise from the same basic set of facts."); *Dynegy*, 226 F.R.D. at 276 ("the presence of false statements and/or omissions of material fact in the registration statement … satisfy Rule 23(a)(2)'s commonality requirement.").

### 3. Typicality Is Established

The test for typicality is also "not demanding," and is "satisfied where the representative plaintiffs' claims arise out of the same event or course of conduct as the other members' claims and are based on the same legal theory." *Lehocky*, 220 F.R.D. at 500.

Typicality is readily established here because the claims of the Plaintiffs and the Class arise from the same misstatements and omissions. The injury Plaintiffs suffered is also the same as the injury suffered by all other Class members, *i.e.*, they purchased Cobalt securities at artificially inflated prices and suffered losses when the truth emerged and the value of their securities declined. This alignment of factual allegations, as well as legal and remedial theories, establishes typicality under Rule 23(a)(3). *See, e.g.*, *Marcus*, 2016 U.S. Dist. LEXIS 115795, at **10-11 ("Because the Fund and the Class members both allege that the same misrepresentations and omissions caused the same result (artificially inflating the value of securities), the Fund's claims are typical of the claims of the Class members."); *Dynegy*, 226 F.R.D. at 287-88 (finding typicality because securities claims are "based on conduct that would have injured all members of the putative class.").

### 4. Adequacy Is Established

To determine whether the proposed class representatives will "fairly and adequately protect the interests of the class" under Rule 23(a)(4), "the Court considers (1) the enthusiasm and competence of the proposed class counsel and (2) the willingness and ability of the representatives to take an active role in the litigation and to protect the interests of class members they seek to represent." *Reliant Energy*, 2005 WL 2000707, at *3. "Differences between the named plaintiffs and class members render the named plaintiffs

inadequate representatives *only* if those differences create conflicts between the named plaintiffs' interests and the class members' interest." *Buettgen v. Harless*, No. 3:09-cv-791-K, 2011 WL 1938130, at *5 (N.D. Tex. May 19, 2011).  Plaintiffs satisfy Rule 23(a)(4) here.

First, Co-Lead Counsel are highly qualified and are zealously prosecuting this Action on behalf of the Class, including by:  (i) investigating and filing the detailed Complaint; (ii) successfully opposing Defendants' motions to dismiss and for interlocutory appeal; (iii) conducting extensive discovery, including document requests, subpoenas, and interrogatories, as well as seeking discovery overseas pursuant to the Hague Convention; and (iv) reviewing hundreds-of-thousands of pages of documents to date.

Second, each Plaintiff is a sophisticated institutional investor that is actively participating in this Action on behalf of the Class, including reviewing drafts of significant pleadings, receiving case status updates, and actively participating in discovery, including the collection of responsive documents and verifying interrogatory responses.  *See* Entwistle Decl., Exhibits 2-6; *see also Lehocky*, 220 F.R.D. at 502-03 (adequacy established where plaintiffs were committed to the action, reviewed court papers, and understood the complaint's allegations).

Third, no conflict of interest exists.  Rather, Plaintiffs' interests are directly aligned with the interests of other Class members because each of the claims alleged in the Action is based upon the same economic injuries caused by the same course of events, and all Plaintiffs seek to maximize the recovery for the Class.  Such alignment of interests satisfies the adequacy requirement of Rule 23(a)(4).  *See id.* at 502-03 (since plaintiffs "are united

in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes"); *see also Enron I*, 529 F. Supp. 2d at 713-16 (finding no conflict among class of stock and bond purchasers asserting Exchange Act and Securities Act claims given "common interests . . . in establishing . . . the material misrepresentations and omissions" and "obtain[ing] the largest recovery for the class.").

### B.   The Action Satisfies The Requirements Of Rule 23(b)(3)

This Action also satisfies the two prerequisites of Rule 23(b)(3).

#### 1.   Predominance Is Established

The predominance inquiry asks whether "questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. Rule 23(b)(3).  "Predominance does *not* require all questions of law or fact to be common, but only that common questions predominate over individual questions."  *In re Elec. Data Sys. Corp. Sec. Litig.* (*EDS*)*,* 226 F.R.D. 559, 570 (E.D. Tex. 2005), *aff'd* 429 F.3d 125 (5th Cir. 2005).    "Where a common nucleus of operative fact exists, the predominance factor is met."  *Enron I*, 529 F. Supp. 2d at 678.  "That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does *not* cause individual questions to predominate."  *Halliburton Co. v. Erica P. John Fund, Inc.* (*Halliburton II*), 134 S. Ct. 2398, 2412 (2014).

As the Fifth Circuit has recently emphasized, "[w]hen 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will

have to be tried separately. . . ." *Torres v. S.G.E. Mgmt., L.L.C.*, No. 14-20128, 2016 WL 5746309, at *11 n.74 (5th Cir. Sept. 30, 2016).

### a)    Predominance Is Established For The Securities Act Claims

Determining whether common questions predominate over individual questions "begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.* (*Halliburton I*), 563 U.S. 804, 809 (2011). For their Securities Act claims, Plaintiffs "need only show a material misstatement or omission" in the registration statement. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). Plaintiffs do not need to show "scienter, causation (materiality) or reliance." *In re Enron Corp. Sec., Derivative & "ERISA" Litig.* (*Enron II*), No. MDL-1446, 2005 WL 3704688, at *17 (S.D. Tex. Dec. 5, 2005); *see also Torres*, 2016 WL 5746309, at *5 (fact that claims "d[id] not require proof of first-party reliance [] largely dooms the Defendants' attempt to identify individual issues.").

The Securities Act claims here are ideally suited for class treatment because the answers to the core questions for these claims are common to all Class members, *i.e.*, (i) was there a misrepresentation or omission; and, if so, (ii) was it objectively material. *See, e.g.*, *Reliant Energy*, 2005 U.S. Dist. LEXIS 9716, at *36 (question of whether there were material misrepresentations was "common to all members of the proposed class and predominate over any individual issues. . . ."); *Dynegy*, 226 F.R.D. at 281 ("common issues predominate because the class members were subjected to the same alleged misrepresentations and omissions, which fit within a common course of

conduct."). In addition, for claims under the Securities Act, damages are based on a straightforward statutory formula common to all Class members. *See In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 785 (3d Cir. 2009) ("The formulaic nature of § 11 [of the Securities Act] leaves defendants with little room to maneuver" in opposing class certification.).

In *Amgen*, the Supreme Court recently reaffirmed that the two core elements of Securities Act claims – falsity and materiality – present purely common questions of law and fact. As the Court explained, the determination of whether a statement or omission is materially misleading in a securities action raises a question "<u>common</u> to all members of the class" because the test of materiality must be assessed by an "objective standard." 133 S. Ct. at 1191.[5] Indeed, "[t]he alleged misrepresentations and omissions, whether material or immaterial, would be so equally for all investors composing the class." *Id*.

Likewise, the ultimate answers to the core questions underlying Plaintiffs' Securities Act claims are common to all Class members given that Defendants' untrue statements and omissions were incorporated into all of the Offering Materials. *See* Complaint ¶¶221-60. Either the Offering Materials did, or did not, misrepresent or omit material information about Cobalt's Angolan partners and the oil content of its

---

[5] Notably, the materiality element need not be proved at the class certification stage. *See Halliburton II*, 134 S. Ct. at 2416 ("Even though materiality is a prerequisite for invoking the *Basic* [reliance] presumption, we held that it should be left to the merits stage, because it does not bear on the predominance requirement of Rule 23(b)(3).").

wells; and the answers to those questions will apply equally to all Class members.[6]  For these reasons, predominance is satisfied for Plaintiffs' Securities Act claims.

**b)** **Predominance Is Established**
**For The Exchange Act Claims**

The elements of Plaintiffs' claims based on violations of Section 10(b) of the Exchange Act are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton I*, 563 U.S. at 809-10.  The elements of falsity, materiality, scienter, and loss causation all raise exclusively common questions of law and fact that support a finding of predominance for the Exchange Act claims. *See*, *e.g.*, *Amgen*, 133 S. Ct. at 1196-97; *Halliburton I*, 563 U.S. at 812; *see also In re FirstPlus Fin. Grp., Inc., Sec. Litig.*, No. 3:98-cv-2551, 2002 WL 31415951, at *4 (N.D. Tex. Oct. 28, 2002) ("the issues of law or fact common to the members of the putative class – whether there was fraudulent conduct by the Defendants – predominate over questions affecting individual class members."); *EDS*, 226 F.R.D. at 570 ("If Defendants are liable to [plaintiff] for these statements, they are liable to all other class members for the same statements, so common questions predominate.").

The reliance element is also a common question because all Class members are

---

[6] Similarly, whether the Control Person Defendants exercised control over Cobalt under Section 15 of the Securities Act presents a common issue that will predominate for these claims. *See In re First RepublicBank Sec. Litig.*, No. 88-0641-H, 1989 WL 108795, at *7 n.16 (N.D. Tex. Aug. 1, 1989) (finding predominance satisfied because the "question of who is a controlling person with respect to Section 15 liability is an issue common to the class.").

entitled to invoke the "fraud-on-the market" presumption of reliance. *See Halliburton II*, 134 S. Ct. at 2402-03 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 246-47 (1988)). The "fraud-on-the-market" presumption is "a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation." *Halliburton II*, 134 S. Ct. at 2417. When applicable, plaintiffs need not show that they actually read or relied on the misstatements or omissions at issue; it is enough that they relied upon the price of the security. *See FirstPlus*, 2002 WL 31415951, at *4 ("A fraud-on-the-market theory would be applicable to this case, so proof of each individual class member's reliance is not necessary here.").

To invoke the fraud-on-the-market presumption of reliance, Plaintiffs must show that the market for the securities was efficient.[7] As set forth below, and detailed in the Hartzmark Report, Plaintiffs have made the requisite showing here.

## 2. The Market For The Cobalt Securities Was Efficient

As a general matter, "market efficiency will not even be an issue" for "heavily-traded or well known stocks." *See Unger v. Amedisys Inc.*, 401 F.3d 316, 322-23 (5th Cir. 2005). This is because for common stock that is traded on a national exchange, such as Cobalt's, the market automatically incorporates publicly known information into its price.

---

[7] Plaintiffs must also show that (i) the false statements were publicly made ("publicity"), and (ii) Plaintiffs' purchases were made after the alleged false statements ("market timing"). *See Halliburton II*, 134 S. Ct. at 2412. Here, the alleged misstatements and omissions were all contained in public filings and/or made during investor calls (*see* Complaint ¶¶127-85), and the Plaintiff certifications to the Complaint show that each Plaintiff purchased Cobalt securities after alleged misstatements. *See* Complaint, ECF No. 72 at p. 120-32; *see also* ECF No. 74-1 at p. 1-8.

In assessing market efficiency, courts consider certain factors, including the volume of trading, the number of analysts covering the company, and whether its securities respond to company-specific information. *See, e.g.*, *Enron I*, 529 F. Supp. 2d at 693-94; *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989). As discussed below, these and many other pertinent factors demonstrate market efficiency here.

### a)  High Trading Volume Supports Market Efficiency

"The average trading volume is one of the most important factors in determining whether the market for a particular stock is efficient." *Enron I*, 529 F. Supp. 2d at 694 n.69. A high average trading volume supports a finding of market efficiency because it indicates "significant investor interest in the company," and "implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information." *Id.* Courts in this Circuit have recognized that "there is a substantial presumption of an efficient market if the securities' average weekly trading volume is 1% or more of the total outstanding shares and an even greater presumption of market efficiency if the percentage is 2%." *Lehocky*, 220 F.R.D. at 508.

Cobalt's common stock traded actively on the NYSE throughout the Class Period, with an average weekly trading volume of approximately 12.6 million shares, or 3.1% of shares outstanding. *See* Hartzmark Rpt. ¶38. The Cobalt bonds at issue were also actively traded during the Class Period, with an average weekly trading volume of 6.5% and 4.2%,

respectively.[8]  This factor, therefore, strongly favors a finding of market efficiency.

**b)      Extensive Analyst Coverage Supports Market Efficiency**

Analyst coverage indicates market efficiency because the "greater the number of securities analysts that cover a security, the more likely that investors rely on disseminated information." *Lehocky*, 220 F.R.D. at 508; *see also KB Partners*, 2013 WL 2443217, at *7 ("The number of securities analysts following the company's stock during the class period may offer 'persuasive' evidence of market efficiency . . . ."). This factor favors market efficiency when, for example, nine to ten analysts covered the company. *See ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 344 (S.D. Tex. 2008).

Here, a weekly average of 14 different financial firms offered recommendations on Cobalt, including analysts from Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, JP Morgan, Morgan Stanley, and UBS. *See* Hartzmark Rpt. ¶41, and Exhibit II. These and other financial firms published a total of 486 analyst reports concerning Cobalt during the Class Period. *Id.* at Exhibit III-A. Additionally, an average of at least 7 separate analysts actively participated in each of Cobalt's conference calls during the Class Period, and financial analysts hosted 36 separate investor conferences with Cobalt during this same period. *Id.* ¶42. The analyst reports issued by these financial institutions were important to holders of Cobalt securities, including the bondholders, because they provided information on the overall financial health of the Company, including its ability to pay on the debt service for the bonds and the value to investors of their

---

[8] *Id.* ¶¶153-55. Moreover, the Class Period trading volume and frequency for the Cobalt bonds was far higher than the corporate bonds found to have traded in efficient markets in the *Enron*, *JFF High Yield Bond Fund*, and *DVI* cases. *Id.* ¶162.

option to convert their bonds into Cobalt common stock.[9]

In addition to analyst coverage, there were over 3,800 news articles published during the Class Period that discussed Cobalt. *Id.* ¶44. The widespread analyst and media coverage of Cobalt's business provides further evidence of market efficiency.

### c) Cobalt's NYSE Listing And Numerous Market Makers Support Market Efficiency

The existence of a recognized market or numerous market makers for a security strengthens a finding of market efficiency. Cobalt's common stock traded on the NYSE, which is an established and paradigmatic efficient market. *See, e.g.*, *ASARCO*, 396 B.R. at 344 ("The NYSE is the most highly regulated trading market in the world, which supports a finding of market efficiency."); *In re Computer Scis. Corp. Sec. Litig.*, 288 F.R.D. 112, 120 (E.D. Va. 2012) ("It is not surprising that no other federal courts have concluded that common shares traded on the NYSE are not traded in an efficient market.").

Moreover, the Cobalt bonds were traded through numerous market makers, which bolsters a finding of market efficiency as to the bonds. *See Lehocky*, 220 F.R.D. at 508 ("The existence and number of market makers is also pertinent to the court's determination of market efficiency."). There were over 100 separate market makers for the 2.65% Cobalt bond during the Class Period, and 46 separate market makers for the 3.125% bond. *See Hartzmark*

---

[9] *Id.* ¶¶170-72. Courts routinely find that equity analyst coverage of a given company has direct relevance to company bondholders as well. *See, e.g.*, *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 215 (E.D. Pa. 2008) (information in equity analyst reports, "particularly forecasts of DVI's financial prospects and condition, would likewise have allowed bond investors to better understand DVI's risk profile and its potential for default."), *aff'd*, 639 F.3d 623 (3d Cir. 2011); *In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 635 (N.D. Ala. 2009) ("The coverage by analysts of HealthSouth's equities also provided information of interest to the bond market when concerned with the overall financial health of the issuing firm.").

Rpt. ¶174. This far exceeds the "twenty to twenty-five" market makers that have been found to "tip[] towards a finding of market efficiency." *Lehocky*, 220 F.R.D. at 509.

### d) Cobalt's Eligibility To File A Short Form Registration Supports Market Efficiency

A company's eligibility to file an SEC Form S-3 registration, which requires a public float of at least $75 million, also indicates market efficiency. *See Enron I*, 529 F. Supp. 2d at 670 n.72 ("Generally speaking, it is the largest and most well-known companies which register equity securities on Form S-3."); *see also* SEC Securities Act Release No. 6331 (August 13, 1981) (rationale for Form S-3 registration status is "predicated on the Commission's belief that the market operates efficiently for these companies . . . .").

Cobalt readily satisfied the requirements for Form S-3 registration throughout the Class Period by having an average public float of $4.3 billion (approximately 208 million shares) in common stock during this time (*see* Hartzmark Rpt. ¶¶52, 59), and Cobalt used a Form S-3 when it completed each of the five registered securities Offerings at issue in this case. *Id.* ¶¶52, 176.

### e) The Price Of Cobalt Securities Reacted To New, Company-Specific Information

"[O]ne of the most convincing ways to demonstrate efficiency [is] to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.'" *KB Partners*, 2013 WL 2443217, at *8; *see also Lehocky*, 220 F.R.D. at 507-08 ("the evidence presented is sufficient to demonstrate, for class certification purposes, that a cause and effect relationship between company-specific announcements and stock price may exist"). Here, Dr. Hartzmark conducted empirical analyses using a widely-

accepted event study methodology to examine the price reaction of Cobalt's common stock and bonds to the disclosure of new information concerning Cobalt. *See* Hartzmark Rpt., Sections VI & IX. Dr. Hartzmark's empirical analyses "show that the market price of the defendant's [securities] tends to respond to pertinent publicly reported events." *See Halliburton II*, 134 S. Ct. at 2415.

First, Dr. Hartzmark assessed the price reaction of Cobalt's stock and bonds following the disclosure of the information that Plaintiffs allege was misrepresented and omitted by Defendants (*i.e.*, the "corrective disclosures"). *See* Hartzmark Rpt. ¶¶97-99; 197-200. This analysis determined that the prices of Cobalt's stock and bonds had rapid and statistically significant reactions on all corrective disclosure dates.[10] This cause-and-effect relationship between the disclosure of new, Company-specific information and the price reaction of Cobalt's securities is strong evidence of market efficiency.

Second, Dr. Hartzmark conducted an additional statistical analysis to demonstrate that there was a significantly different relationship between the returns on Cobalt securities on days with news when compared to those days with no news. *Id.* ¶¶100-15, 201-06. This analysis reinforced his conclusion that the prices of Cobalt's securities reacted to new, Company-specific information, rather than to other economic influences or random events.

---

[10] *Id.* Notably, the Court need not determine at the class certification stage whether the alleged disclosures were corrective of previously misstated or omitted material facts. *See Ludlow v. BP, P.L.C.*, 800 F.3d 674, 688 (5th Cir. 2015), *cert. denied*, 136 S. Ct. 1824 (2016) (finding that the "district court did not err in refusing to resolve concerns about the inclusion of certain corrective events at the class certification stage" because "the question of whether certain corrective disclosures are linked to the alleged misrepresentations in question is undeniably common to the class, and is 'susceptible of a class-wide answer.'").

Dr. Hartzmark's test again found a statistically significant cause-and-effect relationship between the release of new, Company-specific information and rapid movements in the price of Cobalt's stock and bonds. *Id.*

Finally, Dr. Hartzmark performed a separate analysis to confirm that Cobalt stock and bond prices promptly incorporated new, Company-specific information during the Class Period (including on the corrective disclosure dates). *Id.* ¶¶116-18, 207-08. Utilizing a well-accepted "autocorrelation" analysis for Cobalt stock and bond prices, Dr. Hartzmark tested whether the price movements could be predicted on a given day based on the price movements one day prior – *i.e.*, whether there were trends or correlations in daily stock or bond price movements irrespective of new, Company-specific information. *Id.* Dr. Hartzmark found no statistically significant autocorrelation during the Class Period, thereby confirming his conclusion that Cobalt stock and bond prices quickly incorporated and reacted to new, Company-specific information, and thus traded in an efficient market. *Id.* ¶¶118, 208; *see also Lehocky*, 220 F.R.D. at 506-07 n.20 (confirming that autocorrelation analysis "is an accepted test for determining market efficiency."); *DVI*, 249 F.R.D at 213 (same). In sum, Dr. Hartzmark's empirical cause-and-effect analyses further establish that Cobalt's common stock and bonds traded in an open, well-developed and efficient market throughout the Class Period.

### f) Other Considerations Support Market Efficiency

Courts in this Circuit have also considered the following additional factors in determining market efficiency: (i) the company's market capitalization; (ii) the bid-ask spreads for the securities at issue; and (iii) the public float (*i.e.*, the outstanding securities

without counting insider-owned stock).[11] Dr. Hartzmark analyzed each of these additional factors as well, and found they also strongly support a finding of market efficiency for Cobalt's stock and bonds during the Class Period. *See* Hartzmark Rpt. ¶¶54-57, 177-80 (large market capitalization/value of Cobalt stock and bonds); ¶¶58-60, 181-82 (significant Class Period public float for Cobalt stock and bonds); ¶¶61-65, 183-87 (narrow bid-ask spread for Cobalt stock and bonds). In sum, Plaintiffs have provided ample evidence that the market for Cobalt's securities during the Class Period was efficient. Accordingly, reliance is presumed and Plaintiffs have satisfied Rule 23(b)(3)'s predominance requirement.

### 3.      Plaintiffs' Damages Theory Satisfies *Comcast*

Moreover, Plaintiffs' damages methodology is "consistent" with their theory of liability as required by *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013). In *Comcast*, an antitrust case, the Supreme Court explained that a plaintiff's damages theory must take account of plaintiff's theory of liability. *See id.* (rejecting damages model that focused on market distortions that no longer "remained in the case."). While *Comcast* holds that a damages theory must comport with plaintiffs' liability theory, it does not require that damages be calculated with certainty at the class certification stage. *See Ludlow*, 800 F.3d at 685 ("*Comcast* requires a sound methodology, ***not*** certainty."). At the class certification stage, plaintiffs are only required to show the "*ability*" to calculate class-wide damages and are not required to "execute" that calculation. *Id.* at 689. The question at this stage is not

---

[11] *See*, *e.g.*, *Unger*, 401 F.3d at 323; *KB Partners*, 2013 WL 2443217, at *5; *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001). The bid-ask spread is the "difference between the price at which investors are willing to buy the stock and the price at which current stockholders are willing to sell their shares." *KB Partners*, 2013 WL 2443217, at *10. A large bid-ask spread indicates an inefficient market as it suggests that the security is too expensive to trade.

whether Plaintiffs' theory of damages or methodology is ***correct***; rather the sole inquiry is whether they have proposed a sound methodology that is consistent with Plaintiffs' theory of liability. *See Marcus*, 2016 U.S. Dist. LEXIS 115795, at *32 ("Defendants may disagree with the methodology or feel that another methodology is correct, but that does not make this methodology inconsistent with the [plaintiff]'s theory of liability.").

For Plaintiffs' Securities Act claims, damages are calculated based on the Securities Act's statutory formula. *See* 15 U.S.C. § 77k(e); § 77l(a)(2). The *Comcast* requirement is necessarily satisfied when "damages reflect liability by statutory formula." *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 312 F.R.D. 332, 350 (S.D.N.Y. 2015) (finding "*Comcast* does not bar certification . . . where Section 11(e) of the Securities Act provides a statutory formula for damages."); *see also* Hartzmark Rpt. ¶¶218-23.

Plaintiffs' expert, Dr. Hartzmark, has further explained that class-wide Section 10(b) damages can be calculated through the traditionally accepted "out-of-pocket" methodology involving (1) a widely-endorsed event study to measure the artificial inflation in the price of Cobalt's common stock and bonds after adjusting for market and industry forces, (2) removing from the artificial inflation any impact from non-fraud related sources, and (3) thereby measuring the stock price inflation due to the alleged wrongdoing for each day during the Class Period. *See id*. ¶¶210-17. Accordingly, damages will be measured based upon the difference between the inflated price at which Class members actually purchased and sold their Cobalt stock and bonds, and the "but for" price of these securities absent Defendants' misrepresentations and omissions. *Id*.

This is the same methodology that is employed in nearly every securities fraud class action, and is specifically endorsed by the Fifth Circuit. *See Ludlow*, 800 F.3d at 683-85 (approving plaintiffs' expert's "out-of-pocket losses" measure for the "Post-Spill class"); *see also In re BP, Plc Sec. Litig.*, No. 10-md-2185, 2014 WL 2112823, at *9 (S.D. Tex. May 20, 2014) (explaining that the "out of pocket" damages methodology is "a long-standing and widespread practice" in Section 10(b) cases) (collecting cases). Consistent with the Fifth Circuit's decision in *Ludlow*, Plaintiffs are pursuing an "out-of-pocket" measure of damages – not a "consequential damages" theory – that does not require individualized consideration of each investor's "risk tolerance."[12] As Dr. Hartzmark explained, the measure of damages in this case does "not depend on, nor need to consider, an individual investor's risk tolerance or expected returns." Hartzmark Rpt. ¶217. Thus, Plaintiffs' Section 10(b) damages can be calculated on a class-wide basis consistent with the *Comcast* requirements.

### C.  Superiority Is Established Under Rule 23(b)(3)

In determining whether the "superiority" requirement is met, courts evaluate: "(A) the class members' interest in individually controlling their separate actions, (B) the extent and nature of existing litigation by class members concerning the same claims, (C) the desirability of concentrating the litigation in the particular forum, and (D) the likely difficulties of managing a class action." *EDS*, 226 F.R.D. at 570. Each of these factors

---

[12] Indeed, unlike Plaintiffs here, the plaintiffs in *Ludlow* specifically eschewed the traditional securities fraud measure of damages in favor of a "consequential damages" measure for the "Pre-Spill Class," which depended on a materialization-of-risk damages theory and the risk tolerance of individual investors. *See BP,* 2014 WL 2112823, at **11-12; *see also Ludlow*, 800 F.3d at 689-90.

supports class certification here.

First, the thousands of Class members do not have sufficient incentive to individually devote the resources necessary to pursue individual actions against Defendants. *See, e.g.*, *Marcus*, 2016 U.S. Dist. LEXIS 115795, at *33 ("Class members are unlikely to pursue their own cases individually [in securities class actions] because the individual damages are relatively small in relation to the hurdles presented when bringing suit under the PSLRA"). This is particularly true here, "since this is a sophisticated action involving extensive discovery that would be impractical for any one individual to control." *EDS*, 226 F.R.D. at 570-71.

Second, Plaintiffs are not aware of any individual actions currently pending or that have been filed since the Action was consolidated on March 3, 2015 – a fact that further weighs in favor of class certification. *See Reliant Energy*, 2005 WL 2000707, at *2.

Third, this is a desirable forum to resolve the Action because the thousands of Class members are geographically dispersed. In addition, "the value of concentrating litigation in this forum is great as this Court has already made several rulings in this case thus far." *Lehocky*, 220 F.R.D. at 510-11. Moreover, adjudicating this case as a class action will "promote judicial economy and avoid the risk of inconsistent judgments which would exist if multiple individual suits were to be litigated." *FirstPlus*, 2002 WL 31415951, at *4.

Finally, there are no foreseeable management difficulties that will preclude this Action from being maintained as a class action. Co-Lead Counsel have substantial experience in securities class action litigation, and there is no reason to believe that Counsel or the Court will experience any unusual difficulty in the management of this litigation.

*See EDS*, 226 F.R.D. at 571.

### D. The Court Should Approve Co-Lead Counsel As Class Counsel

The Court should appoint Co-Lead Counsel (Entwistle & Cappucci LLP and Bernstein Litowitz Berger & Grossmann LLP) as Class Counsel because they will fairly and adequately represent the Class. *See* Fed. R. Civ. P. 23(a)(4), (g)(1). Co-Lead Counsel are well-qualified to prosecute this Action on behalf of Plaintiffs and the Class, as demonstrated by their extensive experience in prosecuting and resolving complex securities class actions in courts throughout the United States. *See* Entwistle Decl., Exhibits 7-8 (Firm Resumes). As Court-appointed Co-Lead Counsel, these firms have also demonstrated their willingness to commit substantial time and resources to representing the Class. Among other efforts, Co-Lead Counsel have defeated Defendants' motions to dismiss and for interlocutory appeal, are diligently pursuing critical factual discovery from Defendants, have retained experts in market efficiency and damages, FCPA compliance, and oil exploration, and have assembled dedicated teams of experienced attorneys and staff to prosecute the claims on behalf of Plaintiffs and the Class. *See* Section II.A.4. The competence and experience of Co-Lead Counsel demonstrates that the requirements of Rule 23(a)(4) and (g) are satisfied, and Plaintiffs' selected counsel should be appointed as Class Counsel.

## III. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court (i) certify the Action as a class action pursuant to Rules 23(a) and (b)(3); (ii) appoint Plaintiffs as Class Representatives; and (iii) appoint Co-Lead Counsel as Class Counsel.

Dated: November 2, 2016

Respectfully submitted,

**BERNSTEIN LITOWITZ
BERGER & GROSSMANN LLP**

**ENTWISTLE & CAPPUCCI LLP**

*/s/ David R. Stickney*
David R. Stickney (*pro hac vice*)
Jonathan D. Uslaner (*pro hac vice*)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Telephone: (858) 793-0070
Facsimile: (858) 793-0323
Email: davids@blbglaw.com
Email: jonathanu@blbglaw.com

*/s/ Andrew J. Entwistle*
Andrew J. Entwistle
Texas Bar No. 24038131
Vincent R. Cappucci (*pro hac vice*)
Jonathan H. Beemer (*pro hac vice*)
299 Park Avenue, 20th Floor
New York, NY 10171
Telephone: (212) 894-7200
Facsimile: (212) 894-7272
Email: aentwistle@entwistle-law.com
Email: vcappucci@entwistle-law.com
Email: jbeemer@entwistle-law.com

*Co-Lead Counsel for the Class*

**AJAMIE LLP**
Thomas R. Ajamie
(Texas Bar No. 00952400)
Penzoil Place – South Tower
711 Louisiana, Suite 2150
Houston, TX 77002
Telephone: (713) 860-1600
Facsimile: (713) 860-1699
Email: tajamie@ajamie.com

*Liaison Counsel for the Class*

**MOTLEY RICE LLC**
Christopher Moriarty
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9245
Facsimile: (843) 216-9450
E-Mail: cmoriarty@motleyrice.com

*Counsel for Plaintiff Universal
Investment Gesellschaft m.b.H.*

**KESSLER TOPAZ MELTZER
    & CHECK, LLP**
Johnston de F. Whitman, Jr.
(admitted *pro hac vice*)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
E-Mail:  jwhitman@ktmc.com

*Counsel for Plaintiff Sjunde AP-
Fonden*

## CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2016, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

*/s/ Andrew J. Entwistle*
Andrew J. Entwistle
